**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION**

|  |  |
|---|---|
| TEXAS CAPITAL BANK,<br><br>     Plaintiff,<br><br>v.<br><br>GOVERNMENT NATIONAL MORTGAGE ASSOCIATION and UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT,<br><br>     Defendants. | Civil Action No.  2:23-cv-00156<br><br>**COMPLAINT**<br><br>Jury Trial Demanded |

Texas Capital Bank ("TCB") alleges as follows for its Complaint against Government National Mortgage Association ("Ginnie Mae") and the United States Department of Housing and Urban Development ("HUD").

**NATURE OF ACTION**

1.      This action concerns Ginnie Mae's assertion that it extinguished, in return for no consideration, TCB's first priority lien on tens of millions of dollars in collateral associated with a HUD-administered reverse mortgage program.  Ginnie Mae's position finds no support in law, statute, or contract.  It also defies any notion of fair play: Ginnie Mae *induced* TCB to make the relevant loans to a distressed market participant, on an emergency basis, in an effort to protect thousands of senior citizen mortgagors and prevent a catastrophic collapse of the reverse mortgage program.  Senior Ginnie Mae officials, including Ginnie Mae President Alanna McCargo ("President McCargo"), assured TCB that it would be protected.  Yet, just weeks later, Ginnie Mae reversed course and purported to leave TCB empty-handed.  The Federal Housing Administration

("FHA")—an entity that is part of HUD and involved with the reverse mortgage program—has stated that Ginnie Mae's position is wrong.  TCB hereby asks this Court to do so as well.

2.      The reverse mortgage program at the heart of this action is known as the Home Equity Conversion Mortgage ("HECM") program.  The HECM program enables tens of thousands of senior citizens annually to retire comfortably by taking out loans against the value of their homes and receiving advance payments (or draws) that they can use for living expenses and other needs. The loans are insured by FHA.  HECM lenders often securitize HECM loans into securitizations that are guaranteed by Ginnie Mae.

3.      On November 30, 2022, one of the nation's largest HECM lenders and servicers, Reverse Mortgage Funding LLC and its affiliates ("RMF"), filed for bankruptcy.  Shortly thereafter, RMF failed to fund draws owed to thousands of seniors.  RMF desperately required financing to fund those delinquent draws and upcoming draws.  RMF had already harmed these seniors by failing to fund the draws.  Failure to obtain financing would have exacerbated that harm and harmed additional retiree borrowers who relied on the draws for living expenses, while also threatening the stability and liquidity of the entire HECM program.

4.      The threats to the HECM program and RMF's retiree borrowers were a significant concern to Ginnie Mae and FHA, including because successive presidential administrations had made political commitments to the HECM program and its retiree borrowers.  Ginnie Mae, FHA, and RMF therefore urgently sought to identify an entity willing to loan money to RMF so that RMF could make its required payments to the HECM mortgagors.  But only a few banks finance the HECM program under ordinary circumstances and, as relevant here, the loan would need to be made to RMF, a bankrupt company.

5.      After finding no success in identifying a lender, Ginnie Mae ultimately prevailed upon TCB—a Texas-based bank that is one of the largest financiers of the HECM program—to lend the required funds to RMF, so as to avoid a catastrophic disruption to the HECM program. In return, TCB received a first priority lien on certain HECM collateral.  The lien was critically important to TCB because TCB's recourse for repayment absent the lien would be the bankrupt entity, RMF.  TCB is not in the business of making unsecured loans to bankrupt companies, and it was clear that RMF, as a bankrupt entity, did not have additional assets sufficient to make the required repayments.  Indeed, TCB asked Ginnie Mae to confirm that TCB would be able to monetize the collateral if Ginnie Mae seized RMF's mortgage servicing rights during the bankruptcy.  As set forth in the sworn affidavit attached hereto as Exhibit A of TCB's Managing Director and President of Mortgage Finance, senior Ginnie Mae representatives including President McCargo explicitly assured TCB that it would be repaid.  Other witnesses to Ginnie Mae's assurances are willing to testify to the same.

6.      Based on Ginnie Mae's assurances, TCB agreed to provide the financing to RMF in RMF's bankruptcy case (known as "Debtor-in-Possession" or "DIP" financing).  That financing was approved in both interim and final orders of the Bankruptcy Court on December 8, 2022 and February 23, 2023, respectively.  Pursuant to those orders, TCB's financing was secured by first priority valid, perfected, enforceable and unavoidable liens on specified HECM collateral.  Ginnie Mae was aware of and consented to TCB's lien that was memorialized in the orders.

7.      Although TCB satisfied its end of the bargain by delivering tens of millions of dollars in rescue financing to senior citizens through RMF, Ginnie Mae went back on its word. Specifically, on December 20, 2022—just five days after TCB had finished providing the last installment of the agreed financing—Ginnie Mae seized RMF's mortgage servicing rights; three

months later, on March 9, 2023, Ginnie Mae asserted *for the first time* that its seizure of RMF's mortgage servicing rights meant that TCB had *no rights to any proceeds from the collateral* securing TCB's loans.

8.    Put simply, after inducing TCB to lend tens of millions of dollars so as to rescue RMF, thousands of retirees, and the politically important HECM program—and after consenting to TCB's first priority, perfected lien, which was memorialized in court orders—Ginnie Mae has now purported to declare TCB's first priority lien to be a nullity.  Ginnie Mae seeks to declare by fiat that TCB's only recourse for repayment is RMF—a bankrupt entity with few if any assets.

