IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| TEXAS CAPITAL BANK, <br><br> Plaintiff, <br><br> v. <br><br> GOVERNMENT NATIONAL MORTGAGE ASSOCIATION, *et al.*, <br><br> Defendants. | 2:23-CV-156-Z-BR |

## MEMORANDUM OPINION AND ORDER

Before this Court is Plaintiff's Motion for Partial Summary Judgment (ECF No. 56) ("Motion"), filed June 27, 2024. Having reviewed the Motion, briefing, and relevant law, the Court **DENIES** the Motion.

### BACKGROUND

This dispute arose after Government National Mortgage Association ("GNMA") extinguished Plaintiff Texas Capital Bank's ("TCB") first-priority lien in collateral related to a HUD-administered reverse mortgage program. ECF No. 1 at 1; 30-1 at 7.

**I. The HECM/HMBS Programs**

The Home Equity Conversion Mortgage program ("HECM Program") is a Federal Housing Administration–insured reverse mortgage program that enables seniors to convert their homes' equity into cash. ECF No. 53-3 at 11. Under the HECM Program, mortgage lenders ("Issuers") lend money to seniors against the equity of their house and the FHA insures those reverse mortgages. This FHA insurance makes those reverse mortgages eligible for a second program: GNMA's HECM Mortgage-Backed Securities program ("HMBS Program"). 12 U.S.C. § 1721(g)(1).

The HMBS Program "guarantees securities that are backed by pools of mortgages." ECF No. 53-3 at 24. Under the HMBS Program, an Issuer either acquires or originates a group of loans — reverse mortgages in this case — and places them together in a "pool." *Id.* If the mortgages meet a variety of requirements, GNMA then issues securities against the pool of mortgages. GNMA's securities guarantee the holder that if the Issuers "cannot timely pay the proper amount of principal and interest to the pool's investors, the U.S. government will pay any shortage of money." *Hoffman v. Phelan Hallinan, LLP*, No. 13-5700, 2016 WL 4089163, at *4 (E.D. Pa. Aug. 2, 2016); 12 U.S.C. § 1721(g)(1). In short, the HMBS Program helps attract capital and liquidity to the reverse mortgage industry and brings "structure and support" while "lower[ing] costs for the growing population of senior citizens." *Home Equity Conversion Mortgage-Backed (HMBS) Program*, GINNIEMAE, https: //www.ginniemae.gov/products_programs/programs/Pages/hmbs_program.aspx [https://perma.cc/6J5P-QWAE]. Here, Reverse Mortgage Funding LLC ("RMF") was an Issuer under the HECM and HMBS Programs. ECF No. 57 at 6.

**II. The Agreements**

Once GNMA agrees to issue securities against an Issuer's pool of mortgages, it executes a Guaranty Agreement with the Issuer. ECF No. 53-3 at 51, 155. In this case, the Guaranty Agreement dated July 28, 2021, governs the relationship between RMF and GNMA with respect to the HECM loans. ECF No. 53-3 at 155–74. RMF and GNMA entered into a Guaranty Agreement. ECF No. 67 at 13–14; ECF No 53-3 at 155–74 (standard Guaranty Agreement). The Guaranty Agreement conveyed to GNMA all title and interests in specified HECMs. ECF No. 53-3 at 161 (Section 3.01). Then, GNMA conveyed back to RMF certain rights and interests that include the right to service the HECM loans and issue new securities under the Guaranty Agreement and GNMA's Mortgage-Backed Securities Guide. ECF No. 67 at 14. The Guaranty

Agreement essentially granted equitable title to the HECM loans to GNMA and legal title in them to RMF. *U.S. v. NBD Bank, N.A.*, 922 F. Supp. 1235, 1240 (E.D. Mich. 1996); Truth in Lending, 74 Fed. Reg. 60143, 60146 (Nov. 20, 2009) ("[A]s the guarantor of these securities, Ginnie Mae obtains equitable title in the mortgage loans but . . . the issuers of the securities retain legal title to the loans that collateralize the securities.").