9.    There is no basis, however, for the proposition that Ginnie Mae's seizure of RMF's servicing rights extinguished TCB's rights to its collateral.   The notion that Ginnie Mae extinguished TCB's liens: (1) is belied by the relevant agreements and the court orders approving TCB's financing and granting TCB first priority liens; (2) would not be in accordance with applicable law; (3) would require Ginnie Mae to exceed its regulatory and statutory authorization; and (4) would contradict the assurances Ginnie Mae made to TCB.  Moreover, Ginnie Mae's assertion that it has somehow extinguished TCB's rights also has chilled and will continue to chill future HECM lending (including from TCB) to the detriment of HECM borrowers.

10.    Even entities *within HUD* disagree with Ginnie Mae's position:  During the same March 9, 2023 discussion in which Ginnie Mae asserted for the first time that TCB has no recourse to the collateral, the FHA's current Commissioner, who also holds the title of Assistant Secretary of Housing And Federal Housing Commissioner at HUD, stated that FHA disagrees with Ginnie Mae's position.

11.     Accordingly, TCB hereby seeks declaratory relief that Ginnie Mae's actions are not in accordance with the law and exceed Ginnie Mae's lawful authority, that TCB's lien remains enforceable, and for damages in the alternative.

## PARTIES

12.     Plaintiff Texas Capital Bank is an American bank headquartered in Dallas, Texas, with branches in several major cities in Texas.  TCB is a wholly-owned subsidiary of Texas Capital Bancshares, a Delaware corporation.  TCB lends and invests in economic development for underserved communities through its wholly-owned subsidiary, Texas Capital Community Development Corporation.  Through its partnership with a minority-led fintech company, TCB helps veteran-, women-, and minority-owned small businesses achieve equal access to capital. Plaintiff's headquarters is located at 2000 McKinney Avenue, Suite 700, Dallas, Texas 75201.

13.     Defendant Government National Mortgage Association is a self-financing, wholly owned corporation controlled by the United States Department of Housing and Urban Development, which is an agency of the United States government.  Ginnie Mae's headquarters is located at 425 3rd St, S.W., Washington, D.C., 20024.

14.     Defendant United States Department of Housing and Urban Development is an agency of the United States government with its headquarters located at 451 7th Street SW, Washington, DC 20410.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it presents federal questions under the laws of the United States, including the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq*.

16.     This Court also has jurisdiction over this action pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b).

17.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(e)(1)(C) because Ginnie Mae and HUD are each an agency of the United States, Plaintiff resides in the district, and no real property is involved in the action.

18.     This Court has authority to issue declaratory and injunctive relief pursuant to 5 U.S.C. § 706 and 28 U.S.C. §§ 2201 and 2202.

## BACKGROUND

### I.     Seniors Rely On Reverse Mortgages And The HECM Program

19.     The reverse mortgage loan industry serves a crucial role in the economy by offering seniors an affordable means to supplement their incomes and/or retire comfortably while remaining in their homes.  Many seniors with lower monthly incomes, little savings, or an inability to qualify for other loans like cash-out refinance mortgages and home equity lines of credit rely on reverse mortgages.  Under a typical mortgage, a borrower pledges their home as collateral to secure a loan, and the borrower makes regular interest and principal payments on that loan.  Under a reverse mortgage, by contrast, a borrower can withdraw unencumbered equity in their home in the form of a lump sum payment, a line of credit, periodic payments (akin to an annuity), or a combination of the three.  The amount that a reverse mortgage borrower can withdraw is based on a number of factors including the borrower's age, the interest rate, and the home's value.  The borrower may use the loan proceeds for expenses such as food and medical bills, home maintenance, tax and utility payments, and other living expenses.  Unlike a traditional loan, absent a specified "maturity event," the borrower need not repay the reverse mortgage loan balance, interest, and fees until the borrower or the borrower's estate sells the home.

20.     The most common type of reverse mortgages are those insured by the U.S. federal government referred to as HECM loans, which are only available through an FHA-approved lender.  To qualify for the HECM program, the borrower must remain current on property taxes

and home insurance, complete a reverse mortgage counseling session with a HUD-approved counselor, and meet borrower- and property-eligibility criteria. HECM loans are repaid with the proceeds from the sale of the borrower's home. If those funds are insufficient, the lender files an insurance claim with FHA for reimbursement of the difference between the home's sale price (or appraised value) and the loan balance up to a capped amount.

## II.    HECM Loans Are Typically Securitized

21.    Because HECM lenders do not wish to hold HECM loans on their balance sheet, they typically sell or securitize the loans into the HECM secondary market.

22.    Ginnie Mae sits within HUD and in 2007 created a program to allow the issuance of securities by HECM lenders, backed by HECM loans. Ginnie Mae does not purchase HECM loans from lenders but instead guarantees approved mortgage-backed securities issued by approved issuers pursuant to a form Guaranty Agreement (the "Guaranty Agreement"), which incorporates additional terms and conditions set forth in Ginnie Mae's Mortgage-Backed Securities Guide (the "Guide," and together with the Guaranty Agreement, the "Ginnie Contract").