But in the Guaranty Agreement, GNMA retained the right to take full and absolute ownership of the mortgages and all related interests if RMF defaulted. GNMA was then obligated to service the mortgages and securities itself. *See* ECF No. 53-3 at 171 (Section 10.04) (explaining that on default, "Ginnie Mae may . . . automatically effect and complete the extinguishment of any redemption, equitable, legal, or other right, title, or interest of the Issuer in the Mortgages, the related Ginnie Participations and any Other Interests. . . . The Mortgages and the related Ginnie Participations and the Other Interests . . . automatically shall become the absolute property of Ginnie Mae, subject only to unsatisfied rights of the Security Holders"); *NBD Bank*, 922 F. Supp. at 1240 ("Upon the default of the issuer, the GNMA takes the legal title to the mortgages (all equitable title to the mortgages already belongs to GNMA) and begins to service the mortgages itself."). Congress granted GNMA power to extinguish pursuant to the Guaranty Agreement. Under the statute, GNMA may "provide by contract with the issuer for extinguishment" that results in the mortgages "becom[ing] the absolute property of the Association." 12 U.S.C. § 1721(g)(1). The Guaranty Agreement is the contract the statute contemplates. *See NBD Bank*, 922 F. Supp. at 1247 ("Thus, the Guaranty Agreement defines the scope of GNMA's ownership rights in the mortgages.").

### III. The Tails

RMF defaulted under the Guaranty Agreement. ECF No. 57 at 6. But GNMA did not immediately extinguish RMF's rights while attempting to negotiate an alternate resolution to the RMF crisis. ECF No. 67 at 17–18. Because GNMA had not yet exercised its extinguishment rights, RMF was still responsible for servicing the HECM loans and ensuring HMBS security holders received their due. RMF needed funding and "urgently sought to identify an entity willing to loan money to RMF so that [it] could make its required payments." ECF No. 1 at 2. TCB agreed to loan "tens of millions of dollars" to RMF. ECF No. 1 at 1.

As collateral, TCB took a "first priority lien" on certain HECM loan collateral called "Tails." *Id.*; ECF No. 68 at 215. RMF and TCB memorialized their loan agreement in a Tail Agreement. The Tail Agreement defined an "HECM Tail," the collateral at issue, as:

> The aggregate of any additional amounts, including but not limited to amounts created by additional draws by the Obligor, interest accruals, mortgage insurance premiums, fees, or charges, which accrue, are disbursed, or are added to the balance of a previously-securitized HECM Loan after the closing date of any prior securitization of the HECM Loan or any prior HECM Tail related thereto.

ECF No. 68 at 215. When a borrower receives an HECM Loan, the terms between the borrower and note-holder are fixed. The borrower owes, repayment terms are prescribed, and the note holder may enforce its rights against the collateral. ECF No. 67 at 11. The entirety of the agreement exists in one relationship between the borrower and lender. The HECM Loan balance at the time of securitization — not any additional fees, balances, interest amounts, or other charges — is then pooled into the security.

In essence, a single HECM Loan can be split into multiple "Participations," some of which are securitized into a pool and some of which may not be securitized until a later date. ECF No. 67 at 12; ECF No. 68 at 15 (defining a Participation as "balances related to a HECM loan [that] may be pooled into HMBS securities. . . . [and which] generally consist of advances made to

4

borrowers, monthly insurance premiums paid to FHA, [and] certain servicing fees and accrued interest"). Any portion of an HECM Loan that is "securitized into an HMBS security" is a Participation. ECF No. 68 at 16.

The "Tails" are the portions of the HECM Loan that may be later securitized after previous Participations were securitized into the pool. In short, a Tail can only exist if there is an underlying HECM Loan that has already been at least partially securitized into a pool. No Tail can exist unless an underlying, partially-securitized HECM Loan also exists. And Tails are often securitized into the HMBS pool at later dates. ECF No. 57 at 5–6. Tails are simply a portion of an HECM Loan not yet securitized into a pool even though other parts (Participations) of that same HECM Loan are already securitized into a pool.