23.    The securities guaranteed by Ginnie Mae are backed by pools of balances related to HECM loans. Those balances include advances made to borrowers, monthly insurance premiums paid to FHA, certain servicing fees, and accrued interest. Ginnie Mae refers to those balances as participation interests (each a "Participation"). Participations in a single HECM loan can serve as collateral in multiple different securitizations backed by Ginnie Mae. Those securitizations are referred to as Home Equity Conversion Mortgage-Backed Securities ("HMBS").

24.    After a HECM loan is securitized, additional amounts are often added to the balance of that loan. This can occur as a result of, among other things, additional draws from the borrower,

7

accrual of interest, mortgage insurance premiums, and other fees.  These additional amounts are known as "HECM Tails" or "Tails."  Tails associated with a HECM loan are not part of the HMBS that holds the Participation representing the underlying HECM loan.  Instead, Tails can be pooled and securitized into separate securitizations ("Tail Securitizations").  Thus, a single HECM loan can have multiple Tails and Participations that are securitized into multiple HMBS and Tail Securitizations.

### III.    TCB And RMF Were Crucial To The HECM Program

25.    RMF was a government-approved originator and servicer of HECM loans, a government-approved issuer and servicer of HMBS, and an issuer of Tail Securitizations.  As a servicer, RMF had the right to service loans (for example by disbursing funds to mortgagors) and to receive compensation and reimbursement for such servicing.  Those rights are generally known as "Mortgage Servicing Rights" or "MSRs."

26.    For the first three quarters of 2022, RMF issued approximately 41% of all Tail Securitizations nationwide, and had approximately 12% market share in reverse mortgage loan originations.  As of October 31, 2022, RMF had a servicing portfolio of approximately $25.7 billion comprising approximately 130,335 loans.

27.    As is customary, RMF needed credit facilities from various lenders to supplement its own cash and fund its daily operations.  RMF used these credit facilities to originate and purchase HECM loans and Tails, and to make disbursements on draws by HECM borrowers, among other things.

28.    TCB has been one of the largest financiers of the HECM program.  As discussed in further detail below, TCB facilitated RMF's operations—and thus a significant portion of the HECM program—by providing RMF with multiple credit facilities.

#### IV.     RMF Granted TCB A Valid Perfected Lien To Secure TCB's Loans To RMF

29.     Beginning in 2015, TCB provided financing to RMF, to enable RMF to fund and operate its business.  These lending facilities funded the origination and purchase of reverse mortgage loans and other aspects of the Debtors' operations, including Tails.

30.     On August 26, 2021, TCB and RMF entered into a Fifth Amended and Restated Loan and Security Agreement (the "Tail Agreement").  Under the Tail Agreement, TCB provided financing to RMF to fund Tail disbursements to borrowers, and RMF granted TCB a "continuing first priority security interest in all of Borrower's right, title and interest in and to all of the Collateral to secure the prompt and complete payment and performance when due of all of the Indebtedness and all of the Obligations."  The "Collateral" included, among other things, RMF's "rights, title and interest" in "HECM Tails" advanced by RMF "for the purpose of pooling and securitizing into a HMBS and delivering same to a HECM Tail Investor," and "any and all instruments or certificates representing such HECM Tails."

31.     As defined in the Tail Agreement, "HECM Tail" includes "amounts created by additional draws…, interest accruals, mortgage insurance premiums, fees, or charges, which accrue, are disbursed, or are added to the balance of a previously-securitized HECM Loan after the closing date of any prior securitization of the HECM Loan or any prior HECM Tail related thereto."  Tail Agreement ¶ 1.1.

#### V.     Ginnie Mae Consented To TCB's Valid Perfected Lien

32.     Ginnie Mae and RMF entered into a Guaranty Agreement pursuant to which Ginnie Mae guaranteed the timely payment of principal and interest on securities based on and backed by eligible HECM loans.  When an earlier version of the Tail Agreement between RMF and TCB was negotiated and executed in 2018, Ginnie Mae was heavily involved with and consented to the transaction, including TCB's first priority lien on the Tails.  Ginnie Mae did not require TCB to

execute any agreement with Ginnie Mae, let alone an agreement that TCB's first priority lien would be extinguished or relinquished to Ginnie Mae upon Ginnie Mae's exercise of remedies against RMF under the Guaranty Agreement.

33.    The lack of any such agreement is particularly important because in contrast to Ginnie Mae's approach to the Tail Agreement, Ginnie Mae *did* execute agreements with other contemporaneous RMF lenders that expressly extinguished the liens of those lenders upon an exercise of Ginnie Mae's remedies against RMF.  Specifically, Leadenhall Life Insurance Linked Investments Fund PLC ("LCP") entered into a loan and security agreement with RMF, dated October 17, 2018 (the "LCP Loan Agreement").  Under that loan agreement, LCP's loans were collateralized by RMF's MSRs related to the underlying HECM loans in the HMBS pools.

34.    LCP, TCB, and RMF also entered into an Intercreditor Agreement, dated as of October 17, 2018 (the "Intercreditor Agreement").  The Intercreditor Agreement, which Ginnie Mae also reviewed and consented to, recognized the distinction between the MSRs on the one hand and the Tails on the other hand.  Indeed, the Intercreditor Agreement made clear that LCP did not have any lien on Tails, which were governed by the Tail Agreement, and that TCB did not have any lien on the MSRs, which were governed by the LCP Loan Agreement.