### IV. The Dispute

After RMF's default, GNMA "was within its rights to extinguish and terminate RMF and take absolute ownership of [the] mortgage portfolio." ECF No. 67 at 17. But instead, GNMA did not extinguish and sought an alternative resolution to the crisis RMF's bankruptcy caused. However, RMF was unable to meet the conditions GNMA imposed on forbearance. *Id.* at 17–18. So GNMA terminated RMF from the HMBS program, extinguished all RMF's interests in the mortgages per the Guaranty Agreement, and assumed direct servicing of the relevant mortgages and securities. *Id.* at 18; ECF No. 57 at 7.

GNMA's action also extinguished any interest TCB had in the Tails. ECF No. 58 at 122. TCB brought this action against GNMA on October 4, 2023, and this Court dismissed some of TCB's claims on April 3, 2024. TCB's APA excess of statutory authority claim survived in part because the Court assumed all TCB's factual allegations true, as proper for a Motion to Dismiss. ECF No. 67 at 6. TCB filed this Motion on June 27, 2024, to resolve only whether GNMA

exceeded its statutory authority under the APA now that GNMA filed the full administrative record on June 13, 2024.

**LEGAL STANDARD**

Summary judgment is appropriate if the movant shows there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). The moving party bears the initial burden of demonstrating both. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Summary judgment "is particularly appropriate in cases in which the court is asked to review or enforce a decision of a federal administrative agency." *Girling Health Care, Inc. v. Shalala*, 85 F.3d 211, 214–15 (5th Cir. 1996). "Under the APA, it is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record." *Hi-Tech Pharmacal Co., Inc. v. FDA*, 587 F. Supp. 2d 13, 18 (D.D.C. 2008). And it is the role of the court in an APA case to "sit[] as an appellate tribunal." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001); *see also Amin v. Mayorkas*, 24 F.4th 383, 391 (5th Cir. 2022). In such a posture, the "entire case on review is a question of law, and only a question of law." *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993). So summary judgment in an APA case "merely serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Oceana, Inc. v. Locke*, 831 F. Supp. 2d 95, 106 (D.D.C. 2011). Judicial review under the APA is limited to the administrative record. 5 U.S.C. § 706.

ANALYSIS

Congress enacted the APA "as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices." *U.S. v. Morton Salt Co.*, 338 U.S. 632, 644 (1950); *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2261 (2024). The APA compels courts to "hold unlawful and set aside" agency actions that are "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2), (2)(C). The central question then is "always, simply, whether the agency has stayed within the bounds of its statutory authority." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013) (emphasis omitted). To answer that question, courts must begin with the statute's text. *Sackett v. EPA*, 598 U.S. 651, 671 (2023). This inquiry is not mechanical or rigid but instead the plain, "ordinary meaning and structure of the law itself" governs. *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 436 (2019).

### I. The Statute

Thus we begin with the plain text. Section 1721(g)(1) provides the authority to extinguish all interests in mortgages behind the HMBS program. Section 1721(g)(1) provides in relevant part:

> The Association is hereby empowered, in connection with any guaranty under this subsection, whether before or after any default, to provide by contract with the issuer for the extinguishment, upon default by the issuer, of any redemption, equitable, legal, or other right, title, or interest of the issuer in any mortgage or mortgages constituting the trust or pool against which the guaranteed securities are issued; and with respect to any issue of guaranteed securities, in the event of default and pursuant otherwise to the terms of the contract, the mortgages that constitute such trust or pool shall become the absolute property of the Association subject only to the unsatisfied rights of the holders of the securities based on and backed by such trust or pool.