35.    In connection with the LCP Loan Agreement and the Intercreditor Agreement, LCP, RMF, and Ginnie Mae entered into an acknowledgement agreement ("Acknowledgement Agreement").  The Acknowledgement Agreement is a standard form agreement that secured lenders of authorized HMBS issuers often execute in connection with secured lending facilities. The Acknowledgment Agreement gives the secured lender certain rights and benefits, including the right to appoint a "Standby Issuer" to act if the issuer commits an event of default under the Ginnie Contract, and the right to cure certain events of default by the issuer under the Ginnie

Contract.  In exchange for these rights and benefits, however, the secured party also consents to the extinguishment of its liens automatically if Ginnie Mae extinguishes the issuer's interests. Thus, under the Acknowledgment Agreement, LCP expressly agreed that the MSRs that comprised its collateral constituted RMF's interests in the "Pooled Mortgages," and that LCP's lien is "merely derivative of the interest of Issuer [RMF] under the Ginnie [] Contract."  Acknowledgment Agreement § 3(b).  LCP further expressly agreed that if Ginnie Mae extinguished RMF's interest in the Pooled Mortgages, then LCP's lien also "instantly and automatically will be extinguished as well." *Id.*

36.    In contrast to this express agreement, Ginnie Mae and TCB did not enter into any agreement (acknowledgment or otherwise) in which TCB agreed that the Tails constituted RMF's interests in the Pooled Mortgages or that TCB's security interest in the Tails would be extinguished upon Ginnie Mae's extinguishment of RMF's rights in the Pooled Mortgages.  Ginnie Mae never bound TCB to any agreement that would have allowed Ginnie Mae to extinguish TCB's property rights without compensation.

37.    The contrast in Ginnie Mae's approach reflected Ginnie Mae's understanding, and the understanding of lenders like TCB, that Tails, like those that constitute TCB's collateral, are distinct from the MSRs subject to more traditional financing arrangements for which Ginnie Mae obtains acknowledgement agreements.  Indeed, during negotiations of the loan documents and Acknowledgment Agreement, Ginnie Mae was focused on ensuring that there was a clear distinction between the MSRs and the Tails to ensure that Ginnie Mae could cleanly extinguish LCP's liens on those MSRs without impacting the Tails.

**VI.    RMF Filed For Bankruptcy And Needed DIP Financing, Which TCB Extended In Reliance On Ginnie Mae's Assurances**

38.     RMF experienced financial strain and ultimately was driven into bankruptcy as a result of several rapidly-changing economic factors in the second half of 2022.  On November 30, 2022 (the "Petition Date"), certain RMF entities (the "Debtors") filed voluntary petitions for relief pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101-152 (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").  Prior to the Petition Date, HECM loans accounted for the majority of RMF's portfolio. As of the Petition Date, the Debtors had approximately $1.4 billion of funded indebtedness to multiple lenders, including more than $395 million owing to TCB pursuant to multiple lending facilities.

39.     Shortly after the Petition Date, RMF failed to fund draws that were due to reverse-mortgage borrowers.  More borrowers were going to be impacted shortly thereafter.  Thus, RMF needed urgent financing to continue funding consumer payments—a need made especially acute due to the nature of the Debtors' business, lending to elderly consumer borrowers.

40.     Ginnie Mae was deeply concerned about RMF's failure to fund draws.  In general, Ginnie Mae did not want borrowers to be impacted on its watch.  Moreover, Ginnie Mae was concerned that RMF's failure to fund draws could have triggered systemic crisis in the reverse mortgage sector.  Ginnie Mae, as a wholly-owned government corporation that directly supports housing for veterans and the elderly, wanted to avoid such a systemic crisis.

41.     Almost daily discussions involving the Debtors, Ginnie Mae, FHA, LCP, TCB, Longbridge Financial LLC ("Longbridge"), and others quickly ensued.  Ginnie Mae hosted and participated in numerous calls to facilitate the procurement of DIP financing for the Debtors.

42.     Ginnie Mae was anxious to get financing in place, and for consumer payments to resume, and prevailed upon TCB to provide that financing.  But TCB is not in the business of providing DIP financing to bankrupt companies.  Among other things, TCB was concerned that if Ginnie Mae exercised remedies and seized RMF's MSRs, then there would be significant delay between TCB having to fund Tails to the underlying borrowers and repayment of the same.  That is because, if Ginnie Mae seized the MSRs, then it might cause a delay in securitizing or otherwise monetizing the Tails that served as TCB's collateral.  Thus, TCB sought adequate assurances from Ginnie Mae that it would be timely reimbursed for outstanding Tails in the event of a seizure of the MSRs.

43.     Ultimately, the *most senior* representatives of Ginnie Mae and FHA—including, among others, President McCargo and Sam Valverde at Ginnie Mae and FHA Commissioner Julia Gordon—provided commitments and assurances to TCB that Ginnie Mae and the FHA would provide adequate support for TCB's ability to monetize the financed Tails in the event of Ginnie Mae's seizure of the Debtor's MSRs.

44.     TCB's Madison Simm was a first-hand participant in the relevant communications.

45.     Mr. Simm's affidavit, attached hereto as Exhibit A, accurately describes commitments and assurances that were provided to TCB.

46.     As explained by Mr. Simm in the affidavit, "President McCargo assured [TCB] that TCB would be able to look to the Collateral for repayment even if Ginnie Mae were to seize RMF's MSRs."  Ex. A (Simm Aff.) ¶ 5.