12 U.S.C. § 1721(g)(1). The statute thus prescribes several requirements that must be met for GNMA to extinguish interests. TCB argues three of them are at issue. ECF No. 57 at 9–11. First, GNMA's ability to extinguish must be "provide[d] by contract with the issuer." 12 U.S.C. § 1721(g)(1). Second, GNMA may only extinguish the "interest of the issuer." *Id.* And third,

7

GNMA may only extinguish interests "in any mortgage or mortgages constituting the trust or pool." *Id.*

## II. GNMA Did Not Exceed Its Statutory Authority

### A. Contract

TCB argues that GNMA lacks statutory authority to extinguish TCB's lien in the Tails because there is no "privity of contract" between TCB and GNMA. ECF No. 57 at 10. It claims GNMA knew how to craft a contract with TCB and that its failure to do so means GNMA exceeded its statutory authority. *Id.* TCB notes GNMA previously executed an Acknowledgement Agreement with a different RMF lender that expressly acknowledged and enforced GNMA's right to extinguish. ECF No. 58 at 37; ECF No. 75 at 7 n.1. That Acknowledgement Agreement conceded that any interest of the secured party was "merely derivative of the interest of Issuer." *Id.* But the parties entered no such agreement here. GNMA and TCB signed no contract explicitly acknowledging GNMA's rights in the Tails. TCB argues this failure warrants summary judgment. ECF No. 75 at 7.

Yet a contract providing for the power to extinguish did exist. The contract that satisfies the statute is the Guaranty Agreement between RMF and GNMA. GNMA never claims to have *directly* extinguished TCB's rights. Instead, GNMA extinguished *RMF's* rights — some of which RMF granted to TCB. TCB's interests in the Tails derive only from RMF. Thus, TCB's interests were "merely derivative." ECF No. 58 at 37 (Section 3(b)). RMF could not escape GNMA's statutory and contractual ability to seize full ownership of the mortgages merely by granting interests in them to TCB. Just as GNMA argues, the plain text of the statute "does not contemplate, nor could it contemplate, dividing a single mortgage such that . . . [only] some portion" would become GNMA's property following default. ECF No. 67 at 22.

8

After RMF and GNMA executed the Guaranty Agreement, RMF held legal title to mortgages to service them. But all RMF's rights were subject to GNMA's rights. The Guaranty Agreement states that GNMA "may . . . complete the extinguishment of *any* redemption, equitable, legal, or other right, title, or interest of the Issuer in the Mortgages, the related Ginnie Participations and *any Other Interests*." ECF No. 53-3 at 171 (emphasis added). The result? The entire mortgage (no matter how much of it was securitized but more on that later) becomes "the absolute property of Ginnie Mae." *Id.* The Guaranty Agreement explicitly outlined GNMA's ability to extinguish others' *entire* rights in the mortgages. The statute permits the same. And so "the Guaranty Agreement defines the scope of GNMA's ownership rights in the mortgages." *NBD Bank*, 922 F. Supp. at 1247.

TCB fully understood this. TCB knew GNMA could extinguish its interest in the Tails. It admitted as much. In the Tail Agreement between RMF and TCB whereby RMF granted TCB an interest in the Tails, TCB openly acknowledged that its rights were "subject to the rights and interests of Ginnie Mae." ECF No. 68 at 224. It further defined the Tails as property RMF "now has or at any time hereafter has or acquires any right, title or interest." ECF No. 68 at 211. Of course, RMF could not grant to TCB a greater interest in the Tails than the interest it held. As TCB recognized, RMF never held a nonextinguishable right in the Tails. Hence it could not grant one to TCB. TCB's appeals to agreements between GNMA and other lenders which *acknowledge* that a lender's interest is derivative of GNMA's interest do not help it. Rather, they acknowledge the very thing TCB disavows here.[1] Because GNMA fully extinguished RMF's interests, and thereby

---

1 Unlike the statutory interpretation Negative-Implication Canon, TCB cannot claim the lack of an acknowledgement agreement between TCB and GNMA means there was no contract at all that satisfies the statutory requirement. *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW 107 (1st ed. 2012). Rather, invoking agreements between other lenders and GNMA just leaves open the question of why TCB did not execute one with GNMA.