47.     The above-quoted sentence of Mr. Simm's affidavit is true and correct.

48.     Relying on Ginnie Mae's assurances that TCB would be able to monetize its collateral, TCB agreed to provide the bankrupt RMF with tens of millions of dollars of DIP financing.  *See* Ex. A (Simm Aff.) ¶ 7.

49.     Significantly, TCB should never have been asked to finance RMF's draws.  That is because HUD is statutorily required to fund draws when a HECM servicer fails to do so.  As FHA itself explained in a recent publication, "Section 255 of the National Housing Act" requires HUD to "mak[e] any payments that are not paid timely to Borrowers due to the Mortgagee defaulting on their Borrower payment obligation."    Ltr., July 11, 2023 *available at* https://www.hud.gov/sites/dfiles/OCHCO/documents/2023-15hsgml.pdf.  at 2; *see* National Housing Act, § 255(i)(1) (12 U.S.C. § 1715z-20(i)(1)(A)) ("Protection of homeowner and lender. Notwithstanding any other provision of law, and in order to further the purposes of the program authorized in this section, the Secretary [of HUD] shall take any action necessary to provide any mortgagor under this section with funds to which the mortgagor is entitled under the insured mortgage or ancillary contracts but that the mortgagor has not received because of the default of the party responsible for payment").    HUD, however, failed to discharge that statutory responsibility, instead leaving Ginnie Mae to induce TCB to provide the required financing.

## VII.    TCB Obtained A Perfected First Priority Lien On HECM Collateral

50.     On December 8, 2022 the Bankruptcy Court entered an interim order (the "Second Interim DIP Order") approving DIP financing, including the financing of HECM Tails by TCB. The Court entered a final order approving the DIP financing on February 23, 2023 (the "Final DIP Order," and together with the Second Interim DIP Order, the "DIP Orders").  Pursuant to those DIP Orders, TCB's DIP financing was secured by "priming first priority valid, perfected, enforceable and unavoidable liens on, and security interests in the existing collateral securing the

obligations under the [Tail Agreement]."  Second Interim DIP Order ¶ 6(b); Final DIP Order ¶ 8(b).  In short, TCB's DIP financing was secured by a first priority, perfected lien on the same HECM Tails that served as collateral under the pre-bankruptcy Tail Agreement.

51.     Ginnie Mae sought and obtained a reservation of rights that the DIP Orders and related DIP documents would not "modify, impair or affect" certain agreements between the Debtors (including RMF), LCP, and Longbridge on the one hand, and Ginnie Mae and FHA on the other hand.  Second Interim DIP Order ¶ 53; Final DIP Order ¶ 56(a).  That reservation of rights specifically referenced the "[MSRs] associated with mortgages or participations that are backed or are otherwise associated with securities guaranteed by [Ginnie Mae], the [Ginnie Mae] Guide, etc[.]" Ginnie Mae's reservation of rights, however, did not make any reference whatsoever to TCB or Tails.  At no time did Ginnie Mae seek to obtain any such reservation as to TCB or the Tails.  This was consistent with Ginnie Mae's position as to the pre-bankruptcy lending facilities, in which Ginnie Mae recognized the distinction between the MSRs and the Tails.  Ginnie Mae never treated the Tails as part of the pooled mortgages or sought to obtain any agreement that would allow it to strip TCB of its property interest in the Tails.

52.     Starting on December 9, 2022 (one day after the Bankruptcy Court approved the DIP financing on an interim basis), and continuing through December 15, 2022, TCB advanced more than $28 million in DIP financing to allow RMF to fund draws by the underlying borrowers (homeowners).  As described above, TCB did so based on its first priority, perfected lien on Tails, and Ginnie Mae's and FHA's assurances that they would assist in monetizing and securitizing those Tails to enable TCB to be repaid.

## VIII.   Ginnie Mae Improperly And Unlawfully Purported To Extinguish TCB's Lien

53.     On December 20, 2022, days after TCB had provided the financing to RMF at Ginnie Mae's insistence, Ginnie Mae declared that RMF had committed an Event of Default under the Ginnie Mae Contract by filing for bankruptcy protection three weeks earlier.   Ginnie Mae declared that it was extinguishing RMF's rights in the pooled mortgages, including the MSRs.

54.     Shortly after taking the foregoing actions, Ginnie Mae issued a press release to assure borrowers that their payments would continue and that they would not be affected by RMF's default and the extinguishment of RMF's rights.   Specifically, on December 28, 2022, President McCargo issued the following statement:

> The recent acquisition of Ginnie Mae HMBS servicing from [RMF] was accomplished without negatively impacting borrowers. Borrowers received a notification about the transfer of servicing as required by law.   The transfer should be seamless for borrowers and does not change or amend borrower payment schedules or rights under their mortgages.   Borrowers can expect to continue to receive payments as usual, consistent with the terms of their reverse mortgage.

Ginnie Mae and President McCargo could not have issued this press release and made those assurances without TCB's DIP financing.

55.     At the time it declared RMF in default, extinguished RMF's rights, and issued the foregoing press release, Ginnie Mae did not indicate or otherwise suggest that its actions had impacted or extinguished TCB's first priority, perfected lien on the HECM Tails.