TCB's interests, the Guaranty Agreement between RMF and GNMA satisfies the statute's requirement of a *contract*.

### B. Issuer

TCB similarly argues that GNMA exceeded its statutory authority because TCB is not an issuer subject to extinguishment under the statute. The statute permits GNMA to extinguish "any redemption, equitable, legal, or other right, title, or interest *of the issuer*." 12 U.S.C. § 1721(g)(1) (emphasis added). TCB is not an issuer under the definition put forth in the statute. But RMF is. GNMA extinguished RMF's interests in the mortgages. As a result, TCB lost its interest in the Tails. But, again, TCB only lost its interests in the Tails because of GNMA extinguishing *RMF's* rights. If GNMA had purported to extinguish only TCB's rights while leaving RMF's intact, then this case may be different.

Thus GNMA met the statute's requirement that it could only extinguish the rights of the issuer. TCB's rights sprang from RMF's. RMF held only the rights GNMA granted back to it in the Guaranty Agreement after RMF transferred full ownership to GNMA. ECF Nos. 53-3 at 161; 67 at 14. RMF then granted TCB a lien on *RMF's interests* in the Tails. ECF No. 68 at 223 ("Borrower hereby pledges, assigns and grants to Bank a continuing first priority security interest in all of *Borrower's right, title and interest in and to all of the Collateral* to secure the prompt and complete payment and performance when due of all of the Indebtedness and all of the Obligations.") (emphasis added). Because RMF held only an interest in the Tails that was subject to GNMA's rights, that is all it could grant. TCB understood this. TCB attempted to negotiate an assurance from GNMA that GNMA would pay TCB's losses within 60 days if TCB were not paid or its interests securitized after GNMA extinguished RMF's interests. ECF No. 68 at 114, 267.

GNMA provided no such assurance, but TCB funded the loan nonetheless. ECF No. 68 at 124, 267.

GNMA extinguished all the interests of an issuer, RMF, and gained full ownership of the HECM Loans. TCB held a lien on whatever interest RMF held in the Tails. GNMA eradicated RMF's interests in the Tails pursuant to the underlying contract. The destruction of "Borrower's right, title and interest in and to all of the Collateral" meant TCB's interest in that same property also ceased. ECF No. 68 at 223. Even though the valid exercise of GNMA's statutory authority here had peripheral consequences, that does not invalidate GNMA's action. GNMA extinguishing the interests of an *issuer* had other effects. But those effects, namely the extinguishment of TCB's rights in the Tails, were not actions GNMA directly took as an exercise of its statutory authority.

### C. Mortgages Constituting the Pools

Finally, TCB argues that the Tails are not "mortgages constituting the trust or pool against which the guaranteed securities are issued" as the statute requires. 12 U.S.C. § 1721(g)(1); ECF No. 57 at 11. TCB draws a distinction between a Tail and its underlying HECM Loan. TCB claims its interests "are in HECM *tails* rather than mortgage *pools*." ECF No. 57 at 11. As TCB reads the statute, it only empowers GNMA to extinguish interests "in mortgages *that have been pooled and securitized into HMBS.*" *Id.* (emphasis in original). TCB discerns an impregnable wall separating HECM Loans and Tails. Because the Tails *themselves* have not yet been securitized into a pool, TCB argues they cannot be included in "mortgages constituting the trust or pool." 12 U.S.C. § 1721(g)(1).

But a Tail is wholly derivative of the HECM Loans "constituting the trust or pool against which the guaranteed securities are issued." 12 U.S.C. § 1721(g)(1). A Tail is an "aggregate of any additional amounts, . . . interest accruals, mortgage insurance premiums, fees, or charges, which

11

accrue, are disbursed, or are added to the balance of a previously-securitized HECM Loan." ECF No. 68 at 215. As GNMA describes Tails, they are "additional amounts added to the HECM balance that have not yet been securitized [into HMBS]." ECF No. 58 at 125. A Tail is, in essence, an amount of money, not yet itself securitized into a pool, that accrues on an HECM Loan. Those underlying HECM Loans are (at least in part) securitized into an HMBS pool. A Tail cannot exist without an underlying HECM Loan. And the Tails themselves often are securitized into a pool. ECF No. 57 at 5–6. Regardless of whether the Tail *itself* is securitized into the pool, it is at least a portion of an HECM Loan that *is* securitized into a pool. A Tail is a part of an HECM Loan.