56.     After Ginnie Mae's seizure of the MSRs, TCB met with Ginnie Mae multiple times in person and by phone including on January 9, 10, and 27, 2023.

57.     At no point during any of those meetings did Ginnie Mae indicate or otherwise suggest that its actions in December had impacted or extinguished TCB's first priority, perfected lien on the HECM Tails.

16

58.     On information and belief, at the time it seized RMF's MSRs in December 2022, and at the time of the foregoing meetings in January 2023, Ginnie Mae did not believe that its seizure of RMF's MSRs had resulted in an extinguishment of TCB's lien on the Tails.

59.     Nonetheless, during a March 9, 2023 conference call attended by senior Ginnie Mae and FHA representatives, "Mr. Valverde, on behalf of Ginnie Mae, took the position that Ginnie Mae's seizure of the MSRs had eliminated TCB's" first priority, perfected security interest in the Tails.  Ex. A (Simm Aff.) ¶ 9;

60.     The participants in the foregoing call included President McCargo, Sam Valverde, Felicia Rotellini, Gregory Keith, and Leslie Meaux of Ginnie Mae, as well as FHA Commissioner Gordon.

61.     During the foregoing call, TCB indicated it disagreed with Ginnie Mae's position. Ex. A (Simm Aff.) ¶ 10.

62.     The call on March 9, 2023—nearly three months after Ginnie Mae had seized RMF's MSRs—was the first time anyone had indicated or suggested that Ginnie Mae's extinguishment of RMF's servicing rights could result in the extinguishment of TCB's first priority, perfected lien on the Tails, which was consented to by Ginnie Mae.

63.     FHA did not agree with the position Ginnie Mae expressed during the March 9, 2023 call.

64.     Indeed, during the March 9, 2023, call, "FHA Commissioner Julia Gordon responded to Mr. Valverde's comments by stating that FHA disagreed with Ginnie Mae's position." Ex. A (Simm Aff.) ¶ 10.

65.     On information and belief, senior Ginnie Mae representatives did not believe and do not believe that Ginnie Mae's seizure of RMF's MSRs resulted in an extinguishment of TCB's

lien on the Tails. Indeed, on the March 9 call during which Mr. Valverde of Ginnie Mae expressed this position, "Mr. Valverde appeared to be reading mechanically from a script that had been prepared by others and he refused to respond to follow up questions or comments." Ex. A (Simm Aff.) ¶ 9.

66.     By reversing course on its prior assurances and by purporting to have "extinguished" TCB's property interest in the Tails, Ginnie Mae has purportedly co-opted the value of the Tails for itself. Ginnie Mae made no loan but is nonetheless asserting the rights to all of the collateral and the value thereof, while attempting to leave TCB with tens of millions of dollars in unpaid loans.

67.     Notwithstanding Ginnie Mae's seizure of the MSRs, TCB retains its property interest in the Tails. Under the relevant agreements and the Bankruptcy Court's DIP Orders approving TCB's financing, TCB's first priority security interest was not extinguished, and Ginnie Mae's assertion to the contrary is not in accordance with applicable law.

68.     Moreover, Ginnie Mae's purported elimination of TCB's property interest in the Tails is also unlawful because it exceeds Ginnie Mae's statutory authority.

69.     Like all administrative agencies, Ginnie Mae possesses only the authority that Congress has provided to it by statute.

70.     Here, Section 306(g)(1) of the National Housing Act, 12 U.S.C. § 1721(g)(1), authorizes Ginnie Mae to "provide by contract with the issuer [of a mortgage] for the extinguishment, upon default by the issuer, of any redemption, equitable, legal, or other right, title, or interest of the issuer in any mortgage or mortgages constituting the trust or pool against which the guaranteed securities are issued."

71.     Neither Section 306(g)(1) nor any other provision of federal law authorizes Ginnie Mae to extinguish the property rights of a third party—*i.e.*, a party other than the issuer of the mortgage—that has no contract with Ginnie Mae.

72.     In addition, neither Section 306(g)(1) nor any other provision of federal law authorizes Ginnie Mae to extinguish property rights in Tails, which Ginnie Mae itself has recognized are distinct from MSRs and the underlying mortgages.

73.     The provisions of Ginnie Mae's own MBS Guide addressing the extinguishment of HECM loan pools (Ch. 35, Pt. 3, Section F) do not contemplate extinguishing third-party property rights in Tails.

74.     The provisions of the Ginnie Mae HMBS Guaranty Agreement addressing the extinguishment of HECM loan pools (Section 10) also do not contemplate extinguishing third-party property rights in Tails.

75.     Ginnie Mae accordingly lacks statutory or regulatory authority to extinguish TCB's property rights in the Tails.  As alleged above, Ginnie Mae could have negotiated for an agreement to extinguish TCB's property rights, as it did with LCP, but did not.  Instead, Ginnie Mae ensured that the MSRs and Tails were intentionally given different contractual treatment.  Thus, even if there were a statutory basis for Ginnie Mae to extinguish the rights of a third party like TCB (there is not), Ginnie Mae would have been required to contract for such rights.  But Ginnie Mae, with clear thought as to the nature and importance of the HECM assets supporting TCB's loans, did not do so.

76.     The Due Process and Takings Clauses of the Fifth Amendment prevent Ginnie Mae from extinguishing TCB's property rights in the Tails without just compensation.

19

77.    In a letter transmitted April 19, 2023, counsel for TCB explained to Ginnie Mae that Ginnie Mae's position—*i.e.,* that TCB has no remaining property rights in the Tails—is unlawful due to statutory, regulatory, and contractual limitations.  The letter also articulated that the loans TCB made in December 2022 had been induced by Ginnie Mae and were made in reliance on the assurances that Ginnie Mae and FHA had provided to TCB.  The letter accordingly presented Ginnie Mae with the claims that TCB asserts here.

78.    On May 3, 2023, President McCargo transmitted a letter to TCB counsel confirming receipt of TCB's letter and acknowledging its dispute with TCB's "statements of facts, accounts of conversations, interpretations of the Ginnie Mae Charter, program requirements and press releases, as well as mischaracterizations of legal conclusions," but stating that Ginnie Mae's position was unchanged and denying TCB's claims by stating that "Ginnie Mae views this matter as closed."

79.    On July 19, 2023, TCB sent Ginnie Mae's President McCargo and Sam Valverde an email communication requesting a "meeting with [Ginnie Mae] executive leadership, and include FHA, to discuss the proposed options to resolve [TCB]'s RMF tail exposure" and stating, among other things, that "[l]ack of response or delays will result in [TCB] being compelled to … protect its collateral and rights through litigation."

80.    On August 10, 2023, President McCargo confirmed her and Commissioner Gordon's willingness to meet with TCB in an email but stated that "[f]or the avoidance of doubt, neither Ginnie Mae nor FHA are engaging on any matters related to former issuers, to include RMF."

## IX.    If Permitted, Ginnie Mae's Position Would Threaten The HECM Industry

81.    TCB has been the largest financier of Tails throughout the HECM program and is interested in continuing its longstanding support of the HECM industry.  However, TCB's ability

to finance the HECM program has been impacted by Ginnie Mae's change in position that hinders TCB from securitizing and monetizing the Tails that secured its loans to RMF.

82.     If permitted, Ginnie Mae's position will likely trigger an unwillingness on the part of lenders (including TCB) to extend financing necessary for millions of current and future seniors to fund their retirement and will threaten the viability of the HECM program.

## COUNT ONE
### (Violation Of The APA, 5 U.S.C. § 706(2))

83.     Plaintiff restates and re-alleges the foregoing allegations as though fully set forth herein.

84.     The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.

85.     Plaintiff is suffering legal wrong, is adversely affected, and is concretely injured by agency action, namely Ginnie Mae's unlawful declaration that it has eliminated TCB's property interest in the Tails.

86.     The APA provides that "final agency action for which there is no other adequate remedy in a court" is "subject to judicial review."  5 U.S.C. § 704.

87.     Ginnie Mae's purported elimination of TCB's property interest in the Tails is a final agency action for which there is no other adequate remedy in a court.

88.     The APA provides that a "reviewing court shall … hold unlawful and set aside agency action, findings, and conclusions found to be … not in accordance with law" or "contrary to constitutional right."  5 U.S.C. § 706(2)(A)-(B).

89.     Ginnie Mae's purported elimination of TCB's first priority, perfected security interest in the Tails is not in accordance with law because it is contrary to binding agreements and

court orders granting enforceable first priority liens to TCB, and because it exceeds Ginnie Mae's authority under 12 U.S.C. § 1721(g)(1) and the relevant regulations, and is not authorized by any other federal statute or regulation.

90.     Ginnie Mae's purported elimination of TCB's first priority, perfected security interest in the Tails is contrary to TCB's constitutional rights under the Takings and Due Process Clauses of the Fifth Amendment.

## COUNT TWO
(Promissory Estoppel)

91.     Plaintiff restates, and re-alleges, the foregoing allegations as though fully set forth herein.

92.     Ginnie Mae promised TCB that if TCB extended DIP financing to the Debtors, TCB would be timely reimbursed for outstanding Tails in the event of Ginnie Mae's seizure of the MSRs.

93.     TCB was reasonably induced by that promise and relied upon it when TCB agreed to extend DIP financing to the Debtors.

94.     It was foreseeable by Ginnie Mae that TCB would have relied on Ginnie Mae's promise when TCB agreed to extend DIP financing to the Debtors.

95.     TCB would not have loaned money to bankrupt RMF had TCB known that Ginnie Mae would take a position—expressed for the first time nearly three months after its seizure of the MSRs—that would purportedly eliminate TCB's ability to get repaid.

96.     TCB has been harmed by its reliance on Ginnie Mae's promise and has been unable to monetize the Tails securing its DIP financing of tens of millions of dollars to RMF, at Ginnie Mae's behest.

97.     As a result of the foregoing, Ginnie Mae is liable for TCB's damages.

## COUNT THREE
(Tortious Interference With Property Rights)

98.     Plaintiff restates, and re-alleges, the foregoing allegations as though fully set forth herein.

99.     On December 8, 2022, the Second Interim DIP Order approved DIP financing including the financing provided by TCB.  On February 23, 2023, the Final Order approved TCB's DIP financing on substantially the same terms as the Second Interim DIP Order.

100.     Pursuant to the DIP Orders, TCB's DIP financing was secured by a first priority perfected lien on HECM Tails.

101.     TCB's first priority perfected lien constituted a property right of TCB.

102.     Ginnie Mae was aware of and consented to TCB's first priority perfected lien.

103.     Ginnie Mae has improperly asserted that its seizure of the MSRs eliminated TCB's interest in its first priority perfected lien.

104.     That position amounted to an intentional interference with TCB's property rights in its first priority perfected lien.

105.     TCB has been harmed by Ginnie Mae's intentional interference in that it loaned tens of millions of dollars to the Debtors but has been unable to monetize its first priority perfected lien securing those loans to date.

106.     Ginnie Mae's interference lacked just cause and legal basis.

107.     As a result of the foregoing, Ginnie Mae is liable for TCB's damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment in its favor and against Defendants as follows:

(a)     A declaratory judgment that Defendants' purported elimination of TCB's property interest in the Tails is not in accordance with law because it exceeds Defendants' authority under

23

12 U.S.C. § 1721(g)(1) and the relevant regulations, is not authorized by any other federal statute or regulation, and/or violates the Constitution;

(b)      Damages sufficient to reimburse Plaintiff for the liabilities, losses, costs and expenses caused by Defendants' actions, in an amount to be proven at trial in excess of $75,000;

(c)      A monetary award sufficient to restore TCB to the position it would have occupied if HUD had made borrower payments upon the default of RMF as required by Section 255 of the National Housing Act, 12 U.S.C. § 1715z-20;

(d)      An award of attorneys' fees, costs, and interest; and

(e)      Such further relief as the Court deems necessary or proper.

## JURY DEMAND

Plaintiff, by and through undersigned counsel, hereby demand a trial by jury on all claims so triable in this action.

DATED: October 4, 2023

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

*/s/ William A. Burck*
William A. Burck *Pro hac vice forthcoming*
Christopher G. Michel *Pro hac vice forthcoming*
1300 I Street NW, Suite 900
Washington, District of Columbia 20005-3314
Telephone:  (202) 538-8000
Fax:  (202) 538-8100
williamburck@quinnemanuel.com
christophermichel@quinnemanuel.com

Isaac Nesser *Pro hac vice forthcoming*
Heather Christenson *Pro hac vice forthcoming*
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone:  (212) 849-7000
Fax:  (212) 849-7100
isaacnesser@quinnemanuel.com
heatherchristenson@quinnemanuel.com

Matthew Scheck *Pro hac vice forthcoming*
300 West 6th St., Suite 2010
Austin, TX 78701
Telephone:  (737) 667-6100
Fax:  (737) 667-6110
matthewscheck@quinnemanuel.com

Elinor C. Sutton
Texas Bar No. 24129804
3100 McKinnon St, Suite 1125
Dallas, TX 75201
Telephone:  (469)902-3600
Fax:  (469)902-3610
elinorsutton@quinnemanuel.com

# EXHIBIT A

### AFFIDAVIT OF MADISON SIMM

MADISON SIMM, being duly sworn, deposes and states as follows:

1. I am a Managing Director at Texas Capital Bank ("TCB") where I have served as President of Mortgage Finance since 2019.

2. On December 9, 2022, approximately one week after Reverse Mortgage Funding LLC ("RMF") had entered bankruptcy, I participated in a conference call attended by representatives of TCB Longbridge Financial, LLC ("Longbridge") the Government National Mortgage Association ("Ginnie Mae"), and the Federal Housing Administration ("FHA").

3. Prior to and during the call, Ginnie Mae and FHA urged TCB to lend money to RMF so that RMF could pay tail advances on certain reverse mortgage loans.

4. TCB indicated that it would not make such loans without assurance that TCB would be repaid via its lien on the tail advances and certain other collateral (the "Collateral") in the event Ginnie Mae seized RMF's mortgage servicing rights ("MSRs"),

5. In response, Ginnie Mae President Alanna McCargo provided the assurance TCB had requested.  Specifically, President McCargo assured us that TCB would be able to look to the Collateral for repayment even if Ginnie Mae were to seize RMF's MSRs.

6. President McCargo's assurances during the December 9 call were consistent with similar assurances that TCB received from Ginnie Mae and FHA throughout December 2022, communicated not only by President McCargo but also by FHA Commissioner Julia Gordon and Executive Vice President and Chief Operating Officer of Ginnie Mae, Sam Valverde.

7. In reliance on the foregoing assurances, TCB agreed to loan post-petition financing to RMF secured by the Collateral.  TCB is not in the business of making large

uncollateralized loans to bankrupt companies and would not have made that loan if it had not received the foregoing assurances from Ginnie Mae.

8.      On December 20, 2022, Ginnie Mae seized RMF's MSRs.

9.      On March 9, 2023, I participated in a conference call attended by multiple representatives of Ginnie Mae, FHA, and TCB.  During that call, Mr. Valverde, on behalf of Ginnie Mae, took the position that Ginnie Mae's seizure of the MSRs had eliminated TCB's interest in the Collateral.  Mr. Valverde appeared to be reading mechanically from a script that had been prepared by others and he refused to respond to follow up questions or comments.

10.     FHA Commissioner Julia Gordon responded to Mr. Valverde's comments by stating that FHA disagreed with Ginnie Mae's position.  TCB also indicated it disagreed with Ginnie Mae's position, which contradicted the assurances Ginnie Mae and FHA had provided to TCB, at TCB's insistence, in December.  TCB would never have loaned money to RMF if it had known that Ginnie Mae would take that position.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 14th day of Sep, 2023, at Dallas, Texas.

Madison Simm

2