The statute and the Guaranty Agreement permit GNMA to assume *full ownership* of the mortgages in the pool. 12 U.S.C. § 1721(g)(1) ("[T]he mortgages that constitute such trust or pool shall become the absolute property of the Association . . . ."); ECF No. 53-3 at 171 (Section 10.04) (explaining that the "Mortgages and the related Ginnie Participations and the Other Interests . . . automatically shall become the absolute property of Ginnie Mae"). The phrase "mortgages that constitute such trust or pool" clarifies the *types* of mortgages Congress empowered GNMA to acquire if an issuer defaults. GNMA is not empowered to seize any mortgage. It is empowered to seize the entirety of any mortgage that is part of an HMBS pool. If an HECM Loan is securitized into a pool, then it partly constitutes that pool.

But what the statute does not do is split such mortgage into smaller parts. It does not distinguish between the portions securitized and unsecuritized. No such language appears in the statute nor the Guaranty Agreement. TCB would have the Court add such language. Under TCB's interpretation, the statute might better read "portions of the mortgages that constitute such trust or pool." But the Court declines to undertake such a venture.

In *U.S. v. NBD Bank, N.A.*, GNMA regained funds sent to a lender who held a lien on HECM mortgages after the lender granted a loan to an issuer who went bankrupt. 922 F. Supp. 1235 (E.D. Mich. 1996). A question arose of what parts of a mortgage GNMA owned. *Id.* at 1247–48. There, securitized portions of mortgages went to security holders while other parts of the mortgages went to custodial accounts to pay for taxes and insurance. *Id.* But "the most reasonable interpretation of 12 U.S.C. § 1721(g) . . . is that GNMA's ownership rights in the mortgages extend[ed] to all mortgage payments, including payments earmarked for taxes and insurance." *Id.* at 1247. The *NBD* court declined to split the mortgage into securitized and unsecuritized parts. Instead, "GNMA gained all ownership rights in the mortgages." *Id.* Thus, GNMA could regain funds wrongly sent to the lienholder. *Id.* at 1248.

Nor does the statutory language demand that only mortgages that have been fully securitized into the pool may be extinguished. New balances will routinely accrue on an HECM Loan — when a senior draws additional funds, when fees accrue, or when interest rises. Those "tails" are not securitized yet. But the underlying HECM Loan *is*. That underlying mortgage the tail balances accrue upon constitutes (a part) of an HMBS trust or pool. Congress did not demand GNMA split mortgages into parts inside and outside of the pool — and neither does this Court. A mortgage constituting the trust or pool does include portions, like the Tails here, that may not themselves have yet been securitized into the pool. But because their underlying HECM Loan has been, GNMA's extinguishment rights extend to the Tails. GNMA did not exceed its statutory authority when it extinguished RMF's rights in the mortgages and their Tails.

CONCLUSION

GNMA extinguished RMF's rights in the entirety of mortgages constituting the relevant HMBS pool pursuant to the Guaranty Agreement. This fulfils Congress's requirements that

GNMA can only extinguish an *issuer's* rights, pursuant to a *contract*, in mortgages constituting an HMBS *pool*. TCB's lien in RMF's interests in the Tails were similarly extinguished because of GNMA's action. TCB retains its other claims for relief. But summary judgment is not appropriate on its APA claim against GNMA because TCB has not demonstrated it is entitled to judgment as a matter of law. Accordingly, the Court **DENIES** Plaintiff's Motion for Partial Summary Judgment.

**SO ORDERED.**

October 18, 2024

MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE