IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

TEXAS CAPITAL BANK,

       Plaintiff,

v.

GOVERNMENT NATIONAL MORTGAGE
ASSOCIATION and UNITED STATES
DEPARTMENT OF HOUSING AND
URBAN DEVELOPMENT,

       Defendants.

Civil Action No. 2:23-cv-00156

Judge Kacsmaryk

## PLAINTIFF'S APPENDIX IN SUPPORT OF ITS RESPONSE OPPOSING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Texas Capital Bank ("TCB") respectfully files this Appendix accompanying its Response Opposing Defendants' Motion for Summary Judgment.  Plaintiff relies on the following evidence in support of said Opposition and Brief in Support as filed contemporaneously herewith, and the evidence is hereby fully incorporated therein by reference.

| EXHIBIT NUMBER | TITLE OF DOCUMENT | APPENDIX PAGE(S) |
|---|---|---|
| A | Declaration and Expert Report of Robert S. Conway | App. 001-App. 048 |
| B | Final Order (I) Authorizing The Debtors To Obtain Postpetition Financing; (II) Authorizing Certain Debtors' Use of Cash Collateral; (III) Modifying the Automatic Stay; and (III) Granting Related Relief | App. 049-App. 164 |
| C | Excerpt of Administrative Record, ECF No. 53-1 | App. 165 |
| D | Excerpt of Administrative Record, ECF No. 53-3 | App. 166-App. 194 |
| E | Exhibit C to Second Interim DIP Order, Existing Tail Loan Agreement | App. 195- App. 250 |

| F | Second Interim DIP Order | App. 251-App. 411 |
|---|---|---|
| G | Ginnie Mae 2023 Annual Report | App. 412-App. 547 |
| H | Letter from Madison Simm to Alanna McCargo and Julia Gordon, dated March 16, 2023 | App. 548-App. 551 |
| I | Email from Craig Corn to Brian Keena and Jim Rose dated March 3, 2023[1] | App. 552-App. 554 |

Date: February 21, 2025                          Respectfully submitted,

 /s/     Elinor C. Sutton

Isaac Nesser – *Admitted Pro hac vice*
isaacnesser@quinnemanuel.com
Heather Christenson - *Admitted Pro hac vice*
heatherchristenson@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010

William A. Burck – *Admitted Pro hac vice*
williamburck@quinnemanuel.com
Christopher G. Michel - *Admitted Pro hac vice*
christophermichel@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN, LLP
1300 I Street NW, Suite 900
Washington, District of Columbia 20005-3314

Matthew Scheck - *Admitted Pro hac vice*
matthewscheck@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN, LLP
300 West 6th Street, Suite 2010
Austin, Texas 78701

Elinor C. Sutton
Texas Bar No. 24129804
elinorsutton@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN, LLP
3100 McKinnon Street, Suite 1125
Dallas, Texas 75201

---

[1]   The redaction in this document was applied by counsel to RMF's estate and was produced to Plaintiff with this redaction.

Thomas C. Riney
Texas Bar No. 16935100
tom.riney@uwlaw.com
C. Jason Fenton
Texas Bar No. 24087505
jason.fenton@uwlaw.com
UNDERWOOD LAW FIRM, P.C.
500 S. Taylor, Suite 1200
Amarillo, Texas 79101
Phone:(806) 376-5613

*ATTORNEYS FOR PLAINTIFF*

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of this appendix was this 21st day of February 2025, served on all known counsel of record in accordance with the Federal Rules of Civil Procedure.

*/s/     Elinor C. Sutton*
Elinor C. Sutton

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| TEXAS CAPITAL BANK, | |
| Plaintiff, | |
| v. | Civil Action No. 2:23-cv-00156 |
| GOVERNMENT NATIONAL MORTGAGE ASSOCIATION and UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, | Judge Kacsmaryk |
| Defendants. | |

## <u>DECLARATION OF ROBERT S. CONWAY</u>

I, Robert S. Conway, declare, upon personal knowledge and under penalty of perjury, that the following is true and correct:

1.      I have been retained by Quinn Emanuel Urquhart & Sullivan, LLP as an expert witness on behalf of Plaintiff Texas Capital Bank in connection with the above-captioned action. If called as a witness, I could and would testify competently thereto.

2.      Attached hereto as **Exhibit A** is a true and correct copy of my December 16, 2024 expert report titled "Expert Report of Robert S. Conway."

Dated: February 18, 2025

Respectfully submitted,

_____
Robert S. Conway

1

# Exhibit A

# IN THE UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF TEXAS

## AMARILLO DIVISION

| | |
|---|---|
| TEXAS CAPITAL BANK,<br><br>                    Plaintiff,<br><br>      v.<br><br>GOVERNMENT NATIONAL<br>MORTGAGE ASSOCIATION and<br>UNITED STATES DEPARTMENT<br>OF HOUSING AND URBAN<br>DEVELOPMENT,<br><br>                  Defendants. | **Case No. 2:23-cv-00156-z** |

EXPERT REPORT OF

# ROBERT S. CONWAY

**DECEMBER 16, 2024**

## CONTENTS

**I.    INTRODUCTION** .................................................................................................1

I.A.    Background, Qualifications, Experience ...........................................1

I.B.    Compensation, Scope of Report, and Summary of Opinions .............................2

**II.    RELEVANT INDUSTRY BACKGROUND** .........................................4

II.A.    American Seniors Rely On Reverse Mortgages ...................................5

II.B.    Ginnie Mae's And The FHA's Roles In The HECM Program............................7

II.C.    TCB's Facility With RMF ............................................................14

II.D.    RMF Files For Bankruptcy And Requires DIP Financing ...............................15

II.E.    Ginnie Mae Extinguishes RMF's Rights And Seizes Portfolio.........................23

**III.    OPINIONS** ............................................................................................**25**

III.A.    Un-securitized Tails Are Distinct From Pooled Mortgages And Not Derivative Of Pooled Mortgage Participations........................................................25

III.B.    TCB's Funding Resulted In Payments To HECM Borrowers; Ginnie Mae Has Since Received Payments ................................................................30

III.C.    TCB's Damages .............................................................................32

III.D.    The FHA's Role To Make Payments ...............................................33

## LIST OF APPENDICES

Appendix A: Curriculum Vitae of Robert S. Conway.

Appendix B: Materials Considered and Relied Upon.

CONFIDENTIAL

# I.    INTRODUCTION

## I.A.    Background, Qualifications, Experience

1.    My name is Robert Scott Conway.  I have spent the majority of my career in structured finance and mortgages, most recently as Treasurer at Finance of America, where I was responsible for funding facilities, cash management, securitizations, mortgage servicing rights financing and other types of financing for reverse mortgage companies, among other things.  Across years, I spent more than half of my time at Finance of America working on the financing and securitization of reverse mortgages.  I was with Finance of America for almost nine years until I retired in April 2024.  Prior to Finance of America, I was Senior Vice President at Stonegate Mortgage Corporation, a forward mortgage company, where I was responsible for mortgage servicing rights financing, mortgage repurchase agreements, secured and unsecured financings, and re-warehousing financing, as well as mortgage servicing rights sales and purchases. Between 1994 and 2010, I had various roles at GMAC, including Managing Director at GMAC Residential Capital Corporation where I was responsible for acquisitions, divestitures, strategic investments, and new business ventures; Managing Director, Residential Lending at GMAC Residential Funding of Canada where I managed GMAC's Canadian mortgage brokerage business; and Vice President at GMAC Commercial Mortgage where I created and established GMAC's commercial mortgage securitization framework.  I began my career in mortgage finance at Lehman Brothers in 1985.

2.    As the Treasurer for Finance of America, I was intimately involved in the financing and the pooling and securitization of Home Equity Conversion Mortgages ("HECM") assets, mainly in securing financing for HECM assets before the assets were pooled and securitized.  I was also responsible for initiating and managing Finance of America's HECM Mortgage Servicing Rights ("MSR") financing with Leadenhall Capital Partners LLP ("Leadenhall") and for initiating, renewing and managing Finance of America's HECM Tail financing line with Texas Capital Bank ("TCB").  Because of my responsibility for managing financing for HECM loans, HECM

servicing and HECM Tails ("Tails"),[1] I was the main contact for Finance of America with the Government National Mortgage Association ("Ginnie Mae").

3.  I earned an MBA from Cornell in 1985 and a Bachelor of Science in Engineering from Duke University in 1980.  I also achieved a Chartered Financial Analyst (CFA) designation in 1995.

4.  **Appendix A** is a true and correct copy of my curriculum vitae.

## I.B.    Compensation, Scope of Report, and Summary of Opinions

5.  I have been retained by Quinn Emanuel Urquhart & Sullivan, LLP ("Counsel") on behalf of Plaintiff in the matter *Texas Capital Bank v. Government National Mortgage Association and United States Department of Housing and Urban Development*, Case No. 2:23-cv-00156-z.  I am being compensated at an hourly rate of $850.  I have been assisted in this matter by staff at The Brattle Group, working under my direction.  I have no financial or other interest in The Brattle Group's billings in this matter.

6.  I have been asked to provide relevant factual background as well as industry background information about the commercial framework for the reverse mortgage industry in the United States and do so in **Section II** of this report.  In **Section III**, I provide opinions about the distinction between un-securitized Tails and pooled mortgages; an assessment of relevant cash flows from November 1, 2022 through September, 2024, an assessment of TCB's monetary damages; and the role of the Federal Housing Administration ("FHA") regarding Tail draws on HECM loans.  I am not offering any legal opinions in this case.

7.  In summary, my opinions are as follows:

    a.  Un-securitized Tails are distinct from pooled mortgages and are separate assets from pooled mortgages including pooled Tails.  The terms pooling and securitization are interchangeable and relate to creating the mortgage-backed security for which Ginnie Mae provides a

---

[1]    Tails are draws made by borrowers on their existing HECM loans and accrue to the loan balance.  I discuss Tails in more detail in Sections II.B and III.A.

guaranty. Portions of a HECM loan are referred to as "Participations."[2] A Tail Participation is an additional draw on a HECM loan whose initial draw Participation has already been pooled/securitized with other Participations. Participations—not entire HECM loans—are the relevant economic units in the reverse mortgage industry and the widespread industry understanding and expectation is that each Participation is a separate asset which may or may not be pooled/securitized. Tail Participations are initially un-pooled/un-securitized and are accounted for differently than pooled/securitized Participations on the lender's balance sheet. Some Tails, for example, Tails covering payments of the Mortgage Insurance Premium ("MIP") after the borrower has deceased, are ineligible for pooling/securitization. To my knowledge, the Ginnie Mae MBS Guide is silent on what a lender may do with un-pooled/un-securitized Tails, since such Tails are not under Ginnie Mae purview. The Tails at issue in this case were never pooled/securitized and are not guaranteed by Ginnie Mae.

b. Since seizure, the valuation of RMF's portfolio has increased to approximately $380 million.[3] Ginnie Mae extinguished RMF's servicing rights and took the position that TCB's interest in un-securitized Tails were also extinguished. Ginnie Mae had another option in how it handled the un-securitized Tails in the RMF portfolio post-seizure: Ginnie Mae could have extinguished RMF's right to the Ginnie Mae servicing and provided TCB with the collateral that backed TCB's financing, *i.e.,* the un-securitized Tail Participations, in which case TCB would be paid back its debt as the underlying HECM loans are paid off in due course. TCB provided Tail funding of an aggregate of $5.8 million in December 2022 for 635 loans that have since been paid in full and for which Ginnie Mae has received an aggregate of $19.5 million.[4] TCB also provided Tail funding of an aggregate of $22.4

---

[2]    "Chapter 35: Home Equity Conversion Mortgage Loan Pools – Special Requirements (HECM / HMBS)," Ginnie Mae, accessed December 12, 2024, https://www.ginniemae.gov/issuers/program_guidelines/Lists/MBSGuideAPMsLib/Attachments/44/Chapter_35 .pdf, p. 1 ("Participation interests generally consist of advances made to borrowers, monthly insurance premiums paid to FHA, certain servicing fees and accrued interest, which may include certain servicing fees and guaranty fees.").

[3]    "2023 Annual Report," Ginnie Mae, https://www.ginniemae.gov/about_us/what_we_do/Annual_Reports/annual_report23.pdf, p. A-3 ("Reverse mortgage loans, at fair value [Dollars in thousands:] 19,525,649" and "HMBS obligations, at fair value [Dollars in thousands:] 19,147,154"). Calculated as $19,525,649,000 – $19,147,154,000.

[4]    Workpaper A.

million in December 2022 for an additional 2,998 loans that were still outstanding and in "Active" status as of September 2024.[5]  If such loans had been paid off in September 2024, Ginnie Mae would have received an aggregate of $119.7 million.[6]  I reserve the right to update this analysis upon receiving information for any months following September 2024.

c.  As of December 20, 2022, TCB's outstanding balance on the Tail facility was $42.2 million.[7]  Of that balance, $27.3 million was attributable to TCB's outstanding Debtor-in-Possession ("DIP") loan balance, and the remainder of $15.0 million was attributable to TCB's pre-DIP Tail financing.[8]  The current outstanding balance of the debt owed to TCB amounts to approximately $36.3 million.[9]  Including interest, TCB's damages range from $42.0 million to $45.8 million, depending on which interest rate the Court finds appropriate.

d.  When Reverse Mortgage Funding, LLC ("RMF") filed for bankruptcy and stopped funding consumers' draws (including Tails) on the FHA-insured HECM loans, it was the FHA's role to fund those draws, which were instead funded by TCB through bankruptcy financing.

The opinions I have provided are my own and are not contingent on my compensation or the outcome of this matter.  I reserve the right to amend them during the course of this litigation, including if new information becomes available.  **Appendix B** provides a list of materials I considered and relied upon in this matter.

## II.    RELEVANT INDUSTRY BACKGROUND

8.  In this section, I discuss reverse mortgages and the reverse mortgage industry.  I explain that American seniors rely on reverse mortgages for supplemental funding and discuss the roles of the FHA and Ginnie Mae under the HECM and Home Equity Conversion Mortgage-Backed Security ("HMBS") programs.

---

[5]    Workpaper B.

[6]    Workpaper B.

[7]    TCB000000006211 ("Tail Summary" tab).

[8]    TCB000000006211 ("Tail Summary" tab).

[9]    Calculated as $42,206,617.30 - $5,865,614.48, the amount I understand TCB has received from RMF since December 2022.  *See* Section III.C.

9. The FHA and Ginnie Mae are U.S. Government agencies within the U.S. Department of Housing and Urban Development ("HUD"),[10] with the FHA providing guarantees at the *mortgage level* (for individual loans, reducing the risk for borrowers and lenders) and Ginnie Mae providing guarantees at the *security level* (for pooled/securitized portions of HECM loans, reducing the risk for investors)*, as explained in further detail below.[11]  HECM loans are only available through FHA-approved lenders, and such loans are insured by the U.S. Federal Government.[12]

10. For background purposes, I also discuss the events that led up to RMF's bankruptcy and certain funding TCB made available to RMF.  Finally, I discuss how Ginnie Mae extinguished RMF's rights as a Ginnie Mae HMBS issuer and seized its portfolio in December 2022.

## II.A.   American Seniors Rely On Reverse Mortgages

11. Reverse mortgages are fully-secured non-recourse loans, designed for homeowners who are 62 years of age or older, which allow homeowners to borrow against their homes so as to convert

---

[10]   "About Us," U.S. Department of Housing and Urban Development, accessed December 12, 2024, https://www.hud.gov/program_offices/housing/fhahistory ("The Federal Housing Administration (FHA) is part of the U.S. Department of Housing and Urban Development.").

"Ginnie Mae," USA.gov, accessed December 12, 2024, https://www.usa.gov/agencies/ginnie-mae ("Ginnie Mae is a self-financing, wholly owned U.S. Government corporation within the Department of Housing and Urban Development.").

[11]   SP Group LLC, "Home Equity Conversion Mortgage Program Analysis," U.S. Department of Housing and Urban Development, July 2022, https://www.huduser.gov/portal/portal/sites/default/files/pdf/HECM-Report.pdf, p. 2 ("FHA ensures that, when lenders comply with all program requirements, they will usually receive the full value of the HECM loan at term regardless of property values. This insurance from FHA lowers lender risk and makes better loan terms possible.").

"Programs," Ginnie Mae, accessed December 12, 2024, https://www.ginniemae.gov/about_us/what_we_do/pages/programs_products.aspx ("Rather, Ginnie Mae is the guarantor of securities issued by approved lenders who participate in our programs."); "Funding Government Lending," Ginnie Mae, accessed December 12, 2024, https://www.ginniemae.gov/about_us/who_we_are/Pages/funding_government_lending.aspx ("Ginnie Mae securities are the only MBS to carry the full faith and credit guaranty of the United States government, which means that even in difficult times, an investment in Ginnie Mae MBS is one of the safest an investor can make.").

[12]   "Home Equity Conversion Mortgages for Seniors," U.S. Department of Housing and Urban Development, accessed December 12, 2024, https://www.hud.gov/program_offices/housing/sfh/hecm/hecmhome ("The only reverse mortgage insured by the U.S. Federal Government is called a Home Equity Conversion Mortgage (HECM), and is only available through a Federal Housing Administration (FHA)-approved lender.").

equity in the home into a line of credit.[13]  Reverse mortgages do not have a fixed term and are usually repaid in one payment (*e.g.,* after the death of the borrower or when the property is no longer the primary residence of the borrower).[14]  Unlike "forward mortgages," through which borrowers receive money against the value of their homes and subsequently pay interest and amortization charges,[15] reverse mortgages do not require periodic out-of-pocket interest or amortization payments;[16] the loan balance of a reverse mortgage loan is increased by accrued interest on the loan until repayment.[17]

12. Reverse mortgages enable American senior citizens with limited other sources of income to cover expenses while remaining in their homes.[18]  Specifically, reverse mortgages allow seniors to supplement their Social Security or other retirement income to support their financial needs during retirement, without the burden of having to make periodic out-of-pocket interest and

---

[13]  "Declaration of Tanya Meerovich, Chief Restructuring Officer in Support of Chapter 11 Filings and First Day Motions," in re: *Reverse Mortgage Investment Trunk Inc, et al.*, Case No. 22-11225 (MFW), December 1, 2022, ("First Day Declaration"), ¶ 24 ("A reverse mortgage loan is a fully-secured non-recourse loan that enables homeowners to convert the equity in their home into cash in the form of a lump sum payment, a line of credit, a series of monthly advances, or a combination of the three methods."); "How the HECM Program Works," U.S. Department of Housing and Urban Development, accessed December 12, 2024, https://www.hud.gov/program_offices/housing/sfh/hecm/hecmabou ("There are borrower and property eligibility requirements that must be met. […] You must: […] Be 62 years of age or older").

[14]  First Day Declaration, ¶ 24 ("[R]everse mortgage loans do not have a fixed term, and are generally repaid in one payment.  Reverse mortgage loans are generally repaid upon a maturity, refinancing, or liquidation event, most often after the death of the borrower, when the borrower no longer occupies the property as a principal residence, or when the borrower fails to meet other requirements of the loan, such as paying property taxes and insurance.").

[15]  First Day Declaration, ¶ 24 ("traditional 'forward' residential mortgage loans in which homeowners borrow money against the value of their homes and make monthly payments over time […]" and "Until repayment occurs, the loan balance of a reverse mortgage loan accrues at a fixed or floating rate of interest and, similar to a Traditional Forward Mortgage Loan […]").

[16]  "How does a reverse mortgage work?" Finance of America, July 10, 2024, https://www.financeofamerica.com/education/how-does-a-reverse-mortgage-work/ ("Interest and mortgage insurance premiums accrue on the loan balance monthly.  The borrower does not need to make monthly mortgage payments until the loan comes due, at which point the full amount of the loan plus accrued interest and mortgage insurance premiums must be paid.").

[17]  First Day Declaration, ¶ 24 ("[T]he loan balance of a reverse mortgage loan accrues at a fixed or floating rate of interest […]" and "Until repayment occurs, the loan balance of a reverse mortgage loan accrues at a fixed or floating rate of interest […]").

[18]  "Home Equity Conversion Mortgages for Seniors," U.S. Department of Housing and Urban Development, accessed December 12, 2024, https://www.hud.gov/program_offices/housing/sfh/hecm/hecmhome ("The HECM is the FHA's reverse mortgage program that enables you to withdraw a portion of your home's equity to use for home maintenance, repairs, or general living expenses.  HECM borrowers may reside in their homes indefinitely as long as property taxes and homeowner's insurance are kept current.").

amortization payments and without having to sell their homes.[19]  Such financial needs include payments for general living and medical expenses and for home maintenance and repairs.  The amount a borrower may borrow depends on a variety of factors, such as the age of the borrower (or eligible non-borrowing spouse), current interest rates, and the appraised value of the borrower's house.[20]

## II.B.    Ginnie Mae's And The FHA's Roles In The HECM Program

13.  The FHA's HECM program has enjoyed broad support and commitment from multiple presidential administrations in the past four decades.  For example, President Reagan and Congress authorized HECM loans as a demonstration project in 1988, and in 1999, President Clinton and Congress made the HECM initiative a permanent program.[21]  In 2008, President George W. Bush and Congress allowed fixed interest rates on lumpsum distributions from

---

[19]  First Day Declaration, ¶ 25 ("The primary goal of the FHA's HECM Loan program is to provide older Americans with more affordable options to support their financial needs during their retirement years by converting equity in their homes to cash without having to make monthly principal and interest payments."); "Home Equity Conversion Mortgages for Seniors," U.S. Department of Housing and Urban Development, accessed December 12, 2024, https://www.hud.gov/program_offices/housing/sfh/hecm/hecmhome ("Reverse mortgages are increasing in popularity with seniors who have equity in their homes and want to remain in their homes or supplement their income."); "Reverse Mortgages Present Benefits and Risks for Senior Homeowners," U.S. Government Accountability Office, June 2, 2020, https://www.gao.gov/blog/reverse-mortgages-present-benefits-and-risks-senior-homeowners ("Seniors may use reverse mortgages to help supplement their Social Security or other retirement income.").

[20]  "Home Equity Conversion Mortgages for Seniors," U.S. Department of Housing and Urban Development, accessed December 12, 2024, https://www.hud.gov/program_offices/housing/sfh/hecm/hecmhome ("The amount that will be available for withdrawal varies by borrower and depends on: […] Age of the youngest borrower or eligible non-borrowing spouse; […] Current interest rate; and […] Lesser of appraised value or the HECM FHA mortgage limit or the sales price.").
    The HECM FHA mortgage limit for 2024 is $1,149,825.  "How the HECM Program Works," U.S. Department of Housing and Urban Development, accessed December 12, 2024, https://www.hud.gov/program_offices/housing/sfh/hecm/hecmabou ("[T]he HECM FHA mortgage limit ($1,149,825 in CY 2024)").

[21]  Martin Neil Baily and Benjamin H. Harris, *The Retirement Challenge: What's Wrong with America's System and A Sensible Way to Fix It* (New York: Oxford University Press, 2003), 151 ("Throughout the 1980s, lawmakers proposed legislation to establish a home equity conversion program, but it was not established until 1988, when President Reagan and Congress authorized HECMs as a demonstration project. […] In 1999, President Clinton and Congress changed the HECM initiative from a demonstration project to a permanent program […]").

HECM loans, and in 2009, President Obama and Congress enabled owners of FHA-approved multifamily homes to participate in the HECM Purchase program.[22]

14. As of 2022, the FHA's HECM program comprised approximately 90 percent of all underwritten reverse mortgages.[23]  The dominance of the FHA's HECM program is due to its lower liquidity risk relative to private reverse mortgage lenders, which in turn stems from the HECM program being the only reverse mortgage program insured by the U.S. Federal Government.[24]  HECM loans are only available through FHA-approved lenders.[25]

15. Portions of a HECM loan, including the initial draw, subsequent draws or other amounts funded on behalf of the borrower, are referred to as "Participations."[26]  For example, when reverse mortgage loan borrowers make an initial draw of their loan, this amount and the associated

---

[22]  Martin Neil Baily and Benjamin H. Harris, *The Retirement Challenge: What's Wrong with America's System and A Sensible Way to Fix It* (New York: Oxford University Press, 2003), 151 ("In 2009, President Obama and Congress allowed owners of FHA-approved multifamily homes to participate in the HECM Purchase program. […] In 2008, President George W. Bush and Congress allowed HECM loans to offer fixed-rate mortgages on lump-sum distributions, which helped nourish the popularity of fixed-rate products.").

[23]  SP Group LLC, "Home Equity Conversion Mortgage Program Analysis," U.S. Department of Housing and Urban Development, July 2022, https://www.huduser.gov/portal/portal/sites/default/files/pdf/HECM-Report.pdf, p. 2 ("Based on a review of recent literature and interviews with lenders, the research team found that FHA's HECM loan program is the most popular reverse mortgage product available, accounting for more than 90 percent of all underwritten reverse mortgages.").

[24]  SP Group LLC, "Home Equity Conversion Mortgage Program Analysis," U.S. Department of Housing and Urban Development, July 2022, https://www.huduser.gov/portal/portal/sites/default/files/pdf/HECM-Report.pdf, p. 2 ("The HECM program likely dominates the reverse mortgage market because HECM mortgages have less liquidity risk than private reverse mortgages.  The latter lack the benefit of a federal credit guarantee and are, therefore, either less attractive to large investors such as Fannie Mae, which was a large purchaser of HECM loans in the past, or have fewer options for secondary mortgage market securitization, as with Ginnie Mae's HECM Mortgage-Backed Securities program"); "Home Equity Conversion Mortgages for Seniors," U.S. Department of Housing and Urban Development, accessed December 12, 2024, https://www.hud.gov/program_offices/housing/sfh/hecm/hecmhome ("The only reverse mortgage insured by the U.S. Federal Government is called a Home Equity Conversion Mortgage (HECM), and is only available through a Federal Housing Administration (FHA)-approved lender.").

[25]  "Home Equity Conversion Mortgages for Seniors," U.S. Department of Housing and Urban Development, accessed December 12, 2024, https://www.hud.gov/program_offices/housing/sfh/hecm/hecmhome ("The only reverse mortgage insured by the U.S. Federal Government is called a Home Equity Conversion Mortgage (HECM), and is only available through a Federal Housing Administration (FHA)-approved lender.").

[26]  "Chapter 35: Home Equity Conversion Mortgage Loan Pools – Special Requirements (HECM / HMBS)," Ginnie Mae, accessed December 12, 2024, https://www.ginniemae.gov/issuers/program_guidelines/Lists/MBSGuideAPMsLib/Attachments/44/Chapter_35.pdf, p. 1 ("Participation interests generally consist of advances made to borrowers, monthly insurance premiums paid to FHA, certain servicing fees and accrued interest, which may include certain servicing fees and guaranty fees.").

upfront fees would constitute a Participation,[27] which may be securitized with other eligible Participations from other HECM loans into a Ginnie Mae security and sold in the capital markets.[28] An HMBS security hence comprises Participations from multiple HECM loans.[29] Ginnie Mae provides a guaranty for HMBS securities, which reduces the risk for HMBS investors.[30] The reduced risk for HMBS investors is beneficial for both lenders and borrowers:

> [T]he Ginnie Mae guaranty allows mortgage lenders to obtain a better price for their mortgage loans in the secondary mortgage market. The lenders can then use the proceeds to fund new mortgage loans available. Without that liquidity, lenders would be forced to keep all loans in their own portfolio, meaning they would not have adequate capital to make new loans.[31]

16. Additional draws made by borrowers on their existing HECM loans are distinct Participations of the HECM loan that accrue to the loan balance every month and are referred to as "Tails."[32] As

---

[27] First Day Declaration, ¶ 59 ("When reverse mortgage loan borrowers take an initial draw of their loans, the Company securitizes the initial loan amount and upfront fees by pooling those amounts (referred to as 'participations') with participations in other reverse mortgage loans and financing the pools in the secondary market as mortgage-backed securities. The Company also securitizes into separate 'tail securitization' the ongoing monthly servicing fees, annual mortgage insurance premiums, accrued interest, and subsequent draws on the loan by the mortgage borrower.").

[28] First Day Declaration, ¶ 59.

[29] "Chapter 35: Home Equity Conversion Mortgage Loan Pools – Special Requirements (HECM / HMBS)," Ginnie Mae, accessed December 12, 2024, https://www.ginniemae.gov/issuers/program_guidelines/Lists/MBSGuideAPMsLib/Attachments/44/Chapter_35.pdf, p. 2 ("One HECM loan may have multiple Participations in various HMBS securities throughout the life of the loan.").

[30] "Our History," Ginnie Mae, accessed December 12, 2024, https://www.ginniemae.gov/about_us/what_we_do/Pages/programs_products.aspx ("Rather, Ginnie Mae is the guarantor of securities issued by approved lenders who participate in our programs."); "Funding Government Lending," Ginnie Mae, accessed December 12, 2024, https://www.ginniemae.gov/about_us/who_we_are/Pages/funding_government_lending.aspx ("Ginnie Mae securities are the only MBS to carry the full faith and credit guaranty of the United States government, which means that even in difficult times, an investment in Ginnie Mae MBS is one of the safest an investor can make.").

[31] "Funding Government Lending," Ginnie Mae, accessed December 12, 2024, https://www.ginniemae.gov/about_us/who_we_are/Pages/funding_government_lending.aspx.

[32] Edward J. Szymanoski, Alven Lam, and Christopher Feather, "Financial Sustainability and the Home Equity Conversion Mortgage: Advancing Fiscal Soundness and Affordable Financing for Senior Homeowners," in "Cityscape," *A Journal of Policy Development and Research* 19(1) (2017), p. 60 ("Should the borrower make additional draws on the same HECM loan, termed 'tails' in the industry, then the resulting draw would be eligible for securitization as a new participation to be placed into a new pool of cohorts […]"); First Day Declaration, ¶ 59 ("The Company also securitizes into separate 'tail securitizations' the ongoing monthly servicing fees, annual mortgage insurance premiums, accrued interest, and subsequent draws on the loan by the mortgage borrower.").

shown in **Figure 1** below and explained in more detail in **Section III.A**, Tails are not automatically pooled/securitized once borrowers make an additional draw on their HECM loans. The Tails at issue in this case were not securitized/pooled and have never been securitized/pooled.

### FIGURE 1: ILLUSTRATION OF UN-SECURITIZED TAILS



Source: The Brattle Group Illustration of un-securitized Tails, based on Edward J. Szymanoski, Alven Lam, and Christopher Feather, "Financial Sustainability and the Home Equity Conversion Mortgage: Advancing Fiscal Soundness and Affordable Financing for Senior Homeowners," in "Cityscape," A Journal of Policy Development and Research 19(1) (2017), pp. 59–60.

17. Borrowers under the HECM program are required to pay MIP to the FHA.[33] This MIP is not paid out-of-pocket, but instead accrues to the HECM loan balance.[34] The MIP is paid to the FHA by the mortgage servicer on behalf of the borrower and is frequently financed by a

---

[33]  First Day Declaration, ¶ 60 ("MIP[:] Mortgage insurance premiums the Company advances to FHA on behalf of borrower"); "How the HECM Program Works," U.S. Department of Housing and Urban Development, accessed December 12, 2024, https://www.hud.gov/program_offices/housing/sfh/hecm/hecmabou ("**Mortgage Insurance Premium**[:] You will incur a cost for FHA mortgage insurance.") (emphasis in original).

[34]  "How the HECM Program Works," U.S. Department of Housing and Urban Development, accessed December 12, 2024, https://www.hud.gov/program_offices/housing/sfh/hecm/hecmabou ("**Mortgage Insurance Premium**[:] You will incur a cost for FHA mortgage insurance. [...] You can finance the mortgage insurance premium (MIP) as part of your loan.") (emphasis in original).

financing company like TCB.[35]  The MIP creates a Tail Participation.[36]  The MIP guarantees that borrowers will receive their expected loan advances,[37] a fact that the FHA confirmed in a set of Frequently Asked Questions on August 23, 2023: "FHA will ensure that payments owed to HECM borrowers are made when a mortgagee is unable or unwilling to make these payments. Mortgagees that are unable to make borrower payments should contact FHA as soon as possible to reduce delays in borrowers' receipt of payments."[38]

18. A July 11, 2023, Mortgagee Letter signed by Julia R. Gordon, Assistant Secretary for Housing and Federal Housing Commissioner at HUD,[39] similarly stated that:

> To ensure that HECM Borrowers are provided with the payments due to them under the HECM loan documents, Section 255 of the National Housing Act makes FHA responsible for making any payments that are not paid timely to Borrowers due to the Mortgagee defaulting on their Borrower payment obligation. Any payments made by FHA to HECM Borrowers for this reason are secured by the HECM second mortgage.
>
> …
>
> When the Commissioner determines that a Mortgagee is unable or unwilling to make the Borrower payments required under the HECM, including late charges, the Commissioner shall make such payments to the Borrower once the disbursement is due but unpaid. Mortgagees must provide the Commissioner all

---

[35] First Day Declaration, ¶ 60 ("MIP[:] Mortgage insurance premiums the Company advances to FHA on behalf of borrower").

[36] First Day Declaration, ¶ 59 ("The Company also securitizes into separate 'tail securitizations' the ongoing monthly servicing fees, annual mortgage insurance premiums, accrued interest, and subsequent draws on the loan by the mortgage borrower.").

[37] "How the HECM Program Works," U.S. Department of Housing and Urban Development, accessed December 12, 2024, https://www.hud.gov/program_offices/housing/sfh/hecm/hecmabou ("The mortgage insurance guarantees that you will receive expected loan advances.").

[38] "FHA Info," U.S. Department of Housing and Urban Development, August 23, 2023, TCB000000006042, at -043.

[39] "Julia R. Gordon," U.S. Department of Housing and Urban Development, accessed December 12, 2024, https://www.hud.gov/about/leadership/Julia_Gordon ("Julia R. Gordon serves as the Assistant Secretary for Housing and Federal Housing Commissioner at the U.S. Department of Housing and Urban Development (HUD).").

information necessary to enable the Commissioner to make the late payments to the Borrower.[40]

19. HUD was authorized by Congress to insure reverse mortgages made under the HECM program in 1988 by the addition of Section 255 to Title II of the National Housing Act.[41]  Accordingly, one role of the FHA is to make payments if a HECM lender (or "mortgagee"), like RMF, is unable or unwilling to do so.[42]  This role is directly related to the insurance that the borrower pays for through the MIP.

20. The mortgage insurance improves the credit of the underlying mortgage, thereby lowering the risk for a lender, which, in turn, lowers the cost of financing for the borrower.[43]  The MIP not only protects the HECM borrower but also protects the lender.  Specifically, the FHA insures HECM loans, including un-securitized Tail Participations, such that if a borrower defaults prior to securitization, the HECM lender is protected.[44]

21. In reverse mortgages, the FHA insurance plays the critical role of ensuring that consumers who take out an FHA-insured reverse mortgage actually get the funds for which they bargained. Borrowers will typically draw on their line of credit either on an equal monthly basis, like an annuity, or as their needs arise, such as for healthcare expenses, for housing repairs or for basic

---

[40]  "Modifications to FHA Home Equity Conversion Mortgage (HECM) Requirements Related to Secretary Payment of Borrower Disbursements Due to Mortgage Default," U.S Department of Housing and Urban Development, July 11, 2023, TCB000000006038, at -039–040.

[41]  Housing and Community Development Act of 1987, Pub. L. No. 100-242, § 417 (1988).

[42]  "FHA Info," U.S. Department of Housing and Urban Development, August 23, 2023, TCB000000006042, at -043.

[43]  "Ginnie Mae and the Securitization of Federally Guaranteed Mortgages," Congressional Budget Office, January 2022, https://www.cbo.gov/publication/57755 ("[The FHA] provide[s] mortgage insurance that protects lenders against losses if a borrower defaults on a mortgage. When that happens, FHA pays a claim to the lender for the unpaid principal balance of the defaulted mortgage. […] Those federal backstops typically mean that lenders provide mortgages to qualifying borrowers on better terms (such as with lower interest rates, lower closing costs, or smaller down payments) than they might otherwise.").

[44]  Edward J. Szymanoski, Alven Lam, and Christopher Feather, "Financial Sustainability and the Home Equity Conversion Mortgage: Advancing Fiscal Soundness and Affordable Financing for Senior Homeowners," in "Cityscape," *A Journal of Policy Development and Research* 19(1) (2017), p. 49 ("FHA-insured reverse mortgages provide lenders with certainty in recapturing potential losses incurred through their lending of capital to senior borrowers. Nevertheless, through the provision of insurance, government resources are at risk. Although the government provides insurance on these reverse mortgages, due in the event the borrowers default because of inability to meet HECM loan obligations, the fiscal resources to support are intended to ultimately come from the insurance premiums paid from the borrowers into the insurance fund.").

life essentials. The FHA's insuring of that line of credit provides extra protection to borrowers of HECM loans. This can be best understood by the difference between an FHA-insured HECM loan and a non-FHA insured, private-label reverse mortgage: for the HECM loan, future payments due the borrower are guaranteed by the FHA and hence the U.S. Federal Government, but for the private label reverse mortgage, there is no such guarantee. The lender providing the draws for private-label mortgages, usually a mortgage bank, is typically a less financially stable source of future funding than the FHA.

22. By contrast, Ginnie Mae does not guaranty individual un-pooled/un-securitized HECM loans or loan Participations at all. Rather, Ginnie Mae guarantees payments on *securities* that are backed by a pool of HECM loan Participations.[45] Thus, once Participations have been pooled/securitized, Ginnie Mae provides a guaranty of payment for the resulting HMBS security.[46] As explained in a 2019 Congressional Budget Office report entitled *The Role of the Federal Housing Administration in the Reverse Mortgage Market*, "Ginnie Mae guarantees that investors who buy HMBSs will receive payments of principal and interest on the securities in a timely manner, supplementing FHA's guarantee against default on the underlying reverse mortgages."[47] The Ginnie Mae guaranty is hence geared towards securities investors, not individual HECM borrowers, and Ginnie Mae is not guaranteeing in any sense un-pooled/un-securitized Participations, including the un-pooled/un-securitized Tails at issue in this case.

---

[45] "Home Equity Conversion Mortgage-Backed Security (HMBS) Program," Ginnie Mae, accessed December 12, 2024, https://www.ginniemae.gov/products_programs/Pages/hmbs_program.aspx ("Rather, Ginnie Mae is the guarantor of securities issued by approved lenders who participate in our programs.").

[46] "Overview of Ginnie Mae Guaranty Agreement Key Components Transcript," Ginnie Mae, accessed December 13, 2024, https://www.ginniemae.gov/issuers/issuer_training/Documents/overview_ginnie_mae_guaranty_agreement_key_components.pdf, p. 4 ("Ginnie Mae's guaranty, which is applicable with respect to all Ginnie Mae MBS and Home Equity Conversion Mortgage-Backed Securities (HMBS), is included in the terms of each uncertificated Ginnie Mae MBS and appears on the face of each certificated Ginnie Mae MBS. The Ginnie Mae guaranty ensures that the security holder receives the timely payment of scheduled monthly principal and any unscheduled recoveries of principal on the underlying mortgages, plus interest at the rate provided for in the securities."); "Housing Finance Reform Plan," U.S. Department of Housing and Urban Development, March 27, 2019, https://home.treasury.gov/system/files/136/HUD-Housing-Finance-Reform-Plan-September-2019.pdf, p. 6 ("[Ginnie Mae] effectuates its mission by providing a full faith and credit of the United States guaranty of the timely payment of principal and interest to security holders of MBS backed by pools of mortgages insured or guaranteed by federal agencies […]").

[47] "The Role of the Federal Housing Administration in the Reverse-Mortgage Market," Congressional Budget Office, May 2019, https://www.cbo.gov/system/files/2019-05/55247-ReverseMortgages.pdf, p. 9.

## II.C.  TCB's Facility With RMF

23. HMBS issuers, like RMF, typically need Tail financing to support additional draws made by borrowers subsequent to their initial draws.[48]  In other words, HECM borrowers could be prevented from drawing on their HECM line of credit if Tail financing were constrained, a point that Ginnie Mae's then-President Alanna B. McCargo made in an email to HUD colleagues on March 1, 2023:

> To be clear, tail financing is what is used to fund borrower draws, this is the liquidity we have been discussing recently which is at risk in the future and why we are so focused on payment capabilities and legal authority for FHA since these issuers may not be in default with Ginnie Mae yet. The objective is to ensure that these issues in the industry (systemic) don't become huge problems for seniors who are in the program expecting funding on agreed upon terms. It is crucial we devise a construct for future events that can be quickly operationalized and protects our interests and consumers.[49]

24. At the time of its bankruptcy, RMF had various financing facilities with TCB, including warehouse, buyout, and Tail facilities.[50]  RMF's Tail facility with TCB was documented in the Fifth Amended and Restated Tail Agreement between RMF and TCB, entered into on August 26, 2021 (along with prior versions, the "Tail Agreement").[51]  Relevant for this matter, the Tail Agreement defined "HECM Tail" as follows:

> the aggregate of any additional amounts, including but not limited to amounts created by additional draws by the Obligor, interest accruals, mortgage insurance premiums, fees, or charges, which accrue, are disbursed, or are added to the

---

[48]  Edward J. Szymanoski, Alven Lam, and Christopher Feather, "Financial Sustainability and the Home Equity Conversion Mortgage: Advancing Fiscal Soundness and Affordable Financing for Senior Homeowners," in "Cityscape," *A Journal of Policy Development and Research* 19(1) (2017), p. 57 ("The HMBS dual cashflow required funding each time the borrower drew cash from his or her housing wealth.).

[49]  "RE: FAR's conversation with TCB today," Email from Alanna McCargo (HUD), March 1, 2023, HUD-0011690, at -690.

[50]  First Day Declaration, ¶ 41 (Table listing the company's capital structure).

[51]  "Second Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing; (II) Authorizing Certain Debtors' Use of Cash Collateral; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief," in re: *Reverse Mortgage Investment Trunk Inc, et al.*, Case No. 22-11225 (MFW) ("Second Interim Order"), December 8, 2022, HUD-0001276, at -379–418.

balance of a previously-securitized HECM Loan after the closing date of any prior securitization of the HECM Loan or any prior HECM Tail related thereto.[52]

The Tail Agreement between RMF and TCB further defined "HECM Tail Collateral" to mean "HECM Tails, together with any instruments or certificates representing any HECM Tails, including, without limitation, the related HECM Loans and HECM Notes."[53]

## II.D.   RMF Files For Bankruptcy And Requires DIP Financing

25. In the fall of 2022, the entire mortgage industry was under significant financial strain due to the large increase in interest rates that occurred throughout 2022.[54]  The increase was both in long-term U.S. Treasury interest rates, which caused an increase in the forward and reverse mortgage rates to consumers, and also in short-term interest rates, which raised the funding costs for mortgage bankers.[55]  The volume of mortgage originations fell for both forward and reverse

---

[52] "Second Interim Order," December 8, 2022, HUD-0001276, at -386.

[53] "Second Interim Order," December 8, 2022, HUD-0001276, at -386.

[54] First Day Declaration, ¶¶ 12 ("Adverse trends in the reverse mortgage industry, principally caused by an increasing interest rate environment and the reduction of the Federal Reserve's holdings of mortgage-backed securities (totaling approximately $49 billion over the past 12 weeks), have negatively impacted the financing market for these loans and created a perfect storm that caused the Company's business model to become unsustainable.") and 73 ("Traditional Forward Mortgage Loan interest rates have increased significantly over the course of 2022.  The chart below published by Freddie Mac shows a drastic increase in average 30-year fixed mortgage interest rates to 6.95% in November 2022, the highest average rate since 2008."); "FW: From National Mortgage News Ginnie Mae seizing assets from Reverse Mortgage Funding," Email from Douglas Robinson (HUD), December 22, 2022, HUD-0001621, at -623 ("The unraveling of the liquidity in the reverse space began with non-agency products, which lost liquidity first and foremost as the Fed raised interest rates hundreds of basis points, widened spreads and boosted volatility 2x.  This added to pressure on the liquidity of RMF and the industry as a whole.").

[55] Jeff Cox, "Fed approves 0.75-point hike to take rates to highest since 2008 and hints at change in policy ahead," CNBC, November 2, 2022, https://www.cnbc.com/2022/11/02/fed-hikes-by-another-three-quarters-of-a-point-taking-rates-to-the-highest-level-since-january-2008.html ("In a well-telegraphed move that markets have been expecting for weeks, the central bank raised its short-term borrowing rate by 0.75 percentage point to a target range of 3.75%-4%, the highest level since January 2008. […] At the same time, housing demand has plunged as 30-year mortgage rates have soared past 7% in recent days.").

First Day Declaration, ¶ 12 ("Adverse trends in the reverse mortgage industry, principally caused by an increasing interest rate environment and the reduction of the Federal Reserve's holdings of mortgage-backed securities (totaling approximately $49 billion over the past 12 weeks), have negatively impacted the financing market for these loans and created a perfect storm that caused the Company's business model to become unsustainable. […] This decline led the Company to recently pause all new originations.").

mortgage bankers as rates rose,[56] and consumers found it increasingly difficult to afford the higher mortgage rates for new mortgages.[57]

26. For RMF and other reverse mortgage bankers, the increasing rate environment was particularly difficult to manage because RMF was affected both in terms of lower originations—not enough volume to cover the expenses of operating—and in terms of the higher financing costs of holding mortgages on their balance sheet while awaiting the assets' securitization or sale.[58]

27. As of October 31, 2022, RMF was the largest servicer of reverse mortgages in the U.S. with a HECM servicing portfolio of $21.37 billion.[59] RMF's HECM servicing portfolio was largely an aged servicing portfolio, because RMF had purchased several servicing portfolios over the years, including the most recent servicing acquisition from American Advisors Group ("AAG") in 2021.[60] In acquiring servicing portfolios, RMF was not only acquiring assets but also assuming

---

[56] First Day Declaration, ¶ 12 ("In this environment, the Company experience slow loan origination volume (with HECM Loan origination volumes declining 66.1% year-over-year in September 2022) and reduced profitability on HMBS securitizations (including a 45.3% year-over-year decline for first participation HMBS gain-on-sale in September 2022).");  "FW: From National Mortgage News Ginnie Mae seizing assets from Reverse Mortgage Funding," Email from Alanna B. McCargo (HUD), December 22, 2022, HUD-0001621, at -623.

[57] *See* "Why Are Mortgage Rates Going Up?" Forbes, November 1, 2022, https://www.forbes.com/sites/qai/2022/10/31/why-are-mortgage-rates-going-up/ ("Mortgage rates have increased dramatically, with the average 30 year fixed rate increasing from around 3% at the start of 2022 to around 7% now. […] Would-be homeowners are facing monthly mortgage repayments hundreds of dollars higher than just a few months ago, which is likely to mean purchase timelines are pushed back. […] It's no wonder that potential new home owners are having second thoughts on whether they can afford to buy.").

[58] First Day Declaration, ¶ 79 ("For the twelve months ending September 30, 2022, the Debtors generated $28.8 million after-tax net loss. The Company's origination volume has significantly decreased, from 767 total loans originated or otherwise acquired in the month of October 2021 to 589 in September 2022.");  "FW: From National Mortgage News Ginnie Mae seizing assets from Reverse Mortgage Funding," Email from Alanna B. McCargo (HUD), December 22, 2022, HUD-0001621, at -623.
Letter from Craig Corn (Reverse Mortgage Funding LLC), November 25, 2022, HUD-0001022, at -022 ("At this time, the existing shareholders, investors and lenders have lost hundreds of millions of dollars, with equity positions and loans potentially entirely impaired if Ginnie Mae is unwilling to take on a substantial portion of the servicing obligations in the MSR portfolio, which currently represents ~40% of the industry's HECM buyouts and Tail financings.").

[59] First Day Declaration, ¶ 68 ("The Company is the largest servicer of owned Mortgage Servicing Rights in the reverse mortgage industry. As of October 31, 2022, RMF managed reversed mortgage loans with an unpaid principal balance of approximately $25.57 billion.").

[60] First Day Declaration, ¶ 30 ("As part of the Company's growth strategy, the Company purchased mortgage servicing rights assets from several major reverse mortgage lenders, including, among others, Sun West Mortgage Company, Inc. (in 2015), James B. Nutter & Co. (through a series of transactions from 2017 to 2018), Live Well Financial, Inc. (through a series of transactions in 2018 and 2019) and American Advisors Group (AAG) in 2021).").

responsibilities associated with being a Ginnie Mae-approved issuer and with owning the acquired assets—the ownership of a servicing asset and the related issuer responsibilities are tied together.[61]

28. HMBS issuers' servicing responsibilities are broad and include certain operational responsibilities. From a financial perspective, though, an issuer's responsibilities mostly come down to: a) the responsibility to fund the Tails on HECM loans as borrowers draw on their available lines of credit, and b) the responsibility to buy out loans from securitized pools when the HECM loans exceed 98% of a specified Maximum Claim Amount ("MCA").[62] Buying out mortgages that are equal to or greater than 98% of the MCA is one of the main obligations for an issuer of HMBS securities.

29. On November 30, 2022, RMF filed for Chapter 11 bankruptcy, stopped originations and laid off approximately 500 employees.[63] As set forth below, my understanding is that the causes of

---

[61] Letter from Alanna McCargo (Ginnie Mae), November 26, 2022, HUD-0001019, at -019–020 ("For examples, RMF made the business decision to purchase American Advisors Group's portfolio and determined, at that time, it was aware of the loan characteristics and capable of managing this type of portfolio. RMF agreed that it would handle and meet the obligations for the entire portfolio, not just a subset of it. It is RMF's responsibility to find an orderly solution to its upcoming purchase obligations. […] Pursuant to the Guaranty Agreement and Chapter 35 of the MBS Guide, RMF has purchase and payment obligations it must meet.").

[62] Buyout loans come in two types: Assignable Buyout Loans ("ABOs") are loans that are bought out of the related Ginnie Mae security and can be assigned to HUD to claim the insurance. A rule of thumb in the industry is that ABOs make up approximately 85% of the required buyouts. For a buyout loan to qualify for assignment to HUD, the loan must be "active," which means that the borrower is still living in the home and is current on all taxes, insurance and required repairs. Non-assignable Buyout Loans ("NABOs") are loans that are bought out of Ginnie Mae securities because the unpaid principal balance ("UPB") of the loan is greater than or equal to 98% of the MCA, but the loan is "inactive," meaning that the borrower is deceased or is in default on his or her taxes, insurance or required repairs, or the property is in some form of default. The mortgage banker will need to resolve the event of default or work through resolving the loan through the estate of the borrower before the loan can be assigned to HUD for payment.

[63] First Day Declaration, ¶¶ 15 ("Accordingly, on November 30, 2022 (the 'Petition Date'), each of the Debtors filed a voluntary petition for relief in the United States Bankruptcy Court for the District of Delaware (the 'Court') to facilitate an orderly transition of the assets and implement a wind-down plan to preserve value for all the Company's stakeholders.") and 29 ("Given the Company's situation, the Company made the difficult decision to reduce its operational workforce. On November 29, 2022, approximately 472 employees were informed of their separation form the Company, and a subset were provided written notices pursuant to the Worker Adjustment and Retraining Notification (WARN) Act.").

RMF's bankruptcy are multi-faceted, and include, among other things, the burden of buyout obligations associated with RMF's acquisition of the AAG servicing portfolio in 2021.[64]

30. *RMF's deteriorating financial condition:* for the twelve months ending September 30, 2022, RMF had incurred a loss of $28.8 million.[65]  Per RMF's balance sheet, Member's Equity had fallen to $327.5 million by September 30, 2022,[66] and the company only had $55.2 million in cash on hand at the end of that month.[67]  As of the end of November 2022, the amount of cash available to RMF had fallen to $11 million.[68]  Available liquidity is the most important fact in the survival of a mortgage company.  If a mortgage company cannot fund its obligations to consumers, lenders, vendors or investors, it will need to seek bankruptcy protection to continue operating.  In the fall of 2022, RMF's liquidity was barely above the liquidity requirements of its lenders and of Ginnie Mae,[69] and by November 2022, RMF's liquidity had fallen even further.[70]

---

[64] First Day Declaration, ¶¶ 30 and 80–94 ("Furthermore, the Company forecasts that it will incur approximately $2.1 billion in Buyout obligations over the next twelve months, and a total of approximately $13.8 billion in Buyout obligations over the next seven years. According to the Company's projections, the Company does not have sufficient capacity in its warehouse facilities to fund the increases in its Buyout obligations over the next twelve months or the liquidity to address the obligations.").

[65] First Day Declaration, ¶ 79 ("For the twelve months ending September 30, 2022, the Debtors generated a $28.8 million after-tax net loss.").

[66] "Condensed Consolidated Financial Statements, As of September 30, 2022 and the Three and Nine-Month Periods Ended September 30, 2022," Reverse Mortgage Funding LLC, TCB000000001537, at -552 ("TOTAL MEMBER'S EQUITY [in thousands:] 327,523").

[67] "Condensed Consolidated Financial Statements, As of September 30, 2022 and the Three and Nine-Month Periods Ended September 30, 2022," Reverse Mortgage Funding LLC, TCB000000001537, at -552 ("Cash [in thousands:] 55,246").

[68] "Condensed Consolidated Financial Statements As of November 30, 2022 and for the One-Month Period Ended November 30, 2022," Reverse Mortgage Funding, LLC, p. 2 ("Cash [in thousands:] 11,285").

[69] "Exhibit C: Compliance Certificate," Reverse Mortgage Funding LLC, TCB000000001537, at -597 ("TOTAL ELIGIBLE LIQUID ASSETS [amounts in 000s]: 45,404 [and] Required minimum Ginnie Mae Required Liquid Assets (pursuant to the Agreement) [amounts in 000s]: 44,616.").

[70] "Condensed Consolidated Financial Statements As of September 30, 2022 and for the One-Month Period Ended September 30, 2022," Reverse Mortgage Funding, LLC, p. 2 ("Cash [in thousands:] 55,246"); "Condensed Consolidated Financial Statements As of October 31, 2022 and for the One-Month Period Ended October 31, 2022," Reverse Mortgage Funding, LLC ("Cash [in thousands:] 19,682"); "Condensed Consolidated Financial Statements As of November 30, 2022 and for the One-Month Period Ended November 30, 2022," Reverse Mortgage Funding, LLC, p. 2 ("Cash [in thousands:] 11,285").

31. *Adverse fixed income market conditions:* interest rates had increased significantly over 2022 and showed no signs of bottoming out.[71] This environment negatively affected all mortgage bankers and translated into a reduction in credit and in margin calls from mortgage industry lenders on collateral that had fallen in value.[72]

32. *The large near-term and long-term buyout obligations coming due for RMF as a Ginnie Mae HMBS Issuer:* in November 2022, RMF was due to buy out $144 million of HECM loans from Ginnie Mae securitized pools.[73] The $144 million that had to be bought out of Ginnie Mae securitized pools in November 2022 were the HECM loans serviced by RMF that had principal balances that were accreting in November to be equal to or greater than 98% of the MCA.[74] Furthermore, RMF was projected to be required by Ginnie Mae to buy out $2.1 billion over the following twelve months.[75] As explained above, buying out mortgages from Ginnie Mae that are equal to or greater than 98% of the MCA is one of the main obligations of an HMBS issuer. Because of the rise in interest rates, every loan bought out would likely be at a loss to RMF. Consequently, capital markets investors that may have been open to injecting capital or providing additional loans and liquidity to RMF in normal circumstances were unwilling to do

---

[71] First Day Declaration, ¶¶ 12 ("Adverse trends in the reverse mortgage industry, principally caused by an increasing interest rate environment […]"), and 71–78 ("The current environment, such as rapid interest rate increases and the sale of agency mortgage-backed securities from the Federal Reserve's balance sheet, has brought continued volatility and challenges in markets affecting the reverse mortgage industry.").

Jeff Cox, "Fed approves 0.75-point hike to take rates to highest since 2008 and hints at change in policy ahead," CNBC, November 2, 2022, https://www.cnbc.com/2022/11/02/fed-hikes-by-another-three-quarters-of-a-point-taking-rates-to-the-highest-level-since-january-2008.html ("Economists are hoping this is the much talked about 'step-down' in policy that could see a rate increase of half a point at the December meeting and then a few smaller hikes in 2023.").

[72] *See, e.g.*, First Day Declaration, ¶ 96 ("The Company has also defaulted on margin calls in connection with the CS Securities REPO (RMF) Facility, the Barclays Warehouse Facility, and the Nomura Warehouse Facility.").

[73] First Day Declaration, ¶ 82 ("The Company's Buyout obligations for November 2022 were approximately $144 million […]").

[74] First Day Declaration, ¶ 9 ("As the holder of the HECM Loans' mortgage servicing rights, the Company is obligated, per Ginnie Mae requirements, to purchase the participations from their related securitization pools once the balance of a given HECM Loan equals or exceeds 98% of the Maximum Claim Amount.").

[75] First Day Declaration, ¶ 82 ("Furthermore, the Company forecasts that it will incur approximately $2.1 billion in Buyout obligations over the next twelve months […]").

so, and the only option available for RMF and its affiliates was to file for bankruptcy protection.[76]

33.  During the period from December 1 to December 8, 2022, RMF was in a race to find solutions while in bankruptcy to continue operations as a company.[77]  Ginnie Mae was willing to forbear terminating RMF's issuer status and seizing RMF's servicing portfolio until December 19, 2022, to give RMF's management time to find a buyer for the company or the servicing portfolio.[78]

---

[76]  Letter from Craig Corn, (Reverse Mortgage Funding LLC), November 25, 2022, HUD-0001022, at -022 ("RMF's enormous efforts to respond to the changing market environment has included outreach to many participants in the reverse mortgage industry as well as potential new entrants and large institutions that have resources available to finance RMF's impending buyout obligations.  The market feedback has been clear and swift: no party is able or willing to bear the buyout obligations on the scale that the industry (and RMF) will be required to bear in the coming twelve and twenty-four months. […] At this time, we believe a bankruptcy of RMF is imminent and we believe that the only path to a successful reorganization would include a commitment from Ginnie Mae to assume the servicing of a substantial portfolio of RMF's MSR portfolio.")

First Day Declaration, ¶ 15 ("Accordingly, on November 30, 2022 (the 'Petition Date'), each of the Debtors filed a voluntary petition for relief in the United States Bankruptcy Court for the District of Delaware (the 'Court') to facilitate an orderly transition of the assets and implement a wind-down plan to preserve value for all of the Company's stakeholders.").

[77]  *See, e.g.*, "Amended Disclosure Statement for the Joint Chapter 11 Plan of Liquidation for Reverse Mortgage Investment Trust Inc. and Its Debtor Subsidiaries," in re: *Reverse Mortgage Investment Trust Inc., et al.*, Case No. 22-11225 (MFW), March 22, 2023, p. 28 ("The Debtors commenced these Chapter 11 Cases on November 30, 2022. On December 2, 2022, the Debtors filed the *Debtors' Motion for Entry of Interim and Final Orders, Pursuant to Sections 105, 361, 362, 363, 364, and 507 of the Bankruptcy Code, (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors' Use Cash Collateral, (III) Granting Adequate Protection, and (IV) Granting Related Relief* [Dkt. No. 46] (the 'Initial DIP Motion') requesting authority to enter into the DIP Facility and requesting a hearing on December 5, 2022, for approval of the financing necessary to fund the consumer payments.  On December 5, 2022, the Bankruptcy Court entered an order authorizing the Debtors to enter into the DIP Facility on an interim basis [Dkt. No. 115].  Later that day, the Debtors filed the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Granting Liens and Superpriority Claims, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [Dkt. No. 78].  On December 8, 2022, the Bankruptcy Court entered a second interim order approving the DIP Facility on an interim basis [Dkt. No. 170] (the 'Second Interim DIP Order', and the DIP facility contemplated thereby, the 'Joint DIP Facility').") (emphasis in original).

[78]  Ginnie Mae Certification of Administrative Record, Volume 4, at A.R. 585 ("A critical Ginnie Mae financial obligation is passing through payments to the security holders on December 20th. […] Given RMF's and Parties' continued work on meeting all Ginnie Mae's and FHA's requirements as set forth above, Ginnie Mae would continue to forbear on termination prior to the pass-through date.").

CONFIDENTIAL

34. During the period from November 30 to December 9, 2022, draws of RMF's HECM borrowers on their lines of credit were not being advanced by RMF.[79] Seniors who relied on the ability to timely draw on their open HECM lines of credit, guaranteed by the FHA, were unable to get access to those funds. Indications from HUD were that more than 5,069 borrowers with a total of over $5.7 million of draw requests had not been funded in this period.[80] An internal HUD memorandum states that "FHA and Ginnie Mae are working to ensure that the 5,069 seniors who haven't yet received their payments receive them as soon as possible."[81] The same HUD memorandum further states that "FHA is evaluating with counsel whether there are permitted alternative processes that could expedite the payment process should FHA be required to make the payments to borrowers. […] FHA and Ginnie Mae are reviewing available alternatives to distribute payments to the impacted borrowers as soon as possible. […] A phone call is scheduled for Sunday morning to debrief on the state of bankruptcy and financing negotiations, especially whether RMF expects receive approval for funding of the overdue borrower draws. […] FHA will continue to prepare for the possibility that it must step in to facilitate payment of disbursements to borrowers and will continue to explore means to most expediently deliver those payments."[82]

---

[79] "Fwd: < External Message > RE: Status of unscheduled draw payments," Email from Sam Valverde (HUD), December 7, 2022, HUD-0003771, at -771 ("We have 453 borrowers with unscheduled advances on or before 11/29 (all considered pre-petition loans) totaling $4,035,580.80, that have not been paid. We are working with TCB to attempt to fund asap […]"); "RE: RMF Transfer Stipulation," Email from Mary Schmergel (DOJ), December 7, 2022, HUD-0000942, at -944 ("We understand that there are significant MIPs currently owed to the FHA and that over $4mm failed to be paid to borrowers who made unscheduled payment requests prior to the Petition Date."); "Re: Reverse Mortgage Funding (RMF) Update," Internal Briefing Memorandum from Secretary Fudge to Alanna McCargo (Ginnie Mae), Julia Gordon (Ginnie Mae), December 3, 2022, HUD-0004819, at -819 ("Due to RMF's liquidity shortfall, approximately 5,069 seniors that were due a HECM payment on Thursday, December 1, 2022, did not receive their payment. The total undelivered payments outstanding totals $5,698,465.85.").

[80] "Re: Reverse Mortgage Funding (RMF) Update," Internal Briefing Memorandum from Secretary Fudge to Alanna McCargo (Ginnie Mae), Julia Gordon (Ginnie Mae), December 3, 2022, HUD-0004819, at -819 ("Due to RMF's liquidity shortfall, approximately 5,069 seniors that were due a HECM payment on Thursday, December 1, 2022, did not receive their payment. The total undelivered payments outstanding totals $5,698,465.85.").

[81] "Re: Reverse Mortgage Funding (RMF) Update," Internal Briefing Memorandum from Secretary Fudge to Alanna McCargo (Ginnie Mae), Julia Gordon (Ginnie Mae), December 3, 2022, HUD-0004819, at -820.

[82] "Re: Reverse Mortgage Funding (RMF) Update," Internal Briefing Memorandum from Secretary Fudge to Alanna McCargo (Ginnie Mae), Julia Gordon (Ginnie Mae), December 3, 2022, HUD-0004819, at -820–822.

35. On December 8, 2022, the bankruptcy court approved a DIP financing plan for RMF.[83]  As part of the DIP financing plan, TCB was willing to provide up to $80 million in DIP Tail financing to RMF, to allow for the funding of Tail participations, which would finance the draws for RMF's HECM borrowers.[84]

36. On December 9, 2022, TCB entered into a Participation Agreement with Longbridge Financial LLC ("Longbridge") (the "Participation Agreement"), in which Longbridge agreed to fund a 5% subordinate Participation in Tail advances that RMF had made after its bankruptcy filing.[85]  Of the financing provided, TCB agreed to fund 95% and Longbridge agreed to provide a junior financing of the final 5%.[86]

37. Also on December 9, 2022, TCB commenced providing DIP funding for Tails for RMF.[87]  I understand from Counsel that per the applicable DIP Order: a) all new advances under the DIP Tail Advances were secured by priming, first priority valid, perfected enforceable and unavoidable liens on, and security interests in the existing collateral securing the obligations under the Existing Loan Agreement, and b) pre-petition Tail loans were granted first priority valid, perfected, enforceable and unavoidable liens on certain of the debtors' unencumbered assets, and also granted a replacement lien on the DIP collateral, including Tails.  Accordingly, my understanding is that TCB's collateral for its pre-petition and post-petition Tail loans included the Tails at issue in this case, which have not been pooled/securitized.  A total of $28.7 million of Tail advances was funded from December 9 to December 15, 2022, of which $27.3

---

83   "Second Interim Order (1) Authorizing the Debtor to Obtain Postpetition Financing: (II) Authorizing Certain debtors' Use of Cash collateral; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief," in re: *Reverse Mortgage Investment Trust Inc, et al.*, Case No. 22-11225 (MFW) ("Second Interim Order"), December 8, 2022, HUD-0001276, at -290–294.

84   Second Interim Order, HUD-0001276, at -366 ("TCB shall provide a priming first priority senior secured debtor-in-possession short term loan facility (the 'DIP Tail Facility') to the Debtors of up to $80,000,000 (the 'DIP Tail Advances') on terms consistent with the Existing Tail Loan Agreement, as modified herein.").

85   "Participation Agreement," Texas Capital Bank, TCB000000000308, at -309 ("Subject to the terms and conditions of this Agreement, Seller [TCB] hereby sells and Buyer [Longbridge] hereby purchases a five percent (5%) *pro rata* undivided interest (the 'Participation Interest') in DIP Tail Advances made by the Seller under the Facility Documents, up to aggregate DIP Tail Advances made by the Seller under the DIP Tail Facility not to exceed $80,000,000.") (emphasis in original).

86   "Participation Agreement," Texas Capital Bank, TCB000000000308, at -310.

87   TCB000000006211 ("Tail Summary" tab).

million was funded by TCB and $1.4 million was funded by Longbridge pursuant to the Participation Agreement.[88]

38. Longbridge ultimately decided not to go forward with the purchase of the RMF Mortgage Servicing Rights portfolio.[89]

## II.E.   Ginnie Mae Extinguishes RMF's Rights And Seizes Portfolio

39. On December 20, 2022, Ginnie Mae issued a letter notifying RMF of the immediate default, termination and extinguishment of RMF as a Ginnie Mae HMBS issuer.[90]  The letter, by its terms, "complete[d] the extinguishment of any redemption, equitable, legal or other right, title or interest of RMF in the Mortgages, the related Ginnie Participations and any Other Interests pooled under each and every Guaranty Agreement."[91]  The collateral at issue in this case securing TCB's Tail financing with RMF comprises Tail Participations that had not yet been pooled/securitized, and therefore not under the purview of Ginnie Mae; as such, those Tails do not appear to be covered under the language in the letter.

40. Ginnie Mae publicly described its seizure of RMF's HMBS portfolio as follows: "the increased pressures on the reverse mortgage sector resulted in the bankruptcy of a large issuer and Ginnie

---

[88]  TCB000000006211 ("Tail Summary" tab).

[89]  Chris Chow, "Longbridge scoops up big MSR portfolio from RMF bankruptcy," HousingWire, July 6, 2023, https://www.housingwire.com/articles/longbridge-scoops-up-big-msr-portfolio-from-rmf-bankruptcy/ ("Following the bankruptcy of RMF in late 2022, Longbridge was named as a potential buyer of certain RMF MSR assets, but the deal did not initially materialize.").

[90]  Email from Nathan Shultz, December 20, 2022, HUD-0000530, at -530 ("Ginnie is going th [sic] to seize the portfolio, extinguish RMF's rights to the loans, and take over servicing (through Celink)."); "FW: Immediate Default Letter," Email from Rene Mondonedo (Ginnie Mae), December 20, 2022, HUD-0001642, at -642 ("The letter went out.  Waiting for acknowledgement."); "Re: Notice of Violation – Immediate Default, Termination, and Extinguishment Reverse Mortgage Funding LLC, Issuer #4277," Letter from Rene Mondonedo (Ginnie Mae), December 20, 2022, HUD-0001643, at -644 ("Pursuant to Chapter 23, Part 3 of the Guide and Article X, Section 10.04 and 10.05 of the Guaranty Agreements, upon such default by RMF, Ginnie Mae is entitled to terminate RMF's authority to act as a Ginnie Mae Issuer, and to complete the extinguishment of any redemption, equitable, legal or other right, title, or interest of RMF, or anyone claiming through RMF, in the mortgages or related interests in pools or loan packages for which RMF has Issuer responsibility ('Termination and Extinguishment')").

[91]  "Re: Notice of Violation – Immediate Default, Termination, and Extinguishment Reverse Mortgage Funding LLC, Issuer #4277," Letter from Rene Mondonedo (Ginnie Mae), December 20, 2022, HUD-0001643, at -644.

Mae's seizure of its reverse MBS portfolio. […] Ginnie Mae extinguished RMF from the HMBS program and seized and assumed control of the servicing of RMF's HMBS portfolio […] Upon seizure of the defaulted portfolio, Ginnie Mae assumed all obligations to the HMBS investors and all servicing responsibilities, stepping into the role of issuer."[92]

41. Based on the documents I reviewed, from December 20, 2022 to March 9, 2023, there were a series of conversations and meetings between TCB, Ginnie Mae, Celink (the subservicer servicing the HECM loans originally issued by RMF) and the remaining management at RMF regarding the Tail financings that TCB had made.[93]  In March 2023, Celink informed RMF and TCB that "[a]ll funds on the unsecured balances have been sent to GNMA as part of the portfolio seizure."[94]  In other words, as borrowers paid off their HECM loans, those payments were going solely to Ginnie Mae, including funds related to un-pooled/un-securitized Tail Participations that Ginnie Mae had never insured.  Subsequent internal communications between RMF personnel noted that "[t]his should infuriate TCB,"[95] and "[t]hat is a disaster, and really effed up."[96]

42. I understand from Counsel and based on documents I have reviewed that on or around March 9, 2023, Ginnie Mae told TCB for the first time that, in Ginnie Mae's view, TCB had no right to the proceeds from the monetization of the DIP collateral.[97]

---

[92]  "2023 Annual Report," Ginnie Mae, https://www.ginniemae.gov/about_us/what_we_do/Annual_Reports/annual_report23.pdf, pp. 5 and 13.

[93]  "RE: GNMA HMBS tails," Email from Aric Crouch (Texas Capital Bank), February 15, 2023, TCB000000000208, at -208–210 ("I had a good conversation with Marion (CEO of Celink) just now and they've submitted a plan to GNMA to assist with the tail securitizations."); "Onsite Visit to GNMA," Texas Capital Bank, TCB000000007688, at -688; "[EXTERNAL] Ginnie Mae mtg. w/Texas capital Bank," Email From Laura Fleischer (HUD), January 27, 2023, TCB000000015734, at -734; see also, Texas Capital Bank Presentation, January 27, 2023, TCB000000015736, at -736–751.

[94]  "RE: Tail proceeds," Email from Amy Morrill (Celink), March 3, 2023, TCB000000007914, at -914.

[95]  "FW: Tail proceeds," Email from Brian Keena (Reverse Mortgage Funding LLC), March 3, 2023, TCB000000007914, at -914.

[96]  "RE: Tail proceeds," Email from Craig Corn (Reverse Mortgage Funding LLC), March 3, 2023, TCB000000007914, at -914.

[97]  "Texas Capital Bank: Response to March 9, 2023 Conversation," Email from Madison Simm (Texas Capital Bank), March 16, 2023, TCB000000007896, at -896; Letter from Madison Simm (Texas Capital Bank), March 16, 2023, TCB00000007897, at -899–900 ("Ginnie Mae also may have intimated that TCB and Longbridge have no right to the proceeds from the monetization of the DIP Collateral. […] The failure of Ginnie Mae and FHA to recognize and support TCB's interests in the DIP Collateral may have far-reaching and counterproductive consequences.").

43. As I explain in **Section III.C** below, Ginnie Mae continues to receive funds resulting from its seizure of the un-pooled/un-securitized Tails that TCB funded.

# III.   OPINIONS

44. In this section, I provide opinions about the distinction between un-securitized Tail Participations and pooled mortgages, as well as an assessment of relevant cash flows from November 1, 2022, through September 2024, and of TCB's monetary damages due to Ginnie Mae's actions.  I also provide an opinion about FHA's role to fund HECM borrowers' draws if a lender is unable or unwilling to do so.

## III.A.   Un-securitized Tails Are Distinct From Pooled Mortgages And Not Derivative Of Pooled Mortgage Participations

45. Both securitized Participations and un-securitized Tail Participations are derivative of the underlying HECM loans, but, importantly, they are not derivative of each other.  They are distinct from each other in their economics and how the market handles their financing.  Furthermore, as explained in more detail below, Ginnie Mae is only paid to provide a guaranty for pooled/securitized Participations.  Ginnie Mae does not guarantee the cash flow and has no funding obligation for un-pooled/un-securitized Tail Participations.  This is one reason it would not make sense for Ginnie Mae to claim rights to the un-pooled/un-securitized Tail Participations' cash flows.

46. As illustrated in **Figure 1** above, a HECM loan encompasses the entire principal balance up until the principal limit, including the initial draw at origination and each subsequent draw or other additions to the principal balance, such as the MIP payment or other payments that the issuer funds on the borrower's behalf.  When borrowers make draws on their HECM loans, the draw is initially un-pooled/un-securitized.  To reiterate, pooling and securitization are interchangeable and refer to the act of adding multiple Participations together and turning the aggregate pool into a security.  Researchers at HUD explained in a publication that:

Issuers securitized individual borrower draws, termed *participations* in the HMBS program.  Through participations, only part of the HECM loan was securitized.  Because of this technique, issuers were able to pool components of whole HECM loans.  As a result, HMBS pools had a 'one-to-many relationship' with one HECM loan having many participations in various HECM-backed securities. […]  Such pooling with units beneath the scale of HECM whole loans gave issuers and investors the advantage of additional specificity in the securitization process and investment decisionmaking.

The participations model had numerous benefits, including targeted investment and pooling specificity. Should the borrower make additional draws on the same HECM loan, termed 'tails' in the industry, then the resulting draw **would be eligible for securitization** as a new participation to be placed into a new pool of cohorts. The securitization of tails as separate participation components was critical to the success of the HMBS program.[98]

47.  Tail Participations are not pooled/securitized by default once borrowers make an additional draw on their HECM loans; Tail Participations are Participations in the HECM loan and may be securitized into one or multiple HMBS securities.  The emphasis here is on the word "may."  There is no requirement or time limit for the securitization of a Tail.[99]  Therefore, as stated above, un-pooled/un-securitized Tails are not "pooled HECM mortgages" and are not guaranteed by Ginnie Mae.

48.  Not all Tails are eligible to be securitized.  Some Tail Participations are created after the borrower has died or no longer occupies the home.  In such cases, the HMBS issuer continues to have the obligation to fund new Tail Participations in the HECM loan, such as for servicing fees and MIPs.  However, these Tails are not eligible for securitization into new Ginnie Mae securities and are called "Non-Poolable Tails" in the industry.  In other words, even though the initial draw and any previous Tail Participations on the HECM loan would (most likely) have been securitized, the Non-Poolable Tails would remain un-pooled/un-securitized and the HMBS

---

[98]  Edward J. Szymanoski, Alven Lam, and Christopher Feather, "Financial Sustainability and the Home Equity Conversion Mortgage: Advancing Fiscal Soundness and Affordable Financing for Senior Homeowners," in "Cityscape," *A Journal of Policy Development and Research* 19(1) (2017), pp. 59–60 (internal citations omitted, emphasis added).

[99]  The issuer will typically securitize the Tails into Ginnie Mae securities and sell the resulting securitization at a gain.  Consequently, the sooner an issuer can execute the securitization and get paid back on the funds that it advanced the borrower, the better for the issuer.

issuers would still have the obligation to fund them. This fact demonstrates that the term "Tails" does not imply pooling/securitization. Rather, as explained above, "Tails" refers to Participations that originate subsequent to the initial draw Participation of the HECM loan. Some Tail Participations may have been pooled and securitized and some may not have been pooled/securitized, either because the Tail is a Non-Poolable Tail or the Tail is in the HMBS issuer's inventory, potentially being funded by a lender like TCB in advance of securitization.

49.    Prior to RMF's bankruptcy and the seizure of its assets by Ginnie Mae, Tail Participations were, in my experience, generally financeable for HECM issuers: HECM issuers' third-party financing entities, such as TCB, could rely on the underlying Tail Participation collateral to support the financing. It would be reasonable for such third-party financing entities to expect a first lien on the Tail Participation collateral and that in an event of default of the HECM issuer, the third-party financing entity would be able to liquidate the underlying Tail Participation collateral. As such, I do not see how any third-party financing entity would be comfortable financing Tail Participations going forward if Ginnie Mae can seize their collateral. Without third-party Tail financing, the HECM issuer would need to pay for the Tail fundings out of their own capital. Ginnie Mae's position that it has rights to un-pooled and un-securitized Tail Participations could thus undermine the reverse mortgage industry by limiting the availability of Tail financing and by increasing the operating capital required for issuers. Furthermore, there may be spill-over effects to the entire mortgage industry. Securitization—whether in the realm of reverse mortgages, forward mortgages, or other assets—requires that cash flow rights be separable over distinct and mutually exclusive subparts of an asset. In the reverse mortgage industry, those subparts are the Participations.

50.    In my experience, Participations—not entire HECM loans—are the relevant economic units in the reverse mortgage industry, and in my opinion, each Participation is a separate asset which is sometimes, but not always, pooled/securitized.

51.    After pooling/securitizing Participations from multiple HECM loans into a security, an HMBS issuer (such as RMF) sells the security to broker-dealers who place the securities with investors

in the secondary market.[100]  The fact that Participations may be pooled/securitized and sold separately and at different points in time, in my opinion, means that un-pooled/un-securitized Participations are separate assets from pooled/securitized Participations.  This distinction is further evidenced by the fact that securitized and un-securitized Tail Participations are accounted for separately by the issuer, and that, theoretically, un-pooled/un-securitized Tail Participations could be sold to a third party by the issuer (but this is typically not done since such Participations would likely be sold at a discount).  Furthermore, un-pooled/un-securitized Participations have a different risk/reward profile than pooled/securitized Participations.[101]  For example, part of the reason Participations from multiple HECM loans are pooled/securitized into HMBS securities is to mitigate the risk of individual Participations through diversification of the pool.[102]  The risk/reward relationship for an individual HECM Participation is hence different from a pool containing the same Participation along with Participations from other HECM loans.

52.  Finally, the HECM Guide appears to recognize the split between securitized HECM Participations and un-securitized Tail Participations.  As discussed above, un-securitized Tail Participations are insured by the FHA (not Ginnie Mae); by contrast, HMBS securities, consisting of securitized Participations, are guaranteed by Ginnie Mae (not the FHA).  Indeed, Ginnie Mae gets paid a guaranty fee of 6 basis points on the unpaid principal balance of all

---

[100] "Reverse Mortgages," Consumer Financial Protection Bureau, June 28, 2012, https://files.consumerfinance.gov/a/assets/documents/201206_cfpb_Reverse_Mortgage_Report.pdf, p. 74 ("After packaging a security, issuers sell the security to Wall Street broker-dealers who place the securities with investors in the secondary market.").

[101] See "Ginnie Mae Report to Congress," Ginnie Mae, November 13, 2007, https://www.ginniemae.gov/about_us/what_we_do/Reports_To_Congress/ReportToCongress07.pdf, p. 10 ("The HMBS is a new class of Ginnie Mae security backed by FHA insured HECM loans under the umbrella of the Ginnie Mae II Custom Program.  Ginnie Mae approved issuers can pool HECM loan draws, servicing fees, and mortgage insurance premium (MIP) advances, and securitize these balances into an HMBS.  The HMBS is an accrual class pass-through security.  As such, it does not have a payment schedule but rather accrues interest on the securitized principal until such time that payoffs are received.  The HMBS is sold to investors as a stand-alone security […]").

[102] See "Ginnie Mae Report to Congress," Ginnie Mae, November 13, 2007, https://www.ginniemae.gov/about_us/what_we_do/Reports_To_Congress/ReportToCongress07.pdf, p. 24 ("Generally, Ginnie Mae's MBS pools are diversified among issuer and geographic areas.  No significant geographic concentrations of credit risk exist; however, to a limited extent, securities are concentrated among issuers as noted below […]").

CONFIDENTIAL

Participations that have been securitized into HMBS securities.[103]  Ginnie Mae does not get paid or charge a guaranty fee on Tail Participations that have not yet been securitized or that are Non-Poolable.[104]  That is, of course, because Ginnie Mae is not guaranteeing those Tail Participations—they are not within Ginnie Mae's purview.  The FHA, however, gets paid a MIP on all Tail Participations outstanding, whether pooled or un-pooled.[105]  This makes sense, because the FHA insures at the *mortgage level*, and Ginnie Mae guarantees at the HMBS *security level*.[106]  In Ginnie Mae's HECM Guide, Ginnie Mae specifies that: "Issuers are required to pay a monthly guarantee fee to Ginnie Mae for each [HMBS] security for which the

---

[103]  "Chapter 35: Home Equity Conversion Mortgage Loan Pools – Special Requirements (HECM / HMBS)," Ginnie Mae, accessed September 5, 2024, https://www.ginniemae.gov/issuers/program_guidelines/Lists/MBSGuideAPMsLib/Attachments/44/Chapter_35 .pdf, p. 5 ("Issuers are required to pay a monthly guaranty fee to Ginnie Mae for each HMBS security for which the Issuer is Issuer of record. […] The monthly guaranty fee is computed based on the aggregate principal balance of the guaranteed securities outstanding at the beginning of the monthly reporting period.  The monthly rate used to compute the fee is the annual rate of .06 percent (6 basis points) divided by 12 months.").

[104]  "Government National Mortgage Association Mortgage-Backed Securities Program," U.S. Department of Housing and Urban Development, accessed December 16, 2024, https://www.hud.gov/sites/dfiles/CFO/documents/32_FY21CJ_Program_GNMA_MortgageBackedSecrities.p df, p. 2 ("Ginnie Mae, in turn and as authorized by Section 306(g) of the National Housing Act, guarantees the performance (i.e., timely payment of principal and interest) of the Issuer who issues the MBS and who continues to service and manage the underlying loans.  **In return for this guarantee on MBS securitized** by approved issuers, Ginnie Mae charges a guarantee fee.") (emphasis added).

[105]  *See* Edward J. Szymanoski, Alven Lam, and Christopher Feather, "Financial Sustainability and the Home Equity Conversion Mortgage: Advancing Fiscal Soundness and Affordable Financing for Senior Homeowners," in "Cityscape," *A Journal of Policy Development and Research* 19(1) (2017), p. 55 ("The MIP structure for HECM loans originally provided an initial MIP at 2 percent of the maximum claim amount (MCA) and 0.5 percent of MCA for the monthly MIP.  Such payments are accrued and paid by the borrower when HECM matures […]").

[106]  SP Group LLC, "Home Equity Conversion Mortgage Program Analysis," U.S. Department of Housing and Urban Development, July 2022, https://www.huduser.gov/portal/portal/sites/default/files/pdf/HECM-Report.pdf, p. 2 ("FHA ensures that, when lenders comply with all program requirements, they will usually receive the full value of the HECM loan at term regardless of property values. This insurance from FHA lowers lender risk and makes better loan terms possible.").

"Programs," Ginnie Mae, accessed December 12, 2024, https://www.ginniemae.gov/about_us/what_we_do/pages/programs_products.aspx ("Ginnie Mae is the guarantor of securities issued by approved lenders who participate in our programs."); "Funding Government Lending," Ginnie Mae, accessed December 12, 2024, https://www.ginniemae.gov/about_us/who_we_are/Pages/funding_government_lending.aspx ("Ginnie Mae securities are the only MBS to carry the full faith and credit guaranty of the United States government, which means that even in difficult times, an investment in Ginnie Mae MBS is one of the safest an investor can make.").

Issuer is Issuer of record."[107]  In my opinion, Ginnie Mae's exertion of a right over un-securitized Tail Participations is inconsistent with (1) the HECM/HMBS structure, pursuant to which those Tail Participations are not in HMBS pools, and (2) the economic reality that Ginnie Mae is not guaranteeing (and cannot guarantee) those Tail Participations.

## III.B.  TCB's Funding Resulted In Payments To HECM Borrowers; Ginnie Mae Has Since Received Payments

53.  As explained in **Section II.D**, between November 30 and December 9, 2022, RMF borrowers who were expecting draws on their lines of credit were not being advanced.  Seniors who relied on the ability to timely draw on their open HECM lines of credit, guaranteed by the FHA, were unable to get access to those funds.

54.  As also explained in **Section II.D**, a total of $28.7 million of Tail advances was funded from December 9 to December 15, 2022, of which $27.3 million was funded by TCB and $1.4 million was funded by Longbridge pursuant to the Participation Agreement, enabling seniors to draw on their HECM lines of credit.  I have analyzed the Tail advance fundings TCB provided with results discussed below.

55.  **Figure 2** shows loans for which TCB provided DIP Tail funding that have since been paid off in full.  My analysis shows that TCB provided DIP Tail funding of an aggregate of $5.8 million in December 2022 for 635 loans that have since been paid in full.  At the end of 2022, the un-securitized balance on these 635 loans was $7.6 million, and at the time the loans were paid off, the balance had grown to $19.5 million.  What this means is that Ginnie Mae has received an aggregate of $19.5 million from un-pooled/un-securitized Tails of HECM loans for which TCB provided DIP financing for a portion of those loans.

---

[107]  "Chapter 6: Fees," Ginnie Mae, accessed December 11, 2024, https://www.ginniemae.gov/doing_business_with_ginniemae/issuer_resources/MBSGuideLib/Chapter_06.pdf, p. 1.

### FIGURE 2: PAID-OFF LOANS WITH TCB TAIL FINANCING

| | Amount TCB Funded in December 2022 | Un-securitized Balance as of December 31, 2022 | Cash Received by Ginnie Mae |
|---|---|---|---|
| Total | $5,755,604 | $7,612,168 | $19,527,411 |

Source: Workpaper A.

56. **Figure 3** below shows loans for which TCB provided DIP Tail funding that were still outstanding and in "Active" status as of September 2024. TCB provided DIP funding of an aggregate of $22.4 million in December 2022 for 2,998 such loans. The aggregate balance on the un-pooled/un-securitized Tails on these loans had grown to $119.7 million by September 2024. What this means is that if the loans were paid off in September 2024, Ginnie Mae would have received an aggregate of $119.7 million from HECM loans for which TCB provided DIP financing for a portion of those loans. Alternatively, Ginnie Mae could pool, securitize, and sell these Tails for approximately $123.3 million, assuming a 3% premium achievable in securitizing the Tail Participations into Ginnie Mae securities.

### FIGURE 3: OUTSTANDING AND ACTIVE LOANS WITH TCB TAIL FINANCING

| | Amount TCB Funded in December 2022 | Un-securitized Balance as of September 2024 | Value to Ginnie Mae |
|---|---|---|---|
| Total | $22,389,366 | $119,664,486 | $123,254,420 |

Source: Workpaper B.

57. Taken together, more than 3,600 HECM borrowers benefitted from TCB's DIP Tail funding. Furthermore, TCB's DIP Tail funding contributed to both realized and yet-to-be realized cash inflows for Ginnie Mae. Although TCB incurred the cost of lending money, TCB did not receive any benefits—the benefits (including the repayment of loans) were reaped by Ginnie Mae.

58. Not only did Ginnie Mae benefit from TCB's Tail funding, Ginnie Mae also received other benefits from its seizure of RMF's portfolio. In essence, Ginnie Mae's seizure of RMF's portfolio resulted in Ginnie Mae owning cash flow-generating assets without having to incur the expenses and private financing costs of being an HMBS issuer. One benefit to Ginnie Mae can be seen in Ginnie Mae's 2023 balance sheet: the fair value of reverse mortgage loans was $19.53

billion as of September 30, 2023, while the fair value of HMBS obligations was $19.15 billion, for a net asset value of approximately $380 million.[108]  The balance on both of these accounts was zero in the prior year, suggesting that the approximately $380 million of net asset value added to Ginnie Mae's balance sheet came, at least in part, from its seizure of RMF's portfolio.

## III.C.  TCB's Damages

59.  As of December 20, 2022, the outstanding loan balance on the Tail facility TCB had provided RMF was $42.2 million.[109]  Of that balance, $27.3 million is attributable to TCB's DIP Tail funding.[110]  To date, TCB has recovered $5.9 million from the RMF estate.[111]

60.  The current outstanding balance on TCB's Tail facility amounts to approximately $36.3 million.[112]  This number represents the amount TCB would have to recover to be made whole with respect to the Tail financing as of December 2022 and does not factor in profits foregone due to Ginnie Mae's actions—TCB's opportunity cost of capital, which would have been realized had the capital been deployed elsewhere—or interest.  With respect to interest, there are (at least) three different ways in which interest could be calculated to compensate TCB for effectively lending capital to Ginnie Mae: (a) interest per the agreement between TCB and RMF; (b) interest per the agreement between TCB and RMF, with additional default interest or a "late charge" component; and (c) prejudgment interest.  I understand from Counsel that the interest per the agreement between TCB and RMF was the Wall Street Journal Prime Rate plus 0.5

---

[108]  "2023 Annual Report," Ginnie Mae, https://www.ginniemae.gov/about_us/what_we_do/Annual_Reports/annual_report23.pdf, p. A-3 ("Reverse mortgage loans, at fair value [Dollars in thousands:] 19,525,649" and "HMBS obligations, at fair value [Dollars in thousands:] 19,147,154").  Calculated as 19,525,649,000 – 19,147,154,000.

[109]  TCB000000006211 ("Tail Summary" tab).

[110]  TCB000000006211 ("Tail Summary" tab).

[111]  TCB received $4,336,697.89 on November 14, 2023 ("Statement Ending 11/30/2023," Texas Capital, TCB000000006077, at -077), $1,491,060.24 on January 19, 2024 ("Statement Ending 01/31/2024," Texas Capital, TCB000000006046, at -046), and $37,856.35 on February 6, 2024 ("Statement Ending 02/29/2024," Texas Capital, TCB000000006050, at -050).  Calculated as $4,336,697.89 + $1,491,060.24 + $37,856.35.  I understand that Counsel is not aware of any other monies that TCB has recovered from the RMF Estate.

[112]  Calculated as $42,206,617.30 - $5,865,614.48.

percentage points.[113]  Typically, in cases of default, there is an additional default interest rate component.  In my experience, a reasonable additional default interest rate component is between 4% and 6%.  In this case, the Sixth Amended and Restated Promissory Note executed between TCB and RMF stipulates "a 'late charge' equal to five percent (5%) of the amount of any installment on this Note when such installment is not paid within fifteen (15) days following the date such installment is due."[114]  Finally, the Texas prejudgment interest currently is 8.25% (up from 5% effective August 1, 2023).[115]  These rates result in interest amounts of $7.0 million, $9.5 million and $5.7 million, respectively.[116]  Together with the loan balance (net of recoveries), the total amount owed TCB is therefore $43.3 million, $45.8 million, or $42.0 million, depending on which interest rate the Court finds appropriate.  In my opinion, these amounts are conservative estimates, because, as I explained above, they do not consider TCB's opportunity cost of capital.

## III.D.  The FHA's Role To Make Payments

61.  On November 30, 2022, RMF filed for bankruptcy and was unable to fund borrowers' draws on their FHA-insured loans.  FHA, in its role, would typically have funded those draws.  The borrowers had incurred costs for the MIP and were therefore entitled to the benefit of the insurance.  In fact, as I explained in Section II.B, the FHA issued a Mortgagee Letter in July 2023 which confirmed that the FHA funds draws for borrowers when the lender is unable or unwilling to do so.  In this case, the FHA did not do so.  Instead, TCB was asked to fund the draws and did so.

---

[113]  "Sixth Amended and Restated Promissory Note," Texas Capital Bank, National Association, July 15, 2019, p. 1 ("Loan Rate' means the Prime Rate as it may vary from day to day plus one-half percent (0.5%); provided, however, the Loan Rate shall never be lower than five percent (5.0%) per annum.") (emphasis in original).

[114]  "Sixth Amended and Restated Promissory Note," Texas Capital Bank, National Association, July 15, 2019, p. 6.

[115]  JD Reed, "After 15 Years at 5.00%, Pre- and Post-Judgement Interest Goes Up," Holmes Firm PC, July 27, 2023, https://theholmesfirm.com/after-15-years-pre-and-post-judgment-interest-goes-up/ ("This new pre- and post-judgement interest rate of **8.25% becomes effective August 1, 2023** […]") (emphasis in original).

[116]  Workpaper C.

CONFIDENTIAL

I reserve the right to supplement or amend the opinions expressed in this report.

Executed at Minneapolis, Minnesota on December 16, 2024.

_____

Robert S. Conway

APP038

# APPENDIX A

## Curriculum Vitae of Robert S. Conway

# Robert S. Conway, CFA

2708 Irving Ave. S.                    Rsconway3294@gmail.com                    c) 612-816-6530
Minneapolis, Minnesota  55408          http://www.linkedin.com/pub/robert-conway/7/110/978

## PROFILE

Results-oriented senior financial executive with extensive experience in Treasury, Mortgage Finance and New Business Development.  Consistent record of achievement in:

- **Treasury:** negotiated and managed, at the peak, 35 financing facilities with 18 counterparties and $5.6 Billion in available financing for forward residential mortgages, reverse residential mortgages, RTLs, home improvement loans, farm lending, mortgage servicing rights, residual financing, securities repurchase agreements and mezzanine financing.
- **Mortgage Finance:** priced, hedged, structured and sold over $10 billion in residential mortgage securities, $278 million in Canadian mortgage securities, $1.3 billion in commercial mortgage securities and $500 million principal balance of Mortgage Servicing Rights (MSRs).  Expert in all aspects of mortgage finance including servicing, originations, capital markets, hedging and securitizations.
- **New Business Development:** started new businesses through denovo development and acquisitions in commercial mortgages, healthcare financing, Canadian residential mortgages, and U.S. residential mortgage servicing and origination.

## PROFESSIONAL EXPERIENCE

**Finance of America Corporation,** St. Paul, MN                    **7/2015 -4/2024**

SENIOR VICE PRESIDENT, TREASURER

Treasurer: Responsible for managing and optimizing the financing for the multiple lending business lines of Finance of America, a Blackstone sponsored company. Responsible for bank account administration, hedging operations and cashflow forecasting.

- Reverse Mortgage: Execute and optimize the financing for the largest reverse mortgage lender by market share, including managing a HECM MSR financing, Tail financing facilities, Residual asset financing, Buyout financing and Jumbo reverse financing.
- Forward Mortgage: Negotiate and manage the financing facilities for a top ten mortgage banker including MSR financing, repo facilities, warehouse lines and mezzanine financing.
- Home improvement lending, RTLs (Fix and Flip) and Farm Financing: secured loan financing as FOA entered into lending businesses and wound down the financing as the businesses were wound down.

**Stonegate Mortgage Corporation,** Minneapolis, MN                    **4/2013-7/2015**

SENIOR VICE PRESIDENT, TREASURER

Treasurer: Responsible for securing, managing and optimizing the funding for $14 Billion of annual production of mortgages, a $200 million portfolio of MSRs and for a mortgage warehousing business with $400 mm in commitments.

- Manage relationships with funding partners including covenants, operations and negotiations;
- Executed three MSR financings for Ginnie, Fannie and Freddie MSR including negotiating the related Acknowledgement Agreements with the GSEs;

Robert S. Conway, CFA                                                    **Page Two**

**Two Harbors Investment Corp,** Minneapolis, MN                    1/**2012-4/2013**

SENIOR CONSULTANT

New Business Development: building the new business of investing in MSRs for Two Harbors. Created the business case, helped developed the analytical framework, and acquired Matrix Financial, a mortgage banker servicing a portfolio of Fannie, Freddie and Ginnie MSR.

**Aurora Bank, FSB**, Denver, CO                                       **2010-12/2011**

SENIOR CONSULTANT

Master Servicing: Responsible for managing and charting the strategic direction for the master servicing business, a $125 billion portfolio of residential mortgage master servicing contracts managed by a group of 100 employees.

**GMAC Residential Capital Corporation** (ResCap), Minneapolis, MN       **1991-2010**

**Managing Director, Strategy and Business Development,** Minneapolis, MN     2005-2010
Responsible for acquisitions, divestitures, strategic investments and new business ventures for GMAC ResCap, a $20 billion + asset company and the fifth largest mortgage originator and servicer.

**Managing Director, Residential Lending**, Toronto, ON                 2001-2005
Conceived and executed GMAC's Canadian mortgage business strategy.

**Managing Director, Business Development**, Minneapolis, MN            2000-2001
Identified, acquired and integrated non-residential mortgage related businesses.

**Managing Director, Commercial Mortgage Finance**, Minneapolis, MN     1994-2000
Responsible for the capital markets and operational aspects of commercial mortgages including securitization, pricing, hedging, trading and ultimate sale.

**Vice President, Mortgage Securities,** Minneapolis, MN                1991-1994
Negotiated the securitization and sale of residential mortgages.

**Sandler O'Neill & Partners**, New York, NY                           **1989-1991**

**Vice President, Investment Banking**
Specialized in mergers, acquisitions and capital raising for financial institutions.

**Lehman Brothers**, New York, NY                                       **1985-1989**

**Vice President, Investment Banking**
Covered mortgage and financial institutions, focusing on mortgage transactions, capital raising and M&A.

## EDUCATION

**Cornell University, Johnson Graduate School of Management,** Ithaca, NY     1985
Master of Business Administration (Finance), graduation with distinction, GPA: 3.74

**Duke University**, Durham, NC                                         1980
Bachelor of Science in Civil Engineering

APP041

# APPENDIX B
## Materials Considered and Relied Upon

# Materials Considered

## Case Documents

[1] "Amended Disclosure Statement for the Joint Chapter 11 Plan of Liquidation for Reverse Mortgage Investment Trust Inc. and Its Debtor Subsidiaries," in re: *Reverse Mortgage Investment Trust Inc., et al.,* Case No. 22-11225 (MFW), March 22, 2023.

[2] "Complaint," in *Texas Capital Bank v. Government National Mortgage Association and United States Department of Housing and Urban Development*, Civil Action No. 2:23-cv-00156, October 4, 2023.

[3] "Declaration of Tanya Meerovich, Chief Restructuring Officer in Support of Chapter 11 Filings and First Day Motions," in re: *Reverse Mortgage Investment Trust Inc., et al.*, Case No. 22-11225 (MFW), December 1, 2022.

[4] "Memorandum Opinion and Order," in *Texas Capital Bank v. Government National Mortgage Association, et al.*, 2:23-CV-156-Z-BR, October 18, 2024.

[5] Ginnie Mae Certification of Administrative Record, Volumes 1-4.

[6] HUD Certification of Admistrative Record.

## Financial Statements

[7] "Condensed Consolidated Financial Statements As of September 30, 2022 and for the One-Month Period Ended September 30, 2022," Reverse Mortgage Funding, LLC.

[8] "Condensed Consolidated Financial Statements As of October 31, 2022 and for the One-Month Period Ended October 31, 2022," Reverse Mortgage Funding, LLC.

[9] "Condensed Consolidated Financial Statements As of November 30, 2022 and for the One-Month Period Ended November 30, 2022," Reverse Mortgage Funding, LLC.

## Bates-Stamped Documents

| | | | | | |
|---|---|---|---|---|---|
| [10] | HUD-0000286 | [49] | TCB000000000308 | [88] | TCB000000006081 |
| [11] | HUD-0000305 | [50] | TCB000000001537 | [89] | TCB000000006085 |
| [12] | HUD-0000313 | [51] | TCB000000002337 | [90] | TCB000000006089 |
| [13] | HUD-0000317 | [52] | TCB000000002338 | [94] | TCB000000006093 |
| [14] | HUD-0000319 | [53] | TCB000000002339 | [95] | TCB000000006097 |
| [15] | HUD-0000335 | [54] | TCB000000002380 | [96] | TCB000000006101 |
| [16] | HUD-0000337 | [55] | TCB000000002381 | [97] | TCB000000006211 |
| [17] | HUD-0000339 | [56] | TCB000000002382 | [98] | TCB000000006546 |
| [18] | HUD-0000528 | [57] | TCB000000002391 | [99] | TCB000000006548 |
| [19] | HUD-0000529 | [58] | TCB000000002393 | [100] | TCB000000006549 |
| [20] | HUD-0000530 | [59] | TCB000000002447 | [101] | TCB000000006570 |
| [21] | HUD-0000536 | [60] | TCB000000002448 | [102] | TCB000000007158 |
| [22] | HUD-0000538 | [61] | TCB000000002449 | [103] | TCB000000007249 |
| [23] | HUD-0000942 | [62] | TCB000000002453 | [104] | TCB000000007251 |
| [24] | HUD-0000949 | [63] | TCB000000002456 | [105] | TCB000000007252 |
| [25] | HUD-0001001 | [64] | TCB000000002457 | [106] | TCB000000007374 |
| [26] | HUD-0001019 | [65] | TCB000000003167 | [107] | TCB000000007688 |

CONFIDENTIAL

| | | | | | |
|---|---|---|---|---|---|
| [27] | HUD-0001022 | [66] | TCB000000003168 | [108] | TCB000000007896 |
| [28] | HUD-0001238 | [67] | TCB000000003169 | [109] | TCB000000007897 |
| [29] | HUD-0001262 | [68] | TCB000000003354 | [110] | TCB000000007914 |
| [30] | HUD-0001263 | [69] | TCB000000005508 | [111] | TCB000000008688 |
| [31] | HUD-0001276 | [70] | TCB000000005510 | [112] | TCB000000010482 |
| [32] | HUD-0001621 | [71] | TCB000000005511 | [113] | TCB000000013921 |
| [33] | HUD-0001642 | [72] | TCB000000005512 | [114] | TCB000000015273 |
| [34] | HUD-0001643 | [73] | TCB000000005513 | [115] | TCB000000015321 |
| [35] | HUD-0001734 | [74] | TCB000000005514 | [116] | TCB000000015357 |
| [36] | HUD-0002506 | [75] | TCB000000005515 | [117] | TCB000000015719 |
| [37] | HUD-0003771 | [76] | TCB000000005516 | [118] | TCB000000015722 |
| [38] | HUD-0003776 | [77] | TCB000000005518 | [119] | TCB000000015734 |
| [39] | HUD-0004238 | [78] | TCB000000005520 | [120] | TCB000000015736 |
| [40] | HUD-0004819 | [79] | TCB000000005829 | [121] | TCB000000015831 |
| [41] | HUD-0007138 | [80] | TCB000000006038 | [122] | TCB000000015833 |
| [42] | HUD-0010208 | [81] | TCB000000006042 | [123] | TCB000000016583 |
| [43] | HUD-0011690 | [82] | TCB000000006046 | [124] | TCB000000016584 |
| [44] | HUD-0011808 | [83] | TCB000000006050 | [125] | TCB000000017977 |
| [45] | HUD-0013615 | [84] | TCB000000006052 | [126] | TCB000000017978 |
| [46] | HUD-0013888 | [85] | TCB000000006075 | [127] | TCB000000017979 |
| [47] | HUD-0021033 | [86] | TCB000000006077 | | |
| [48] | TCB000000000208 | [87] | TCB000000006079 | | |

## Excel Workbooks

[128] 2022 12 21 CMS Reimbursement Request_Redacted

[129] 2022 12 22 CMS Reimbursement Request_Redacted

[130] 2022 12 23 CMS Reimbursement Request_Redacted

[131] 2022 12 23 CMS Remittance_Redacted

[132] 2022 12 27 Carrington MIP Request_Redacted

[133] 2022 12 27 CMS Reimbursement Request_Redacted

[134] 2022 12 27 CMS Remittance_Redacted

[135] 2022 12 28 CMS Reimbursement Request_Redacted

[136] 2022 12 28 CMS Remittance V2_Redacted

[137] 2022 12 29 CMS Reimbursement Request_Redacted

[138] 2022 12 29 CMS Remittance_Redacted

[139] 2022 12 30 CMS Remittance_Redacted

[140] 2023 01 13_Carrington Mortgage Services LLCSuppBillRpt_Redacted

[141] 2023-01-01 _ Carrington Mortgage Services LLCPrelimBillRpt_Redacted

[142] CONFIDENTIAL 2022 12 01 Non-recoverable expenses Reimbursement request

[143] CONFIDENTIAL 2022 12 01 RMF Reimbursement Request

[144] CONFIDENTIAL 2022 12 02 Non-recoverable expenses Reimbursement request

[145] CONFIDENTIAL 2022 12 02 RMF Reimbursement Request

[146] CONFIDENTIAL 2022 12 05 Non-recoverable expenses Reimbursement request

[147] CONFIDENTIAL 2022 12 05 RMF Reimbursement Request

[148]   CONFIDENTIAL 2022 12 06 Non-recoverable expenses Reimbursement request
[149]   CONFIDENTIAL 2022 12 06 RMF Reimbursement Request
[150]   CONFIDENTIAL 2022 12 07 Non-recoverable expenses Reimbursement request
[151]   CONFIDENTIAL 2022 12 07 RMF Reimbursement Request
[152]   CONFIDENTIAL 2022 12 08 Non-recoverable expenses Reimbursement request
[153]   CONFIDENTIAL 2022 12 08 RMF Reimbursement Request
[154]   CONFIDENTIAL 2022 12 09 Non-recoverable expenses Reimbursement request
[155]   CONFIDENTIAL 2022 12 09 RMF Reimbursement Request
[156]   CONFIDENTIAL 2022-12-01 _ Reverse Mortgage Funding LLCPrelimBillRpt
[157]   CONFIDENTIAL 20221213-094909_Reverse Mortgage Funding LLCSuppBillRpt
[158]   CONFIDENTIAL GNMA -2 Reporting Package_20221130 RMF v20230110
[159]   CONFIDENTIAL RMF 2022 12 01 GNMA remittance___
[160]   CONFIDENTIAL RMF 2022 12 02 GNMA remittance___
[161]   CONFIDENTIAL RMF 2022 12 05 GNMA remittance___
[162]   CONFIDENTIAL RMF 2022 12 06 GNMA remittance___
[163]   CONFIDENTIAL RMF 2022 12 07 GNMA remittance___
[164]   CONFIDENTIAL RMF 2022 12 08 GNMA remittance___
[165]   CONFIDENTIAL RMF 2022 12 09 GNMA remittance___
[166]   Confidential RMF 2022 12 19 GNMA remittance
[167]   Confidential RMF 2022 12 20 GNMA remittance
[168]   CONFIDENTIAL Trans Codes
[169]   GNMA -1 Reporting Package_20221231 RMF v20220110_Redacted
[170]   GNMA -2 Reporting Package_20221231 RMF v20220110_Redacted
[171]   GNMA -2 Reporting Package_20230131 RMF v20230207
[172]   GNMA -2 Reporting Package_20230331_RMF_v20230406
[173]   GNMA -2 Reporting Package_20230430_RMF_v20230504
[174]   GNMA -2 Reporting Package_20230531_RMF_20230604
[175]   GNMA -2 Reporting Package_20230630_RMF_20230707
[176]   GNMA -2 Reporting Package_20230731_RMF_20230804
[177]   GNMA -2 Reporting Package_20230831_RMF_20230908_V2
[178]   GNMA -2 Reporting Package_20230930_RMF_20231005
[179]   GNMA -2 Reporting Package_20231031__RMF_20231106
[180]   GNMA -2 Reporting Package_20231130_RMF_20231206
[181]   GNMA -2 Reporting Package_20231231_RMF_20240105
[182]   GNMA -2 Reporting Package_20240131__RMF_20240206_v1
[183]   GNMA -2 Reporting Package_20240229__RMF_20240306
[184]   GNMA -2 Reporting Package_20240331_RMF_20240404
[185]   GNMA -2 Reporting Package_20240430_RMF_20240506
[186]   GNMA -2 Reporting Package_20240531__RMF_20240606_v2
[187]   GNMA -2 Reporting Package_20240630__RMF_20240705
[188]   GNMA -2 Reporting Package_20240630__RMF_20240705nometa
[189]   GNMA -2 Reporting Package_20240731__RMF_20240806_MetaRemoved
[190]   GNMA -2 Reporting Package_20240831_RMF_20240906_MetaRemoved
[191]   GNMA -2 Reporting Package_20240930_RMF_20241004_NoMeta_Locked
[192]   GNMA-2_Reporting_Package_20230228_RMF_v20230306nometa

[193]  ID_00007166
[194]  ID_00009235
[195]  ID_00009236
[196]  ID_00009237
[197]  ID_00009238
[198]  ID_00016031
[199]  ID_00016296
[200]  ID_00016366
[201]  ID_00016558
[202]  ID_00016559
[203]  ID_00024723
[204]  ID_00034953
[205]  ID_00034961
[206]  ID_00034983
[207]  ID_00035822
[208]  ID_00035868
[209]  NEW RMF 2022 12 21 GNMA remittance_redacted
[210]  NEW RMF 2022 12 22 GNMA remittance_redacted
[211]  RM-5_20221231 RMF v20220107_redacted
[212]  RMBR-6 Weekly_20221223_redacted
[213]  RMBR-6 Weekly_20221230_redacted

## Literature

[214]  Edward J. Szymanoski, Alven Lam, and Christopher Feather, "Financial Sustainability and the Home Equity Conversion Mortgage: Advancing Fiscal Soundness and Affordable Financing for Senior Homeowners," in "Cityscape," A Journal of Policy Development and Research 19(1)

[215]  Martin Neil Baily and Benjamin H. Harris, *The Retirement Challenge: What's Wrong with America's System and A Sensible Way to Fix It* (New York: Oxford University Press, 2003).

## Public Sources

[216]  "How does a reverse mortgage work?" Finance of America, July 10, 2024, https://www.financeofamerica.com/education/how-does-a-reverse-mortgage-work.

[217]  "2023 Annual Report," Ginnie Mae, https://www.ginniemae.gov/about_us/what_we_do/Annual_Reports/annual_report23.pdf.

[218]  "About Us," U.S. Department of Housing and Urban Development, https://www.hud.gov/program_offices/housing/fhahistory.

[219]  "Chapter 35: Home Equity Conversion Mortgage Loan Pools – Special Requirements (HECM / HMBS)," Ginnie Mae, https://www.ginniemae.gov/issuers/program_guidelines/Lists/MBSGuideAPMsLib/Attachments/44/Chapter_35.pdf.

[220]  "Chapter 6: Fees," Ginnie Mae, accessed December 11, 2024, https://www.ginniemae.gov/doing_business_with_ginniemae/issuer_resources/MBSGuideLib/Chapter_06.pdf.

APP046

[221]  "Funding Government Lending," Ginnie Mae,
https://www.ginniemae.gov/about_us/who_we_are/Pages/funding_government_lending.aspx.

[222]  "Ginnie Mae and the Securitization of Federally Guaranteed Mortgages," Congressional Budget
Office, January 2022, https://www.cbo.gov/publication/57755.

[223]  "Ginnie Mae Report to Congress," Ginnie Mae, November 13, 2007,
https://www.ginniemae.gov/about_us/what_we_do/Reports_To_Congress/ReportToCongress07.p
df.

[224]  "Ginnie Mae," USA.gov, https://www.usa.gov/agencies/ginnie-mae.

[225]  "Government National Mortgage Association Mortgage-Backed Securities Program," U.S.
Department of Housing and Urban Development, accessed December 16, 2024,
https://www.hud.gov/sites/dfiles/CFO/documents/32_FY21CJ_Program_GNMA_MortgageBacke
dSecurities.pdf.

[226]  "Home Equity Conversion Mortgage-Backed Security (HMBS) Program," Ginnie Mae,
https://www.ginniemae.gov/products_programs/programs/Pages/hmbs_program.aspx.

[227]  "Home Equity Conversion Mortgages for Seniors," U.S. Department of Housing and Urban
Development, https://www.hud.gov/program_offices/housing/sfh/hecm/hecmhome.

[228]  "Housing Finance Reform Plan," U.S. Department of Housing and Urban Development, March
27, 2019, https://home.treasury.gov/system/files/136/HUD-Housing-Finance-Reform-Plan-
September-2019.pdf.

[229]  "How the HECM Program Works," U.S. Department of Housing and Urban Development,
https://www.hud.gov/program_offices/housing/sfh/hecm/hecmabou.

[230]  "Julia R. Gordon," U.S. Department of Housing and Urban Development,
https://www.hud.gov/about/leadership/Julia_Gordon.

[231]  "Our History," Ginnie Mae,
https://www.ginniemae.gov/about_us/who_we_are/Pages/our_history.aspx.

[232]  "Over of Ginnie Mae Guaranty Agreement Key Components Transcript," Ginnie Mae,
https://www.ginniemae.gov/issuers/issuer_training/Documents/overview_ginnie_mae_guaranty_a
greement_key_components.pdf.

[233]  "Prime Rate - current values and history covering 2020-present," HSH,
https://www.hsh.com/indices/prime-rate.html.

[234]  "Programs," Ginnie Mae,
https://www.ginniemae.gov/about_us/what_we_do/pages/programs_products.aspx.

[235]  "Reverse Mortgages Present Benefits and Risks for Senior Homeowners," U.S. Government
Accountability Office, June 2, 2020, https://www.gao.gov/blog/reverse-mortgages-present-benefits-
and-risks-senior-homeowners.

[236]  "Reverse Mortgages," Consumer Financial Protection Bureau, June 28, 2012,
https://files.consumerfinance.gov/a/assets/documents/201206_cfpb_Reverse_Mortgage_Report.pd

[237]  "The Role of Federal Housing Administration in the Reverse-Mortgage Market," Congressional
Budget Office, May 2019, https://www.cbo.gov/system/files/2019-05/55247-
ReverseMortgages.pdf.

[238]  "Why Are Mortgage Rates Going Up?" Forbes, November 1, 2022,
https://www.forbes.com/sites/qai/2022/10/31/why-are-mortgage-rates-going-up/.

[239]  Chris Chow, "Longbridge scoops up big MSR portfolio from RMF bankruptcy," HousingWire,
July 6, 2023, https://www.housingwire.com/articles/longbridge-scoops-up-big-msr-portfolio-from-
rmf-bankruptcy/.

B-5

CONFIDENTIAL

[240]  Housing and Community Development Act of 1987, Pub. L. No. 100-242, § 417 (1988).

[241]  JD Reed, "After 15 Years at 5.00%, Pre- and Post-Judgement Interest Goes Up," Holmes Firm PC, July 27, 2023, https://theholmesfirm.com/after-15-years-pre-and-post-judgment-interest-goes-up/.

[242]  Jeff Cox, "Fed approves 0.75-point hike to take rates to highest since 2008 and hints at change in policy ahead," CNBC, November 2, 2022, https://www.cnbc.com/2022/11/02/fed-hikes-by-another-three-quarters-of-a-point-taking-rates-to-the-highest-level-since-january-2008.html.

[243]  SP Group LLC, "Home Equity Conversion Mortgage Program Analysis," U.S. Department of Housing and Urban Development, July 2022, https://www.huduser.gov/portal/portal/sites/default/files/pdf/HECM-Report.pdf.

**Miscellaneous**

[244]  "Sixth Amended and Restated Promissory Note," Texas Capital Bank, National Association.

In addition, I also relied upon any other documents cited in this report and exhibits but not mentioned in this list.

APP048

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| REVERSE MORTGAGE INVESTMENT | ) | Case No. 22-11225 (MFW) |
| TRUST INC, *et al.*,[1] | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | Re: D.I. 46, 170, 171, 172 |

### FINAL ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING;  (II) AUTHORIZING CERTAIN DEBTORS' USE OF CASH COLLATERAL; (III) MODIFYING THE AUTOMATIC STAY;  AND (III) GRANTING RELATED RELIEF

Upon the motions [D.I. 46 and 78] and notice of summary of revised order [D.I. 152] (collectively, the "Motion")[2] of the above-referenced debtors and debtors in possession (collectively, the "Debtors") in the above-referenced chapter 11 cases (the "Chapter 11 Cases"), for entry of an interim order and a final order (this "Final Order") pursuant to sections 105, 361, 362, 363, 364, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1, 4001-2, and 9006-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules"):

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Reverse Mortgage Investment Trust Inc. (3421); Reverse Mortgage Funding LLC (0209); RMIT Cash Management LLC (6241); RMIT Operating I LLC (1844); and RMIT Operating II LLC (2301). The location of the Debtors' service address for purposes of these chapter 11 cases is: 1455 Broad Street, 2nd Floor, Bloomfield, NJ 07003.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the DIP Term Sheets (as defined herein) and Motion, as applicable.

APP049

(i)      authorizing on a final basis the Debtors to obtain postpetition debtor in possession financing already advanced under the Interim DIP Orders (as defined herein) and authorizing the Debtors to obtain additional postpetition debtor in possession financing on a junior basis from BNGL Holdings, L.L.C. ("BNGL") subject to an Approved Budget (as defined herein) in an amount up to $8 million (such postpetition debtor in possession financings, collectively, the "DIP Facilities") in the aggregate amount of:

(a)      up to $25,499,999.99 ($7,500,000 of which is subject to resolution of the Disputed Issues (defined below) related to the DIP Fee Notes) advanced to the Debtors pursuant to DIP Notes (as defined in the DIP Term Sheets) on the terms and conditions set forth in (I) this Final Order and (II) that certain DIP Notes Term Sheet appended as Exhibit A to the Second Interim DIP Order (the "DIP Notes Term Sheet", and the DIP Notes Term Sheet collectively with this Final Order and the Approved Budget (defined below), as the same may be amended, restated, supplemented from time to time, or amended by this Final Order, and any other agreements, instruments, pledge agreements, guarantees, indemnities, security agreements, intellectual property security agreements, mortgages, control agreements, escrow agreements, instruments, notes, and documents executed in accordance and connection therewith, each as amended, restated supplemented, waived, or otherwise modified from time to time in accordance with the terms hereof and thereof, shall constitute, the "DIP Notes Documents"), by and among the Debtors, Leadenhall Capital Partners LLP and certain of its affiliates ("Leadenhall"), and BNGL (BNGL together with Leadenhall, the "DIP Notes Lenders"), consisting of (i) the Leadenhall DIP Obligations (as defined herein) and (ii) $10 million already advanced by BNGL plus up to $7 million under the DIP Notes (the "DIP Notes Obligations") (the amounts set forth in preceding clauses (i) and (ii) collectively, the "Approved Notes Amount"), upon entry of this Final Order pursuant to the terms and conditions of this Final Order and the applicable DIP Notes Documents;

(b)      not less than $30,733,668 of DIP Tail Advances (as defined in the Tail Advance DIP Term Sheet) (the "Approved Tail Amount") all on the terms and conditions set forth in this Final Order and that certain term sheet attached hereto as **Exhibit B** (the "Tail Advance DIP Term Sheet" and collectively with this Final Order, the Approved Budget and TCB Existing Tail Loan Agreement (defined below), as the same may be amended, restated, supplemented from time to time, or amended by the Tail Advance DIP Term Sheet, this Final Order, and any other agreements, instruments, pledge agreements, guarantees, indemnities, security agreements,

2

intellectual property security agreements, mortgages, control agreements, escrow agreements, instruments, notes, and documents executed in accordance and connection therewith (including that certain Participation Agreement, dated on or about the date hereof by and between TCB (as defined below) and Longbridge Financial, LLC ("Longbridge")) (each as amended, restated supplemented, waived, or otherwise modified from time to time in accordance with the terms hereof and thereof), collectively, the "Tail Facility Documents"), by and among the Debtors and Texas Capital Bank ("TCB" or the "Tail Advance DIP Lenders"), consisting of $30,733,668 drawn under the Tail Advance DIP Term Sheet (the "Approved Tail Amount"), pursuant to the terms and conditions of this Final Order; and

(c)     up to $8 million in incremental advances under the additional notes (the "Additional Notes") by and among the Debtors and BNGL (in such capacity, the "Additional Note Lender", and together with the DIP Notes Lender and the Tail Advance Lender, the "DIP Lenders") set forth in that term sheet attached hereto as **Exhibit A** (the "Additional Notes Term Sheet"; and together with this Order, the "Additional Notes Documents"; which, together with the DIP Notes Documents and the Tail Facility Documents, constitute the "DIP Loan Documents"), consisting of $8 million (the "Approved Additional Notes Amount", and together with the Approved Notes Amount and the Approved Tail Amount, the "Approved DIP Amount").

(ii)     authorizing the Debtors to (a) enter into the DIP Facilities and incurring all obligations owing thereunder and under the DIP Loan Documents to the DIP Lenders, as set forth in the DIP Notes Term Sheet, the Tail Advance DIP Term Sheet and the Additional Notes Term Sheet (collectively, the "DIP Term Sheets" and the obligations thereunder and this Final Order, the "DIP Obligations") and, (b) as set forth herein, grant liens and superpriority administrative expense claim status in each of the Chapter 11 Cases and any Successor Cases (as defined herein) subject, in certain circumstances described herein, to the Initial Carve-Out (as defined herein) and the Second Carve-Out (as defined herein) as set forth herein;

(iii)     granting to the DIP Lenders, as set forth herein, validly perfected and enforceable security interests in and superpriority liens on the DIP Collateral (as defined below) and which liens and security interests shall be subject to the priorities set forth herein;

3

(iv)     authorizing and directing the Debtors to use proceeds of the DIP Notes and the Additional Notes to (a) pay the principal, interest, fees, expenses and other amounts payable and reimbursable under the DIP Loan Documents or this Final Order as such become due, (b) make permitted adequate protection payments in respect of the Prepetition Obligations (as defined below); and (c) provide financing for working capital and other general corporate purposes, all to the extent provided in, and in accordance with, the Approved Budget, this Final Order and the DIP Loan Documents;

(v)     authorizing and directing the Debtors to use proceeds of the Approved Tail Amount in accordance with the Tail Advance DIP Term Sheet and other Tail Facility Documents to fund the Debtors' tail obligations during the Debtors' Chapter 11 Cases;

(vi)     authorizing each Debtor, pursuant to sections 105, 361, 362, 363 and 507 of the Bankruptcy Code, to use cash collateral, as such term is defined in section 363(a) of the Bankruptcy Code ("Cash Collateral"), and all other Prepetition Collateral (defined below), on a final basis in accordance with this Final Order, the Approved Budget and the DIP Loan Documents, and providing, among other things, adequate protection to the Prepetition Secured Parties for any diminution in the value as set forth in the Bankruptcy Code ("Diminution") of their interests in the Prepetition Collateral;

(vii)     authorizing the Debtors, as set forth herein, to provide adequate protection of the liens and security interests (such liens and security interests, the "Prepetition Liens") of TCB, BNGL, and Leadenhall (collectively, in such capacity as prepetition secured lender, the "Prepetition Secured Parties"), under (i) that certain *Loan and Security Agreement (Buyout Financing Line)*, by and between TCB and RMF, dated October 31, 2021 (as in effect on the date hereof, the "TCB Buyout Facility"); (ii) that certain *Mortgage Warehouse Agreement*, by and

4

between TCB and RMF, dated as of July 29, 2020, as amended (as in effect on the date hereof, the "TCB Warehouse Facility"); (iii) that certain *Loan and Security Agreement*, by and between TCB and RMF, dated August 26, 2021, as amended (as in effect on the date hereof, the "TCB Tail Facility" and such loan agreement, the "TCB Tail Loan Agreement" and, collectively with the TCB Buyout Facility and TCB Warehouse Facility, the "Prepetition TCB Facilities" and the loan agreements, securities documents and any other ancillary documents in connection with the Prepetition TCB Facilities, the "Prepetition TCB Debt Documents" and the obligations owing to TCB thereunder, collectively, the "Prepetition TCB Obligations" and the liens and security interest granted in favor of TCB under the Prepetition TCB Debt Documents, the "Prepetition TCB Liens" and the collateral securing the Prepetition TCB Obligations, the "Prepetition TCB Collateral"); (iv) that certain *Demand Promissory Note and Security Agreement*, by and between Reverse Mortgage Investment Trust Inc. and BNGL, dated July 13, 2022 (as in effect on the date hereof, the "Prepetition BNGL Demand Loan"); (v) that certain *Master Repurchase Agreement* by and among Reverse Mortgage Funding, LLC and BNGL, dated as of November 17, 2022 (as in effect on the date hereof, the "Prepetition BNGL Repo Facility" and collectively with the Prepetition BNGL Demand Note, the "Prepetition BNGL Secured Loan"); (vi) that certain *Loan and Security Agreement* by and between Debtor RMF and Leadenhall, as amended from time to time (as in effect on the date hereof, the "Existing Note Agreement" and, collectively with the Prepetition TCB Facilities, and the Prepetition BNGL Secured Loan, the "Prepetition Secured Facilities" and, along with any other agreements, instruments, notes, guaranties, and other documents related thereto (including the Prepetition TCB Debt Documents), the "Prepetition Secured Facility Documents");

5

(viii)    approving the stipulations by the Debtors herein with respect to the Prepetition Secured Facility Documents and the Prepetition Liens;

(ix)    modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and this Final Order; and

The Bankruptcy Court having considered the Motion, the exhibits attached thereto, the First Day Declaration [D.I. 44], the Meerovich DIP Declaration [D.I. 47] (as supplemented by the *Supplemental Declaration of Tanya Meerovich, Chief Restructuring Officer, in Support of Debtors' Motion for Entry of Interim and Final Orders, Pursuant to Sections 105, 361, 362, 363, 364, and 507 of the Bankruptcy Code, (I) Authorizing the Debtors to Obtain Post-Petition Financing, (II) Authorizing the Debtors' Use of Cash Collateral, (III) Granting Adequate Protection, and (IV) Granting Related Relief* [D.I. 78] and the *Second Supplemental Declaration of Tanya Meerovich, Chief Restructuring Officer, in Support of Debtors' Motion for Entry of Interim and Final Orders, Pursuant to Sections 105, 361, 362, 363, 364, and 507 of the Bankruptcy Code, (I) Authorizing the Debtors to Obtain Post-Petition Financing, (II) Authorizing the Debtors' Use of Cash Collateral, (III) Granting Adequate Protection, and (IV) Granting Related Relief* [D.I. 152-5], the DIP Loan Documents, and the evidence submitted and argument made at the final hearing (the "Final Hearing"); notice of the Final Hearing having been provided in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and all applicable Local Bankruptcy Rules; and the Final Hearing having been held and concluded; all objections, if any, to the final relief requested in the Motion having been withdrawn, resolved or overruled by the Bankruptcy Court; it appearing that approval of the final relief requested in the Motion is necessary and otherwise is fair and reasonable and in the best interests of the Debtors, their Estates and all parties-in-interest,

and is essential for the continued operation of the Debtors' business and the preservation of the value of the Debtors' assets; and the Bankruptcy Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; it appearing that the Debtors' entry into the DIP Facilities is a sound and prudent exercise of the Debtors' business judgment; after due deliberation and consideration, and good and sufficient cause appearing therefor; and based upon the record established at the Final Hearing, the Bankruptcy Court makes the following findings of fact and conclusions of law;

A.    **Disposition.** The relief requested in the Motion is granted on a final basis in accordance with the terms of this Final Order.  Any objections to the Motion with respect to the entry of this Final Order that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby denied and overruled on [a final basis].  This Final Order shall become effective immediately upon its entry and any applicable stay (including under Bankruptcy Rule 6004) is waived to permit such effectiveness.

B.    **Petition Date**.  On November 30, 2022 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Bankruptcy Court.

C.    **Debtors in Possession**.  The Debtors are operating their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.   As of the date hereof, no trustee or examiner has been appointed.

D.    **Jurisdiction and Venue**.  This Bankruptcy Court has jurisdiction over these Chapter 11 Cases, the Motion and the parties and property affected hereby pursuant to 28 U.S.C. § 1334.  Consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2). This Court may enter a final order consistent with Article III of the United States Constitution.

Venue for these Chapter 11 Cases and the proceedings on the Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.  The bases for the relief sought in the Motion are sections 105, 361, 362, 363, 364, 507 and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004 and 9014, and the Local Bankruptcy Rules.

E.    **Committee**.  On December 13, 2022, the Office of the United States Trustee for the District of Delaware appointed, pursuant to section 1102 of the Bankruptcy Code, an official committee of unsecured creditors (the "Committee") [D.I. 191].

F.    **Notice**.  Notice of the Motion and the Final Hearing have been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and no other or further notice of the Motion with respect to the relief requested at the Final Hearing or the entry of this Final Order shall be required under the circumstances.

G.    **Initial DIP Facilities**.  On December 5, 2022, the Bankruptcy Court entered the *Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing; (II) Authorizing Certain Debtors' Use of Cash Collateral; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* (the "Initial Interim DIP Order") [D.I. 115].  On December 8, 2022, the Bankruptcy Court entered the *Second Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing; (II) Authorizing Certain Debtors' Use of Cash Collateral; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* (the "Second Interim DIP Order" and together with the Initial Interim DIP Order, the "Interim DIP Orders") [D.I. 170].  The Second Interim DIP Order and the rights granted therein shall be in full force and effect, except as expressly modified by this Final Order, in which case, the Final Order shall control.

8

H.    **Stipulations to Extend Remedies Notice Period.**

(i)    On December 22, 2022 (the "Leadenhall Termination Date"), Leadenhall gave notice (the "Leadenhall Termination Notice") to the Debtors, among other things, (i) asserting that the Debtors are in default under the DIP Notes Term Sheet appended as Exhibit A to the Second Interim DIP Order, (ii) revoking Leadenhall's consent to the Debtors' use of Leadenhall's Cash Collateral, and (iii) asserting that a portion of the Debtors' cash on hand as of the Leadenhall Termination Date (as defined below) constitutes Leadenhall's Cash Collateral (as defined below), which the Debtors have disputed (the "Cash Collateral Dispute").

(ii)    On December 22, 2022, TCB provided the Debtors with a notice of default under the Tail Facility Documents (the "TCB Termination Notice" and together with the Leadenhall Termination Notice, the "Prior Termination Notices").

(iii)    On December 30, 2022, the Debtors filed the *Certification of Counsel Regarding Stipulation to Extend Remedies Notice Period to January 13, 2023* [D.I. 276], which sought approval of that certain stipulation dated as of December 26, 2022 (the "Initial Remedies Extension Stipulation"), by and between Debtors, each of the DIP Lenders in their respective capacities as DIP Lender, and the Committee (collectively, the "Stipulation Parties").

(iv)    On January 3, 2023, the Bankruptcy Court entered the *Order Approving the Stipulation to Extend Remedies Notice Period to January 13, 2023* [D.I. 287] (the "Initial Remedies Extension Order"), which has the effect of extending the Remedies Notice Period (as defined in the Second Interim DIP Order) to January

9

13, 2022, and reserving the rights the Debtors, the Committee, Leadenhall, TCB and the Parent with respect to the Cash Collateral Dispute.

(v)   On January 19, 2023, the Debtors filed the *Certification of Counsel Regarding Stipulation to Further Extend Remedies Notice Period to February 3, 2023* [D.I. 369], which sought approval of that certain further stipulation dated as of January 13, 2023, among the Stipulation Parties further extending the Remedies Notice Period (the "Second Remedies Extension Stipulation").

(vi)   On January 20, 2023, the Bankruptcy Court entered the *Order Approving the Stipulation to Extend Remedies Notice Period to February 3, 2023* [D.I. 374] (the "Second Remedies Extension Order") approving the Second Remedies Extension Stipulation, further extending the Remedies Notice Period, setting forth the Stipulation Parties' agreement that the Carve-Out Trigger under the Second Interim DIP Order (the "Initial Carve-Out Trigger") shall not be deemed to have occurred as a result of the Termination Declarations or any other events taking place prior to the execution of the Second Remedies Extension Stipulation; *provided*, that the Initial Carve-Out Trigger may be deemed to have occurred on the earlier of (a) the expiration of the Forbearance Period or (b) an acceleration of the DIP Obligations that takes place subsequent to the execution of the Second Remedies Extension Stipulation.

(vii)   On February 4. 2023, the Debtors filed the *Certification of Counsel Regarding Stipulation to Further Extend Remedies Notice Period to February 9, 2023* [D.I. 418], which sought approval of that certain further stipulation dated as of February 3, 2023 among the Stipulation Parties (the "Third Remedies Extension Stipulation"

APP058

and together with the Initial Remedies Extension Stipulation and Second Remedies Extension Stipulation, the "Remedies Extension Stipulations").

(viii)   On February 6, 2023, the Bankruptcy Court entered the *Order Approving the Stipulation to Extend Remedies Notice Period to February 9, 2023* [D.I. 420] (the "Third Remedies Extension Order" and together with the Initial Remedies Extension Order and Second Remedies Extension Order, the "Remedies Extension Orders") approving the Third Remedies Extension Stipulation and further extending the Remedies Notice Period.

I.   **Motion to Enforce**.  On January 6, 2023, the Debtors filed the *Debtors' Motion to Enforce the Order (I) Authorizing Debtors to Enter Into Stipulation to Transfer Servicing and Approving the Terms Thereof; (II) Authorizing Debtors to Take All Actions to Facilitate Transfer of Certain Servicing Rights and Obligations; (III) Approving Procedures for the Debtors' Potential Assumption and Assignment of Executory Contracts and Unexpired Leases; (IV) Modifying the Automatic Stay on a Limited Basis; and (V) Granting Related Relief* [D.I. 318] (the "Motion to Enforce"), and the *Declaration of Tanya Meerovich, Chief Restructuring Officer of the Debtors in Support of the Debtors' Motion to Enforce the Order (I) Authorizing Debtors to Enter Into Stipulation to Transfer Servicing and Approving the Terms Thereof; (II) Authorizing Debtors to Take All Actions to Facilitate Transfer of Certain Servicing Rights and Obligations; (III) Approving Procedures for the Debtors' Potential Assumption and Assignment of Executory Contracts and Unexpired Leases; (IV) Modifying the Automatic Stay on a Limited Basis; and (V) Granting Related Relief* [D.I. 319], pursuant to which the Debtors seek to enforce that certain stipulation dated as of December 9, 2022 (and approved by the Bankruptcy Court on December 16, 2022), by and between Leadenhall, Longbridge, BNGL, and RMF (the "December 9, 2022 Stipulation").

J.    **Committee Settlement**.  On February 14, 2023, the Debtors filed the (i) *Motion of the Debtors for Entry of an Order Pursuant to Bankruptcy Rule 9019 Approving Settlement By and Among the Debtors, the Official Committee of Unsecured Creditors, and BNGL Holdings, L.L.C. and Certain of Its Affiliates* [D.I. 444] (the "9019 Motion"),  (ii) *Declaration of Patrick Bartels in Support of the Debtors' Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 Approving the Settlement By and Among the Debtors, the Official Committee of Unsecured Creditors, and BNGL Holdings, L.L.C. and Certain of Its Affiliates* [D.I. 445], and (iii) *the Motion for Entry of an Order Pursuant to Bankruptcy Rule 9006(c) and Local Rule 9006-1(e) Shortening the Notice Period for Debtors' Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 Approving Settlement By and Among the Debtors, the Official Committee of Unsecured Creditors, and BNGL Holdings, L.L.C. and Certain of Its Affiliates* [D.I. 446], which collectively seek entry of an order (the "9019 Order") approving the global settlement between the Debtors, the Committee, and BNGL (the "Committee Settlement").  Pursuant to the Committee Settlement and subject to Bankruptcy Court approval thereof, BNGL has agreed to, among other things, provide the Debtors with an additional $8,000,000 on a junior basis pursuant to the Additional Notes Documents in accordance with this Final Order and the Approved Budget.  Consistent with the 9019 Order, all cash receipts (other than amounts funded under the DIP Facilities and any Warehouse Lender Reimbursements) received by the Debtors from February 11, 2023 through the effective date of a plan of liquidation (the "Plan") shall be placed in a Plan reserve (the "Plan Reserve").  For the avoidance of doubt, the funding of amounts into the Plan Reserve that constitute DIP Collateral or Prepetition Collateral (subject to paragraph 44) does not alter the DIP Lenders' rights and their respective lien priority as set forth in this Final Order with respect to such DIP Collateral or Prepetition Collateral (subject to paragraph 44).

12

K.    **Debtors' Stipulations**.    Subject to paragraph 44 hereof,    each    stipulation, admission, and agreement contained in this Final Order, including, without limitation, the Debtors' Stipulations, shall be binding upon the Debtors, their assets that will be used to satisfy the claims of creditors (the "Estates") and any successors thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors) under all circumstances and for all purposes.  After consultation with their attorneys and financial advisors, and without prejudice to the rights of parties in interest as set forth in paragraph 44 herein, the Debtors, on their own behalf and on behalf of their Estates, admit, stipulate, acknowledge, and agree as follows (paragraphs K(i) through K(ix) below are referred to, collectively, as the "Debtors' Stipulations"):

(i)    All Prepetition Secured Facility Documents (as defined herein) are valid, binding, and enforceable by the Prepetition Secured Parties against each of the relevant Debtors.

(ii)    As of the Petition Date, each of the Debtors was indebted and liable, without any objection, defense, counterclaim, recoupment, challenge, or offset of any kind, to the Prepetition Secured Parties pursuant to the respective Prepetition Secured Facility Documents, in the principal amounts of not less than those set forth on Schedule 1 attached hereto, plus, in each case, all accrued or hereafter accruing and unpaid interest thereon and any additional amounts, charges, fees and expenses (including any attorneys', accountants', appraisers' and financial advisors' fees and expenses that are chargeable or reimbursable under the Prepetition Secured Facility Documents as to such Debtor) now or hereafter due under the Prepetition Secured Facility Documents (all obligations of each Debtor arising under any Prepetition Secured Facility Documents, including all loans, advances, debts, liabilities,

13

principal, interest, fees, charges, expenses and obligations for the performance of covenants, tasks or duties, or for the payment of monetary amounts owing to the Prepetition Secured Parties by such Debtor, of any kind or nature, whether or not evidenced by any note, agreement or other instrument, shall be referred to herein collectively as the "Prepetition Obligations"), which Prepetition Obligations are legal, valid, and binding obligations of each relevant Debtor and no portion of which is subject to avoidance, disallowance, reduction, recharacterization, subordination, or other challenge pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

(iii)    Pursuant to the Prepetition Secured Facility Documents and to the extent set forth therein, as of the Petition Date, each Debtor granted to the Prepetition Secured Parties, to secure such Debtor's Prepetition Obligations, a valid, duly authorized, non-voidable, binding, perfected, first-priority security interest in the Collateral (as specified more fully in the respective Prepetition Secured Facility Documents and referred to in this Final Order as the "Prepetition Collateral").

(iv)    The Debtors have a critical need to obtain postpetition financing under the DIP Facilities and, subject to paragraph 6 herein, to use Cash Collateral, as applicable, to, among other things, pay the costs and expenses associated with administering the Chapter 11 Cases, continue the orderly operation of the Debtors' business, maximize and preserve the Debtors' going concern value, make lease and other contractual payments and satisfy other working capital and general corporate purposes, make capital expenditures as needed in the ordinary course of business to maximize the value of the Debtor's assets, in each case, in accordance with the Approved Budget,

and to provide adequate protection.   The Debtors do not have sufficient available sources of working capital and financing to operate their businesses or maintain their properties in the ordinary course of business without access to the DIP Facilities and the authorized use of Cash Collateral, as applicable.

(v)     In light of the Debtors' facts and circumstances, the Debtors would be unable to obtain (i) adequate unsecured credit allowable either (a) under sections 364(b) and 503(b)(1) of the Bankruptcy Code, or (b) under section 364(c)(1) of the Bankruptcy Code, (ii) adequate credit secured by (a) a senior lien on unencumbered assets of their estates under section 364(c)(2) of the Bankruptcy Code, and (b) a junior lien on encumbered assets under section 364(c)(3) of the Bankruptcy Code, or (iii) secured credit under section 364(d)(1) of the Bankruptcy Code from sources other than the DIP Lenders on terms more favorable than the terms of the DIP Facilities.   The only viable source of secured credit available to the Debtors, other than the use of Cash Collateral, is the DIP Facilities.   The Debtors require both additional financing under the DIP Facilities and, subject to paragraph 6, the continued use of Cash Collateral, as applicable, under the terms of this Final Order to satisfy their postpetition liquidity needs.

(vi)    The DIP Lenders have, or have previously, indicated a willingness to provide the Debtors with certain financing commitments, and the Prepetition Secured Parties authorize the use of Prepetition Collateral, including Cash Collateral, but solely on the terms and conditions set forth in the Second Interim DIP Order, this Final Order, as applicable, and the DIP Loan Documents.

(vii)    Pursuant to the Second Interim DIP Order, on December 14, 2022, Leadenhall advanced (a) $999,999.99 to the Debtors under the DIP Notes and (b) an amount to be determined under the DIP Fee Notes, subject to resolution of the Disputed Issues (the amounts set forth in the foregoing clauses (a) and (b) together, together with any and all interest (including, where applicable, default interest), fees and expenses that shall accrue and be paid as set forth in the DIP Notes Term Sheet appended as Exhibit A to the Second Interim DIP Order, the "Leadenhall DIP Obligations").  Pursuant to Leadenhall's Termination Notice, the commitment of Leadenhall as a DIP Lender to make further advances under the DIP Notes was terminated on December 22, 2022 (the "Leadenhall Termination Date").  Leadenhall shall have no commitment to make further advances under the DIP Notes pursuant to this Final Order.  Pursuant to the Leadenhall Termination Declaration, Leadenhall revoked its consent to the Debtors' right to use Leadenhall's Cash Collateral after the Leadenhall Termination Date, but subsequently stipulated to its use pursuant to the Remedies Extension Stipulations.

(viii)    Accordingly, after considering all of their practical alternatives, the Debtors have concluded, in an exercise of their sound business judgment, that the financing to be provided by the DIP Lenders pursuant to the terms of this Final Order and the DIP Loan Documents represents the best financing currently available to the Debtors.

(ix)    Good cause has been shown for immediate entry of this Final Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2) and Local Rule 4001-2.   Entry of this Final Order is in the best interest of the Debtors, their estates and creditors.   The terms of the DIP Loan Documents (including the Debtors' continued use of the Prepetition

16

Collateral, including Cash Collateral) are fair and reasonable under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration for the Prepetition Secured Parties' consent thereto.

(x)      The Debtors, the DIP Lenders and the Prepetition Secured Parties have negotiated the terms and conditions of the DIP Loan Documents (including the Debtors' continued use of the Prepetition Collateral, including Cash Collateral), and this Final Order in good faith and at arm's length, and any credit extended and loans made to the Debtors pursuant to this Final Order and the Debtors' Stipulations shall be, and hereby are, deemed to have been extended, issued or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code. Subject to paragraph 44 of this Final Order, the Prepetition Secured Parties are entitled to receive adequate protection as set forth herein pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code for any Diminution in the Prepetition Collateral, including Cash Collateral, resulting from the automatic stay or the Debtors' use, sale or lease of the Prepetition Collateral, including Cash Collateral, during the Chapter 11 Cases.

Based upon the foregoing findings and conclusions, the Motion and the record before the Bankruptcy Court with respect to the Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

1.      <u>DIP Financing Approved</u>. On a final basis, entry into the DIP Facilities is authorized and approved, and the use of Cash Collateral is authorized, in each case, subject to the

17

terms and conditions set forth in this Final Order.  All objections to this Final Order to the extent

not withdrawn, waived, settled or resolved, and all reservations of rights included therein, are

hereby denied and overruled.  This Final Order shall become effective immediately upon its entry.

### DIP Facilities Authorization

2.     <u>Termination Notices</u>.  The authorizations and approvals set forth in this Final Order

shall in no way be limited by any prior Events of Default that have been alleged to occur as set

forth in the Prior Termination Notices.   Upon the entry of this Final Order, TCB shall withdraw,

without prejudice, the TCB Termination Notice.  Leadenhall's rights and remedies under the

Leadenhall Termination Notice, the Second Interim DIP Order, and this Final Order, including

those rights and remedies set forth in this Final Order, are reserved pursuant to paragraph 6 hereof.

Consistent with the Remedies Extension Stipulations, the Termination Date and the Carve-Out

Trigger (defined herein) shall not be deemed to have occurred as a result of either of the Prior

Termination Notices or any other events taking place prior to the entry of this Final Order.

3.     <u>Authorization of the DIP Financing</u>.     The Debtors are expressly and

immediately authorized and empowered to execute and deliver the DIP Loan Documents, and to

incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Final

Order and the DIP Loan Documents (and consistent with the 9019 Order), and to execute, deliver

and perform under all instruments, certificates, agreements, and documents which may be required

or necessary for the performance by the Debtors under the DIP Loan Documents and the creation

and perfection of the DIP Liens described in this Final Order and the DIP Loan Documents.  The

Debtors are hereby authorized and directed to pay, in accordance with this Final Order, any

principal, interest, fees, expenses, and other amounts described in the DIP Loan Documents and this

Final Order, as such amounts become due and owing, without need to obtain further Bankruptcy

APP066

Court approval (except as otherwise provided herein or in the DIP Loan Documents subject to and in accordance with the terms hereof and thereof, whether or not such disbursements arose before or after the Petition Date, and whether or not the transactions contemplated hereby are consummated, to implement all applicable reserves and to take any other actions that may be necessary or appropriate, all to the extent provided in this Final Order and the DIP Loan Documents).  Upon execution and delivery, the DIP Loan Documents shall represent legal, valid and binding obligations of the Debtors, enforceable against each of the Debtors and their Estates in accordance with their terms.   Each officer of a Debtor acting individually is hereby authorized to execute and deliver each of the DIP Loan Documents, such execution and delivery to be conclusive evidence of such officer's respective authority to act in the name of and on behalf of the Debtors.  All collections and proceeds, whether from ordinary course collections, asset sales, debt or equity issuances, insurance recoveries, condemnations or otherwise, will be deposited and applied as required by this Final Order and the DIP Loan Documents.   In consideration of Longbridge's participation in the Tail Advance DIP Facility, the Debtors are authorized to, and hereby do, transfer their interests in any tail securitization proceeds, to the extent they reflect a premium to par, funded by the DIP Tail Advances to Longbridge.

4.    Authorization to Borrow.  Subject to the terms and conditions set forth in the DIP Loan Documents and this Final Order, including the Approved Budget, the Debtors are hereby authorized to borrow the Approved Amount, subject to any limitations on, or conditions to, borrowing under the DIP Loan Documents, which borrowings shall be used solely for purposes permitted under the DIP Loan Documents, including, without limitation, to provide working capital for the Debtors and to pay interest, fees, costs, charges and expenses, in each case, in

APP067

accordance with, and subject to, this Final Order, the DIP Loan Documents, and the Approved Budget.

5.    <u>Leadenhall Forbearance</u>.  Leadenhall hereby agrees to forbear the exercise of any rights and remedies under this Final Order, the Second Interim DIP Order, the DIP Loan Documents, and the Remedies Extension Stipulations, until the earlier of (a) May 15, 2023, (b) two business days following the conclusion of the hearing (the "<u>Confirmation Hearing</u>") regarding confirmation of a chapter 11 plan in these Chapter 11 Cases, or (c) the date BNGL or TCB deliver a Termination Declaration following entry of this Final Order (such period, the "<u>Forbearance Period</u>").  The Debtors, Leadenhall, and the Committee hereby agree that this Final Order does not resolve the Disputed Issues relating to Leadenhall's rights under the Second Interim DIP Order, including related to Cash Collateral, Leadenhall's ability to exercise remedies, the Debtors' rights under the December 9, 2022 Stipulation (including as set forth in the Enforcement Motion), except that all parties agree and do not dispute that Leadenhall has funded and holds valid DIP Obligations of not less than $999,999.99.[3]   Solely with respect to the Disputed Issues,[4] all parties' rights are fully reserved under the Second Interim DIP Order and any remaining Disputed Issues that are not resolved by this Final Order shall be adjourned and either (i) heard in connection with the

---

[3] For the avoidance of doubt, all parties rights related to the treatment of such DIP Obligations (including those arguments set forth in the Enforcement Motion) are not resolved by this Final Order and, if necessary, shall be either (i) adjudicated in connection with the Confirmation Hearing or (ii) resolved through an adversary proceeding or contested matter, as applicable.

[4] The "<u>Disputed Issues</u>" are the disputes relating to:  (i) the Leadenhall Termination Notice, (ii) any issues referenced and reserved by the Stipulation Parties in any of the Remedies Extension Stipulations, including but not limited to the Cash Collateral Dispute, (iii) any issues and/or arguments raised in the Motion to Enforce, or any response, objection, or reply thereto; (iv) Leadenhall's rights under the Second Interim DIP Order  (including the DIP Notes Term Sheet attached thereto) and Leadenhall's ability to exercise remedies thereunder, including with respect to claims under section 506(c) of the Bankruptcy Code (v) Leadenhall's remaining security interests and liens on the Leadenhall MSR Collateral; and (vi) the Debtors' and Leadenhall's rights under the December 9, 2022 Stipulation (including as set forth in the Motion to Enforce).

APP068

Confirmation Hearing or (ii) be resolved by an adversary proceeding or contested matter, as applicable.

6.      [Reserved.]

7.      <u>DIP Obligations</u>.    The DIP Loan Documents and this Final Order shall constitute and evidence the validity and binding effect of the Debtors' DIP Obligations.    All DIP Obligations shall be enforceable against the Debtors, their Estates and any successors thereto, including without limitation, any trustee appointed in the Chapter 11 Cases, in any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "<u>Successor Cases</u>"). Upon entry of this Final Order, the DIP Obligations will include all  loans, reimbursement obligations, and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the Debtors to the DIP Lenders, including, without limitation, all principal, accrued interest, costs, charges, fees, expenses and other amounts under the DIP Loan Documents.    The Debtors shall be jointly and severally liable for the DIP Obligations.  Except as otherwise agreed, the DIP Obligations shall become due and payable, without notice or demand, and the use of Cash Collateral shall automatically cease on the Termination Date, subject to the Carve-Outs requirements herein.   No obligation, payment, transfer, or grant of collateral security hereunder or under the DIP Loan Documents (including any DIP Obligation or DIP Liens) to the DIP Lenders, and including in connection with any adequate protection provided to the Prepetition Secured Parties hereunder, shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 544, and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer

21

Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or be subject to any disgorgement, avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), claim, counterclaim, defense, charge, assessment, cross-claim, defense, or any other liability or challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity for any reason.

8.    _DIP Collateral_.  As security for the DIP Obligations, effective immediately upon entry of the Interim DIP Orders and as ratified by this Final Order, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Lenders are hereby granted continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on in the following order of priority (collectively, the "_DIP Liens_" and the assets and properties subject thereto, the "_DIP Collateral_"):

(a)    all obligations under the DIP Tail Advances and the Prepetition TCB Obligations shall be secured by first priority valid, perfected, enforceable and unavoidable liens on, and security interests in (such lien granted pursuant to this subsection (a), the "_TCB Unencumbered Assets DIP Lien_"), all assets of the Debtors that are not otherwise subject to valid, perfected, enforceable and unavoidable liens and security interests in existence as of the Petition Date or valid liens perfected (but not granted) after the Petition Date (to the extent such perfection in respect of a prepetition claim is expressly permitted under the Bankruptcy Code), including, without limitation, each item included within each category of unencumbered assets set forth on _Exhibit E_ of the DIP Notes Term Sheet (together constituting the "_Unencumbered Assets_"); _provided_, that solely with respect to the Unencumbered Assets securing the Prepetition TCB Obligations hereunder, such postpetition liens granted hereunder shall be limited to $3,129,000; _provided_, _further_, that upon the liquidation or monetization of any Unencumbered Assets, the first $3,129,000 shall be deposited into a segregated account at TCB for the benefit of TCB and any further disposition of such funds shall be subject to an order of the Bankruptcy Court (the "_TCB Additional Collateral Account_").  Any amounts released in accordance with the terms hereof from the TCB Additional Collateral Account after satisfaction of DIP Obligations owing to TCB and the Prepetition TCB Obligations shall constitute Unencumbered Assets.

22

(b)     all obligations under the DIP Tail Advances shall be secured by (i) priming first priority valid, perfected, enforceable and unavoidable liens on, and security interests in, the existing collateral securing the obligations under the Existing Tail Loan Agreement ("Existing TCB Tail Collateral"); (ii) a priming first priority valid, perfected, enforceable and unavoidable liens on, and security interests in, the proceeds of prepetition tail securitization proceeds to the extent they reflect a premium to par (the "TCB Tail Premium Collateral"), notwithstanding any provision in the Intercreditor Agreement by and between RMF, Leadenhall, and TCB, dated October 17, 2018; and (iii) junior priority valid, perfected, enforceable and unavoidable liens on, and security interests in, any collateral securing any other postpetition funded debt obligations that does not constitute Existing Collateral or TCB Tail Premium Collateral (the "TCB Junior DIP Collateral," and such lien, the "TCB Junior DIP Lien"), subject to the DIP Notes Liens; *provided*, that such TCB Tail Premium Collateral and the TCB Junior DIP Collateral shall also secure the Prepetition TCB Obligations up to $3,129,000 (which shall be coextensive and not incremental to the liens granted to secure the Prepetition TCB Obligations in subsection (a) immediately above) and upon the liquidation or monetization of any TCB Tail Premium Collateral and TCB Junior DIP Collateral that TCB's lien is senior at such time that the cash proceeds become available to satisfy the Prepetition TCB Obligations such cash proceeds shall be funded to the TCB Additional Collateral Account for the benefit of TCB, unless and until the TCB Additional Collateral Account is funded with an aggregate amount of $3,129,000.  For the avoidance of doubt, nothing herein shall affect Longbridge's property interest, pursuant to the Participation Agreement or otherwise, in the proceeds of the tails funded by the DIP Tail Advances.  The term "TCB Liens" as used in this Final Order shall include the Prepetition TCB Liens, the DIP Liens granted in favor of TCB under section (a) and (b) of this paragraph 8, and the TCB Replacement Liens.

(c)     all of Leadenhall's DIP Obligations shall be secured *pari passu* by valid, perfected, enforceable and unavoidable junior liens on the Leadenhall MSR Collateral, if any.

(d)     all obligations under the DIP Notes and the Additional Notes shall be secured by second priority valid, perfected, enforceable and unavoidable liens on, and security interests in Unencumbered Assets subject only to the TCB Unencumbered Assets DIP Lien and the Carve-Outs (the "DIP Notes Liens"); *provided,* that, solely with respect to the Additional Notes, the DIP Notes Liens securing such DIP Notes shall be subordinate to (i) all other DIP Notes, (ii) the Replacement Liens, and (iii) the Carve-Outs (the "Additional Notes DIP Liens").

Neither (i) Unencumbered Assets (as used herein) nor (ii) any other DIP Collateral shall include assets, collateral, or property that has been transferred, sold, pledged, or conveyed in connection with the Debtors' Repo Facilities (as defined below); _provided_, that upon the full and final satisfaction of any debt, obligations or other amounts owed under any Repo Facility, Repo Facility Equity Value (as defined below), in accordance with Section 559 of the Bankruptcy Code, shall constitute Unencumbered Assets.

As used here, "Repo Facility" or together "Repo Facilities" means the Debtors' warehouse repo facilities and securities repo facilities, including:

1. (i) the Master Repurchase Agreement between Credit Suisse AG, Cayman Islands Branch and Reverse Mortgage Funding LLC, dated January 15, 2021, (ii) the Master Repurchase Agreement between Credit Suisse Securities (USA) LLC and Reverse Mortgage Funding LLC, dated January 15, 2021, (iii) the Master Repurchase Agreement between Credit Suisse AG, Cayman Islands Branch and RMIT Operating II LLC, dated March 1, 2022, (iv) the Master Repurchase Agreement between Credit Suisse Securities (USA) LLC and RMIT Operating II LLC, dated March 1, 2022, (v) the Master Repurchase Agreement between Credit Suisse First Boston Mortgage Capital LLC (as administrative agent), Credit Suisse AG, Cayman Islands Branch, Alpine Securitization LTD (along with certain other buyers) and Reverse Mortgage Funding LLC, dated September 30, 2022 and (vi) any and all other contracts, agreements or other documents entered into in connection with the foregoing (i) through (vi) (such agreements, the "Credit Suisse Repo Facilities" and the Credit Suisse parties thereto, "collectively, "Credit Suisse");

2. (i) That certain Amended and Restated Master Repurchase Agreement, by and between Nomura Corporate Funding Americas, LLC, Reverse Mortgage Funding LLC and Broad Street Funding Trust II, dated as of June 4, 2019; (ii) that certain Master Repurchase Agreement, by and between Nomura Securities International, Inc. and Reverse Mortgage Funding LLC, dated as of January 9, 2017, as amended; and (iii) that certain Master Repurchase Agreement, by and between Nomura Securities International, Inc. and RMIT Operating II LLC, dated as of May 26, 2015 (such agreements, in each case, together with all guarantees, schedules and exhibits thereto, and confirmations exchanged pursuant to transactions entered into in connection with any of the foregoing the "Nomura Repo Facilities" and the Nomura parties thereto, collectively, "Nomura");

24

3.     That certain Master Repurchase Agreement, dated September 15, 2017, (as amended, restated, supplemented or otherwise modified from time to time, and together with all guarantees, schedules and exhibits thereto, Facility Documents (as defined therein) and confirmations exchanged pursuant to Transactions entered into in connection therewith, the "TIAA Agreement" or  "TIAA Repo Facility"), by and between TIAA, FSB, formerly known as EverBank ("TIAA") and Reverse Mortgage Funding LLC; and

4.     That certain Amended and Restated Master Repurchase Agreement, dated as of May 15, 2017 (as amended, restated, supplemented or otherwise modified from time to time), among Barclays Bank PLC as purchaser and agent ("Barclays"), Reverse Mortgage Funding LLC, as sellers, and Reverse Mortgage Investment Trust Inc, RMIT Operating I LLC, RMIT Operating II LLC, and RMIT Cash Management LLC, as guarantors (the "Barclays Repo Facility").

As used here, "Repo Facility Equity Value" means the property deemed to be property of the estate pursuant to the second sentence of Section 559 of the Bankruptcy Code, to the extent applicable and subject to the right of set-off as set forth in Section 559.

As used here, "Repo Party" means each of Credit Suisse, Nomura, TIAA and Barclays and any other party to a Repo Facility with the Debtors.

"Unencumbered Assets" as used herein includes all claims and/or causes of action of any Debtors, including any claims against Compu-Link Corporation (d/b/a Celink; "Celink") (inclusive of any Avoidance Action (as defined below)).  Unencumbered Assets shall not include actions for preferences, fraudulent conveyances, and other avoidance power claims under Sections 544, 545, 547, 548, 550 and 553 of the Bankruptcy Code (the "Avoidance Actions"), but shall include the proceeds of Avoidance Actions (the "Avoidance Action Proceeds").

Nothing in this Final Order precludes any Repo Party from proceeding in accordance with its respective repo facility or facilities (each as defined above).  The DIP Liens and Replacement Liens and any other liens granted pursuant to this order do not give the DIP Lenders or any of the Prepetition Secured Parties any rights or remedies with respect to any Repo Party or the Repo Facilities.  The DIP Lenders and the Prepetition Secured Parties shall only have recourse against the value, if any, actually returned to the Debtors' estate by a Repo Party, in accordance with Section 559 of the Bankruptcy Code, after full and final satisfaction of any debt, obligations or other amounts owed under the relevant Repo Facilities in accordance with Section 559 of the Bankruptcy Code. The DIP Lender and Prepetition Secured Parties may not take any action against any Repo Party on account

25

of the DIP Lien, Replacement Liens or any other rights or liens granted pursuant to this Final Order unless after full and final satisfaction of any debt, obligations or other amounts owed under the relevant Repo Facilities, a Repo Party refuses to turnover Repo Facility Equity Value.

9.    <u>DIP Liens</u>.    The DIP Liens securing the DIP Obligations are valid, automatically perfected, non-avoidable, senior in priority and superior to any security, mortgage, collateral interest, lien or claim to any of the DIP Collateral (as defined herein) except as otherwise stated herein, subject only to the Carve-Out; <u>*provided*</u>, that for the avoidance of doubt, the TCB Liens shall not be subject to, or subordinate to, the Carve-Out.  Other than as expressly set forth herein or in the DIP Loan Documents, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Cases, and shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases or any Successor Cases, upon the conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code (or in any other Successor Cases), and/or upon the dismissal of any of the Chapter 11 Cases or Successor Cases.  No other DIP Lender other than BNGL shall have a lien on funds advanced by BNGL on or after the date of this Final Order (including pursuant to the Additional Notes) (such funds, the "<u>New BNGL Advance</u>").  The DIP Liens shall not be subject to section 510, 549 or 550 of the Bankruptcy Code. No lien or interest avoided and preserved for the benefit of any Estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Liens.

10.    <u>DIP Notes Superpriority Claims</u>.  Subject to the Carve-Out, effective immediately upon entry of the Interim Orders and as ratified by this Final Order, each DIP Lender under the DIP Notes and the Additional Notes is hereby granted, pursuant to section 364(c)(1) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Chapter 11 Cases and any Successor Cases in the amount of the Debtors' obligations owed to such DIP

26

Lender under the DIP Notes and the Additional Notes (the "DIP Notes Superpriority Claims"): (a) which shall (i) have priority over any and all superpriority administrative claims granted by the Debtors other than the DIP Tail Advance Superpriority Claim, including priority over the Superpriority Adequate Protection Claims and (ii) have priority over all unsecured claims against the Debtors or their Estates in any of the Chapter 11 Cases and any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 364, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, as provided under Section 364(c)(1) of the Bankruptcy Code; *provided* that the DIP Notes Superpriority Claims on account of the Additional Notes shall be junior and subordinate to all other DIP Notes Superpriority Claims, all Adequate Protection Claims, and the Initial Carve-Out and Second Carve-Out, and (b) which shall at all times be senior to the rights of the Debtors and any successor trustee or other estate representative to the extent permitted by law.  Notwithstanding the foregoing, the DIP Notes Superpriority Claims held by Leadenhall shall be junior to the Initial Carve-Out and the DIP Notes Superpriority Claims held by BNGL shall be junior to both Carve-Outs.

11.    DIP Tail Advance Superpriority Claims.  Subject to the Carve-Outs, effective immediately upon entry of the Interim Orders and as ratified by this Final Order, the Tail Advance DIP Lenders are hereby granted, pursuant to section 364(c)(1) of the Bankruptcy Code, allowed superpriority administrative expense claims in each of the Chapter 11 Cases and any Successor Cases for all obligations under the DIP Tail Advances (collectively, the "DIP Tail Advance Superpriority Claims", and with the DIP Notes Superpriority Claims, the "DIP Superpriority

27

Claims"):[5] (a) which shall have priority over (i) any and all superpriority administrative claims granted by the Debtors, including priority over the DIP Notes Superpriority Claims, the Superpriority Adequate Protection Claims and (ii) unsecured claims against the Debtors or their Estates in any of the Chapter 11 Cases and any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 364, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, as provided under Section 364(c)(1) of the Bankruptcy Code; and (b) which shall at all times be senior to the rights of the Debtors and any successor trustee or other estate representative to the extent permitted by law.   Notwithstanding the foregoing, the DIP Tail Advance Superpriority Claims shall be junior to the Carve-Outs.

12.    No Obligation to Extend Credit. The DIP Lenders shall have no obligation to make any loan or advance under the DIP Loan Documents unless all of the conditions precedent under the DIP Loan Documents and this Final Order have been satisfied in full or waived by the DIP Lenders in accordance with the terms of the DIP Loan Documents, including the Approved Budget.  Leadenhall shall have no commitment to make further advances under the DIP Notes pursuant to this Final Order, and TCB shall have no commitment to make further advances under the DIP Tail Facility pursuant to this Final Order.

13.    Use of Proceeds of DIP Facilities.  From and after the Petition Date, the Debtors shall use advances of credit under the DIP Facilities only for the purposes specifically set forth in this Final Order and the DIP Loan Documents, and in compliance with the Approved Budget,

---

[5] For the avoidance of doubt, the "DIP Superpriority Claims" as used herein shall include the "DIP Superpriority Claims" granted to BNGL and TCB pursuant to the DIP Interim Orders and funded in accordance therewith.

subject to the Permitted Variances, and the terms and conditions in this Final Order and the DIP Loan Documents.

14.   <u>No Monitoring Obligation</u>.    The DIP Lenders shall have no obligation nor responsibility to monitor the Debtors' use of the DIP Facilities, and the DIP Lenders may rely upon the Debtors' representation that the use of the DIP Facilities at any time are in accordance with the requirements of this Final Order and the DIP Loan Documents.

<b><u>Authorization to Use Cash Collateral</u></b>

15.   <u>Authorization to Use Cash Collateral</u>.   Subject to the terms and conditions of the Second Interim DIP Order, this Final Order (including but not limited to paragraph 6),  the DIP Facilities, the DIP Loan Documents, the Remedies Extension Stipulations, and in accordance with the Approved Budget, subject to the Permitted Variances, the Prepetition Secured Parties consent to, and the Debtors are authorized to use Cash Collateral until the occurrence of the Termination Date (not including any Termination Date occurring prior to the entry of this Final Order); *provided*, that the Debtors shall not be authorized to use (a) cash on hand in the TCB Additional Collateral Account or the restricted accounts at TCB identified in **Schedule 1** attached the Tail Advance DIP Term Sheet, nor (b) cash proceeds of TCB's DIP Collateral or the Prepetition TCB Collateral, including, without limitation, any Repo Facility Equity Value that is received by the Debtors (collectively, the "Restricted Cash Collateral"); *provided*, *further*, that, for the avoidance of doubt, neither Leadenhall nor TCB have an interest in, or lien on (including pursuant to any DIP Lien), the funds advanced by BNGL pursuant to this Final Order and the 9019 Order that constitute the New BNGL Advance.  Notwithstanding the limitation on the Debtors' use of TCB's Cash Collateral in the preceding sentence, the Debtors may use TCB's Cash Collateral that constitutes the cash proceeds of TCB's DIP Collateral or the Prepetition TCB

29

Collateral that is identified in the Approved Budget as (i) "Other Asset Recovery", (ii) "Servicing Fee Reimbursement (Warehouse)", (iii) "Tail Reimbursement (RPIT)", (iv) "Tail Reimbursement (Warehouse)", and (v) "Tail Reimbursement (Non-GNMA MSR)."   Notwithstanding the limitation on the Debtors' use of Leadenhall's cash collateral in this paragraph, to the extent such funds constitute Leadenhall's cash collateral, pursuant to the *Order Approving the Stipulation Granting Relief From the Automatic Stay, Authorizing the Transfer of Certain Assets, Authorizing Certain Advances, and Granting Related Relief* [D.I. 397] (the "Nomura Stipulation"), the Debtors are authorized to use Payments (as defined in the Nomura Stipulation) paid by Nomura (as defined herein), and payments made by Credit Suisse (as defined herein) pursuant to the Reimbursement Stipulation (as defined below) (the funds to be reimbursed by Nomura and Credit Suisse pursuant to such stipulations, the "Warehouse Lender Reimbursements").   For the avoidance of doubt, the Debtors are not authorized to use cash proceeds of Repo Facility Equity Value returned to the Estates pursuant to the foregoing.  Nothing in this Final Order shall authorize the disposition of any assets of the Debtors outside the ordinary course of business, or any Debtor's use of any Cash Collateral or other proceeds resulting therefrom, except as permitted by this Final Order, the DIP Facilities, the DIP Loan Documents, and in accordance with the Approved Budget, as applicable.

16.    Consent of Prepetition Secured Parties.   Subject to and in consideration of the adequate protection (subject to the Disputed Issues) set forth in this Final Order, the Prepetition Secured Parties hereby consent to (a) the provisions of this Final Order including the Debtors' entry into the DIP Facilities on a final basis, (b) the granting of the DIP Liens and DIP Superpriority Claims on the terms and subject to the conditions set forth herein, and (c) the Approved Budget, subject to the Permitted Variances.

30

17.  <u>Adequate Protection for Leadenhall</u>.  As adequate protection for Diminution, if any, in the Leadenhall MSR Collateral (subject to paragraph 44) securing the Existing Notes, the holders of the Existing Notes (the "<u>Existing Note Parties</u>") shall receive:

(a)  continuing valid, binding, enforceable and perfected postpetition replacement liens pursuant to sections 361, 363(e), and 364(d)(l) of the Bankruptcy Code on the DIP Collateral, which shall be subject and subordinated only to the DIP Liens (including, for the avoidance of doubt, the TCB Liens on the TCB Tail Premium Collateral) and the Initial Carve-Out and *pari passu* with the BNGL Replacement Liens (the "<u>Existing Note Providers Replacement Liens</u>") and which shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Cases other than the DIP Liens and shall be valid and enforceable against any trustee appointed in any of the Chapter 11 Cases or any Successor Cases, and shall not be subject to sections 510, 549 or 550 of the Bankruptcy Code;

(b)  a superpriority administrative expense claim (the "<u>Existing Note Providers Superpriority Adequate Protection Claim</u>"), subject and subordinate to (i) the Carve-Out, (ii) the DIP Superpriority Claims, and (iii) TCB Superpriority Adequate Protection Claims and *pari passu* with the BNGL Superpriority Adequate Protection Claim pursuant to section 507(b) with priority over any and all other administrative expenses, administrative expense claims and unsecured claims against the Debtors or their Estates, now existing or hereafter arising, of any kind or nature whatsoever as to and to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code;

(c)  the assignment to Existing Notes Parties on account of its Existing Notes of all rights to AAG payments (including, without limitation, any monthly Premium Recapture Plan component and any AAG Tail GOS Revenue share payment); and

(d)  (1) on Thursday of each week (commencing December 8, 2022), no later than 12:00 pm ET, a variance report in form reasonably acceptable to Leadenhall  (each, a "<u>Variance Report</u>") with respect to the immediately prior week ended the last business day of such week, setting forth (i) the actual cash receipts and disbursements for such immediately preceding week on a line-item basis and available cash on hand as of the end of such week, (ii) the variance in dollar amounts of the actual receipts and disbursements for each weekly period from those reflected for the corresponding period in the  Budget, (iii) a description of the nature of any material positive or negative variance in certain line items to be agreed, (iv) whether the Debtors complied with the budget covenant for the applicable testing period, and (v) payments made pursuant to any first-day orders

31

during the prior week;

(2) on Thursday of each week, a weekly call with representatives of Leadenhall to discuss financial results, projections, variance reports, and related matters; and

(3) promptly, such additional information regarding the business, legal, financing, or corporate affairs of the Debtors or any of their respective subsidiaries, or compliance with the terms of the DIP Notes, as Leadenhall may from time to time reasonably request; *provided* (i) that under no circumstance shall the Debtors be required to disclose information or communications subject to attorney-client privilege and (ii) subject to Leadenhall agreeing to treat any sensitive information on a confidential basis.

18.    <u>Adequate Protection for TCB Secured Parties</u>.  As adequate protection for any Diminution in the Prepetition TCB Collateral securing the Prepetition TCB Obligations, TCB shall receive:

(a)    continuing valid, binding, enforceable and perfected postpetition replacement liens pursuant to sections 361, 363(e), and 364(d)(l) of the Bankruptcy Code on the DIP Collateral, subject and subordinated only to the DIP Liens (the "<u>TCB Replacement Liens</u>") and which shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Cases other than the DIP Liens and shall be valid and enforceable against any trustee appointed in any of the Chapter 11 Cases or any Successor Cases, and shall not be subject to sections 510, 549 or 550 of the Bankruptcy Code;

(b)    a superpriority administrative expense claim (the "<u>TCB Superpriority Adequate Protection Claim</u>"), subject and subordinate to (i) the Carve-Out, and (ii) the DIP Tail Advance Superpriority Claim pursuant to section 507(b) with priority over any and all administrative expense claims, including priority over the DIP Superpriority Claims, the Existing Note Providers Superpriority Adequate Protection Claim, and the BNGL Superpriority Adequate Protection Claim and unsecured claims against the Debtors or their Estates, now existing or hereafter arising, of any kind or nature whatsoever as to and to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code;

(c)    with respect to Advances (as defined in the Existing Tail Loan Agreement) funded to the Debtors prior to the Petition Date, the Debtors shall comply on a postpetition basis with all terms of payment set forth in the Existing

Tail Loan Agreement, including, but not limited to, sections 2.4, 2.7(b), 2.7(c), 2.8 and 2.10;

(d)     TCB may setoff all reasonable professional fees and expenses of TCB's counsel (Paul, Weiss, Rifkind, Wharton & Garrison LLP and Landis Rath & Cobb LLP) out of Restricted Cash Collateral, and that such professional fees and expenses shall be included as part of the DIP Obligations owing to TCB and/or the Prepetition TCB Obligations; *provided, that*, under no circumstances shall the Debtors be obligated to pay any such professional fees and expenses out of any cash other than Restricted Cash Collateral as part of TCB's adequate protection under this paragraph 17; *provided, further*, that TCB reserves all rights to the extent any such professional fees and expenses remain unpaid to seek recovery of such professional fees and expenses as part of the DIP Obligations owing to TCB and/or the Prepetition TCB Obligations;

(e)     (i) a Variance Report with respect to the immediately prior week ended the last business day of such week, setting forth the actual cash receipts and disbursements for such immediately preceding week, the source of such disbursements, the variance in dollar amounts of the actual receipts and disbursements for each weekly period from those reflected for the corresponding period in the Approved Budget, and a description of the nature of any material positive or negative variance in certain line items to be agreed, (ii) a weekly call with FTI Consulting, Inc. with respect to the Variance Report, and (iii) delivery to TCB's counsel of any reporting that is provided to any other DIP Lenders pursuant to this Final Order; and

(f)     TCB is authorized to apply any amounts received from the FHA to which TCB is entitled on account of (i) assignment of "Active Buyouts" to FHA or (ii) any claim submitted following liquidation of "Non-Active Buyouts, in each case, to the extent that TCB is entitled to such proceeds under the Prepetition TCB Facilities.

19.     <u>Adequate Protection for BNGL</u>.   As adequate protection for any Diminution in the Prepetition Collateral of BNGL, BNGL shall receive (i) continuing valid, binding, enforceable and perfected postpetition replacement liens pursuant to sections 361, 363(e), and 364(d)(l) of the Bankruptcy Code on the DIP Collateral, which shall be subject and subordinated only to the DIP Liens, the TCB Liens, and the Carve-Out and *pari passu* with the Existing Note Providers Replacement Liens (the "<u>BNGL Replacement Liens</u>," and with the Existing Note Providers Replacement Liens and the TCB Replacement Liens, the "<u>Replacement Liens</u>") and which shall

33

not be made subject to or *pari passu* with any other lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Cases and shall be valid and enforceable against any trustee appointed in any of the Chapter 11 Cases or any Successor Cases, and shall not be subject to sections 510, 549 or 550 of the Bankruptcy Code; (ii) administrative superpriority expense claims in each of the Chapter 11 Cases (the "BNGL Superpriority Adequate Protection Claims," and with the Existing Note Providers Superpriority Adequate Protection Claims, and the TCB Superpriority Adequate Protection Claims, the "Superpriority Adequate Protection Claims"), junior and subordinate only to (a) the DIP Superpriority Claims, (b) the TCB Superpriority Adequate Protection Claims, and (c) the Carve-Out, and *pari passu* with the Existing Note Providers Superpriority Adequate Protection Claims pursuant to section 507(b) with priority over any and all other administrative expenses, administrative expense claims and unsecured claims against the Debtors or their Estates, now existing or hereafter arising, of any kind or nature whatsoever as to and to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code.

20.    Adequate Protection Reservation.    Nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition Secured Parties hereunder is insufficient to compensate for any Diminution of their respective interests in the Prepetition Collateral during the Chapter 11 Cases or any Successor Cases.  The receipt by the Prepetition Secured Parties of the adequate protection provided herein shall not be deemed an admission that the interests of the Prepetition Secured Parties are adequately protected, and this Final Order shall not prejudice or limit the rights of the Prepetition Secured Parties to seek additional relief with respect to the use of Cash Collateral or for additional adequate protection.

34

**Provisions Common to DIP Financing and Use of Cash Collateral**

21.    <u>Amendment of the DIP Loan Documents</u>.    The Debtors irrevocably waive any right to seek any amendment, modification or extension of this Final Order without the prior written notice to the Committee and written consent of the DIP Lenders (which they may grant) in their sole discretion.  No such consent shall be implied by any action, inaction or acquiescence of the DIP Lenders.    After obtaining the DIP Lenders' prior written consent, the Debtors are authorized and empowered, without further notice and hearing or approval of this Court, to amend, modify, supplement, or waive any provision of the DIP Loan Documents in accordance with the provisions thereof.    Notwithstanding the foregoing, to the extent that an amendment, modification or extension referenced in this paragraph 21 is materially adverse to any party-in-interest, the Debtors shall provide not less than five (5) business days' notice to such party-in-interest so that such party may have an opportunity to be heard by the Bankruptcy Court prior to the effective date of such amendment, modification or extension of this Final Order.

22.    <u>Approved Budget</u>.  The Approved Budget (as approved by TCB and BNGL and as may be updated in accordance with the terms and conditions of this Final Order, the DIP Loan Documents, and the 9019 Order), attached to this Final Order as **<u>Exhibit C</u>**, is approved on a final basis.  TCB hereby consents to the Professional Fee Escrow being funded after the date hereof pursuant to the Approved Budget (and solely with funds advanced by BNGL under the DIP Notes) and that all funds in the Professional Fee Escrow shall be utilized to fund the Carve-Out following a Carve-Out Trigger.  The proceeds of the DIP Facilities and Cash Collateral under this Final Order shall be used by the Debtors in accordance with the Approved Budget, this Final Order and the DIP Loan Documents.

23.    <u>Budget & Reporting</u>.    The Debtors shall comply with all budget and reporting procedures set forth in the DIP Term Sheets.  A copy of all Variance Reports shall be shared with counsel to Leadenhall and the Creditors' Committee at the same time or contemporaneously with such report being shared with BNGL and TCB.

24.    <u>Modification of Automatic Stay</u>.    The automatic stay of section 362 of the Bankruptcy Code is hereby modified and vacated to the extent necessary to permit the Debtors, the DIP Lenders and the Prepetition Secured Parties to accomplish the transactions contemplated by this Final Order.  The automatic stay of section 362 of the Bankruptcy Code is hereby modified and vacated to the extent necessary to permit the Debtors, the DIP Lenders, and the Prepetition Secured Parties to accomplish the transactions contemplated by this Final Order, including, without limitation, to implement and effectuate the Adequate Protection granted to the Prepetition Secured Parties hereunder.  Furthermore, (a) pursuant to sections 362, 555 and 559 of the Bankruptcy Code, TCB is authorized to exercise their rights and remedies to liquidate, accelerate and/or terminate their relevant repurchase agreements with the Debtors and any related documents, and to the extent not within the scope of sections 362(b)(6) or (7), the automatic stay is hereby lifted to allow TCB to exercise such rights and remedies and/or to set off against any amounts of the Debtors held by TCB, and (b) the Debtors shall fully and expeditiously cooperate with TCB to facilitate the exercise of any such rights or remedies by TCB.  For the avoidance of doubt, the foregoing does not authorize TCB, in its capacity as the Debtors' cash management bank, to exercise any setoff rights not otherwise permitted under the Cash Management Order [D.I. 116].

25.    <u>Perfection of DIP Liens and Replacement Liens</u>.    This Final Order shall be sufficient and conclusive evidence of the creation, validity, perfection, and priority of all liens granted herein, including the Carve-Out, the DIP Liens, as applicable and the Replacement Liens,

APP084

without the necessity of filing or recording any financing statement, mortgage, deed of trust, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including entering into any deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens and the Replacement Liens or to entitle the DIP Lenders and the Prepetition Secured Parties to the priorities granted herein.   Notwithstanding the foregoing, the DIP Lenders are authorized, but not required, to file, as each deems necessary or advisable, such financing statements, security agreements, mortgages, notices of liens and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the DIP Liens and the Replacement Liens, and all such financing statements, mortgages, notices, agreements, and other documents shall be deemed to have been filed or recorded as of the Petition Date; *provided*, *however*, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens or the Replacement Liens.   The Debtors are authorized and directed to execute and deliver promptly upon demand to the DIP Lenders all such financing statements, mortgages, notices and other documents as each may reasonably request.  The DIP Lenders may, in their discretion, file a photocopy of this Final Order as a financing statement with any filing or recording office or with any registry of deeds or similar office in addition to or in lieu of such financing statements, notices of lien or similar instruments.   Notwithstanding the forgoing, in the event any of the Chapter 11 Cases or Successor Cases are dismissed prior to the indefeasible payment in full of the DIP Obligations, such order dismissing any Chapter 11 Cases or Successor Cases shall not be effective for five (5) business days to permit the DIP Lenders to enter into any agreements or file any documents (including financing statements, mortgages, or other notices) evidencing the perfection and priority of the DIP Liens and Replacement Liens, and during such

APP085

period, the Debtors shall comply with all reasonable requests of the DIP Lenders and to ensure the perfection of the DIP Liens and the Replacement Liens, as applicable.

26.    <u>Access to Books and Records</u>.  The Debtors will maintain books, records, and accounts to the extent and as required by the DIP Loan Documents and cooperate with, consult with, and provide to the DIP Lenders and Prepetition Secured Parties all such information and documents that any or all of the Debtors are obligated to provide under the DIP Loan Documents or the provisions of this Final Order or as otherwise reasonably requested by the DIP Lenders or Prepetition Secured Parties.

27.    <u>Proceeds of Subsequent Financing</u>.  Following entry of this Final Order (and the DIP Lenders having waived any rights to the contrary in the Second Interim DIP Order), if the Debtors, any trustee, any examiner with expanded powers, or any responsible officer subsequently appointed in these Chapter 11 Cases or any Successor Cases, shall obtain credit or incur debt pursuant to Bankruptcy Code sections 364(b), 364(c) or 364(d) or in violation of the DIP Loan Documents at any time prior to the indefeasible repayment in full in cash of all DIP Obligations and the termination of the DIP Lenders' obligation to extend credit under the DIP Facilities, including subsequent to the confirmation of the Plan with respect to any or all of the Debtors and the Debtors' Estates, and such facilities are secured by any DIP Collateral, then all cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Lenders to be distributed in accordance with this Final Order and the DIP Loan Documents, and then to the Prepetition Secured Parties for the repayment of the Prepetition Obligations.  If the Debtors, any trustee, any examiner with expanded powers, or any responsible officer subsequently appointed in the Chapter 11 Cases, or any Successor Cases, shall obtain credit or incur debt (other than the DIP Facilities) pursuant to Bankruptcy Code section 364(d) at any time prior to the indefeasible

repayment in full of the Prepetition Obligations, the Prepetition Secured Parties' rights to object to the Debtors' use of Cash Collateral and assert a lack of adequate protection shall be fully preserved.

28.      <u>Maintenance of DIP Collateral</u>.  Until the indefeasible payment in full in cash of all DIP Obligations, all Prepetition Obligations, and the termination of the DIP Lenders' obligation to extend credit under the DIP Facilities, the Debtors shall insure the DIP Collateral consistent with their business practice prior to the Petition Date.

29.      <u>Termination Date</u>.  On the applicable Termination Date (defined below), (a) all applicable DIP Obligations shall be immediately due and payable, except as otherwise agreed, (b) all commitments to extend credit under the applicable DIP Facilities will terminate, and (c) all authority to use Cash Collateral shall cease except (i) as necessary to fund the Carve-Out Reserve (as defined below) and (ii) to pay expenses necessary for the operation of the Debtors as provided in the Approved Budget.

30.      <u>Events of Default</u>. Until the DIP Obligations are indefeasibly paid in full in cash (or as otherwise agreed) and all commitments thereunder are terminated (the "<u>DIP Repayment</u>") the occurrence of any of the following events, unless waived by the DIP Lenders, shall constitute an event of default (collectively, the "<u>Events of Default</u>"): (a) the failure of the Debtors to perform, in any respect, any of the terms, provisions, conditions, covenants or obligations under this Final Order, including, without limitation, failure to make any payment under this Final Order when due or to comply with any Milestones; or (b) the occurrence and continuation of an "Event of Default" under, and as defined in, the DIP Loan Documents or an event of default under any other DIP Loan Documents.

31.    <u>Milestones</u>. As a condition to the DIP Facilities and the use of Cash Collateral, the Debtors shall comply with the milestones (the "<u>Milestones</u>") as set forth in the DIP Term Sheets attached hereto.   Unless waived by the DIP Lenders (applicable to each DIP Term Sheet), the failure of the Debtors to comply with any of the Milestones shall constitute an immediate Event of Default under the DIP Loan Documents and this Final Order.  The Milestones may be extended by email confirmation by counsel to the applicable DIP Lender and notice to the Committee.

32.    <u>Rights and Remedies Upon Event of Default.</u> Upon the occurrence and during the continuation of an Event of Default, and subject to the provision of paragraphs 2 and 30 herein, notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from the Bankruptcy Court, but subject to the terms of this Final Order: (a) BNGL or TCB may send a written notice to the Debtors, counsel to the Committee, and the U.S. Trustee (any such declaration shall be referred to herein as a "<u>Termination Declaration</u>") declaring (except as otherwise agreed) (1) all DIP Obligations owing under the DIP Loan Documents to be immediately due and payable, (2) the commitment of the DIP Lender to extend financing under the DIP Facilities to be terminated, whereupon such commitments and obligation shall be terminated to the extent any such commitment remains under the DIP Facilities, (3) the termination of the DIP Facilities and the DIP Loan Documents as to any future liability or obligation of the DIP Lender, but without affecting any of the DIP Liens or the DIP Obligations, and (4) the application of the Carve-Out has occurred following the Carve-Out Trigger; (b) interest, including, where applicable, default interest, shall accrue and be paid as set forth in the DIP Loan Documents; and (c) the DIP Lender (in accordance with the DIP Loan Documents) may declare a termination, reduction or restriction on the ability of the Debtors to use cash collateral (the earliest

APP088

date on which a Termination Declaration is delivered by the DIP Lender shall be referred to herein as the "Termination Date").   Following a Termination Date, neither the DIP Lender nor the Prepetition Secured Parties shall be required to consent to the use of any Cash Collateral or provide any loans or other financial accommodations under the DIP Facilities.

33.     The Debtors and the Committee may seek an emergency hearing during the five (5) days following the date a Termination Declaration is delivered (such five (5) day period, the "Remedies Notice Period"); *provided*, *however*, that the Debtors hereby waive their right to and shall not be entitled to seek relief, including, without limitation, under Section 105 of the Bankruptcy Code, to the extent that such relief would in any way materially impair or restrict the rights and remedies of the DIP Lender or, if applicable, the Prepetition Secured Parties.

34.     Rights and Remedies Following Termination Date. Following the expiration of the Remedies Notice Period, TCB and/or BNGL shall be entitled to exercise all rights and remedies in accordance with the DIP Loan Documents, this Final Order and applicable law and shall be permitted to satisfy the relevant DIP Obligations and DIP Superpriority Claims, to the extent applicable, subject to the Carve-Out (as applicable).   The Debtors are hereby authorized and directed to, with the exclusion of the Carve-Out, remit to the DIP Lender one-hundred percent (100%) of all collections on, and proceeds of, the DIP Collateral, all collections, remittances, and proceeds of the DIP Collateral in accordance with the DIP Loan Documents and this Final Order. In furtherance of the foregoing, (a) each bank or other financial institution with an account of any Debtor is hereby authorized and directed to (i) comply at all times with any instructions originated by TCB and/or BNGL to such bank or financial institution directing the disposition of cash, securities, investment property and other items from time to time credited to such account, without further consent of any Debtor, including without limitation, any instruction to send to the DIP

41

Lender by wire transfer or in such other manner as the DIP Lender directs, all cash, securities, investment property and other items held by such bank or financial institution, and (ii) waive any right of set off, banker's lien or other similar lien, security interest or encumbrance, (b) subject to the payment of any and all fees and expenses of the Debtors associated therewith, TCB and/or BNGL may compel the Debtors to seek authority to (i) sell or otherwise dispose of all or any portion of the Prepetition Collateral pursuant to section 363 (or any other applicable provision) of the Bankruptcy Code on terms and conditions pursuant to sections 363, 365 and other applicable provisions of the Bankruptcy Code, (ii) assume and assign any lease or executory contract included in the DIP Collateral to the DIP Lender's respective designees in accordance with and subject to section 365 of the Bankruptcy Code, (c) subject to the payment of any and all fees and expenses of the Debtors associated therewith by the DIP Lender, TCB and/or BNGL may direct the Debtors to, (and the Debtors shall comply with such direction to), dispose or liquidate the DIP Collateral via one or more sales of such DIP Collateral and/or the monetization of other DIP Collateral with the DIP Lender having sole authority over the price of any DIP Collateral to be disposed of, (d) subject to the payment of any and all fees and expenses of the Debtors associated therewith by TCB and/or BNGL, TCB and/or BNGL may, or may direct the Debtors to, (and the Debtors shall comply with such direction to) collect accounts receivable, without setoff by any account debtor, and (e) to the extent authorized under applicable law, the DIP Lender shall be authorized to succeed to any of the Debtors' rights and interests under any licenses for the use of any intellectual property.  Subject to the payment of any and all fees and expenses of the Debtors associated therewith by the DIP Lender, the Debtors shall take all action that is reasonably necessary or advisable to cooperate with TCB and/or BNGL in the exercise of their rights and remedies and to facilitate the realization of the DIP Collateral by the DIP Lender.

35.     Carve-Out. Except for the TCB Liens (which includes the TCB Replacement Liens), each of the DIP Liens, the DIP Superpriority Claims, the Superpriority Adequate Protection Claims, and the Replacement Liens shall be subject and subordinate to payment of the Initial Carve-Out, and the DIP Notes Liens with respect to the Additional Notes, the Superpriority Adequate Protection Claims other than Leadenhall's, and the DIP Superpriority Clams other than Leadenhall's shall be subject and subordinate to payment of the Second Carve-Out.  The TCB Liens shall not be subject to nor subordinate to payment of the Initial Carve-Out or the Second Carve-Out.  For the avoidance of doubt, the Debtor may not utilize TCB's Cash Collateral under the DIP Tail Advances, the Prepetition TCB Facilities, any amounts in the TCB Additional Collateral Account (the "TCB Cash Collateral"), or Leadenhall's prepetition Cash Collateral (if any), but shall be permitted to utilize to fund the Carve-Outs (i) any other Cash Collateral of the other DIP Lenders or other Prepetition Secured Parties that is maintained at TCB, in its capacity as cash management bank (the "Non-TCB Cash Collateral"), (ii) amounts funded by BNGL, including the New BNGL Advance, (iii) all funds in Professional Fee Reserve, including all funds in the Professional Fee Reserve as of February 16, 2023.

(a)     As used in this Final Order, the "Initial Carve-Out" means the sum of (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (collectively, the "Bankruptcy Statutory Fees"); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under sections 726(b) and 1183(a) of the Bankruptcy Code (collectively, the "Trustee Fees"); and (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code

43

(the "Debtor Professionals") and the Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time on or before February 16, 2023; and

(b)    As used in this Final Order, "Second Carve-Out" (each of the Initial Carve-Out and the Second Carve-Out, a "Carve-Out", and together, the "Carve-Outs") means the sum of (i) the Bankruptcy Statutory Fees, (ii) the Trustee Fees, and (iii) Allowed Professional Fees incurred by the Professional Persons at any time before or on the first business day following the Second Carve-Out Trigger, and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $1,500,000 incurred after occurrence of the Second Carve-Out Trigger until the case is converted to chapter 7, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve-Out Trigger Cap").  For purposes of the foregoing, "Carve-Out Trigger" shall mean the occurrence of a Termination Declaration or an acceleration of the DIP Obligations under the DIP Facilities and "Second Carve-Out Trigger" means a Carve-Out Trigger subsequent to the Initial Carve-Out Trigger.

(c)    Carve-Out Reserves.  On the day of the occurrence of the Second Carve-Out Trigger (the "Second Termination Declaration Date"), the Second Carve-Out Trigger shall (i) be deemed a draw request and notice of borrowing by the Debtors for DIP Loans under the DIP Notes, in an amount equal to the then unpaid amounts of the Allowed Professional Fees (any such amounts actually advanced shall constitute DIP Loans) and (ii) also constitute a demand to the Debtors (in each case excluding TCB Cash Collateral and Prepetition TCB Collateral) to utilize all cash on hand, including Non-TCB Cash Collateral and the funds in the Professional Fee Reserve, as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount

44

equal to the then unpaid amounts of the Allowed Professional Fees (which, for the avoidance of

doubt, includes Allowed Professional Fees under both) the Initial Carve-Out and the Second

Carve-Out.  The Debtors shall deposit and hold such amounts in a segregated account at TD Bank,

N.A. ("TD Bank") (and may use the existing Professional Fee Reserve bank account for this

purpose) in trust to pay such then unpaid Allowed Professional Fees (the "Pre-Carve-Out Trigger

Reserve") prior to any and all other claims.  On the Second Termination Declaration Date, the

Second Carve-Out Trigger shall also (i) be deemed a request by the Debtors for DIP Loans under

the DIP Notes, in an amount equal to the Post-Carve-Out Trigger Cap (any such amounts actually

advanced shall constitute DIP Loans) and (ii) constitute a demand to the Debtors (in each case

excluding TCB Cash Collateral and Prepetition TCB Collateral) to utilize all cash on hand,

including Non-TCB Cash Collateral and the Professional Fee Reserve, as of such date and any

available cash thereafter held by any Debtor, after funding the Pre-Carve-Out Trigger Reserve, to

fund a reserve in an amount equal to the Post-Carve-Out Trigger Cap.  The Debtors shall deposit

and hold such amounts in a segregated account at TD Bank in trust to pay such Allowed

Professional Fees benefiting from the Post-Carve-Out Trigger Cap (the "Post-Carve-Out Trigger

Reserve" and, together with the Pre-Carve-Out Trigger Reserve, the "Carve-Out Reserves") prior

to any and all other claims.  On the first business day after the Second Termination Declaration

Date, notwithstanding anything in the DIP Loan Documents to the contrary, including with respect

to the existence of an Event of Default (as defined in the DIP Loan Documents), the failure of the

Debtors to satisfy any or all of the conditions precedent for the DIP Loans under the DIP Facilities,

any termination of the DIP Obligations following an Event of Default, or the occurrence of the

Maturity Date (as defined in the DIP Loan Documents), the DIP Lender shall make available such

DIP Loans under the DIP Notes.  For the avoidance of doubt, the Carve-Out Reserves shall not be

funded with the Plan Reserve.  All funds in the Pre-Carve-Out Trigger Reserve shall be used first

to pay the obligations benefiting from the Initial Carve-Out and clauses (i) through (iii) of the

definition of Second Carve-Out set forth above (the "Pre-Carve-Out Amounts"), but not, for the

avoidance of doubt, the Post-Carve-Out Trigger Cap, until paid in full, and then, to the extent the

Pre-Carve-Out Trigger Reserve has not been reduced to zero, to pay the DIP Lenders, unless the

DIP Obligations have been indefeasibly paid in full, in cash, and all DIP Obligations have been

terminated, in which case any such excess shall be paid to the Prepetition Secured Parties

(excluding TCB) in accordance with their rights and priorities as of the Petition Date.  All funds

in the Post-Carve-Out Trigger Reserve shall be used first to pay the obligations set forth in clause

(iv) of the definition of Second Carve-Out set forth above (the "Post-Carve-Out Amounts"), and

then, to the extent the Post-Carve-Out Trigger Reserve has not been reduced to zero, to pay the

DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all DIP

Obligations have been terminated, in which case any such excess shall be paid to the Prepetition

Secured Parties in accordance with their rights and priorities as of the Petition Date.

Notwithstanding anything to the contrary in the DIP Loan Documents or this Final Order, if either

of the Carve-Out Reserves is not funded in full in the amounts set forth in this paragraph **Error!**

**Reference source not found.**, then any excess funds in one of the Carve-Out Reserves following

the payment of the Pre-Carve-Out Amounts and Post-Carve-Out Amounts, respectively, shall be

used to fund the other Carve-Out Reserve, up to the applicable amount set forth in this paragraph

**Error! Reference source not found.**, prior to making any payments to the DIP Lenders or the

Prepetition Secured Parties, as applicable.  Notwithstanding anything to the contrary in the DIP

Loan Documents or this Final Order, following a Carve-Out Trigger, the DIP Lenders and the

Prepetition Secured Parties (excluding TCB) shall not sweep or foreclose on cash (including cash

received as a result of the sale or other disposition of any assets) of the Debtors until the Carve-Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve-Out Reserves, with any excess paid to the DIP Lenders for application in accordance with the DIP Loan Documents.  Further, notwithstanding anything to the contrary in this Final Order, (i) disbursements by the Debtors from the Carve-Out Reserves shall not constitute DIP Loans (as defined in the DIP Loan Documents) or increase or reduce the DIP Obligations, (ii) the failure of the Carve-Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve-Outs, and (iii) in no way shall the Approved Budget, Carve-Outs, Post-Carve-Out Trigger Cap, Carve-Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors. Notwithstanding anything to the contrary in this Final Order, the DIP Facilities, or with respect to any Prepetition Obligations, the Initial Carve-Out shall be junior to the TCB Liens in all respects, but senior to all other liens and claims securing the DIP Facilities, the Adequate Protection, and the Superpriority Adequate Protection Claims, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the Prepetition Obligations, and the Second-Carve Out shall be junior only to the TCB Liens, all DIP Liens other than BNGL's DIP Liens, all Replacements Liens other than BNGL's Replacement Liens, and the Superpriority Adequate Protection Claims other than BNGL's Superpriority Adequate Protection Claims, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the Prepetition Obligations (other than BNGL's).  Notwithstanding anything to the contrary contained herein, in no event shall the DIP Lenders be obligated to fund DIP Loans pursuant to this clause (b) in excess of the remaining available commitments to be borrowed under the DIP Notes.

(d)    <u>Payment of Allowed Professional Fees Prior to the Termination Declaration</u>. Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve-Out.

(e)    <u>No Direct Obligation To Pay Allowed Professional Fees</u>. Neither the DIP Lenders nor the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person or the U.S. Trustee or Clerk of the Bankruptcy Court (or of any other entity) incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code.  Nothing in this Final Order shall be construed to obligate the DIP Lenders or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(f)    <u>Payment of Carve-Out On or After the Termination Declaration Date</u>. Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the applicable Carve-Out on a dollar-for-dollar basis.  Any funding of the applicable Carve-Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Final Order, the DIP Loan Documents, the Bankruptcy Code, and applicable law.

(g)    <u>Reservation of Rights</u>. The DIP Lenders and the Prepetition Secured Parties reserve their rights to object to the allowance of any fees and expenses, including without limitation any fees and expenses of any Professional Person.  The payment of any fees or expenses of any Professional Person pursuant to the Carve-Outs shall not, and shall not be deemed to (i) reduce any Debtor's obligations owed to the DIP Lenders or the Prepetition Secured Parties, or

48

(ii) modify, alter or otherwise affect any of the liens and security interests of such parties in the DIP Collateral or Prepetition Collateral (or their respective claims against any Debtor).

36.    <u>Professional Fee Reserve</u>. On a weekly basis, the fees of the Debtor Professionals and the Committee Professionals provided in the Approved Budget shall be funded into an account with TD Bank to satisfy the Professional Fees included within the Carve-Outs (the "<u>Professional Fee Reserve</u>").  The funds on deposit in the Professional Fee Reserve shall be available solely to satisfy the obligations benefiting from the Carve-Outs, and the DIP Lenders shall have a security interest upon any residual interest in the Professional Fee Reserve available following satisfaction in cash in full of all obligations benefiting from the Carve-Outs.  If, after paying all amounts set forth in the definition of Carve-Outs, the Professional Fee Reserve has not been reduced to zero, all remaining funds therein that are funded pursuant to paragraph 34 out of the proceeds of DIP Collateral securing the DIP Notes Liens, shall be distributed on account of the DIP Notes. Notwithstanding anything to the contrary herein, the existing funds in the Professional Fee Reserve shall be utilized to fund the Carve-Outs, if applicable.

37.    <u>Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Final Order</u>.  The DIP Lenders and Prepetition Secured Parties have acted in good faith in connection with this Final Order and are entitled to rely upon the protections granted herein and by section 364(e) of the Bankruptcy Code.   Based on the findings set forth in this Final Order and the record made during the Final Hearing, and in accordance with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Final Order are hereafter modified or vacated by a subsequent order of this Bankruptcy Court or any other court, the DIP Lenders and Prepetition Secured Parties are entitled to the protections provided in section 364(e) of the Bankruptcy Code.   Any such modification or reversal shall not affect the validity and

APP097

enforceability of any advances previously made or made hereunder, or lien, claim or priority authorized or created hereby.

38.    <u>Approval of DIP Fees</u>.  In consideration for the DIP Facilities and in accordance with the terms of this Final Order, the DIP Lenders shall be paid all fees, expenses and other amounts payable under the DIP Loan Documents as such become due, without regard to whether or not the transactions contemplated hereby are consummated (all such fees, together, the "<u>DIP Fees</u>").  The DIP Fees shall be fully earned and payable upon entry of this Final Order.   The DIP Fees shall be part of the DIP Obligations.   Any and all DIP Fees paid prior to the Petition Date by any of the Debtors to the DIP Lenders in connection with or with respect to the DIP Facilities in each case is hereby approved in full.

39.    <u>Indemnification</u>.  The Debtors shall indemnify and hold harmless the DIP Lenders, each of their respective affiliates, and each of their and their affiliates respective successors, assigns, parents, subsidiaries, partners, controlling persons, representatives, agents, trustees, administrators, representatives, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders and employees past, present, and future, and their respective heirs, predecessors, successors and assigns relating to any claims arising from or relating to the DIP Facilities, except for losses resulting directly from such party's gross negligence,  or willful misconduct as determined in a final non-appealable order by a court of competent jurisdiction.

40.    <u>Proofs of Claim</u>.  Neither the DIP Lenders nor the Prepetition Secured Parties shall be required to file proofs of claim in any of the Chapter 11 Cases or Successor Cases for any claim arising under the DIP Loan Documents or the Prepetition Secured Facility Documents.  The Debtors' stipulations, admissions, and acknowledgments and the provisions of this Final Order

shall be deemed to constitute a timely filed proof of claim for the DIP Lenders and the Prepetition

Secured Parties with regard to all claims arising under the DIP Loan Documents and the Prepetition

Secured Facility Documents, and, as a result, the Prepetition Obligations shall be deemed allowed

for all purposes in accordance with section 502(a) of the Bankruptcy Code.  However, in order to

facilitate the processing of claims, to ease the burden upon the Bankruptcy Court and to reduce

any unnecessary expense to the Debtors' estates, the Prepetition Secured Parties are each

authorized, but not required, in their sole discretion, to file in the Debtors' lead chapter 11 case *In*

*re Reverse Mortgage Investment Trust, Inc., et al.,* Case No. 22-11225 (MFW), a master proof of

claim on behalf of the respective Prepetition Secured Parties on account of any and all of their

respective claims arising under the Prepetition Secured Facility Documents and hereunder (as

applicable) (each, a "Master Proof of Claim") against each of the Debtors.  Upon the filing of any

such Master Proof of Claim, the Prepetition Secured Parties shall be deemed to have filed a proof

of claim in the amount set forth opposite its name therein in respect of its claims of any type or

nature whatsoever with respect to the applicable Prepetition Secured Facility Documents, and the

claim of each applicable Prepetition Secured Party (and each of its successors and assigns), named

in a Master Proof of Claim shall be treated as if such entity had filed a separate proof of claim in

each of the Chapter 11 Cases.  The Master Proofs of Claim shall not be required to attach any

instruments, agreements or other documents evidencing the obligations owing by each of the

Debtors to the applicable Prepetition Secured Parties.

     41.    <u>Limitations on Use of DIP Proceeds, Cash Collateral and Carve-Out</u>. Except

as otherwise permitted in this Final Order (including but not limited to paragraph 6), the DIP

Facilities, the DIP Collateral, the Prepetition Collateral, the Cash Collateral, and the Carve-Out

may not be used in connection with: (a) preventing, hindering, or delaying the DIP Lenders or the

Prepetition Secured Parties' enforcement or realization upon any of the DIP Collateral or

Prepetition Collateral; (b) using or seeking to use Cash Collateral or selling or otherwise disposing

of DIP Collateral, as applicable, without the consent of the Prepetition Secured Parties or the DIP

Lenders, as applicable; (c) outside the ordinary course of business, using or seeking to use any

insurance proceeds constituting Cash Collateral or DIP Collateral without the consent of the

Prepetition Secured Parties or DIP Lenders, as applicable; (d) incurring any indebtedness without

the prior consent of TCB and/or BNGL; (e) seeking to amend or modify any of the rights granted

to the DIP Lenders or the Prepetition Secured Parties under this Final Order, the DIP Loan

Documents or the Prepetition Secured Facility Documents; (f) objecting to or challenging in any

way the DIP Liens, as applicable, the DIP Obligations, the Prepetition Liens or the Prepetition

Obligations, the DIP Collateral (including Cash Collateral) or, as the case may be, Prepetition

Collateral, or any other claims or liens, held by or on behalf of any of the DIP Lenders or the

Prepetition Secured Parties, respectively; (g) asserting, commencing or prosecuting any claims or

causes of action whatsoever, including, without limitation, any actions under Chapter 5 of the

Bankruptcy Code, applicable state law equivalents, any so-called "lender liability" claims and

causes of action or other actions to recover or disgorge payments against the DIP Lenders, the

Prepetition Secured Parties, or any of their respective affiliates, successors and assigns and the

partners, shareholders, controlling persons, directors, officers, employees, agents, attorneys,

advisors, and professionals); (h) litigating, objecting to, challenging, contesting in any manner, or

raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any

of the DIP Obligations, the DIP Liens, as applicable, the Prepetition Liens, the Prepetition

Obligations or any other rights or interests of the DIP Lenders or the Prepetition Secured Parties;

or (i) seeking to subordinate, recharacterize, disallow or avoid the DIP Obligations or the

Prepetition Obligations.  Consistent with the 9019 Order, all cash receipts, other than amounts funded under the DIP Facilities and any Warehouse Lender Reimbursements, received by the Debtors from February 11, 2023 through the effective date of Plan shall be placed in a Plan Reserve.  For the avoidance of doubt, the funding of amounts into the Plan Reserve that constitute DIP Collateral and Prepetition Collateral (subject to paragraph 44) does not alter the DIP Lenders' rights and their respective lien priority as set forth in this Final Order with respect to such DIP Collateral.

42.    Turn Over.    Except as provided in the 9019 Order with respect to BNGL, prior to the indefeasible payment in full in cash and the complete satisfaction of all DIP Obligations and termination of the commitment in accordance with the DIP Loan Documents, any party who receives a payment or is paid the proceeds of any DIP Collateral or receives any other payment or consideration from the Debtors or any other source (including under the Plan) other than as expressly permitted in the DIP Loan Documents and this Final Order, such party shall be deemed to have received, and shall hold, such proceeds or payments in trust for the DIP Lenders and shall immediately turn over such amounts to the DIP Lenders to repay the DIP Obligations in accordance with the DIP Loan Documents and this Final Order until indefeasibly paid in full in cash.  For the avoidance of doubt, to the extent this paragraph 42 is inconsistent with the terms of the 9019 Order with respect to BNGL, the 9019 Order shall control.

43.    [Reserved].

44.    Effect of Stipulations on Third Parties.  The Debtors' Stipulations contained in paragraph K hereof shall be binding in all circumstances upon the Debtors and any successors thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors) upon entry of this Final Order and shall be binding upon each other party-in-

53

interest, including the Committee, except to the extent such party in interest *first* obtains standing

(including any chapter 11 trustee or if the Chapter 11 Cases are converted to cases under chapter

7 prior to the expiration of the Challenge Period (as defined below), the chapter 7 trustee in such

Successor Case), by no later than March 31, 2023 (the "Challenge Period"); *provided*, *however*,

that the Challenge Period with respect to BNGL shall be extended to the earlier of (i) the Settlement

Effective Date (as defined in the 9019 Motion), (ii) ten (10) days after the Bankruptcy Court enters

an order denying the 9019 Motion, or (iii) March 31, 2023 (the earlier of the foregoing (i) – (iii)

shall be referred to as the "Challenge Period" with respect to BNGL);[6] *provided*, *further*, that the

Challenge Period with respect to TCB shall be March 14, 2023, and the date that is the next calendar

day after the termination of the Challenge Period in the event that either (a) no Challenge (as defined

below) is properly raised during the  Challenge Period or (b) with respect only to those parties

who properly file a contested matter, adversary proceeding, or other matter challenging or

otherwise objecting to the admissions, stipulations, findings, or releases included in the Debtors'

Stipulations (each, a "Challenge"), such Challenge is fully and finally adjudicated, (a) and (b) shall

be referred to as the "Challenge Period Termination Date") and *second*, obtains a final, non-

appealable order in favor of such party-in-interest sustaining any such Challenge in any such

timely-filed contested matter, adversary proceeding, or other action (any such Challenge timely

brought for which such a final and non- appealable order is so obtained, a "Successful Challenge").

The filing of a motion seeking a grant of standing to file a Challenge (a "Challenge Standing

Motion") before the end of the Challenge Period, which motion must be accompanied by a draft

complaint setting forth with particularity the basis for such Challenge, shall be deemed to have

---

[6] For the avoidance of doubt, the Settlement Term Sheet (as defined in the Committee Settlement) shall be binding upon the Debtors and any chapter 7 trustee, as applicable.

tolled the expiration of the Challenge Period with respect to that particular party only.    If upon consideration of the applicable Challenge Standing Motion the Bankruptcy Court denies a grant of standing, the Challenge Period shall be deemed to have automatically and irrevocably expired effective as of such date.   If upon consideration of the applicable Challenge Standing Motion the Bankruptcy Court grants the moving party standing to commence and prosecute a Challenge, the Challenge Period shall be deemed to have been automatically extended until the date that is the later of (i) two (2) business days after the grant of such standing, or (ii) such other date as may be fixed by the Bankruptcy Court in any order granting such standing.   Except as otherwise expressly provided herein, from and after the Challenge Period Termination Date and for all purposes in these Chapter 11 Cases and any Successor Cases (and after the dismissal of these Chapter 11 Cases or any Successor Cases), and without further notice, motion, or application to, order of, or hearing before this Court, (i) any and all payments made to or for the benefit of the Prepetition Secured Parties or otherwise authorized by this Final Order (whether made prior to, on, or after the Petition Date) shall be indefeasible and not be subject to counterclaim, set-off, subordination, recharacterization, defense, disallowance, recovery or avoidance by any party in interest, (ii) any and all such Challenges by any party-in-interest shall be deemed to be forever released, waived, and barred, (iii) all of the Prepetition Obligations shall be deemed to be fully allowed claims within the meaning of section 506 of the Bankruptcy Code, and (iv) the Debtors' Stipulations shall be binding on all parties in interest in these Chapter 11 Cases or any Successor Cases, including the Committee or chapter 11 or chapter 7 trustee.  Notwithstanding the foregoing, to the extent any Challenge is timely asserted, the Debtors' Stipulations and the other provisions in clauses (i) through (iv) in the immediately preceding sentence shall nonetheless remain binding and preclusive on the Committee and on any other party-in-interest from and after the Challenge Period

Termination Date, except to the extent that such Debtors' Stipulations or the other provisions in clauses (i) through (iv) of the immediately preceding sentence were expressly challenged in such Challenge and such Challenge becomes a Successful Challenge; *provided* that all other stipulations (other than those subject to a successful Challenge) shall remain binding on the Committee or other party-in-interest.  Notwithstanding any provision to the contrary herein, nothing in this Final Order shall be construed to grant standing on any party in interest, including the Committee, to bring any Challenge on behalf of the Debtors' Estates.   The failure of any party- in-interest, including the Committee, to obtain an order of this Court prior to the Challenge Period Termination Date granting standing to bring any Challenge on behalf of the Debtors' estates shall not be a defense to failing to commence a Challenge prior to the Challenge Period Termination Date as required under this paragraph 44 or to require or permit an extension of the Challenge Period Termination Date.

45.    <u>No Third-Party Rights</u>.  Except as explicitly provided for herein or in any of the DIP Loan Documents, this Final Order does not create any rights for the benefit of any third party, creditor, equity holder, or direct, indirect, or incidental beneficiary.

46.    <u>Releases</u>.

(a)    <u>BNGL Releases Regarding Leadenhall</u>.  Effective upon entry of the Second Interim DIP Order, BNGL stipulated and agreed that they absolutely and unconditionally released and forever and irrevocably discharge and acquit Leadenhall and its affiliates and each of their respective former or current officers, partners, directors, managers, owners, members, principals, employees, agents, related funds, investors, financing sources, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof (collectively, the "<u>Leadenhall Released Parties</u>") from any and all obligations and liabilities to BNGL (and their successors and assigns) and from any

56

and all claims, counterclaims, demands, debts, accounts, contracts, disputes, liabilities, liens, allegations, suits, controversies, proceedings, actions and causes of action arising prior to the Petition Date (collectively, the "Leadenhall Released Claims") of any kind, nature or description, whether known or unknown, foreseen or unforeseen, matured or unmatured, direct or indirect, or liquidated or unliquidated, arising in law or equity or upon contract or tort or under any state or federal law or regulation or otherwise, arising out of or related to (as applicable) the Prepetition Secured Facility Documents, the DIP Loan Documents and the negotiation thereof, the obligations owing and the financial obligations made thereunder, the negotiation thereof and of the transactions reflected thereby and the obligations and financial obligations made thereunder, in each case that BNGL at any time had, now has or may have, or that its successors or assigns hereafter can or may have against any of the Leadenhall Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the date of the Second Interim DIP Order.  BNGL further waived and released any defense, right of counterclaim, right of set-off, or deduction to the payment of the Prepetition Obligations with respect to Leadenhall that BNGL may now have or may claim to have against the Leadenhall Released Parties, arising out of, connected with, or relating to any and all acts, omissions, or events occurring on or prior to this Court entering the Second Interim DIP Order relating to the Debtors' secured lending relationship with the Prepetition Secured Parties.

(b)    Leadenhall Releases Regarding BNGL.  Effective upon entry of the Second Interim DIP Order, Leadenhall (and its affiliates, successors, and assigns) stipulated and agreed that it absolutely and unconditionally released and forever and irrevocably discharged and acquitted BNGL, and their respective affiliates and each of their respective former or current officers, partners, directors, managers, owners, members, principals, employees, agents, related funds,

investors, financing sources, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof (but excluding, in the case of BNGL, any of the Debtors and the Debtors' current and former officers in their capacities as such, in connection with the Note Parties for all transactions prior to the entry of the Second Interim DIP Order) (collectively, the "BNGL Released Parties") from any and all obligations and liabilities to Leadenhall (and its successors and assigns) and from any and all claims, counterclaims, demands, debts, accounts, contracts, disputes, liabilities, liens, allegations, suits, controversies, proceedings, actions and causes of action arising prior to the Petition Date of any kind, nature or description, whether known or unknown, foreseen or unforeseen, matured or unmatured, direct or indirect, or liquidated or unliquidated, arising in law or equity or upon contract or tort or under any state or federal law or regulation or otherwise, arising out of or related to (as applicable) the Prepetition Secured Facility Documents, the obligations owing and the financial obligations made thereunder, the negotiation thereof and of the transactions reflected thereby and the obligations and financial obligations made thereunder, in each case that the BNGL at any time had, now have or may have, or that their successors or assigns hereafter can or may have against any of the BNGL Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the date of the Second Interim DIP Order; *provided*, that notwithstanding the foregoing, the Prepetition Obligations shall remain in full force and effect; and *further provided*, that Leadenhall shall not be deemed to have released any rights to distributions from the estate from any of the Debtors' causes of action, including claims against BNGL and the current and former directors and officers of the Debtors.

APP106

(c)    <u>TCB Releases</u>.  Effective upon entry of this Final Order, the Debtors, on behalf of

themselves and their respective Estates (including any successor trustee or other estate

representative in the Chapter 11 Cases and any Successor Cases (as defined herein), and any party

acting by, through or under the Debtors or their Estates (the "<u>Debtor Release Parties</u>") hereby

stipulate and agree that they absolutely and unconditionally release and forever and irrevocably

discharge and acquit TCB and its affiliates and each of their respective former or current officers,

partners, directors, managers, owners, members, principals, employees, agents, related funds,

investors, financing sources, financial advisors, attorneys, accountants, investment bankers,

consultants, representatives and other professionals and the respective successors and assigns

thereof (collectively, the "<u>TCB Released Parties</u>") from any and all obligations and liabilities to

Debtor Release Parties (and their successors and assigns) and from any and all claims,

counterclaims, demands, debts, accounts, contracts, disputes, liabilities, liens, allegations, suits,

controversies, proceedings, actions and causes of action arising prior to the Petition Date

(collectively, the "<u>Debtor TCB Released Claims</u>") of any kind, nature or description, whether

known or unknown, foreseen or unforeseen, matured or unmatured, direct or indirect, or liquidated

or unliquidated, arising in law or equity or upon contract or tort or under any state or federal law

or regulation or otherwise, arising out of or related to (as applicable) the Prepetition Secured

Facility Documents, the DIP Loan Documents and the negotiation thereof, the obligations owing

and the financial obligations made thereunder, the negotiation thereof and of the transactions

reflected thereby and the obligations and financial obligations made thereunder, in each case that

the Debtor Release Parties at any time had, now have or may have, or that their successors or

assigns hereafter can or may have against any of the TCB Released Parties for or by reason of any

act, omission, matter, cause or thing whatsoever arising at any time on or prior to the date of this

Final Order. The Debtor Release Parties further waive and release any defense, right of counterclaim, right of set-off, or deduction to the payment of the Prepetition Obligations with respect to TCB Released Parties that the Debtor Release Parties may now have or may claim to have against the TCB Released Parties, arising out of, connected with, or relating to any and all acts, omissions, or events occurring prior to this Court entering this Final Order relating to the Debtors' secured lending relationship with the Prepetition Secured Parties.

      (d)   <u>Longbridge Release</u>. The Debtor Release Parties hereby stipulate and agree that they absolutely and unconditionally release and forever and irrevocably discharge and acquit Longbridge and its affiliates and each of their respective former or current officers, partners, directors, managers, owners, members, principals, employees, agents, related funds, investors, financing sources, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof (collectively, the "<u>Longbridge Released Parties</u>") from any and all obligations and liabilities to Debtor Release Parties (and their successors and assigns) and from any and all claims, counterclaims, demands, debts, accounts, contracts, disputes, liabilities, liens, allegations, suits, controversies, proceedings, actions and causes of action arising prior to the Petition Date (collectively, the "<u>Debtor Longbridge Released Claims</u>") of any kind, nature or description, whether known or unknown, foreseen or unforeseen, matured or unmatured, direct or indirect, or liquidated or unliquidated, arising in law or equity or upon contract or tort or under any state or federal law or regulation or otherwise, arising out of or related to (as applicable) the DIP Loan Documents and the negotiation thereof, the obligations owing and the financial obligations made thereunder, the negotiation thereof and of the transactions reflected thereby and the obligations and financial obligations made thereunder, in each case that the Debtor Release Parties at any time

had, now have or may have, or that their successors or assigns hereafter can or may have against

any of the Longbridge Released Parties for or by reason of any act, omission, matter, cause or

thing whatsoever arising at any time on or prior to the date of this Final Order.

(e)    Settlement Releases.[7]   Pursuant to the 9019 Order, in exchange for good and

valuable consideration, the adequacy of which is hereby confirmed, on (i) the Settlement Effective

Date and (ii) the Plan Effective Date, each Released Party is deemed to be hereby conclusively,

absolutely, unconditionally, irrevocably, and forever released and discharged by each of the other

Released Parties (including any successor trustee or other representative in the Chapter 11 Cases

and any successor cases), in each case on behalf of themselves and their respective successors,

assigns, and representatives, and any and all other Entities who may purport to assert any Cause

of Action owned by the Released Parties, directly or derivatively, by, through, for, or because of

the foregoing Entities on behalf of the Released, from any and all direct or derivative Claims and

Causes of Action asserted on behalf of the Released Parties, whether known or unknown, foreseen

or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or

otherwise, that the Released Parties or their Estates would have been legally entitled to assert in

their own right (whether individually or collectively) or on behalf of the Holder of any Claim

against, or Interest in, a Released Party or other Entity, or that any Holder of any Claim against,

or Interest in, a Released Party or other Entity could have asserted on behalf of the Released Party,

based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including

the capital structure, management, ownership, or operation thereof), the assertion or enforcement

of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts,

---

[7] Capitalized terms used in this section (e) shall have the meanings ascribed to them in the Committee Settlement Term Sheet.

any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions, the Chapter 11 Cases and any successor cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the DIP Loan Documents, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Wind-Down Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the DIP Loan Documents, or the Plan, the Plan Supplement, the filing of the Chapter 11 Cases and any successor cases, the pursuit of a transfer of the GNMA MSR, the pursuit of Confirmation and the Settlement, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan or the distribution of property in a manner consistent with the Settlement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before, in respect of the foregoing clause (i), the Settlement Effective Date, and, in respect of the foregoing clause (ii), the Plan Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Plan Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Wind-Down Transactions, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or any Claim or obligation arising under the Plan.

(f)    <u>Repo Party Releases</u>.  Effective upon entry of the Final Order, each (i) Repo Party (and their affiliates, successors, and assigns) stipulate and agree that they absolutely and

unconditionally release and forever and irrevocably discharge and acquit the BNGL Released

Parties from any and all obligations and liabilities to each Repo Party (and their successors and

assigns) and (ii) each BNGL Released Party stipulate and agree that they absolutely and

unconditionally release and forever and irrevocably discharge and acquit each Repo Party from

any and all obligations and liabilities to each BNGL Released Party, and, in each case of the

foregoing (i) and (ii), and from any and all claims, counterclaims, demands, debts, accounts,

contracts, disputes, liabilities, liens, allegations, suits, controversies, proceedings, actions and

causes of action arising prior to the Petition Date of any kind, nature or description, whether known

or unknown, foreseen or unforeseen, matured or unmatured, direct or indirect, or liquidated or

unliquidated, arising in law or equity or upon contract or tort or under any state or federal law or

regulation or otherwise, arising out of or related to (as applicable) the Prepetition Secured Facility

Documents, the Repo Facilities, the obligations owing and the financial obligations made

thereunder, the negotiation thereof and of the transactions reflected thereby and the obligations

and financial obligations made thereunder other than claims or causes of action arising out of any

act or omission that constitutes fraud or intentional misconduct as determined by a final order, in

each case that each Repo Party or BNGL Released Party, as applicable, at any time had, now have

or may have, or that their successors or assigns hereafter can or may have against any of the BNGL

Released Parties or Repo Party, as applicable, for or by reason of any act, omission, matter, cause

or thing whatsoever arising at any time on or prior to the date of this Final Order; *provided*,

however, that under no circumstance shall any of the Debtors or any of their subsidiaries be

included within the foregoing releases (either as a releasing party or a released party) and all

claims, rights, and remedies (or otherwise) held by any of the Repo Parties against any of the

Debtors are not and shall not be impacted in any way whatsoever by this limited release provision.

For the avoidance of doubt, the Debtors' officers and directors may be included in the foregoing release to the extent that such officers and directors constitute a BNGL Released Party, but only the Debtors themselves are excluded by the foregoing.  Notwithstanding the foregoing, Credit Suisse shall not be included in the above release (either as a releasing party or a released party) until such time as the Court approves the Reimbursement Stipulation (as defined in that certain *Stipulation Extending General Bar Date for Credit Suisse* at D.I. 469) in a form acceptable to Credit Suisse.  Notwithstanding anything to the contrary herein, nothing in this Final Order shall modify or otherwise affect the *Order Approving the Stipulation Granting Relief from the Automatic Stay, Authorizing the Transfer of Certain Assets, Authorizing Certain Advances, and Granting Related Relief* [D.I. 397] or Nomura's rights under the *Stipulation granting Relief from the Automatic Stay, Authorizing the Transfer of Certain Assets, Authorizing Certain Advances, and Granting Related Relief* [D.I. 397-1].  For the avoidance of doubt, the relief provided herein shall not, in any way, modify, amend, affect, or otherwise impair the (i) Reimbursement Stipulation and the terms thereof or (ii) the relief provided to, and obligations of, the parties to the Reimbursement Stipulation as set forth in, and provided by, the Reimbursement Stipulation.  Notwithstanding anything to the contrary in this paragraph 46(f), as used in this paragraph 46(f), the term "Repo Party" shall not include Barclays and Barclays shall not be construed to have provided a release to any party or to have received a release from any party.

47.    Termination of TCB Buyout Facility and Authorization of any TCB Transfers.

(a)    Subject to this Final Order, the Debtors acknowledge that consistent with paragraph 24 herein, sections 362(b), 555, and 559 of the Bankruptcy Code apply to TCB and the TCB Buyout Facility (including the Collateral under the TCB Buyout Facility), and TCB is authorized, pursuant to the TCB

64

Buyout Facility, to terminate and liquidate the TCB Buyout Facility and take all actions in connection therewith (the "TCB Buyout Facility Termination").  TCB's Collateral provided under the TCB Buyout Facility may be transferred to TCB (or one or more of its designees, including any third party buyer, including Longbridge, of all or a portion of the assets, interests or rights) in each case, in accordance with the TCB Buyout Facility (any such transfer of Collateral, including the transfers contemplated by the terms of the Letter of Intent attached to the Tail Advance DIP Term Sheet as **Schedule 2**, the "TCB-LB LOI", a "TCB Transfer" and collectively, the "TCB Transfers").

(b)      The Debtors and TCB stipulate and have agreed that (i) the TCB Buyout Facility Termination and the TCB Transfers contemplated by the TCB-LB LOI to be consummated upon approval of this Final Order by the Bankruptcy Court, including without limitation, the marketing and the sale processes utilized by TCB, decisions to sell, transfer, or assign the Collateral, and decisions to transfer servicing, are commercially reasonable and the parties to the transactions have acted in good faith in connection with the TCB Buyout Facility Termination, such TCB Transfers, and all of the transactions contemplated by the TCB Buyout Facility Termination and the TCB-LB LOI, and (ii) any such TCB Buyout Facility Termination and further TCB Transfers other than those contemplated by the TCB-LB LOI after the date of this Final Order that (A) are disclosed to the Debtors in advance (and the nature and manner of such disclosure is consistent with

65

the type of information shared and past practices), and (B) TCB utilizes the same or substantially similar marketing and sale processes utilized by TCB in connection with the TCB-LB LOI, will also be viewed by the parties to the transaction as commercially reasonable and the Debtors and TCB will be deemed to have acted in good faith in connection with the TCB Buyout Facility Termination, such TCB Transfers, and all of the contemplated transactions.

(c)      The Debtors, TCB, any other servicer or subservicer, as applicable, and all other parties (acting directly or on behalf of the Debtors) are authorized to cooperate in the TCB Buyout Facility Termination, the TCB Transfers, and all related transactions, without the need for a further order of the Bankruptcy Court.

(d)      With respect to the Collateral subject to the TCB Buyout Facility, the Debtors acknowledge and agree that the Debtors and the Debtors' Estates have an interest only in the value, if any, returned to the Debtors' Estate by TCB, in accordance with sections 555 and 559 of the Bankruptcy Code, after full and final satisfaction of any debt, obligations, or other amounts owed under the TCB Buyout Facility in accordance with sections 555 and 559 of the Bankruptcy Code (the "Excess Value"); *provided*, *that*, no Excess Value shall be deemed to exist, nor shall the Debtors be entitled to, nor receive, any amounts (including any Excess Value) from the TCB Buyout Facility Termination until all of TCB's DIP Obligations and the Prepetition TCB Obligations have been satisfied in full, in cash, including,

for the avoidance of doubt, the liens and claims arising under or related to the TCB Buyout Facility, the TCB Transfers, and any other payments contemplated by this TCB Buyout Facility Termination, and all fees, costs, interest, and expenses (including indemnification obligations) and any other obligations or amounts incurred, in each case related to TCB's DIP Obligations and the Prepetition TCB Obligations.

(e)    None of the relief provided in this paragraph 47 shall relate or apply to any mortgages, loans, servicing rights, or other collateral (including securities and collections) related to the Debtors' other warehouse repo facilities or securities repo facilities, private label securitization trusts.

(f)    Notwithstanding anything to the contrary herein or under the Bankruptcy Code or other applicable law, if the Debtors propose a Plan, TCB hereby agrees that it shall support the Plan (including by timely submitting a vote in favor of its treatment) so long as the Plan (a) is consistent with this Final Order, (b) provides for satisfaction of the DIP Tail Advance Superpriority Claims and TCB's Superpriority Adequate Protection Claims consistent with priorities in this Final Order, even if not paid in full; (c) does not otherwise adversely affect TCB, its Claims, or its Collateral, and (e) contains the TCB Releases (as defined herein).

48.    <u>No Lender Liability</u>.  In determining to make any loan (whether under the DIP Loan Documents or otherwise) or to permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Final Order or the DIP Loan Documents or taking any other act permitted under this Final Order and the DIP Loan Documents, the DIP Lenders shall

not (i) be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 et seq., as amended, or any similar federal, state or local statute or regulation) or (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders, or estates.    Furthermore, nothing in this Final Order shall in any way be construed or interpreted to impose or allow the imposition upon any of the DIP Lenders or the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their respective affiliates (as defined in section 101(2) of the Bankruptcy Code).

49.    <u>No Marshaling</u>.   The DIP Lenders and the Prepetition Secured Parties, shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral, as applicable.

50.    <u>Section 552(b)</u>.  BNGL and TCB shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to BNGL or TCB with respect to proceeds, product, offspring or profits of any of the Prepetition Collateral or DIP Collateral, as applicable; *provided*, *however*, that Leadenhall reserves the right that (i) Leadenhall is entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and (ii) that the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to Leadenhall with respect to proceeds, product, offspring or profits of any of Leadenhall's Prepetition Collateral or Leadenhall's DIP Collateral, as applicable.

APP116

51.     _Section 506(c) Waiver_.  Solely with respect to TCB, the Debtors and their Estates waive any claim under section 506(c) of the Bankruptcy Code for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by TCB upon the Prepetition TCB Collateral or Postpetition Collateral.  For the avoidance of doubt, the Debtors and their estates do not waive any claim under section 506(c) of the Bankruptcy Code for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by Leadenhall with respect to Prepetition Collateral or Postpetition Collateral asserted by Leadenhall; _provided_, _however_, that Leadenhall reserves the right to (i) challenge any surcharge asserted against it pursuant to section 506(c) of the Bankruptcy Code and (ii) argue its entitlement to a section 506(c) waiver.

52.     _Exculpation_. Nothing in this Final Order or the DIP Loan Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lenders or Prepetition Secured Parties any liability for any claims arising from the prepetition or postpetition activities of the Debtors, including with respect to the operation of their businesses, in connection with their restructuring efforts or administration of these Chapter 11 Cases.   In addition, (a) the DIP Lenders shall not in any way or manner be liable or responsible for: (i) the safe-keeping of the DIP Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any Diminution thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person, and (b) all risk of loss, damage, or destruction of the DIP Collateral shall be borne by the Debtors.

53.     _Insurance Proceeds and Policies_.  Upon entry of this Final Order and to the fullest extent provided by applicable law, the DIP Lenders and the Prepetition Secured Parties with respect to the Replacement Liens, shall be, and shall be deemed to be, without any further action

or notice, named as additional insured and loss payee on each insurance policy maintained by the Debtors, including in respect of the DIP Collateral and other Prepetition Collateral securing the Replacement Liens (if any).

54.    <u>Fannie Mae</u>.

(a)    Notwithstanding anything to the contrary contained in the DIP Loan Documents or this Final Order, (i) no lien or security interest granted pursuant to the DIP Loan Documents or this Final Order (including, without limitation, the DIP Liens, the Replacement Liens, or any adequate protection lien) shall attach to, modify, include or otherwise affect, and (iii) no administrative expense claim of a superpriority nature or otherwise, including, without limitation, the Carve-Out, the DIP Superpriority Claims, or the Superpriority Adequate Protection Claims shall prime, encumber, impair or limit in any way: (1) any mortgage loan presently owned by, subsequently transferred to, or otherwise acquired by, the Federal National Mortgage Association (together with any successor thereto, "Fannie Mae"; and such mortgage loans, the "<u>Fannie Mae Loans</u>"), (2) any servicing rights with respect to the Fannie Mae Loans (the "<u>Fannie Mae Servicing Rights</u>"), (3) the Fannie Mae Lender Contract (as defined below) or any rights of the Debtors, or obligations of Fannie Mae, under the Fannie Mae Lender Contract or any of Fannie Mae's rights with respect to the sale and delivery of mortgage loans to, or the servicing of Fannie Mae Loans for, Fannie Mae under the Fannie Mae Lender Contract or the rights or obligations of the Debtors, or rights or obligations of Fannie Mae, under the Fannie Mae Lender Contract; and/or (d) any (i) recoupments and offsets or (ii) cash, accounts, or other collateral (or any proceeds of the foregoing) that has been pledged to Fannie Mae pursuant to any collateral pledge agreement or other security agreement between Debtors and Fannie Mae. Each of the DIP Lenders (and any agents thereof)

70

stipulates that it has no claim as a secured creditor against Fannie Mae in connection with the DIP Facilities.

(b)    Furthermore, without limiting the foregoing, none of the amounts collected by any Debtor or any subservicer in connection with its performance of its servicing obligations under the Fannie Mae Lender Contract are property of the Debtors' estates under section 541 of the Bankruptcy Code.  Fannie Mae reserves all rights in and under all of its agreements with the Debtors, including, the Fannie Mae Lender Contract, none of which are impaired by DIP Loan Documents or this Final Order.  None of the DIP Lenders or any other applicable lender has any claim against Fannie Mae arising by virtue of this Final Order. No secured claim or administrative expense granted pursuant to, or lien approved by, this Final Order, trumps, or negatively impacts, in any way, Fannie Mae's rights and the Debtors' obligations under the Fannie Mae Lender Contract (including, without limitation, with respect to the Fannie Mae Loans and the Fannie Mae Servicing Rights).

(c)    If, notwithstanding the foregoing, any lender or other party hereafter asserts that the DIP Liens, the Replacement Liens, the DIP Collateral and adequate protection collateral, or any other lien in any other collateral that may be approved or granted pursuant to the terms of this Final Order, include (i) any Fannie Mae Servicing Rights, (ii) the Fannie Mae Lender Contract, and/or (iii) any other rights of the Debtors, or rights or obligations of Fannie Mae, under the Fannie Mae Lender Contract, any and all security interests therein shall be subject and subordinate to all rights of Fannie Mae under the Mortgage Selling and Servicing Contract, the Fannie Mae Selling Guide, the Fannie Mae Servicing Guide, the Reverse Mortgage Loan Servicing Manual, and all supplemental servicing instructions or directives provided by Fannie Mae, all applicable master agreements, recourse agreements, repurchase agreements, indemnification agreements, loss

sharing agreements, and any other agreements between Fannie Mae and the Debtors, and all as amended, restated or supplemented from time to time (collectively, the "Fannie Mae Lender Contract"), which rights include, among other rights, the right of Fannie Mae to: (i) terminate at any time, all or a portion of, the Fannie Mae Lender Contract or the Fannie Mae Servicing Rights with or without cause and (ii) sell, or have transferred, the Fannie Mae Servicing Rights with any such sale or transfer being subject to Fannie Mae's consent.

(d)     Fannie Mae reserves all of its rights under the Fannie Mae Lender Contract. If there is any conflict between the terms of the Fannie Mae Lender Contract and those of the DIP Loan Documents or this Final Order, the terms of the Fannie Mae Lender Contract, shall explicitly supersede and control.  Nothing in this Final Order or the DIP Loan Documents shall subordinate, discharge, release or otherwise preclude any valid right of setoff or recoupment that Fannie Mae may have.

(e)     Fannie Mae shall be entitled to the additional reservations of rights as stipulated on the record of the hearings on the Motion.

55.     Notwithstanding anything to the contrary herein, nothing in this Order shall modify or otherwise affect the *Order Approving the Stipulation Granting Fannie Mae Limited Relief from the Automatic Stay and Authorizing Certain Advances* [Docket No. 243] or Fannie Mae's rights under the *Stipulation Granting Fannie Mae Limited Relief From the Automatic Stay and Authorizing Certain Advances* [Docket No. 243-2].

56.     United States Reservation of Rights.  Notwithstanding anything to the contrary in this Final Order or the DIP Loan Documents, nothing in this Final Order or the DIP Loan Documents shall:

APP120

(a)      modify, impair or affect any contract, guaranty agreement, escrow agreement, cross

default agreement, FHA insurance contract, HECM second mortgage lien, FHA indemnification

agreement, mortgage servicing rights associated with mortgages or participations that are backed

or are otherwise associated with securities guaranteed by GNMA, the GNMA Guide,  MBS

prospectus documents, unilateral notification, notices of violation, supplements, addendums,

amendments, and related documents or agreements, authorizations or writings (collectively the

"HUD Agreements") between, either individually or together, (a) the Debtors (including Debtor

RMF LLC); (b) Leadenhall; and/or (c) Longbridge; and (y) GNMA and/or (z) the FHA (GNMA,

together with FHA, "HUD"), including but not limited to that certain Acknowledgment Agreement

dated May 8, 2019 between and among RMF, Leadenhall and GNMA, and in the event there is

any conflict between this Final Order and the DIP Loan Documents, on the one hand, and any

HUD Agreement on the other hand, the HUD Agreement shall control;

(b)      release or waive any of the Debtors' or non-debtor's obligations and liabilities

under the HUD Agreements and any statutes, regulations, rules, policies and procedures of HUD,

including, without limitation, (1) all applicable GNMA statutes, regulations, rules, policies and

procedures, including, without limitation, 12 U.S.C. § 1721(g), 12 U.S.C. §§ 1716 et seq. and 24

C.F.R. parts 300 - 310; (2) the GNMA Guide, (3) all applicable FHA statutes, regulations, rules,

policies and procedures, including, without limitation, Title II of the National Housing Act (12

USC §1707 et seq, 12 U.S.C.§§ 1702 – 1715z-25 and 24 C.F.R. parts 201 – 203 and 206; (4) all

FHA handbooks, mortgagee letters, and (5) all administrative materials issued under such statutes

or regulations (collectively, "Federal Law");

(c)      subordinate, prime, authorize or grant any lien or security interest (including any

Replacement Liens) or otherwise impair HUD's interest in, or rights to, (a) any escrow or custodial

73

account, and all funds therein, held for the benefit of borrowers with FHA-insured mortgages, or

otherwise affect mortgages or participations (as defined in the "HUD Agreements"); (b) the

mortgages or participations backing or otherwise associated with GNMA guaranteed securities

(c) any related collateral, including, but not limited to, cash, FHA mortgage insurance payments,

accounts or collateral held or required to be held by the Debtors or any non-Debtor affiliates,

GNMA, or any other party in connection with HUD Agreements;

(d)     waive, release or obviate the obligations and requirements to comply with Federal

Law with respect to the sale, assignment, transfer or conveyance of any mortgage loan (or pools

of mortgage loans) backing a GNMA guaranteed mortgage-backed security, mortgage servicing

rights, or real estate obtained by foreclosure, or waive or release (a) the Debtors, (b) Leadenhall,

and/or (c) Longbridge from their obligations to collect and submit any loan fees, closing fees,

funding fees, guaranty fees, technology fees, FHA mortgage insurance payments, FHA claim

remittances, FHA indemnification payments, FHA-required remedies pursuant to a loan-level

review or HUD enforcement action, periodic payments or other fees or payments due pursuant to

Federal Law, and to submit loan information to the loan systems of HUD, including, without

limitation, GNMA's MyGinnieMae portal, including GinnieNET, RFS, IPMS-PTS, all associated

sub-modules, and other systems related to the GNMA securities, FHA's Loan Review System

("LRS"),  Home Equity Reverse Mortgage Information Technology ("HERMIT") system, and

Catalyst systems;

(e)     construe any HUD Agreement as an executory contract or otherwise be interpreted

to set cure amounts in respect of, or to require HUD to novate, approve or otherwise consent to,

the assumption, sale, assignment or other transfer of any HUD Agreement without compliance

with all applicable legal requirements, obligations and approvals under non-bankruptcy laws;  or

(f)        modify, impair or affect the United States of America's rights and defenses of setoff and recoupment.

57.        <u>Texas Taxing Authorities' Reservation of Rights</u>.  Notwithstanding any other provisions included in this Final Order, or any agreements approved by this Final Order, the statutory liens of Bexar County, Harris County and Navarro County, if any, for prepetition and postpetition taxes shall not be primed by nor subordinated to any liens granted to any party by this Final Order.

58.        <u>Safe Harbor Rights</u>.  For the avoidance of doubt, nothing in this Final Order limits or impacts any rights and remedies a party may have pursuant to Sections 362(b), 555 and 559 of the Bankruptcy Code to liquidate, accelerate and/or terminate any repurchase agreement or securities contract as such terms are defined under the Bankruptcy Code, to the extent in accordance with Section §555 and §559 and nothing herein waives any of the Debtors' defenses with respect thereto except as expressly provided in this Final Order, including, without limitation, paragraph 24 hereof

59.        <u>Nomura</u>.

(a)        <u>No Liens on Nomura Collateral or Property</u>.  Nothing herein shall be deemed to grant a lien on, or security interest in any collateral or property granted for the benefit of Nomura under the Nomura Repo Facilities (including the proceeds thereof) or any property of Nomura wherever located and all parties rights are reserved with respect to any Final Order.

60.        <u>No Use of Certain Nomura Collateral or Property</u>.  For the avoidance of doubt, Nomura does not consent to, and the Debtors are not authorized to, use the collateral or property (including, without limitation, proceeds of collateral and cash collateral) granted under or in

connection with the Nomura Repo Facilities, or any property of Nomura wherever such collateral or property may be located.

61.     No provision of this Order, including any lien, claim, or other grant for the benefit of any postpetition lender shall be deemed to modify, impair, or otherwise prejudice Nomura's rights under the Nomura Repo Facilities.

62.     Nomura reserves all of its rights under or related to the Nomura Facilities, the Bankruptcy Code and applicable non-bankruptcy law.

63.     <u>Credit Suisse</u>

(a)     <u>No Liens on Credit Suisse Collateral or Property</u>.  Nothing herein shall be deemed to grant a lien on, or security interest in any collateral or property granted for the benefit of Credit Suisse under the Credit Suisse Repo Facilities (including the proceeds thereof) or any property of Credit Suisse wherever located and all parties rights are reserved with respect to any Final Order.

64.     <u>No Use of Certain Credit Suisse Collateral or Property</u>.  For the avoidance of doubt, Credit Suisse does not consent to, and the Debtors are not authorized to, use the collateral or property (including, without limitation, proceeds of collateral and cash collateral) granted under or in connection with the Credit Suisse Repo Facilities, or any property of Credit Suisse wherever such collateral or property may be located.

65.     No provision of this Order, including any lien, claim, or other grant for the benefit of any postpetition lender shall be deemed to modify, impair, or otherwise prejudice Credit Suisse's rights under the Credit Suisse Repo Facilities.

66.     Credit Suisse reserves all of its rights under or related to the Credit Suisse Repo Facilities, the Bankruptcy Code and applicable non-bankruptcy law.

67.     <u>Barclays</u>

(a)     <u>No Liens on Barclays' Collateral or Property</u>.  Nothing herein shall be deemed to grant a lien on, or security interest in any collateral or property granted for the benefit of Barclays under the Barclays Repo Facility (including the proceeds thereof) or any property of Barclays wherever located and all parties rights are reserved with respect to any Final Order.

68.     <u>No Use of Certain Barclays' Collateral or Property</u>.  For the avoidance of doubt, Barclays does not consent to, and the Debtors are not authorized to, use the collateral or property (including, without limitation, proceeds of collateral and cash collateral) granted under or in connection with the Barclays Repo Facility or any property of Barclays wherever such collateral or property may be located.

69.     No provision of this Order, including any lien, claim, or other grant for the benefit of any postpetition lender shall be deemed to modify, impair, or otherwise prejudice Barclays' rights under the Barclays Repo Facility.

70.     Barclays reserves all of its rights under or related to the Barclays Repo Facility, the Bankruptcy Code and applicable non-bankruptcy law.

71.     <u>TIAA</u>

(a)     <u>No Liens on TIAA Collateral or Property</u>.  Nothing herein shall be deemed to grant a lien on, or security interest in any collateral or property granted for the benefit of TIAA under the TIAA Repo Facility (including the proceeds thereof) or any property of TIAA wherever located and all parties rights are reserved with respect to any Final Order.

72.     <u>No Use of Certain TIAA Collateral or Property</u>.  For the avoidance of doubt, TIAA does not consent to, and the Debtors are not authorized to, use the collateral or property (including, without limitation, proceeds of collateral and cash collateral) granted under or in connection with

the TIAA Repo Facility or any property of TIAA wherever such collateral or property may be located.

73.      No provision of this Order, including any lien, claim, or other grant for the benefit of any postpetition lender shall be deemed to modify, impair, or otherwise prejudice TIAA's rights under the TIAA Repo Facility.

74.      TIAA reserves all of its rights under or related to the TIAA Repo Facility, the Bankruptcy Code and applicable non-bankruptcy law.

75.      <u>No Waiver by Failure to Seek Relief</u>.  The failure of the DIP Lenders or Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies under this Final Order, the DIP Loan Documents, the Prepetition Secured Facility Documents or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise.

76.      <u>Binding Effect of Final Order</u>.  Subject only to paragraph 44, immediately upon entry of this Final Order by this Court, the terms and provisions of this Final Order shall become valid and binding upon and inure to the benefit of the Debtors, the DIP Lenders, the Prepetition Secured Parties, all other creditors of any of the Debtors, the Committee (or any other court appointed committee) appointed in the Chapter 11 Cases and all other parties-in-interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in any of the Chapter 11 Cases, any Successor Cases, or upon dismissal of any Chapter 11 Case or Successor Case.

77.      <u>No Modification of Final Order</u>.  If any or all of the provisions of this Final Order are hereafter reversed, stayed, or modified that action will not affect (i) the validity of any obligation, indebtedness or liability under this Final Order and the DIP Loan Documents by the Debtors prior to the date of receipt of written notice to the DIP Lenders and the Prepetition Secured

APP126

Parties of the effective date of such action, or (ii) the validity and enforceability of any lien, administrative expense, right, or priority authorized or created hereby or pursuant to this Final Order and the DIP Loan Documents, including, without limitation, the DIP Obligations, the DIP Liens, the DIP Superpriority Claims, the Prepetition Obligations, the Replacement Liens, and the Superpriority Adequate Protection Claims.

78.    <u>Any Conflict with DIP Term Sheets</u>.  If there is any conflict between the DIP Term Sheets and the Final Order, the terms of the Final Order control.

79.    <u>Joint and Several</u>.  The Debtors are jointly and severally liable for the DIP Obligations and all other obligations hereunder.

80.    <u>Survival</u>. The provisions of this Final Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming the Plan in these Chapter 11 Cases (and, to the extent not indefeasibly paid in full in cash, the DIP Obligations shall not be discharged by the entry of any such order, each of the Debtors having hereby waived such discharge pursuant to section 1141(d)(4) of the Bankruptcy Code); (b) converting any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code; (c) dismissing any of the Chapter 11 Cases or any Successor Cases; or (d) pursuant to which this Bankruptcy Court abstains from hearing any of the Chapter 11 Cases or Successor Cases.   The terms and provisions of this Final Order, including the claims, liens, security interests and other protections granted to the DIP Lenders and the Prepetition Secured Parties pursuant to this Final Order and the DIP Loan Documents, shall continue in the Chapter 11 Cases, in any Successor Cases, or following dismissal of the Chapter 11 Cases or any Successor Cases, and shall maintain their priority as provided by this Final Order until: (i) in respect of the DIP Facilities, all the DIP Obligations, pursuant to the DIP Loan Documents and this Final Order, have been indefeasibly paid in full in cash (such payment

being without prejudice to any terms or provisions contained in the DIP Facilities which survive such discharge by their terms), and all commitments to extend credit under the DIP Facilities are terminated; and (ii) in respect of the Prepetition Secured Facilities, all of the Prepetition Obligations pursuant to the Prepetition Secured Facility Documents and this Final Order, have been indefeasibly paid in full in cash.   The terms and provisions concerning the indemnification of the DIP Lenders shall continue in the Chapter 11 Cases, in any Successor Cases, following dismissal of the Chapter 11 Cases or any Successor Cases, following termination of the DIP Loan Documents and/or the indefeasible repayment of the DIP Obligations.   In addition, the terms and provisions of this Final Order shall continue in full force and effect for the benefit of the Prepetition Secured Parties notwithstanding the repayment in full or termination of the DIP Obligations until such time as the Prepetition Obligations have been indefeasibly paid in full.

81.    _Necessary Action_. The Debtors are authorized to take any and all such actions and to make, execute and deliver any and all instruments as may be reasonably necessary to implement the terms and conditions of this Final Order and the transactions contemplated hereby.

82.    _Enforceability_. This Final Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable immediately upon entry thereof _nunc pro tunc_ to the Petition Date.   Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9014 of the Bankruptcy Rules, any applicable Local Bankruptcy Rules, or Rule 62(a) of the Federal Rules of Civil Procedure, this Final Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Final Order.

83.    _Headings_. The headings in this Final Order are for purposes of reference only and shall not limit or otherwise affect the meaning of this Final Order.

84.    <u>Retention of Jurisdiction</u>. This Court has and will retain jurisdiction to enforce this Final Order according to its terms.

**Dated: February 23rd, 2023**
**Wilmington, Delaware**

81 **MARY F. WALRATH**
**UNITED STATES BANKRUPTCY JUDGE**

APP129

## <u>Schedule 1</u>

### Prepetition Secured Facilities

| Facility | Outstanding Balance |
|---|---|
| TCB Warehouse Facility | $159,554,366 |
| TCB Tail Facility | $89,804,394.32 |
| TCB Buyout Facility | $137,652,839.70 |
| Existing Note Agreement | $192,778,848.22 |
| Prepetition BNGL Repo Facility | $12,018,549.04 |
| Prepetition BNGL Secured Loan | $52,947,397.92 |

APP130

## **Exhibit A**

**Additional Notes Term Sheet**

APP131

**REVERSE MORTGAGE FUNDING LLC**

Senior Secured DIP Notes Facility of $25,000,000

<u>Summary of Principal Terms and Conditions</u>

**THIS SUMMARY OF TERMS AND CONDITIONS OUTLINES CERTAIN TERMS OF THE PROPOSED DIP NOTES REFERRED TO BELOW.  THIS PROPOSED AMENDED AND RESTATED TERM SHEET IS NOT EXHAUSTIVE AS TO ALL OF THE TERMS AND CONDITIONS THAT WOULD GOVERN THE TRANSACTIONS DESCRIBED HEREIN. THE STATEMENTS CONTAINED IN THIS TERM SHEET AND ALL DISCUSSIONS BETWEEN AND AMONG THE PARTIES IN CONNECTION THEREWITH CONSTITUTE CONFIDENTIAL SETTLEMENT COMMUNICATIONS ENTITLED TO PROTECTION UNDER RULE 408 OF THE FEDERAL RULES OF EVIDENCE.**

**<u>UPON APPROVAL FROM THE BANKRUPTCY COURT (AS DEFINED BELOW), THIS TERM SHEET SHALL AMEND AND RESTATE THE "DIP NOTES TERM SHEET" INCLUDED AS EXHIBIT A TO DOCKET NO. 170 (THE "PRIOR DIP NOTES TERM SHEET") SOLELY WITH RESPECT TO THE $17 MILLION ADVANCED BY BNGL UNDER THE PRIOR DIP NOTES TERM SHEET (IT BEING UNDERSTOOD THAT $10 MILLION WAS FUNDED ON DECEMBER 5, 2022 AND THE REMAINING $7 MILLION HAS NOT BEEN FUNDED).</u>**

| | |
|---|---|
| **Note Issuer**: | Reverse Mortgage Funding, LLC (the "***Note Issuer***"), as debtor and debtor-in-possession. |
| **Guarantors**: | Each of the entities listed on <u>Exhibit B</u>, each as debtor and debtor-in-possession (collectively, the "***Guarantors***").  Such Guarantors, together with the Note Issuer, are referred to herein each as a "***Note Party***" and collectively, as the "***Note Parties***" or the "***Debtors***". |
| | "***Chapter 11 Cases***" mean proceedings under chapter 11 of title 11 of the U.S. Code (the "***Bankruptcy Code***") of the Note Issuer and the Guarantors before that certain U.S. Bankruptcy Court in the District of Delaware (the "***Bankruptcy Court***") filed on November 30, 2022 (the "***Petition Date***"). |
| **DIP Notes**: | BNGL Holdings, L.L.C. ("***BNGL***") shall provide a secured debtor-in-possession note facility to the Debtors (the "***DIP Notes***") in an aggregate amount of $25 million as follows:[1] |
| | • BNGL shall have advanced, or shall advance, as applicable, funds under notes in the aggregate amount up to $25 million directly to the Debtors to fund their operating costs and expenses and Chapter 11 costs (it being understood and agreed that $10 million was funded on December 5, 2022 and the remaining |

---

[1] For the avoidance of doubt, the DIP Notes contemplated herein does not include the $999,999.99 of DIP funding previously provided by Leadenhall (as defined in the Prior DIP Notes Term Sheet) pursuant to the Prior DIP Notes Term Sheet.

$15 million in commitments shall be funded on a delayed draw basis in accordance with the Budget).

BNGL hereby agrees that this Term Sheet and the DIP Orders amend and restate any prior term sheet and shall constitute the agreements that govern the DIP Notes until such time as promissory notes in form and substance acceptable to the DIP Funding Party are executed and delivered by the Note Issuer.

| | |
|---|---|
| **DIP Funding Party**: | BNGL shall constitute the ***"DIP Funding Party"*** or the "***DIP Lender***". |
| **Use of Cash Collateral:** | The use of any collateral that constitutes "cash collateral" as such term is defined in Section 363(a) of the Bankruptcy Code ("***Cash Collateral***") shall be used in accordance with the Final DIP Order |
| **Purpose/Use of Proceeds**: | The Cash Collateral and the proceeds of the DIP Notes will be used solely in accordance with the Budget attached as <u>Exhibit C</u> and as set forth under "DIP Notes" above. |
| **DIP Collateral; DIP Lien Priority**: | The Final DIP Order shall grant and approve, among other things, the liens, claims and security interests (collectively, the "***DIP Liens***", and the assets subject thereto, the "***DIP Collateral***") in the order of priority as detailed thereunder. |
| **Adequate Protection of Existing Secured Parties:** | The adequate protection of any diminution in the value of the interests of the Existing Note Providers (including Leadenhall) and the pre-petition secured claims of BNGL or its affiliates (the "***BNGL MRA Secured Parties***" and together, the "***Existing Secured Parties***") in the collateral securing the obligations owed to each of the respective Existing Secured Parties after the Petition Date shall be in accordance with the Final DIP Order. |
| **Carve-Out:** | The terms of the Carve-Out shall be in accordance and consistent with the Final DIP Order. |
| **Limitations on Use of Carve-Out, DIP Notes Proceeds and Cash Collateral:** | The limitations on the use of the Carve-Out, the DIP Notes Proceeds, and Cash Collateral shall be in accordance with the Final DIP Order. |
| **Cash Management:** | Subject to approval by the Bankruptcy Court, after commencement of the Chapter 11 Cases, the Note Parties shall use a cash management system satisfactory to BNGL. |
| **Challenge Period:** | The Challenge Period provided to the Committee and any other party in interest shall be in accordance and consistent with the terms of the Final DIP Order. |
| **Closing Date**: | The date on which an interim order approving the DIP Notes (the "***Interim DIP Order***") is entered by the Bankruptcy Court and the initial funding under the DIP Notes is made in accordance with |

2

the terms thereof (the "**Closing Date**"), but in no event later than December 9, 2022.

On or before February 23, 2023, a final DIP Order shall have been entered and shall not have been reversed, modified, amended, stayed or vacated and shall not be subject to a stay pending appeal, and which shall be in form and substance reasonably acceptable to BNGL, the "**Final DIP Order**", and together with the Interim DIP Order, collectively, "**DIP Orders**" and individually, a "**DIP Order**").

|  |  |
|---|---|
| **Maturity**: | To the extent not already terminated, the DIP Notes shall automatically and permanently terminate on the earliest of following dates (unless waived by BNGL, in its sole discretion) (each a "**Maturity Date**"): |

(a)    February 24, 2023 if the Final DIP Order has not been entered; *provided,* that in the event entry of the Final DIP Order is delayed due to unforeseen delays, the parties shall mutually agree to a reasonable extension,

(b)    the "effective date" of a chapter 11 plan filed in the Chapter 11 Cases that is confirmed pursuant to an order entered by the Bankruptcy Court,

(c)    the date the Chapter 11 Cases are dismissed or converted to chapter 7 case(s),

(d)    the acceleration of the DIP Notes, or

(e)    June 6, 2023.

|  |  |
|---|---|
| **Interest Rates**: | SOFR (3 month) plus 8.0% *per annum,* to be payable in kind and compounded monthly on the last day of each calendar month. |
| **Compliance with Budget**: | The Note Parties shall comply with the Budget, subject to an adverse variance for total "Operating Disbursements" of 20%, in accordance with the Budget.  Compliance with the Budget shall be tested on a weekly basis, with the first cumulative measurement to occur as of December 16 for the period between December 2 and December 16, with the first Budget to be re-set as of December 29.  Thereafter, the Budget covenants shall be on an aggregate, cumulative basis until the New Budget (as defined below) is in effect, at which point, the Budget covenants shall be on an aggregate, cumulative, four-week basis, measured weekly.  Any adverse deviation from the Budget beyond any applicable permitted adverse variance shall constitute an Event of Default unless waived in writing by BNGL (a "**Budget Event**").  Professional fees shall not be included in any calculations for purposes of testing compliance with the Budget and permitted variances. |
| **Reporting**: | The Note Issuer shall: |

(a)   deliver to BNGL prior to or on the Closing Date, an initial 10-week statement of projected receipts, disbursements, net cash flow, liquidity and loans through the end of December 2022 in a form and format acceptable to BNGL (the "***Budget***");

(b)   on the first Thursday of each month, no later than 12:00 pm ET, deliver to BNGL a variance report in form reasonably acceptable to BNGL (each, a "***Variance Report***") with respect to the immediately prior month ended the last business day of such month, setting forth (i) the actual cash receipts and disbursements for such immediately preceding month on a line-item basis and available cash on hand as of the end of such month, (ii) the variance in dollar amounts of the actual receipts and disbursements for each monthly period from those reflected for the corresponding period in the Budget, (iii) a description of the nature of any material positive or negative variance in certain line items to be agreed, (iv) whether the Note Parties complied with the budget covenant for the applicable testing period, and (v) payments made pursuant to any first-day orders during the prior month;

(c)   on the final Thursday of each calendar month, deliver a new two-month budget (the "***New Budget***") by week, to BNGL, which shall be deemed the new approved Budget pursuant to which the covenants will be measured commencing in the subsequent month;

(d)   on Thursday of each week, host a weekly call with representatives of BNGL to discuss financial results, projections, variance reports, and related matters; and

(e)   promptly, such additional information regarding the business, legal, financing, or corporate affairs of the Note Parties or any of their respective subsidiaries, or compliance with the terms of the DIP Notes, as BNGL may from time to time reasonably request.

**Affirmative Covenants**:   The Note Parties agree to support and take all steps reasonably necessary or reasonably requested by BNGL with respect to consummating a chapter 11 plan, including, without limitation:

(a)   the Note Parties shall have executed this Term Sheet;

(b)   [Reserved];

(c)   [Reserved];

(d)    [Reserved];

(e)    the Note Parties shall provide all material notices of litigation, defaults, and unmatured defaults and certain other information (including all documents filed with the Bankruptcy Court or distributed to any Committee),

(f)    the Note Parties provide notice of any event, occurrence, or circumstance in which a material portion of the DIP Collateral is damaged, destroyed, or otherwise impaired or adversely affected,

(g)    the Note Parties promptly and diligently oppose any motion filed by persons in the Bankruptcy Court to lift the stay on the DIP Collateral (other than motions filed by the DIP Funding Party), any motion filed by persons in the Bankruptcy Court to terminate the exclusive ability of the Note Parties to file a chapter 11 plan, and any other motion filed by persons in the Bankruptcy Court that, if granted, could reasonably be expected to have a material adverse effect on BNGL or any DIP Collateral, and

(h)    The Note Parties shall satisfy each of the following (each, a ***"Milestone"***):

1.    By no later than February 23, 2023, the Bankruptcy Court shall enter the Final DIP Order, in form and substance reasonably acceptable to the Debtors and BNGL; *provided,* that in the event entry of the Final DIP Order is delayed due to unforeseen delays, the parties shall mutually agree to a reasonable extension.

2.    By no later than March 16, 2023, file a chapter 11 plan (the "***Approved Chapter 11 Plan***") and disclosure statement, in each case, satisfactory to the Debtors and BNGL.

3.    By no later than June 4, 2023, the Approved Chapter 11 Plan shall have been confirmed by the Bankruptcy Court.

**Acknowledgment**    Each party to this Term Sheet acknowledges that no party to this Term Sheet is required to fund proceeds in addition to the DIP Notes or to otherwise fund any amounts under the DIP Notes inconsistent with such the Budget (as defined therein). The Debtors reserve the right to take any actions consistent with their fiduciary duties in the event the proceeds of the DIP Notes are insufficient to administer the Chapter 11 Cases or if this agreement is terminated pursuant to the terms hereof.

Each party to this Term Sheet also acknowledges that any additional party may provide financing to the Debtors, and the parties hereto shall not object or otherwise challenge such financing so long as such capital is provided on a junior basis.

**Events of Default**:    BNGL shall hold the sole right to assert that an event of default has occurred (each, an "***Event of Default***" and the occurrence of any event or

existence of any condition that would, with the passage of time or notice, constitute an Event of Default shall constitute a "***Default***"). It shall constitute an Event of Default (or, as applicable, a Default), if any of the following occurs:

(a)  the filing of any pleading, motion or application seeking, or the entry of an order authorizing, approving or granting:

  (i)  conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code;

  (ii)  the dismissal of any of the Chapter 11 Cases (or any subsequent Chapter 7 case);

  (iii)  appointment of a trustee, examiner or disinterested person with expanded powers relating to the operations or the business of any Note Party in the Chapter 11 Cases;

  (iv)  additional post-petition senior financing or liens on the DIP Collateral;

  (v)  any action materially adverse to the DIP Funding Party or their rights and remedies in the DIP Collateral;

  (vi)  relief from the automatic stay for the benefit of any other creditor with respect to any material DIP Collateral without the consent of BNGL; or

  (vii)  any Note Party's motion to disallow in whole or in part the DIP Funding Party's claim in respect of the obligations under the DIP Notes or contest any material provision of any DIP Notes document;

(b)  the material failure of any Note Party to comply with any DIP Order;

(c)  an order is entered by the Bankruptcy Court in any of the Chapter 11 Cases without the express prior written consent of BNGL (i) to revoke, reverse, stay, modify, supplement or amend the DIP Orders in a manner that is inconsistent with the DIP Notes that adversely affects, and is not otherwise consented to by BNGL, (ii) to grant or permit the grant of a lien on the DIP Collateral (other than liens permitted under the DIP Notes);

(d)  the payment by any Note Party of any pre-petition claim without the prior written consent of BNGL other than as expressly permitted by the Budget;

(e)    the commencement of, support of or failure to oppose any action against BNGL by or on behalf of any Note Party or any Note Party's affiliates or officers;

(f)    any administrative expense claim is allowed having priority to or ranking in parity with the rights of the DIP Funding Party;

(g)    any chapter 11 plan is confirmed without the consent of BNGL;

(h)    the filing of any chapter 11 plan that does not provide for the treatment of the DIP Notes as set forth in the Stipulation without the consent of BNGL;

(i)    payment of or granting adequate protection with respect to any of the existing secured debt of any of the Note Parties, other than as set forth herein without the consent of BNGL;

(j)    liens or super-priority claims with respect to the DIP Notes shall at any time cease to be valid, perfected and enforceable in all respects with the priority described herein;

(k)    allowance of any claim under Bankruptcy Code Section 506(c) or otherwise against BNGL or BNGL's DIP Collateral;

(l)    any termination or modification of the exclusivity periods set forth in Bankruptcy Code Section 1121;

(m)    any subsidiary of a Note Party that is not subject to the Chapter 11 Cases becomes subject to an insolvency proceeding without the consent of BNGL;

(n)    the occurrence of a Budget Event; or

(p)    the failure to meet any Milestone that is not waived by BNGL.

BNGL may exercise remedies consistent with the DIP Orders upon five (5) business' days' notice to the Note Parties of the occurrence of an event of default; *provided, however,* that BNGL agrees not to oppose a request by the Note Parties for an expedited hearing during such five-business-day period to re-impose or continue the automatic stay under Section 362 of the Bankruptcy Code.

To the extent the Committee Settlement (as defined in the Final DIP Order) is approved by the Court, an Event of Default shall not relieve BNGL of their obligation to fund the full $15 million contemplated in the Committee Settlement.

**Conditions Precedent to Initial Advances**:    The conditions precedent to the initial advances under the DIP Notes on the Closing Date shall consist of those conditions precedent required in

similar financings, including the conditions applicable to the DIP Notes set forth on Exhibit A hereto.

| | |
|---|---|
| **Conditions to Subsequent Advances**: | The conditions precedent to subsequent advances under the DIP Notes after the Closing Date will consist of the following conditions precedent, which may be waived by the DIP Funding Party in its sole discretion: |

(a)    entry of the Final DIP Order;

(b)    there is no ongoing Default or Event of Default;

(c)    receipt by BNGL of a borrowing request in form and substance satisfactory to BNGL at least two (2) Business Days prior to such advance;

(d)    all reasonable and documented out-of-pocket costs, fees, expenses (including, without limitation, reasonable and documented legal fees and expenses) set forth in the DIP Orders on or before such date such amounts shall have been paid; and

(d)    the amount to be advanced under the DIP Notes shall not exceed the amount set forth in the Budget.

| | |
|---|---|
| **Plan Support** | Parties to this Term Sheet agree to affirmatively support any chapter 11 plan that is materially consistent with this Term Sheet and to timely vote and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate) in each case in favor of any matter requiring approval to the extent necessary to implement such chapter 11 plan. |
| **Governing Law**: | New York but excluding any principles of conflicts of law or other rule of law that would cause the application of the law of any jurisdiction other than the State of New York. |
| | The Note Parties will submit to the exclusive jurisdiction and venue of the Bankruptcy Court, or in the event that the Bankruptcy Court does not have or does not exercise jurisdiction, then in any state or federal court of competent jurisdiction in the State, County and City of New York, borough of Manhattan. |

## EXHIBIT A

Conditions Precedent to Initial Advances under DIP Notes on the Closing Date:

(a)    The Note Parties shall have complied in full with the notice and other requirements of the Bankruptcy Code, in a manner acceptable to BNGL with respect to the Interim DIP Order and BNGL shall have received such evidence thereof as it shall reasonably require. No trustee, or other disinterested person with expanded powers pursuant to Section 1104(c) of the Bankruptcy Code, shall have been appointed or designated with respect to any Note Party or their respective business, properties or assets and no motion shall be pending seeking any such relief.  All of the "first day orders" and "second day orders" entered by the Bankruptcy Court at the time of the commencement of the Chapter 11 Cases and prior to the Interim DIP Order shall be in form and substance reasonably satisfactory to BNGL.  A cash management order approving the cash management arrangements of the Note Parties consistent with the requirements under the DIP Notes, and otherwise in form and substance reasonably satisfactory to BNGL shall have been entered and shall be in full force and effect.

(b)    The Interim DIP Order shall have been entered by the Bankruptcy Court.

(c)    Receipt by BNGL of the Budget.

**EXHIBIT B**

Guarantors

- Reverse Mortgage Investment Trust Inc.

- RMIT Cash Management LLC

- RMIT Operating I LLC

- RMIT Operating II LLC

**EXHIBIT C**

Budget

**<u>Exhibit B</u>**

**Tail Advance DIP Term Sheet**

## REVERSE MORTGAGE FUNDING LLC

Senior Secured DIP Tail Advances

### Terms and Conditions[1]

| | |
|---|---|
| **Borrower**: | Reverse Mortgage Funding, LLC (the "***Borrower***"), as debtor and debtor-in-possession. |
| **Guarantors**: | Each of the entities listed on <u>Exhibit B</u>, each as debtor and debtor-in-possession (collectively, the "***Guarantors***").  Such Guarantors, together with the Borrower, are referred to herein each as a "***Loan Party***" and collectively, as the "***Loan Parties***" or the "***Debtors***". |
| | "***Chapter 11 Cases***" mean proceedings under chapter 11 of title 11 of the U.S. Code (the "***Bankruptcy Code***") of the Borrower and the Guarantors before that certain U.S. Bankruptcy Court in the District of Delaware (the "***Bankruptcy Court***") filed on November 30, 2022 (the "***Petition Date***"). |
| **DIP Tail Advances**: | TCB shall provide a priming first priority senior secured debtor-in-possession short term loan facility (the "***DIP Tail Facility***") to the Debtors of not less than $30,733,668.00 (the "***DIP Tail Advances***") on terms consistent with the Existing Tail Loan Agreement, as modified herein.  Notwithstanding anything to the contrary herein, in no event shall TCB have any obligation to provide DIP Tail Advances after December 16, 2022. |
| | Each of the Loan Parties and TCB hereby agrees that the version of the Existing Tail Loan Agreement attached as Exhibit C to Exhibit B to the Interim DIP Order shall constitute the fully effective Existing Tail Loan Agreement. |
| | The DIP Tail Advances shall in all cases be funded directly to Celink in its capacity as subservicer, for the benefit of the Borrower, for the purpose of pooling and securitizing HECM Tails into a HMBS and delivering same to a HECM Tail Investor for purchase (the "<u>Approved Purpose</u>"). |
| **Use of Cash Collateral:** | The Final DIP Order (as defined below) shall authorize the Debtors to continue to use Cash Collateral in each case in accordance with the budget attached as Exhibit [ ] to the Final DIP Order (the "***Agreed*** |

---

[1] Capitalized terms used but not defined in this Term Sheet shall have the meanings ascribed to them in either (a) that certain that certain Fifth Amended and Restated Loan and Security Agreement, dated as of August 26, 2021, among Reverse Mortgage Funding LLC (the "***Borrower***") and Texas Capital Bank (the "***TCB***") guaranteed by Reverse Mortgage Investment Trust Inc., a Maryland Corporation, RMIT Cash Management LLC, a Delaware limited liability company, and RMIT Operating II LLC, a Delaware limited liability company (as heretofore amended, restated, supplemented or otherwise modified, the "***Existing Tail Loan Agreement***"), or (b) the Second Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing; (II) Authorizing Certain Debtors' Use of Cash Collateral; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief [Docket No. 170 (the "***Second Interim DIP Order***").  For the avoidance of doubt, the Maturity Date under the existing Promissory Note (which is incorporated into the Existing Tail Loan Agreement) is extended out to coincide with the Maturity Dates set forth in this Term Sheet.

APP144

*Budget*"); provided, that the Debtors shall not be authorized to use (a) the cash on hand in the TCB Additional Collateral Account or the restricted accounts at TCB identified in **Schedule 1** attached hereto, nor (b) the cash proceeds of TCB's DIP Collateral or the Prepetition TCB Collateral, including, without limitation, any Repo Facility Equity Value that is received by the Debtors (collectively, the "***Restricted Cash Collateral***"). Notwithstanding the limitation on the Debtors' use of TCB's Cash Collateral in the preceding sentence, the Debtors may use TCB's Cash Collateral that constitutes the cash proceeds of TCB's DIP Collateral or the Prepetition TCB Collateral that is identified in the Agreed Budget as (i) "Other Asset Recovery", (ii) "Servicing Fee Reimbursement (Warehouse)", (iii) "Tail Reimbursement (RPIT)", (iv) "Tail Reimbursement (Warehouse)", and (v) Tail Reimbursement (Non-GNMA MSR).

|  |  |
|---|---|
| **Purpose/Use of Proceeds**: | The proceeds of the DIP Tail Advances may be used solely for the Approved Purpose. |
| **DIP Collateral; DIP Lien Priority; Cross-Collateralization**: | The DIP Orders shall grant and approve, among other things, the liens, claims and security interests (collectively, the "***DIP Liens***", and the assets subject thereto, the "***DIP Collateral***") in the order of priority described below: |

(a)    pursuant to Bankruptcy Code Section 364(c)(1), a joint and several superpriority administrative expense claim in the Chapter 11 Cases in respect of all obligations under the DIP Tail Advances with priority over all other administrative expenses ("***DIP Tail Advances Superpriority Claim***"), including all other superpriority administrative claims granted by the Debtors in connection with any other post-petition financing incurred by the Debtors or any adequate protection of prepetition secured interests.

(b)    pursuant to Bankruptcy Code Section 364(c)(2), all obligations under the DIP Tail Advances and any other existing prepetition indebtedness owing from the Debtors to TCB (the "***Prepetition TCB Obligations***") shall be secured by first priority valid, perfected, enforceable and unavoidable liens on, and security interests in, all assets of the Loan Parties that are not otherwise subject to valid, perfected, enforceable and unavoidable liens and security interests in existence as of the Petition Date or valid liens perfected (but not granted) after the Petition Date (to the extent such perfection in respect of a prepetition claim is expressly permitted under the Bankruptcy Code) (the "***Unencumbered Assets***"); provided, that solely with respect to the Unencumbered Assets securing the Prepetition TCB Obligations hereunder, such post-petition liens granted hereunder shall be limited to $3,129,000;[2] provided, further, that upon the liquidation or

---

[2] TCB shall provide a credit with respect to the servicing fees, advances and related expenses previously funded by the Debtors in connection with the Existing Facilities (as defined herein) against the TCB Additional Collateral

monetization of any Unencumbered Assets, the first $3,129,000 shall be deposited into a segregated account at TCB for the benefit of TCB and any further disposition of such funds shall be subject to an order of the Bankruptcy Court (the "***TCB Additional Collateral Account***").  For the avoidance of doubt, Unencumbered Assets do not include assets or property that has been transferred in connection with the Debtors' warehouse repo facilities or securities repo facilities (collectively, the "***Repo Facilities***"); <u>provided</u>, that Repo Facility Equity Value shall constitute Unencumbered Assets.  As used here, "***Repo Facility Equity Value***" means the property deemed to be property of the estate pursuant to Section 559 of the Bankruptcy Code;

(c)      pursuant to Bankruptcy Code Section 364(c) and (d), all obligations under the DIP Tail Advances shall be secured by (i) priming first priority valid, perfected, enforceable and unavoidable liens on, and security interests in, the existing collateral securing the obligations under the Existing Tail Loan Agreement ("***Existing Collateral***"); (ii) a priming first priority valid, perfected, enforceable and unavoidable liens on, and security interests in, the proceeds of prepetition tail securitization proceeds to the extent they reflect a premium to par (the "***TCB Tail Premium Collateral***"), notwithstanding any provision in the Intercreditor Agreement by and between RMF, Leadenhall, and TCB, dated October 17, 2018; and (iii) junior priority valid, perfected, enforceable and unavoidable liens on, and security interests in, any collateral securing any other postpetition funded debt obligations that does not constitute Existing Collateral or TCB Tail Premium Collateral (the "***Junior DIP Collateral***"); <u>provided</u>, that such TCB Tail Premium Collateral and the Junior DIP Collateral shall also secure the Prepetition TCB Obligations up to $3,129,000 (which shall be coextensive and not incremental to the liens granted to secure the Prepetition TCB Obligations in subsection (b) immediately above) and upon the liquidation or monetization of any TCB Tail Premium Collateral and/Junior DIP Collateral that TCB's lien is senior at such time that the cash proceeds become available to satisfy the Prepetition TCB Obligations such cash proceeds shall be funded to the TCB Additional Collateral Account for the benefit of TCB, unless and until the TCB Additional Collateral Account is funded with an aggregate amount of $3,129,000.

Notwithstanding anything to the contrary herein (or in any other debtor in possession financing term sheet or other DIP Facility) for the avoidance of doubt, the DIP Liens granted to TCB hereunder shall be senior and prior to claims on account of or liens securing obligations incurred by the Debtors in connection with any other post-petition financing facility incurred by the Debtors.  For the avoidance of doubt,

---

Account in the amount of [$871,000], reducing the aggregate amount of the TCB Additional Collateral Account from $4,000,000 to $3,129,000.

the DIP Liens and the liens securing the Prepetition TCB Obligations shall not be subordinated or subject to a professional fee Carve-Out.

Unencumbered Assets include, without limitation, all claims and/or causes of action of any Loan Party against Celink (inclusive of any Avoidance Action (as defined below)). The DIP Collateral shall not include actions for preferences, fraudulent conveyances, and other avoidance power claims under Sections 544, 545, 547, 548, 550 and 553 of the Bankruptcy Code (the *"Avoidance Actions"*), but, subject to the entry of the Final DIP Order, shall include the proceeds of Avoidance Actions.

Subject to the entry of the Final DIP Order, the DIP Tail Advances shall not be subject to surcharge under Section 506(c) of the Bankruptcy Code or the "equities of the case" exception under Section 552(b) of the Bankruptcy Code.

All of the security interests and liens described herein with respect to the Loan Parties shall be effective and perfected as of the entry of the Second Interim DIP Order and without the necessity of the execution of security agreements, pledge agreements, financing statements or other agreements.

**Adequate Protection of TCB:**   As adequate protection of TCB as the lender under (i) the Existing Tail Loan Agreement, (ii) that certain Loan and Security Agreement, by and between TCB and Reverse Mortgage Funding LLC, dated as of October 31, 2018, as amended (the "*Existing Buyout Facility*"), (iii) that certain Mortgage Warehouse Agreement, dated as of July 29, 2022 by and between TCB and Reverse Mortgage Funding LLC, as amended (the "*Existing Repo Facility*"), and (iv) any other prepetition secured indebtedness owing from the Loan Parties to the TCB (collectively, the "*Existing Facilities*"), TCB shall receive:

(a) pursuant to Bankruptcy Code Section 361(2), adequate protection replacement liens on the DIP Collateral, junior only to the DIP Liens;

(b) a superpriority administrative expense claim as contemplated by Sections 507(b) and 364(c)(1) of the Bankruptcy Code (the "*Existing Lender Superpriority Adequate Protection Claim*"), junior only to the DIP Tail Advances Superpriority Claim granted in respect of the DIP Tail Advances obligations;

(c) with respect to Advances funded to the Debtors prior to the Petition Date, the Debtors shall comply on a post-petition basis with all terms of payment set forth in the Existing Tail Loan Agreement to the extent necessary to facilitate such payment terms, including, but not limited to, sections 2.4, 2.7(b), 2.7(c), 2.8 and 2.10;

(d) with respect to TCB's reasonable and documented out-of-pocket costs and expenses (including reasonable and documented fees and expenses of counsel, which includes, without limitation, Paul, Weiss, Rifkind,

Wharton & Garrison LLP and one Delaware local counsel) in connection with administering the DIP Tail Advances, preparing all documents and enforcing any and all obligations relating to the DIP Tail Advances, such fees and expenses shall be part of TCB's DIP Claims and/or Prepetition TCB Obligations and, subject to the review rights of the Debtors, the Committee and the U.S. Trustee set forth in the Final DIP Order, TCB shall be entitled to reimbursement for such fees and expenses incurred during the Chapter 11 Cases solely from Restricted Cash Collateral; *provided*, that nothing herein restricts and TCB reserves all its rights to the extent any such professional fees, servicing fees, advances, and related expenses remain unpaid to seek recovery of such fees and expenses as part of the DIP Obligations owing to TCB and/or the Prepetition TCB Obligations, consistent with the Bankruptcy Code;

(e) express recognition under any future DIP Order approving the DIP Tail Advances that pursuant to §§ 362, 555, and 559 of the Bankruptcy Code, TCB is authorized to exercise its rights and remedies to liquidate, accelerate and/or terminate its relevant governing agreements under the Existing Facilities with the Borrower and any related documents, and to the extent not within the scope of § 362(b)(6) or (7), the automatic stay is lifted to allow TCB to exercise such rights and remedies and/or to set off against any amounts of the Borrower held by TCB that constitute proceeds of its collateral;[3] and

(f) express authorization under the DIP Orders that TCB is authorized to apply any amounts received from the FHA to which TCB is entitled on account of (i) assignment of "Active Buyouts" to FHA or (ii) any claim submitted following liquidation of "Non-Active Buyouts, in each case, to the extent that TCB is entitled to such proceeds under the Existing Buyout Facility.

Any DIP Order (as defined herein) shall include relief from the automatic stay to make such payments as adequate protection.

**Cash Management:**   Subject to approval by the Bankruptcy Court, after commencement of the Chapter 11 Cases, the Loan Parties shall use a cash management system reasonably satisfactory to TCB.  TCB shall not be permitted to exercise setoff rights unless otherwise permitted by any order of the Bankruptcy Court authorizing the Debtors' continued use of their cash management system, any order of the Bankruptcy Court approving post-petition financing, including, without limitation, the DIP Orders, or any further order of the Bankruptcy Court.  Notwithstanding the foregoing, the final Cash Management order (the "Final Cash Management Order") shall be in form and substance acceptable to TCB and provide that upon entry of the Final Cash Management Order and without further court order, the automatic stay shall be lifted and TCB shall be permitted to set off against the Restricted Cash Collateral account x5321 on account of its prepetition credit card receivables claim in the amount of $358,576.18.

---

[3] The Debtors shall fully and expeditiously cooperate with TCB to facilitate the exercise of such rights.

APP148

| | |
|---|---|
| **Payment of Serving Fees, Advances and Related Expenses** | To the extent not previously satisfied by the Debtors, TCB may fund any necessary serving fees, advances and/or related expenses directly to Celink to preserve the value of TCB's DIP Collateral and the Prepetition TCB Collateral, and TCB will be authorized to reimbursement for such amounts from Restricted Cash Collateral, and to exercise any rights under the Existing Facilities to assert claims against the Debtor for reimbursement of such amounts as obligations under the DIP Tail Facility and the Prepetition TCB Obligations, as applicable, in each case to be paid solely out of Restricted Cash Collateral; *provided*, that nothing herein restricts and TCB reserves all its rights to the extent any such professional fees, servicing fees, advances, and related expenses remain unpaid to seek recovery of such fees and expenses as part of the DIP Obligations owing to TCB and/or the Prepetition TCB Obligations, consistent with the Bankruptcy Code. |
| **Compliance with Terms of Payment:** | With respect to any DIP Tail Advances, the Debtors shall comply in all respects with the terms of payment set forth Article 2 of the Existing Tail Loan Agreement and shall remit payment of any cash proceeds from the monetization of the HECM Tails to TCB to satisfy the Debtors' obligations under the DIP Tail Facility. |
| **Challenge Period:** | The DIP Orders shall provide that a Committee and any other party in interest must file a pleading with the Bankruptcy Court challenging the validity, extent, perfection and/or priority of any claims or security interest of TCB no later than 75 days after entry of the Second Interim DIP Order.  Failure of the Committee or any other party in interest to file such a pleading with the Bankruptcy Court shall forever bar such party from making such a challenge. |
| **Closing Date**: | The date on which the Second Interim DIP Order to which this term sheet is approved and entered by the Bankruptcy Court and the conditions precedent under the DIP Tail Advances have been satisfied or waived (the "***Closing Date***"), but in no event later than December 9, 2022. |
| | On or before February 27, 2023, a final DIP Order shall have been entered and shall not have been reversed, modified, amended, stayed or vacated and shall not be subject to a stay pending appeal, and which shall be in form and substance acceptable to TCB (the "***Final DIP Order***", and together with the Second Interim DIP Order, "***DIP Orders***", and each individually, a "***DIP Order***"). |
| **Maturity**: | The DIP Tail Advances shall be repaid in full in cash (and, to the extent not already repaid or terminated, and all commitments thereunder shall automatically and permanently terminate) on the earliest of following dates (each a "***Maturity Date***"), subject to any earlier termination pursuant to the occurrence of an Event of Default: |
| | (a)        December 9, 2022, if the Second Interim DIP Order has not been entered, |

6

(b) December 16, 2022, if the Bankruptcy Court has not entered an order approving the Stipulation (as defined in the Second Interim DIP Order),

(c) February 27, 2023, if the Final DIP Order has not been entered,

(d) June 15, 2023, upon which the Debtors' use Cash Collateral shall terminate,

(e) the "effective date" of a chapter 11 plan filed in the Chapter 11 Cases that is confirmed pursuant to an order entered by the Bankruptcy Court,

(f) the date the Chapter 11 Cases are dismissed or converted to chapter 7 case(s), and

(g) the day that is one (1) business day prior to the date upon which any other postpetition debtor-in-possession DIP financing facility of the Debtors is scheduled to mature (as of the Closing Date, without regard to any extension of such maturity date following the Closing Date).

| | |
|---|---|
| **Interest Rates**: | As set forth in the Existing Tail Loan Agreement |
| **HECM Tail Collateral Value:** | For purposes of determining the HECM Tail Collateral Value for any DIP Tail Advances, the definition of HECM Tail Collateral Value in the Existing Tail Loan Agreement shall be replaced by the following: |

"***HECM Tail Collateral Value***" means, as of any date of determination, an amount equal to 100% of the aggregate outstanding principal amount of all non-securitized Eligible HECM Tails held by Borrower for which a first priority, perfected, security interest in the HECM Tail Collateral has been granted by Borrower to Bank. Notwithstanding anything to the contrary contained herein, HECM Tails for which an Advance has been outstanding for sixty (60) days or longer shall be expressly excluded from the calculation of the Borrower Base, except for, subject to the Extended Period HECM Tail Sublimit, Extended Period HECM Tail Tails; provided, that once an Advance on a HECM Tail has been timely repaid, Borrower may request a subsequent Advance on the same HECM Tail (and consequently such HECM Tail may be included in the Borrower Base) so long as such HECM Tail remains an Eligible HECM Tail.

| | |
|---|---|
| **Participation Agreement** | The Existing Tail Loan Agreement shall be automatically deemed to be modified in all appropriate respects to (i) permit the transactions contemplated by that certain Participation Agreement to be entered into by and between TCB and Longbridge (the "<u>Participation Agreement</u>"), pursuant to which Longbridge has agreed (subject to the fulfillment of the conditions precedent therein), among other things, to participate in the making DIP Tail Advances up to five percent (5%) (i.e., $4,000,000) of the DIP Tail commitment prior to TCB making any DIP Tail Advances and (ii) reflect the Longbridge's status as an "Indemnified Party" under |

7

Section 10.10 of the Loan and Security Agreement by virtue of it being a successor and/or assign of TCB.

**Expenses**:

TCB's reasonable and documented out-of-pocket costs and expenses (including reasonable and documented fees and expenses of counsel, which includes, without limitation, Paul, Weiss, Rifkind, Wharton & Garrison LLP and one Delaware local counsel) in connection with administering the DIP Tail Advances, preparing all documents and enforcing any and all obligations relating to the DIP Tail Advances shall be part of TCB's DIP Claims and/or Prepetition TCB Obligations and, subject to the review rights of the Debtors, the Committee and the U.S. Trustee set forth in the Final DIP Order, TCB shall be entitled to reimbursement for such fees and expenses incurred during the Chapter 11 Cases solely from Restricted Cash Collateral; *provided*, that nothing herein restricts and TCB reserves all its rights to the extent any such professional fees, servicing fees, advances, and related expenses remain unpaid to seek recovery of such fees and expenses as part of the DIP Obligations owing to TCB and/or the Prepetition TCB Obligations, consistent with the Bankruptcy Code.

**Affirmative Covenants**:

(a)    Unless otherwise consented to by TCB, the Loan Parties shall ensure that Celink, subject to the Debtors' reservation of rights for preexisting claims, continues to act as subservicer with respect to TCB's DIP Collateral and the Prepetition TCB Collateral;

(b)    the Loan Parties shall provide all notices of litigation, defaults, and unmatured defaults and other information reasonably requested (including (i) all documents filed under seal with the Bankruptcy Court or (ii) distributed to any Committee to the extent that such information or communications reasonably relate to TCB),

(c)    the Loan Parties provide notice of any event, occurrence, or circumstance in which a material portion of the DIP Collateral is damaged, destroyed, or otherwise impaired or adversely affected,

(d)    the Loan Parties promptly and diligently oppose any motion filed by persons in the Bankruptcy Court to lift the stay on the DIP Collateral (other than any such motion(s) filed by TCB), any motion filed by persons in the Bankruptcy Court to terminate the exclusive ability of the Loan Parties to file a plan of reorganization, and any other motion filed by persons in the Bankruptcy Court that, if granted, could reasonably be expected to have a material adverse effect on TCB or any DIP Collateral,

(e)    the Loan Parties shall take all commercially reasonable actions to engage with GNMA in good faith to monetize the HECM Tails to satisfy the Debtors' obligations under the DIP Tail Facility.

APP151

(f)    the Loan Parties shall provide TCB with (i) a weekly variance report in form reasonably acceptable to TCB (each, a "***Variance Report***") with respect to the immediately prior week ended the last business day of such week, setting forth the actual cash receipts and disbursements for such immediately preceding week, the source of such disbursements, the variance in dollar amounts of the actual receipts and disbursements for each weekly period from those reflected for the corresponding period in the Agreed Budget, and a description of the nature of any material positive or negative variance in certain line items to be agreed and (ii) a weekly call with FTI Consulting, Inc. with respect to the Variance Report.

(h)    satisfaction of each of the following (each, a ***"Milestone"***):

1.    By no later than December 9, 2022, the Bankruptcy Court shall enter the Second Interim DIP Order, in form and substance acceptable to TCB.

2.    By no later than December 16, 2022, the Bankruptcy Court shall enter an order approving the Stipulation.

3.    By no later than December 16, 2022, no less than $60,000,000 of the Advances are securitized by GNMA by such date.

4.    By no later than February 27, 2023, the Bankruptcy Court shall enter the Final DIP Order, in form and substance reasonably acceptable to TCB.

5.    By no later than March 16, 2023, the Debtors shall file (or amend in the case of already filed document) a chapter 11 plan of liquidation (the "***Plan***"), the associated disclosure statement and related motion (the "***Disclosure Statement***" and "***Solicitation Motion***") seeking entry of an order approving of the disclosure statement and authorizing the Debtors to solicit creditors' acceptances of the Plan (the "***Solicitation Order***"), and the Plan, Disclosure Statement, Solicitation Motion and Solicitation Order shall, in each case, be in form (as amended, if applicable) that honors the priorities set forth in the Final DIP Order (including with respect to distribution of proceeds of DIP Collateral) and otherwise reasonably acceptable to TCB with respect to other terms.

6.    By no later than March 31, 2023, the Bankruptcy Court shall have entered the Solicitation Order;

7.    By no later than May 31, 2023, the Bankruptcy Court shall have entered an order confirming the Debtors'

chapter 11 plan of liquidation, and such order shall honor the priorities set forth in the Final DIP Order (including with respect to distribution of proceeds of DIP Collateral) and otherwise be reasonably acceptable to TCB with respect to other terms.

8.    By no later than June 15, 2023, the effective date of the Debtors' chapter 11 plan of liquidation shall have occurred.

(i)    the Loan Parties shall use commercially reasonable efforts to liquidate or otherwise monetize the DIP Collateral and Prepetition TCB Collateral in an efficient and timely manner to maximize the value of TCB's DIP Collateral and the Prepetition TCB Collateral.

**Events of Default**:    Events of default to include, without limitation, the following:

(a)    the filing by the Debtors of any pleading, motion or application seeking, or the entry of an order authorizing, approving or granting:

(i)    the conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code;

(ii)    the dismissal of any of the Chapter 11 Cases (or any subsequent Chapter 7 case);

(iii)    the appointment of a trustee, examiner or disinterested person with expanded powers relating to the operations or the business of any Loan Party in the Chapter 11 Cases;

(iv)    the incurrence of additional post-petition senior financing or liens on the DIP Collateral, in each case, without the consent of TCB;

(v)    any action adverse to TCB's rights and remedies in the DIP Collateral;

(vi)    any modification of the priorities of TCB's liens, claims or security interests as set forth herein or in the DIP Orders;

(vii)    relief from the automatic stay for the benefit of any other creditor with respect to any material DIP Collateral without the consent of TCB; or

(viii)    any Loan Party's motion to disallow in whole or in part TCB's claims in respect of the obligations under the DIP Tail Advances, the Advances, the Existing Tail Loan

10

APP153

Agreement, the Existing Buyout Facility or any other indebtedness owing to TCB, or contest any material provision of any DIP Tail Advances documents;

(b)      the failure of any Loan Party to comply with any DIP Order;

(c)      an order is entered by the Bankruptcy Court in any of the Chapter 11 Cases without the express prior written consent of TCB (i) to revoke, reverse, stay, modify, supplement or amend the DIP Orders in a manner that is inconsistent with the DIP Tail Advances that adversely affects, and is not otherwise consented to by, TCB, (ii) to grant or permit the grant of a senior lien on the DIP Collateral (other than liens permitted under the DIP Tail Advances);

(d)      the commencement of, support of or failure to oppose any action against TCB by or on behalf of any Loan Party or any Loan Party's affiliates or officers;

(e)      any lien or administrative expense claim is allowed having priority to or ranking in parity with the rights of TCB;

(f)      the breach by the Debtors of any affirmative covenant set forth herein;

(g)      the filing by the Debtors of a chapter 11 plan after March 1, 2023 that does not honor the priorities set forth in the Final DIP Order;

(h)      payment of or granting senior adequate protection with respect to any of the existing secured debt of any of the Loan Parties, other than as set forth herein without the consent of TCB or in the DIP Orders;

(i)      liens or super-priority claims with respect to the DIP Tail Advances shall at any time cease to be valid, perfected and enforceable in all respects in the amount and with the priority described herein;

(j)      allowance of any claim under Bankruptcy Code Section 506(c) or otherwise against any or all of TCB's DIP Collateral or the Prepetition TCB Collateral;

(k)      any termination or modification of the exclusivity periods set forth in Bankruptcy Code Section 1121;

(l)      any subsidiary of a Loan Party that is not subject to the Chapter 11 Cases becomes subject to an insolvency proceeding without the consent of TCB;

(m)     the failure of Parent to fulfill its obligations under the DIP Financing such that the Debtors have insufficient funds to administer the Chapter 11 Cases;

(n)     Leadenhall, whether by court authorization or otherwise, is permitted to exercise and/or exercises secured creditor remedies against the Debtors or any of the Debtors' assets;

(p)     after the entry of the Final DIP Order, the occurrence of an event of default under any other DIP Facility, or the delivery of a Termination Declaration by any other DIP Lender;

(q)     the Loan Parties seek approval from the Bankruptcy Court to obtain additional financing, credit or incur additional debt pursuant to Bankruptcy Code sections 364(b), 364(c) or 364(d) (a "***Subsequent Financing***") that contemplates the grant of liens and claims that are senior to or *pari passu* with the DIP Obligations owing to TCB and the DIP Liens securing such DIP Obligations; <u>provided</u>, that there shall be no event of default to the extent TCB consents to such Subsequent Financing or the proceeds of the Subsequent Financing shall immediately be turned over to TCB and indefeasible repay in full in cash all of the DIP Obligations owing to TCB; or

(p)     the failure to satisfy any Milestone.

TCB may exercise remedies consistent with the DIP Orders upon five (5) business' days' notice from TCB to the Loan Parties of the occurrence of an event of default; <u>provided,</u> however, that TCB agrees not to oppose a request by the Loan Parties for an expedited hearing during such five (5) business-day period to re-impose or continue the automatic stay under Section 362 of the Bankruptcy Code.

**Conditions Precedent to Borrowing**:

The conditions precedent to the borrowing of the DIP Tail Advances (x) on the Closing Date are set forth on <u>Exhibit A</u> hereto and (y) thereafter, are the conditions in the Existing Tail Loan Agreement as modified by this Term Sheet, including (a) with respect to HECM Tail Collateral Value and (b) that the following conditions from the Existing Tail Loan Agreement shall be not required to be satisfied:[4] (i) absence of any Default or Event of Default arising (A) before the commencement of the Chapter 11 Cases, (B) because of the Chapter 11 Cases, (C) because of the occurrence of any event of default (or the equivalent) in respect of any other indebtedness of the Borrower or any affiliate thereof, (D) because of any failure to satisfy any financial covenant or test at any time and/or (E) because of failure to give any notice with respect to any matter described in the foregoing clauses or (ii) inability to make any representation or warranty because of any of the matters described in

---

[4] For the avoidance of doubt, TCB does not waive any (or any rights with respect to) Defaults or Events of Default, and hereby expressly reserves all rights in all respect.

12

clause (i) above or related in any way to the solvency or financial condition of the Borrower or any affiliate thereof.

Notwithstanding anything else provided herein, TCB shall have no obligation to provide any DIP Tail Advances after December 16, 2022.

**Governing Law**:    The governing law provisions of the Existing Tail Loan Agreement shall control; provided, that the parties will submit to the exclusive jurisdiction and venue of the Bankruptcy Court, or in the event that the Bankruptcy Court does not have or does not exercise jurisdiction, then in any state or federal court of competent jurisdiction in the State, County and City of New York, borough of Manhattan.

**Releases**    The DIP Orders shall provide for releases effective as of the entry of the Second Interim DIP Order of TCB and Longbridge in connection with the Loan Parties and all prepetition and postpetition transactions.

**Withdrawal of**    Upon the entry of the Final DIP Order, TCB shall withdraw without
**Termination Declaration**    prejudice the Termination Declaration TCB delivered on December 22, 2022, to the Debtors, the U.S. Trustee and the Committee pursuant to paragraph 31 of the Second Interim DIP Order.

APP156

## EXHIBIT A

Conditions Precedent to Initial Borrowings under DIP Tail Advances on the Closing Date:

(a)     The Loan Parties shall have complied in full with the notice and other requirements of the Bankruptcy Code, in a manner acceptable to TCB with respect to the Second Interim DIP Order and TCB shall have received such evidence thereof as it shall reasonably require. No trustee, or other disinterested person with expanded powers pursuant to Section 1104(c) of the Bankruptcy Code, shall have been appointed or designated with respect to any Loan Party or their respective business, properties or assets and no motion shall be pending seeking any such relief.  All of the "first day orders" and "second day orders" entered by the Bankruptcy Court at the time of the commencement of the Chapter 11 Cases and prior to the Second Interim DIP Order shall be in form and substance reasonably satisfactory to TCB.  A cash management order approving the cash management arrangements of the Loan Parties consistent with the requirements under the DIP Tail Advances, and otherwise in form and substance reasonably satisfactory to TCB shall have been entered and shall be in full force and effect.

(b)     The Second Interim DIP Order shall have been approved by the Bankruptcy Court.

(c)     Leadenhall and Longbridge have agreed to support the Debtors' buyout obligations on December 19, 2022.

(d)     Confirmation that Celink will use the proceeds of the applicable DIP Tail Advances only for the Approved Purpose.

(e)     TCB shall have received a copy of the Participation Agreement duly authorized and executed by TCB and Longbridge.

(f)     Longbridge, Leadenhall, RMF Parent, and the Debtors shall have executed the Transfer Stipulation.

(g)     TCB shall have received a written agreement from GNMA stating: (a) GNMA shall support the Debtors' securitization of any HECM Tails and HECM Loans in accordance with the HECM program; and (b) GNMA shall agree that if any successor Issuer of the MSRs (or GNMA itself) does not transfer the MSRs to a new Issuer within 60 days, GNMA will pay off any remaining outstanding amounts under the DIP Tail Facility on or before such 60-day period; provided, that, if the HECM Tails are securitized, then GNMA will pay off the premiums on the HECM Tails.

**<u>EXHIBIT B</u>**

<u>Guarantors</u>

- Reverse Mortgage Investment Trust Inc.

- RMIT Cash Management LLC

- RMIT Operating I LLC

- RMIT Operating II LLC

## **SCHEDULE 1**

Restricted Cash Collateral

TCB Acct xxxx7641

TCB Acct xxxx7633

TCB Acct xxxx5321

TCB Acct xxxx4216

TCB Acct xxxx7625

TCB Acct xxxx8950

TCB Acct xxxx8968

TCB Acct xxxx8976

**SCHEDULE 2**

TCB-LB LOI

# TCB-LB LOI
## ESSENTIAL TERMS

| | |
|---|---|
| Debtor in Possession/ Transferor: | REVERSE MORTGAGE FUNDING LLC, a Delaware limited liability company |

Secured Party: TEXAS CAPITAL BANK ("TCB")

Transferee:   LONGBRIDGE FINANCIAL, LLC, a Delaware limited liability company, as Designee of TCB, in accordance with the Stipulation

Subject
Assets:       HECM Loans, on a "servicing released" basis, which constitute Collateral under the Buyout Facility; save and except HECM Loans which Transferor shall retain and directly present for assignment to FHA, if any, as provided in the Stipulation

Transfer
Price:        $0.80/Dollar for HECM Loans which are not Assignable Loans and $0.95375/Dollar for HECM Loans which are Assignable Loans, in each case, to be delivered servicing released. The total Transfer Price will be based upon "total debt". Total debt is defined as the unpaid principal balance of the HECM Loans to be transferred as of Transferor's December 23, 2022 bid cut off tape plus, subject to the mutual agreement of Transferee and TCB, in their discretion, claimable advances (per FHA guidelines) viewed as recoverable made after December 23, 2022 and up to the closing date of the Transfer. TCB understands that payoffs occurring between December 23, 2022 and the closing date of the Transfer may have an adverse impact on overall or loan level pricing, subject to Transferee's and TCB's mutual agreement. The Transfer Price is also subject to change based upon the results of Transferee's due diligence process, subject to Transferee's and TCB's mutual agreement.

Terms:        Funding of the Transfer Price is anticipated to be 100% financed by Transferee through a credit facility with TCB on terms mutually agreeable to Transferee and TCB, with the Transfer Price to be credited against the indebtedness, obligations, and other amounts owed by Transferor to TCB in respect of the Buyout Facility.

Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in that certain Third Amended and Restated Loan and Security Agreement dated October 31, 2021, by and among TCB and Transferor (as amended, modified or otherwise supplemented from time to time; the facility thereunder being referred to herein as the "Buyout Facility").

**TCB-LB LOI**
**ESSENTIAL TERMS**

The terms reflected herein are non-binding, and the closing of the transfer of the Subject Assets from Transferor to Transferee is subject to the negotiation and execution of definitive documentation and closing conditions mutually acceptable to TCB and Transferee.

## <u>Exhibit C</u>

## Approved Budget

**Reverse Mortgage Investment Trust Inc.**
**DIP Budget**
*($ in millions)*

| | DIP Budget | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Week Number: | 1 | 2 | 3 | 4 | 5 | 6 | 7 | |
| Week Ending: | 17-Feb | 24-Feb | 3-Mar | 10-Mar | 17-Mar | 24-Mar | 31-Mar | Total |
| Servicing & Tails Activity | $ (1.3) | $ - | $ 0.5 | $ 0.2 | $ (0.1) | $ (0.1) | $ (0.1) | $ (0.8) |
| Operating Disbursements | (0.5) | (1.2) | (0.5) | (1.1) | (0.9) | (1.1) | (2.4) | (7.7) |
| Restructuring Costs | (1.0) | (1.0) | (1.0) | (1.0) | (1.0) | (1.0) | (1.0) | (7.1) |
| Net Cash Flow | $ (2.8) | $ (2.2) | $ (1.1) | $ (1.9) | $ (2.0) | $ (2.1) | $ (3.5) | $ (15.6) |
| Beginning Cash | $ 3.3 | $ 0.4 | $ 2.3 | $ 3.2 | $ 3.3 | $ 3.3 | $ 3.1 | $ 3.3 |
| Net Cash Flow | (2.8) | (2.2) | (1.1) | (1.9) | (2.0) | (2.1) | (3.5) | (15.6) |
| DIP Funding | - | 4.0 | 2.0 | 2.0 | 2.0 | 2.0 | 3.0 | 15.0 |
| Ending Cash | $ 0.4 | $ 2.3 | $ 3.2 | $ 3.3 | $ 3.3 | $ 3.1 | $ 2.7 | $ 2.7 |

# §1717. Federal National Mortgage Association and Government National Mortgage Association

### (a) Creation; succession; principal and other offices

(1) There is created a body corporate to be known as the "Federal National Mortgage Association", which shall be in the Department of Housing and Urban Development. The Association shall have succession until dissolved by Act of Congress. It shall maintain its principal office in the District of Columbia and shall be deemed, for purposes of venue in civil actions, to be a resident thereof. Agencies or offices may be established by the Association in such other place or places as it may deem necessary or appropriate in the conduct of its business.

(2) On September 1, 1968, the body corporate described in the foregoing paragraph shall cease to exist in that form and is hereby partitioned into two separate and distinct bodies corporate, each of which shall have continuity and corporate succession as a separated portion of the previously existing body corporate, as follows:

(A) One of such separated portions shall be a body corporate without capital stock to be known as Government National Mortgage Association (hereinafter referred to as the "Association"), which shall be in the Department of Housing and Urban Development and which shall retain the assets and liabilities acquired and incurred under sections 1720 ¹ and 1721 of this title prior to such date, including any and all liabilities incurred pursuant to subsection (c). The Association shall have succession until dissolved by Act of Congress. It shall maintain its principal office in the District of Columbia and shall be deemed, for purposes of venue in civil actions, to be a resident thereof. Agencies or offices may be established by the Association in such other place or places as it may deem necessary or appropriate in the conduct of its business.

(B) The other such separated portion shall be a body corporate to be known as Federal National Mortgage Association (hereinafter referred to as the "corporation"), which shall retain the assets and liabilities acquired and incurred under sections 1718 and 1719 of this title prior to such date. The corporation shall have succession until dissolved by Act of Congress. It shall maintain its principal office in the District of Columbia or the metropolitan area thereof and shall be deemed, for purposes of jurisdiction and venue in civil actions, to be a District of Columbia corporation.

(3) The partition transaction effected pursuant to the foregoing paragraph constitutes a reorganization within the meaning of section 368(a)(1)(E) of title 26; and for the purposes of such title 26, no gain or loss is recognized by the previously existing body corporate by reason of the partition, and the basis and holding period of the assets of the corporation immediately following such partition are the same as the basis and holding period of such assets immediately prior to such partition.

### (b) Purchase and sale of insured and conventional mortgages; transactions in loans and advances of credit

(1) For the purposes set forth in section 1716 of this title and subject to the limitations and restrictions of this subchapter, each of the bodies corporate named in subsection (a)(2) is authorized pursuant to commitments or otherwise, to purchase, service, sell, or otherwise deal in any mortgages which are insured under this chapter or title V of the Housing Act of 1949 [42 U.S.C. 1471 et seq.], or which are insured or guaranteed under the Servicemen's Readjustment Act of 1944 or chapter 37 of title 38; and to purchase, service, sell, or otherwise deal in any loans made or guaranteed under part B of title VI of the Public Health Service Act [42 U.S.C. 291j–1 et seq.]; and the corporation is authorized to lend on the security of any such mortgages and to purchase, sell, or otherwise deal in any securities guaranteed by the Association under section 1721(g) of this title: *Provided*, That (1) the Association may not purchase any mortgage at a price exceeding 100 per centum of the unpaid principal amount thereof at the time of purchase, with adjustments for interest and any comparable items; (2) the Association may not purchase any mortgage, except a mortgage insured under title V of the Housing Act of 1949 [42 U.S.C. 1471 et seq.], if it is offered by, or covers property held by, a State, territorial, or municipal instrumentality; and (3) the Association may not purchase any mortgage under section 1720 ¹ of this title, except a mortgage insured under section 1715k of this title or subchapter VIII or section 1709(k) of this title, or under subchapter IX–A ¹ with respect to a new community approved under section 1749cc–1 ¹ of this title, or insured under section 1715e of this title and covering property located in an urban renewal area, or a mortgage covering property located in Alaska, Guam, or Hawaii, if the original principal obligation thereof exceeds or exceeded $55,000 in the case of property upon which is located a dwelling designed principally for a one-family residence; or $60,000 in the case of a two- or three-family residence; or $68,750 in the case of a four-family residence; or, in the case of a property containing more than four dwelling units, $38,000 per dwelling unit (or such higher amount not in excess of $45,000 per dwelling unit as the Secretary may by regulation specify in any geographical area where the Secretary finds that cost levels so require) for that part of the property attributable to dwelling use. Notwithstanding the provisions of clause (3) of the preceding sentence, the Association may purchase a mortgage under section 1720 ¹ of this title with an original principal obligation which exceeds the otherwise applicable maximum amount per dwelling unit if the mortgage is insured under section 1713(c)(3), 1715e(b)(2), 1715k(d)(3)(B)(iii), 1715l(d)(3)(ii), 1715l(d)(4)(ii), 1715v(c)(2), 1715y(e)(3), or 1715z–1 of this title. For the purposes of this subchapter, the terms "mortgages" and

GNMA A.R. 005
Texas Capital Bank v. GNMA APP165
Case No. 2:23-cv-       (N.D. Tex.)

# GLOSSARY

| | |
|---|---|
| **Growing Equity Mortgage** | A mortgage whose monthly payments increase annually at a predetermined rate for a period of years or over the life of the loan. |
| **Guaranty Agreement** | The contract between Ginnie Mae and an Issuer that establishes the rights and obligations of each party in connection with (a) a Ginnie Mae I MBS pool and the related securities and (b) if the related securities have an issue date after November 1, 1999, a Ginnie Mae II MBS pool and the related securities. In addition, if an Issuer issues, under either Ginnie Mae MBS Program, securities with an issue date after November 1, 1999, the term "Guaranty Agreement" includes the contract that establishes thereafter the rights and obligations of each party in connection with each Ginnie Mae II MBS pool backing Ginnie Mae II MBS with an issue date on or prior to November 1, 1999. In any case in which a contractual agreement remains in effect with respect to a Ginnie Mae II MBS pool and the related securities, the use of the term "Guaranty Agreement" with respect to the pool or related securities shall be construed, unless the context otherwise requires, as though it said "Contractual Agreement." |
| **Guaranty Fee** | For each issue of MBS, a monthly fee paid by each Issuer to Ginnie Mae for Ginnie Mae's full faith and credit guaranty. |
| **Guide** | Ginnie Mae Mortgage-Backed Securities Guide, Handbook 5500.3, Rev. 1, as hereafter amended. |
| **HECM** | See Home Equity Conversion Mortgage. |
| **HMBS** | See Home Equity Conversion Mortgage Security. |
| **HMBS Issuer Monthly Report** | A report required by Ginnie Mae for each Reporting Period covering an HMBS Issuer's servicing activities, including the specific Loan, Pool, and Participation data identified in Appendix VI-17 of this Guide. |
| **HUD** | United States Department of Housing and Urban Development. |
| **Home Equity Conversion Mortgage (HECM)** | A home equity conversion mortgage (HECM) loan, also commonly referred to as a "reverse mortgage," is an FHA-insured mortgage designed specifically to permit senior citizens to convert the home equity of their principal residence into cash. |

GNMA A.R.
Texas Capital Bank v. GNMA
Case No. 2:23-cv-      (N.D. Tex.)
APP166

# GLOSSARY

| | |
|---|---|
| **Issue Date** | The date from which an MBS issued under a Ginnie Mae MBS program accrues interest. The issue date is always the first calendar day of the month of issue. |
| **Issuer** | A business organization that, having met certain criteria established by Ginnie Mae, has been approved by Ginnie Mae to issue securities guaranteed by Ginnie Mae. |
| **Jurat** | See "Conveyance Acknowledgment." |
| **LIBOR** | See London Interbank Offered Rate. |
| **LM** | The designation for a pool created under the Ginnie Mae I MBS Program and consisting of (A) a single project loan with a first scheduled payment date more than 24 months before the issue date of the securities or (B) a single project loan that has been modified by the FHA after final endorsement. |
| **LS** | The designation for a pool created under the Ginnie Mae I MBS Program and consisting of one or more project loans, each of which is secured by a lien on a small project as determined by FHA and has a first scheduled payment date no more than 24 months before the issue date of the securities and none of which has been modified subsequent to FHA's final endorsement. |
| **Level Payment** | A loan payment (fixed installment control) that remains constant over the life of the loan. |
| **Limited Participant** | An Issuer approved to transfer Issuer Responsibility for pools in a PIIT transaction. |
| **Loan Package** | A group of mortgages that is submitted through GinnieNET, and is designated by the Issuer to be included in a multiple Issuer pool under the Ginnie Mae II MBS Program. |
| **London Interbank Offered Rate** | Commonly referred to as LIBOR, it is the designation of the London Interbank Offered Rate. It is the average of interbank offered rates for U.S. dollar-denominated deposits of a stated maturity. The LIBOR index may be used as a base index for setting rates of some adjustable rate mortgages. The index is published in the Money Rates Section of *The Wall Street Journal*. |
| **MAMS** | Master Agreement Management System. |
| **MBS** | Mortgage-backed securities. |
| **MBS Program Pool** | A Pool and/or Loan Package that backs an MBS issued under any of the the Ginnie Mae MBS Programs. |

GNMA A.R.
Texas Capital Bank v. GNMA
Case No. 2:23-cv- (N.D. Tex.)
APP167

# CHAPTER 1. GENERAL FEATURES OF THE PROGRAM

## PART 1. GENERAL FEATURES
*Effective Date: 2013-08-01*

The Government National Mortgage Association (Ginnie Mae), through its Mortgage-Backed Securities (MBS) Programs, guarantees securities that are backed by pools of mortgages and issued by mortgage lenders (Issuers) approved by Ginnie Mae. Security holders receive a "passthrough" of the principal and interest payments on a pool of mortgages, less amounts required to cover servicing costs and Ginnie Mae guaranty fees. The Ginnie Mae guaranty ensures that the security holder receives the timely payment of scheduled monthly principal and any unscheduled recoveries of principal on the underlying mortgages, plus interest at the rate provided for in the securities. If a borrower fails to make a timely payment on a mortgage, the Issuer must use its own funds to ensure that the security holders receive timely payment. If an Issuer fails to ensure that the funds necessary to make timely payment are available or otherwise defaults in the discharge of its responsibilities, Ginnie Mae, in accordance with its guaranty, will make payments to security holders.

Ginnie Mae also guarantees Home Equity Conversion Mortgage (HECM) securities, hereinafter referred to as HMBS. HMBS are accrual coupon pass-through securities which perform differently than Ginnie Mae's forward MBS pass-through securities. In addition to program requirements applicable to the forward MBS, HMBS Issuers must also meet special Program requirements found in MBS Guide, Ch. 35.

## PART 2. THIS GUIDE
*Effective Date: 2013-08-01*

Ginnie Mae has two MBS programs (the Programs): the Ginnie Mae I MBS Program for the issuance of securities backed by single family or multifamily loans and the Ginnie Mae II MBS Program for the issuance of securities backed by single family loans (MBS). In addition, the Ginnie Mae II MBS Program contains special provisions for the issuance of HMBS. This Guide describes, and provides instructions to, the participants in both Ginnie Mae MBS Programs. This Guide replaces the Ginnie Mae Mortgage-Backed Securities Guide 5500.3, issued November 1, 1999, which in turn replaced the Ginnie Mae Mortgage-Backed Securities Guide, Ginnie Mae 5500.1 (Ginnie Mae I MBS Guide) and the Ginnie Mae Mortgage-Backed Securities Guide, Handbook GNMA 5500.2 (Ginnie Mae II MBS Guide). Any requirement in a document created under a Ginnie Mae MBS Program (including any Guaranty Agreement or Contractual Agreement), which document is in effect on the effective date of this Guide, that would otherwise require compliance with the Ginnie Mae Mortgage-Backed Securities Guide 5500.3, the Ginnie Mae I MBS Guide or the Ginnie Mae II MBS Guide on or after the effective date of this Guide shall be deemed to require, instead, compliance with this Guide as it may be amended from time to time. For example, a provision in a Contractual Agreement in effect on the effective date of this Guide that requires compliance, "as it shall be amended from time to time" after the date of the Contractual Agreement shall be deemed to require compliance with this Guide.

## PART 3. GINNIE MAE I AND II MBS PROGRAMS

### Section A. Unique Features of Each Program
*Effective Date: 2013-08-01*

Although the Ginnie Mae I and Ginnie Mae II MBS Programs are identical in many ways, there are several respects in which the features are unique to that Program. The most important

GNMA A.R.
HUD-000C
Texas Capital Bank v. GNMA
Case No. 2:23-cv- (N.D. Tex.)
APP168

## ACKNOWLEDGMENT AGREEMENT

**THIS ACKNOWLEDGMENT AGREEMENT**, made and entered into as of this 8th day of May 2019 by Leadenhall Life Insurance Linked Investments Fund Plc, with its principal offices at 122 Leadenhall Street, London, EC3V 4AG, United Kingdom ("Secured Party"), Reverse Mortgage Funding LLC, a Delaware limited liability company, with its principal office at 1455 Broad Street, 2nd Floor, Bloomfield, New Jersey 07003 ("Issuer") and the Government National Mortgage Association, a corporation organized and existing under the laws of the United States of America, with a mailing address of 425 Third Street, S.W., Suite 500, Washington, D.C. 20024 ("Ginnie Mae").

### RECITALS

A.      Issuer participates in the mortgage-backed securities program ("MBS Program") operated by Ginnie Mae pursuant to section 306(g) of the National Housing Act, 12 U.S.C. § 1721(g). Under the MBS Program, Issuer packages certain federally insured or guaranteed mortgages or participation interests in such mortgages (see definition of "Pooled Mortgages," below) into groups or "pools" that back securities issued by Issuer and are sold to private investors, or acquires existing pools and is deemed to be the issuer as to such pools. Ginnie Mae guarantees that the investors will receive timely payment of principal and interest on those securities.

B.      To provide Ginnie Mae with security for its guarantee of securities, Issuer has assigned, conveyed and transferred to Ginnie Mae all redemption, equitable, legal or other right, title or interest of Issuer in and to the Pooled Mortgages backing such securities, except that, under the Ginnie Mae Contract (defined below), Ginnie Mae permits Issuer to hold nominal title to the Pooled Mortgages, and Issuer is obligated to service the Pooled Mortgages and the securities backed thereby, all in accordance with the provisions of the Ginnie Mae Contract. Further under the Ginnie Mae Contract, (i) Issuer is allowed to keep certain income ("Servicing Income") from servicing the Pooled Mortgages, consisting of the spread between interest actually collected from mortgagors and interest required to be paid to holders of the corresponding mortgage-backed securities, less Ginnie Mae's guarantee fee and (ii) Issuer is entitled to reimbursement for servicer advances ("Advances"), all as more particularly set forth in the Ginnie Mae Contract. However, all of the rights, title and interests of Issuer are subject to possible extinguishment by Ginnie Mae, as described below.

C.      Pursuant to the terms of this Acknowledgment Agreement, each of the Issuer and the Secured Party agree that if and when Ginnie Mae declares Issuer in default under the MBS Program, Ginnie Mae shall have the right and authority to direct a Transfer of Issuer Responsibility ("TIR") from the Issuer to the Standby Issuer (defined below). For the avoidance of doubt, issuer responsibility as referred to herein shall include without limitation, rights to reimbursement of Advances made by Issuer in connection with servicing Pooled Mortgages under the Ginnie Mae Contract.

D.      If and when Ginnie Mae declares Issuer in default under the MBS Program and issues a letter of extinguishment to Issuer pursuant to the Ginnie Mae Contract, all redemption, equitable, legal or other right, title or interest of Issuer in and to the Pooled Mortgages (including but not limited to nominal title thereto, the Servicing Income and all other rights and interests described above or otherwise pertaining in any way to the Pooled Mortgages or to the servicing thereof) are extinguished and such redemption, equitable, legal or other right, title or interest

GNMA A.R.

Texas Capital Bank v. GNMA
Case No. 2:23-cv-      (N.D. Tex.)      APP169

become the absolute property of Ginnie Mae, subject only to the unsatisfied rights of the holders of the securities backed by the Pooled Mortgages ("Security Holders").

E.  Secured Party and Issuer have entered into a certain Loan and Security Agreement, dated October 17, 2018 (the "Security Agreement"), whereby Issuer granted to Secured Party a security interest ("Security Interest") in (i) any rights (including any rights ("Servicing Rights") to Servicing Income related thereto) that Issuer has, pursuant to the Ginnie Mae Contract, in the servicing of the Pooled Mortgages and (ii) any right of the Issuer to reimbursement of Advances made under the Pooled Mortgages pursuant to the Ginnie Mae Contract, including any right of the Issuer to receive all reimbursements for Advances made thereunder and all Servicing Income in respect of such Servicing Rights.

F.  Secured Party and Issuer have requested that Ginnie Mae consent, and Ginnie Mae is willing to consent, subject to the terms and conditions of this Acknowledgment Agreement, to Issuer's grant or assignment of the Security Interest to Secured Party.

**NOW THEREFORE**, in accordance with the Ginnie Mae Contract referenced below, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Secured Party and Issuer hereby acknowledge, and all parties hereto agree to, the following:

1.  **Certain Definitions**.

(a)  "Pooled Mortgages" shall mean and include all of the following with regard to any and all mortgages backing, or participation interests in mortgages backing, or placed in pools backing, any issuance of securities guaranteed by Ginnie Mae under the MBS Program as to which Issuer is deemed the "issuer": the security instruments and security interests reflected by such mortgages, together with the promissory notes or instruments related thereto and the indebtedness secured thereby, all payments, proceeds, receivables, recoveries, other funds paid, provided or held pursuant to or in connection with any of the foregoing items, all claims or choses in action, insurance or guaranty claims pertaining to the foregoing, the title evidence pertaining to the secured properties, and all other assets, documents, instruments and other papers pertaining to the foregoing and the transactions to which they relate, the Servicing Rights, and the Servicing Income. The word "issuer" (when not capitalized) shall refer to an approved issuer under the MBS Program. In the case of home equity conversion mortgage loans ("HECMs"), in addition to the foregoing, "Pooled Mortgages" shall mean and include the Mortgages, the Ginnie Mae Participations and the Other Interests, as such terms are defined in the Guaranty Agreement for HMBS.

(b)  "Claims and Losses" shall mean any and all losses, costs, expenses, actions, claims, damages, demands, judgments, proceedings, or suits, whether at law or in equity.

2.  **Ginnie Mae Consent**. Ginnie Mae hereby consents, subject to the terms and conditions of this Acknowledgment Agreement, to Issuer's grant or assignment of the Security Interest and a security interest in the Other Interests to Secured Party. No further grant or assignment of a security interest in the Servicing Rights is permitted.

GNMA A.R.
Texas Capital Bank v. GNMA   APP170
Case No. 2:23-cv-   (N.D. Tex.)

3.    **Ginnie Mae's Rights.**

(a)    Except as otherwise provided herein, the Security Interest is subject and subordinate to all rights, remedies, powers, and prerogatives of Ginnie Mae under and in connection with (1) this Acknowledgment Agreement, (2) 12 U.S.C. § 1721(g) and the implementing regulations governing the MBS Program, 24 C.F.R. Part 300, (3) applicable Guaranty Agreements and contractual agreements between Ginnie Mae and Issuer, and (4) the Ginnie Mae Mortgage-Backed Securities Guide, Handbook 5500.3 Rev. 1, and other applicable guides, ((2), (3) and (4) collectively, the "Ginnie Mae Contract"), which rights, remedies, powers, and prerogatives include, without limitation, the right of Ginnie Mae under section 306(g) of the National Housing Act, 12 U.S.C. § 1721(g), to effect and complete the extinguishment of any redemption, equitable, legal or other right, title or interest of Issuer in the mortgages pooled under the Ginnie Mae Contract against which the guaranteed securities are issued.

(b)    Issuer and Secured Party acknowledge and agree that the Servicing Rights and rights to reimbursement of Advances pledged by Issuer pursuant to the Security Agreement constitute an interest of Issuer in the Pooled Mortgages, and that the Security Interest given by Issuer to Secured Party is merely derivative of the interest of Issuer under the Ginnie Mae Contract. Therefore, except as otherwise provided herein, if Ginnie Mae extinguishes Issuer's redemption, equitable, legal or other right, title or interest in the Pooled Mortgages in accordance with the Ginnie Mae Contract, the Security Interest instantly and automatically will be extinguished as well. Accordingly, if and when Ginnie Mae issues a letter of extinguishment to Issuer pursuant to the Ginnie Mae Contract, all of Issuer's redemption, equitable, legal or other right, title or interest in the Pooled Mortgages become the absolute property of Ginnie Mae, subject only to the unsatisfied rights of the Security Holders, free and clear of the Security Interest or any other claim, right, title or interest of Issuer, Secured Party or anyone claiming an interest through either of them, including but not limited to any redemption, legal or equitable claim.

(c)    Secured Party also acknowledges that Ginnie Mae has no duty or obligation to Secured Party under this Acknowledgment Agreement or otherwise, except as expressly provided herein. No automatic default or violation of the Ginnie Mae Contract by Issuer shall be deemed to have occurred solely by reason of any actual or alleged breach of the Security Agreement. As between Ginnie Mae and Secured Party, in the event of any conflict or inconsistency between the terms and provisions of this Acknowledgment Agreement and those of the Security Agreement, the terms and provisions of this Acknowledgment Agreement shall prevail. Each of the parties agrees that Ginnie Mae shall not be bound in any way by any terms or provisions of the Security Agreement.

(d)    Issuer and Secured Party acknowledge and agree that Issuer has pledged to Secured Party under and pursuant to the terms of the Security Agreement all of Issuer's right, title and interest, whether now existing or hereafter arising, in the Servicing Rights and rights to reimbursement of Advances related to the Pooled Mortgages.

4.    **Security Agreement and Financing Statement Language**. In recognition of the foregoing, Secured Party agrees, represents and warrants that (a) the following language appears in, and is a valid and legally enforceable part of, the Security Agreement, any financing statement filed in connection with the Security Agreement or the Security Interest, and any and all other instruments that establish the Security Interest, or (b) any and all such documents shall be

GNMA A.R.

Texas Capital Bank v. GNMA   APP171
Case No. 2:23-cv-    (N.D. Tex.)

amended forthwith to include the following language therein and shall be a valid and legally enforceable part thereof:

"Notwithstanding anything to the contrary contained herein:

(1)    The property subject to the security interest reflected in this instrument includes all of the right, title and interest of the Debtor in certain mortgages and/or participation interests related to such mortgages ("Pooled Mortgages") and pooled under the mortgage-backed securities program of the Government National Mortgage Association ("Ginnie Mae"), pursuant to section 306(g) of the National Housing Act, 12 U.S.C. § 1721(g);

(2)    To the extent that the security interest reflected in this instrument relates in any way to the Pooled Mortgages, such security interest is subject and subordinate to all rights, powers and prerogatives of Ginnie Mae, whether now existing or hereafter arising, under and in connection with: (i) 12 U.S.C. § 1721(g) and any implementing regulations; (ii) the terms and conditions of that certain Acknowledgment Agreement, dated as of May [   ], 2019 with respect to the Security Interest, by and among Ginnie Mae, Reverse Mortgage Funding LLC (the "Debtor"), and Leadenhall Life Insurance Linked Investments Fund Plc; (iii) applicable Guaranty Agreements and contractual agreements between Ginnie Mae and the Debtor and (iv) the Ginnie Mae Mortgage-Backed Securities Guide, Handbook 5500.3 Rev. 1, and other applicable guides;

(3)    Such rights, powers and prerogatives of Ginnie Mae include, but are not limited to, Ginnie Mae's right, by issuing a letter of extinguishment to Debtor, to effect and complete the extinguishment of all redemption, equitable, legal or other right, title or interest of the Debtor in the Pooled Mortgages, in which event the security interest as it relates in any way to the Pooled Mortgages shall instantly and automatically be extinguished as well; and

(4)    For purposes of clarification, "subject and subordinate" in clause (2) above means, among other things, that any cash held by the Secured Party as collateral and any cash proceeds received by the Secured Party in respect of any sale or other disposition of, collection from, or other realization upon, all or any part of the collateral may only be applied by the Secured Party to the extent that such proceeds have been received by, or for the account of, the Debtor free and clear of all Ginnie Mae rights and other restrictions on transfer under applicable Ginnie Mae guidelines; provided that this clause (4) shall not be interpreted as establishing rights in favor of Ginnie Mae except to the extent that such rights are reflected in, or arise under, the Ginnie Mae Contract."

## 5.    Waiver of Rights, Claims and Remedies by Issuer and Secured Party.

(a)    Secured Party's only remedy for enforcement of, and only means of enforcing, the Security Agreement and the Security Interest as they relate to the Servicing Rights that are subject to the Security Interest where permitted pursuant to the Security Agreement or applicable law, is by seeking a TIR (as provided in the Guides and Section 9 below) to another issuer designated by Secured Party and approved by Ginnie Mae, subject to all of the conditions, exceptions and other provisions set forth herein.

4

(b)   Except for any rights that are expressly granted by this Acknowledgment Agreement, Secured Party shall have no claim or right, whether at law or in equity, and shall not assert any Claims and Losses, against Ginnie Mae, based upon or arising out of this Acknowledgment Agreement, or the Security Agreement, or any other transaction between Secured Party and Issuer relating to the Pooled Mortgages, or the Ginnie Mae Contract with Issuer.

(c)   Secured Party and Issuer acknowledge and agree that the Pooled Mortgages are not subject to attachment or injunction (or other similar process including but not limited to garnishment, levy or execution) by or on behalf of Issuer or Secured Party.

(d)   Issuer and Secured Party each agree that, except as provided herein or in the Ginnie Mae Contract, immediately and automatically upon any approval by Ginnie Mae of a TIR pursuant to this Acknowledgment Agreement, Issuer and Secured Party shall be deemed to have released and waived any and all Claims and Losses against Ginnie Mae, whether then-existing or arising thereafter, based upon or arising out of this Acknowledgment Agreement, or the Security Agreement, or any other transaction between Secured Party and Issuer relating to the Pooled Mortgages, or the Ginnie Mae Contract with Issuer. This includes but is not limited to reimbursement or recovery of any Advances made or other monies expended by Issuer or Secured Party, in connection with Issuer's having held issuer status or in connection with the servicing of the Pooled Mortgages or the securities backed thereby, and, without limiting Section 5(f), they hereby waive, agree and covenant not to assert or cause to be asserted, directly or indirectly, such Claims and Losses. Standby Issuer or other issuer approved by Ginnie Mae shall also agree to the foregoing release and waiver of Claims and Losses against Ginnie Mae.

(e)   Issuer agrees that, if Secured Party notifies Issuer and Ginnie Mae of an event of default under the Security Agreement and requests that Ginnie Mae effect a TIR pursuant to this Acknowledgment Agreement, Issuer shall not challenge Ginnie Mae's right to grant or deny such request.

(f)   Issuer agrees that Ginnie Mae may effect a TIR in the event of a default and extinguishment under the Ginnie Mae Contract. Issuer shall not challenge Ginnie Mae's right to take such action.

(g)   Issuer and Secured Party each hereby waive, agree and covenant not to assert or cause to be asserted, directly or indirectly, any Claims and Losses or other claims, rights or remedies against Ginnie Mae or the Pooled Mortgages based upon or arising out of or in connection with this Acknowledgment Agreement, whether any such Claim or Loss or other claim, right or remedy is pursued under or in relation to (i) Ginnie Mae's exercise of any of its rights and remedies under the Ginnie Mae Contract with Issuer, (ii) any TIR, (iii) the Servicing Rights and rights to reimbursement of Advances, (iv) the Security Agreement, (v) the Pooled Mortgages or (vi) this Acknowledgment Agreement.

### 6.   Provision of Documents.

(a)   Subject to Paragraphs (e) and (f) below, upon request of Secured Party, Ginnie Mae agrees to provide to Secured Party a copy of any of the following documents received by Ginnie Mae: (1) independent public accountants annual audited financial report and

5

GNMA A.R.

Texas Capital Bank v. GNMA   APP173
Case No. 2:23-cv-   (N.D. Tex.)

reports of compliance on Issuer, and (2) such other periodic reporting and monitoring reports compiled by Ginnie Mae in connection with the Issuer as mutually agreed by Ginnie Mae and Secured Party.

(b)     Subject to Paragraphs (e) and (f) below, Ginnie Mae agrees to provide to Secured Party copies of any of the following documents pertaining to Issuer: (1) notice of extinguishment, (2) notice of default, (3) notice from Issuer received by Ginnie Mae of an event of default, and (4) corrective action plan or letter of understanding between Ginnie Mae and Issuer relating to a notice of default.

(c)     Secured Party shall give Ginnie Mae prompt notice upon the occurrence of an event of default under the Security Agreement. At any time after Ginnie Mae shall have received such notice from Secured Party, and for so long as such event of default is continuing, Secured Party may attend any meetings between Issuer and Ginnie Mae relating to portfolio performance problems or other defaults under the Ginnie Mae Contract. Ginnie Mae shall be under no obligation to notify Secured Party of the time or place of any such meetings.

(d)     Secured Party shall give Ginnie Mae prompt written notice of any amendment, restatement, supplement, waiver or other modification to the Security Agreement and related documents (including, without limitation, any material increase or decrease in the amount of the credit facility(ies) available thereunder) that would materially affect Ginnie Mae's interests or rights under this Acknowledgement Agreement.

(e)     Issuer consents to the provision of the foregoing documents and information by Ginnie Mae, its agents, representatives, and contractors, to Secured Party or its designee and to Secured Party's attendance and participation at any meetings.

(f)     Ginnie Mae shall have no liability to any person or entity, including but not limited to Issuer and Secured Party, for giving or for failing to give (or for any delay in giving) the documents or notices set forth above, nor shall Ginnie Mae have any liability on account of any matter contained in or omitted from such documents.

(g)     If Ginnie Mae determines that providing Secured Party with any of the documents or notices set forth in this section would be harmful to the MBS Program, then Ginnie Mae need not do so.

7.     **Standby Issuer.**

As provided in this Section and in Section 8(a) below, Secured Party may appoint a Standby Issuer to act in the event of a default under the Ginnie Mae Contract. In such event, Secured Party shall either (i) retain the services of one or more independent third party issuers or (ii) have a subsidiary or affiliate which is an issuer that, in either case, meets the following conditions (any such issuer, herein, a "Standby Issuer"; and should Secured Party or any affiliate or subsidiary be acting as Standby Issuer, references to Secured Party herein shall not include Secured Party or any affiliate or subsidiary acting as such Standby Issuer):

(a)     Pursuant to the MBS Program requirements and in accordance with other requirements established by Ginnie Mae from time to time, each such Standby Issuer must

6

at all times (1) be an approved Ginnie Mae issuer, (2) be eligible to act as an issuer for the Pooled Mortgages, including but not limited to, having an adequate net worth to service the Pooled Mortgages at the time of transfer, and (3) have the capacity and experience to service the Pooled Mortgages in addition to its existing portfolio;

(b)     Secured Party must obtain from Ginnie Mae a written approval for such Standby Issuer to serve as the Standby Issuer with regard to the Pooled Mortgages, which approval shall be granted if the conditions set forth in this Section 7 are satisfied (provided, however, that such written approval by Ginnie Mae does not constitute approval of the actual TIR, for which separate written approval must be obtained from Ginnie Mae) provided that in the case of HMBS pools, each HECM loan and its related securities must be serviced by only one independent third party issuer;

(c)     Each Standby Issuer must have agreed in writing to accept, immediately upon demand, the TIR (as set forth in this Acknowledgment Agreement) with regard to the Pooled Mortgages and to comply with the requirements set forth herein;

(d)     Each Standby Issuer must have supplied Ginnie Mae with a letter agreement, in the form of Exhibit B hereto, to comply with the requirements set forth herein; and

(e)     No Standby Issuer may be an affiliate or subsidiary of the original Issuer. Secured Party may change the Standby Issuer, provided that all requirements set forth herein are satisfied with regard to any new Standby Issuer. Secured Party may serve as the Standby Issuer if it meets all of the requirements set forth herein.

### 8.     Issuer Default under Ginnie Mae Contract.

If Ginnie Mae determines that an event of default has occurred under the Ginnie Mae Contract and issues a notice of issuer default and extinguishment, then, subject to any and all conditions and exceptions set forth herein, Ginnie Mae shall notify Secured Party of the default, and Secured Party will be provided an opportunity to cure each default in accordance with this section.

(a)     Approved Standby Issuer

If Secured Party previously has appointed a Standby Issuer approved by Ginnie Mae, at the time Ginnie Mae issues a notice of issuer default and extinguishment, it must confirm that the Standby Issuer remains eligible in accordance with Section 7. If Secured Party has not previously appointed a Standby Issuer approved by Ginnie Mae, or if the named Standby Issuer is no longer eligible, within two (2) business days of receipt of notice of issuer default and extinguishment, Secured Party must name a Standby Issuer that satisfies the requirements of Section 7.

(b)     Secured Party's Cure

(1)     If such default is a payment default (that is, failure to make a required remittance to security holders by the 15th or 20th of the month, as required, or, in connection with Home Equity Conversion Mortgage loans, failure to make an advance to a

7

mortgagor), Secured Party shall cure such default within one (1) business day of notice from Ginnie Mae.

(2)      Within three (3) business days of approval by Ginnie Mae of a TIR to the Standby Issuer or other issuer approved by Ginnie Mae hereunder, Secured Party shall have on site at defaulted Issuer's place of business a team from the Standby Issuer to begin the process of transferring the portfolio to the Standby Issuer.

(3)      If such default is of the type described in Section 12(b) below, Ginnie Mae shall have no obligation to offer Secured Party an opportunity to cure such default, but may in its sole discretion offer Secured Party an opportunity to cure such default upon such terms and within a time period specified by Ginnie Mae.

(c)      Transfer of Issuer Responsibility

Ginnie Mae shall effect a TIR with respect to the Pooled Mortgages and the securities backed thereby from Issuer to the Standby Issuer in accordance with the provisions set forth in Section 9 below and the requirements set forth by Ginnie Mae for the transfer to the Standby Issuer.

(d)      Failure to Cure

If Secured Party fails to confirm or appoint (as applicable) a Standby Issuer in accordance with Paragraph (a), or fails to effect the cure required above in Paragraph (b), Ginnie Mae may terminate all rights of Issuer and Secured Party in accordance with Section 12(a) below. In such event, Secured Party will be liable to Ginnie Mae for all Claims and Losses resulting from its failure to perform, unless Secured Party timely notifies Ginnie Mae pursuant to Section 11(a) or 11(b) of its termination of this Acknowledgment Agreement and abandonment without compensation of its Security Interest.

## 9.      Issuer Default under Security Agreement.

(a)      If Secured Party seeks a TIR to enforce its Security Interest as a result of an event of default under the Security Agreement but absent a default by Issuer under the Ginnie Mae Contract, Secured Party shall simultaneously notify Issuer and Ginnie Mae of such event of default and submit an application and all other documents required by this section to effect such transfer. No TIR hereunder to the Standby Issuer or other issuer approved by Ginnie Mae hereunder shall occur unless Ginnie Mae first provides written approval of such transfer. Such approval by Ginnie Mae shall be based upon the conditions, requirements, and provisions of this Acknowledgment Agreement, including without limitation Section 7 hereof, the Ginnie Mae Contract and the MBS Program regarding the TIR as then in effect. Secured Party shall submit to Ginnie Mae the following in connection with such request:

(1)      Application for a TIR, with applicable fees, together with all other documents that the Ginnie Mae Contract requires for a possible TIR, and any other documentation that Ginnie Mae might prescribe in support of such application.

GNMA A.R.
Texas Capital Bank v. GNMA   APP176
Case No. 2:23-cv-   (N.D. Tex.)

(2)   A properly executed transfer agreement, in a form prescribed by Ginnie Mae. Unless Ginnie Mae, in its sole discretion, grants a written waiver, the transfer agreement must provide for the following:

(aa) The Standby Issuer or other issuer approved by Ginnie Mae hereunder must agree to service the Pooled Mortgages and the securities backed thereby in accordance with the applicable provisions of the Ginnie Mae Contract, and such other requirements as Ginnie Mae might establish from time to time;

(bb) The Standby Issuer or other issuer approved by Ginnie Mae hereunder must agree to assume all obligations that Issuer had under its Ginnie Mae Contract including, without limitation, supplying its own funds to meet the following obligations if funds available from servicing the Pooled Mortgages, applied according to the Ginnie Mae Contract, are insufficient to meet such obligations:

(i)   make all required payments, as and when due, to holders of the securities backed by the Pooled Mortgages, in accordance with the Ginnie Mae Contract;

(ii)   cover and/or restore to the principal and interest custodial account any shortfalls in collections (whether past or future) of principal and interest; and

(iii)   cover and/or restore to the taxes and insurance custodial account and other escrow custodial accounts any shortfalls in collections (whether past or future) of escrow payments for taxes, insurance and other escrow items to the extent applicable to such Pooled Mortgages, as required pursuant to the related Ginnie Mae Contract.

(cc) The Standby Issuer or other issuer approved by Ginnie Mae hereunder must assume joint and several liability with Issuer for any and all liabilities of Issuer to Ginnie Mae based upon or arising out of this Acknowledgment Agreement, or the Ginnie Mae Contract with Issuer, or the Security Agreement, or any other transaction between Secured Party and Issuer relating to the Pooled Mortgages, that have arisen or occurred as of or prior to the date of transfer, whether then known or discovered thereafter.

(dd) The Standby Issuer or other issuer approved by Ginnie Mae hereunder must assume responsibility for any and all obligations and liabilities to Ginnie Mae (including but not limited to liability for breach of the Ginnie Mae Contract) that arise on or after the date of transfer with regard to the Ginnie Mae Contract and the Pooled Mortgages.

(ee) In addition to any other events of default under the Ginnie Mae Contract, any failure of Standby Issuer or other issuer approved by Ginnie Mae hereunder to fulfill its obligations set forth herein shall be deemed an event of default under the Ginnie Mae Contract.

9

GNNA A.R.
Texas Capital Bank v. GNMA   APP177
Case No. 2:23-cv-   (N.D. Tex.)

(ff)      Standby Issuer or other issuer approved by Ginnie Mae must agree to waive any Claims and Losses against Ginnie Mae in accordance with Paragraph 5(d) above.

(gg)      Acceptance of subsequent modifications to or requirements of the MBS Program implemented or adopted by Ginnie Mae from time to time.

(b)      Ginnie Mae may, in its sole discretion, deny approval of a transfer requested hereunder if it determines that any of the following have occurred:

(1)      Secured Party, Standby Issuer or other issuer approved by Ginnie Mae hereunder has failed to meet any of the requirements set forth herein, or has failed to submit true, accurate and properly completed forms and documents as required hereby;

(2)      Standby Issuer or other issuer designated by Secured Party hereunder fails to meet any requirements for eligibility of issuers, as Ginnie Mae may establish from time to time under the MBS Program;

(3)      Any of the conditions and prerequisites for the TIR that Ginnie Mae may establish from time to time, as set forth in the Ginnie Mae Contract, shall not have been satisfied;

(4)      Any additional conditions and prerequisites that Ginnie Mae established in a notice or notices to Issuer or Secured Party prior to Ginnie Mae's approval of the TIR shall not have been satisfied; or

(5)      Any of the events that trigger termination, extinguishment and forfeiture, as set forth in Section 12, shall have occurred.

(c)      Secured Party acknowledges that, upon Ginnie Mae's approval of the transfer of Issuer responsibility, and the transfer thereof, the Security Interest shall be deemed extinguished, and Secured Party shall have no remaining rights under this Acknowledgment Agreement; but any and all liabilities of Secured Party, Issuer and Standby Issuer or other issuer approved by Ginnie Mae under the Acknowledgment Agreement shall survive, as shall all rights and remedies of Ginnie Mae.

(d)      Notice to Ginnie Mae from Secured Party of the occurrence of an event entitling it to realize upon the Servicing Rights and/or the rights to reimbursement of Advances under the Security Agreement or at law shall be conclusive and binding upon Issuer for all purposes of this Acknowledgment Agreement.

10.      **Transfers Sought by Issuer.** If Issuer seeks a TIR, it must obtain the express written consent of Secured Party. If Issuer submits a document or instrument that Ginnie Mae reasonably believes contains such written consent of Secured Party, Ginnie Mae may conclusively rely on such document or instrument. Issuer and Secured Party each shall indemnify, defend and hold harmless Ginnie Mae from all Claims and Losses arising out of or related to Ginnie Mae's acting or relying on such matters. A TIR initiated by an Issuer shall be in accordance with the then-existing provisions and requirements relating to TIRs.

GNMA A.R.
Texas Capital Bank v. GNMA
Case No. 2:23-cv-   (N.D. Tex.)   APP178

**11.    Notice of Termination by Secured Party and Intent to Abandon its Security Interest.**

(a)    The Secured Party shall promptly notify Ginnie Mae of termination of the Acknowledgment Agreement or the Security Agreement, regardless of the reason for such termination.

(b)    If Secured Party notifies Ginnie Mae, within the earlier of (1) two (2) business days of its being informed of an Issuer default under Section 8, or (2) within one (1) business day of such notification if a payment is required under the Guaranty Agreement during that period for principal and interest advances on any of the Pooled Mortgages, that Secured Party is terminating this Acknowledgment Agreement and abandoning its Security Interest without compensation from Ginnie Mae, then the Secured Party, unless Ginnie Mae reasonably determines that Secured Party is directly responsible for the default, shall not be liable to Ginnie Mae for Claims and Losses attributable to the Pooled Mortgages subject to the Security Interest. The parties acknowledge that for purposes of interpreting this Section 11, Secured Party shall not be deemed "directly responsible" for an Issuer default solely by reason of its good faith exercise of remedies available to Secured Party under or pursuant to the Security Agreement.

(c)    Upon the occurrence of a default subject to Section 9 or a termination of the underlying Security Agreement, the Secured Party, upon notice of default in accordance with Section 6(c) and written confirmation of Ginnie Mae receipt of such notice, may elect to terminate this Acknowledgement Agreement and to abandon any and all claims pursuant to the Security Interest in the Servicing Rights in the related Pooled Mortgages. Unless Ginnie Mae reasonably determines that Secured Party is directly responsible for a subsequent Issuer default under Section 8, Secured Party shall not be liable to Ginnie Mae for Claims and Losses attributable to the Pooled Mortgages subject to the Security Interest.

**12.    Ginnie Mae Right to Termination, Extinguishment and Forfeiture Due to Fraud, Non-performance or Legal Requirement.**

(a)    Notwithstanding any other provision in this Acknowledgment Agreement, if Ginnie Mae (1) in its sole discretion, determines that any of the events in Paragraph (b) have occurred, whether prior to, as of, or after the date of this Acknowledgment Agreement; and (2) issues a notice so stating to Issuer or Secured Party, then all rights, title and interests (whether legal or equitable) of Issuer or Secured Party under this Acknowledgment Agreement (including but not limited to any security interest of Secured Party in the Pooled Mortgages or any possible rights to obtain notices or documents or to seek a TIR to Standby Issuer or other issuer designated by Secured Party hereunder, or under the Security Agreement, or any other instrument by which any interest of Issuer in the Servicing Rights or any other interest in the Pooled Mortgages was given to Secured Party) shall instantly and automatically be terminated, extinguished and forfeited, and Issuer and Secured Party waive, agree and covenant not to assert or cause to be asserted any argument or position that they have any such rights, title or interest.

(b)    Ginnie Mae shall have the right to issue a notice of extinguishment upon Ginnie Mae's determination that any of the following conditions exist or events have occurred:

11

(1)    If Issuer, Standby Issuer or Secured Party makes or has made any material false representation or warranty, or engages or has engaged in fraud or other reckless or intentional wrongdoing in connection with this Acknowledgment Agreement or any document submitted pursuant to this Acknowledgment Agreement, in connection with the Ginnie Mae Contract, in connection with the MBS Program, or in connection with any federal mortgage insurance or loan guaranty program, or other federal program related to any of the Pooled Mortgages;

(2)    If Issuer, Standby Issuer or Secured Party has used, in violation of the requirements of the Ginnie Mae Contract, any payments, collections, recoveries or other funds pertaining in any way to the Pooled Mortgages;

(3)    If required to cure pursuant to Section 8 above, Secured Party has failed to cure any default on the terms and in the time required by Ginnie Mae;

(4)    Otherwise as required by law or court order.

13.    **Funds and Bank Accounts**. Notwithstanding anything to the contrary contained herein or in the Security Agreement or in any other instrument, Ginnie Mae shall be entitled, in its sole discretion, to retitle and to exercise control and ownership of any and all (a) custodial or escrow accounts for principal and interest or for taxes and insurance or other collections that pertain to the Pooled Mortgages, in accordance with the "Master Agreement for Servicer's Principal and Interest Custodial Account," "Master Agreement for Servicer's Escrow Custodial Account" (or successor documents) executed pursuant to the Ginnie Mae Contract, (b) all documents, in accordance with the "Master Custodial Agreement" executed pursuant to the Ginnie Mae Contract, and (c) if applicable, "Master Agreement for Participation Accounting". Issuer and Secured Party agree and covenant not to oppose, challenge, interfere with, hinder or obstruct, directly or indirectly, any such actions by Ginnie Mae.

14.    **Recording of Release**.

(a)    If a financing statement reflecting the Security Interest was filed, or if the security interest otherwise was recorded with any government recording office, then within five (5) business days after the earliest of any of the following dates or events that occur, Secured Party shall file for recording, in the appropriate recording office, a full and complete release of the Security Interest, and of any other right, title or interest of Secured Party in the Pooled Mortgages, and shall give Ginnie Mae written confirmation of such filing on the date thereof:

(1)    The effective date of any TIR pursuant to this Acknowledgment Agreement;

(2)    The date on which Secured Party receives notice from Ginnie Mae of any termination, extinguishment or forfeiture of Secured Party's or Issuer's rights under Section 11 above, or otherwise; or

(3)    The date on which Secured Party receives notice of the extinguishment by Ginnie Mae of Issuer's redemption, equitable, legal or other right, title or

12

interest in the Pooled Mortgages. For the avoidance of doubt, any TIR shall include transfer of any outstanding rights to reimbursement of Advances.

(b)     If Secured Party believes the Security Interest is being challenged or is likely to be challenged by anyone other than Ginnie Mae, then it may request that Ginnie Mae agree to a deferral of the filing required by this section, and Ginnie Mae shall have sole discretion in determining whether to grant such a deferral.

(c)     If Secured Party fails to comply with this section, then, by this Acknowledgment Agreement, Secured Party hereby irrevocably appoints Ginnie Mae as its lawful attorney-in-fact solely for the purpose of recording, on behalf of Secured Party, the release contemplated by this section, and Secured Party agrees and covenants not to oppose, challenge, interfere with, hinder or obstruct, directly or indirectly, any efforts by Ginnie Mae to do so.

(d)     Issuer and Secured Party agree and acknowledge that Ginnie Mae's right, title and interest is superior to that of Secured Party or Issuer, whether or not Ginnie Mae's right, title and interest are recorded, and that Ginnie Mae's right, title and interest need not be recorded in order to be effective. Issuer and Secured Party waive, agree and covenant not to assert, directly or indirectly, any argument to the contrary.

15.     **Rights Reserved**. Nothing contained in this Acknowledgment Agreement shall obligate Ginnie Mae to give notice to Secured Party of any exercise by Ginnie Mae of any of the rights, powers, or prerogatives referred to in Section 3 of this Acknowledgment Agreement, or to delay, postpone, or refrain from such exercise (whether or not Secured Party shall have elected to enforce the Security Interest or remedies in connection therewith, or shall have submitted to Ginnie Mae a Transfer Request), except to the extent provided in Section 8 and Section 9. If Ginnie Mae terminates the interests of Issuer and Secured Party pursuant to Section 11, Secured Party hereby waives any and all right or standing which it may have, and covenants not to assert, directly or indirectly, as a secured creditor of Issuer, or in any other capacity, to protest or challenge a termination of Issuer's status as a Ginnie Mae-approved issuer or a notice of extinguishment by Ginnie Mae, and hereby covenants and agrees not to interfere with, hinder or obstruct, directly or indirectly, any termination of Issuer's status as a Ginnie Mae approved issuer, notice of extinguishment by Ginnie Mae, or Ginnie Mae's exercise of any of its rights relating thereto.

16.     **No Duty to Verify**. Ginnie Mae shall be fully protected in acting or relying upon, and shall have no duty or obligation to verify the truth, accuracy, authenticity, validity, or legal sufficiency of, any written notice, direction, request, waiver, consent, receipt, or other paper or document which Ginnie Mae in good faith believes to be genuine and to have been signed or presented by Secured Party or Issuer pursuant to this Acknowledgment Agreement.

17.     **Indemnification by Secured Party**. Secured Party shall indemnify, defend and hold harmless Ginnie Mae against all Claims and Losses arising or resulting from any past, present, or future act or omission of Secured Party, pursuant or with respect to this Acknowledgment Agreement or the Security Agreement. Furthermore, Secured Party shall indemnify, defend, and hold harmless Ginnie Mae against all Claims and Losses, arising from or connected with any future act, error or omission by Secured Party under the Security Agreement,

13

GNMA A.R.
Texas Capital Bank v. GNMA    APP181
Case No. 2:23-cv-    (N.D. Tex.)

including but not limited to any actual or attempted foreclosure, transfer, assignment or sale of the Servicing Rights or Issuer responsibility by Secured Party.

**18.     Indemnification by Issuer**. Issuer shall indemnify, defend, and hold harmless Ginnie Mae against all Claims and Losses arising out of or resulting from any past, present, or future act or omission of Issuer, pursuant or with respect to this Acknowledgment Agreement or the Security Agreement, including but not limited to any actual or attempted transfer or sale of the Servicing Rights or a TIR by Issuer.

**19.     Issuer Warranties and Representations**. Issuer hereby warrants, represents, and confirms to Ginnie Mae the following:

(a)     Except for the interest granted by Issuer to Ginnie Mae pursuant to the Ginnie Mae Contract, the Security Interest is the only outstanding and existing interest that Issuer has granted to Secured Party, or any other person or entity, in the Servicing Rights, the rights to reimbursement of Advances, or the Pooled Mortgages that are subject to the Security Interest; and the Security Agreement is the only outstanding and existing agreement or instrument containing any grant by Issuer of any interest in the Servicing Rights and the rights to reimbursement of Advances that are subject to the Security Interest.

(b)     The execution and delivery of this Acknowledgment Agreement will not violate any provision of law or regulation applicable to Issuer, any order of any court or other agency of government or any agreement or other instrument to which Issuer is bound, or be in conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any such agreement or other instrument.

(c)     The grant of the Security Interest in the Servicing Rights and the rights to reimbursement of Advances to Secured Party pursuant to the Security Agreement, and Issuer's execution, delivery and performance of this Acknowledgment Agreement, has each been duly authorized by all necessary corporate action on the part of the Issuer. All other acts have been performed to make this Acknowledgment Agreement the legal, valid, binding, and enforceable obligation and undertaking of Issuer. If Secured Party is a federally insured institution or an affiliate or subsidiary of a federally insured institution, this Acknowledgment Agreement, together with the applicable Security Agreement between Issuer and Secured Party and any amendments thereto, and any Uniform Commercial Code ("UCC") financing statements, constitute the "written agreement" governing Issuer's grant of a Security Interest in its Servicing Rights and the rights to reimbursement of Advances to Secured Party pursuant to the Security Agreement and the matters agreed to in this Acknowledgment Agreement, and Issuer shall continuously maintain all components of such "written agreement" as an official record of Issuer (or any successor thereto).

**20.     Secured Party Warranties and Representations**. Secured Party hereby warrants, represents, and confirms to Ginnie Mae the following:

(a)     Except for the interest granted by Issuer to Ginnie Mae pursuant to the Ginnie Mae Contract, the Security Interest is the only outstanding and existing interest that Issuer has granted to Secured Party in the Servicing Rights and the rights to reimbursement of Advances or the Pooled Mortgages and, to the best of Secured Party's knowledge, information,

14

GNMA A.R.
Texas Capital Bank v. GNMA
Case No. 2:23-cv-   (N.D. Tex.)   APP182

and belief (based solely on a review of UCC searches conducted by Secured Party, which Secured Party represents that it has conducted in the appropriate public offices of the jurisdiction where Issuer is organized), the Security Agreement is the only outstanding and existing agreement or instrument containing any grant by Issuer of any interest in the Servicing Rights and the rights to reimbursement of Advances that are subject to the Security Interest.

      (b)    The execution and delivery of this Acknowledgment Agreement will not violate any provision of law or regulation applicable to Secured Party, any order of any court or other agency of government or any agreement or other instrument to which Secured Party is bound, or be in conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any such agreement or other instrument.

      (c)    Secured Party's execution, delivery and performance of the Security Agreement and the Acknowledgment Agreement, has each been duly authorized by all necessary corporate action on the part of the Secured Party. All other acts have been performed to make this Acknowledgment Agreement the legal, valid, binding, and enforceable obligation and undertaking of Secured Party. If Secured Party is a federally insured institution or an affiliate or subsidiary of a federally insured institution, this Acknowledgment Agreement, together with the applicable Security Agreement between Issuer and Secured Party and any amendments thereto, and any UCC financing statements, constitute the "written agreement" governing Issuer's grant of a Security Interest in its Servicing Rights and the rights to reimbursement of Advances to Secured Party pursuant to the Security Agreement and the matters agreed to in this Acknowledgment Agreement, and Secured Party shall continuously maintain all components of such "written agreement" as an official record of Secured Party (or any successor thereto).

      **21.**    **Participations.** Secured Party represents and warrants that if Secured Party sells one or more participations in the loans or is the designated agent for a group of lenders in a syndicated credit made pursuant to the Security Agreement (or enters into any other arrangement whereby one or more entities have rights through, or with, Secured Party with respect to the Security Interest), such participants or other entities shall benefit under the Security Agreement and the Acknowledgment Agreement solely through Secured Party, and shall have no rights greater than Secured Party. Secured Party represents and warrants that Ginnie Mae shall have no liability to any such participant or other entities in the loans made pursuant to the Security Agreement, and Secured Party shall indemnify, defend and hold harmless Ginnie Mae for any Claims and Losses asserted by such participants or other entities against Ginnie Mae or suffered by Ginnie Mae as a result thereof. Secured Party hereby represents, warrants, and confirms to Ginnie Mae that, (a) Secured Party has the authority to enter into this Acknowledgment Agreement on behalf of any such participants or other entities, (b) this Acknowledgment Agreement, the Security Agreement, and any amendments thereto, shall be binding on any such participants or other entities as if they were original signatories thereto and hereto, and (c) Secured Party shall have the authority and duty to act exclusively for such participants or other entities with respect to Ginnie Mae.

      **22.**    **Fees.** The parties agree that, as a condition of agreeing to the terms of this Acknowledgment Agreement, Ginnie Mae shall be entitled to charge fees to Issuer in connection with this Acknowledgment Agreement and transfer fees in connection with the TIR to a Standby Issuer pursuant to Section 9, in each case, in accordance with the Guide.

GNMA A.R.
Texas Capital Bank v. GNMA
Case No. 2:23-cv- (N.D. Tex.) APP183

23.    **Notice**. Any notice, request, or other communication to Ginnie Mae pursuant to this Acknowledgment Agreement shall be in writing and shall be (a) mailed by first-class mail or delivered by commercial courier, postage and fees prepaid, to Ginnie Mae at the address and to the attention of the officer shown below, or (b) sent to Ginnie Mae (to the attention of such officer) by email or facsimile and confirmed by mailing or courier delivery at substantially the same time as such facsimile transmission, provided, however, that any notices provided in connection with a notice of extinguishment to Issuer shall be sent by email or facsimile and confirmed by mailing or courier delivery pursuant to (b) above. Any notice, request or other communication from Ginnie Mae, Secured Party or Issuer shall be given in the same manner, and under the same procedures, as provided above, with such party's address for such purpose, and related information, being as shown below. Any party may change the address and intended recipient designated below by providing written notice of such change to each of the other parties pursuant to this provision.

**GINNIE MAE:**

Government National Mortgage Association
425 Third Street, S.W., Suite 500
Washington, D.C. 20024
Attention: Senior Vice President, Office of Mortgage-Backed Securities
Email: OIPM Notification GinnieMae@hud.gov
Facsimile No.: (202) 485-0232

**SECURED PARTY:**

Leadenhall Capital Partners LLP
The Leadenhall Building
122 Leadenhall Street
London, EC3V 4AG
United Kingdom
Attention: Dan Knipe
Email: dan.knipe@leadenhallcp.com
Telephone No.: +44 7932 562 785

**ISSUER:**

Reverse Mortgage Funding LLC
1455 Broad Street, 2nd Floor
Bloomfield, New Jersey 07003
Attention: Richard C. Jensen
Email: rjensen@reversefunding.com
Telephone No.: 973-542-7033

24.    **Termination**. Any and all rights and interests of Secured Party shall terminate on the earlier of (a) the termination of the Security Agreement and (b) five years from the effective date hereof unless extended pursuant to agreement of the parties hereto in writing.

25.    **Other Provisions**.

GNMA A.R.

Texas Capital Bank v. GNMA   APP184
Case No. 2:23-cv-    (N.D. Tex.)

(a)     This Acknowledgment Agreement shall be construed under federal law.

(b)     This Acknowledgment Agreement and the rights of Secured Party and Issuer hereunder shall not be assigned or transferred by Issuer or Secured Party, or assumed by a third party, without the prior written consent of Ginnie Mae.

(c)     The parties agree that the rule of contract construction that ambiguities are to be construed against the drafter shall not apply to this Acknowledgment Agreement.

(d)     Issuer and Secured Party agree and acknowledge that any breach of this Acknowledgment Agreement by either of them could pose a serious risk to the integrity and functioning of the MBS Program, that Ginnie Mae might not have an adequate remedy at law, and that, therefore, upon any such breach, Ginnie Mae shall be entitled to obtain injunctive relief.

(e)     This Acknowledgment Agreement and all Exhibits attached hereto when delivered constitute the entire agreement of the parties with regard to the subject matter hereof.

(f)     This Acknowledgment Agreement may be amended only by agreement in writing of all parties.

(g)     The recitals of this Acknowledgment Agreement are part of the agreement and are binding on the parties hereto. The section and paragraph headings are merely for convenience and shall not be deemed to change the meaning of the text.

(h)     The invalidity or unenforceability of any particular provision of this Acknowledgment Agreement shall not affect the other provisions hereof, and this Acknowledgment Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.

(i)     This Acknowledgment Agreement may be executed in one or more counterparts each of which shall together constitute one and the same Acknowledgment Agreement.

(j)     Secured Party and Issuer agree to acknowledge and reaffirm the rights of Ginnie Mae pursuant to the Ginnie Mae Contract, and agree to be bound by the terms, provisions, and conditions of this Acknowledgment Agreement and the Ginnie Mae Contract.

**(SIGNATURES CONTINUED ON NEXT PAGE)**

17

GNMA A.R.

Texas Capital Bank v. GNMA   APP185
Case No. 2:23-cv-      (N.D. Tex.)

**IN WITNESS WHEREOF,** Secured Party, Issuer, and Ginnie Mae have executed and delivered this Acknowledgment Agreement as of the date first above written.

**SECURED PARTY:** Leadenhall Capital Partners LLP

By: _____

Print Name: Dan Knipe

Title: Senior Portfolio Manager

Company Name: Leadenhall Capital Partners LLP

**ISSUER:** Reverse Mortgage Funding LLC

By: _____

Print Name: Craig Corn

Title: Chief Executive Officer

Company Name: Reverse Mortgage Funding LLC

**GOVERNMENT NATIONAL MORTGAGE ASSOCIATION:**

By: _____

Print Name: _____

Title _____

Company Name: _____

**IN WITNESS WHEREOF,** Secured Party, Issuer, and Ginnie Mae have executed and delivered this Acknowledgment Agreement as of the date first above written.

**SECURED PARTY:** Leadenhall Capital Partners LLP

By: _____
Print Name: Dan Knipe
Title: Senior Portfolio Manager
Company Name: Leadenhall Capital Partners LLP

**ISSUER:** Reverse Mortgage Funding LLC

By: _____
Print Name: Craig Corn
Title: Chief Executive Officer
Company Name: Reverse Mortgage Funding LLC

**GOVERNMENT NATIONAL MORTGAGE ASSOCIATION:**

By: _____
Print Name: _____
Title _____
Company Name: _____

**IN WITNESS WHEREOF**, Secured Party, Issuer, and Ginnie Mae have executed and delivered this Acknowledgment Agreement as of the date first above written.

**SECURED PARTY:** Leadenhall Capital Partners LLP

By: _____
Print Name: Dan Knipe
Title: Senior Portfolio Manager
Company Name: Leadenhall Capital Partners LLP

**ISSUER:** Reverse Mortgage Funding LLC

By: _____
Print Name: Richard C. Jensen
Title: General Counsel
Company Name: Reverse Mortgage Funding LLC

**GOVERNMENT NATIONAL MORTGAGE ASSOCIATION:**

By: _____
Print Name: Leslie M. Pordzik
Title: Vice President and Senior Advisor
Company Name: Government National Mortgage Association

## JOINDER

Each of the undersigned hereby join in this Acknowledgment Agreement for the limited purpose of acknowledging and agreeing that its interests in the Servicing Rights and in all reimbursements for Advances and Servicing Income in respect of the Servicing Rights are subject to the terms of this Acknowledgment Agreement and shall be subordinate in all respects to the rights and powers of Ginnie Mae hereunder and under the Ginnie Mae Contract. Without limiting the generality of the foregoing, each of the undersigned confirms that it shall have no rights under, and that pursuant to the Loan and Security Agreement it has waived (and hereby waives) any and all rights under or pursuant to, this Acknowledgment Agreement in respect of the Security Agreement and the Security Interest; provided that the foregoing shall not be interpreted as a waiver of such entity's rights under and pursuant to the Loan and Security Agreement, nor as a waiver of its rights in respect of the Security Agreement or the Security Interest.

[to be signed by any other lenders, purchasers and other investors]

**Exhibit "A" to Acknowledgment Agreement dated May [ ], 2019 among
Secured Party, Issuer and Ginnie Mae**

Form Letter to Ginnie Mae Relating to Standby Issuer to be placed on letterhead of Standby
Issuer (Attesting to Standby Issuer's Eligibility and Consent to Perform as Required)

Government National Mortgage Association
425 Third Street, S.W., Suite 500
Washington, D.C. 20024
*Attention:* Senior Vice President, Office of Mortgage-Backed Securities

Ladies and Gentlemen:

This letter is written in reference to the Acknowledgment Agreement dated May [ ],
2019, among Leadenhall Life Insurance Linked Investments Fund Plc (Secured Party), Reverse
Mortgage Funding LLC (Issuer), and the Government National Mortgage Association (Ginnie
Mae). I hereby certify that_____ (Standby Issuer) is an approved issuer under the Ginnie Mae
Mortgage-Backed Securities program. I further certify that _____[Standby Issuer] will meet all
requirements to serve as Standby Issuer for the Secured Party in the event that all or a portion of
the portfolio identified in Exhibit A or acquired by Issuer after the date of the Acknowledgment
Agreement are transferred to this firm for servicing. Officials of the firm have reviewed the terms
of the Acknowledgment Agreement, and _ [Standby Issuer] hereby adopts and agrees to abide by
all terms of the Acknowledgment Agreement relating to obligations of the Standby Issuer. ____
further agrees that Ginnie Mae shall conduct periodic reviews of the firm to insure the firm's
continuing qualification to serve as Standby Issuer under the Acknowledgement Agreement, and
agrees to cooperate with such reviews and provide such information, documents and other items
requested by Ginnie Mae in the course of such reviews.

I further certify that, should Secured Party provide notice to _____ [Standby
Issuer] that all or a portion of such portfolio will be transferred to this firm for servicing, upon
receipt of such notice by this firm and Ginnie Mae's approval of the transfer request, this firm
shall assume responsibility for all records and accounts so as to enable us to carry out the duties
and obligations of an issuer as set out in the Ginnie Mae Contract.

[This letter must be signed by Standby Issuer]

Standard Base Acknowledgement Agreement Model

GNMA A.R.
Texas Capital Bank v. GNMA
Case No. 2:23-cv-     (N.D. Tex.)   APP190

**Exhibit "B" to Acknowledgment Agreement dated May [ ], 2019 among
Secured Party, Issuer and Ginnie Mae**

[Transfer Request]

Form Letter to Ginnie Mae Relating to Security Interest to be placed on
letterhead of Secured Party

Government National Mortgage Association
425 Third Street, S.W., Suite 500
Washington, D.C. 20024
*Attention:* Senior Vice President, Office of Mortgage-Backed Securities

Ladies and Gentlemen:

Under and by authority of a power of attorney ("Power of Attorney") granted to
Leadenhall Life Insurance Linked Investments Fund Plc ("Secured Party") referred to in a certain
Loan and Security Agreement ("Security Agreement") dated May [ ], 2019 among Secured
Party, Reverse Mortgage Funding LLC, the Issuer ("Issuer") referred to in the Security
Agreement, Secured Party hereby notifies the Government National Mortgage Association
("Ginnie Mae") that, by reason of an event of default under the Security Agreement [if other
valid reason exists for enforcing the Security Interest or exercising remedies under the Security
Agreement, specify such reason and, if appropriate, delete reference to a default], Secured Party
has the right under such agreement (and has elected) to enforce the Security Interest created
therein and/or to exercise its remedies thereunder.

In this regard, Secured Party has elected to seek to transfer the servicing of pooled
mortgages, participation interests related to mortgages, other interests related to pooled
Participations and related securities under the Ginnie Mae mortgage-backed securities program
from Issuer to _____ (Standby Issuer), subject to Ginnie Mae's right to approve or reject
such transfer and subject to all conditions and requirements and all related rights of Ginnie Mae
provided or referred to in the Acknowledgment Agreement referred to below. We ask that Ginnie
Mae process and approve this request in accordance with the terms of that certain
Acknowledgment Agreement dated _____ by and among Secured Party, Issuer, and
Ginnie Mae.

Secured Party hereby certifies that it simultaneously has sent a copy of this letter to
Issuer, and that Ginnie Mae, pursuant to the terms of the Acknowledgment Agreement, has
authority (i) to rely upon this letter and upon the Power of Attorney (an executed counterpart of
which is enclosed), and (ii) to assume the existence, authenticity, validity, and legal sufficiency
of the Power of Attorney (whether or not actually examined by Ginnie Mae), and that the Power
of Attorney is irrevocable.

[This letter must be signed by Secured Party]

**GOVERNMENT NATIONAL MORTGAGE ASSOCIATION SECURITY
INTEREST INFORMATION TO ACCOMPANY ACKNOWLEDGMENT AGREEMENT
FOR PLEDGE OF SERVICING**

(Complete and submit this form with the Acknowledgment Agreement. All Information is for
the use of Ginnie Mae and its employees and/or counsel, and will be treated as confidential)

## I. ISSUER

Complete legal name:

Reverse Mortgage Funding LLC
1455 Broad Street
1st Floor
Bloomfield, NJ 07003
(973) 842-2448

Ginnie Mae Issuer ID number: 4277

## II. SECURED PARTY

Complete legal name: Leadenhall Capital Partners LLP
Street address: The Leadenhall Building, 122 Leadenhall Street, London, EC3V 4AG,
United Kingdom
Contact Person: Dan Knipe, Senior Portfolio Manager
E-mail: dan.knipe@leadenhallcp.com, Telephone: +44 7932 562 785

## III. SECURITY INTEREST

All Ginnie Mae Servicing Rights and the rights to reimbursement of Advances (as defined in the
Acknowledgement Agreement) must be subject to the security interest granted.

State principal amount of secured obligation:

Warehouse line of credit $100,000,000 Other line of credit or loan $0

State maturity date of secured obligation:

[•], 2023

Has Issuer previously granted a security interest in the Ginnie Mae Servicing Rights or the rights
to reimbursement of Advances to a party other than the Secured Party? Yes No

If "yes" Issuer must provide a Statement of Release executed by the previous secured party.
Include with the documents a copy of the Security Agreement between Issuer and Secured Party.

GNMA A.R.

Texas Capital Bank v. GNMA  APP192
Case No. 2:23-cv-   (N.D. Tex.)

## IV.   STANDBY ISSUER

Complete legal name:

Street address

(Do not write post office box)

Contact       person (Name)       (Title) (Telephone     number)       (Facsimile

number):

Standard Base Acknowledgement
Agreement Model

# GinnieNET Form 11705
# Schedule of Subscribers and Ginnie Mae Guaranty Agreement
### HMBS Electronic Pool Submission

Version 7.1

Date : 03/09/2023    Time : 9-39-43 PM

| | | | | |
|---|---|---|---|---|
| Pool Number : CP3128 | | Pool Amount : $18,115,745.00 | | |
| Issuer Number : 4277 | | Issuer Name : REVERSE MORTGAGE FUNDING, LLC | Specified Date for Ginnie Mae Pool Delivery : 12/08/2022 | |

File Transmission Number : 4277-000405-CP3128-H-RM-120222-122329-1

Delivery Instructions :

| Issue Date | Security Rate (WAC) | Security Margin | Issue Type | Pool Type | Guaranty Fee | Index | Cap Structure |
|---|---|---|---|---|---|---|---|
| 12/01/2022 | 6.489 | 0.00 | H | RM | 0.06 | CMT | |

Name of Subscriber/FED Clearing Bank
STATE ST BOS/

Total Subscribed
$18,115,745.00

| | | Pool Tax ID | | |
|---|---|---|---|---|
| | | 886600417 | | |

ABA Number
011000028

Total :    $18,115,745.00

| Principal and Interest(P&I) Custodial Account Number | P&I Bank ID Number | Escrow Custodial (T & I) Account Number | Escrow Bank ID Number | Document Custodian ID Number | Subcontract Servicer's Ginnie Mae Issuer Number (if applicable) |
|---|---|---|---|---|---|
| | | 0 | 0 | 000405 | 4083 |

**Purpose** This form authorizes the issuance of securities backed by Home Equity Coversion Mortgages under the Ginnie Mae II program and establishes the contract between the Issuer and Ginnie Mae.

**Authorization.** Ginnie Mae is instructed to prepare and deliver the securities to be issued by the undersigned against the Ginnie Mae Pool number specified below in conformity with the information provided in this form, which consists of (    ) pages.

**Ginnie Mae Guaranty Agreement for Securities Backed by Participations Related to Home Equity Conversion Mortgages:** The Issuer, by executing this form, and Ginnie Mae, by approving the proposed issue, and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, agree as follows: (1) the Issuer and Ginnie Mae contract for the issuance and guaranty of securities backed by the mortgages and the related participations listed on the accompanying Schedule of Mortgages and Pooled Participations, which form is incorporated herein by reference, and the Issuer hereby certifies to the accuracy of the information contained thereon; (2) the Issuer and Ginnie Mae incorporate by reference, and the Issuer agrees to comply with, all of the terms and conditions of the Ginnie Mae Mortgage-Backed Securities Guide in effect as of the issue date specified above (the Ginnie Mae Handbook 5500.3, the "Guide"), and the Issuer acknowledges that it has received the complete text of the Guide and agrees that each of the Issuer's existing pools and loan packages, whether formed under the Ginnie Mae II MBS Program, shall be governed by the terms of such Guide; (3) the Issuer and Ginnie Mae incorporate by reference all of the terms and conditions of the Guaranty Agreement included in the Guide for the pool type described above as of the issue date specified above and agree, further, that each of the Issuer's existing pools and loan packages, whether formed under the Ginnie Mae II MBS Program or the Ginnie Mae II MBS Program, shall be governed by the terms of the Guaranty Agreement that is included in the Guide for that pool type as of the issue date specified above (which shall prevail over any inconsistent terms of the applicable Guide), and that the terms of any and all previously effective Guaranty Agreements and Contractual Agreements shall be null and void and of no further effect in defining the rights and obligations of the Issuer and Ginnie Mae with respect to any pool that is currently the responsibility of the Issuer; (4) the effective date of this form and Guaranty Agreement shall be the issue date specified above; and (5) pursuant to the Guide, the Issuer transfers, assigns, sets over and otherwise conveys to Ginnie Mae all of the Issuer's right, title, and interest in and to the mortgages and the related participations identified and described in the attached Schedule of Mortgages and Pooled Participations. Such transfer shall be effective as of the date and time of delivery of the securities by Ginnie Mae or the CPTA, but shall include: (a) for each mortgage related to a Participation, all unscheduled payments received after the date on which the original principal balance of the pool was determined for purposes of this Schedule, and (b) for each mortgage related to a Participation, (i) all advances made before, on or after the issue date specified above for principal payments to or on behalf of the mortgagor; and (ii) all servicing fees, mortgage insurance premiums, and interest accruals before, on, or after the issue date specified above.

| Authorized Signature : | Name : John Langan | Title : Authorized Signatory | Date : 12/2/22 |
|---|---|---|---|

**Approved for Issue :**
Ginnie Mae Authorized Signature :

Date :

Page-    1

GNMA A.R.
Texas Capital Bank v. GNMA    APP194
Case No. 2:23-cv-    (N.D. Tex.)

**EXHIBIT C**

Existing Tail Loan Agreement

# TEXAS CAPITAL BANK, NATIONAL ASSOCIATION

## FIFTH AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT

**THIS FIFTH AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT** ("Agreement") is made and entered into as of August 26, 2021 (the "Effective Date"), by and between TEXAS CAPITAL BANK, NATIONAL ASSOCIATION, a national banking association ("Bank") and REVERSE MORTGAGE FUNDING LLC, a Delaware limited liability company ("Borrower").

## RECITALS

A.     Borrower has requested that Bank extend credit to Borrower as described in this Agreement.

B.     Subject to and upon the provisions, terms and conditions of this Agreement, Bank is willing to make such credit available to Borrower and has agreed to lend to Borrower the amounts herein described for the purposes set forth below.

## AGREEMENT

NOW, THEREFORE, in consideration of the premises, the covenants, representations, warranties and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby covenant and agree as follows:

## ARTICLE 1
## CERTAIN DEFINITIONS

1.1     Definitions.  As used in this Agreement, all exhibits and schedules hereto and in any note, certificate, report or other Loan Documents made or delivered pursuant to this Agreement, the following terms will have the meanings given such terms in Article One.

"Accounts" mean all of Borrower's accounts receivable of every nature and description, whether now existing or hereafter arising, the Proceeds and products thereof including, without limitation, all notes, drafts, acceptances, instruments, and chattel paper arising therefrom, any returned or repossessed goods the sale of which created any such accounts receivable, and all Proceeds (in any form or fashion) of any sale or other disposition of Borrower's inventory.

"Acknowledgment Agreement" means that certain Acknowledgement Agreement, executed by the Agency, the Borrower, and Leadenhall Capital Partners LLP.

"Advance" means any disbursement of an amount or amounts to be loaned by Bank to Borrower hereunder or the reborrowing of amounts previously loaned hereunder.

"Advance Request" means, as of the date of preparation, a certificate requesting an Advance in the form of **Exhibit A** prepared by an Authorized Officer.

"Affiliate" means, as to any Person, any other Person (a) that directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, such Person, (b) that directly or indirectly beneficially owns or holds ten percent (10%) or more of any class of voting stock of such Person, or (c) that controls ten percent (10%) or more of the voting stock of which is directly or indirectly beneficially owned or held by the Person in question.  As used herein, the term "control" means the possession, directly or indirectly, of the power to direct or cause direction of the management and

1

APP196

policies of a Person, whether through the ownership of voting securities, by control, or otherwise; provided, however, in no event shall Bank be deemed an Affiliate of Borrower; provided that Affiliate shall not mean any Person satisfying any of the foregoing to the extent that such Person obtains such status through ownership of a corporate parent of Borrower and such Person is not in the reverse mortgage origination business.

"Agency" means Ginnie Mae, or any other governmental agency which now or hereafter purchases and/or guaranties mortgage loans.

"Aging Report" has the meaning set forth in Section 6.1(i).

"Agreement" means this Fifth Amended and Restated Loan and Security Agreement, as the same may, from time to time, be amended, supplemented, or replaced.

"Approved Purposes" mean for the purpose of pooling and securitizing HECM Tails into a HMBS and delivering same to a HECM Tail Investor for purchase.

"Article" and "Articles" have the meanings set forth in Section 1.6.

"Asset Representation" means each of the representations set forth in (i) the last sentence of Section 5.12, (ii) Section 5.14, (iii) Section 5.15 to the extent related to a specific HECM Tail, (iv) Section 5.20, (v) Section 5.21 and (vi) Section 5.22.

"Authorized Officer" means the President, Chief Executive Officer, Chief Financial Officer, and any other officers legally authorized by Borrower and approved hereafter in writing by Bank.

"Bank" means Texas Capital Bank, National Association and its successors and assigns.

"Borrower" means the Person identified as such in the introductory paragraph hereof, and its successors and assigns.

"Borrower Base" means at any time an amount equal to the HECM Tail Collateral Value of all Eligible HECM Tails which have been identified by Borrower on the most recent Aging Report delivered to the Bank pursuant to Section 6.1(i), subject to the Extended Period HECM Tails Sublimit.

"Borrowing Base Certificate" means, as of any date of preparation, a Borrowing Base Certificate in substantially the form of **Exhibit B** attached hereto, prepared by and certified by an Authorized Officer of Borrower.

"Borrowing Limit" means the lesser of the Borrower Base or the Committed Sum.

"Business Day" means a day other than a Saturday, Sunday or a day on which commercial banks in Dallas, Texas, or the State of New Jersey, are authorized to be closed. Unless otherwise provided, the term "days" means calendar days.

"Capital Lease Obligation" means, with respect to any Person, the amount of Debt under a lease of property by such Person that would be shown as a liability on a balance sheet of such Person prepared for financial reporting purposes in accordance with GAAP, or other method of accounting acceptable to Bank.

"Code" means the Uniform Commercial Code of the State of Texas or other applicable jurisdiction as it may be amended from time to time.

"Collateral" means the following, wherever located, in which Borrower now has or at any time hereafter has or acquires any right, title or interest, and all Proceeds and products thereof, together with all books and records, customer lists, credit files, computer files, programs, printouts and other computer materials and records related thereto:

(a)    Borrower's rights, title and interest in HECM Tails made by Borrower for the purpose of pooling and securitizing into a HMBS and delivering same to a HECM Tail Investor, and any and all instruments or certificates representing such HECM Tails; provided, that Bank's security interest in any such HECM Tail or instrument (used herein as such term is defined in the Code) or certificate representing such HECM Tail shall terminate (x) at such time as Borrower has delivered to Bank, to Bank's satisfaction, evidence that such HECM Tail has been securitized into a HMBS and Bank has irrevocably received from the HECM Tail Investor good funds or (y) the related HECM Loan was securitized, has been repurchased or acquired by Borrower out of a securitized pool and, to the extent that Borrower had previously received an Advance from Bank in respect of such HECM Tail, Bank has irrevocably received from Borrower good funds.

(b)    Borrower's rights, title and interest into any HMBS resulting from the pooling and securitization of HECM Tails described in clause (a) above; provided, that Bank's security interest in any HMBS described in clause (a) above shall terminate at such time as Bank has irrevocably received good funds from the sale or financing of such HMBS.

(c)    together with the following ancillary rights:

(i)    all insurance, claims for insurance, and rights to guaranty repayments accruing with respect to the HECM Tails;

(ii)    all of the Borrower's files, certificates, correspondence, appraisals, accounting entries, journals and reports, other information and data that describes, catalogs or lists such information or data, or that otherwise directly relate to the HECM Tails, and other information and data that is used or useful for managing and administering the HECM Tails;

(iii)    all media (tapes, discs, cards, drives, flash memory or any other kind of physical or virtual data or information storage media or systems) on which is stored only information or data that relates to the HECM Tails, and on which no other material information and data that relates to property other than the HECM Tails is stored;

(iv)    the nonexclusive right to use (in common with the Borrower) Borrower's operating systems to manage and administer the HECM Tails and any of the related data and information described above, or that otherwise relates to the HECM Tails, together with the media on which the same are stored to the extent stored with material information or data that relates to property other than the HECM Tails (tapes, discs, cards, drives, flash memory or any other kind of physical or virtual data or information storage media or systems, and the Borrower's rights to access the same, whether exclusive or nonexclusive, to the extent that such access rights may lawfully be transferred or used by the Borrower's permittees), and any computer programs that are owned by the Borrower (or licensed to the Borrower under licenses that may lawfully be transferred or used by the Borrower's permittees) and that are used or useful to access, organize, input, read, print or otherwise output and otherwise handle or use such information and data;

(v)    all security for or claims against any Person in respect of the HECM Tails; and

(vi)    all Accounts, Proceeds, payments, entitlements and rights to payments, in each case, arising out of HECM Tails.

(d)        the Repayment Account.

provided, however, that the term "Collateral" shall not include any Servicing Rights of the Borrower.

"Commitment" means the obligation of Bank to make the Revolving Loans in an aggregate principal amount at any time outstanding up to but not to exceed in the aggregate the Borrowing Limit in effect from time to time.

"Commitment Fee" means Two Hundred Sixty Thousand and No/        Dollars ($260,000.00).

"Committed Sum" means Sixty-Five Million and No/        Dollars ($65,000,000.00).

"Compliance Certificate" means a certificate, substantially in the form of **Exhibit C** attached hereto, prepared by and executed by an Authorized Officer of Borrower.

"Conforming Loan" means a HECM Loan with respect to which each of the following statements is accurate and complete:

(a)        Such HECM Loan is a binding and valid obligation of the Obligor thereon, is in full force and effect and enforceable in accordance with its terms, except as enforceability may be limited by Debtor Relief Laws, and is eligible for inclusion in a Ginnie Mae HMBS securitization;

(b)        Borrower is the owner and, pursuant to the Custodian, holder of the HECM Loan and HECM Note, subject to prior participations, if any, sold by Borrower in prior HMBS securitizations in portions of the HECM Loan other than the HECM Tail, and Borrower's interest in the HECM Tail is free and clear of all liens and encumbrances;

(c)        The HECM Note evidencing such HECM Loan is genuine in all respects as appearing on its face and as represented in the books and records of Borrower, and all information set forth therein is true and correct;

(d)        The HECM Note evidencing such HECM Loan contains the entire agreement of the parties thereto with respect to the subject matter thereof, has not been modified or amended in any respect not expressed in writing therein and is free of concessions or understandings with the Obligor thereon of any kind not expressed in writing therein;

(e)        Such HECM Loan is in all respects in accordance with all requirements of Law applicable thereto, including, without limitation, all federal and state Laws applicable to residential mortgage loans, including without limitation home equity conversion mortgages, and the regulations promulgated thereunder and all applicable usury Laws and restrictions, and all notices, disclosures and other statements or information required by Law or regulation to be given, and any other act required by Law or regulation to be performed, in connection with such HECM Loan have been given and performed as required;

(f)        All advance payments and other deposits on such HECM Loan have been paid in cash, and no part of said sums has been loaned, directly or indirectly, by Borrower to the Obligor, except in accordance with the terms of the HECM Loan, and, other than as disclosed to Bank in writing or as permitted under the HECM Loan, there have been no prepayments;

(g)        The property covered by such HECM Loan is insured against loss or damage by fire and all other hazards normally included within standard extended coverage in accordance with the provisions of such HECM Loan with Borrower named as a loss payee thereon;

(h)       Such HECM Loan is secured by a first Mortgage on property consisting of a completed one-to-four unit single family residence which is not used for commercial purposes and which is not a construction loan;

(i)       Such HECM Loan is covered by title insurance insuring the Mortgage as a first and prior lien on the real property encumbered by the Mortgage;

(j)       Subject to Ginnie Mae's rights under the Acknowledgment Agreement and the Ginnie Mae Contract, at all times such HECM Loan will be owned by Borrower free and clear of all Liens, except in favor of Bank;

(k)       Such HECM Loan conforms to Ginnie Mae, HUD or Federal Housing Administration guidelines and is insured by the Federal Housing Administration; and

(l)       Borrower shall have retained and shall not have conveyed Servicing Rights with respect to such HECM Loan.

"Consent to Third Party Auditor Engagement Agreement" has the meaning set forth in Section 6.14.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of stock or other ownership interest, by contract, by the ability to appoint directors or managers or otherwise; it being acknowledged that a Person shall not be deemed to lack Control of another Person solely because certain decisions may be subject to "major decisions" consent or approval rights of limited partners, shareholders or non-managing members or representative body or bodies of the foregoing, as applicable ("Controlled" and "Controlling" each have the meanings correlative thereto).

"Current Financial Statements" means the financial statements of Borrower most recently submitted to Bank and dated within sixty (60) days of the Effective date.

"Custodian" means any custodian of a HECM Loan for the benefit of Borrower and Ginnie Mae designated in writing by Borrower to Bank and acceptable to Bank.

"Debt" means with respect to any Person at any time (without duplication), all obligations of such Person for borrowed money, whether evidenced by bonds, notes, debentures, or other similar instruments, including, without limitation, term financing, but expressly excluding mortgage loan warehouse or repurchase facilities and purchase money debt.

"Debtor Relief Laws" means the Bankruptcy Code of the United States and all other applicable liquidation, conservatorship, bankruptcy, moratorium, rearrangement, insolvency, reorganization, or similar debtor relief Laws affecting the rights of creditors generally from time to time in effect.

"Eligible HECM Tail" means a HECM Tail with respect to which each of the following statements is accurate and complete (and the Borrower by including such HECM Tail in any computation of the HECM Tail Collateral Value of the Borrower Base shall be deemed to so represent to Bank at and as of the date of such computation):

(a)       Such HECM Tail arises from a Conforming Loan;

(b)       Such HECM Tail has not been securitized into a HMBS;

5

APP200

(c)    Such HECM Tail has not been extended and outstanding sixty (60) days or more prior to Borrower's request for an Advance or, subject to the Extended Period HECM Tail Sublimit, one hundred-eighty (     days or more prior to Borrower's request for an Advance;

(d)    Such HECM Tail has not been included in the Borrower Base for more than sixty (60) days;

(e)    Such HECM Tail is eligible for securitization; and

(f)    If such HECM Tail is an Extended Period HECM Tail, the outstanding principal amount of such Extended Period HECM Tail, when added to the outstanding principal amount of all other Extended Period HECM Tails, does not exceed the Extended Period HECM Tail Sublimit.

"Environmental Laws" means any and all federal, state, and local laws, regulations, judicial decisions, orders, decrees, plans, rules, permits, licenses, and other governmental restrictions and requirements pertaining to health, safety, or the environment, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. § 9601, et seq., the Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6901, et seq., the Occupational Safety and Health Act,     U.S.C. § 651, et seq., the Clean Air Act, 42 U.S.C. § 7401 et seq., the Clean Water Act,     U.S.C. § 1251, et seq., and the Toxic Substances Control Act, 15 U.S.C. § 2601, et seq., as the same may be amended or supplemented from time to time.

"Event of Default" has the meaning set forth in Article Nine of this Agreement.

"Existing Litigation" has the meaning set forth in Section 5.5.

"Extended Period HECM Tails" means Eligible HECM Tails held by Borrower which have been extended for sixty (60) days or more but less than one hundred-eighty (     days.

"Extended Period HECM Tail Sublimit" means Three Million and No/     Dollars ($3,000,000.00).

"GAAP" means generally accepted accounting principles, applied on a consistent basis, set forth in Opinions of the Accounting Principles Board of the American Institute of Certified Public Accountants and/or in statements of the Financial Accounting Standards Board which are applicable under the circumstances and in effect as of the date in question; provided, however, that the phrase "applied on a consistent basis" means that the accounting principles applied in the current period be comparable in all material respects to those applied in preceding periods, except  to the extent that a deviation therefrom is expressly permitted by this Agreement.

"Ginnie Mae" means the Government National Mortgage Association and any successor.

"Ginnie Mae Contract" means (a) 12 U.S.C. § 1721(g) (the "Act") and the implementing regulations governing the mortgage-backed securities program operated by Ginnie Mae pursuant to Section     g) of the Act, 24 C.F.R. Part     (b) applicable Guaranty Agreements and contractual agreements between Ginnie Mae and Borrower, and (c) the Guide, Handbook 5500.3 Rev. 1, and other applicable guides.

"Guarantor" means any Person who from time to time guarantees all or any part of the Indebtedness.

"Guaranty" means a written guaranty of each Guarantor in favor of Bank, in form and substance satisfactory to Bank, as the same may be amended, modified, restated, renewed, replaced, extended, supplemented or otherwise changed from time to time.

"Guide" means the Ginnie Mae Mortgage-Backed Securities Guide, Handbook 5500.3 Rev. 1, as amended from time to time, together with the other documents or instruments issued for the benefit of Ginnie Mae thereunder (including without limitation, any guarantees).

"Hazardous Material" means any substance, product, waste, pollutant, material, chemical, contaminant, constituent, or other material which is or becomes listed, regulated, or addressed under any Environmental Law, including, without limitation, asbestos, petroleum, and polychlorinated biphenyls.

"HECM Loan" means Federal Housing Administration-insured home equity conversion mortgage loans which are evidenced by a HECM Note and secured by a Mortgage, together with the rights and obligations of a holder thereof and payments thereon and proceeds therefrom.

"HECM Note" means the note or other evidence of indebtedness evidencing the indebtedness of an Obligor under a HECM Loan.

"HECM Tail" means the aggregate of any additional amounts, including but not limited to amounts created by additional draws by the Obligor, interest accruals, mortgage insurance premiums, fees, or charges, which accrue, are disbursed, or are added to the balance of a previously-securitized HECM Loan after the closing date of any prior securitization of the HECM Loan or any prior HECM Tail related thereto.

"HECM Tail Collateral" means HECM Tails, together with any instruments or certificates representing any HECM Tails, including, without limitation, the related HECM Loans and HECM Notes.

"HECM Tail Collateral Value" means, as of any date of determination, an amount equal to ninety-five percent (95.0%) of the aggregate outstanding principal amount of all non-securitized Eligible HECM Tails held by Borrower for which a first priority, perfected, security interest in the HECM Tail Collateral has been granted by Borrower to Bank. Notwithstanding anything to the contrary contained herein, HECM Tails for which an Advance has been outstanding for sixty (60) days or longer shall be expressly excluded from the calculation of the Borrower Base, except for, subject to the Extended Period HECM Tail Sublimit, Extended Period HECM Tails; provided, that once an Advance on a HECM Tail has been timely repaid, Borrower may request a subsequent Advance on the same HECM Tail (and consequently such HECM Tail may be included in the Borrower Base) so long as such HECM Tail remains an Eligible HECM Tail.

"HECM Tail Investor" means any securitizer, investor, or other Person who purchases a HECM Tail or any pool of which a HECM Tail is a part, from Borrower.

"HMBS" means a Home Equity Conversion Mortgage-Backed Security.

"HUD" means the U.S. Department of Housing and Urban Development.

"Inchoate Lien" means any Lien for Taxes not yet due and payable and any mechanic's Lien and materialman's Lien for services or materials for which payment is not yet due.

"Indebtedness" means all present and future indebtedness, obligations, and liabilities of Borrower to Bank, including all direct and contingent obligations arising under letters of credit, banker's acceptances, bank guaranties and similar instruments, overdrafts, Automated Clearing House obligations, and all other financial accommodations which could be considered a liability under GAAP, or other

method of accounting acceptable to Bank, and all renewals, extensions, and modifications thereof, or any part thereof, now or hereafter owed to Bank by Borrower, and all interest accruing thereon and costs, expenses, and reasonable attorneys' fees incurred in the enforcement or collection thereof, regardless of whether such indebtedness, obligation, and liabilities are direct, indirect, fixed, contingent, liquidated, unliquidated, joint, several, or joint and several, including, but not limited to, the indebtedness, obligations, and liabilities evidenced, secured, or arising pursuant to any of the Loan Documents and all renewals and extensions thereof, or any part thereof, and all present and future amendments thereto, together with all liabilities of such Borrower in respect of indemnities or repurchase obligations made in connection with the sale of HECM Loans.

"Laws" means all statutes, laws, ordinances, regulations, orders, writs, injunctions, or decrees of the United States, any city or municipality, state, commonwealth, nation, country, territory, possession, or any Tribunal.

"Liabilities" means, at any particular time, all amounts which in conformity with GAAP, or other method of accounting acceptable to Bank, would be included as liabilities on a balance sheet of a Person.

"Lien" means any lien, security interest, Tax lien, mechanic's lien, materialman's lien, or other encumbrance, whether arising by contract or under Law.

"Liquid Assets" means, at any particular time, the sum of Borrower's cash, cash equivalents (certificates of deposit and other depository accounts established at FDIC-insured banks), United States government-issued securities and other registered, unrestricted equity or debt securities which are publicly traded on a recognized United States exchange and have been approved by Bank, in its sole and absolute discretion and which, in all events, are held in Borrower's name and are free and clear of all Liens (except Liens in favor of Bank).

"Litigation" means any proceeding, claim, lawsuit, and/or investigation conducted or threatened by or before any Tribunal, including, but not limited to, proceedings, claims, lawsuits, and/or investigations under or pursuant to any environmental, occupational safety and health, antitrust, unfair competition, securities, Tax, or other Law, or under or pursuant to any agreement, document, or instrument.

"Loan" means the Revolving Loans.

"Loan Documents" mean this Agreement, the Note, the Security Documents, and any and all other agreements, documents, and instruments executed and delivered pursuant to the terms of this Agreement, and any future amendments hereto, or restatements hereof, or pursuant to the terms of any of the other loan documents, together with any and all renewals, extensions, and restatements of, and amendments and modifications to, any such agreements, documents, and instruments.

"Material Adverse Effect" means any set of circumstances or event which with respect to any Person (a) could reasonably be expected to have a material adverse effect upon the validity, performance, or enforceability of any Loan Document against such Person, (b) is or could reasonably be expected to have a material adverse effect upon the condition (financial or otherwise), properties, liabilities (actual or contingent), business operations or prospects of such Person, (c) could reasonably be expected to materially impair the ability of such Person to pay the Indebtedness or to fulfill its Obligations under the Loan Documents, or (d) could reasonably be expected to cause an Event of Default.

"Maximum Rate" means the maximum non-usurious rate of interest (or, if the context so requires, an amount calculated at such rate) which Bank is allowed to contract for, charge, take, reserve, or receive in this transaction under applicable federal or state (whichever is higher) Law from time to time in effect

9

APP204

with any requisition, confiscation, condemnation, seizure, or forfeiture of all or any part of the Collateral by any Tribunal (or any person acting under color of Tribunal), and (c) any and all other amounts from time to time paid or payable under or in connection with any of the Collateral.

"Regulation U" means Regulation U issued by the Board of Governors of the Federal Reserve System as in effect from time to time.

"Release" means, as to any Person, any release, spill, emissions, leaking, pumping, injection, deposit, disposal, disbursement, leaching, or migration of Hazardous Materials into the indoor or outdoor environment or into or out of property owned by such Person, including, without limitation, the movement of Hazardous Materials through or in the air, soil, surface water, ground water, or property.

"Remedial Action" means all actions required to (a) clean up, remove, treat, or otherwise address Hazardous Materials in the indoor or outdoor environment, (b) prevent the Release or threat of Release or minimize the further Release of Hazardous Materials so that they do not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment, or (c) perform pre-remedial studies and investigations and post-remedial monitoring and care.

"Repayment Account" means the deposit account established, owned and controlled by Bank, into which all proceeds from each sale of HMBS relating to the HECM Tail Collateral shall be funded and deposited, and such account and all funds deposited or maintained therein shall be disbursed and applied by Bank for the payment of the Obligations and Indebtedness; provided that the Repayment Account shall be and is hereby pledged as security for Borrower's Obligations and Indebtedness (and this Agreement shall be deemed to constitute a security agreement).

"Revolving Loan" and "Revolving Loans" have the meanings set forth in Section 2.1.

"Revolving Note" means the promissory note, dated as of the Effective Date, in the maximum principal amount of Sixty-Five Million and No/     Dollars ($65,000,000.00), executed by Borrower and payable to the order of Bank, in form and substance satisfactory to Bank, and all amendments, extensions, renewals, replacements, increases, and modifications thereof.

"Revolving Principal Balance" means the aggregate unpaid principal balance of the Revolving Note on any date of determination.

"Rights" mean any remedies, powers, and privileges exercisable by Bank under the Loan Documents, at Law, equity, or otherwise.

"RMIT" means Reverse Mortgage Investment Trust Inc. or any successor thereto.

"SCGG Party" means any of (i) Starwood Capital Group Global II, L.P., a Delaware limited partnership, (ii) Starwood Capital Group Holdings, L.P., a Delaware limited partnership or (iii) another entity Controlled by, or under common Control and ownership with, any SCGG Party listed in clauses (i)-(ii).

"Section" and "Sections" have the meanings set forth in Section 1.6.

"Security Documents" means this Agreement and each other pledge agreement, security agreement or similar agreement or document required by or delivered to Bank from time to time that purports to create a Lien in favor of any of Bank to secure payment or performance of Indebtedness and/or Obligations or any portion thereof.

10

"Servicing Agreement" means, the arrangement, whether or not evidenced in writing, pursuant to which Borrower (or a party designated by Borrower and approved by Bank) acts as servicer of HECM Loans, whether or not any such HECM Loan is owned by Borrower, which may include, but is not limited to, the Ginnie Mae Contract.

"Servicing Rights" means all of the Borrower's rights and interests under any Servicing Agreement, including the rights to (a) service the HECM Loans that are the subject matter of such Servicing Agreement and (b) be compensated, directly or indirectly, for doing so.

"Submission List" means a list in the form of Schedule A-2 to the form of Advance Request.

"Subordinated Debt" means all unsecured Debt of Borrower whether now existing or hereafter incurred which is subordinate in right of payment to the Indebtedness, pursuant to a written agreement in form and content satisfactory to Bank.

"Subsection" and "Subsections" have the meanings set forth in Section 1.6.

"Subsidiary(ies)" means any entity more than fifty percent (50%) of whose ownership, equity or voting interest now or hereafter is owned directly or indirectly by Borrower or any Subsidiary or may be voted by Borrower or any Subsidiary.

"Tangible Net Worth" means, for any Person at any particular time, all amounts which, in conformity with GAAP, or other method of accounting acceptable to Bank, would be included as owner's equity on a balance sheet of a Person; but excluding (a) all assets which are properly classified as intangible assets, and (b) all loans and advances to any owner, officer, or employee of such Person.

"Taxes" means all taxes (including withholding), assessments, fees, levies, imposts, duties, deductions, withholdings, or other charges of any nature whatsoever from time to time or at any time imposed by any Laws or by any Tribunal, excluding state and local sales and use taxes.

"Tribunal" means any state, commonwealth, federal, foreign, territorial, or other court or governmental department, commission, board, bureau, agency, or instrumentality.

"Tribunal Proceedings" has the meaning set forth in Section 5.4.

"Unpaid Judgments" has the meaning set forth in Section 5.5.

1.2     Terms Defined in the Code.  Terms (whether or not capitalized) defined in the Code which are not otherwise defined in this Agreement are used herein as defined in the Code as in effect on the date hereof.

1.3     Accounting Matters.  Any accounting term used in this Agreement or the other Loan Documents shall have, unless otherwise specifically provided therein, the meaning customarily given such term in accordance with GAAP, or other method of accounting acceptable to Bank, and all financial computations thereunder shall be computed, unless otherwise specifically provided therein, in accordance with GAAP, or other method of accounting acceptable to Bank, consistently applied.  That certain items or computations are explicitly modified by the phrase "in accordance with GAAP, or other method of accounting acceptable to Bank" shall in no way be construed to limit the foregoing.

1.4     Headings.  The headings, captions, and arrangements used in any of the Loan Documents are, unless specified otherwise, for convenience only and shall not be deemed to limit, amplify, or modify the terms of the Loan Documents nor to affect the meaning thereof.

11

APP206

1.5    <u>Number and Gender of Words</u>.  Whenever herein the singular number is used, the same shall include the plural where appropriate, and words of any gender shall include each other gender where appropriate.  Reference herein to Borrower shall mean, jointly and severally, each Person comprising same.

1.6    <u>Articles, Sections and Exhibits</u>.  All references herein to "Article," "Articles," "Section," "Sections," "Subsection," and "Subsections" contained herein are, unless specified indicated otherwise, references to articles, sections, and subsections of this Agreement.  All references herein to an "Exhibit" or "Schedule" are references to exhibits or schedules attached hereto, all of which are made a part hereof for all purposes, the same as if set forth herein verbatim, it being understood that if any exhibit or schedule attached hereto which is to be executed and delivered, contains blanks, the same shall be completed correctly and in accordance with the terms and provisions contained and as contemplated herein prior to or at the time of the execution and delivery thereof.  The words "herein," "hereof," "hereunder" and other similar compounds of the word "here" when used in this Agreement shall refer to the entire Agreement and not to any particular provision or section.

**ARTICLE 2**
**<u>COMMITMENT TO LEND, TERMS OF PAYMENT</u>**

2.1    <u>Revolving Loans</u>.  Subject to and upon the terms and conditions of this Agreement, Bank agrees to make one or more Advances (hereinafter called, individually, a "<u>Revolving Loan</u>" and, collectively, the "<u>Revolving Loans</u>") to Borrower for Approved Purposes in an aggregate principal amount at any one time outstanding up to but not exceeding the Borrowing Limit.  Within the limit of the Borrowing Limit in effect from time to time, Borrower may borrow, repay, and reborrow at any time and from time to time from the Effective Date to the earlier of (a) the maturity date of the Revolving Note, or (b) the termination of Bank's Commitment hereunder.  If, by virtue of payments made on the Revolving Note, the principal amount owed on the Revolving Note during its term reaches zero at any point, Borrower agrees that all of the Collateral and all of the Loan Documents shall remain in full force and effect to secure any Advances made thereafter, and Bank shall be fully entitled to rely on all of the Collateral and all of the Loan Documents unless an appropriate release of all or any part of the Collateral or all or any part of the Loan Documents has been executed by Bank. The Revolving Principal Balance may not exceed the Borrowing Limit at any time.

2.2    <u>Revolving Note.</u>  The Revolving Loans shall be evidenced by, be repayable, and accrue interest in accordance with, the Revolving Note.  Subject to the terms and conditions in this Agreement, the Revolving Note, and the other Loan Documents, Borrower may borrow, repay, and reborrow under the Revolving Note. The unpaid principal balance of the Revolving Note shall be repaid as provided therein.

2.3    <u>Borrowing Procedure.</u>  Borrower shall give Bank notice of each Revolving Loan by means of a written request containing the information required by Bank and delivered (by hand, electronically, or by mechanically confirmed facsimile) to Bank no later than 1:00 p.m. (Texas time) on the day on which the Revolving Loan is desired to be funded.  Bank, at its option, may accept telephonic requests for such Advances, provided, however, that such acceptance shall not constitute a waiver of Bank's right to require delivery of a written request in connection with subsequent Revolving Loans.  Any telephonic request for a Revolving Loan by Borrower shall be promptly confirmed by submission of a properly completed written request to Bank, but failure to deliver a written request shall not be a defense to payment of a Revolving Loan.  Bank shall have no liability to Borrower for any loss or damage suffered by Borrower as a result of Bank's honoring of any requests, execution of any instructions, authorizations or agreements or reliance on any reports communicated to it telephonically, by facsimile or electronically, and purporting to have been sent to Bank by Borrower and Bank shall have no duty to verify the origin of any such communication or the identity or authority of the Person sending it.  Subject to the terms and conditions of this Agreement, each Revolving Loan shall be made available to Borrower

by depositing the same, in immediately available funds in an account designated by Borrower maintained with Bank.

2.4    Payments.  If a scheduled payment under the Revolving Note is not made in a timely manner, Bank is authorized by Borrower to debit the amount of any such payments from the Repayment Account or any other depository account of Borrower with Bank.  If at any time the Revolving Principal Balance exceeds the Borrowing Limit, Borrower shall immediately repay to Bank an amount sufficient to eliminate such excess.

2.5    Purpose of Loans.  Borrower represents that the proceeds of the Revolving Loans will be used only for Approved Purposes.

2.6    Sale of Participations; Disclosure of Information.  Reserved.

2.7    Sale or Securitization of HECM Tails; Processing.

(a)    Establishment of Repayment Account.  Upon closing this Agreement, Borrower shall deposit One Hundred Thousand and No/      Dollars ($100,000.00) into the Repayment Account.  In the event the balance of the Repayment Account falls below One Hundred Thousand and No/      Dollars ($100,000.00) at any time during the term of this Agreement, whether such be due to any shortfall in proceeds from any sale or securitization of an Eligible HECM Tail, any offset by the Bank in accordance with its rights, or any other reason, Borrower shall deposit into the Repayment Account such amount as may be necessary to maintain a minimum balance of One Hundred Thousand and No/      Dollars ($100,000.00).

(b)    Payments from HECM Tail Investors.  When any HECM Tail, or a pool of which a HECM Tail is a part, is sold to or securitized by a HECM Tail Investor, Borrower shall cause such HECM Tail Investor or the Custodian to deposit the proceeds of such sale or securitization or from the sale or financing of the HMBS resulting from such securitization in immediately available funds directly into the Repayment Account on Borrower's behalf.  Upon Bank's request, Borrower will obtain or provide such irrevocable payment instructions as Bank may reasonably request.

(c)    Processing Payments from HECM Tail Investors.  With respect to each payment or amount of funds deposited into the Repayment Account by a HECM Tail Investor or the Custodian from a sale or securitization of any HECM Tail or otherwise:

(i)    Each payment shall be applied on a "first-in-first-out" basis so that Advances made hereunder shall be repaid in the chronological order in which such Advances were made; i.e., Advances made first are first to be repaid;

(ii)    In the event that insufficient funds are delivered by the HECM Tail Investor or the Custodian to fully repay any Advance outstanding for more than sixty (60) days, Borrower shall immediately pay Bank the difference between such Advance and the amount, if any, delivered by the HECM Tail Investor or the Custodian (subject, however, to Borrower's limited right following such payment to request another Advance against the same HECM Tail so long as said HECM Tail remains an Eligible HECM Tail);

(iii)    The proceeds of each such payment shall be applied by Bank pursuant to Section 2.8.

2.8    Order of Application.  Prepayments of the Indebtedness under this Agreement shall be applied to the principal.  Except as otherwise provided in the Loan Documents or otherwise agreed by Bank, and except for prepayments of the Indebtedness, all payments of the Indebtedness under this

13

Agreement, including proceeds from the exercise of any Rights under the Loan Documents or proceeds of any of the Collateral, shall be applied to the Indebtedness under this Agreement in the following order, any instructions from Borrower to the contrary notwithstanding:  (a) to the expenses for which Bank shall not have been reimbursed under the Loan Documents, and then to all indemnified amounts due under the Loan Documents; (b) to fees then owed Bank hereunder; (c) to accrued interest on the portion of the Indebtedness being paid or prepaid; (d) to the portion of the principal being paid or prepaid; (e) to the remaining accrued interest on the Indebtedness; (f) to the remaining principal; and (g) to the remaining Indebtedness.  All amounts remaining after the foregoing application of funds shall be paid to Borrower.

2.9     Commitment Fee.  Borrower shall pay to Bank the Commitment Fee for agreeing to make the Revolving Loan.  The Commitment Fee shall be due and payable by Borrower to Bank on or before the Effective Date.

2.10    Mandatory Repayments.  Borrower shall immediately make mandatory payments (in the amounts set forth below) on the Revolving Loan upon the occurrence of any of the following events:

(a) If at any time the Revolving Principal Balance exceeds the Borrowing Limit, Borrower shall pay to Bank an amount equal to any such excess;

(b) If at any time at least sixty (60) days have elapsed since the date of an Advance to finance any HECM Tail hereunder and such Advance has not been sooner repaid, Borrower shall pay to Bank an amount equal to the amount of such Advance;

(c)  The sale or securitization of a HECM Tail, or a pool of which a HECM Tail is a part, to or by a HECM Tail Investor, the Borrower shall pay to Bank an amount equal to such HECM Tail;

(d)     If at any time the aggregate outstanding amount of Advances made in relation to Extended Period HECM Tails exceeds the Extended Period HECM Tail Sublimit, Borrower shall pay to Bank an amount equal to such excess.

2.11    Borrower Base Exclusion.  Notwithstanding anything contained to the contrary herein, any HECM Tail that has been securitized into a HMBS shall be expressly excluded from the Borrower Base hereunder.

2.12    Increased Cost and Reduced Return.

(a)     If, after the date hereof, Bank shall have determined that the adoption of any applicable Law, rule, or regulation regarding capital adequacy or any change therein or in the interpretation or administration thereof by any governmental authority, central bank, or comparable agency charged with the interpretation or administration thereof, or any request or directive regarding capital adequacy (whether or not having the force of Law) of any such governmental authority, central bank, or comparable agency, has or would have the effect of reducing the rate of return on the capital of Bank or any corporation controlling Bank, due to the obligations of Bank hereunder, to a level below that which Bank or such corporation could have achieved but for such adoption, change, request, or directive (taking into consideration its policies with respect to capital adequacy), then, within fifteen (15) days after demand by Bank, Borrower shall pay to Bank such additional amount or amounts as will compensate Bank for such reduction.

(b)     Bank shall promptly notify Borrower of any event of which it has knowledge, occurring after the date hereof, which will entitle Bank to compensation pursuant to this Section. In the event that Bank claims compensation under this Section, Bank shall furnish to Borrower a statement setting forth the additional amount or amounts to be paid to it hereunder which shall be conclusive in the absence of

manifest error. In determining such amount, Bank shall act in good faith and may use any reasonable averaging and attribution methods.

2.13    Termination Right.  Reserved.

2.14    Unused Facility Fee; Minimum Utilization.  Borrower agrees to pay to Bank an unused facility fee with respect to each calendar quarter during the term of the Note, beginning with the calendar quarter ending September      2021, based on the daily average unused amount of the Committed Sum during such calendar quarter. The unused facility fee shall be an amount equal to A x (B-C) x (D/E), where: A equals one-half percent (0.50%); B equals the Committed Sum; C equals the daily average outstanding Advances during such calendar quarter; D equals the actual number of days elapsed during such calendar quarter; and E equals      The accrued unused facility fee shall be payable quarterly, in arrears, within fifteen (15) days of each calendar quarter end. Notwithstanding anything contained to the contrary herein, Bank hereby agrees that for any calendar quarter in which Borrower maintains daily average outstanding Advances in an amount that is equal to or greater than fifty percent (50.0%) of the Committed Sum, Bank shall waive the unused facility fee for such calendar quarter and such unused facility fee shall not be due and payable by Borrower for such calendar quarter.

## ARTICLE 3
## COLLATERAL

3.1    Security Interests.  Borrower hereby pledges, assigns and grants to Bank a continuing first priority security interest in all of Borrower's right, title and interest in and to all of the Collateral to secure the prompt and complete payment and performance when due of all of the Indebtedness and all of the Obligations.

3.2    Power of Attorney.  Borrower hereby designates and/or appoints Bank and each of its designees or agents as attorney-in-fact of Borrower, irrevocably and with power of substitution, with authority to take any or all of the following actions upon the occurrence of an Event of Default, subject to any rights of Ginnie Mae under the Ginnie Mae Contract with respect to the HECM Tail Collateral and the servicing of the HECM Loans: (i) with respect to any HECM Tail Collateral, demand, collect, receive, settle, compromise, adjust, foreclose and resell and/or give discharges and releases, all as Bank may determine; (ii) commence and prosecute any actions in any court for the purposes of collecting amounts owed on HECM Tail Collateral and enforcing any other rights in respect thereof; (iii) defend, settle or compromise any action brought and, in connection therewith, give such discharge or release as Bank may deem appropriate; (iv) receive, open and dispose of mail addressed to Borrower and endorse checks, notes, drafts, acceptances, money orders, bills of lading, warehouse receipts or other instruments or documents evidencing payment made on account of or funds paid relating to HECM Tail Collateral on behalf of and in the name of Borrower; (v) sell, assign, transfer, make any agreement in respect of, or otherwise deal with or exercise rights in respect of, any HECM Tail Collateral as fully and completely as though Bank were the absolute owner thereof for all purposes; (vi) adjust and settle claims under any insurance policy related thereto; and (vii) execute and file in the public records financing statements or amendments thereto or any other documents or writings deemed necessary by Bank to evidence or perfect Bank's security interest in the HECM Tail Collateral; provided that Bank agrees to furnish copy of any document executed hereunder to Borrower, as applicable, upon request; and (viii) enter on the premises of Borrower in order to exercise any of Bank's rights and remedies.  The appointment of Bank as attorney-in-fact is coupled with an interest and is irrevocable.

3.3    Borrower Remains Liable; No Duty of Bank.  Notwithstanding anything to the contrary contained herein, (a) Borrower and each other Obligated Party shall remain liable under the contracts and agreements to which such Person is a party and which are included in the Collateral and shall perform all of its respective duties and obligations thereunder to the same extent as if this Agreement had not been executed, and (b) Bank shall not have any obligation or liability under any of the contracts and

15

agreements included in the Collateral by reason of this Agreement, nor shall Bank be obligated to perform any of the obligations or duties of Borrower or any other Obligated Party thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

3.4    <u>Authorization to File Financing Statements</u>.  Borrower hereby irrevocably authorizes Bank at any time and from time to time to prepare and file one or more financing statements (and any continuation statements and amendments thereto) describing the Collateral whether or not the Borrower's signature appears thereon.

3.5    <u>Collection of HECM Tail Collateral</u>.  Prior to the Bank exercising its right to collect HECM Tail Collateral, pursuant to this <u>Section 3.5</u>, Borrower shall collect with diligence all payments due thereunder.  After the occurrence of an Event of Default, Borrower shall, at the request of the Bank, notify the Borrower's servicer to make all such payments directly to the Bank unless prohibited or otherwise restricted under the Ginnie Mae Contract.

3.6    <u>Further Assurances Concerning Collateral</u>. In furtherance of the foregoing, the Borrower hereby agrees to perform, or cause to be performed, such acts and duly to authorize, execute, acknowledge, deliver, file and record (or cause such actions to be taken with respect to) such financing statements, assignments, security agreements, deeds of trust, mortgages, bond powers and supplements, modifications or amendments to any of them, and such other papers as Bank may reasonably request in order to establish and preserve the priority of, perfect and protect the Liens granted or intended to be granted to Bank in and to any and all such Collateral and to preserve and protect Bank's rights in respect of all present and future Collateral for the Obligations.

3.7    <u>Rights in Property Held by the Bank</u>.  As further security for the prompt satisfaction of all Obligations, the Borrower hereby assigns, transfers, and sets over to the Bank all of its right, title, and interest in and to, and grants the Bank a lien on and a security interest in, all amounts that may be owing, from time to time, by the Bank to the Borrower in any capacity, including, but without limitation, any deposit or other account with the Bank, including, without limitation, the Repayment Account, which lien and security interest shall be independent of, and in addition to, any right of set-off that the Bank has hereunder or otherwise, excluding escrow accounts.

3.8    <u>Rights Subject to the Guide</u>.  Bank hereby acknowledges that the pledge, assignment or grant of a first priority security interest in any Collateral or Lien on any HECM Tail Collateral, or the exercise of Bank's rights and remedies hereunder, is subject to the rights and interests of Ginnie Mae under the Guide.

**ARTICLE 4**
**CONDITIONS PRECEDENT TO LENDING**

4.1    <u>Initial Extension of Credit</u>.  The obligation of Bank to make the initial Advance under any Note is subject to the condition precedent that Bank shall have received on or before the day of such Advance all of the following, each dated (as applicable and unless otherwise indicated) on or as of the Effective Date, in form and substance satisfactory to Bank:

(a)    <u>Resolutions</u>.  Resolutions of the Board of Directors (or other governing body) of Borrower and each other Obligated Party certified by the Secretary (or other custodian of records) of Borrower and each other Obligated Party which authorize the execution, delivery, and performance by Borrower or any such Obligated Party of this Agreement and the other Loan Documents to which Borrower or any such Obligated Party is or is to be a party;

(b)    <u>Incumbency Certificate</u>.  A certificate of incumbency certified by an authorized officer or representative certifying the names of the individuals or other Persons authorized to sign this Agreement

16

and the other Loan Documents to which Borrower or any other Obligated Party is or is to be a party on behalf of Borrower or any such Obligated Party together with specimen signatures of such Persons;

(c)     <u>Organizational Documents</u>.  The Organizational Documents for Borrower and each other Obligated Party as of a date acceptable to Bank;

(d)     <u>Governmental Certificates</u>.  Certificates of the appropriate government officials of the state of incorporation or organization of Borrower and each other Obligated Party as to the existence and good standing of Borrower or any such Obligated Party, each dated within ten (10) days prior to the date of the initial Advance;

(e)     <u>Note</u>.  The Note, executed by Borrower;

(f)     <u>Credit Agreement</u>.  This Agreement, executed by the Borrower;

(g)     <u>Insurance Matters</u>.  Copies of insurance certificates describing all insurance policies required by the Agreement and the other Loan Documents, together with loss payable and lender endorsements in favor of Bank with respect to all insurance policies covering Collateral;

(h)     <u>Fees</u>.  Payment of the Commitment Fee from the Borrower;

(i)     <u>Security Documents</u>.  The Security Documents executed by each party thereto;

(j)     <u>Guaranty Agreements</u>.  A Guaranty Agreement executed by each Guarantor;

(k)     <u>Consent to Third Party Auditor Engagement Agreement</u>.  Reserved;

(l)     <u>Other Loan Documents</u>.  Each other Loan Document, duly executed by each Obligated Party which is a party thereto;

(m)     <u>Opinion of Counsel</u>.  An opinion of Borrower's legal counsel in form and content satisfactory to Bank to the effect that: (a) upon due authorization and execution, each of the Loan Documents shall be legal, valid and binding instruments, enforceable against Borrower in accordance with their respective terms; (b) Borrower is duly formed and has all requisite authority to enter into the Loan Documents; and (c) upon the recordation or filing of a UCC financing statement, Bank will have a perfected first priority security interest in the Collateral, and (d) such other matters, incident to the transactions contemplated hereby, as Bank may reasonably request;

(n)     <u>Additional Items</u>.  All other additional items as may be reasonably required by the Bank.

4.2     <u>Conditions for All Advances</u>.  In addition to the conditions precedent stated elsewhere herein, Bank shall not be obligated to make any Advance unless:

(a)     <u>Representations and Warranties</u>.  The representations and warranties made in <u>Article Five</u> of this Agreement are true and correct at and as of the time the Advance is to be made, and the request for an Advance shall constitute the representation and warranty by Borrower that such representations and warranties are true and correct at such time.

(b)     <u>No Event of Default</u>.  On the date of, and upon receipt of, the Advance, no Event of Default, and no event which, with the lapse of time or notice or both, could reasonably be expected to become an Event of Default, shall have occurred and be continuing.

    (c)    <u>Advance Request</u>.  Bank has received an Advance Request, as well as such other documents, opinions, certificates, agreements, instruments and evidences as Bank may reasonably request, including, but not limited to, a Borrowing Base Certificate and an Aging Report.

    (d)    <u>Additional Documentation</u>.  Bank shall have received such additional approvals, opinions, or documents as Bank may reasonably request.

    Each Advance hereunder shall be deemed to be a representation and warranty by the Borrower to Bank that the conditions specified in this <u>Section 4.2</u> have been satisfied on and as of the date of the applicable Advance, unless expressly waived in writing by Bank.

    4.3    <u>Further Conditions for All Advances</u>. In addition to the conditions precedent stated elsewhere herein, Borrower acknowledges that the Consent to Third Party Auditor Engagement Agreement previously executed by Borrower shall continue in full force and effect during the term of the Loan.

**ARTICLE 5**
**<u>REPRESENTATIONS AND WARRANTIES</u>**

    Borrower represents and warrants to Bank as follows:

    5.1    <u>Existence</u>.  Borrower is a duly organized, validly existing, and in good standing under the laws of the State of its formation, and is duly qualified to transact business and is in good standing in all jurisdictions where the nature and extent of its business and property requires the same. Borrower does not conduct business under any tradename other than as previously disclosed to the Bank in writing, in connection with Borrower's application for the Mortgage Warehouse Agreement and/or application for the Loan.

    5.2    <u>Authorization</u>.  Borrower possesses all requisite authority, power, licenses, permits, and franchises to conduct its business and execute, deliver, and comply with the terms of the Loan Documents. The execution and delivery of this Agreement, the consummation of the transactions herein contemplated and compliance with the terms and provisions hereof, the making of the Loans, and the execution, issuance, and delivery of the Loan Documents have been duly authorized and approved by all necessary entity action on the part of Borrower. No consent or approval of any Tribunal or any other Person is required in order for Borrower to legally execute, deliver, and comply with the terms of the Loan Documents, except for those consents and/or approvals that the Borrower has obtained and delivered to Bank, and which Bank has approved.

    5.3    <u>Properties; Permitted Liens</u>.  Borrower has good and indefeasible title to the Collateral, in each case free and clear of any Liens except the Permitted Liens.  Borrower has full power and authority to grant to Bank the security interest in the Collateral pursuant hereto. When financing statements have been filed in the appropriate offices against Borrower with respect to any Collateral, Bank will have a fully perfected first priority security interest in that portion of the Collateral in which a security interest may be perfected by filing, subject only to any Permitted Liens.

    5.4    <u>Compliance with Laws and Documents</u>.  Borrower is not, nor will the execution, delivery, and performance of and compliance with the terms of the Loan Documents cause Borrower to be, in violation of any Laws or in default (nor has any event occurred which, with the giving of notice or lapse of time or both, could constitute such a default) under any contract in any respect which could reasonably be expected to have a Material Adverse Effect. During the past five (5) years, there have been no proceedings, claims, or (to the best of Borrower's knowledge) investigations against or involving Borrower by any Tribunal under or pursuant to any environmental, occupational safety and health, antitrust, unfair competition, securities, or other Laws which could have a Material Adverse Effect, except

18

as previously disclosed to the Bank in writing, in connection with Borrower's application for the Mortgage Warehouse Agreement and/or application for the Loan (the "Tribunal Proceedings").

5.5    Litigation.  Except for Litigation in which Borrower is exclusively a plaintiff without a counterclaim, crossclaim, or similar action asserted against Borrower and except as previously disclosed to the Bank in connection with Borrower's application for the Mortgage Warehouse Agreement and/or application for the Loan (the "Existing Litigation"), there are no material actions, suits, or legal, equitable, arbitration or administrative proceedings pending, or to the knowledge of Borrower, threatened against Borrower which, if determined adversely to Borrower, would have a Material Adverse Effect on Borrower or its financial condition, and there are no material outstanding or unpaid judgments against Borrower except as previously disclosed to the Bank in connection with Borrower's application for the Mortgage Warehouse Agreement and/or application for the Loan (the "Unpaid Judgments").

5.6    Taxes.  All federal, state, foreign, and other Tax returns of Borrower required to be filed have been filed, all federal, state, foreign, and other Taxes imposed upon Borrower which are due and payable have been paid, and no material amounts of Taxes not reflected on such returns are payable by Borrower, other than Taxes being contested in good faith by appropriate legal proceedings.

5.7    Enforceability of Loan Documents.  All Loan Documents when duly executed and delivered by Borrower will constitute legal, valid, and binding obligations of Borrower enforceable against Borrower in accordance with their terms subject to Debtor Relief Laws and except that the availability of equitable remedies may be limited.

5.8    Financial Statements.  All financial statements of Borrower heretofore and hereafter to be delivered to Bank have been and shall continue to be prepared in accordance with GAAP, or other method of accounting acceptable to Bank (subject to the absence of notes for interim financial statements), and do and shall fairly represent the financial condition of Borrower as of the date of each such financial statement (subject to reasonable year end adjustments for interim financial statements).  There are and shall be no material liabilities, direct or indirect, fixed or contingent, as of the date of each such financial statement which are not reflected therein or in the notes thereto.  Except for transactions directly related to, or specifically contemplated by, this Agreement and transactions heretofore disclosed in writing to Bank, there has been no material adverse change in the financial condition of Borrower as shown by the Current Financial Statements for Borrower between the date of such Current Financial Statements and the date hereof, nor has Borrower incurred any material liability, direct or indirect, fixed, or contingent, except as otherwise disclosed to and approved in writing by Bank.  Neither Borrower nor any of its Subsidiaries has any material Debt, other contingent liabilities, liabilities for taxes, any long-term lease obligations or unusual forward or long-term commitments, or any hedge agreement or other transaction or obligation in respect of derivatives, that are not reflected in the most recent financial statements referred to in this paragraph.

5.9    Regulation U.  The proceeds of the Advances are not and will not be used directly or indirectly for the purpose of purchasing or carrying, or for the purpose of extending credit to others for the purpose of purchasing or carrying, any "margin stock" as that term is defined in Regulation U of the Board of Governors of the Federal Reserve System.

5.10    Subsidiaries.  Borrower has no Subsidiaries as of the date of this Agreement except those previously disclosed to the Bank in writing in connection with Borrower's application for the Mortgage Warehouse Agreement and/or application for the Loan.  There are no outstanding subscriptions, options, warrants, calls, rights or other agreements or commitments of any nature relating to any equity interests of the Borrower or any Obligated Party, except as created by the Loan Documents.

5.11    Other Debt.  Except as previously disclosed to the Bank in writing on Schedule 5.11 attached to this Agreement, Borrower is not directly, indirectly, or contingently obligated with respect to

19

any Debt as of the Effective Date. Borrower represents and warrants to Bank that the amount, description, nature of any collateral securing, and lender or creditor in respect of, such Debt is true and correct. To the best of Borrower's knowledge and belief, Borrower is not in default in the payment of the principal of or interest on any such Debt. Further, as of the Effective Date, Borrower is not directly, indirectly, or contingently obligated with respect to any Debt which is secured by HECM Tails or any pool of which a HECM Tail is a part.

     5.12   <u>Regulatory Acts</u>.  Borrower is not an "investment company" or "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940, as amended, nor is Borrower subject to regulation under the Federal Power Act, the Interstate Commerce Act, or any other Law (other than Regulation X of the Board of Governors of the Federal Reserve System) which regulates the incurring by Borrower of debt, including, without limitation, Laws regulating common or contract carriers or the sale of electricity, gas, steam, water, or other public utility serves. All HECM Loans relating to HECM Tails that are Collateral have been and will hereafter be produced in compliance with all applicable laws.

     5.13   <u>Locations</u>.  The location of Borrower's chief executive office and all other locations where Borrower conducts its business are the same as were previously disclosed to the Bank in writing in connection with Borrower's application for the Mortgage Warehouse Agreement and/or application for the Loan.

     5.14   <u>Accounts</u>.  Each Account related to HECM Loans or HECM Tails represents the valid and legally binding indebtedness of a bona fide account debtor arising from the sale or lease by Borrower of goods or the rendition by Borrower of services and is not subject to contra accounts, setoffs, defenses or counterclaims by or available to account debtors obligated on such Accounts except as disclosed by Borrower to Bank from time to time in writing.  The amount shown as to each such Account on Borrower's books is the true and undisputed amount owing and unpaid thereon, subject only to discounts, allowances, rebates, credits and adjustments to which the account debtor has a right and which have been disclosed to Bank in writing.

     5.15   <u>General</u>.  There is no significant material fact or condition relating to the financial condition and business of Borrower, or the Collateral which has not been disclosed in writing to Bank, and all writings heretofore or hereafter exhibited, made, or delivered to Bank by or on behalf of Borrower are and will be genuine and in all respects what they purport and appear to be.

     5.16   <u>Licensing</u>. The Borrower and the Servicers (if any) of its Mortgage loans, including HECM Loans, are duly registered as mortgage lenders and servicers in each state in which such Mortgage loans have been or are from time to time originated, to the extent such registration is required by any applicable Laws, except where the failure to register could not reasonably be expected to result in a Material Adverse Effect.

     5.17   <u>Intellectual Property</u>.  All material Intellectual Property owned or used by the Borrower, or any Subsidiary, in relation to HECM Loans or HECM Tails, together with application or registration numbers, where applicable, is the same as previously disclosed to the Bank in writing, in connection with Borrower's application for the Mortgage Warehouse Agreement and/or application for the Loan. Borrower has disclosed to the Bank in writing each Person who owns, or is licensed to use, all Intellectual Property necessary to conduct its business as currently conducted except for such Intellectual Property the failure of which to own or license could not reasonably be expected to have a material adverse effect, in connection with Borrower's application for the Mortgage Warehouse Agreement and/or application for the Loan.  Each such Person will maintain the patenting and registration of all Intellectual Property with the United States Patent and Trademark Office, the United States Copyright Office, or other appropriate Governmental Authority and each such Person will promptly patent or register, as the case may be, all new Intellectual Property.

5.18    <u>Solvency</u>. Borrower and each Subsidiary are solvent and generally able to pay their debts as they come due.

5.19    <u>Financial Information</u>.    All representations and warranties set forth in the Loan Documents with respect to any financial information concerning Borrower shall apply to all financial information delivered to Bank by Borrower or any Person purporting to be an Authorized Officer or other representative of Borrower regardless of the method of transmission to Bank or whether or not signed by Borrower or such Authorized Officer or other representative, as applicable.

5.20    <u>Individual HECM Loans</u>. Borrower hereby represents that each HECM Note and HECM Loan which is part of the Collateral relates to a Conforming Loan.

5.21    <u>Individual HECM Tails</u>. Subject to Ginnie Mae's rights under the Ginnie Mae Contract, Borrower hereby represents with respect to each HECM Tail which is part of the Collateral:

(a)    Each HECM Tail is a binding and valid obligation of the Obligor thereon, relates to a Conforming Loan, is in full force and effect and enforceable in accordance with its terms, except as enforceability may be limited by Debtor Relief Laws;

(b)    Any instrument evidencing a HECM Tail is genuine in all respects as appearing on its face and as represented in the books and records of Borrower, and all information set forth therein is true and correct;

(c)    Each HECM Tail is in all respects in accordance with all requirements of Law applicable thereto, including, without limitation, all federal and state Laws applicable to residential mortgage loans, including without limitation home equity conversion mortgages, and the regulations promulgated thereunder and all applicable usury Laws and restrictions, and all notices, disclosures and other statements or information required by Law or regulation to be given, and any other act required by Law or regulation to be performed, in connection with such HECM Tail have been given and performed as required;

(d)    Each HECM Tail is owned by Borrower free and clear of all Liens, except in favor of Bank; and

(e)    the aggregate outstanding principal amount of Extended Period HECM Tails does not exceed the Extended Period HECM Tail Sublimit.

5.22    <u>Individual Eligible HECM Tails</u>. Borrower hereby represents with respect to each HECM Tail that is submitted with an Advance Request, each such HECM Tail is, at the time of the Advance Request, an Eligible HECM Tail.

**ARTICLE 6**
**AFFIRMATIVE COVENANTS**

So long as Bank is committed to make Advances hereunder, and thereafter until payment and performance in full of all of the Indebtedness and Obligations, Borrower covenants and agrees that:

6.1    <u>Reporting Requirements</u>.  Borrower shall furnish (or, in the case of subclause (a) and (c), make available through public filings) to Bank the following, all in form and detail satisfactory to Bank:

(a)    <u>Annual Financial Statements</u>.    Promptly after becoming available, and in any event within ninety (90) days after the close of each fiscal year of Borrower and RMIT, a consolidated audited balance sheet of Borrower and RMIT as of the end of such year, and a consolidated audited statement of

21

income and retained earnings of Borrower and RMIT for such year, setting forth in each case in comparative form the corresponding figures for the preceding fiscal year, accompanied by the related report of independent certified public accountants acceptable to Bank, which report shall be to the effect that such statements have been prepared in accordance with GAAP;

(b)    Monthly Financial Statements. Within forty-five (45) days after the last day of each calendar month, internally prepared consolidated financial statements (including, but not necessarily limited to, balance sheets and related statements of income and cash flow) of Borrower and RMIT, showing the financial position and results of operations of Borrower and RMIT as of and for such calendar month and for the period from the beginning of the current fiscal year to the last day of such calendar month, together with a certificate executed by the principal financial officer of Borrower certifying that such financial statements present fairly the financial position of Borrower and RMIT as of the last day of such periods in conformity with GAAP;

(c)    Quarterly Financial Statements. Promptly after becoming available, and in any event within forty-five (45) days after the close of each fiscal quarter of Borrower and RMIT, a consolidated balance sheet of Borrower and RMIT as of the end of such fiscal quarter, a consolidated statement of income and retained earnings for such fiscal quarter and a consolidated operating statement of Borrower and RMIT for such fiscal quarter setting forth in each case in comparative form the corresponding figures for the corresponding fiscal quarter of the preceding fiscal year, prepared in accordance with GAAP and certified by the principal financial officer of Borrower and RMIT;

(d)    Weekly Hedging Reports. If Borrower has been approved by Bank to sell Mortgage Loans to Issuers and is selling Mortgage Loans to an Issuer, weekly hedging reports, in such form and content required by Bank;

(e)    Audit Reports. Promptly upon receipt thereof, a copy of each other report submitted to Borrower by independent accountants in connection with any annual, interim or special audit of the books of Borrower;

(f)    Other Information Requested by Bank. Such other information concerning the business, properties or financial condition of Borrower as Bank may reasonably request;

(g)    Borrowing Base Certificate. With each Advance Request and within five (5) days after the last day of each calendar month, a Borrowing Base Certificate as of the date of the Advance Request, or the end of such month, as applicable.  Such Borrowing Base Certificate shall be in the form of **Exhibit B** attached hereto or in such other form as Bank may reasonably require;

(h)    Compliance Certificate.  Within forty-five (45) days after the last day of each calendar month, (1) a Compliance Certificate as of the end of such month; and (2) a certificate of the chief financial officer of Borrower (i) stating that to the best of such Person's knowledge, no Event of Default has occurred and is continuing, or if an Event of Default has occurred and is continuing, a statement as to the nature thereof and the action which is proposed to be taken with respect thereto, and (ii) showing in reasonable detail the calculations demonstrating compliance with Article Eight.  Additionally, Bank reserves the right to request a Compliance Certificate and the accompanying certificate of the chief financial officer of Borrower concurrently with the delivery of the annual financial statements referred to herein.  Such Compliance Certificate shall be in the form of **Exhibit C** to the Agreement or in such other form as Bank may reasonably require; and

(i)    Aging Report.  With each Advance Request and within five (5) days after the last day of each calendar month, a report on the aging of Eligible HECM Tails which, in a form satisfactory to Lender, (i) sets forth the inception date of each Eligible HECM Tail, (ii) reflects and categorizes the length of time each such HECM Tail has been outstanding, (iii) sets forth the date of each Advance

related to each such Eligible HECM Tail, and (iv) reflects and categorizes the length of time each such Advance has been outstanding, certified as true and accurate by an Authorized Officer (the "Aging Report").

6.2    Insurance.  Borrower shall maintain with financially sound and reputable insurers, insurance with respect to its business and properties against such liabilities, casualties, risks and contingencies and in such types and amounts as is customary in the case of Persons engaged in the same or similar businesses and similarly situated and as required by Bank.  The insurance required herein shall be in such amounts and covering such risks as is usually carried by companies engaged in similar businesses and owning similar properties in the same general areas in which Borrower operates, provided that such insurance must include: (a) a fidelity bond of at least One Million and No/      Dollars ($1,000,000.00); and (b) an errors and omissions policy with minimum coverage of at least One Million and No/      Dollars ($1,000,000.00); each with maximum deductibles of Fifty Thousand and No/ Dollars ($50,000.00) and each in such form, with endorsements and issued by insurers reasonably acceptable to Bank. Borrower shall also maintain workmen's compensation insurance, property insurance, and comprehensive general liability insurance, reasonably satisfactory to Bank. Bank reserves the right, in its sole and absolute discretion, to increase such insurance coverage requirements *ab initio* or from time to time during the term of this Agreement. Each fidelity bond and errors and omissions policy covering Collateral shall name Bank as loss payee and Borrower shall notify the Bank in writing if any such policy has been canceled or reduced at least thirty (      days prior thereto.  Upon request of Bank, Borrower shall furnish, or cause to be furnished to Bank from time to time a summary of the insurance coverage of Borrower in form and substance satisfactory to Bank and if requested shall furnish Bank copies of the applicable policies.

6.3    Payment of Debts.  Borrower will pay or cause to be paid all of its Debt prior to the date on which penalties attach thereto (except to the extent and so long as the payment thereof is being properly contested in good faith by appropriate proceedings and adequate reserves have been established therefor).

6.4    Taxes.  Borrower will promptly pay or cause to be paid when due (for the account of Bank, where appropriate) any and all Taxes due by Borrower, including, without limitation, all taxes, duties, fees, levies and other charges of whatsoever nature which have been or may be imposed by any government or by any department, agency, state, other political subdivision or taxing authority thereof or therein; provided that Borrower shall not be required to pay and discharge any such Taxes or charges so long as the validity thereof shall be contested in good faith by appropriate proceedings and Borrower shall set aside on its books adequate reserves with respect thereto and shall pay any such Taxes or charge before the property subject thereto shall be sold to satisfy any lien which has attached as security therefor.

6.5    Expenses of Bank.  Borrower will reimburse Bank for all reasonable out-of-pocket costs, fees, and expenses incident to the Loan Documents or any transactions contemplated thereby, including, without limitation, all recording fees, all recording taxes, and the reasonable fees and disbursements of special counsel for Bank for negotiation and preparation of the Loan Documents, preparation and review of other documents, and providing of other legal services, from time to time, in connection herewith up through the Effective Date, and thereafter for services (a) in connection with any subsequent Advance, (b) in connection with or in anticipation of an Event of Default or otherwise in the enforcement of the Loan Documents, (c) in connection with any amendment or waiver to any of the Loan Documents, (d) in connection with any request or action initiated by Borrower, or (e) in connection with the exercise of any of Bank's rights and remedies under this Agreement, the Note, or any of the other Loan Documents, or at law, including, without limitation, all consulting fees, filing fees, brokerage fees and commissions, fees incident to security interests, liens, and other title and other searches and reports, escrow fees, attorney's fees, legal expenses, court costs, auctioneer fees and expenses, and other fees and expenses incurred in connection with liquidation or sale of the Collateral, all of which shall be and become a part of the Indebtedness.

6.6     <u>Maintenance of Entity Existence, Assets and Business; Continuance of Present Business</u>. Borrower will preserve and maintain its existence and all of its leases, licenses, permits, franchises, qualifications, and rights that are necessary or desirable in the ordinary conduct of its business, including Borrower's approval to participate in the Ginnie Mae HMBS program.  Borrower will conduct its business in an orderly and efficient manner in accordance with good business practices.  Borrower will keep or cause to be kept all of Borrower's assets which are useful and necessary in their respective businesses in good repair, working order and condition, and will make or cause to be made all necessary repairs, renewals and replacements as may be reasonably required.  Borrower will carry on and conduct its business in substantially the same fields as such business is now and has heretofore been carried on.

6.7     <u>Books and Records</u>.  Borrower will maintain proper books of record and account in which full, true, and correct entries in conformity with GAAP, or other method of accounting acceptable to Bank, shall be made of all dealings and transactions in relation to its business and activities. Borrower shall maintain and implement administrative and operating procedures (including, without limitation, an ability to recreate all records pertaining to each of the HECM Tails in the event of the destruction of the originals of such records) and keep and maintain all documents, books, records, computer tapes and other information reasonably necessary or advisable for the performance by Borrower of its obligations with respect to the HECM Tails.

6.8     <u>Compliance with Applicable Laws and with Contracts</u>.  Borrower will comply with the requirements of all applicable material Laws, rules, regulations and orders of any governmental authority, except where contested in good faith and by proper proceedings.  Borrower will comply in all material respects with all agreements, contracts, and instruments binding on it or affecting its properties or business.

6.9     <u>Comply with Agreement</u>.  Borrower will fully comply with the terms, provisions and conditions of this Agreement and of all documents executed pursuant hereto.

6.10     <u>Notice of Event of Default, Suits, and Material Adverse Effect</u>.  Upon discovery, Borrower will promptly notify Bank of any breach of any of the covenants contained in <u>Article Six</u> and <u>Article Seven</u> of this Agreement which are reasonably expected to result in the occurrence of any Event of Default hereunder, or of the filing of any claim, action, suit or proceeding before any Tribunal against Borrower in which an adverse decision could have a Material Adverse Effect upon Borrower and advise Bank from time to time of the status thereof.

6.11     <u>Information and Inspection</u>.  To the extent applicable, upon request, Borrower will furnish to Bank as soon as available copies of all (a) materials filed pursuant to the Securities Act of 1933, or 1934, as amended, by Borrower with the Securities and Exchange Commission, (b) reports to stockholders, and (c) press releases, and at any reasonable time any other information pertinent to any provision of this Agreement or to Borrower's business which Bank may reasonably request. Borrower shall permit an authorized representative of Bank to visit and inspect at reasonable times any of the properties of Borrower and to discuss the affairs, finances, and accounts of Borrower with the officers and employees of Borrower.

6.12     <u>Depository Relationship</u>.  To induce Bank to establish the interest rates provided for in the Notes and if and to the extent permitted by applicable laws, Borrower will use and maintain Bank as a principal depository bank, including for the maintenance of business, cash management, operating and administrative deposit accounts for activities related to Approved Purposes.

6.13     <u>Additional Information</u>.  Borrower will promptly furnish or cause to be furnished to Bank such other information not otherwise required herein respecting the business affairs, assets and liabilities of Borrower, Guarantor, the Subsidiaries and the Collateral as Bank shall from time to time reasonably request.

6.14    <u>Asset Audit</u>.  Borrower shall permit representatives of Bank and its third party auditor, at the expense of Borrower, to regularly monitor and audit the processing and status of the Collateral during the term of this Agreement, and Borrower shall make its books and records and personnel available at all times during normal business hours for such purpose.  Borrower shall pay the costs and expenses of the third party auditor. Borrower has entered into a Consent to Third Party Auditor Engagement Agreement (herein so called), dated on or about March 1, 2016, as required by Bank and agrees that such auditing has been implemented and shall continue throughout the term of the Loan.

6.15    <u>Covenants Relating to Collateral</u>:

(a)    <u>Records and Reports; Notification of Event of Default</u>.  Borrower will maintain complete and accurate books and records with respect to the Collateral, and furnish to Bank such reports relating to the Collateral as Bank shall from time to time reasonably request.

(b)    <u>Inspection</u>.  Borrower will permit representatives of the Bank and its third party auditor, during normal business hours with reasonable advance notice to Borrower (i) to inspect the Collateral, (ii) to examine and make copies of the records of Borrower relating to the Collateral, and (iii) to discuss the Collateral and the related records of Borrower with, and to be advised as to the same by, Borrower's officers and employees.

(c)    <u>Taxes</u>.  Borrower will pay when due all taxes, assessments and governmental charges and levies upon the Collateral, except those which are being contested in good faith by appropriate proceedings and with respect to which no Lien exists.

(d)    <u>Defense of Title</u>.  Borrower will take any and all actions necessary to defend title to the Collateral against all persons and to defend the security interest of Bank in the Collateral and the priority thereof against any Lien not expressly permitted hereunder.

(e)    <u>Liens</u>.  Borrower will not create, incur, or suffer to exist any Lien on the Collateral except (i) the security interest created by this Security Agreement, and (ii) Permitted Liens.

(f)    <u>Change in Location, Jurisdiction of Organization or Name</u>.  Borrower will not (i) maintain a principal place of business at a location other than a location previously disclosed to the Bank in writing, in connection with Borrower's application for the Mortgage Warehouse Agreement and/or application for the Loan, (ii) change its name or taxpayer identification number, (iii) change its mailing address, or (iv) change its jurisdiction of organization, unless, in each case, Borrower shall have given Bank not less than thirty (    ) days' prior written notice thereof, and Bank shall have determined that such change will not adversely affect the validity, perfection or priority of Bank's security interest in the Collateral.

(g)    <u>Other Financing Statements</u>.  Borrower will not sign or authorize the preparation and filing of any financing statement naming it as debtor covering all or any portion of the Collateral, except as permitted by the Loan Documents.

(h)    <u>Further Assurances</u>.  At any time and from time to time, upon the request of Bank, and at the sole expense of Borrower, Borrower shall promptly execute and deliver all such further instruments and documents and take such further action as Bank may deem necessary or desirable to preserve and perfect its security interest in the Collateral and carry out the provisions and purposes of this Agreement, including, without limitation, (a) the preparation (and execution, if necessary) and filing of such financing statements as Bank may require and (b) the deposit of all certificates of title issuable with respect to any of the Collateral and noting thereon the Bank's security interest hereunder.

25

(i)     Collection of HECM Tails.   Except as otherwise provided in this Security Agreement, Borrower will collect and enforce, at Borrower's sole expense, all amounts due or hereafter due to Borrower under the HECM Tails.

6.16    Repayment Account; Minimum Balance. Borrower shall maintain a balance of not less than One Hundred Thousand and No/      Dollars ($100,000.00) in the Repayment Account at all times.

6.17    Additional Guarantors. Borrower shall notify Bank at the time that any Person becomes a Subsidiary of REVERSE MORTGAGE INVESTMENT TRUST INC., a Maryland corporation, and, if requested by Bank, reasonably promptly thereafter cause such Person to (a) become a Guarantor by executing and delivering to Bank a Guaranty Agreement in form and substance acceptable to Bank, and (b) execute and/or deliver to Bank such other documents and instruments as Bank may require.

# ARTICLE 7
## NEGATIVE COVENANTS

So long as Bank is committed to make Advances hereunder, and thereafter until payment and performance in full of all of the Indebtedness and all of the Obligations, Borrower covenants and agrees that, without the prior written consent of Bank:

7.1     Debt.  Borrower will not incur, create, assume, or permit to exist, any Debt, except:

(a)     Debt to Bank;

(b)     Debt secured by Mortgage loans (or interests therein, including, without limitation, mortgage servicing rights and advances) other than HECM Loans;

(c)     Debt (i) which exists on the Effective Date which has been disclosed to Bank in writing prior to the Effective Date, or (ii) with respect to which Bank has provided written consent;

(d)     Trade Debt incurred in the ordinary course of business;

(e)     Subordinated Debt;

(f)     Debt incurred in the ordinary course of business to hedge the risk of interest rate fluctuations or any of the Borrower's portfolios or pipelines of HECM Loans or Tails in respect of other Permitted Debt obligations; and

(g)     Debt incurred in connection with the issuance of securities issued in connection with a securitization of HECM Loans or HECM Tails.

Notwithstanding anything in this Agreement to the contrary, other than a lien created in favor of Ginnie Mae pursuant to the Guide, Borrower shall not incur, create, assume, or permit to exist any Debt which is secured by HECM Tail Collateral or any pool of which HECM Tail Collateral is a part, without the prior written consent of Bank.

7.2     Contingent Liabilities.   Borrower will not, directly or indirectly, assume, guarantee, endorse, contingently agree to purchase or otherwise become liable upon the obligation of any Person (other than Borrower) except  (a) by the endorsement of negotiable instruments for deposit or collection or similar transactions  in the ordinary course of business, and (b) joint and several liabilities of the Borrower with one or more of its Affiliates pursuant to warehouse or aggregation borrowing arrangements, providing for no more than 10.0% recourse liability by the Borrower under such arrangements.

7.3    <u>Limitation on Liens</u>.  Borrower will not, directly or indirectly, incur, create, assume, or permit to exist any Lien upon any of its property, assets, or revenues, whether now owned or hereafter acquired, except:

(a)    The Permitted Liens;

(b)    Encumbrances consisting of minor easements, zoning restrictions, or other restrictions on the use of real property that do not (individually or in the aggregate) materially affect the value of the assets encumbered thereby or materially impair the ability of Borrower to use such assets in its business, and none of which is violated in any material respect by existing or proposed structures or land use;

(c)    Liens for taxes, assessments, or other governmental charges which are being contested in good faith and for which adequate reserves have been established;

(d)    Liens resulting from good faith deposits to secure payments of workmen's compensation or other social security programs or to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, or contracts (other than for payment of Debt), or leases made in the ordinary course of business; and

(e)    Liens on mortgage servicing rights (including, without limitation, Servicing Rights).

Notwithstanding anything in this Agreement to the contrary, other than a lien created in favor of Ginnie Mae pursuant to the Guide, Borrower shall not, directly or indirectly, incur, create, assume, or permit to exist any Lien upon HECM Tail Collateral, or any pool of which such HECM Tail Collateral is a part, or any instrument or certificates representing, or any rights incident to, such HECM Tail Collateral or pools, without the prior written consent of Bank.

7.4    <u>Mergers, Etc</u>.  Without the prior written consent of Bank, Borrower shall not, directly or indirectly: (a) become a party to any merger or consolidation, (b) purchase or otherwise acquire all or any part of the assets or shares or other evidence of beneficial ownership of any Person, or (c) sell or otherwise transfer all or substantially all of the assets or Properties of Borrower to any other Person; or (d) wind-up, dissolve or liquidate; provided that Borrower may merge or consolidate with (i) any wholly owned subsidiary of Borrower, or (ii) any other Person if Borrower is the surviving corporation; and provided further that, in either case, if after giving effect thereto, no Event of Default would exist hereunder.

7.5    <u>Restricted Payments</u>.  Reserved.

7.6    <u>Loans and Investments</u>.  Borrower will not, directly or indirectly, make any advance, loan, extension of credit, or capital contribution to or investment in, or purchase, any stock, bonds, notes, debentures, or other securities of, any Person, except:

(a)    Mortgage loans, including HECM Loans, made in the ordinary course of business;

(b)    Draws on Mortgage loans, including HECM Tails, made in the ordinary course of business;

(c)    Any advance, loan, extension of credit, or capital contribution to or investment in, or purchase, any stock, bonds, notes, debentures, or other securities made in the ordinary course business of advancing or originating Mortgage loans and which do not invoke the provisions of, and are not subject to, Regulation U;

(d)    Readily marketable direct obligations of the United States of America or any agency thereof with maturities of one year or less from the date of acquisition; and

(e)     Fully insured depository accounts maintained at a commercial bank operating in the United States of America having capital and surplus in excess of Fifty Million and No/     Dollars ($50,000,000.00).

7.7     <u>Limitation on Issuance of Equity</u>.  Borrower will not, directly or indirectly, at any time issue, sell, assign, or otherwise dispose of (a) any of its equity interests, (b) any securities exchangeable for or convertible into or carrying any rights to acquire any of its equity interests, or (c) any option, warrant, or other right to acquire any of its equity interests.

7.8     <u>Transactions with Affiliates</u>.  Borrower will not, directly or indirectly, enter into any transaction, including, without limitation, the purchase, sale, or exchange of property or the rendering of any service or the payment of any management, advisory or similar fees, with any Affiliate of Borrower, except in the ordinary course of and pursuant to the reasonable requirements of Borrower's business, pursuant to a transaction which is otherwise expressly permitted under this Agreement, and upon fair and reasonable terms no less favorable to Borrower than would be obtained in a comparable arm's-length transaction with a Person not an Affiliate of Borrower.

7.9     <u>Disposition of Assets</u>.  Borrower will not, directly or indirectly, sell, lease, assign, transfer, or otherwise dispose of any of its assets, except (a) dispositions or financings of inventory (including, without limitation, Mortgage loans) in the ordinary course of business, (b) dispositions, for fair value, of worn out and obsolete equipment not necessary to the conduct of its business, (c) dispositions of HECM Tails in the ordinary course of business so long as Borrower makes all mandatory prepayments to Bank required hereunder, (d) sales of HMBS in the ordinary course of business so long as Borrower makes all mandatory prepayments to Bank required hereunder, or (e) transactions between Affiliates that are not otherwise prohibited under this Agreement, which sale, lease, assignment, transfer or other disposition would not reasonably be expected to result in a material adverse effect on Borrower or its ability to perform its obligations hereunder.

7.10     <u>Nature of Business</u>.  Borrower will not engage in any business other than the Permitted Businesses.

7.11     <u>Environmental Protection</u>.  Borrower will not, directly or indirectly, (a) use (or permit any tenant to use) any of its properties or assets for the handling, processing, storage, transportation, or disposal of any Hazardous Material, (b) generate any Hazardous Material, (c) conduct any activity that is likely to cause a Release or threatened Release of any Hazardous Material, or (d) otherwise conduct any activity or use any of its respective properties or assets in any manner that is likely to violate any Environmental Law or create any Environmental Liabilities for which Borrower would be responsible.

7.12     <u>No Negative Pledge</u>.  Excepting mortgage loan warehouse or repurchase facilities, purchase money debt, restricted cash accounts, and arrangements permitted pursuant to <u>Sections 7.1</u> and <u>7.3</u>, in each case, which are in place as of the Effective Date, Borrower will not enter into or permit to exist any arrangement or agreement, other than pursuant to this Agreement, any Loan Document, or the Guide, which directly or indirectly prohibits or limits the ability of Borrower to or from creating or incurring a Lien on any of its assets, whether now owned or hereafter acquired.

7.13     <u>Judgments</u>.  Borrower will not allow any judgment or judgments rendered against it in excess of Five Million and No/     Dollars ($5,000,000.00) in the aggregate over any twelve month period to remain undischarged or unsuperseded for a period of thirty (     days during which execution shall not be effectively stayed.

7.14     <u>Sale and Leaseback</u>.  The Borrower will not enter into, and will not permit any Subsidiary to enter into, any arrangement with any Person pursuant to which it leases from such Person

real or personal property that has been or is to be sold or transferred, directly or indirectly, by it to such Person.

7.15    <u>Prepayment of Debt</u>.  Reserved.

7.16    <u>Actions with Respect to HECM Tail Collateral</u>.  Borrower shall not transfer, sell, assign, or deliver any HECM Tail Collateral pledged to Bank to any Person other than Bank, except through a HMBS as contemplated herein.

# ARTICLE 8
# FINANCIAL COVENANTS

Borrower covenants and agrees that, as long as any Indebtedness or Obligations or any part thereof is outstanding or Bank is under any obligation to make additional Advances under this Agreement, Borrower will, at all times, observe and perform the following financial covenants:

8.1    <u>Minimum Ginnie Mae Required Net Worth</u>.  Borrower shall maintain net worth of not less than $5,000,000.00 <u>plus</u> one percent (1.0%) of Borrower's Total Effective HMBS Outstanding Obligations, or such greater amount which is the sum of the minimum net worth requirements for all program types in which Borrower is approved to participate by Ginnie Mae, which shall include the HMBS program ("<u>Ginnie Mae Required Net Worth</u>").  For the purposes of this <u>Section 8.1</u>, (a) "<u>Total Effective HMBS Outstanding Obligations</u>" shall mean, as of any date of determination, the sum of (i) all HMBS securities outstanding, (ii) available commitment authority to issue new HMBS pools, and (iii) total HMBS pools funded by Borrower; and (b) Borrower's net worth shall be calculated as provided under Chapter 2, Part 9 of the Guide, or as otherwise required by Ginnie Mae.

8.2    <u>Minimum Ginnie Mae Required Liquid Assets</u>.  Borrower shall maintain liquid assets of not less than twenty percent (20.0%) of Borrower's Ginnie Mae Required Net Worth, or such greater amount which is the sum of the minimum liquid assets requirements for all program types in which Borrower is approved to participate by Ginnie Mae, which shall include the HMBS program. For the purposes of this <u>Section 8.2</u>, "liquid assets" shall mean cash and cash equivalents as defined under Financial Accounting Standards Board Statement of Financial Accounting Standards No. 95, or such other definition of liquid assets set forth in the Guide with respect to minimum liquid assets requirements for the Ginnie Mae HMBS program.

# ARTICLE 9
# EVENTS OF DEFAULT

The term "<u>Event of Default</u>" as used herein shall mean the occurrence of any one or more of the following events:

9.1    <u>Payment of Indebtedness</u>.  Borrower shall fail to punctually make any payment of fees or other sums when due hereunder, or under any other Loan Document to which it is a party or other document executed in connection herewith, and such failure shall continue for a period of three (3) Business days thereafter (provided that Bank shall not be required to provide any such three (3)-day grace period more than two (2) times in any twelve (12)-month period).

9.2    <u>Misrepresentation</u>.  Any material statement, warranty or representation made at any time by or on behalf of Borrower in this Agreement, any other Loan Document or any document executed in connection herewith, or in any writing, or any statement or representation made in any certificate, report, or opinion delivered to Bank pursuant to any Loan Document, is false, calculated to mislead, misleading or erroneous in any material respect at the time made; provided that a false, misleading or erroneous breach of any Asset Representation shall not be an Event of Default hereunder unless such breach was

calculated to mislead or otherwise intentionally misrepresented; provided further, however, that any HECM Tail which is the subject of any false, misleading or erroneous Asset Representation or to which any false, misleading or erroneous Asset Representation relates shall be excluded from the Borrower Base hereunder, regardless of Borrower's intent.

9.3    <u>Covenants</u>.  The failure or refusal of Borrower or any Obligated Party to perform, observe, and comply with any material covenant or agreement contained in any of the Loan Documents, which failure or refusal continues for a period of fifteen (15) Business days (provided that Bank shall not be required to provide any such fifteen (15)-day grace period more than two (2) times in any twelve (12)-month period).

9.4    <u>Voluntary Debtor Relief</u>.  Borrower or any Obligated Party shall: (i) apply for or consent to the appointment of a receiver, trustee, custodian, intervenor or liquidator of such Person or of all or a substantial part of its assets; (ii) file a voluntary petition in bankruptcy, admit in writing that it is unable to pay its debts as they become due or generally not pay its debts as they become due; (iii) make a general assignment for the benefit of creditors; (iv) file a petition or answer seeking reorganization or an arrangement with creditors or to take advantage of any bankruptcy or insolvency laws; (v) file an answer admitting the material allegations of, or consent to, or default in answering, a petition filed against it in any bankruptcy, reorganization or insolvency proceeding; or (vi) take any action for the purpose of effecting any of the foregoing.

9.5    <u>Involuntary Proceedings</u>.  An involuntary petition or complaint shall be filed against Borrower or any Obligated Party seeking bankruptcy or reorganization of such Person or the appointment of a receiver, custodian, trustee, intervenor or liquidator of it, or of all or substantially all of its assets, and such petition or complaint shall not have been dismissed within thirty (     days of the filing thereof; or an order, order for relief, judgment or decree shall be entered by any court of competent jurisdiction or other competent authority approving a petition or complaint seeking reorganization of such Person or appointing a receiver, custodian, trustee, intervenor or liquidator of such Person, or of all or substantially all of its assets, and such order, judgment or decree shall continue unstayed and in effect for a period of thirty (     days.

9.6    <u>Attachment</u>.  The failure to have discharged within a period of thirty (     days after the commencement thereof any attachment, sequestration, or similar proceedings against any of the material assets of Borrower or any Obligated Party.

9.7    <u>Other Debt</u>.  Borrower or any other Obligated Party shall default in the due and punctual payment of the principal of or the interest, under the Mortgage Warehouse Agreement or on any Debt (other than the Loans made hereunder) with Bank, secured or unsecured, or in the due performance or observance of any covenant or condition of any agreement executed in connection therewith (including, without limitation, the Mortgage Warehouse Agreement), and such default shall have continued beyond any period of grace or cure provided with respect thereto.

9.8    <u>Change in Management</u>.  Borrower shall both (a) permit any change in the senior executive management of Borrower whereby more than two of any of Craig Corn, Jim Rose, Richard Jensen, Michelle Zachensky or David Peskin no longer serve as senior executive management of Borrower, except by reason of death, disability or retirement and (b) fail to appoint successors for such individuals, such that more than two of Craig Corn, Jim Rose, Richard Jensen, Michelle Zachensky or David Peskin or successors with substantially similar qualifications and industry experience to such individuals do not serve as senior executive management of Borrower for more than ninety (90) days.

9.9    Change in Ownership.  Borrower shall both (a) permit any change in the ownership or control of Borrower, or permit the sale, transfer or conveyance of any shares or other interest in Borrower and (b) cease to be Controlled by a SCGG Party.

9.10    Defaults on Other Debt or Agreements.  Borrower or any other Obligated Party shall default in the due and punctual payment of the principal of or the interest on any Debt owing to any Person (other than Bank), or shall fail to perform, observe or comply with any covenant, agreement or other obligation to be performed, observed or complied with by Borrower or such Obligated Party in any agreement ancillary to such Debt, subject to any grace and/or cure periods provided therein, which failure could reasonably be expected to result in a material adverse effect on the business, operations, condition (financial or otherwise), or assets of Borrower or such Obligated Party, the ability of Borrower or such Obligated Party to perform its Obligations under any Loan Document to which it is a party or by which it is bound, or the enforceability of any Loan Document.

9.11    Proceedings against Obligated Parties.  Borrower shall fail within thirty (    days to pay, bond or otherwise discharge any judgment or order for payment of money in excess of Five Million and No/    Dollars ($5,000,000.00) in the aggregate over any twelve month period that is not otherwise being satisfied in accordance with its terms and is not stayed on appeal or otherwise being contested in good faith.

9.12    Loan Documents.  Any of the Loan Documents ceases to be in full force and effect, or be enforceable by Bank in accordance with their terms.

## ARTICLE 10
## CERTAIN RIGHTS AND REMEDIES OF BANK

10.1    Rights Upon Event of Default; Attorney in Fact.  If any Event of Default shall occur and be continuing, Bank may without notice terminate the Commitment and declare the Indebtedness or any part thereof to be immediately due and payable, and the same shall thereupon become immediately due and payable, without notice, demand, presentment, notice of dishonor, notice of acceleration, notice of intent to accelerate, notice of intent to demand, protest, or other formalities of any kind, all of which are hereby expressly waived by Borrower; provided, however, that upon the occurrence of an Event of Default under Section 9.4 or Section 9.5, the Commitment shall automatically terminate, and the Indebtedness shall become immediately due and payable without notice, demand, presentment, notice of dishonor, notice of acceleration, notice of intent to accelerate, notice of intent to demand, protest, or other formalities of any kind, all of which are hereby expressly waived by the Borrower.  If any Event of Default shall occur and be continuing, Bank may exercise all rights and remedies available to it in law or in equity, under the Loan Documents, or otherwise; provided that all such rights, including those set forth in this Section 10.1, shall be subject to the terms and conditions of the Ginnie Mae Contract, if applicable. Further, conditioned upon the occurrence and continuation of an Event of Default, Borrower hereby irrevocably appoints and designates Bank and each Vice President or more senior officer of Bank as Borrower's agent and attorney-in-fact, to execute and deliver documents and instruments and take such actions as said agent and attorney-in-fact shall deem, in his discretion, necessary or appropriate to allow Bank to realize upon the benefit of its security interests and liens in the HECM Tail Collateral, including without limitation, opening mail or other correspondence addressed or directed to Borrower, endorsing and negotiating checks, money orders or other instruments payable to Borrower with respect to the HECM Tail Collateral, processing, executing, and recording in the public records such assignments and instruments of transfer as may be appropriate to fully vest in Bank title to the HECM Tail Collateral, seeking and prosecuting collection of or settling and compromising amounts owed on the HECM Tail Collateral or exercising the rights of the holder of the HECM Tail Collateral, selling, assigning or transferring the HECM Loans, and in general acting under changed circumstances, the exact nature of which may not be currently foreseen or foreseeable, in order to effectuate Bank's rights under this Agreement, and such appointment shall be deemed coupled with an interest.

10.2     Rights Relating to Collateral.

10.2.1   Application of Proceeds.  If any Event of Default shall have occurred and be continuing, Bank may at its discretion, in accordance and as provided in the Code and other applicable law, apply or use any cash held by Bank as Collateral and any cash proceeds received by Bank in respect of any sale or other disposition of, collection from, or other realization upon, all or any part of the Collateral as follows in such order and manner as Bank may elect:

(a)     To the repayment or reimbursement of the reasonable costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) incurred by Bank in connection with (i) the administration of the Loan Documents, (ii) the custody, preservation, use or operation of, or the sale of, collection from, or other realization upon, the Collateral, and (iii) the exercise or enforcement of any of the rights and remedies of Bank hereunder;

(b)     To the payment or other satisfaction of any Liens upon the Collateral;

(c)     To the satisfaction of the Indebtedness under this Agreement;

(d)     To the payment of any other amounts required by applicable law; and

(e)     By delivery to Borrower or any other party lawfully entitled to receive such cash or proceeds whether by direction of a court of competent jurisdiction or otherwise.

10.2.2   Deficiency.  In the event that the proceeds of any sale of, collection from, or other realization upon, all or any part of the Collateral by Bank are insufficient to pay all amounts to which Bank is legally entitled, Borrower and any Obligated Party shall be liable for the deficiency, together with interest thereon as provided in the Loan Documents.

10.2.3   Non-Judicial Remedies.  In granting to Bank the power to enforce its rights hereunder without prior judicial process or judicial hearing, Borrower expressly waives, renounces, and knowingly relinquishes any legal right which might otherwise require Bank to enforce its rights by judicial process. Borrower recognizes and concedes that non-judicial remedies, including non-judicial foreclosure, subject to Ginnie Mae's rights under the Ginnie Mae Contract, are consistent with the usage of trade, are responsive to commercial necessity and are the result of a bargain at arm's length.  Nothing herein is intended to prevent Bank or Borrower from resorting to judicial process at either party's option.

10.2.4   Other Recourse.  Borrower waives any right to require Bank to proceed against any third party, exhaust any Collateral or other security for the Indebtedness, or to have any third party joined with Borrower in any suit arising out of the Indebtedness or any of the Loan Documents, or pursue any other remedy available to Bank, subject to Ginnie Mae's rights under the Guide.  Borrower further waives any and all notice of acceptance of this Agreement. Borrower further waives any defense arising by reason of any disability or other defense of any third party or by reason of the cessation from any cause whatsoever of the liability of any third party.

10.2.5   Disclaimer of Warranties, Sales on Credit and Limitation of Liability.  In connection with any foreclosure sale of the Collateral, Bank may specifically disclaim any warranties of title or the like.  This procedure will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral.  If Bank sells any of the Collateral upon credit, Borrower will be credited only with payments actually made by the purchaser, received by Bank and applied to the indebtedness of the purchaser.  In the event the purchaser fails to pay for the Collateral, Bank may resell the Collateral and Borrower shall be credited with the proceeds of

the sale. Bank shall not incur any liability as a result of the sale of the Collateral, or any part of it, at any private sale. The Borrower hereby waives any claims it may have against the Bank arising by reason of the fact that the price at which the Collateral may have been sold at such private sale was less than the price that might have been obtained at a public sale, less than the price that might have been obtained had the Collateral been sold pursuant to a purchase agreement for it obtained by the Borrower, or less than the aggregate amount of the outstanding Revolving Loans and the unpaid interest accrued on them, even if the Bank accepts the first offer received and does not offer the Collateral to more than one offeree.

10.2.6  <u>License</u>.  Bank is hereby granted a license or other right to use, following the occurrence and during the continuance of an Event of Default, without charge, Borrower's labels, patents, copyrights, rights of use of any name, trade secrets, trade names, trademarks, service marks, customer lists and advertising matter, or any property of a similar nature, as it pertains to the Collateral, in completing production of, advertising for sale, and selling any Collateral, and, following the occurrence and during the continuance of any Event of Default, Borrower's rights under all licenses and all franchise agreements shall inure to Bank's benefit.

10.3  <u>Setoff</u>.  At any time an Event of Default exists, Bank shall be entitled to exercise the Rights of setoff and/or banker's lien against the interests of Borrower in and to each and every account (excluding escrow accounts or accounts that contain monies held for the benefit of Persons other than Borrower or any Affiliates) and other property of Borrower which are in the possession of Bank to the extent of the full amount of the Indebtedness, whether or not any such Indebtedness is then due. The rights and remedies of Bank hereunder are in addition to other rights and remedies (including, without limitation, other rights of setoff) which Bank may have.

10.4  <u>Performance by Bank</u>.  Should any covenant, duty, or agreement of Borrower fail to be performed in accordance with the terms of the Loan Documents, subject to Ginnie Mae's rights under the Guide, Bank may, at its option, perform or attempt to perform such covenant, duty, or agreement on behalf of Borrower. In such event, or if Bank expends any sum pursuant to the exercise of any Right provided herein, Borrower shall, at the request of Bank, promptly pay to Bank such amount expended by Bank in such performance or attempted performance, together with interest thereon at the Maximum Rate from the date of such expenditure by Bank until paid. Notwithstanding the foregoing, it is expressly understood that Bank does not assume any liability or responsibility for the performance of any duties of Borrower or Guarantor hereunder or in connection with all or any part of the Collateral.

10.5  <u>Appointment of Receiver</u>.  Subject to Ginnie Mae's rights under the Guide, at any time an Event of Default exists, Bank shall be entitled to exercise the right to appoint or seek appointment of a receiver, custodian, or trustee of Borrower or any of the Collateral pursuant to an order by any Tribunal, and Borrower consents to such appointment and will not oppose Bank's efforts to obtain such receiver, custodian, or trustee.

10.6  <u>Diminution in Collateral Value</u>.  Bank does not assume, and shall never have, any liability or responsibility for any loss or diminution in the value of all or any part of the Collateral.

10.7  <u>Bank Not In Control</u>.  None of the covenants or other provisions contained in this Agreement shall, or shall be deemed to, give Bank the Right to exercise control over the affairs and/or management of Borrower, the power of Bank being limited to the Right to exercise the remedies provided in the other Sections of this Article; <u>provided</u> however, if Bank becomes the owner of any ownership interest of any Person, whether through foreclosure or otherwise, Bank shall be entitled to exercise such legal Rights as it may have by virtue of being an owner of such Person.

10.8  <u>Waivers</u>.  The acceptance of Bank at any time and from time to time of part payment on the Indebtedness shall not be deemed to be a waiver of any Event of Default then existing. No waiver by

Bank of any Event of Default shall be deemed to be a waiver of any other then-existing or subsequent Event of Default. No waiver by Bank of any of its Rights hereunder, in the other Loan Documents, or otherwise shall be considered a waiver of any other or subsequent Right of Bank.  No delay or omission by Bank in exercising any Right under the Loan Documents shall impair such Right or be construed as a waiver thereof or any acquiescence therein, nor shall any single or partial exercise of any such Right preclude other or further exercise thereof, or the exercise of any other Right under the Loan Documents or otherwise.

10.9    <u>Cumulative Rights</u>.  All Rights available to Bank under the Loan Documents shall be cumulative of and in addition to all other Rights granted to Bank at Law or in equity, whether or not the Obligations be due and payable and whether or not Bank shall have instituted any suit for collection, foreclosure, or other action under or in connection with the Loan Documents.

10.10    <u>**INDEMNIFICATION OF BANK**</u>**. BORROWER SHALL INDEMNIFY, DEFEND, PROTECT AND HOLD HARMLESS BANK, BANK'S PARENTS, SUBSIDIARIES, AND AFFILIATES, AND ALL DIRECTORS, OFFICERS, EMPLOYEES, REPRESENTATIVES, AGENTS, ATTORNEYS, SUCCESSORS, AND ASSIGNS (COLLECTIVELY, THE "<u>INDEMNIFIED PARTIES</u>") FROM AND AGAINST ANY AND ALL LOSSES, LIABILITIES, DAMAGES, CLAIMS, PENALTIES, JUDGMENTS, OBLIGATIONS, DISBURSEMENTS, COSTS AND EXPENSES (INCLUDING REASONABLE ATTORNEYS' FEES AND EXPENSES), ACTIONS, PROCEEDINGS, OR DISPUTES (COLLECTIVELY "<u>LOSSES</u>") INCURRED OR SUFFERED OR TO WHICH ANY INDEMNIFIED PARTY MAY BECOME SUBJECT WHICH DIRECTLY OR INDIRECTLY ARISE FROM OR RELATE TO THIS AGREEMENT, THE OTHER LOAN DOCUMENTS, THE HECM TAILS, OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY, INCLUDING ANY AND ALL LOSSES DUE TO: (A) ANY NEGLIGENT OR FRAUDULENT ACT OR OMISSION OF BORROWER OR ITS AGENTS OR EMPLOYEES; (B) ANY BREACH BY BORROWER OF ANY MATERIAL WARRANTY OR REPRESENTATION CONTAINED HEREIN; (C) ANY BREACH BY BORROWER OF ANY MATERIAL TERM OR CONDITION OF THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT; (D) THE PRESENCE, RELEASE, THREATENED RELEASE, DISPOSAL, REMOVAL, OR CLEANUP OF ANY HAZARDOUS MATERIAL LOCATED ON, ABOUT, WITHIN OR AFFECTING ANY OF THE PROPERTIES OR ASSETS OF THE BORROWER OR ANY SUBSIDIARY; (E) ANY EVENT OF DEFAULT; (F) ANY FAILURE BY BORROWER TO COMPLY WITH ANY LAW; AND (G) THE UNMARKETABILITY OF ANY HECM TAIL RESULTING FROM ANY MATTER DESCRIBED IN CLAUSES (A) THROUGH (F) OF THIS SENTENCE. WITHOUT LIMITING ANY PROVISION OF THIS AGREEMENT OR OF ANY OTHER LOAN DOCUMENT, IT IS THE EXPRESS INTENTION OF THE PARTIES HERETO THAT EACH PERSON TO BE INDEMNIFIED UNDER THIS SECTION SHALL BE INDEMNIFIED FROM AND HELD HARMLESS AGAINST ANY AND ALL LOSSES ARISING OUT OF OR RESULTING FROM THE SOLE CONTRIBUTORY OR ORDINARY NEGLIGENCE OF SUCH PERSON; PROVIDED, HOWEVER, THE INDEMNITIES PROVIDED IN THIS <u>SECTION 10.10</u> DO NOT EXTEND TO LOSSES, LIABILITIES, CLAIMS, OR DAMAGES CAUSED BY BANK'S GROSS NEGLIGENCE OR MISCONDUCT. BANK MAY EMPLOY AN ATTORNEY OR ATTORNEYS TO PROTECT OR ENFORCE ITS RIGHTS, REMEDIES AND RECOURSES UNDER THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, AND TO ADVISE AND DEFEND BANK WITH RESPECT TO ANY SUCH ACTIONS AND OTHER MATTERS.  BORROWER SHALL REIMBURSE BANK FOR THEIR RESPECTIVE ATTORNEYS' FEES AND EXPENSES (INCLUDING EXPENSES AND COSTS FOR EXPERTS) IMMEDIATELY UPON RECEIPT OF A WRITTEN DEMAND THEREFOR, WHETHER ON A MONTHLY OR OTHER TIME INTERVAL, AND WHETHER OR NOT AN ACTION IS ACTUALLY COMMENCED OR CONCLUDED.    ALL OTHER REIMBURSEMENT AND INDEMNITY OBLIGATIONS HEREUNDER SHALL BECOME DUE AND PAYABLE WHEN ACTUALLY INCURRED BY**

**BANK.  ANY PAYMENTS NOT MADE WITHIN THIRTY (    DAYS AFTER WRITTEN DEMAND THEREFOR SHALL BEAR INTEREST AT THE HIGHEST RATE PERMITTED UNDER APPLICABLE LAW FROM THE DATE OF SUCH DEMAND UNTIL FULLY PAID. THE PROVISIONS OF THIS SECTION SHALL SURVIVE THE TERMINATION OF THIS AGREEMENT.**

  10.11 <u>Limitation of Liability</u>.  Neither Bank nor any Affiliate, officer, director, employee, attorney, or agent of Bank shall have any liability with respect to, and Borrower hereby waives, releases, and agrees not to sue any of them upon, any claim for any special, indirect, incidental, or consequential damages suffered or incurred by the Borrower in connection with, arising out of, or in any way related to, this Agreement or any of the other Loan Documents, or any of the transactions contemplated by this Agreement or any of the other Loan Documents.  Borrower hereby waives, releases, and agrees not to sue Bank or any of Bank's Affiliates, officers, directors, employees, attorneys, or agents for punitive damages in respect of any claim in connection with, arising out of, or in any way related to, this Agreement or any of the other Loan Documents, or any of the transactions contemplated by this Agreement or any of the other Loan Documents. Nothing in this <u>Section 10.11</u> shall be construed to limit the provisions of <u>Section 3.9</u>, applicable law, or the Guide.

**ARTICLE 11**
**MISCELLANEOUS**

  11.1 <u>Headings</u>.  The headings, captions, and arrangements used in any of the Loan Documents are, unless specified otherwise, for convenience only and shall not be deemed to limit, amplify, or modify the terms of the Loan Documents, nor affect the meaning thereof.

  11.2 <u>Number and Gender of Words</u>.  Whenever herein the singular number is used, the same shall include the plural where appropriate, and vice versa; and words of any gender shall include each other gender where appropriate.

  11.3 <u>Notices</u>.    Unless otherwise expressly provided herein, all notices and other communications provided for hereunder shall be in writing (including by facsimile transmission) and mailed, faxed, or delivered, to the address or facsimile number specified for notices on the signature page below or to such other address as shall be designated by such party in a notice to the other parties.   All such other notices and other communications shall be deemed to have been given or made upon the earliest to occur of (a) actual receipt by the intended recipient or (b) (i) if delivered by hand or courier, when signed for by the designated recipient; (ii) if delivered by mail, four (4) business days after deposit in the mail, postage prepaid; and (iii) if delivered by facsimile, when sent and receipt has been confirmed. Electronic mail and internet websites may be used only to distribute routine communications, such as financial statements and other information, and to distribute Loan Documents for execution by the parties thereto, and may not be used for any other purpose.

  11.4 <u>Form and Number of Documents</u>.  Each agreement, document, instrument, or other writing to be furnished to Bank under any provision of this Agreement must be in form and substance and in such number of counterparts as may be satisfactory to Bank and its counsel.

  11.5 <u>Survival</u>.  All covenants, agreements, undertakings, representations, and warranties made in any of the Loan Documents shall survive all closings under the Loan Documents and shall continue in full force and effect so long as any part of the Indebtedness remains outstanding and, except as otherwise indicated, shall not be affected by any investigation made by any party.   Notwithstanding anything contained herein to the contrary, the covenants, agreements, undertakings, representations, and warranties made in <u>Section 6.5</u> and <u>Section 10.10</u> shall survive the expiration or termination of this Agreement, regardless of the means of such expiration or termination.

W:\4437\1174\020 - LOAN MOD - AUG 2021\Loan and Security Agreement (5AR) V4.doc    RLOC – HECM Tail Loans

APP230

11.6   **GOVERNING LAW; PLACE OF PERFORMANCE. THE LOAN DOCUMENTS ARE BEING EXECUTED AND DELIVERED, AND ARE INTENDED TO BE PERFORMED, IN THE STATE OF TEXAS, AND THE LAWS OF SUCH STATE AND OF THE UNITED STATES SHALL GOVERN THE RIGHTS AND DUTIES OF THE PARTIES HERETO AND THE VALIDITY, CONSTRUCTION, ENFORCEMENT, AND INTERPRETATION OF THE LOAN DOCUMENTS, EXCEPT TO THE EXTENT OTHERWISE SPECIFIED IN ANY OF THE LOAN DOCUMENTS. THIS AGREEMENT, ALL OF THE OTHER LOAN DOCUMENTS, AND ALL OF THE OBLIGATIONS OF BORROWER UNDER ANY OF THE LOAN DOCUMENTS ARE PERFORMABLE IN DALLAS COUNTY, TEXAS. VENUE OF ANY LITIGATION INVOLVING THIS AGREEMENT OR ANY LOAN DOCUMENT SHALL BE MAINTAINED IN AN APPROPRIATE STATE OR FEDERAL COURT LOCATED IN DALLAS COUNTY, TEXAS, TO THE EXCLUSION OF ALL OTHER VENUES.**

11.7   <u>Maximum Interest</u>. It is expressly stipulated and agreed to be the intent of Borrower and Bank at all times to comply strictly with the applicable Texas law governing the maximum rate or amount of interest payable on the indebtedness evidenced by any Note or any Loan Document, and the Related Indebtedness (or applicable United States federal law to the extent that it permits Bank to contract for, charge, take, reserve or receive a greater amount of interest than under Texas law). If the applicable law is ever judicially interpreted so as to render usurious any amount (a) contracted for, charged, taken, reserved or received pursuant to any Note, any of the other Loan Documents or any other communication or writing by or between Borrower and Bank related to the transaction or transactions that are the subject matter of the Loan Documents, (b) contracted for, charged, taken, reserved or received by reason of Bank's exercise of the option to accelerate the maturity of any Note and/or any and all indebtedness paid or payable by Borrower to Bank pursuant to any Loan Document other than any Note (such other indebtedness being referred to in this Section as the "Related Indebtedness"), or (c) Borrower will have paid or Bank will have received by reason of any prepayment by Borrower of any Note or Related Indebtedness, then it is Borrower's and Bank's express intent that all amounts charged in excess of the Maximum Rate shall be automatically canceled, ab initio, and all amounts in excess of the Maximum Rate theretofore collected by Bank shall be credited on the principal balance of any Note and/or the Related Indebtedness (or, if any Note and the Related Indebtedness have been or would thereby be paid in full, refunded to Borrower), and the provisions of any Note and the other Loan Documents shall immediately be deemed reformed and the amounts thereafter collectible hereunder and thereunder reduced, without the necessity of the execution of any new document, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder and thereunder; <u>provided</u>, <u>however</u>, if any Note has been paid in full before the end of the stated term of any such Note, then Borrower and Bank agree that Bank shall, with reasonable promptness after Bank discovers or is advised by Borrower that interest was received in an amount in excess of the Maximum Rate, either refund such excess interest to Borrower and/or credit such excess interest against such Note and/or any Related Indebtedness then owing by Borrower to Bank. Borrower hereby agrees that as a condition precedent to any claim or counterclaim (in which event such proceeding shall be abated for such time period) seeking usury penalties against Bank, Borrower will provide written notice to Bank, advising Bank in reasonable detail of the nature and amount of the violation, and Bank shall have sixty (60) days after receipt of such notice in which to correct such usury violation, if any, by either refunding such excess interest to Borrower or crediting such excess interest against the Note to which the alleged violation relates and/or the Related Indebtedness then owing by Borrower to Bank. All sums contracted for, charged, taken, reserved or received by Bank for the use, forbearance or detention of any debt evidenced by any Note and/or the Related Indebtedness shall, to the extent permitted by applicable law, be amortized or spread, using the actuarial method, throughout the stated term of such Note and/or the Related Indebtedness (including any and all renewal and extension periods) until payment in full so that the rate or amount of interest on account of any Note and/or the Related Indebtedness does not exceed the Maximum Rate from time to time in effect and applicable to such Note and/or the Related Indebtedness for so long as debt is outstanding. In no event shall the provisions of Chapter      of the Texas Finance Code (which regulates certain revolving credit loan accounts and revolving triparty accounts) apply to any

Note and/or any of the Related Indebtedness. Notwithstanding anything to the contrary contained herein or in any of the other Loan Documents, it is not the intention of Bank to accelerate the maturity of any interest that has not accrued at the time of such acceleration or to collect unearned interest at the time of such acceleration.

11.8    <u>Ceiling Election</u>.  To the extent that Bank is relying on Chapter        of the Texas Finance Code to determine the Maximum Rate payable on any such Note and/or any other portion of the Indebtedness, Bank will utilize the weekly ceiling from time to time in effect as provided in such Chapter        as amended.  To the extent federal law permits Bank to contract for, charge, take, receive or reserve a greater amount of interest than under Texas law, Bank will rely on federal law instead of such Chapter        for the purpose of determining the Maximum Rate.  Additionally, to the extent permitted by applicable law now or hereafter in effect, Bank may, at its option and from time to time, utilize any other method of establishing the Maximum Rate under such Chapter        or under other applicable law by giving notice, if required, to Borrower as provided by applicable law now or hereafter in effect.

11.9    <u>Invalid Provisions</u>.  If any provision of any of the Loan Documents is held to be illegal, invalid, or unenforceable under present or future Laws effective during the term thereof, such provision shall be fully severable, the appropriate Loan Document shall be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part thereof, and the remaining provisions thereof shall remain in full force and effect and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance therefrom.  Furthermore, in lieu of such illegal, invalid, or unenforceable provision, there shall be added automatically as a part of such Loan Document a provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible and be legal, valid, and enforceable.

11.10    <u>Entirety and Amendments</u>.  This instrument embodies the entire agreement between the parties relating to the subject matter hereof (except documents, agreements and instruments delivered or to be delivered in accordance with the express terms hereof), supersedes all prior agreements and understandings, if any, relating to the subject matter hereof, and may be amended only by an instrument in writing executed jointly by Borrower and Bank and supplemented only by documents delivered or to be delivered in accordance with the express terms hereof.

11.11    <u>Multiple Counterparts</u>.  This Agreement has been executed in a number of identical counterparts, each of which constitutes an original and all of which constitute, collectively, one agreement; but in making proof of this Agreement, it shall not be necessary to produce or account for more than one such counterpart.

11.12    <u>Joint and Several Liability</u>.  The liability of all Persons obligated to Bank in any manner under this Agreement shall be joint and several.

11.13    <u>Parties Bound</u>.  This Agreement shall be binding upon and inure to the benefit of Borrower, Bank and their respective successors and assigns; <u>provided</u>, however that Borrower may not, without the prior written consent of Bank, assign any of its Rights, duties, or obligations hereunder.  No term or provision of this Agreement shall inure to the benefit of any Person other than Borrower and Bank and their respective successors and assigns; consequently, no Person other than Borrower and Bank and their respective successors and assigns, shall be entitled to rely upon, or to raise as a defense, in any manner whatsoever, the failure of Borrower or Bank to perform, observe, or comply with any such term or provision.

11.14    <u>Bank's Consent or Approval</u>.  Except where otherwise expressly provided in the Loan Documents, in any instance where the approval, consent or the exercise of judgment of Bank is required, the granting or denial of such approval or consent and the exercise of such judgment shall be (a) within the sole discretion of Bank, and (b) deemed to have been given only by a specific writing intended for the

purpose and executed by Bank.  Each provision for consent, approval, inspection, review, or verification by Bank is for Bank's own purposes and benefit only.

11.15    <u>Loan Agreement Governs</u>.    In the event of any conflict between the terms of this Agreement and any terms of any other Loan Document, the terms of this Agreement shall govern.  All of the Loan Documents are by this reference incorporated into this Agreement.

11.16    <u>WAIVER OF JURY TRIAL</u>.    TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, BORROWER HEREBY IRREVOCABLY AND EXPRESSLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT, OR OTHERWISE) ARISING OUT OF OR RELATING TO ANY OF THE LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREBY OR THE ACTIONS OF BANK IN THE NEGOTIATION, ADMINISTRATION, OR ENFORCEMENT THEREOF.

11.17    <u>Independence of Covenants</u>.  All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or be otherwise within the limitations of, another covenant shall not avoid the occurrence of an Event of Default if such action is taken or such condition exists.

11.18    <u>USA Patriot Act</u>.  Bank is subject to the requirements of the USA Patriot Act (Title III of Pub. L.    56 (signed into law October 26, 2001)) (the "*Act*") and hereby notifies the Borrower that pursuant to the requirements of the Act, it is required to obtain, verify, and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Bank to identify the Borrower in accordance with the Act.

11.19    <u>Amended and Restated Loan Agreement</u>.    This Agreement is in amendment and restatement of, and is intended to carry forward the liens and security interests of (i) that certain Loan and Security Agreement, dated September 16, 2015, executed by and between Borrower and Bank, (ii) that certain that certain First Amended and Restated Loan and Security Agreement, dated November    2016, executed by and between Borrower and Bank, (iii) that certain Second Amended and Restated Loan and Security Agreement, dated April 13, 2018, executed by and between Borrower and Bank, (iv) that certain Third Amended and Restated Loan and Security Agreement, dated July 15, 2019, executed by and between Borrower and Bank; and (v) that certain Fourth Amended and Restated Loan and Security Agreement, dated August 26, 2020, executed by and between Borrower and Bank (collectively, the "<u>Prior Loan Agreement</u>").  Borrower acknowledges that the liens and security interests of Bank pursuant to the Prior Loan Agreement are renewed, extended, amended and restated in full force to secure payment of the Note.

11.20    <u>STATUTE OF FRAUDS NOTICE</u>.  THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

**[Signature Page Follows]**

EXECUTED to be effective as of the date first written above.

**BANK:**

TEXAS CAPITAL BANK, NATIONAL
ASSOCIATION

By: _____
    Aric Crouch, Vice President

TEXAS CAPITAL BANK, N.A.
2000 McKinney Avenue, Suite 700
Dallas, Texas 75201
Attention:   Aric Crouch
E-mail:       aric.crouch@texascapitalbank.com

**BORROWER:**

REVERSE MORTGAGE FUNDING LLC,
a Delaware limited liability company

By: _____
    Craig Corn, Chief Executive Officer

Address for Notices:

1445 Broad Street, Floor 2
Bloomfield, New Jersey 07003
Attn:       Craig Corn
E-mail:     ccorn@reversefunding.com

RLOC – HECM Tail Loans

APP234

## EXHIBIT A

## ADVANCE REQUEST

FROM:   REVERSE MORTGAGE FUNDING LLC, a Delaware limited liability company ("Borrower")

TO:       TEXAS CAPITAL BANK, NATIONAL ASSOCIATION ("Bank")

DATE:   _____, 20___

I.      Borrower hereby requests Revolving Loans in the amount and on the date specified below, pursuant to the Fifth Amended and Restated Loan and Security Agreement between Borrower and Bank dated as of August 26, 2021 (as amended, modified or restated from time to time, the "Agreement"). Capitalized terms used herein and defined in the Agreement shall be used herein as so defined.

II.      Loans requested:

(a)       Borrower hereby requests Revolving Loan(s) in the aggregate principal amount of $_____.

(b)       Requested advance date: _____, 20___.

III.     The undersigned officer of Borrower represents and warrants to Bank:

(a)       Borrower is entitled to receive the requested Revolving Loan(s) under the terms and conditions of the Agreement;

(b)       all items which Borrower is required to furnish to Bank pursuant to the Agreement accompany this Advance Request (or shall be delivered to Bank in accordance with the Agreement);

(c)       all HECM Tails included in the attached Submission List are Eligible HECM Tails which conform in all respects with the applicable requirements set forth in the Agreement;

(d)       no Event of Default has occurred and is continuing under the Agreement;

(e)       no change or event which with notice and/or the passage of time would constitute an Event of Default has occurred;

(f)       after giving effect to the Revolving Loan(s) requested hereby, the aggregate amount of the outstanding principal balance of the Revolving Loan(s) will not exceed the Borrowing Limit; and

(g)       after giving effect to the Revolving Loan(s) requested hereby, the aggregate amount of the outstanding principal amount of the Extended Period HECM Tails will not exceed the Extended Period HECM Tail Sublimit.

APP235

Borrower has attached and submits herewith a Borrowing Base Certificate and a Submission List describing all Eligible HECM Tails included in the HECM Tail Collateral Value of the Borrower Base, as well as an Aging Report in accordance with Section 6.1(i) of the Agreement.

The representations and warranties of Borrower stated herein, contained in the Agreement, and contained in each other Loan Document to which Borrower is a party are true and correct in all respects on and as of the date hereof.

**BORROWER:**

REVERSE MORTGAGE FUNDING LLC,
a Delaware limited liability company


By: _____
Name: _____
Title: _____

## SCHEDULE A-1

### BORROWING BASE CERTIFICATE

To be Attached

APP237

**SCHEDULE A-2**

**SUBMISSION LIST**

To be Attached

## SCHEDULE A-3

**AGING REPORT**

To be Attached

## EXHIBIT B

### BORROWING BASE CERTIFICATE

FOR PERIOD ENDED _____ (THE " <u>DATE OF DETERMINATION</u> ")

BANK:            TEXAS CAPITAL BANK, NATIONAL ASSOCIATION

BORROWER:    REVERSE MORTGAGE FUNDING LLC, a Delaware limited liability company

      This certificate is delivered under the Fifth Amended and Restated Loan and Security Agreement dated as of August 26, 2021, between Borrower and Bank (as from time to time amended, the "<u>Agreement</u>").  Capitalized terms used in this certificate shall, unless otherwise indicated, have the meanings set forth in the Agreement.  On behalf of Borrower, the undersigned certifies to Bank that, as of the Date of Determination, (a) no Event of Default has occurred and is continuing, (b) a review has been made to determine the amount of the current Borrower Base, (c) the HECM Tails included in the Borrower Base below are each Eligible HECM Tails and otherwise meet all conditions to qualify for inclusion therein as set forth in the Agreement, and (d) the information set forth below hereto is true and correct as of the Date of Determination:

A.    Loan Balance:

    1.    Total Principal Outstanding as of Borrowing Base Report    $_____
           dated _____, 20_____ ("<u>Prior Date of Determination</u>")

    2.    Principal payments made since Prior Date of Determination    $_____

    3.    New Advances since Prior Date of Determination    $_____

    4.    Estimated Amount Outstanding (1 <u>minus</u> 2 <u>plus</u> 3)    $_____

B.    Borrower Base Calculation:

    5.    Total outstanding monetary amount of all Eligible HECM Tails    $_____
           (attach a schedule)

    6.    Total monetary amount of previously pledged Eligible HECM Tails    $_____
           which are no longer Eligible HECM Tails

    7.    Total monetary amount of previously pledged Eligible HECM Tails
           which are the subject of any false, misleading or erroneous Asset
           Representation or to which any false, misleading or erroneous Asset
           Representation relates    $_____

    8.    Borrower Base (Lines 5 <u>minus</u> Line 6 <u>minus</u> Line 7 <u>multiplied by</u>    $_____
           Advance Rate of 95% <u>minus</u> all curtailments made pursuant to
           <u>Section 2.10</u> of the Agreement) (Aging Report attached)

    9.    Availability (Line 8 minus Line 4)    $_____

    10.    Mandatory Paydown (Line 4 minus Line 8)    $_____

C.   Sublimits

11.   Extended Period HECM Tail Sublimit                          $            3,000,000.00

12.   Aggregate outstanding principal amount of Extended Period HECM     $_____
      Tails

13.   Mandatory paydown (Line 12 minus Line 11)                          $_____

D.   Outstanding HECM Tails

14.   Total outstanding advances on HECM Tails which have not been     $_____
      securitized into HMBS, including amounts funded by Bank

This Borrowing Base Report is executed as of the Date of Determination.

REVERSE MORTGAGE FUNDING LLC,
a Delaware limited liability company

By:      _____
Name:    _____
Title:   _____

## EXHIBIT C

### COMPLIANCE CERTIFICATE

REPORTING PERIOD:         _____, 20_____ through _____, 20_____

This Compliance Certificate (this "Certificate") is being delivered in connection with that certain Fifth Amended and Restated Loan and Security Agreement (as amended and modified from time to time, and including all addenda and exhibits thereto, the "Agreement") dated August 26, 2021, executed by TEXAS CAPITAL BANK, NATIONAL ASSOCIATION ("Bank") and the undersigned executing this Certificate as "Borrower".  Capitalized terms used in this Certificate shall, unless otherwise indicated herein, have the meanings set forth in the Agreement.  On behalf of Borrower, the undersigned certifies to Bank as of the last day of the reporting period indicated above (the "Determination Date") that: (a) no Event of Default has occurred and is continuing; (b) all representations and warranties of Borrower contained in the Agreement and in the other Loan Documents are true and correct in all material respects; and (c) the information set forth below and all documents provided to Bank to substantiate the same are true, correct and complete.

**Minimum Ginnie Mae Required Net Worth:**

| *Actual Total Effective HMBS Outstanding Obligations/Net Worth (as of the Determination Date)* | *Required minimum Ginnie Mae Required Net Worth (pursuant to the Agreement)* |
|---|---|
| A.  Total Effective HMBS Outstanding Obligations (sum of Lines i.—iii.)     $_____<br><br>    i.   All HMBS securities outstanding     $_____<br>    ii.  Available commitment authority to issue new HMBS pools     $_____<br>    iii. Total HMBS pools funded by Borrower     $_____<br><br>B.  Total Effective HMBS Outstanding Obligations (Line A) multiplied by .01     $_____<br><br>C.  Net worth, as calculated pursuant to the Guide or otherwise required by Ginnie Mae     $_____ | Greater of (i) $5,000,000.00 plus Line B = $_____, or (ii) the sum of the minimum net worth requirements for all program types in which Borrower is approved to participate by Ginnie Mae ($_____) ("*Ginnie Mae Required Net Worth*") |

**Minimum Ginnie Mae Required Liquid Assets**:

| *Actual Ginnie Mae Required Net Worth/Liquid Assets (as of the Determination Date)* | | *Required minimum Ginnie Mae Required Liquid Assets (pursuant to the Agreement)* |
|---|---|---|
| A.  Ginnie Mae Required Net Worth<br><br>B.  Liquid Assets, pursuant to the Guide | $_____ | Greater of (i) Ginnie Mae Required Net Worth (Line A) multiplied by .20 = $_____, or (ii) the sum of the minimum liquid assets requirements for all program types in which Borrower is approved to participate by Ginnie Mae ($_____) |
|     Cash | $_____ | |
|     Cash Equivalents | $_____ | |
| *TOTAL ELIGIBLE LIQUID ASSETS:* | $_____ | |

**Non-Financial Requirements:**

| *In Compliance for the Reporting Period* | *Mark for all Required* |
|---|---|
| Financial Statements and Reports:<br>(a) Deliver Annual Consolidated Financial Statements – 90 days Grace; Audited | _____ Yes _____ No |
| (b) Deliver Monthly Consolidated Financial Statements – 45 days Grace | _____ Yes _____ No |
| (c) Deliver Quarterly Consolidated Financial Statements – 45 days Grace | _____ Yes _____ No |
| (d) Deliver Weekly Hedging Reports (If applicable) | _____ Yes _____ No _____ N/A |
| (e) Deliver Monthly Borrowing Base Certificate – 5 days Grace | _____ Yes _____ No |
| (f) Deliver Monthly Compliance Certificate – 45 days Grace | _____ Yes _____ No |
| (g) Deliver Monthly HECM Tails Aging Report – 5 days Grace | _____ Yes _____ No |
| Depository Relationship: Borrower to use and maintain Bank as its principal depository bank | _____ Yes _____ No |
| Minimum Repayment Account Balance: Borrower to maintain minimum balance of $100,000.00 in Repayment Account | _____ Yes _____ No |
| Change in Management: Borrower not to change its senior executive management except as permitted in Section 9.8 of the Agreement | _____ Yes _____ No |
| Change in Ownership or Control: Borrower not permit to change its ownership or control, or permit the sale, transfer or conveyance of any shares or other interest in Borrower | _____ Yes _____ No |
| No Defaults: No Event of Default and no event which, with the lapse of time or notice or both, could reasonably be expected to become an Event of Default has occurred and is continuing | _____ Yes _____ No |
| Compliance with Affirmative Covenants: As of the | |

| | | |
|---|---|---|
| date hereof, Borrower is in compliance with all Affirmative Covenants set forth in the Agreement | _____ True | _____ False |
| Compliance with Negative Covenants: As of the date hereof, Borrower is in compliance with all Negative Covenants set forth in the Agreement | _____ True | _____ False |
| Representations and Warranties: As of the date hereof, all Representations and Warranties set forth in the Agreement are true and correct | _____ True | _____ False |

**Exceptions from Compliance:**

Please provide notice and details regarding any exception from compliance (describe areas of non-compliance, or else note "none" if there are no points of non compliance): _____

_____

_____

_____

_____

_____

_____

_____

**[Signature Page Follows]**

EXECUTED by Borrower as of the Determination Date.

**BORROWER**:

REVERSE MORTGAGE FUNDING LLC,
a Delaware limited liability company

By: _____

Name: _____

Title: _____

## SCHEDULE 5.11

### OTHER DEBT

| Lender /Trust | Type | Description of Collateral Security, if Any | Principal Balance [1] |
|---|---|---|---|
| Leadenhall Capital Partners LLP [2] | Secured MSR Financing | | $96,598,539.45 |
| RMF Proprietary Issuance Trust 2019-1 [3] | Asset Backed Notes | | $174,954,873 |
| RMF Proprietary Issuance Trust 2020-1 [4] | Asset Backed Notes | | $183,576,822 |
| RMF Buyout Issuance Trust 2020-1 [5] | Asset Backed Notes | | $111,203,430 |
| RMF Buyout Issuance Trust 2020-2 [6] | Asset Backed Notes | | $285,552,730 |
| RMF Buyout Issuance Trust 2020-HB1 [7] | Asset Backed Notes | | $472,387,055 |
| RMF Proprietary Issuance Trust 2021-1 [8] | Asset Backed Notes | | $246,754,192 |
| Veritate Issuance Trust 2021-1 [9] | Asset Backed Notes | | $75,400,000 |

(1) Principal balance as of June    2021, except for Veritate Issuance Trust 2021-1, which represents the amount issued.

(2) $100,000,000 Facility size.

(3) Issued $256,667,000 of notes on October 15, 2019.  This is non-recourse debt.

(4) Issued $219,300,000 of notes on April    2020.  This is non-recourse debt.

(5) Issued $175,730,000 of notes on January    2020.  This is non-recourse debt.

(6) Issued $371,054,000 of notes on June 26, 2020.  This is non-recourse debt.

(7) Issued $471,524,000 of notes on October 19, 2020. This is non-recourse debt.

(8) Issued $249,300,000 of notes on June 4, 2021. This is non-recourse debt.

(9) Issued $75,400,000 of notes on July    2021.  This is non-recourse debt.

As of December 6, 2021

REVERSE MORTGAGE FUNDING LLC
1445 Broad Street, Floor 2
Bloomfield, New Jersey 07003
Attn: Craig Corn

Re:   Modification and increase of revolving line of credit loan from TEXAS CAPITAL
      BANK (previously known as Texas Capital Bank, National Association) ("Lender" or
      "Bank") to REVERSE MORTGAGE FUNDING LLC, a Delaware limited liability
      company ("Borrower"), guaranteed by REVERSE MORTGAGE INVESTMENT
      TRUST INC., a Maryland corporation, RMIT CASH MANAGEMENT LLC, a Delaware
      limited liability company, RMIT OPERATING I LLC, a Delaware limited liability
      company, and RMIT OPERATING II LLC, a Delaware limited liability company
      (collectively, "Guarantors")

Gentlemen:

Reference is hereby made to that certain Fifth Amended and Restated Loan and Security
Agreement (as modified and amended by that certain letter agreement, dated November 1, 2021, by and
between Lender, Borrower, and Guarantors, the "Loan Agreement"), dated August 26, 2021, by and
between Borrower and Lender, securing that certain $200,000,000.00 Ninth Amended and Restated
Promissory Note (the "Note"), dated November 1, 2021, executed by Borrower, payable to the order of
Lender, guaranteed by Guarantors as reflected in those certain Guaranty Agreements (collectively, the
"Guaranty Agreements"), dated of even date with the Loan Agreement, executed by Guarantors in favor
of Lender, and the loan transaction evidenced thereby (the "Loan") (the Note, Loan Agreement, Guaranty
Agreements, and all other documents executed in connection therewith, as modified and amended by that
certain letter agreement, dated November 1, 2021, by and between Lender, Borrower, and Guarantors, are
collectively referred to herein as the "Loan Documents"). Capitalized terms used but not defined herein
shall have the meanings set forth in the Loan Agreement.

This Agreement (herein so called) shall evidence the agreement, effective for all purposes as of
the date set forth above, by and between Borrower, Guarantors, and Lender, to modify the Loan
Documents as follows:

1.      During the period of December 6, 2021 through December 31, 2021 (the "Temporary
Increase Period"), the Committed Sum is hereby increased from TWO HUNDRED MILLION and
NO/100 DOLLARS ($200,000,000.00) to TWO HUNDRED THIRTY-FIVE MILLION and NO/100
DOLLARS ($235,000,000.00). Borrower acknowledges and agrees that Borrower shall execute and
deliver with this Agreement a promissory note of even date herewith in substitution, modification,
rearrangement, but not extinguishment of the Note (the "New Note"), in form and substance acceptable to
Lender. Hereafter, references within this Agreement and the Loan Documents to the "Note" or the
"Revolving Note" shall mean and refer to the New Note.

2.      The definition of "Committed Sum" in the Loan Agreement is modified and amended to
read in its entirety as follows:

        "Committed Sum" means (i) during the period of December 6, 2021 through
December 31, 2021, TWO HUNDRED THIRTY-FIVE MILLION and NO/100

DOLLARS ($235,000,000.00); and (ii) commencing on January 1, 2022 and continuing through the remaining term of the Loan, ONE HUNDRED FIFTEEN MILLION and NO/100 DOLLARS ($115,000,000.00).

3.      Immediately upon the expiration of the Temporary Increase Period, and without the necessity of any further action on the part of Lender, Borrower, or Guarantors, the Committed Sum shall automatically be decreased to ONE HUNDRED FIFTEEN MILLION and NO/100 DOLLARS ($115,000,000.00). Borrower acknowledges and agrees that in the event the Revolving Principal Balance exceeds the Borrowing Limit, as affected by the decrease in the Committed Sum upon the expiration of the Temporary Increase Period, Borrower shall immediately pay to Bank an amount sufficient to eliminate such excess.

Guarantors acknowledge and agree that the increase of the Committed Sum as set forth herein is a substantial and direct benefit to Guarantors and hereby consent to the execution of this Agreement and the New Note by Borrower. As an inducement to Bank to increase and extend such credit to Borrower, Guarantors acknowledge and agree that the Guaranty Agreements shall continue to be valid and binding guarantees of Guarantors enforceable in accordance with the terms thereof, and shall guarantee payment by Borrower to Bank of the Note, as modified by this Agreement.

Contemporaneously with its execution of this Agreement, Borrower shall deliver to Lender an opinion of Borrower's legal counsel in form and content satisfactory to Lender to the effect that: (i) each of the Loan Documents, as modified herein, are legal, valid and binding instruments, enforceable against Borrower in accordance with their respective terms; (ii) Borrower is duly formed and has all requisite authority to enter into this Agreement and the Loan Documents, as modified herein; and (iii) Lender has a first priority security interest in the Collateral, perfected as of the date of filing of Lender's UCC-1 financing statement with respect to the Loan, and (iv) such other matters, incident to the transactions contemplated hereby, as Lender may reasonably request.

The Loan Documents are hereby modified where appropriate, to reflect the modification of the terms of the Loan as provided herein.  Except for the modifications set forth herein, the Loan Documents shall remain in full force and effect, all liens and security interests securing the Note are hereby retained and preserved, and the liability of Guarantors and Borrower for repayment of the Note and under the Guaranty Agreements and other Loan Documents continues unaffected.  Guarantors and Borrower hereby acknowledge and agree that there are no claims or offsets against, or defenses or counterclaims to, their respective liabilities under the Note and the Loan Documents.

**This Agreement represents the final agreement between the parties with respect to subject matter hereof, and may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements between the parties.  There are no unwritten oral agreements between the parties.**

In the event this Agreement accurately expresses our agreements with respect hereof, please so indicate by executing this Agreement in the space provided below and returning a fully executed copy to the undersigned.  The parties executing this Agreement on behalf of Borrower and Guarantors hereby represent that they have been duly authorized to enter into this Agreement and bind Borrower and each Guarantor, respectively, thereby.

**[Signature Page Follows]**

APP248

Very truly yours,

TEXAS CAPITAL BANK

By: _____
    Aric Crouch, Vice President

**AGREED TO AND ACCEPTED.**

**BORROWER:**

REVERSE MORTGAGE FUNDING LLC,
a Delaware limited liability company

By: _____
    Craig Corn, Chief Executive Officer

**GUARANTORS:**

REVERSE MORTGAGE INVESTMENT TRUST INC.,
a Maryland corporation

By: _____
    Craig Corn, Chief Executive Officer

RMIT CASH MANAGEMENT LLC,
a Delaware limited liability company

By: _____
    Craig Corn, Chief Executive Officer

RMIT OPERATING I LLC,
a Delaware limited liability company

By: _____
    Craig Corn, Chief Executive Officer

RMIT OPERATING II LLC,
a Delaware limited liability company

By: _____
    Craig Corn, Chief Executive Officer

Very truly yours,

TEXAS CAPITAL BANK

By: _____
      Aric Crouch, Vice President

**AGREED TO AND ACCEPTED.**

**BORROWER:**

REVERSE MORTGAGE FUNDING LLC,
a Delaware limited liability company

By: _____
      Craig Corn, Chief Executive Officer

**GUARANTORS:**

REVERSE MORTGAGE INVESTMENT TRUST INC.,
a Maryland corporation

By: _____
      Craig Corn, Chief Executive Officer

RMIT CASH MANAGEMENT LLC,
a Delaware limited liability company

By: _____
      Craig Corn, Chief Executive Officer

RMIT OPERATING I LLC,
a Delaware limited liability company

By: _____
      Craig Corn, Chief Executive Officer

RMIT OPERATING II LLC,
a Delaware limited liability company

By: _____
      Craig Corn, Chief Executive Officer

APP250

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| REVERSE MORTGAGE INVESTMENT | ) | Case No. 22-11225 (MFW) |
| TRUST INC, *et al.*,[1] | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | Re: D.I. 46 |

## SECOND INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING; (II) AUTHORIZING CERTAIN DEBTORS' USE OF CASH COLLATERAL; (III) MODIFYING THE AUTOMATIC STAY; (IV) SCHEDULING A FINAL HEARING; AND (V) GRANTING RELATED RELIEF

Upon the motions [D.I. 46 and 78] and notice of summary of revised order (collectively, the "Motion")[2] of the above-referenced debtors and debtors in possession (collectively, the "Debtors") in the above-referenced chapter 11 cases (the "Chapter 11 Cases"), for entry of an interim order (this "Second Interim Order") and a final order (the "Final Order") pursuant to sections            503, and 507 of title 11 of the United States Code, 11 U.S.C. §§
 et seq. (the "Bankruptcy Code"), Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1, 4001-2, and 9006-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules"),

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Reverse Mortgage Investment Trust Inc. (3421); Reverse Mortgage Funding LLC (0209); RMIT Cash Management LLC (6241); RMIT Operating I LLC (1844); and RMIT Operating II LLC (2301). The location of the Debtors' service address for purposes of these chapter 11 cases is: 1455 Broad Street, 2nd Floor, Bloomfield, NJ 07003.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the DIP Notes Term Sheet or the Tail Advance DIP Term Sheet (each as defined herein), as applicable.

APP251

(i)    authorizing the Debtors to obtain postpetition debtor in possession financing

(the "DIP Facilities") in the aggregate amount up to $124,500,000 consisting of:

(a)    up to 44.5 million under DIP Notes (as defined in the DIP Term Sheet), all on the terms and conditions set forth in this Second Interim Order and that certain term sheet attached hereto as **Exhibit A** (the "DIP Notes Term Sheet" and collectively with this Second Interim Order and the Approved Budget (defined below), as the same may be amended, restated, supplemented from time to time, or amended by this Second Interim Order or the Final Order, and any other agreements, instruments, pledge agreements, guarantees, indemnities, security agreements, intellectual property security agreements, mortgages, control agreements, escrow agreements, instruments, notes, and documents executed in accordance and connection therewith, each as amended, restated supplemented, waived, or otherwise modified from time to time in accordance with the terms hereof and thereof, collectively, the "DIP Notes Documents"), by and among the Debtors, Leadenhall Capital Partners LLP and certain of its affiliates ("Leadenhall"), and BNGL Holdings, L.L.C. ("Parent," and together with Leadenhall, the "DIP Notes Lenders"), consisting (i) of $34.5 million drawn under the DIP Notes (the "Approved Notes Amount"), upon entry of the Second Interim Order and (ii) $10 million of Prepetition Obligations owed to Leadenhall under the Existing Note Agreement, which shall roll up and convert on a cashless dollar-for-dollar basis into DIP LH Op Notes under the DIP Facilities upon entry of the Final Order and satisfaction of the Roll-Up Condition (as defined below) (the "Roll-Up"), pursuant to the terms and conditions of this Second Interim Order and the remaining DIP Notes Documents; and

(b)    $80,000,000 of DIP Tail Advances (as defined in the Tail Advance DIP Term Sheet) all on the terms and conditions set forth in this Second Interim Order and that certain term sheet attached hereto as **Exhibit B** (the "Tail Advance DIP Term Sheet" and collectively with this Second Interim Order and TCB Existing Tail Loan Agreement (defined below), as the same may be amended, restated, supplemented from time to time, or amended by the Tail Advance DIP Term Sheet, this Second Interim Order or the Final Order, and any other agreements, instruments, pledge agreements, guarantees, indemnities, security agreements, intellectual property security agreements, mortgages, control agreements, escrow agreements, instruments, notes, and documents executed in accordance and connection therewith (including that certain Participation Agreement, dated on or about the date hereof by and  between TCB (as defined below) and Longbridge Financial, LLC ("Longbridge"), each as amended, restated supplemented, waived, or otherwise modified from time to time in accordance with the terms hereof and thereof, collectively, the ("Tail Facility Documents," and together with the DIP Notes Documents, the "DIP Loan Documents"), by

2

and among the Debtors and Texas Capital Bank ("TCB" or the "Tail Advance DIP Lenders," and together with the DIP Notes Lenders, the "DIP Lenders"), consisting of $80,000,000 drawn under the Tail Advance DIP Term Sheet (the "Approved Tail Amount" and together with the Approved Notes Amount, the "Approved Amount")[3], upon entry of the Interim Order, pursuant to the terms and conditions of this Second Interim Order and the other DIP Loan Documents;

(ii)     authorizing the Debtors to enter into the DIP Facilities and incurring all obligations owing thereunder and under the DIP Loan Documents to the DIP Lenders, as set forth in the DIP Notes Term Sheet and the Tail Advance DIP Term Sheet (collectively, the "DIP Term Sheets" and the obligations thereunder and this Second Interim Order, the "DIP Obligations") and, as set forth herein, granting liens, and superpriority administrative expense claim status in each of the Chapter 11 Cases and any Successor Cases (as defined below) subject, in certain circumstances described herein, to the Carve-Out (as defined herein) as set forth herein;

(iii)     granting to the DIP Lenders, as set forth herein, validly perfected and enforceable security interests in and superpriority liens on the DIP Collateral (as defined below) as set forth herein, and which liens and security interests shall be subject to the priorities set forth herein;

(iv)     authorizing and directing the Debtors to use proceeds of the DIP Notes to (a) pay the principal, interest, fees, expenses and other amounts payable and reimbursable under the DIP Notes Documents or this Second Interim Order as such become due, (b) make permitted adequate protection payments in respect of the Prepetition Obligations (as defined below); and (c) provide financing for working capital and other general corporate purposes, all to the extent provided in,

---

[3] For the avoidance of doubt, the Approved Amount includes (and is not incremental) to the Approved Amount set forth in the Initial Interim DIP Order (as defined below).  As explained below, this Second Interim DIP Order amends and restates the Initial Interim DIP Order in full.

3

and in accordance with, the Approved Budget, this Second Interim Order and the DIP Loan Documents;

(v)     authorizing and directing the Debtors to use proceeds of the Approved Tail Amount in accordance with the Tail Advance DIP Term Sheet and other Tail Facility Documents to fund the Debtors' tail obligations during the Debtors' Chapter 11 Cases;

(vi)     authorizing each Debtor, pursuant to sections                and 507 of the Bankruptcy Code, to use cash collateral, as such term is defined in section      a) of the Bankruptcy Code ("Cash Collateral"), and all other Prepetition Collateral (defined below), on an interim basis in accordance with both the Approved Budget and the DIP Loan Documents, and providing, among other things, adequate protection to the Prepetition Secured Parties for any diminution in the value ("Diminution") of their interests in the Prepetition Collateral;

(vii)     authorizing the Debtors to provide adequate protection of the liens and security interests (such liens and security interests, the "Prepetition Liens") of Parent, Leadenhall, and Texas Capital Bank ("TCB" and, together with Parent in such capacity as prepetition secured lender, the "Prepetition Secured Parties"), under (i) that certain *Loan and Security Agreement (Buyout Financing Line)*, by and between TCB and RMF, dated October      2021 (as in effect on the date hereof, the "TCB Buyout Facility"); (ii) that certain *Mortgage Warehouse Agreement*, by and between TCB and RMF, dated as of July      2020, as amended (as in effect on the date hereof, the "TCB Warehouse Facility"); (iii) that certain *Loan and Security Agreement*, by and between TCB and RMF, dated August 26, 2021, as amended (as in effect on the date hereof, the "TCB Tail Facility" and such loan agreement, the "TCB Tail Loan Agreement" and, collectively with the TCB Buyout Facility and TCB Warehouse Facility, the "Prepetition TCB Facilities" and the loan agreements, securities documents and any other

ancillary documents in connection with the Prepetition TCB Facilities, the "Prepetition TCB Debt Documents" and the obligations owing to TCB thereunder, collectively, the "Prepetition TCB Obligations" and the liens and security interest granted in favor of TCB under the Prepetition TCB Debt Documents, the "Prepetition TCB Liens"); (iv) that certain *Demand Promissory Note and Security Agreement*, by and between Reverse Mortgage Investment Trust Inc. and Parent, dated July 13, 2022 (as in effect on the date hereof, the "Prepetition Parent Demand Loan"); (v) that certain *Master Repurchase Agreement* by and among Reverse Mortgage Funding, LLC and Parent, dated as of November 17, 2022 (as in effect on the date hereof, the "Prepetition Parent Repo Facility" and collectively with the Prepetition Parent Demand Note, the "Prepetition Parent Secured Loan"); (vi) that certain *Loan and Security Agreement* by and between Debtor RMF and Leadenhall, as amended from time to time (as in effect on the date hereof, the "Existing Note Agreement" and, collectively with the Prepetition TCB Facilities, and the Prepetition Parent Secured Loan, the "Prepetition Secured Facilities" and, along with any other agreements, instruments, notes, guaranties, and other documents related thereto (including the Prepetition TCB Debt Documents), the "Prepetition Secured Facility Documents");

(viii)   approving the stipulations by the Debtors herein with respect to the Prepetition Secured Facility Documents and the Prepetition Liens;

(ix)    modifying the automatic stay imposed by section        of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and this Second Interim Order;

(x)    scheduling a final hearing within approximately    days after entry of the Interim

Order to consider entry of the Final Order (the "Final Hearing") and approving the form of notice

with respect to the Final Hearing.

The Bankruptcy Court having considered the Motion, the exhibits attached thereto, the

First Day Declaration [D.I. 44], the Meerovich DIP Declaration [D.I. 47] (as supplemented at

[D.I. 78 and    the DIP Loan Documents, and the evidence submitted and argument made at

the interim hearing (the "Interim Hearing"); notice of the Interim Hearing having been provided

in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and all applicable Local

Bankruptcy Rules; and the Interim Hearing having been held and concluded; all objections, if any,

to the interim relief requested in the Motion having been withdrawn, resolved or overruled by the

Bankruptcy Court; it appearing that approval of the interim relief requested in the Motion is

necessary to avoid immediate and irreparable harm to the Debtors and their Estates pending the

Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their

Estates and all parties-in-interest, and is essential for the continued operation of the Debtors'

business and the preservation of the value of the Debtors' assets; and the Bankruptcy Court having

determined that the legal and factual bases set forth in the Motion establish just cause for the relief

granted herein; it appearing that the Debtors' entry into the DIP Facilities is a sound and prudent

exercise of the Debtors' business judgment; after due deliberation and consideration, and good and

sufficient cause appearing therefor; and based upon the record established at the Interim Hearing,

the Court makes the following findings of fact and conclusions of law;

A.    **Disposition.** The relief requested in the Motion is granted on an interim basis in

accordance with the terms of this Second Interim Order.  Any objections to the Motion with respect

to the entry of this Second Interim Order that have not been withdrawn, waived or settled, and all

reservations of rights included therein, are hereby denied and overruled on the merits.  This Second

Interim Order shall become effective immediately upon its entry and any applicable stay (including

under Bankruptcy Rule 6004) is waived to permit such effectiveness.

      B.    **Petition Date**.  On November      2022 (the "Petition Date"), each of the Debtors

filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Bankruptcy

Court.

      C.    **Debtors in Possession**.  The Debtors are operating their businesses and properties

as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.   As of the

date hereof, no trustee or examiner has been appointed.

      D.    **Jurisdiction and Venue**.  This Bankruptcy Court has jurisdiction over these

Chapter 11 Cases, the Motion and the parties and property affected hereby pursuant to      U.S.C.

§ 1334.  Consideration of the Motion constitutes a core proceeding pursuant to      U.S.C. §      b)(2).

This Court may enter a final order consistent with Article III of the United States Constitution.

Venue for these Chapter 11 Cases and the proceedings on the Motion is proper in this District

pursuant to      U.S.C. §§ 1408 and 1409.   The bases for the relief sought in the Motion are sections

507 and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003,

6004 and 9014, and the Local Bankruptcy Rules.

      E.    **Committee**.  As of the date hereof, no statutory committee has been appointed in

these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (a "Committee").

      F.    **Notice**.  Notice of the Motion and the Interim Hearing have been provided in

accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and no other

or further notice of the Motion with respect to the relief requested at the Interim Hearing or the

entry of this Second Interim Order shall be required under the circumstances.   The interim relief

granted herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing.

G.   **Initial DIP Facility**.   On December 5, 2022, the Bankruptcy Court entered the *Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing; (II) Authorizing Certain Debtors' Use of Cash Collateral; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* (the "Initial Interim DIP Order") [D.I. 115]. The Initial Interim DIP Order and the rights granted therein shall be in full force and effect for the period between entry of the Initial Interim DIP Order and the entry of this Second Interim DIP Order.  This Second Interim Order amends and restates the entire Initial Interim DIP Order and shall govern from and after entry of this Second Interim Order.

H.   **Debtors' Stipulations**.   Subject to a Final Order and paragraph 47 hereof,  each stipulation, admission, and agreement contained in this Second Interim Order, including, without limitation, the Debtors' Stipulations, shall be binding upon the Debtors, their assets that will be used to satisfy the claims of creditors (the "Estates") and any successors thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors) under all circumstances and for all purposes.  After consultation with their attorneys and financial advisors, and without prejudice to the rights of parties in interest as set forth in paragraph 47 herein, the Debtors, on their own behalf and on behalf of their Estates, admit, stipulate, acknowledge, and agree as follows (paragraphs H(i) through H(ix) below are referred to, collectively, as the "Debtors' Stipulations"):

(i)   All Prepetition Secured Facility Documents (as defined herein) are valid, binding, and enforceable by the Prepetition Secured Parties against each of the relevant Debtors.

APP258

(ii)    As of the Petition Date, each of the Debtors was indebted and liable, without any objection, defense, counterclaim, recoupment, challenge, or offset of any kind, to the Prepetition Secured Parties pursuant to the respective Prepetition Secured Facility Documents, in the principal amounts of not less than those set forth on Schedule 1 attached hereto, plus, in each case, all accrued or hereafter accruing and unpaid interest thereon and any additional amounts, charges, fees and expenses (including any attorneys', accountants', appraisers' and financial advisors' fees and expenses that are chargeable or reimbursable under the Prepetition Secured Facility Documents as to such Debtor) now or hereafter due under the Prepetition Secured Facility Documents (all obligations of each Debtor arising under any Prepetition Secured Facility Documents, including all loans, advances, debts, liabilities, principal, interest, fees, charges, expenses and obligations for the performance of covenants, tasks or duties, or for the payment of monetary amounts owing to the Prepetition Secured Parties by such Debtor, of any kind or nature, whether or not evidenced by any note, agreement or other instrument, shall be referred to herein collectively as the "Prepetition Obligations"), which Prepetition Obligations are legal, valid, and binding obligations of each relevant Debtor and no portion of which is subject to avoidance, disallowance, reduction, recharacterization, subordination, or other challenge pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

(iii)    Pursuant to the Prepetition Secured Facility Documents and to the extent set forth therein, as of the Petition Date, each Debtor granted to the Prepetition Secured Parties, to secure such Debtor's Prepetition Obligations, a valid, duly authorized,

non-voidable, binding, perfected, first-priority security interest in the Collateral (as specified more fully in the respective Prepetition Secured Facility Documents and referred to in this Second Interim Order as the "Prepetition Collateral").

(iv)     The Debtors have a critical need to obtain postpetition financing under the DIP Facilities and to use Cash Collateral, as applicable, to, among other things, pay the costs and expenses associated with administering the Chapter 11 Cases, continue the orderly operation of the Debtors' business, maximize and preserve the Debtors' going concern value, make lease and other contractual payments and satisfy other working capital and general corporate purposes, make capital expenditures as needed in the ordinary course of business to maximize the value of the Debtor's assets, in each case, in accordance with the Approved Budget, and to provide adequate protection.   The Debtors do not have sufficient available sources of working capital and financing to operate their businesses or maintain their properties in the ordinary course of business without access to the DIP Facilities and the authorized use of Cash Collateral, as applicable.

(v)     In light of the Debtors' facts and circumstances, the Debtors would be unable to obtain (i) adequate unsecured credit allowable either (a) under sections         b) and 503(b)(1) of the Bankruptcy Code, or (b) under section         c)(1) of the Bankruptcy Code, (ii) adequate credit secured by (a) a senior lien on unencumbered assets of their estates under section         c)(2) of the Bankruptcy Code, and (b) a junior lien on encumbered assets under section         c)(3) of the Bankruptcy Code, or (iii) secured credit under section         d)(1) of the Bankruptcy Code from sources other than the DIP Lenders on terms more favorable than the terms of the DIP Facilities.

10

The only viable source of secured credit available to the Debtors, other than the use of Cash Collateral, is the DIP Facilities.   The Debtors require both additional financing under the DIP Facilities and the continued use of Cash Collateral, as applicable, under the terms of this Second Interim Order and subject to the Final Order, to satisfy their postpetition liquidity needs.

(vi)    The DIP Lenders have indicated a willingness to provide the Debtors with certain financing commitments, and the Prepetition Secured Parties authorize the use of Prepetition Collateral, including Cash Collateral, but solely on the terms and conditions set forth in this Second Interim Order and subject to the Final Order, and in the DIP Loan Documents.

(vii)    Accordingly, after considering all of their practical alternatives, the Debtors have concluded, in an exercise of their sound business judgment, that the financing to be provided by the DIP Lenders pursuant to the terms of this Second Interim Order and the DIP Loan Documents represents the best financing currently available to the Debtors.

(viii)    Good cause has been shown for immediate entry of this Second Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2) and Local Rule 4001-2.   Entry of this Second Interim Order is in the best interest of the Debtors, their estates and creditors.  The terms of the DIP Loan Documents (including the Debtors' continued use of the Prepetition Collateral, including Cash Collateral) are fair and reasonable under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration for the Prepetition Secured Parties' consent thereto.

(ix)    The Debtors, the DIP Lenders and the Prepetition Secured Parties have negotiated the terms and conditions of the DIP Loan Documents (including the Debtors' continued use of the Prepetition Collateral, including Cash Collateral), and this Second Interim Order in good faith and at arm's length, and any credit extended and loans made to the Debtors pursuant to this Second Interim Order and the Debtors' Stipulations shall be, and hereby are, deemed to have been extended, issued or made, as the case may be, in "good faith" within the meaning of section        e) of the Bankruptcy Code.    Subject to paragraph 47 of this Second Interim Order, the Prepetition Secured Parties are entitled to receive adequate protection as set forth herein pursuant to sections                and        of the Bankruptcy Code for any Diminution in the Prepetition Collateral, including Cash Collateral, resulting from the automatic stay or the Debtors' use, sale or lease of the Prepetition Collateral, including Cash Collateral, during the Chapter 11 Cases.

Based upon the foregoing findings and conclusions, the Motion and the record before the Bankruptcy Court with respect to the Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

1.      <u>DIP Financing Approved</u>.  On an interim basis, entry into the DIP Facilities is authorized and approved, and the use of Cash Collateral is authorized, in each case, subject to the terms and conditions set forth in this Second Interim Order. All objections to this Second Interim Order to the extent not withdrawn, waived, settled or resolved, and all reservations of rights included therein, are hereby denied and overruled on the merits. This Second Interim Order shall become effective immediately upon its entry.

### DIP Facilities Authorization

2.      Authorization of the DIP Financing.   The Debtors are expressly and immediately authorized and empowered to execute and deliver the DIP Loan Documents, and to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Second Interim Order and the DIP Loan Documents, and to execute, deliver and perform under all instruments, certificates, agreements, and documents which may be required or necessary for the performance by the Debtors under the DIP Loan Documents and the creation and perfection of the DIP Liens described in this Second Interim Order and the DIP Loan Documents.  The Debtors are hereby authorized and directed to pay, in accordance with this Second Interim Order, any principal, interest, fees, expenses, and other amounts described in the DIP Loan Documents and this Second Interim Order, as such amounts become due and owing, without need to obtain further Court approval (except as otherwise provided herein or in the DIP Loan Documents subject to and in accordance with the terms hereof and thereof, whether or not such disbursements arose before or after the Petition Date, and whether or not the transactions contemplated hereby are consummated, to implement all applicable reserves and to take any other actions that may be necessary or appropriate, all to the extent provided in this Second Interim Order and the DIP Loan Documents.  Upon execution and delivery, the DIP Loan Documents shall represent legal, valid and binding obligations of the Debtors, enforceable against each of the Debtors and their Estates in accordance with their terms.   Each officer of a Debtor acting individually is hereby authorized to execute and deliver each of the DIP Loan Documents, such execution and delivery to be conclusive evidence of such officer's respective authority to act in the name of and on behalf of the Debtors.  All collections and proceeds, whether from ordinary course collections, asset sales, debt or equity issuances, insurance recoveries, condemnations or otherwise, will be deposited and

applied as required by this Second Interim Order and the DIP Loan Documents. In consideration of Longbridge's participation in the Tail Advance DIP Facility, the Debtors are authorized to, and hereby do, transfer their interests in any tail securitization proceeds, to the extent they reflect a premium to par, funded by the DIP Tail Advances to Longbridge.

3.        Subject to (a) the entry of the Final Order containing such relief and (b) satisfaction of the Roll-Up Condition, without any further action by the Debtors or any other party, the Debtors shall be authorized and deemed to have effectuated the Roll-Up and the November Buyout Notes shall be added to, and become part of, the DIP LH Op Notes. The "Roll-Up Condition" shall have the meaning ascribed to the "ABO/NABO Requirement" in the DIP Notes Term Sheet. For the avoidance of doubt, the foregoing is not intend to imply or any way require Longbridge to participate in any such securitization or other transaction.

4.        Authorization to Borrow. To prevent immediate and irreparable harm to the Debtors' Estates, subject to the terms and conditions set forth in the DIP Loan Documents and this Second Interim Order, including the Budget, the Debtors are hereby authorized to borrow the Approved Amount, subject to any limitations on, or conditions to, borrowing under the DIP Loan Documents, which borrowings shall be used solely for purposes permitted under the DIP Loan Documents, including, without limitation, to provide working capital for the Debtors and to pay interest, fees, costs, charges and expenses, in each case, in accordance with, and subject to, this Second Interim Order, the DIP Loan Documents and the Approved Budget.

5.        DIP Obligations. The DIP Loan Documents and this Second Interim Order shall constitute and evidence the validity and binding effect of the Debtors' DIP Obligations. All DIP Obligations shall be enforceable against the Debtors, their Estates and any successors thereto, including without limitation, any trustee appointed in the Chapter 11 Cases, in any case under

Chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "Successor Cases"). Upon entry of this Second Interim Order, the DIP Obligations will include all loans, reimbursement obligations, and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the Debtors to the DIP Lenders, including, without limitation, all principal, accrued interest, costs, charges, fees, expenses and other amounts under the DIP Loan Documents. The Debtors shall be jointly and severally liable for the DIP Obligations. The DIP Obligations shall become due and payable, without notice or demand, and the use of Cash Collateral shall automatically cease on the Termination Date, subject to the Carve-Out requirements herein. No obligation, payment, transfer, or grant of collateral security hereunder or under the DIP Loan Documents (including any DIP Obligation or DIP Liens) to the DIP Lenders, and including in connection with any adequate protection provided to the Prepetition Secured Parties hereunder, shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 544, and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or be subject to any disgorgement, avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), claim, counterclaim, defense, charge, assessment, cross-claim, defense, or any other liability or challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity for any reason.

6.     DIP Collateral. As security for the DIP Obligations, effective immediately upon the date of this Second Interim Order and the DIP Term Sheet (which are incorporated fully into this

Second Interim Order), pursuant to sections                c)(2),        c)(3), and        d) of the

Bankruptcy Code, the DIP Lenders are hereby granted continuing, valid, binding, enforceable,

non-avoidable, and automatically and properly perfected postpetition security interests in and

liens on in the following order of priority (collectively, the "DIP Liens" and the assets subject

thereto, the "DIP Collateral"):

<blockquote>

(a)    all obligations under the DIP Tail Advances and the Prepetition TCB Obligations shall be secured by first priority valid, perfected, enforceable and unavoidable liens on, and security interests in (such lien granted pursuant to this subsection (a), the "TCB Unencumbered Assets DIP Lien"), all assets of the Debtors that are not otherwise subject to valid, perfected, enforceable and unavoidable liens and security interests in existence as of the Petition Date or valid liens perfected (but not granted) after the Petition Date (to the extent such perfection in respect of a prepetition claim is expressly permitted under the Bankruptcy Code), including, without limitation, each item included within each category of unencumbered assets set forth on Exhibit E of the DIP Notes Term Sheet (together constituting the "Unencumbered Assets"); provided, that solely with respect to the Unencumbered Assets securing the Prepetition TCB Obligations hereunder, such postpetition liens granted hereunder shall be limited to $4,000,000; provided, further, that upon the liquidation or monetization of any Unencumbered Assets, the first $4,000,000 shall be deposited into a segregated account at TCB for the benefit of TCB and any further disposition of such funds shall be subject to an order of the Bankruptcy Court (the "TCB Additional Collateral Account").

(b)    all obligations under the DIP Tail Advances shall be secured by (i) priming first priority valid, perfected, enforceable and unavoidable liens on, and security interests in, the existing collateral securing the obligations under the Existing Tail Loan Agreement ("Existing TCB Tail Collateral"); (ii) a priming first priority valid, perfected, enforceable and unavoidable liens on, and security interests in, the proceeds of prepetition tail securitization proceeds to the extent they reflect a premium to par (the "TCB Tail Premium Collateral"), notwithstanding any provision in the Intercreditor Agreement by and between RMF, Leadenhall, and TCB, dated October 17, 2018; and (iii) junior priority valid, perfected, enforceable and unavoidable liens on, and security interests in, any collateral securing any other postpetition funded debt obligations that does not constitute Existing Collateral or TCB Tail Premium Collateral (the "TCB Junior DIP Collateral," and such lien, the "TCB Junior DIP Lien"), subject to the DIP Notes Lien; provided, that such TCB Tail Premium Collateral and the TCB Junior DIP Collateral shall also secure the Prepetition TCB Obligations up

</blockquote>

16

to $4,000,000 (which shall be coextensive and not incremental to the liens granted to secure the Prepetition TCB Obligations in subsection (a) immediately above) and upon the liquidation or monetization of any TCB Tail Premium Collateral and TCB Junior DIP Collateral that TCB's lien is senior at such time that the cash proceeds become available to satisfy the Prepetition TCB Obligations such cash proceeds shall be funded to the TCB Additional Collateral Account for the benefit of TCB, unless and until the TCB Additional Collateral Account is funded with an aggregate amount of $4,000,000. Any amounts released in accordance with the terms hereof from the TCB Additional Collateral Account after satisfaction of TCB shall constitute Unencumbered Assets. For the avoidance of doubt, nothing herein shall affect Longbridge's property interest, pursuant to the Participation Agreement or otherwise, in the proceeds of the tails funded by the DIP Tail Advances. The term "TCB Liens" as used in this Second Interim DIP Order shall include the Prepetition TCB Liens, the DIP Liens granted in favor of TCB under section (a) and (b) of this paragraph 7, and the TCB Replacement Liens.

(c)    all obligations under the DIP Fee Notes, the DIP Transfer Notes, and the DIP LH Op Notes shall be secured *pari passu* by valid, perfected, enforceable and unavoidable junior liens on the Leadenhall MSR Collateral;

(d)    all obligations under the DIP Notes shall be secured by second priority valid, perfected, enforceable and unavoidable liens on, and security interests in Unencumbered Assets; subject only to the TCB Unencumbered Assets DIP Lien and the Carve-Out (the "DIP Notes Lien").

Neither (i) Unencumbered Assets (as used herein) nor (ii) any other DIP Collateral shall include assets, collateral, or property that has been transferred, sold, pledged, or conveyed in connection with the Debtors' Repo Facilities (as defined below); provided, that upon the full and final satisfaction of any debt, obligations or other amounts owed under any Repo Facility, Repo Facility Equity Value (as defined below), in accordance with Section 559 of the Bankruptcy Code, shall constitute Unencumbered Assets.

As used here, "Repo Facility" or together "Repo Facilities" means the Debtors' warehouse repo facilities and securities repo facilities, including:

1.    (i) the Master Repurchase Agreement between Credit Suisse AG, Cayman Islands Branch and Reverse Mortgage Funding LLC, dated January 15, 2021, (ii) the Master Repurchase Agreement between Credit Suisse Securities (USA) LLC and Reverse Mortgage Funding LLC, dated January 15, 2021, (iii) the Master Repurchase Agreement between Credit Suisse AG, Cayman Islands Branch and RMIT Operating II LLC, dated March 1, 2022, (iv) the Master

Repurchase Agreement between Credit Suisse Securities (USA) LLC and RMIT Operating II LLC, dated March 1, 2022, (v) the Master Repurchase Agreement between Credit Suisse First Boston Mortgage Capital LLC (as administrative agent), Credit Suisse AG, Cayman Islands Branch, Alpine Securitization LTD (along with certain other buyers) and Reverse Mortgage Funding LLC, dated September      2022 and (vi) any and all other contracts, agreements or other documents entered into in connection with the foregoing (i) through (vi) (such agreements, the "Credit Suisse Repo Facilities" and the Credit Suisse parties thereto, "collectively, "Credit Suisse");

2. (i) That certain Amended and Restated Master Repurchase Agreement, by and between Nomura Corporate Funding Americas, LLC, Reverse Mortgage Funding LLC and Broad Street Funding Trust II, dated as of June 4, 2019; (ii) that certain Master Repurchase Agreement, by and between Nomura Securities International, Inc. and Reverse Mortgage Funding LLC, dated as of January 9, 2017, as amended; and (iii) that certain Master Repurchase Agreement, by and between Nomura Securities International, Inc. and RMIT Operating II LLC, dated as of May 26, 2015 (such agreements, in each case, together with all guarantees, schedules and exhibits thereto, and confirmations exchanged pursuant to transactions entered into in connection with any of the foregoing the "Nomura Repo Facilities" and the Nomura parties thereto, collectively, "Nomura");

3. That certain Master Repurchase Agreement, dated September 15, 2017, (as amended, restated, supplemented or otherwise modified from time to time, and together with all guarantees, schedules and exhibits thereto, Facility Documents (as defined therein) and confirmations exchanged pursuant to Transactions entered into in connection therewith, the "TIAA Agreement" or  "TIAA Repo Facility"), by and between TIAA, FSB, formerly known as EverBank ("TIAA") and Reverse Mortgage Funding LLC; and

4. That certain Amended and Restated Master Repurchase Agreement, dated as of May 15, 2017 (as amended, restated, supplemented or otherwise modified from time to time), among Barclays Bank PLC as purchaser and agent ("Barclays"), Reverse Mortgage Funding LLC, as sellers, and Reverse Mortgage Investment Trust Inc, RMIT Operating I LLC, RMIT Operating II LLC, and RMIT Cash Management LLC, as guarantors (the "Barclays Repo Facility").

As used here, "Repo Facility Equity Value" means the property deemed to be property of the estate pursuant to the second sentence of Section 559 of the Bankruptcy Code, to the extent applicable and subject to the right of set-off as set forth in Section 559.

As used here, "Repo Party" means each of Credit Suisse, Nomura, TIAA and Barclays and any other party to a Repo Facility with the Debtors.

Unencumbered Assets also includes all claims and/or causes of action of any Debtors against Celink (inclusive of any Avoidance Action (as defined below)). Unencumbered Assets shall not include actions for preferences, fraudulent conveyances, and other avoidance power claims under Sections 544, 545, 547, 548, 550 and 553 of the Bankruptcy Code (the "Avoidance Actions") but, subject to the entry of the Final Order, shall include the proceeds of Avoidance Actions (the "Avoidance Action Proceeds").

Nothing in this this Second Interim DIP Order precludes any Repo Party from proceeding in accordance with its respective repo facility or facilities (each as defined above). The DIP Liens and Replacement Liens and any other liens granted pursuant to this order do not give the DIP Lenders or any of the Prepetition Secured Parties any rights or remedies with respect to any Repo Party or the Repo Facilities. The DIP Lenders and the Prepetition Secured Parties shall only have recourse against the value, if any, actually returned to the Debtors' estate by a Repo Party, in accordance with Section 559 of the Bankruptcy Code, after full and final satisfaction of any debt, obligations or other amounts owed under the relevant Repo Facilities in accordance with Section 559 of the Bankruptcy Code. The DIP Lender and Prepetition Secured Parties may not take any action against any Repo Party on account of the DIP Lien, Replacement Liens or any other rights or liens granted pursuant to the Second Interim Order unless after full and final satisfaction of any debt, obligations or other amounts owed under the relevant Repo Facilities, a Repo Party refuses to turnover Repo Facility Equity Value.

7.    DIP Liens.    The DIP Liens securing the DIP Obligations are valid, automatically perfected, non-avoidable, senior in priority and superior to any security, mortgage, collateral interest, lien or claim to any of the DIP Collateral (as defined herein) except as otherwise stated herein, subject only to the Carve-Out; *provided*, that for the avoidance of doubt, the TCB Liens shall not be subject to, or subordinate to, the Carve-Out. Other than as expressly set forth herein or in the DIP Loan Documents, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Cases, and shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases or any Successor Cases, upon the conversion of any of the Chapter 11 Cases to a case under Chapter

7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of any of the Chapter 11 Cases or Successor Cases. The DIP Liens shall not be subject to section 510, 549 or 550 of the Bankruptcy Code. No lien or interest avoided and preserved for the benefit of any Estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Liens.

8.     <u>DIP Notes Superpriority Claims</u>.  Subject to the Carve-Out, upon entry of this Second Interim Order, the DIP Lenders under the DIP Notes are hereby granted, pursuant to section c)(1) of the Bankruptcy Code, allowed superpriority administrative expense claims in each of the Chapter 11 Cases and any Successor Cases for all obligations under the DIP Notes (collectively, the "<u>DIP Notes Superpriority Claims</u>"): (a) which shall (i) have priority over any and all superpriority administrative claims granted by the Debtors other than the DIP Tail Advance Superpriority Claim, including priority over the Superpriority Adequate Protection Claims and (ii) have priority over all unsecured claims against the Debtors or their Estates in any of the Chapter 11 Cases and any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections                    503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, as provided under Section        c)(1) of the Bankruptcy Code; and (b) which shall at all times be senior to the rights of the Debtors and any successor trustee or other estate representative to the extent permitted by law.    Notwithstanding the foregoing, the DIP Notes Superpriority Claims shall be junior to the Carve-Out.

9.     <u>DIP Tail Advance Superpriority Claims</u>. Subject to the Carve-Out, upon entry of this Second Interim Order, the Tail Advance DIP Lenders are hereby granted, pursuant to section

APP270

c)(1) of the Bankruptcy Code, allowed superpriority administrative expense claims in each of the Chapter 11 Cases and any Successor Cases for all obligations under the DIP Tail Advances (collectively, the "DIP Tail Advance Superpriority Claims, and with the DIP Notes Superpriority Claims, the "DIP Superpriority Claims"):[4]: (a) which shall have priority over (i) any and all superpriority administrative claims granted by the Debtors, including priority over the DIP Notes Superpriority Claims, the Superpriority Adequate Protection Claims and (ii) unsecured claims against the Debtors or their Estates in any of the Chapter 11 Cases and any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections

503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, as provided under Section

c)(1) of the Bankruptcy Code; and (b) which shall at all times be senior to the rights of the Debtors and any successor trustee or other estate representative to the extent permitted by law. Notwithstanding the foregoing, the DIP Tail Advance Superpriority Claims shall be junior to the Carve-Out.

10.    No Obligation to Extend Credit.  The DIP Lenders shall have no obligation to make any loan or advance under the DIP Loan Documents unless all of the conditions precedent under the DIP Loan Documents and this Second Interim Order have been satisfied in full or waived by the DIP Lenders in accordance with the terms of the DIP Loan Documents, including the DIP Budget.

11.    Use of Proceeds of DIP Facilities.  From and after the Petition Date, the Debtors shall use advances of credit under the DIP Facilities only for the purposes specifically set forth in

---

[4] For the avoidance of doubt, the "DIP Superpriority Claims" as used herein shall include the "DIP Superpriority Claims" granted pursuant to the Initial DIP Interim Order and funded in accordance therewith.

this Second Interim Order and the DIP Loan Documents, and in compliance with the Approved Budget, subject to the Permitted Variances, and the terms and conditions in this Second Interim Order and the DIP Loan Documents.

12.    No Monitoring Obligation.    The DIP Lenders shall have no obligation nor responsibility to monitor the Debtors' use of the DIP Facilities, and the DIP Lenders may rely upon the Debtors' representation that the use of the DIP Facilities at any time are in accordance with the requirements of this Second Interim Order and the DIP Loan Documents.

### Authorization to Use Cash Collateral

13.    Authorization to Use Cash Collateral.  Subject to the terms and conditions of this Second Interim Order, the DIP Facilities, and the DIP Loan Documents and in accordance with the Approved Budget, subject to the Permitted Variances, and the terms and conditions of this Second Interim Order, the Prepetition Secured Parties consent to, and the Debtors are authorized to use Cash Collateral until the Termination Date.    Nothing in this Second Interim Order shall authorize the disposition of any assets of the Debtors outside the ordinary course of business, or any Debtor's use of any Cash Collateral or other proceeds resulting therefrom, except as permitted by this Second Interim Order, the DIP Facilities, the DIP Loan Documents, and in accordance with the Approved Budget, as applicable.

14.    Consent of Prepetition Secured Parties. The Prepetition Secured Parties hereby consent to (a) the provisions of this Second Interim Order including the Debtors' entry into the DIP Facilities on an interim basis, (b) the granting of the DIP Liens and DIP Superpriority Claims on the terms and subject to the conditions set forth herein, and (c) the Approved Budget, subject to the Permitted Variances.

15.    Adequate Protection for Leadenhall.  As adequate protection for any Diminution in

the Leadenhall MSR Collateral securing the Existing Notes, the holders of the Existing Notes

(the "Existing Note Parties") shall receive:

(a)    continuing valid, binding, enforceable and perfected postpetition replacement liens pursuant to sections          e), and      d)(l) of the Bankruptcy Code on the DIP Collateral, which shall be subject and subordinated only to the DIP Liens (including, for the avoidance of doubt, the TCB Liens on the TCB Tail Premium Collateral) and the Carve-Out and *pari passu* with the Parent Replacement Liens (the "Existing Note Providers Replacement Liens") and which shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Cases other than the DIP Liens and shall be valid and enforceable against any trustee appointed in any of the Chapter 11 Cases or any Successor Cases, and shall not be subject to sections 510, 549 or 550 of the Bankruptcy Code;

(b)    a superpriority administrative expense claim (the "Existing Note Providers Superpriority Adequate Protection Claim"), subject and subordinate to (i) the Carve-Out, (ii) the DIP Superpriority Claims, and (iii) TCB Superpriority Adequate Protection Claims and *pari passu* with the Parent Superpriority Adequate Protection Claim pursuant to section 507(b) with priority over any and all other administrative expenses, administrative expense claims and unsecured claims against the Debtors or their Estates, now existing or hereafter arising, of any kind or nature whatsoever as to and to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code; and

(c)    the assignment to Existing Notes Parties on account of its Existing Notes of all rights to AAG payments (including, without limitation, any monthly Premium Recapture Plan component and any AAG Tail GOS Revenue share payment).

16.    Adequate Protection for TCB Secured Parties.  As adequate protection for any

Diminution in the Prepetition TCB Collateral securing the Prepetition TCB Obligaitons, TCB shall

receive:

(a)    continuing valid, binding, enforceable and perfected postpetition replacement liens pursuant to sections          e), and      d)(l) of the Bankruptcy Code on the DIP Collateral, subject and subordinated only to the DIP Liens (the "TCB Replacement Liens") and which shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Cases other than the DIP Liens and shall be valid and enforceable against any trustee appointed in any of the Chapter 11 Cases or any Successor Cases, and shall

23

not be subject to sections 510, 549 or 550 of the Bankruptcy Code;

(b)     a superpriority administrative expense claim (the "TCB Superpriority Adequate Protection Claim"), subject and subordinate to (i) the Carve-Out, and (ii) the DIP Tail Advance Superpriority Claim pursuant to section 507(b) with priority over any and all administrative expense claims, including priority over the DIP Superpriority Claims, the Existing Note Providers Superpriority Adequate Protection Claim, and the Parent Superpriority Adequate Protection Claim and unsecured claims against the Debtors or their Estates, now existing or hereafter arising, of any kind or nature whatsoever as to and to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code;

(c)     with respect to Advances (as defined in the Existing Tail Loan Agreement) funded to the Debtors prior to the Petition Date, the Debtors shall comply on a postpetition basis with all terms of payment set forth in the Existing Tail Loan Agreement, including, but not limited to, sections 2.4, 2.7(b), 2.7(c), 2.8 and 2.10;

(d)     solely out of proceeds from the DIP Fee Notes and subject to paragraph 41, payment in cash of all reasonable professional fees and expenses of TCB (Paul, Weiss, Rifkind, Wharton & Garrison LLP and Landis Rath & Cobb LLP);

(e)     TCB is authorized to apply any amounts received from the FHA to which TCB is entitled on account of (i) assignment of "Active Buyouts" to FHA or (ii) any claim submitted following liquidation of "Non-Active Buyouts, in each case, to the extent that TCB is entitled to such proceeds under the Prepetition TCB Facilities; and

(f)     The Debtors shall be authorized, but not required, to take all steps and actions reasonably necessary to facilitate compliance with or satisfaction of the Debtors' obligations to buyout certain FHA guaranteed loans by a third-party acceptable to Ginnie Mae by December 19, 2022.

17.     Adequate Protection for Parent.  As adequate protection for any Diminution in the Prepetition Collateral of Parent, Parent shall receive (i) continuing valid, binding, enforceable and perfected postpetition replacement liens pursuant to sections        e), and        d)(l) of the Bankruptcy Code on the DIP Collateral, which shall be subject and subordinated only to the DIP Liens, the TCB Liens, and the Carve-Out and *pari passu* with the Existing Note Providers Replacement Liens (the "Parent Replacement Liens," and with the Existing Note Providers

24

Replacement Liens and the TCB Replacement Liens, the "Replacement Liens") and which shall not be made subject to or *pari passu* with any other lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Cases and shall be valid and enforceable against any trustee appointed in any of the Chapter 11 Cases or any Successor Cases, and shall not be subject to sections 510, 549 or 550 of the Bankruptcy Code; (ii) administrative superpriority expense claims in each of the Chapter 11 Cases (the "Parent Superpriority Adequate Protection Claims," and with the Existing Note Providers Superpriority Adequate Protection Claims, and the TCB Superpriority Adequate Protection Claims, the "Superpriority Adequate Protection Claims"), junior and subordinate only to (a) the DIP Superpriority Claims, (b) the TCB Superpriority Adequate Protection Claims, and (c) the Carve-Out, and *pari passu* with the Existing Note Providers Superpriority Adequate Protection Claims pursuant to section 507(b) with priority over any and all other administrative expenses, administrative expense claims and unsecured claims against the Debtors or their Estates, now existing or hereafter arising, of any kind or nature whatsoever as to and to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code.

18.    Adequate Protection Reservation.    Nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition Secured Parties hereunder is insufficient to compensate for any Diminution of their respective interests in the Prepetition Collateral during the Chapter 11 Cases or any Successor Cases.  The receipt by the Prepetition Secured Parties of the adequate protection provided herein shall not be deemed an admission that the interests of the Prepetition Secured Parties are adequately protected, and this Second Interim Order shall not prejudice or limit the rights of the Prepetition Secured Parties to seek additional relief with respect to the use of Cash Collateral or for additional adequate protection.

**Provisions Common to DIP Financing and Use of Cash Collateral**

19.    Amendment of the DIP Loan Documents.    The Debtors irrevocably waive any right to seek any amendment, modification or extension of this Second Interim Order without the prior written consent of the DIP Lenders (which they may grant) in their sole discretion.  No such consent shall be implied by any action, inaction or acquiescence of the DIP Lenders.  After obtaining the DIP Lenders' prior written consent, the Debtors are authorized and empowered, without further notice and hearing or approval of this Court, to amend, modify, supplement, or waive any provision of the DIP Loan Documents in accordance with the provisions thereof. Notwithstanding the foregoing, to the extent that an amendment, modification or extension referenced in this paragraph 20 is materially adverse to any party-in-interest, the Debtors shall provide not less than five (5) business days' notice to such party-in-interest so that such party may have an opportunity to be heard by the Bankruptcy Court prior to the effective date of such amendment, modification or extension of this Second Interim Order.

20.    Approved Budget.  Attached to this Second Interim Order as **Exhibit C** is a cash flow forecast approved by the DIP Notes Lenders, which sets forth, among other things, cash revenues, receipts, expenses, professional fees and other disbursements (including, without limitation, any payments with respect to real property leases), net cash flows, inventory receipts and other items on a line-item basis (as may be updated in accordance with the terms and conditions of this Second Interim Order and the DIP Loan Documents, the "Approved Budget").

21.    The Approved Budget is approved on an interim basis.  The proceeds of the DIP Facilities and Cash Collateral under this Second Interim Order shall be used by the Debtors in accordance with the Approved Budget, this Second Interim Order and the DIP Loan Documents.

22.    Budget & Reporting.    The Debtors shall comply with all budget and reporting

26

procedures set forth in the DIP Notes Term Sheet. A copy of the any variance report shall be shared with counsel to TCB at the same time or contemporaneously with such report being shared with the DIP Lenders.

23.     <u>Modification of Automatic Stay</u>.  The automatic stay of section        of the Bankruptcy Code is hereby modified and vacated to the extent necessary to permit the Debtors, the DIP Lenders and the Prepetition Secured Parties to accomplish the transactions contemplated by this Second Interim Order.  The automatic stay of section        of the Bankruptcy Code is hereby modified and vacated to the extent necessary to permit the Debtors, the DIP Lenders and the Prepetition Secured Parties to accomplish the transactions contemplated by this Second Interim Order, including, without limitation, to implement and effectuate the Adequate Protection granted to the Prepetition Secured Parties hereunder.  Furthermore, (a) pursuant to sections        555 and 559 of the Bankruptcy Code, TCB is authorized to exercise their rights and remedies to liquidate, accelerate and/or terminate their relevant repurchase agreements with the Debtors and any related documents, and to the extent not within the scope of sections        b)(6) or (7), the automatic stay is hereby lifted to allow TCB to exercise such rights and remedies and/or to set off against any amounts of the Debtors held by TCB, and (b) the Debtors shall fully and expeditiously cooperate with TCB to facilitate the exercise of any such rights or remedies by TCB.  For the avoidance of doubt, the foregoing does not authorize TCB, in its capacity as the Debtors' cash management bank, to exercise any setoff rights not otherwise permitted under the Cash Management Order [D.I. 116].

24.     <u>Perfection of DIP Liens and Replacement Liens</u>.  This Second Interim Order shall be sufficient and conclusive evidence of the creation, validity, perfection, and priority of all liens granted herein, including the Carve-Out, the DIP Liens, as applicable and the Replacement Liens,

without the necessity of filing or recording any financing statement, mortgage, deed of trust, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including entering into any deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens and the Replacement Liens or to entitle the DIP Lenders and the Prepetition Secured Parties to the priorities granted herein.    Notwithstanding the foregoing, the DIP Lenders are authorized, but not required, to file, as each deems necessary or advisable, such financing statements, security agreements, mortgages, notices of liens and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the DIP Liens and the Replacement Liens, and all such financing statements, mortgages, notices, agreements, and other documents shall be deemed to have been filed or recorded as of the Petition Date; *provided*, *however*, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens or the Replacement Liens.    The Debtors are authorized and directed to execute and deliver promptly upon demand to the DIP Lenders all such financing statements, mortgages, notices and other documents as each may reasonably request.  The DIP Lenders may, in their discretion, file a photocopy of this Second Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office in addition to or in lieu of such financing statements, notices of lien or similar instruments.    Notwithstanding the forgoing, in the event any of the Chapter 11 Cases or Successor Cases are dismissed prior to the indefeasible payment in full of the DIP Obligations, such order dismissing any Chapter 11 Cases or Successor Cases shall not be effective for five (5) business days to permit the DIP Lenders to enter into any agreements or file any documents (including financing statements, mortgages, or other notices) evidencing the perfection and priority of the DIP Liens and Replacement Liens, and during such

period, the Debtors shall comply with all reasonable requests of the DIP Lenders and to ensure the perfection of the DIP Liens and the Replacement Liens, as applicable.

25.    <u>Access to Books and Records</u>.  The Debtors will maintain books, records, and accounts to the extent and as required by the DIP Loan Documents and cooperate with, consult with, and provide to the DIP Lenders and Prepetition Secured Parties all such information and documents that any or all of the Debtors are obligated to provide under the DIP Loan Documents or the provisions of this Second Interim Order or as otherwise reasonably requested by the DIP Lenders or Prepetition Secured Parties.

26.    <u>Proceeds of Subsequent Financing</u>. If the Debtors, any trustee, any examiner with expanded powers, or any responsible officer subsequently appointed in these Chapter 11 Cases or any Successor Cases, shall obtain credit or incur debt pursuant to Bankruptcy Code sections        b),        c) or        d) or in violation of the DIP Loan Documents at any time prior to the indefeasible repayment in full in cash of all DIP Obligations and the termination of the DIP Lenders' obligation to extend credit under the DIP Facilities, including subsequent to the confirmation of any plan with respect to any or all of the Debtors and the Debtors' Estates, and such facilities are secured by any DIP Collateral, then all cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Lenders to be distributed in accordance with this Second Interim Order and the DIP Loan Documents, and then to the Prepetition Secured Parties for the repayment of the Prepetition Obligations.  If the Debtors, any trustee, any examiner with expanded powers, or any responsible officer subsequently appointed in the Chapter 11 Cases, or any Successor Cases, shall obtain credit or incur debt (other than the DIP Facilities) pursuant to Bankruptcy Code section        d) at any time prior to the indefeasible repayment in full of the Prepetition Obligations, the Prepetition Secured Parties' rights to object to the Debtors' use of

Cash Collateral and assert a lack of adequate protection shall be fully preserved.

Maintenance of DIP Collateral.  Until the indefeasible payment in full in cash of all DIP Obligations, all Prepetition Obligations, and the termination of the DIP Lenders' obligation to extend credit under the DIP Facilities, the Debtors shall insure the DIP Collateral consistent with their business practice prior to the Petition Date.

Termination Date.  On the applicable Termination Date (defined below), (a) all applicable DIP Obligations shall be immediately due and payable, (b) all commitments to extend credit under the applicable DIP Facilities will terminate, and (c) all authority to use Cash Collateral shall cease except (i) as necessary to fund the Carve-Out Reserve (as defined below) and (ii) to pay expenses necessary for the operation of the Debtors as provided in the Approved Budget.

Events of Default. Until the DIP Obligations are indefeasibly paid in full in cash (or as otherwise agreed) and all commitments thereunder are terminated (the "DIP Repayment"), the occurrence of any of the following events, unless waived by the DIP Lenders, shall constitute an event of default (collectively, the "Events of Default"): (a) the failure of the Debtors to perform, in any respect, any of the terms, provisions, conditions, covenants or obligations under this Second Interim Order, including, without limitation, failure to make any payment under this Second Interim Order when due or to comply with any Milestones; or (b) the occurrence and continuation of an "Event of Default" under, and as defined in, the DIP Loan Documents or an event of default under any other DIP Loan Documents.

Milestones. As a condition to the DIP Facilities and the use of Cash Collateral, the Debtors shall comply with the milestones (the "Milestones") as set forth in the DIP Term Sheets.  Unless waived by the DIP Lenders (applicable to each DIP Term Sheet), the failure of the Debtors to comply with any of the Milestones shall constitute an immediate Event of Default

under the DIP Loan Documents and this Second Interim Order.

<u>Rights and Remedies Upon Event of Default.</u> Upon the occurrence and during the continuation of an Event of Default, and subject to the provision of paragraph       herein, notwithstanding the provisions of section       of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from the Bankruptcy Court, but subject to the terms of this Second Interim Order: (a) the DIP Lender may send a written notice to the Debtors, counsel to the Committee (if appointed), and the U.S. Trustee  (any such declaration shall be referred to herein as a "<u>Termination Declaration</u>") declaring (1) all DIP Obligations owing under the DIP Loan Documents to be immediately due and payable, (2) the commitment of the DIP Lender to extend financing under the DIP Facilities to be terminated, whereupon such commitments and obligation shall be terminated to the extent any such commitment remains under the DIP Facilities, (3) the termination of the DIP Facilities and the DIP Loan Documents as to any future liability or obligation of the DIP Lender, but without affecting any of the DIP Liens or the DIP Obligations, and (4) the application of the Carve-Out has occurred following the Carve-Out Trigger; (b) interest, including, where applicable, default interest, shall accrue and be paid as set forth in the DIP Loan Documents; and (c) the DIP Lender (in accordance with the DIP Loan Documents) may declare a termination, reduction or restriction on the ability of the Debtors to use cash collateral (the earliest date on which a Termination Declaration is delivered by the DIP Lender shall be referred to herein as the "<u>Termination Date</u>").    Following a Termination Date, neither the DIP Lender nor the Prepetition Secured Parties shall be required to consent to the use of any Cash Collateral or provide any loans or other financial accommodations under the DIP Facilities.

The Debtors and the Committee (if any) may seek an emergency hearing during the five (5) days following the date a Termination Declaration is delivered (such five (5) day

period, the "Remedies Notice Period"); *provided*, *however*, that the Debtors hereby waive their right to and shall not be entitled to seek relief, including, without limitation, under Section       of the Bankruptcy Code, to the extent that such relief would in any way materially impair or restrict the rights and remedies of the DIP Lender or, if applicable, the Prepetition Secured Parties.

Rights and Remedies Following Termination Date. Following a Termination Date and after the expiration of the Remedies Notice Period, the DIP Lender shall be entitled to exercise all rights and remedies in accordance with the DIP Loan Documents, this Second Interim Order and applicable law and shall be permitted to satisfy the relevant DIP Obligations and DIP Superpriority Claims, to the extent applicable, subject to the Carve-Out (as applicable).      The Debtors are hereby authorized and directed to, with the exclusion of the Carve-Out, remit to the DIP Lender one-hundred percent (       of all collections on, and proceeds of, the DIP Collateral, all collections, remittances, and proceeds of the DIP Collateral in accordance with the DIP Loan Documents and this Second Interim Order.   In furtherance of the foregoing, (a) each bank or other financial institution with an account of any Debtor is hereby authorized and directed to (i) comply at all times with any instructions originated by the DIP Lender to such bank or financial institution directing the disposition of cash, securities, investment property and other items from time to time credited to such account, without further consent of any Debtor, including without limitation, any instruction to send to the DIP Lender by wire transfer or in such other manner as the DIP Lender directs, all cash, securities, investment property and other items held by such bank or financial institution, and (ii) waive any right of set off, banker's lien or other similar lien, security interest or encumbrance, (b) subject to the payment of any and all fees and expenses of the Debtors associated therewith, the DIP Lender may compel the Debtors to seek authority to (i) sell or otherwise dispose of all or any portion of the Prepetition Collateral pursuant to section       (or any

other applicable provision) of the Bankruptcy Code on terms and conditions pursuant to sections

and other applicable provisions of the Bankruptcy Code, (ii) assume and assign any lease

or executory contract included in the DIP Collateral to the DIP Lender's respective designees in

accordance with and subject to section      of the Bankruptcy Code, (c) subject to the payment of

any and all fees and expenses of the Debtors associated therewith by the DIP Lender, the DIP

Lender may direct the Debtors to, (and the Debtors shall comply with such direction to), dispose

or liquidate the DIP Collateral via one or more sales of such DIP Collateral and/or the monetization

of other DIP Collateral with the DIP Lender having sole authority over the price of any DIP

Collateral to be disposed of, (d) subject to the payment of any and all fees and expenses of the

Debtors associated therewith by the DIP Lender, the DIP Lender may, or may direct the Debtors

to, (and the Debtors shall comply with such direction to) collect accounts receivable, without setoff

by any account debtor, and (e) to the extent authorized under applicable law, the DIP Lender shall

be authorized to succeed to any of the Debtors' rights and interests under any licenses for the use of

any intellectual property.  Subject to the payment of any and all fees and expenses of the Debtors

associated therewith by the DIP Lender, the Debtors shall take all action that is reasonably

necessary or advisable to cooperate with the DIP Lender in the exercise of their rights and remedies

and to facilitate the realization of the DIP Collateral by the DIP Lender.

Carve-Out.   Except for the TCB Liens (which includes the TCB Replacement

Liens), each of the DIP Liens, the DIP Superpriority Claims, the Superpriority Adequate Protection

Claims, and the Replacement Liens shall be subject and subordinate to payment of the Carve-Out.

The TCB Liens shall not be subject to nor subordinate to payment of the Carve-Out.    For the

avoidance of doubt, the Debtor may not utilize TCB's Cash Collateral under the DIP Tail

Advances, the Prepetition TCB Facilities, or any amounts in the TCB Additional Collateral

Account (the "TCB Cash Collateral") to fund the Carve-Out, but shall be permitted to utilize any other Cash Collateral of the other DIP Lenders or other Prepetition Secured Parties that is maintained at TCB, in its capacity as cash management bank (the "Non-TCB Cash Collateral") to fund any Carve-Out related to the Debtor.

(a)     As used in this Interim Order, the "Carve-Out" means the sum of (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the U.S. Trustee under section 1930(a) of title    of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under sections 726(b) and 1183(a) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section          or      of the Bankruptcy Code (the "Debtor Professionals") and the Committee pursuant to section      or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first business day following the Carve-Out Trigger (as defined below); and (iv), after the first business day following the Carve-Out Trigger, Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $1,500,000 incurred after occurrence of the Carve-Out Trigger until the case is converted to chapter 7, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve-Out Trigger Cap"). For purposes of the foregoing, "Carve-Out Trigger" shall mean the occurrence of a Termination Declaration or an acceleration of the DIP Obligations under the DIP Facilities.

(b)     Carve-Out Reserves. On the day of the occurrence of the Carve-Out Trigger

(the "Termination Declaration Date"), the Carve-Out Trigger shall (i) be deemed a draw request and notice of borrowing by the Debtors for DIP Loans under the DIP Notes, in an amount equal to the then unpaid amounts of the Allowed Professional Fees (any such amounts actually advanced shall constitute DIP Loans) and (ii) also constitute a demand to the Debtors (in each case excluding TCB Cash Collateral and  Prepetition TCB Collateral) to utilize all cash on hand, including Non-TCB Cash Collateral, as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees.    The Debtors shall deposit and hold such amounts in a segregated account at TD Bank, N.A. ("TD Bank") in trust to pay such then unpaid Allowed Professional Fees (the "Pre-Carve-Out Trigger Reserve") prior to any and all other claims.   On the Termination Declaration Date, the Carve-Out Trigger shall also (i) be deemed a request by the Debtors for DIP Loans under the DIP Notes, in an amount equal to the Post-Carve-Out Trigger Cap (any such amounts actually advanced shall constitute DIP Loans) and (ii) constitute a demand to the Debtors (in each case excluding TCB Cash Collateral and Prepetition TCB Collateral) to utilize all cash on hand, including Non-TCB Cash Collateral, as of such date and any available cash thereafter held by any Debtor, after funding the Pre-Carve-Out Trigger Reserve, to fund a reserve in an amount equal to the Post-Carve-Out Trigger Cap.  The Debtors shall deposit and hold such amounts in a segregated account at TD Bank in trust to pay such Allowed Professional Fees benefiting from the Post-Carve-Out Trigger Cap (the "Post-Carve-Out Trigger Reserve" and, together with the Pre-Carve-Out Trigger Reserve, the "Carve-Out Reserves") prior to any and all other claims.    On the first business day after the Termination Declaration Date, notwithstanding anything in the DIP Loan Documents to the contrary, including with respect to the existence of an Event of Default (as defined in the DIP Loan Documents), the failure of the Debtors to satisfy any or all of the conditions precedent for the DIP

Loans under the DIP Facilities, any termination of the DIP Obligations following an Event of

Default, or the occurrence of the Maturity Date (as defined in the DIP Loan Documents), the DIP

Lender shall make available such DIP Loans under the DIP Notes.   All funds in the Pre-Carve-Out

Trigger Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the

definition of Carve-Out set forth above (the "Pre-Carve-Out Amounts"), but not, for the avoidance

of doubt, the Post-Carve-Out Trigger Cap, until paid in full, and then, to the extent the Pre-Carve-

Out Trigger Reserve has not been reduced to zero, to pay the DIP Lenders, unless the DIP

Obligations have been indefeasibly paid in full, in cash, and all DIP Obligations have been

terminated, in which case any such excess shall be paid to the Prepetition Secured Parties

(excluding TCB) in accordance with their rights and priorities as of the Petition Date.  All funds in

the Post-Carve-Out Trigger Reserve shall be used first to pay the obligations set forth in clause

(iv) of the definition of Carve-Out set forth above (the "Post-Carve-Out Amounts"), and then, to

the extent the Post-Carve-Out Trigger Reserve has not been reduced to zero, to pay the DIP

Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all DIP

Obligations have been terminated, in which case any such excess shall be paid to the Prepetition

Secured Parties in accordance with their rights and priorities as of the Petition Date.

Notwithstanding anything to the contrary in the DIP Loan Documents, this Interim Order, or the

Final Order, if either of the Carve-Out Reserves is not funded in full in the amounts set forth in this

paragraph    b), then, any excess funds in one of the Carve-Out Reserves following the payment

of the Pre-Carve-Out Amounts and Post-Carve-Out Amounts, respectively, shall be used to fund

the other Carve-Out Reserve, up to the applicable amount set forth in this paragraph     b), prior

to making any payments to the DIP Lenders or the Prepetition Secured Parties, as applicable.

Notwithstanding anything to the contrary in the DIP Loan Documents, this Interim Order, or the

Final Order, following the Carve-Out Trigger, the DIP Lenders and the Prepetition Secured Parties (excluding TCB) shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve-Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve-Out Reserves, with any excess paid to the DIP Lenders for application in accordance with the DIP Loan Documents. Further, notwithstanding anything to the contrary in this Interim Order, (i) disbursements by the Debtors from the Carve-Out Reserves shall not constitute DIP Loans (as defined in the DIP Loan Documents) or increase or reduce the DIP Obligations, (ii) the failure of the Carve-Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve-Out, and (iii) in no way shall the Approved Budget, Carve-Out, Post-Carve-Out Trigger Cap, Carve-Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors. Notwithstanding anything to the contrary in this Interim Order, the Final Order, the DIP Facilities, or with respect to any Prepetition Obligations, the Carve-Out shall be junior to the TCB Liens in all respects, but senior to all other liens and claims securing the DIP Facilities, the Adequate Protection, and the Superpriority Adequate Protection Claims, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the Prepetition Obligations. Notwithstanding anything to the contrary contained herein, in no event shall the DIP Lenders be obligated to fund DIP Loans pursuant to this clause (b) in excess of the remaining available commitments to be borrowed under the DIP Notes.

(c)     Payment of Allowed Professional Fees Prior to the Termination Declaration. Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve-Out.

(d)    <u>No Direct Obligation To Pay Allowed Professional Fees</u>.  Neither the DIP Lenders

nor the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any

fees or disbursements of any Professional Person or the U.S. Trustee or Clerk of the Bankruptcy

Court (or of any other entity) incurred in connection with the Chapter 11 Cases or any successor

cases under any chapter of the Bankruptcy Code.   Nothing in this Interim Order or the Final Order

or otherwise shall be construed to obligate the DIP Lenders or the Prepetition Secured Parties, in

any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to

guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(e)    <u>Payment of Carve-Out On or After the Termination Declaration Date</u>.  Any payment

or reimbursement made on or after the occurrence of the Termination Declaration Date in respect

of any Allowed Professional Fees shall permanently reduce the Carve-Out on a dollar- for-dollar

basis.   Any funding of the Carve-Out shall be added to, and made a part of, the DIP Obligations

secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this

Interim Order and the Final Order, the DIP Loan Documents, the Bankruptcy Code, and applicable

law.

(f)    <u>Reservation of Rights</u>.  The DIP Lenders and the Prepetition Secured Parties

reserve their rights to object to the allowance of any fees and expenses, including without

limitation any fees and expenses of any Professional Person.   The payment of any fees or expenses

of any Professional Person pursuant to the Carve-Out shall not, and shall not be deemed to (i)

reduce any Debtor's obligations owed to the DIP Lenders or the Prepetition Secured Parties, or (ii)

modify, alter or otherwise affect any of the liens and security interests of such parties in the DIP

Collateral or Prepetition Collateral (or their respective claims against any Debtor).

<u>Professional Fee Reserve</u>.  On a weekly basis, the fees of the Debtor

38

Professionals and the Committee Professionals provided in the Approved Budget shall be funded into an escrow account with TD Bank to satisfy the Professional Fees included within the Carve-Out (the "Professional Fee Reserve").  The funds on deposit in the Professional Fee Reserve shall be available to satisfy the obligations benefiting from the Carve-Out, and the DIP Lenders shall have a security interest upon any residual interest in the Professional Fee Reserve available following satisfaction in cash in full of all obligations benefiting from the Carve-Out.  If, after paying all amounts set forth in the definition of Carve-Out, the Professional Fee Reserve has not been reduced to zero, all remaining funds therein that are funded pursuant to paragraph     out of the proceeds of DIP Collateral securing the DIP Notes Liens, shall be distributed on account of the DIP Notes.

Good Faith Under Section       e) of the Bankruptcy Code; No Modification or Stay of this Second Interim Order.  The DIP Lenders and Prepetition Secured Parties have acted  in good faith in connection with this Second Interim Order and are entitled to rely upon the protections granted herein and by section       e) of the Bankruptcy Code.    Based on the findings set forth in this Second Interim Order and the record made during the Interim Hearing, and in accordance with section       e) of the Bankruptcy Code, in the event any or all of the provisions of this Second Interim Order are hereafter modified or vacated by a subsequent order of this Bankruptcy Court or any other court, the DIP Lenders and Prepetition Secured Parties are entitled to the protections provided in section       e) of the Bankruptcy Code.   Any such modification or reversal shall not affect the validity and enforceability of any advances previously made or made hereunder, or lien, claim or priority authorized or created hereby.

Approval of DIP Fees.  In consideration for the DIP Facilities and in accordance with the terms of this Second Interim Order, the DIP Lenders shall be paid all fees, expenses and

other amounts payable under the DIP Loan Documents as such become due, without regard to whether or not the transactions contemplated hereby are consummated (all such fees, together, the "DIP Fees"). The DIP Fees shall be fully earned and payable upon entry of this Second Interim Order. The DIP Fees shall be part of the DIP Obligations. Any and all DIP Fees paid prior to the Petition Date by any of the Debtors to the DIP Lenders in connection with or with respect to the DIP Facilities in each case is hereby approved in full.

38.    Professionals' Fees.  Professionals for the DIP Lenders (the "DIP  Professionals") and professionals for the Prepetition Secured Parties ("Prepetition Professionals," and together with the DIP Professionals, the "Lender Professionals") shall not be required to comply with the U.S. Trustee fee guidelines or file applications or motions with, or  obtain approval of, this Court to the extent payment is sought from the Debtors solely out of proceeds from the DIP Fee Notes. The Lender Professionals shall submit copies of summary invoices to the Debtors, which invoices shall be forwarded by the Debtors to the U.S. Trustee, and counsel for any Committee.   The summary invoices shall provide only the total aggregate number of hours billed and a summary description of services provided and the expenses incurred by the applicable party and/or professionals, and shall be subject to all applicable privilege and work product doctrines.  If the Debtors, U.S. Trustee, or any Committee object to the reasonableness of the fees and expenses of any Lender Professional and cannot resolve such objection within ten (10) days after receipt of such invoices, (the "Fee Review Period"), then the Debtors, U.S. Trustee, or the Committee, as the case may be, shall file with this Court and serve on such Lender Professional an objection (the "Fee Objection"), and any failure by any such party to file a Fee Objection within the Fee Review Period shall constitute a waiver of any right of such party to object to the applicable invoice.  The Debtors shall pay the invoices within five (5) days of the expiration of the Fee Review

APP290

Period solely out of proceeds from the DIP Fee Notes.  Notwithstanding any provision herein to the contrary, any objection to, and any hearing on an objection to, payment of any fees, costs, and expenses set forth in a professional fee invoice in respect of the Lender Professionals shall be limited to the reasonableness of the particular items or categories of the fees, costs, and expenses that are the subject of such objection.   Solely out of proceeds from the DIP Fee Notes, the Debtors shall timely pay in accordance with the terms and conditions of this Second Interim Order (a) the undisputed fees, costs, and expenses reflected on any invoice to which a Fee Objection has been timely filed and (b) all fees, costs and expenses on any invoice to which no Fee Objection has been timely filed.   Any and all fees, costs, and expenses paid prior to the Petition Date by any of the Debtors to the DIP Lender in connection with or with respect to the DIP Facility are, subject to paragraph 47, hereby approved in full and shall not be subject to recharacterization, avoidance, subordination, disgorgement or any similar form of recovery by the Debtors or any other person.

39.    Indemnification.  The Debtors shall indemnify and hold harmless the DIP Lenders, each of their respective affiliates, and each of their and their affiliates respective successors, assigns, parents, subsidiaries, partners, controlling persons, representatives, agents, trustees, administrators, representatives, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders and employees past, present, and future, and their respective heirs, predecessors, successors and assigns except for losses resulting directly from such party's gross negligence,  or willful misconduct as determined in a final nonappealable order by a court of competent jurisdiction.

40.    Proofs of Claim.  Neither the DIP Lenders nor the Prepetition Secured Parties shall be required to file proofs of claim in any of the Chapter 11 Cases or Successor Cases for any claim arising under the DIP Loan Documents or the Prepetition Secured Facility Documents.  The

Debtors' stipulations, admissions, and acknowledgments and the provisions of this Second Interim

Order shall be deemed to constitute a timely filed proof of claim for the DIP Lenders and the

Prepetition Secured Parties with regard to all claims arising under the DIP Loan Documents and

the Prepetition Secured Facility Documents , and, as a result, the Prepetition Obligations shall be

deemed allowed for all purposes in accordance with section 502(a) of the Bankruptcy Code.

41.    <u>Limitations on Use of DIP Proceeds, Cash Collateral and Carve-Out</u>. Except

as otherwise permitted in this Second Interim Order, the DIP Facilities, the DIP Collateral, the

Prepetition Collateral, the Cash Collateral, and the Carve-Out may not be used in connection with:

(a) preventing, hindering, or delaying the DIP Lenders or the Prepetition Secured Parties'

enforcement or realization upon any of the DIP Collateral or Prepetition Collateral; (b) using or

seeking to use Cash Collateral or selling or otherwise disposing of DIP Collateral, as applicable,

without the consent of the Prepetition Secured Parties or the DIP Lenders, as applicable; (c) outside

the ordinary course of business, using or seeking to use any insurance proceeds constituting Cash

Collateral or DIP Collateral without the consent of the Prepetition Secured Parties or DIP Lenders,

as applicable; (d) incurring any indebtedness without the prior consent of the DIP Lenders;

(e) seeking to amend or modify any of the rights granted to the DIP Lenders or the Prepetition

Secured Parties under this Second Interim Order, the DIP Loan Documents or the Prepetition

Secured Facility Documents; (f) objecting to or challenging in any way the DIP Liens, as

applicable, the DIP Obligations, the Prepetition Liens or the Prepetition Obligations, the DIP

Collateral (including Cash Collateral) or, as the case may be, Prepetition Collateral, or any other

claims or liens, held by or on behalf of any of the DIP Lenders or the Prepetition Secured Parties,

respectively; (g) asserting, commencing or prosecuting any claims or causes of action whatsoever,

including, without limitation, any actions under Chapter 5 of the Bankruptcy Code, applicable state

law equivalents, any so-called "lender liability" claims and causes of action or other actions to

recover or disgorge payments against the DIP Lenders, the Prepetition Secured Parties, or any of

their respective affiliates, successors and assigns and the partners, shareholders, controlling

persons, directors, officers, employees, agents, attorneys, advisors, and professionals); (h)

litigating, objecting to, challenging, contesting in any manner, or raising any defenses to, the

validity, extent, amount, perfection, priority, or enforceability of any of the DIP Obligations, the

DIP Liens, as applicable, the Prepetition Liens, the Prepetition Obligations or any other rights or

interests of the DIP Lenders or  the Prepetition Secured Parties; or (i) seeking to subordinate,

recharacterize, disallow or avoid the DIP Obligations or the Prepetition Obligations.

42.    _Turn Over._    Prior to the indefeasible payment in full in cash and the

complete satisfaction of all DIP Obligations and termination of the commitment in accordance

with the DIP Loan Documents, any party who receives a payment or is paid the proceeds of any

DIP Collateral or receives any other payment or consideration from the Debtors or any other source

(including under any chapter 11 plan) other than as expressly permitted in the DIP Loan

Documents and this Second Interim Order, such party shall be deemed to have received, and shall

hold, such proceeds or payments in trust for the DIP Lenders and shall immediately turn over such

amounts to the DIP Lenders to repay the DIP Obligations in accordance with the DIP Loan

Documents and this Second Interim Order until indefeasibly paid in full in cash.

43.    _Turn Over of Avoidance Action Proceeds_.  Subject to entry of a Final Order, each

of the respective DIP Lenders hereby agrees that if the DIP Lenders receive payments under the

DIP Facilities on a _pro rata_ basis other than with respect to payments or proceeds that a DIP Lender

(or an affiliate of any DIP Lender) is required to pay resulting from Avoidance Action Proceeds

paid by (or paid in part by) a DIP Lender or an affiliate of a DIP Lender, in which case the

Avoidance Action Proceeds shall be turned over to the other applicable DIP Lender(s) or affiliate of such DIP Lender(s) that was the ultimate payor of such Avoidance Action Proceeds; *provided* that if the Transfer occurs, Existing Note Providers' recovery under the DIP Notes shall be limited to its pro rata share of the DIP Collateral and any Existing Note Providers' deficiency claim under the DIP Facilities shall be compromised pursuant to a chapter 11 plan (the "Plan"); *provided*, *further*, that if the Plan is consummated, Parent's recovery under the DIP Notes shall be limited to its *pro rata* share of the DIP Collateral and any deficiency claim under the DIP Notes shall be compromised pursuant to the Plan.

44.    Effect of Stipulations on Third Parties.  The Debtors' Stipulations contained in paragraph H hereof shall be binding in all circumstances upon the Debtors upon entry of this Second Interim Order and shall be binding upon each other party-in-interest, including the Committee (if any), except to the extent such party in interest *first* obtains standing (including any chapter 11 trustee or if the Chapter 11 Cases are converted to cases under chapter 7 prior to the expiration of the Challenge Period (as defined below), the chapter 7 trustee in such Successor Case), by no later than seventy-five (75) calendar days following the date of entry of the Interim Order, and (such time period established by the earlier of clauses (i) and (ii) shall be referred to as the "Challenge Period," and the date that is the next calendar day after the termination of the Challenge Period in the event that either (a) no Challenge (as defined below) is properly raised during the  Challenge Period or (b) with respect only to those parties who properly file a contested matter, adversary proceeding, or other matter challenging or otherwise objecting to the  admissions, stipulations, findings, or releases included in the Debtors'  Stipulations (each, a "Challenge"), such Challenge is fully and finally adjudicated, (a) and (b) shall be referred to as the "Challenge Period Termination Date") and *second*, obtains a final, non-appealable order in favor

of such party-in-interest sustaining any such Challenge in any such timely-filed contested matter, adversary proceeding, or other action (any such Challenge timely brought for which such a final and non- appealable order is so obtained, a "Successful Challenge").     The filing of a motion seeking a grant of standing to file a Challenge (a "Challenge Standing Motion") before the end of the Challenge Period, which motion must be accompanied by a draft complaint setting forth with particularity the basis for such Challenge, shall be deemed to have tolled the expiration of the Challenge Period with respect to that particular party only.   If upon consideration of the applicable Challenge Standing Motion the Court denies a grant of standing, the Challenge Period shall be deemed to have automatically and irrevocably expired effective as of such date.    If upon consideration of the applicable Challenge Standing Motion the Court grants the moving party standing to commence and prosecute a Challenge, the Challenge Period shall be deemed to have been automatically extended until the date that is the later of (i) two (2) business days after the grant of such standing, or (ii) such other date as may be fixed by the Court in any order granting such standing.   Except as otherwise expressly provided herein, from and after the Challenge Period Termination Date and for all purposes in these Chapter 11 Cases and any Successor Cases (and after the dismissal of these Chapter 11 Cases or any Successor Cases), and without further notice, motion, or application to, order of, or hearing before this Court, (i) any and all payments made to or for the benefit of the Prepetition Secured Parties or otherwise authorized by this Second Interim Order (whether made prior to, on, or after the Petition Date) shall be indefeasible and not be subject to counterclaim, set-off, subordination, recharacterization, defense, disallowance, recovery or avoidance by any party in interest, (ii) any and all such Challenges by any party-in-interest shall be deemed to be forever released, waived, and barred, (iii) all of the Prepetition Obligations shall be deemed to be fully allowed claims within the meaning of section 506 of the

45

Bankruptcy Code, and (iv) the Debtors' Stipulations shall be binding on all parties in interest in these Chapter 11 Cases or any Successor Cases, including any Committee or chapter 11 or chapter 7 trustee.  Notwithstanding the foregoing, to the extent any Challenge is timely asserted, the Debtors' Stipulations and the other provisions in clauses (i) through (iv) in the immediately preceding sentence shall nonetheless remain binding and preclusive on any Committee and on any other party-in-interest from and after the Challenge Period Termination Date, except to the extent that such Debtors' Stipulations or the other provisions in clauses (i) through (iv) of the immediately preceding sentence were expressly challenged in such Challenge and such Challenge becomes a Successful Challenge; *provided* that all other stipulations (other than those subject to a successful Challenge) shall remain binding on any Committee or other party-in-interest.   Notwithstanding any provision to the contrary herein, nothing in this Second Interim Order shall be construed to grant standing on any party in interest, including any Committee, to bring any Challenge on behalf of the Debtors' Estates.   The failure of any party- in-interest, including any Committee, to obtain an order of this Court prior to the Challenge Period Termination Date granting standing to bring any Challenge on behalf of the Debtors' estates shall not be a defense to failing to commence a Challenge prior to the Challenge Period Termination Date as required under this paragraph 47 or to require or permit an extension of the Challenge Period Termination Date.

45.     No Third-Party Rights.  Except as explicitly provided for herein or in any of the DIP Loan Documents, this Second Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or direct, indirect, or incidental beneficiary.

46.     Releases.

(a)     Debtors and Parent Releases Regarding Leadenhall.  Effective upon entry of this Interim Order with respect to the Parent and upon a Final Order with respect to the Debtors, the

Debtors, on behalf of themselves and their respective Estates (including any successor trustee or other estate representative in the Chapter 11 Cases and any Successor Cases (as defined herein), and any party acting by, through or under the Debtors or their Estates (the "Debtor Release Parties") and Parent hereby stipulate and agree that they absolutely and unconditionally release and forever and irrevocably discharge and acquit Leadenhall and its affiliates and each of their respective former or current officers, partners, directors, managers, owners, members, principals, employees, agents, related funds, investors, financing sources, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof (collectively, the "Leadenhall Released Parties") from any and all obligations and liabilities to Debtor Release Parties and Parent (and their successors and assigns) and from any and all claims, counterclaims, demands, debts, accounts, contracts, disputes, liabilities, liens, allegations, suits, controversies, proceedings, actions and causes of action arising prior to the Petition Date (collectively, the "Leadenhall Released Claims") of any kind, nature or description, whether known or unknown, foreseen or unforeseen, matured or unmatured, direct or indirect, or liquidated or unliquidated, arising in law or equity or upon contract or tort or under any state or federal law or regulation or otherwise, arising out of or related to (as applicable) the Prepetition Secured Facility Documents, the DIP Loan Documents and the negotiation thereof, the obligations owing and the financial obligations made thereunder, the negotiation thereof and of the transactions reflected thereby and the obligations and financial obligations made thereunder, in each case that the Debtor Release Parties and Parent at any time had, now have or may have, or that their successors or assigns hereafter can or may have against any of the Leadenhall Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the date of this Second Interim Order.  The Debtor

Release Parties and Parent further waive and release any defense, right of counterclaim, right of set-off, or deduction to the payment of the Prepetition Obligations with respect to Leadenhall that the Debtor Release Parties and Parent may now have or may claim to have against the Leadenhall Released Parties, arising out of, connected with, or relating to any and all acts, omissions, or events occurring prior to this Court entering this Second Interim Order relating to the Debtors' secured lending relationship with the Prepetition Secured Parties.

(b)    <u>Leadenhall Releases Regarding Parent</u>.  Effective upon entry of this Interim Order, Leadenhall (and its affiliates, successors, and assigns) hereby stipulates and agrees that it absolutely and unconditionally releases and forever and irrevocably discharges and acquits Parent, and their respective affiliates and each of their respective former or current officers, partners, directors, managers, owners, members, principals, employees, agents, related funds, investors, financing sources, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof (but excluding, in the case of Parent, any of the Debtors and the Debtors' current and former officers in their capacities as such, in connection with the Note Parties for all transactions prior to the entry of this Second Interim Order) (collectively, the "<u>Parent Released Parties</u>") from any and all obligations and liabilities to Leadenhall (and its successors and assigns) and from any and all claims, counterclaims, demands, debts, accounts, contracts, disputes, liabilities, liens, allegations, suits, controversies, proceedings, actions and causes of action arising prior to the Petition Date of any kind, nature or description, whether known or unknown, foreseen or unforeseen, matured or unmatured, direct or indirect, or liquidated or unliquidated, arising in law or equity or upon contract or tort or under any state or federal law or regulation or otherwise, arising out of or related to (as applicable) the Prepetition Secured Facility Documents, the obligations owing and the financial

obligations made thereunder, the negotiation thereof and of the transactions reflected thereby and the obligations and financial obligations made thereunder, in each case that the Parent at any time had, now have or may have, or that their successors or assigns hereafter can or may have against any of the Parent Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the date of this Second Interim Order; *provided* that, notwithstanding the foregoing, the Prepetition Obligations shall remain in full force and effect; and *further provided* that Leadenhall shall not be deemed to have released any rights to distributions from the estate from any of the Debtors' causes of action, including claims against Parent and the current and former directors and officers of the Debtors.

(c)     TCB Releases.  Subject to entry of a Final Order, the Debtor Release Parties hereby stipulate and agree that they absolutely and unconditionally release and forever and irrevocably discharge and acquit TCB and its affiliates and each of their respective former or current officers, partners, directors, managers, owners, members, principals, employees, agents, related funds, investors, financing sources, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof (collectively, the "TCB Released Parties") from any and all obligations and liabilities to Debtor Release Parties (and their successors and assigns) and from any and all claims, counterclaims, demands, debts, accounts, contracts, disputes, liabilities, liens, allegations, suits, controversies, proceedings, actions and causes of action arising prior to the Petition Date (collectively, the "Debtor TCB Released Claims") of any kind, nature or description, whether known or unknown, foreseen or unforeseen, matured or unmatured, direct or indirect, or liquidated or unliquidated, arising in law or equity or upon contract or tort or under any state or federal law or regulation or otherwise, arising out of or related to (as applicable) the Prepetition Secured

Facility Documents, the DIP Loan Documents and the negotiation thereof, the obligations owing and the financial obligations made thereunder, the negotiation thereof and of the transactions reflected thereby and the obligations and financial obligations made thereunder, in each case that the Debtor Release Parties at any time had, now have or may have, or that their successors or assigns hereafter can or may have against any of the TCB Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the date of this Second Interim Order.  The Debtor Release Parties further waive and release any defense, right of counterclaim, right of set-off, or deduction to the payment of the Prepetition Obligations with respect to TCB Released Parties that the Debtor Release Parties may now have or may claim to have against the TCB Released Parties, arising out of, connected with, or relating to any and all acts, omissions, or events occurring prior to this Court entering this Second Interim Order relating to the Debtors' secured lending relationship with the Prepetition Secured Parties.

(d)     Longbridge Release.  Subject to entry of a Final Order, the Debtor Release Parties hereby stipulate and agree that they absolutely and unconditionally release and forever and irrevocably discharge and acquit Longbridge and its affiliates and each of their respective former or current officers, partners, directors, managers, owners, members, principals, employees, agents, related funds, investors, financing sources, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof (collectively, the "Longbridge Released Parties") from any and all obligations and liabilities to Debtor Release Parties (and their successors and assigns) and from any and all claims, counterclaims, demands, debts, accounts, contracts, disputes, liabilities, liens, allegations, suits, controversies, proceedings, actions and causes of action arising prior to the Petition Date (collectively, the "Debtor Longbridge Released Claims") of any kind, nature or description,

whether known or unknown, foreseen or unforeseen, matured or unmatured, direct or indirect, or liquidated or unliquidated, arising in law or equity or upon contract or tort or under any state or federal law or regulation or otherwise, arising out of or related to (as applicable) the DIP Loan Documents and the negotiation thereof, the obligations owing and the financial obligations made thereunder, the negotiation thereof and of the transactions reflected thereby and the obligations and financial obligations made thereunder, in each case that the Debtor Release Parties at any time had, now have or may have, or that their successors or assigns hereafter can or may have against any of the Longbridge Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the date of this Interim Order.

47.    <u>No Lender Liability</u>.  In determining to make any loan (whether under the DIP Loan Documents or otherwise) or to permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Second Interim Order or the DIP Loan Documents or taking any other act permitted under this Second Interim Order and the DIP Loan Documents, the DIP Lenders shall not (i) be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 et seq., as amended, or any similar federal, state or local statute or regulation) or (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders, or estates.   Furthermore, nothing in this Second Interim Order shall in any way be construed or interpreted to impose or allow the imposition upon any of the DIP Lenders or the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their respective affiliates (as defined in section        2) of the Bankruptcy Code).

APP301

48.    <u>No Marshaling</u>.   Subject to entry of the Final Order, the DIP Lenders and, subject to entry of the Final Order, the Prepetition Secured Parties, shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral, as applicable.

49.    <u>Section 552(b)</u>.  Subject to entry of the Final Order, the DIP Lenders and  Prepetition Secured Parties, shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Lenders or the Prepetition Secured Parties, as applicable with respect to proceeds, product, offspring or profits of any of the Prepetition Collateral or DIP Collateral, as applicable.

50.    <u>Exculpation</u>. Nothing in this Second Interim Order or the DIP Loan Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lenders or Prepetition Secured Parties any liability for any claims arising from the prepetition or postpetition activities of the Debtors, including with respect to the operation of their businesses, in connection with their restructuring efforts or administration of these Chapter 11 Cases.   In addition, (a) the DIP Lenders shall not in any way or manner be liable or responsible for: (i) the safe-keeping of the DIP Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any Diminution thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person, and (b) all risk of loss, damage, or destruction of the DIP Collateral shall be borne by the Debtors.

51.    <u>Insurance Proceeds and Policies</u>.  Upon entry of this Second Interim Order and to the fullest extent provided by applicable law, the DIP Lenders and the Prepetition Secured Parties with respect to the Replacement Liens, shall be, and shall be deemed to be, without any further

action or notice, named as additional insured and loss payee on each insurance policy maintained

by the Debtors, including in respect of the DIP Collateral and other Prepetition Collateral securing

the Replacement Liens (if any).

52.    <u>Fannie Mae</u>.

(a)    Notwithstanding anything to the contrary contained in the DIP Loan Documents or

this Second Interim Order, (i) no lien or security interest granted pursuant to the DIP Loan

Documents or this Second Interim Order (including, without limitation, the DIP Liens, the

Replacement Liens, or any adequate protection lien) shall attach to, modify, include or otherwise

affect, and (iii) no administrative expense claim of a superpriority nature or otherwise, including,

without limitation, the Carve-Out, the DIP Superpriority Claims, or the Superpriority Adequate

Protection Claims shall prime, encumber, impair or limit in any way: (1) any mortgage loan

presently owned by, subsequently transferred to, or otherwise acquired by, the Federal National

Mortgage Association (together with any successor thereto, "Fannie Mae"; and such mortgage

loans, the "<u>Fannie Mae Loans</u>"), (2) any servicing rights with respect to the Fannie Mae Loans

(the "<u>Fannie Mae Servicing Rights</u>"), (3) the Fannie Mae Lender Contract (as defined below) or

any rights of the Debtors, or obligations of Fannie Mae, under the Fannie Mae Lender Contract or

any of Fannie Mae's rights with respect to the sale and delivery of mortgage loans to, or the

servicing of Fannie Mae Loans for, Fannie Mae under the Fannie Mae Lender Contract or the

rights or obligations of the Debtors, or rights or obligations of Fannie Mae, under the Fannie Mae

Lender Contract; and/or (d) any (i) recoupments and offsets or (ii) cash, accounts, or other

collateral (or any proceeds of the foregoing) that has been pledged to Fannie Mae pursuant to any

collateral pledge agreement or other security agreement between Debtors and Fannie Mae. Each

of the DIP Lenders (and any agents thereof) stipulates that it has no claim as a secured creditor

against Fannie Mae in connection with the DIP Facilities.

(b)    Furthermore, without limiting the foregoing, none of the amounts collected by any Debtor or any subservicer in connection with its performance of its servicing obligations under the Fannie Mae Lender Contract are property of the Debtors' estates under section 541 of the Bankruptcy Code.  Fannie Mae reserves all rights in and under all of its agreements with the Debtors, including, the Fannie Mae Lender Contract, none of which are impaired by DIP Loan Documents or this Second Interim Order.  None of the DIP Lenders or any other applicable lender has any claim against Fannie Mae arising by virtue of this Second Interim Order. No secured claim or administrative expense granted pursuant to, or lien approved by, this Second Interim Order, trumps, or negatively impacts, in any way, Fannie Mae's rights and the Debtors' obligations under the Fannie Mae Lender Contract (including, without limitation, with respect to the Fannie Mae Loans and the Fannie Mae Servicing Rights).

(c)    If, notwithstanding the foregoing, any lender or other party hereafter asserts that the DIP Liens, the Replacement Liens, the DIP Collateral and adequate protection collateral, or any other lien in any other collateral that may be approved or granted pursuant to the terms of this Second Interim Order, include (i) any Fannie Mae Servicing Rights, (ii) the Fannie Mae Lender Contract, and/or (iii) any other rights of the Debtors, or rights or obligations of Fannie Mae, under the Fannie Mae Lender Contract, any and all security interests therein shall be subject and subordinate to all rights of Fannie Mae under the Mortgage Selling and Servicing Contract, the Fannie Mae Selling Guide, the Fannie Mae Servicing Guide, the Reverse Mortgage Loan Servicing Manual, and all supplemental servicing instructions or directives provided by Fannie Mae, all applicable master agreements, recourse agreements, repurchase agreements, indemnification agreements, loss sharing agreements, and any other agreements between Fannie Mae and the

APP304

Debtors, and all as amended, restated or supplemented from time to time (collectively, the "Fannie Mae Lender Contract"), which rights include, among other rights, the right of Fannie Mae to: (i) terminate at any time, all or a portion of, the Fannie Mae Lender Contract or the Fannie Mae Servicing Rights with or without cause and (ii) sell, or have transferred, the Fannie Mae Servicing Rights with any such sale or transfer being subject to Fannie Mae's consent.

(d)    Fannie Mae reserves all of its rights under the Fannie Mae Lender Contract. If there is any conflict between the terms of the Fannie Mae Lender Contract and those of the DIP Loan Documents or this Second Interim Order, the terms of the Fannie Mae Lender Contract, shall explicitly supersede and control.    Nothing in this Second Interim Order or the DIP Loan Documents shall subordinate, discharge, release or otherwise preclude any valid right of setoff or recoupment that Fannie Mae may have.

(e)    Fannie Mae shall be entitled to the additional reservations of rights as stipulated on the record of the hearings on the Motion.

53.    United States Reservation of Rights.  Notwithstanding anything to the contrary in this Second Interim DIP Order or the DIP Loan Documents, nothing in this Second Interim DIP Order or the DIP Loan Documents shall:

(a)    modify, impair or affect any contract, guaranty agreement, escrow agreement, cross default agreement, FHA insurance contract, HECM second mortgage lien, FHA indemnification agreement, mortgage servicing rights associated with mortgages or participations that are backed or are otherwise associated with securities guaranteed by GNMA, the GNMA Guide,  MBS prospectus documents, unilateral notification, notices of violation, supplements, addendums, amendments, and related documents or agreements, authorizations or writings (collectively the "HUD Agreements") between, either individually or together, the (a) the Debtors (including

Debtor RMF; (b) Leadenhall; and/or (c) Longbridge (collectively, the "Potential Transfer Parties")

and (y) GNMA and/or (z) the FHA (GNMA, together with FHA, "HUD"), including but not

limited to that certain Acknowledgment Agreement dated May 8, 2019 between and among RMF,

Leadenhall and GNMA, and in the event there is any conflict between this Second Interim DIP

Order and the DIP Loan Documents, on the one hand, and any HUD Agreement on the other hand,

the HUD Agreement shall control;

(b)      release or waive any of the Debtors' or non-debtor's obligations and liabilities

under the HUD Agreements and any statutes, regulations, rules, policies and procedures of HUD,

including, without limitation, (1) all applicable GNMA statutes, regulations, rules, policies and

procedures, including, without limitation, 12 U.S.C. § 1721(g), 12 U.S.C. §§ 1716 et seq. and 24

C.F.R. parts    -     (2) the GNMA Guide, (3) all applicable FHA statutes, regulations, rules,

policies and procedures, including, without limitation, Title II of the National Housing Act (12

USC §1707 et seq, 12 U.S.C.§§ 1702 – 1715z-25 and 24 C.F.R. parts      –      and      (4) all

FHA handbooks, mortgagee letters, and (5) all administrative materials issued under such statutes

or regulations (collectively, "Federal Law");

(c)      subordinate, prime, authorize or grant any lien or security interest (including any

Replacement Liens) or otherwise impair HUD's interest in, or rights to, (a) any escrow or custodial

account, and all funds therein, held for the benefit of borrowers with FHA-insured mortgages, or

otherwise affect mortgages or participations (as defined in the "HUD Agreements"); (b) the

mortgages or participations backing or otherwise associated with GNMA guaranteed securities (c)

any related collateral, including, but not limited to, cash, FHA mortgage insurance payments,

accounts or collateral held or required to be held by the Debtors or any non-Debtor affiliates,

GNMA, or any other party in connection with HUD Agreements;

(d)  waive, release or obviate the obligations and requirements to comply with Federal Law with respect to the sale, assignment, transfer or conveyance of any mortgage loan (or pools of mortgage loans) backing a GNMA guaranteed mortgage-backed security, mortgage servicing rights, or real estate obtained by foreclosure, or waive or release the Transfer Parties from their obligations to collect and submit any loan fees, closing fees, funding fees, guaranty fees, technology fees, FHA mortgage insurance payments, FHA claim remittances, FHA indemnification payments, FHA-required remedies pursuant to a loan-level review or HUD enforcement action, periodic payments or other fees or payments due pursuant to Federal Law, and to submit loan information to the loan systems of HUD, including, without limitation, GNMA's MyGinnieMae portal, including  GinnieNET, RFS, IPMS-PTS,  all associated sub-modules, and other systems related to the GNMA securities, FHA's Loan Review System ("LRS"), Home Equity Reverse Mortgage Information Technology ("HERMIT") system, and Catalyst systems;

(e)  construe any HUD Agreement as an executory contract or otherwise be interpreted to set cure amounts in respect of, or to require HUD to novate, approve or otherwise consent to, the assumption, sale, assignment or other transfer of any HUD Agreement without compliance with all applicable legal requirements, obligations and approvals under non-bankruptcy laws;  or

(f)  modify, impair or affect the United States of America's rights and defenses of setoff and recoupment.

54.  <u>Safe Harbor Rights</u>.  For the avoidance of doubt, nothing in this Second Interim Order limits or impacts any rights and remedies a party may have pursuant to Sections        b), 555 and 559 of the Bankruptcy Code to liquidate, accelerate and/or terminate any repurchase agreement or securities contract as such terms are defined under the Bankruptcy Code, to the extent

in accordance with Section §555 and §559 and nothing herein waives any of the Debtors' defenses with respect thereto except as expressly provided in this Second Interim Order, including, without limitation, paragraph 26 hereof

55.    <u>Nomura</u>.

(a)    <u>No Liens on Nomura Collateral or Property</u>.  Nothing herein shall be deemed to grant a lien on, or security interest in any collateral or property granted for the benefit of Nomura under the Nomura Repo Facilities (including the proceeds thereof) or any property of Nomura wherever located and all parties rights are reserved with respect to any Final Order.

56.    <u>No Use of Certain Nomura Collateral or Property</u>.  For the avoidance of doubt, Nomura does not consent to, and the Debtors are not authorized to, use the collateral or property (including, without limitation, proceeds of collateral and cash collateral) granted under or in connection with the Nomura Repo Facilities, or any property of Nomura wherever such collateral or property may be located.

57.    No provision of this Order, including any lien, claim, or other grant for the benefit of any postpetition lender shall be deemed to modify, impair, or otherwise prejudice Nomura's rights under the Nomura Repo Facilities.

58.    Nomura reserves all of its rights under or related to the Nomura Facilities, the Bankruptcy Code and applicable non-bankruptcy law.

59.    <u>Credit Suisse</u>

(a)    <u>No Liens on Credit Suisse Collateral or Property</u>.  Nothing herein shall be deemed to grant a lien on, or security interest in any collateral or property granted for the benefit of Credit Suisse under the Credit Suisse Repo Facilities (including the proceeds thereof) or any property of Credit Suisse wherever located and all parties rights are reserved with respect to any Final Order.

APP308

60.    <u>No Use of Certain Credit Suisse Collateral or Property</u>.  For the avoidance of doubt, Credit Suisse does not consent to, and the Debtors are not authorized to, use the collateral or property (including, without limitation, proceeds of collateral and cash collateral) granted under or in connection with the Credit Suisse Repo Facilities, or any property of Credit Suisse wherever such collateral or property may be located.

61.    No provision of this Order, including any lien, claim, or other grant for the benefit of any postpetition lender shall be deemed to modify, impair, or otherwise prejudice Credit Suisse's rights under the Credit Suisse Repo Facilities.

62.    Credit Suisse reserves all of its rights under or related to the Credit Suisse Repo Facilities, the Bankruptcy Code and applicable non-bankruptcy law.

63.    <u>Barclays</u>

(a)    <u>No Liens on Barclays' Collateral or Property</u>.  Nothing herein shall be deemed to grant a lien on, or security interest in any collateral or property granted for the benefit of Barclays under the Barclays Repo Facility (including the proceeds thereof) or any property of Barclays wherever located and all parties rights are reserved with respect to any Final Order.

64.    <u>No Use of Certain Barclays' Collateral or Property</u>.  For the avoidance of doubt, Barclays does not consent to, and the Debtors are not authorized to, use the collateral or property (including, without limitation, proceeds of collateral and cash collateral) granted under or in connection with the Barclays Repo Facility or any property of Barclays wherever such collateral or property may be located.

65.    No provision of this Order, including any lien, claim, or other grant for the benefit of any postpetition lender shall be deemed to modify, impair, or otherwise prejudice Barclays' rights under the Barclays Repo Facility.

APP309

66.     Barclays reserves all of its rights under or related to the Barclays Repo Facility, the Bankruptcy Code and applicable non-bankruptcy law.

67.     <u>TIAA</u>

(a)     <u>No Liens on TIAA Collateral or Property</u>.  Nothing herein shall be deemed to grant a lien on, or security interest in any collateral or property granted for the benefit of TIAA under the TIAA Repo Facility (including the proceeds thereof) or any property of TIAA wherever located and all parties rights are reserved with respect to any Final Order.

68.     <u>No Use of Certain TIAA Collateral or Property</u>.  For the avoidance of doubt, TIAA does not consent to, and the Debtors are not authorized to, use the collateral or property (including, without limitation, proceeds of collateral and cash collateral) granted under or in connection with the TIAA Repo Facility or any property of TIAA wherever such collateral or property may be located.

69.     No provision of this Order, including any lien, claim, or other grant for the benefit of any postpetition lender shall be deemed to modify, impair, or otherwise prejudice TIAA's rights under the TIAA Repo Facility.

70.     TIAA reserves all of its rights under or related to the TIAA Repo Facility, the Bankruptcy Code and applicable non-bankruptcy law.

71.     <u>No Waiver by Failure to Seek Relief</u>.  The failure of the DIP Lenders or Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies under this Second Interim Order, the DIP Loan Documents, the Prepetition Secured Facility Documents or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise.

72.     <u>Binding Effect of Interim Order</u>.  Subject only to paragraph 47, immediately upon

entry of this Second Interim Order by this Court, the terms and provisions of this Second Interim

Order shall become valid and binding upon and inure to the benefit of the Debtors, the DIP

Lenders, the Prepetition Secured Parties, all other creditors of any of the Debtors, any Committee

(or any other court appointed committee) appointed in the Chapter 11 Cases and all other parties-in-

interest and their respective successors and assigns, including any trustee or other fiduciary

hereafter appointed in any of the Chapter 11 Cases, any Successor Cases, or upon dismissal of any

Chapter 11 Case or Successor Case.

73.    No Modification of Interim Order.   If any or all of the provisions of this Second

Interim Order are hereafter reversed, stayed, or modified that action will not affect (i) the validity

of any obligation, indebtedness or liability under this Second Interim Order and the DIP Loan

Documents by the Debtors prior to the date of receipt of written notice to the DIP Lenders and the

Prepetition Secured Parties of the effective date of such action, or (ii) the validity and enforceability

of any lien, administrative expense, right, or priority authorized or created hereby or pursuant to

this Second Interim Order and the DIP Loan Documents, including, without limitation, the DIP

Obligations, the DIP Liens, the DIP Superpriority Claims, the Prepetition Obligations, the

Replacement Liens, and the Superpriority Adequate Protection Claims.

74.    Any Conflict with DIP Term Sheets.   If there is any conflict between the DIP Term

Sheets and the Second Interim DIP Order, the terms of the Second Interim DIP Order control.

75.    Joint and Several.   The Debtors are jointly and severally liable for the DIP

Obligations and all other obligations hereunder.

76.    Survival. The provisions of this Second Interim Order and any actions taken

pursuant hereto shall survive entry of any order which may be entered: (a) confirming any plan of

reorganization in any of the Chapter 11 Cases (and, to the extent not indefeasibly paid in full in

APP311

cash, the DIP Obligations shall not be discharged by the entry of any such order, each of the Debtors having hereby waived such discharge pursuant to section 1141(d)(4) of the Bankruptcy Code); (b) converting any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code; (c) dismissing any of the Chapter 11 Cases or any Successor Cases; or (d) pursuant to which this Bankruptcy Court abstains from hearing any of the Chapter 11 Cases or Successor Cases.    The terms and provisions of this Second Interim Order, including the claims, liens, security interests and other protections granted to the DIP Lenders and the Prepetition Secured Parties pursuant to this Second Interim Order and the DIP Loan Documents, shall continue in the Chapter 11 Cases, in any Successor Cases, or following dismissal of the Chapter 11 Cases or any Successor Cases, and shall maintain their priority as provided by this Second Interim Order until: (i) in respect of the DIP Facilities, all the DIP Obligations, pursuant to the DIP Loan Documents and this Second Interim Order, have been indefeasibly paid in full in cash (such payment being without prejudice to any terms or provisions contained in the DIP Facilities which survive such discharge by their terms), and all commitments to extend credit under the DIP Facilities are terminated; and (ii) in respect of the Prepetition Secured Facilities, all of the Prepetition Obligations pursuant to the Prepetition Secured Facility Documents and this Second Interim Order, have been indefeasibly paid in full in cash.    The terms and provisions concerning the indemnification of the DIP Lenders shall continue in the Chapter 11 Cases, in any Successor Cases, following dismissal of the Chapter 11 Cases or any Successor Cases, following termination of the DIP Loan Documents and/or the indefeasible repayment of the DIP Obligations.    In addition, the terms and provisions of this Second Interim Order shall continue in full force and effect for the benefit of the Prepetition Secured Parties notwithstanding the repayment in full or termination of the DIP Obligations until such time as the Prepetition Obligations have been indefeasibly paid in full.

77.    <u>Final Hearing</u>.  The Final Hearing on the Motion shall be held on **January 5, 2023,**

**at 10:    a.m. (prevailing Eastern Time)**.  The Debtors shall promptly serve copies of this Second

Interim Order (which shall constitute adequate notice of the Final Hearing) to the parties having

been given notice of the Interim Hearing, and to any other party that has filed a request for notices

with this Court.  Any objections or responses to entry of the Final Order shall be filed on or before

4:00 p.m., prevailing Eastern Time, on December      2022 at 4:00 p.m. (prevailing Eastern Time).

78.    <u>Necessary Action</u>. The Debtors are authorized to take any and all such actions

and to make, execute and deliver any and all instruments as may be reasonably necessary to

implement the terms and conditions of this Second Interim Order and the transactions

contemplated hereby.

79.    <u>Enforceability</u>. This Second Interim Order shall constitute findings of fact and

conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable

immediately upon entry thereof *nunc pro tunc* to the Petition Date.   Notwithstanding Bankruptcy

Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9014 of the Bankruptcy Rules, any applicable Local

Bankruptcy Rules, or Rule 62(a) of the Federal Rules of Civil Procedure, this Second Interim Order

shall be immediately effective and enforceable upon its entry and there shall be no stay of execution

or effectiveness of this Second Interim Order.

80.    <u>Headings</u>. The headings in this Second Interim Order are for purposes of reference

only and shall not limit or otherwise affect the meaning of this Second Interim Order.

81.    <u>Retention of Jurisdiction</u>. This Court has and will retain jurisdiction to enforce

this Second Interim Order according to its terms.

Dated: December 8th, 2022
Wilmington, Delaware

**MARY F. WALRATH**
63 **UNITED STATES BANKRUPTCY JUDGE**

## Schedule 1

### Prepetition Secured Facilities

| Facility | Outstanding Balance |
|---|---|
| TCB Warehouse Facility | $159,554,366 |
| TCB Tail Facility | $89,804,394.32 |
| TCB Buyout Facility | $137,652,839.70 |
| Existing Note Agreement | $192,778,848.22 |
| Prepetition Parent Repo Facility | $12,018,549.04 |
| Prepetition Parent Secured Loan | $52,947,397.92 |

APP314

**Exhibit A**

**DIP Notes Term Sheet**

APP315

# REVERSE MORTGAGE FUNDING LLC

Senior Secured DIP Notes Facility Up To $44,500,000

### Summary of Principal Terms and Conditions[1]

**THIS SUMMARY OF TERMS AND CONDITIONS OUTLINES CERTAIN TERMS OF THE PROPOSED DIP NOTES REFERRED TO BELOW.  THIS SUMMARY OF TERMS AND CONDITIONS WAS PREPARED FOR DISCUSSION PURPOSES ONLY AND DOES NOT CONSTITUTE A COMMITMENT TO PROVIDE ANY FINANCING TO THE NOTE ISSUER. THIS PROPOSED TERM SHEET IS NOT EXHAUSTIVE AS TO ALL OF THE TERMS AND CONDITIONS THAT WOULD GOVERN THE TRANSACTIONS DESCRIBED HEREIN.  THE STATEMENTS CONTAINED IN THIS TERM SHEET AND ALL DISCUSSIONS BETWEEN AND AMONG THE PARTIES IN CONNECTION THEREWITH CONSTITUTE CONFIDENTIAL SETTLEMENT COMMUNICATIONS ENTITLED TO PROTECTION UNDER RULE    OF THE FEDERAL RULES OF EVIDENCE.**

| | |
|---|---|
| **Note Issuer**: | Reverse Mortgage Funding, LLC (the "***Note Issuer***"), as debtor and debtor-in-possession. |
| **Guarantors**: | Each of the entities listed on <u>Exhibit B</u>, each as debtor and debtor-in-possession (collectively, the "***Guarantors***").  Such Guarantors, together with the Note Issuer, are referred to herein each as a "***Note Party***" and collectively, as the "***Note Parties***" or the "***Debtors***". |
| | "***Chapter 11 Cases***" mean proceedings under chapter 11 of title 11 of the U.S. Code (the "***Bankruptcy Code***") of the Note Issuer and the Guarantors before that certain U.S. Bankruptcy Court in the District of Delaware (the "***Bankruptcy Court***"). filed on November    2022 (the "***Petition Date***"). |
| **DIP Notes**: | In order to (a) complete the transfer of the Note Issuer's Ginnie Mae HECM MSR business ("***GNMA MSR***") to Longbridge Financial, LLC ("***Longbridge***") prior to or on January 3, 2023 (the "***Transfer Date***" and such transaction, the "***Transfer***"), (b) provide financing for working capital and other general corporate purposes, and (c) make any other payments provided in the Interim DIP Order,  Leadenhall and BNGL Holdings, L.L.C. ("***Parent***") shall together provide a secured debtor-in-possession note facility to the Debtors (the "***DIP Notes***") in an aggregate amount of no more than $44.5 million as follows: |

---

[1] Capitalized terms used but not defined in this term sheet (the "***Term Sheet***") shall have the meanings ascribed to them in that certain that certain Loan and Security Agreement, dated as of October 17, 2018, among Reverse Mortgage Funding LLC (the "***Note Issuer***"), the Leadenhall Capital Partners LLP, as agent on behalf of the lenders (the "***Agent***" or "***Leadenhall***"), Leadenhall Life Insurance Linked Investments Fund PLC, as collateral agent on behalf of the lenders (the "***Collateral Agent***"), and the financial institutions party thereto as lenders (the "***Existing Note Providers***") (as heretofore amended, restated, supplemented or otherwise modified prior to the date hereof, the "***Existing Note Agreement***").

1

- Leadenhall shall advance funds to pay its professionals in an amount up to $7.5 million (the "***DIP Fee Notes***");

- Leadenhall shall advance funds under notes in the amount up to $3.5 million directly to Compu-Link Corporation (d/b/a Celink; "***Celink***") and any additional vendors necessary on the Transfer Date to fund the out of pocket per loan transfer costs on the Transfer Date (the "***DIP Transfer Notes***");

- Leadenhall shall advance funds under notes in an aggregate amount of $6.5 million to fund the operating costs and expenses and Chapter 11 costs (the "***DIP LH Op Notes***");

- Parent shall have advanced, or shall advance, as applicable, funds under notes in the aggregate amount up to $17 million directly to the Debtors to fund their operating costs and expenses and Chapter 11 costs (it being understood and agreed that $10 million was funded on December 5, 2022 and the remaining $7 million in commitments shall be funded on a delayed draw basis in accordance with the Budget) (the "***DIP Parent Op Notes***"; and together with the DIP LH Op Notes, the "***DIP Op Notes***"); and

- The $10 million of funds advanced by Leadenhall on November 17, 2022 under the Existing Loan Agreement to GNMA in respect of the shortfall of the Note Issuer's November buyout obligations (the "***November Buyout Notes***") shall be rolled-up with the DIP LH Op Notes subject to the entry of the Final DIP Orders and the satisfaction by Longbridge of the ABO/NABO Requirement (as defined below) and Leadenhall's agreement to the First New Budget.

; *provided,* that in no event shall the DIP Fee Notes, the DIP Transfer Notes and the DIP LH Op Notes (inclusive of the November Buyout Notes) exceed the aggregate amount of $27.5 million at any time.

Each of the Note Parties, Leadenhall, the Collateral Agent, each of the Existing Note Providers and Parent hereby agree that this Term Sheet and the DIP Orders shall constitute the agreements that govern the DIP Notes until such time as promissory notes in form and substance acceptable to the DIP Funding Parties are executed and delivered by the Note Issuer.

Each of the Note Parties, Leadenhall, the Collateral Agent, each of the Existing Note Providers and Parent hereby agrees that the version of the Existing Note Agreement attached as Exhibit C hereto shall constitute the fully effective Existing Note Agreement; *provided, however,* that such

APP317

parties may agree to modify the terms thereof subsequent to the entry of the Interim DIP Order.

"***ABO/NABO Requirement***" means Longbridge's purchase of ABOs and NABOs in a principal balance of an amount to be determined at a purchase price not less than the amount that the Note Issuer has borrowed against such ABOs and NABOs.  The ABO/NABO Requirement may be funded with the proceeds of a securitization transaction (a "***New Private Label Securitization***") sponsored by Longbridge that is generally consistent with the prepetition "RBIT" securitization transactions sponsored by the Note Issuer.  In the event the ABO/NABO Requirement is not funded with a simultaneous closing of a New Private Label Securitization, the Debtors will use commercially reasonable efforts to help facilitate Longbridge's sponsorship of a New Private Label Securitization, including by doing the following: (i) sharing of RBIT transaction and disclosure precedents, (ii) coordination with the applicable rating agency or rating agencies and (iii) coordination with underwriters and third party service providers (e.g., trustees).

The "***Existing Leadenhall Notes***" shall mean the advances made under the Existing Note Agreement.

| | |
|---|---|
| **Agent/Collateral Agent**: | Leadenhall shall continue to serve as Agent and, the ***"DIP Agent",*** and Leadenhall Life Insurance Linked Investments Fund PLC as Collateral Agent; *provided, however,* that for the purposes of this Term Sheet, Parent is deemed to have the same rights and remedies afforded to the DIP Agent and/or the Collateral Agent in all respects. |
| **DIP Funding Parties**: | The Lenders under the Existing Note Agreement, which shall constitute the ***"DIP MSR Funding Parties"***, and Parent (each such party being individually a "***DIP Funding Party***", and the DIP MSR Funding Parties and Parent collectively, the "***DIP Funding Parties***"). |
| **Use of Cash Collateral:** | Except as provided herein, in addition to the liquidity provided by the DIP Notes, the Interim DIP Order and Final DIP Order (each as defined below) will authorize the Note Parties to use any collateral that constitutes "cash collateral" as such term is defined in Section      a) of the Bankruptcy Code ("***Cash Collateral***") in accordance with the terms hereof.  The Debtors shall have access to Cash Collateral, including proceeds from the sale of the Debtors' assets at all times. |
| **Purpose/Use of Proceeds**: | The Cash Collateral and the proceeds of the DIP Op Notes will be used solely in accordance with the Budget attached as <u>Exhibit D</u> and as set forth under "DIP Notes" above. |
| **DIP Collateral; DIP Lien Priority**: | The DIP Orders shall grant and approve, among other things, the liens, claims and security interests (collectively, the "***DIP Liens***", and the assets subject thereto, the "***DIP Collateral***") in the order of priority described below: |

3

(a)    pursuant to Bankruptcy Code Section        c)(1), a joint and several superpriority administrative expense claim in the Chapter 11 Cases in respect of all obligations under the DIP Notes (the "***DIP Notes Superpriority Claim***") with priority over all other administrative expenses (and all other superpriority administrative claims, including the Existing Note Superpriority Adequate Protection Claim and the BNGL MRA Superpriority Adequate Protection Claim), but subject to the TCB superpriority claim in an amount up to $4 million (the "***TCB Superpriority Claim***") and the Carve-Out (each as defined below);

(b)    pursuant to Bankruptcy Code Section        c)(3), all obligations under the DIP Fee Notes, the DIP Transfer Notes and the DIP LH Op Notes shall be secured *pari passu* by valid, perfected, enforceable and unavoidable junior liens on, assets and properties that secure the Existing Leadenhall Notes (the "***Leadenhall MSR Collateral***") until the Transfer Date; and

(c)    pursuant to Bankruptcy Code Section        c)(2), all obligations under the DIP Notes shall be secured by second priority valid, perfected, enforceable and unavoidable liens on, and security interests in, all assets of the Note Parties that are not otherwise subject to valid, perfected, enforceable and unavoidable liens and security interests in existence as of the Petition Date or valid liens perfected (but not granted) after the Petition Date (to the extent such perfection in respect of a prepetition claim is expressly permitted under the Bankruptcy Code), including, without limitation, each item included within each category of unencumbered assets set forth on <u>Exhibit E</u>    (the "***DIP Collateral***"); subject to the "DIP Liens" granted to Prepetition TCB Obligations under the TCB Term Sheet (the "***TCB DIP Liens***") and the Carve-Out.

The DIP Collateral shall include, without limitation, all claims and/or causes of action of any Note Party against Celink (inclusive of any Avoidance Action (as defined below)).  The DIP Collateral shall not include actions for preferences, fraudulent conveyances, and other avoidance power claims under Sections 544, 545, 547, 548, 550 and 553 of the Bankruptcy Code (the *"Avoidance Actions"*), but, subject to the entry of the Final DIP Order, shall include the proceeds of Avoidance Actions.

Unencumbered Collateral does not include assets or property that has been transferred in connection with the Debtors' warehouse repo facilities or securities repo facilities (collectively, the "***Repo Facilities***"); *provided*, that Repo Facility Equity Value shall constitute Unencumbered Collateral.

Subject to the entry of the Final DIP Order, the DIP Notes shall not be subject to surcharge under Section 506(c) of the Bankruptcy Code or the

"equities of the case" exception under Section 552(b) of the Bankruptcy Code.

All of the security interests and liens described herein with respect to the Note Parties shall be effective and perfected as of the entry of the Interim DIP Order and without the necessity of the execution of security agreements, pledge agreements, financing statements or other agreements.

"***Repo Facility Equity Value***" means the property deemed to be property of the estate pursuant to Section 559 of the Bankruptcy Code.

**Adequate Protection of Existing Secured Parties:**

As adequate protection of any diminution in the value of the interests of Leadenhall, the Existing Note Providers and the pre-petition secured claims of the Parent or its affiliates (the "***BNGL MRA Secured Parties***," and together, the "***Existing Secured Parties***") in the collateral securing the obligations owed to each of the respective Existing Secured Parties after the Petition Date, the Existing Secured Parties shall receive:

(a) pursuant to Bankruptcy Code Section    2), adequate protection replacement liens on the DIP Collateral (the "***Existing Secured Parties Replacement Liens***") subject to the Carve-Out, the DIP Liens and the TCB DIP Liens;

(b) a superpriority administrative expense claim as contemplated by Sections 507(b) and    c)(1) of the Bankruptcy Code (the "***Existing Secured Parties Superpriority Adequate Protection Claim***"), subject to the Carve-Out, the DIP Notes Superpriority Claim, and the TCB Superpriority Claim; and

(c) as additional adequate protection for Leadenhall, the assignment to Leadenhall on account of the Existing Leadenhall Loan of all rights to AAG payments (including, without limitation, any monthly Premium Recapture Plan component and any AAG Tail GOS Revenue share payment).

The DIP Order shall include relief from the automatic stay to make such payments as adequate protection.

**Carve-Out:**

The "***Carve-Out***" means the sum of: (i) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under    U.S.C. § 1930(a) plus interest at the statutory rate (without regard to the notice set forth in clause (iv) below); (ii) fees and expenses up to $50,000 incurred by a trustee under Sections 726(b) and 1183(a) of the Bankruptcy Code (without regard to the notice set forth in clause (iv) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid professional Fees of professional persons (collectively, the "***Allowed Professional Fees***") incurred by persons or firms retained by the Debtors pursuant to section    or    of the Bankruptcy Code at any time before or on the first business day following the delivery of a Carve-Out Trigger Notice (as defined below); and

(iv) Allowed Professional Fees incurred after the first business day following the Carve-Out Trigger in an aggregate amount not to exceed $1,500,000 with respect to professional persons (the amount set forth in this clause (iv) being the ***Post-Carve-Out Trigger Cap***").

***"Carve-Out Trigger"*** means the occurrence of a Termination Declaration or an acceleration of the DIP Loans.

"***Termination Declaration***" means a written notice from the Borrowers to the Debtors, counsel to the Committee (if appointed), and the U.S. Trustee.

| | |
|---|---|
| **Limitations on Use of Carve-Out, DIP Notes Proceeds and Cash Collateral:** | No portion of the Carve-Out, proceeds of the DIP Notes, or DIP Collateral (including, without limitation, any Cash Collateral) may be used to (or support any other party to) litigate, object to, contest or challenge in any manner or raise any defenses to the debt, collateral position, liens or claims of the DIP Funding Parties, the DIP Agent, Leadenhall, the Collateral Agent, the Existing Note Providers, or the BNGL MRA Secured Parties, whether by challenging the validity, extent, amount, perfection, priority or enforceability of the indebtedness under the DIP Notes, the Existing Note Agreement or BNGL MRA, or the validity, extent, perfection, priority or enforceability of any mortgage, security interest or lien with respect thereto or any other rights or interests or replacement liens with respect thereto or any other rights or interests of the DIP Agent, the DIP Funding Parties, Leadenhall, the Collateral Agent, or the Existing Note Providers, or the BNGL MRA Secured Parties, or by seeking to subordinate or recharacterize the DIP Notes (or amounts outstanding thereunder) or the Existing Note Agreement (or amounts outstanding thereunder), or to disallow or avoid any claim, mortgage, security interest, lien, or replacement lien or by asserting any claims or causes of action, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, against any of the DIP Funding Parties, the DIP Agent, Leadenhall, the Collateral Agent, the Existing Note Providers, or the BNGL MRA Secured Parties, or any of their respective officers, directors, agents, or employees; *provided, however,* that notwithstanding the foregoing, any official unsecured creditors' committee appointed in the Note Parties' Chapter 11 Cases (a ***"Committee"***) may use up to $25,000 to investigate the, validity, extent, perfection and priority of any claims or security interests of the Leadenhall, the Collateral Agent, or the Existing Note Providers, or the BNGL MRA Secured Parties.

In addition, none of the Carve-Out, proceeds of DIP Notes, nor any DIP Collateral (including, without limitation, any Cash Collateral) shall be used in connection with (a) preventing, hindering or delaying the DIP Funding Parties', the DIP Agent's, Leadenhall, the Collateral Agent's, or the Existing Note Providers' enforcement or realization upon the Collateral or the exercise of rights once an Event of Default has occurred and is continuing, (b) using or seeking to use Cash Collateral or selling or otherwise disposing of the DIP Collateral other than as provided herein, (c) using or seeking to use any insurance proceeds related to the |

APP321

|  | DIP Collateral without the consent of Leadenhall; or (d) incurring Indebtedness other than in accordance with the Budget. |
|---|---|
| **Cash Management:** | Subject to approval by the Bankruptcy Court, after commencement of the Chapter 11 Cases, the Note Parties shall use a cash management system satisfactory to Leadenhall and Parent. |
| **Challenge Period:** | The Interim DIP Order and Final DIP Order shall provide that a Committee and any other party in interest must file a pleading with the Bankruptcy Court challenging the validity, extent, perfection and/or priority of any claims or security interest of the Existing Secured Parties no later than 75 days after entry of the Interim DIP Order. Failure of the Committee or any other party in interest to file such a pleading with the Bankruptcy Court shall forever bar such party from making such a challenge. |
| **Closing Date**: | The date on which an interim order approving the DIP Notes (the "***Interim DIP Order***") is entered by the Bankruptcy Court and the initial funding under the DIP Notes is made in accordance with the terms thereof (the "***Closing Date***"), but in no event later than December 9, 2022. |
|  | On or before the 35th day following the entry of the Interim DIP Order, a final DIP Order shall have been entered and shall not have been reversed, modified, amended, stayed or vacated and shall not be subject to a stay pending appeal, and which shall be in form and substance reasonably acceptable to Leadenhall and Parent, the "***Final DIP Order***", and together with the Interim DIP Order, collectively, "***DIP Orders***" and individually, a "***DIP Order***"). |
| **Maturity**: | To the extent not already terminated, the DIP Notes shall automatically and permanently terminate on the earliest of following dates (each a "***Maturity Date***"): |
|  | (a)    days after the Interim DIP Order if the Final DIP Order has not been entered; *provided,* that in the event entry of the Interim DIP Order is delayed due to unforeseen delays in obtaining a hearing with the Bankruptcy Court, the parties shall mutually agree to a reasonable extension, |
|  | (b)    the "effective date" of a chapter 11 plan filed in the Chapter 11 Cases that is confirmed pursuant to an order entered by the Bankruptcy Court, |
|  | (c)    the date the Chapter 11 Cases are dismissed or converted to chapter 7 case(s), |
|  | (d)    the acceleration of the DIP Notes, or |
|  | (e)    June 6, 2023. |

| | |
|---|---|
| **Interest Rates**: | SOFR (3 month) <u>plus</u> 8.0% *per annum,* to be payable in kind and compounded monthly on the last day of each calendar month. |
| **Expenses**: | Solely using the proceeds of the DIP Fee Notes, the Note Issuer will pay in accordance with the Budget all reasonable and documented out-of-pocket costs and expenses (including reasonable and documented fees and expenses of counsel (including local counsel in each appropriate jurisdiction), a financial advisor and an investment banker) for Leadenhall (which shall be Latham & Watkins LLP, Young, Conaway Stargatt & Taylor LLP, as local counsel, BRG, as financial advisor, and Moelis as investment banker) in connection with administering the DIP Notes, preparing all documents and enforcing any and all obligations relating to the DIP Notes. |
| **Compliance with Budget**: | The Note Parties shall comply with the Budget, subject to an adverse variance for total "Operating Disbursements" of 20%, in accordance with the Budget.  Compliance with the Budget shall be tested on a weekly basis, with the first cumulative measurement to occur as of December 16 for the period between December 2 and December 16, with the first Budget to be re-set as of December        Thereafter, the Budget covenants shall be on an aggregate, cumulative basis until the New Budget (as defined below) is in effect, at which point, the Budget covenants shall be on an aggregate, cumulative, four-week basis, measured weekly.  Any adverse deviation from the Budget beyond any applicable permitted adverse variance shall constitute an Event of Default unless waived in writing by the applicable DIP Funding Parties (a "***Budget Event***").  For the avoidance of doubt, professional fees and any adequate protection payments made on account of obligations under the Existing Note Agreement shall be included in the Budget; *provided, however,* that such included amounts shall not constitute a cap on the amount of any such payments that the Note Parties are obligated to pay.  Professional fees shall not be included in any calculations for purposes of testing compliance with the Budget and permitted variances. |
| **Reporting**: | In addition to continued compliance with the Existing Note Agreement (which reporting shall be provided to Parent), the Note Issuer shall: |

|  |  |  |
|---|---|---|
| | (a) | deliver to Leadenhall and Parent prior to or on the Closing Date, an initial 10-week statement of projected receipts, disbursements, net cash flow, liquidity and loans through the end of December 2022 in a form and format acceptable to Parent and Leadenhall (the "***Budget***"); |
| | (b) | on Thursday of each week (commencing December 8, 2022), no later than 12:00 pm ET, deliver to Leadenhall and Parent a variance report in form reasonably acceptable to Leadenhall and Parent (each, a "***Variance Report***") with respect to the immediately prior week ended the last business day of such week, setting forth (i) the actual cash receipts and disbursements for such |

8

immediately preceding week on a line-item basis and available cash on hand as of the end of such week, (ii) the variance in dollar amounts of the actual receipts and disbursements for each weekly period from those reflected for the corresponding period in the Budget, (iii) a description of the nature of any material positive or negative variance in certain line items to be agreed, (iv) whether the Note Parties complied with the budget covenant for the applicable testing period, and (v) payments made pursuant to any first-day orders during the prior week; *provided, however,* that the Note Issuer shall deliver to Leadenhall and Parent a Variance Report on a monthly basis commencing in January 2023;

(c)    on the final Thursday of each calendar month, deliver a new two-month budget (the "***New Budget***", by week, to Leadenhall and Parent, which shall be deemed the new approved Budget pursuant to which the covenants will be measured commencing in the subsequent month;

(d)    on Thursday of each week (commencing December 15 2022), host a weekly call with representatives of Leadenhall and Parent to discuss financial results, projections, variance reports, and related matters; and

(e)    promptly, such additional information regarding the business, legal, financing, or corporate affairs of the Note Parties or any of their respective subsidiaries, or compliance with the terms of the DIP Notes, as the DIP Agent or Parent may from time to time reasonably request.

**Additional Budget-Related Provisions:**[2]

(a)    By December 15, 2022, the DIP Lenders and the Debtors with the consent of Leadenhall will agree to operate according to the Budget covering the period until February 3, 2023 or the Transfer Date (whichever is earlier), which shall provide that any monies received by the Debtors prior to the Transfer Date (including the servicing fees) can be used to fund the Debtors**,** including that expenses related to the Debtors' operations that are variable can be paid with any monies received by the Debtors prior to the Transfer Date.

(b)    Prior to the Transfer Date, the Debtors will be subject to an agreed budget between the DIP Lenders and the Debtors with the consent of Leadenhall.

---

[2]    To the extent of any inconsistencies within this section of the Term Sheet and the rest of the Term Sheet, the terms of this "Additional Budget-Related Provisions" section shall control.

(c)     Prior to the Transfer Date, net unencumbered asset sale proceeds (net of expenses and professional and other fees, to be agreed by the DIP Lenders and the Debtors with the consent of Leadenhall) shall be used in accordance with the Budget for any period after January 3, 2023 and operating the business (the net amount hereof, the "***Pre-Transfer Proceeds***"); *provided* that any fees and expenses associated with transferring the servicing to Longbridge for any period after January 3, 2023, or any additional fees and expenses related to the transfer of the servicing that are not budgeted, shall be funded by Leadenhall with either (A) additional DIP money that will rank pari passu to the existing DIP Notes or (B) net proceeds of unencumbered asset sales but that will result in (i) a decrease of Leadenhall's DIP Notes balance and (ii) an increase in the DIP Carveout (the increase and decrease amounts to be agreed by the DIP Lenders and the Debtors with the consent of Leadenhall.  Leadenhall has the sole discretion whether to fund under option (A) or (B) in this subparagraph.

(d)     Any additional DIP financing provided by the DIP Lenders prior to the Transfer Date shall be pari passu to the existing DIP Notes facility.

(e)     Any Pre-Transfer Proceeds in excess of the DIP Carveout prior to the Transfer Date will either be paid on the Transfer Date to the DIP Lenders or used in accordance with a Budget approved by the DIP Lenders, or used in accordance with subparagraph (c) above.

(f)     After entry of the Final DIP Order, there will be a $10 million carveout from the DIP Collateral (unencumbered assets) that can be used to fund the chapter 11 cases after the Transfer Date (such carveout, as may be modified in amount solely in accordance with above paragraph (c) clause (B)(ii) or below subparagraph (g), the "***DIP Carveout***").

(g)     The DIP Carveout will be reduced by any fees and expenses related to prosecuting and administering the Approved Chapter 11 Plan process that occurred prior to the Transfer Date.

(h)     After the Transfer Date, the DIP Carveout will be funded first by any Pre-Transfer Proceeds and then with any additional net unencumbered asset sale proceeds (net of expenses and professional and other fees, to be agreed by the DIP Lenders and the Debtors with the consent of Leadenhall).

10

(i)    After the Transfer Date and the DIP Carveout is exhausted, any net unencumbered asset sale proceeds (net of expenses and professional and other fees, to be agreed by the DIP Lenders and the Debtors with the consent of Leadenhall) shall be paid to the DIP Lenders.

(j)    If the Debtors have an opportunity to monetize any remaining unencumbered assets after the DIP Carveout is exhausted, the Debtors shall obtain the consent of Leadenhall to incur the costs associated with monetizing such assets prior to pursuing the sale.

(k)    After the Transfer Date, the Debtors will be subject to an agreed Budget between the DIP Lenders and the Debtors with the consent of Leadenhall.

(l)    The parties agree that the Transfer Date shall have occurred if 90% or more of the GNMA mortgage servicing rights (the "***GNMA MSRs***") of the Debtors are transferred.

(m)    In the event that less than          of the GNMA MSRs are transferred on the Transfer Date, the Debtors and the DIP Lenders with the consent of Leadenhall will agree upon the incremental costs to service the remaining GNMA MSR portfolio, which may be funded consistent with the funding mechanics in the proviso of paragraph (c), and a Budget for such incremental costs.

(n)    All DIP repayments will be subject to entry of the Final DIP Order.

**Affirmative Covenants**:    The Note Parties agree to support and take all steps reasonably necessary or reasonably requested by Parent, Leadenhall and/or Longbridge to consummate the Transfer prior to or on the Transfer Date, including, without limitation:

(a)    the Note Parties shall have executed this Term Sheet;

(b)    the Note Issuer shall deliver a fully executed stipulation (the "***Stipulation***") to which this Term Sheet shall be attached, prior to funding under the Interim Order;

(c)    the Note Issuer shall obtain Bankruptcy Court approval of the motion with the Bankruptcy Court to seek authority for the Note Issuer to enter into the Stipulation on an expedited basis and engage in the other actions set forth therein (the "***Transfer Motion***") prior to the Closing Date;

11

(d)     The Note Parties shall ensure that Celink, subject to the Debtors' reservation of rights for preexisting claims, continues to act as subservicer with respect to all loans acquired by Longbridge before the Transfer Date;

(e)     the Note Parties shall provide all material notices of litigation, defaults, and unmatured defaults and certain other information (including all documents filed with the Bankruptcy Court or distributed to any Committee),

(f)     the Note Parties provide notice of any event, occurrence, or circumstance in which a material portion of the DIP Collateral is damaged, destroyed, or otherwise impaired or adversely affected,

(g)     the Note Parties promptly and diligently oppose any motion filed by persons in the Bankruptcy Court to lift the stay on the DIP Collateral (other than motions filed by the DIP Agent or DIP Funding Parties), any motion filed by persons in the Bankruptcy Court to terminate the exclusive ability of the Note Parties to file a chapter 11 plan, and any other motion filed by persons in the Bankruptcy Court that, if granted, could reasonably be expected to have a material adverse effect on the DIP Agent, the DIP Funding Parties or any DIP Collateral, and

(h)     The Note Parties shall satisfy each of the following (each, a *"Milestone"*):

1.  By no later than December 12, 2022, the Bankruptcy Court shall enter the Interim DIP Order, in form and substance reasonably acceptable to the Debtors, Leadenhall and Parent.

2.  By no later than December 15, 2022, the Bankruptcy Court shall have approved the Debtors' motion to approve the Transfer Motion; *provided, that* in the event entry of such order is delayed due to unforeseen delays in obtaining a hearing with the Bankruptcy Court, the parties shall mutually agree to a reasonable extension.

3.  By no later than     days following the entry of the Interim DIP Order, the Bankruptcy Court shall enter the Final DIP Order, in form and substance reasonably acceptable to the Debtors, Leadenhall and Parent; *provided, that* in the event entry of the Interim DIP Order is delayed due to unforeseen delays in obtaining a hearing with the Bankruptcy Court, the parties shall mutually agree to a reasonable extension.

4.  By no later than the Transfer Date, the Transfer shall have been consummated.

5.  By no later than March 16, 2023, file a chapter 11 plan (the "*Approved Chapter 11 Plan*") and disclosure statement, in each case, satisfactory to the Debtors, Leadenhall and Parent.

6.  By no later than June 4, 2023, the Approved Chapter 11 Plan shall have been confirmed by the Bankruptcy Court.

**Acknowledgment**

Each party to this Term Sheet acknowledges that no party to this Term Sheet is required to fund proceeds in addition to the DIP Notes or to otherwise fund any amounts under the DIP Notes inconsistent with the Budget (as defined therein). The Debtors reserve the right to take any actions consistent with their fiduciary duties in the event the proceeds of the DIP Notes are insufficient to administer the Chapter 11 Cases or if this agreement is terminated pursuant to the terms hereof.

Each party to this Term Sheet also acknowledges that any additional party may provide financing to the Debtors, and the parties hereto shall not object or otherwise challenge such financing so long as such capital is provided on a junior basis.

**Events of Default**:

It shall constitute an event of default if any of the following occurs (each, an "*Event of Default*" and the occurrence of any event or existence of any condition that would, with the passage of time or notice, constitute an Event of Default shall constitute a "*Default*"):

(a)    the filing of any pleading, motion or application seeking, or the entry of an order authorizing, approving or granting:

    (i)    conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code;

    (ii)    the dismissal of any of the Chapter 11 Cases (or any subsequent Chapter 7 case);

    (iii)    appointment of a trustee, examiner or disinterested person with expanded powers relating to the operations or the business of any Note Party in the Chapter 11 Cases;

    (iv)    additional post-petition senior financing or liens on the DIP Collateral, in each case, without the consent of Leadenhall and Parent;

    (v)    any action materially adverse to the DIP Agent or the DIP Funding Parties or their rights and remedies in the DIP Collateral;

    (vi)    relief from the automatic stay for the benefit of any other creditor with respect to any material DIP Collateral without the consent of Leadenhall and Parent; or

    (vii)    any Note Party's motion to disallow in whole or in part the DIP Funding Parties' claim in respect of the

obligations under the DIP Notes or contest any material provision of any DIP Notes document;

(b)     the material failure of any Note Party to comply with any DIP Order;

(c)     an order is entered by the Bankruptcy Court in any of the Chapter 11 Cases without the express prior written consent of Leadenhall and Parent (i) to revoke, reverse, stay, modify, supplement or amend the DIP Orders in a manner that is inconsistent with the DIP Notes that adversely affects, and is not otherwise consented to by, Leadenhall and Parent, (ii) to grant or permit the grant of a lien on the DIP Collateral (other than liens permitted under the DIP Notes);

(d)     the payment by any Note Party of any pre-petition claim without the prior written consent of Leadenhall and Parent other than as expressly permitted by the Budget;

(e)     the commencement of, support of or failure to oppose any action against any of the DIP Agent or any DIP Funding Party by or on behalf of any Note Party or any Note Party's affiliates or officers;

(f)     any administrative expense claim is allowed having priority to or ranking in parity with the rights of the DIP Agent and DIP Funding Parties;

(g)     any chapter 11 plan is confirmed without the consent of Leadenhall and Parent;

(h)     the filing of any chapter 11 plan that does not provide for the treatment of the DIP Notes as set forth in the Stipulation without the consent of Leadenhall and Parent;

(i)     payment of or granting adequate protection with respect to any of the existing secured debt of any of the Note Parties, other than as set forth herein without the consent of the DIP Agents and Parent;

(j)     liens or super-priority claims with respect to the DIP Notes shall at any time cease to be valid, perfected and enforceable in all respects with the priority described herein;

(k)     allowance of any claim under Bankruptcy Code Section 506(c) or otherwise against any or all of the DIP Agent, the DIP Funding Parties or the DIP Collateral;

(l)     any termination or modification of the exclusivity periods set forth in Bankruptcy Code Section 1121;

14

(m)    any subsidiary of a Note Party that is not subject to the Chapter 11 Cases becomes subject to an insolvency proceeding without the consent of Leadenhall and Parent;

(n)    the occurrence of a Budget Event;

(o)    the occurrence of any GNMA-related defaults beginning subsequent to the date this Term Sheet is executed; or

(p)    the failure to meet any Milestone that is not waived by Leadenhall and Parent.

The DIP Agent may exercise remedies consistent with the DIP Orders upon five (5) business' days' notice from the DIP Agents to the Note Parties of the occurrence of an event of default; *provided, however,* that Leadenhall and Parent agree not to oppose a request by the Note Parties for an expedited hearing during such five-business-day period to re-impose or continue the automatic stay under Section     of the Bankruptcy Code.

| | |
|---|---|
| **Conditions Precedent to Initial Advances**: | The conditions precedent to the initial advances under the DIP Notes on the Closing Date shall consist of those conditions precedent required in similar financings, including the conditions applicable to the DIP Notes set forth on <u>Exhibit A</u> hereto, and Leadenhall and Longbridge shall have agreed to the material business terms of the Transfer, subject only to a material adverse change (to be agreed). |
| **Conditions to Subsequent Advances**: | The conditions precedent to subsequent advances under the DIP Notes after the Closing Date will consist of the following conditions precedent, which may be waived by the DIP Funding Parties in their sole discretion: |

(a)    entry of the Final DIP Order;

(b)    there is no ongoing Default or Event of Default;

(c)    receipt by Leadenhall and Parent of a borrowing request in form and substance satisfactory to Leadenhall and Parent at least two (2) Business Days prior to such advance;

(d)    all reasonable and documented out-of-pocket costs, fees, expenses (including, without limitation, reasonable and documented legal fees and expenses) set forth in the DIP Orders on or before such date such amounts shall have been paid; and

(d)    the amount to be advanced under the DIP Notes shall not exceed the amount set forth in the Budget.

| | |
|---|---|
| **Treatment of Leadenhall Deficiency Claim:** | The Debtors and Leadenhall will agree that all of Leadenhall's claims against the Debtors, except with respect to the DIP Facility ("<u>Leadenhall's Non-DIP Claims</u>"), will be based on Leadenhall's |

15

projected recovery from the Transfer and will be allowed unsecured claims.

Leadenhall's recovery under the DIP Loans shall be limited to its pro rata share of the DIP Collateral (and any deficiency claim under the DIP Facility shall be treated similarly to Leadenhall's Non-DIP Claims); *provided*, *further*, that if the Approved Chapter 11 Plan is consummated, Parent's recovery under the DIP Loans shall be limited to its pro rata share of the DIP Collateral and any deficiency claim under the DIP Loans shall be compromised pursuant to the Approved Chapter 11 Plan.

| | |
|---|---|
| **Plan Support** | Parties to this Term Sheet agree to affirmatively support any chapter 11 plan that is materially consistent with the Stipulation and the Term Sheet and to timely vote and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate) in each case in favor of any matter requiring approval to the extent necessary to implement such chapter 11 plan. |
| **Governing Law**: | New York but excluding any principles of conflicts of law or other rule of law that would cause the application of the law of any jurisdiction other than the State of New York. |
| | The Note Parties will submit to the exclusive jurisdiction and venue of the Bankruptcy Court, or in the event that the Bankruptcy Court does not have or does not exercise jurisdiction, then in any state or federal court of competent jurisdiction in the State, County and City of New York, borough of Manhattan. |
| **Mutual Releases** | The DIP Orders shall provide for mutual releases effective as of the entry of the Interim DIP Order among Leadenhall, on one hand, and the Parent, on the other hand, in favor of each other and their respective affiliates (including the current and former officers, directors, and employees of each party) but excluding, in the case of the Parent, the Debtors and the Debtors' current and former officers in their capacities as such, in connection with the Note Parties for all transactions prior to the entry of the Interim DIP Order; *provided* that Leadenhall, in its capacity as a creditor of the Debtors, is not releasing any rights to distributions from the estate from any of the Debtors' causes of action, including claims against Parent and the current and former directors and officers of the Debtors. |

APP331

## EXHIBIT A

Conditions Precedent to Initial Advances under DIP Notes on the Closing Date:

(a)     The Note Parties shall have complied in full with the notice and other requirements of the Bankruptcy Code, in a manner acceptable to Leadenhall and Parent with respect to the Interim DIP Order and Leadenhall and Parent shall have received such evidence thereof as it shall reasonably require.  No trustee, or other disinterested person with expanded powers pursuant to Section 1104(c) of the Bankruptcy Code, shall have been appointed or designated with respect to any Note Party or their respective business, properties or assets and no motion shall be pending seeking any such relief.  All of the "first day orders" and "second day orders" entered by the Bankruptcy Court at the time of the commencement of the Chapter 11 Cases and prior to the Interim DIP Order shall be in form and substance reasonably satisfactory to Leadenhall and Parent.  A cash management order approving the cash management arrangements of the Note Parties consistent with the requirements under the DIP Notes, and otherwise in form and substance reasonably satisfactory to Leadenhall and Parent shall have been entered and shall be in full force and effect.

(b)     The Interim DIP Order shall have been entered by the Bankruptcy Court.

(c)     Receipt by Leadenhall and Parent of the Budget.

**<u>EXHIBIT B</u>**

<u>Guarantors</u>

- Reverse Mortgage Investment Trust Inc.

- RMIT Cash Management LLC

- RMIT Operating I LLC

- RMIT Operating II LLC

## EXHIBIT C

Existing Note Agreement

**EXHIBIT D**

Budget

## **EXHIBIT E**

Unencumbered Assets

**<u>Exhibit E</u>**

**Unencumbered Assets**

**Unencumbered Collateral of the Debtors[1]**

| Unencumbered Asset | Description |
|---|---|
| Equity in Warehouse Lines | Depending on the valuation of the assets financed on the Debtors' warehouse lines, the Debtors estimate that there may be unencumbered asset value in net equity in the following facilities:<br><br>• Amended and Restated Master Repurchase Agreement, by and between Nomura Corporate Funding Americas, LLC, Reverse Mortgage Funding LLC and Broad Street Funding Trust II, dated as of June 4, 2019 (the "Nomura Warehouse Facility");<br><br>• Master Repurchase Agreement, by and between TIAA, FSB, and Reverse Mortgage Funding LLC, dated as of September 15, 2017, as amended (the "TIAA Warehouse Facility");<br><br>• Mortgage Warehouse Agreement between Texas Capital Bank, National Association and Reverse Mortgage Funding LLC, dated as of July 2020, as amended (the "TCB Warehouse Facility"); and<br><br>• Amended and Restated Master Repurchase Agreement, by and between Barclays Bank PLC, Reverse Mortgage Funding LLC, Reverse Mortgage Investment Trust Inc., RMIT Operating I LLC, RMIT Operating II LLC and RMIT Cash Management LLC, dated as of May 15, 2017, as amended (the "Barclays Warehouse Facility"). |
| FNMA MSRs | As an approved Federal National Mortgage Association ("Fannie Mae") servicer, the Debtors may have interests as a servicer under the applicable Fannie Mae seller/servicer guides, including the right to submit requests for reimbursement by Fannie Mae, called 571 Claims, for certain advances the Debtors have made as servicers of |
| ICBC Retained Cash | The Debtors hold cash in a brokerage account with broker-dealer ICBC. |

[1] The analysis herein is preliminary and subject to material review, and constitutes an estimation of assets that may potentially constitute Unencumbered Collateral. The descriptions herein shall not be used by any party as support for a conclusion that unencumbered exists as it relates to any of the assets herein.

| Unencumbered Asset | Description |
|---|---|
| | reverse mortgage loans, including for property taxes, insurance premiums, applicable homeowners association dues, and other out-of-pocket expenses. |
| Security Deposits | Certain lessors of the Debtors hold security deposits that constitute funds of the Debtors. |
| REO Property | The Debtors hold real estate owned property. |
| Unfinanced Buyouts | Once the balance of a given Home Equity Conversion Mortgage loan ("HECM Loan") equals or exceeds 98% of the designated "maximum claim amount" for such loan, the Debtors are obligated, per Ginnie Mae requirements, to purchase participations from their related securitization pools (the "Buyouts"). The Debtors at times complete buyouts without the use of warehouse financing, and in such cases the HECM Loans whose participations are purchased by the Debtors constitute unencumbered assets. |
| HUD Receivables | Once the Debtors complete a Buyout, the Debtors are entitled to seek repayment on the amounts advanced to perform the Buyout. Depending on the performing or non-performing status of the reverse mortgage loan, the Debtors must either (i) undergo a Federal Housing Administration ("FHA")[2] claims assignment process; or (ii) seek to liquidate the underlying reverse mortgage loan and subsequently file a reimbursement claim from the FHA to the extent the liquidation proceeds do not satisfy the total obligations owed under the loan. The Debtors are owed amounts from the FHA pursuant to both the claims assignment process and the reimbursement claim process. |
| Celink Claims | The Debtors believe they are owed certain amounts from Compulink d/b/a Celink ("Celink") on account of servicing error claims against Celink. |

---

[2]    The FHA is an agency within the U.S. Department of Housing and Urban Development ("HUD").

**Exhibit B**

**Tail Advance DIP Term Sheet**

APP340

## REVERSE MORTGAGE FUNDING LLC

$80,000,000 Senior Secured DIP Tail Advances

### Terms and Conditions[1]

**Borrower**:  Reverse Mortgage Funding, LLC (the "**Borrower**"), as debtor and debtor-in-possession.

**Guarantors**:  Each of the entities listed on <u>Exhibit B</u>, each as debtor and debtor-in-possession (collectively, the "**Guarantors**").  Such Guarantors, together with the Borrower, are referred to herein each as a "**Loan Party**" and collectively, as the "**Loan Parties**" or the "**Debtors**".

"**Chapter 11 Cases**" mean proceedings under chapter 11 of title 11 of the U.S. Code (the "**Bankruptcy Code**") of the Borrower and the Guarantors before that certain U.S. Bankruptcy Court in the District of Delaware (the "**Bankruptcy Court**") filed on November     2022 (the "**Petition Date**").

**DIP Tail Advances**:  TCB shall provide a priming first priority senior secured debtor-in-possession short term loan facility (the "**DIP Tail Facility**") to the Debtors of up to $80,000,000 (the "**DIP Tail Advances**") on terms consistent with the Existing Tail Loan Agreement, as modified herein. Notwithstanding anything to the contrary herein, in no event shall (i) the amount of Advances (as defined in the Existing Tail Loan Agreement) plus DIP Tail Advances outstanding at any time exceed $115,000,000 in the aggregate, and (ii) TCB have any obligation to provide DIP Tail Advances after December 16, 2022, unless the Bankruptcy Court enters an order approving the transfer stipulation between the Government National Mortgage Association ("**GNMA**"), Leadenhall Life Insurance Linked Investments Fund Plc) ("**Leadenhall**"), Longbridge Financial, LLC ("**Longbridge**"), BNGL Holdings, L.L.C. ("**RMF Parent**"), and Borrower (the "**Stipulation**"), and to the extent the Bankruptcy Court enters such an order, TCB's obligation to make DIP Tail Advances in accordance with, and subject to, the terms and conditions hereof shall extend to January 3, 2022.

Each of the Loan Parties and TCB hereby agrees that the version of the Existing Tail Loan Agreement attached as <u>Exhibit C</u> hereto shall constitute the fully effective Existing Tail Loan Agreement.

---

[1] Capitalized terms used but not defined in this Term Sheet shall have the meanings ascribed to them in that certain that certain Fifth Amended and Restated Loan and Security Agreement, dated as of August 26, 2021, among Reverse Mortgage Funding LLC (the "**Borrower**") and Texas Capital Bank (the "**TCB**") guaranteed by Reverse Mortgage Investment Trust Inc., a Maryland Corporation, RMIT Cash Management LLC, a Delaware limited liability company, and RMIT Operating II LLC, a Delaware limited liability company (as heretofore amended, restated, supplemented or otherwise modified, the "**Existing Tail Loan Agreement**").  For the avoidance of doubt, the Maturity Date under the existing Promissory Note (which is incorporated into the Existing Tail Loan Agreement) is extended out to coincide with the Maturity Dates set forth in this Term Sheet.

The DIP Tail Advances shall in all cases be funded directly to Celink in its capacity as subservicer, for the benefit of the Borrower, for the purpose of pooling and securitizing HECM Tails into a HMBS and delivering same to a HECM Tail Investor for purchase (the "Approved Purpose").

**Use of Cash Collateral:** Except as provided herein, in addition to the liquidity provided by the DIP Tail Advances, the DIP Orders (as defined below) will authorize the Loan Parties to use any collateral that constitutes "cash collateral" as such term is defined in Section    a) of the Bankruptcy Code ("*Cash Collateral*") in accordance with the terms hereof.

**Purpose/Use of Proceeds:** The proceeds of the DIP Tail Advances may be used solely for the Approved Purpose.

**DIP Collateral; DIP Lien Priority; Cross-Collateralization:** The DIP Orders shall grant and approve, among other things, the liens, claims and security interests (collectively, the "*DIP Liens*", and the assets subject thereto, the "*DIP Collateral*") in the order of priority described below:

(a)    pursuant to Bankruptcy Code Section    c)(1), a joint and several superpriority administrative expense claim in the Chapter 11 Cases in respect of all obligations under the DIP Tail Advances with priority over all other administrative expenses ("*DIP Tail Advances Superpriority Claim*"), including all other superpriority administrative claims granted by the Debtors in connection with any other post-petition financing incurred by the Debtors or any adequate protection of prepetition secured interests;

(b)    pursuant to Bankruptcy Code Section    c)(2), all obligations under the DIP Tail Advances and any other existing prepetition indebtedness owing from the Debtors to TCB (the "*Prepetition TCB Obligations*") shall be secured by first priority valid, perfected, enforceable and unavoidable liens on, and security interests in, all assets of the Loan Parties that are not otherwise subject to valid, perfected, enforceable and unavoidable liens and security interests in existence as of the Petition Date or valid liens perfected (but not granted) after the Petition Date (to the extent such perfection in respect of a prepetition claim is expressly permitted under the Bankruptcy Code) (the "*Unencumbered Assets*"); provided, that solely with respect to the Unencumbered Assets securing the Prepetition TCB Obligations hereunder, such post-petition liens granted hereunder shall be limited to $4,000,000; provided, further, that upon the liquidation or monetization of any Unencumbered Assets, the first $4,000,000 shall be deposited into a segregated account at TCB for the benefit of TCB and any further disposition of such funds shall be subject to an order of the Bankruptcy Court (the "*TCB Additional Collateral Account*"). For the avoidance of doubt, Unencumbered Assets do not

include assets or property that has been transferred in connection with the Debtors' warehouse repo facilities or securities repo facilities (collectively, the "**Repo Facilities**"); provided, that Repo Facility Equity Value shall constitute Unencumbered Assets. As used here, "**Repo Facility Equity Value**" means the property deemed to be property of the estate pursuant to Section 559 of the Bankruptcy Code;

(c)  pursuant to Bankruptcy Code Section c) and (d), all obligations under the DIP Tail Advances shall be secured by (i) priming first priority valid, perfected, enforceable and unavoidable liens on, and security interests in, the existing collateral securing the obligations under the Existing Tail Loan Agreement ("**Existing Collateral**"); (ii) a priming first priority valid, perfected, enforceable and unavoidable liens on, and security interests in, the proceeds of prepetition tail securitization proceeds to the extent they reflect a premium to par (the "**TCB Tail Premium Collateral**"), notwithstanding any provision in the Intercreditor Agreement by and between RMF, Leadenhall, and TCB, dated October 17, 2018; and (iii) junior priority valid, perfected, enforceable and unavoidable liens on, and security interests in, any collateral securing any other postpetition funded debt obligations that does not constitute Existing Collateral or TCB Tail Premium Collateral (the "**Junior DIP Collateral**"); provided, that such TCB Tail Premium Collateral and the Junior DIP Collateral shall also secure the Prepetition TCB Obligations up to $4,000,000 (which shall be coextensive and not incremental to the liens granted to secure the Prepetition TCB Obligations in subsection (b) immediately above) and upon the liquidation or monetization of any TCB Tail Premium Collateral and/Junior DIP Collateral that TCB's lien is senior at such time that the cash proceeds become available to satisfy the Prepetition TCB Obligations such cash proceeds shall be funded to the TCB Additional Collateral Account for the benefit of TCB, unless and until the TCB Additional Collateral Account is funded with an aggregate amount of $4,000,000.

Notwithstanding anything to the contrary herein (or in any other debtor in possession financing term sheet) for the avoidance of doubt, the DIP Liens granted to TCB hereunder shall be senior and prior to claims on account of or liens securing obligations incurred by the Debtors in connection with any other post-petition financing facility incurred by the Debtors. For the avoidance of doubt, the DIP Liens and the liens securing the Prepetition TCB Obligations shall not be subordinated or subject to a professional fee Carve-Out.

Unencumbered Assets include, without limitation, all claims and/or causes of action of any Loan Party against Celink (inclusive of any Avoidance Action (as defined below)). The DIP Collateral shall not include actions for preferences, fraudulent conveyances, and other

3

avoidance power claims under Sections 544, 545, 547, 548, 550 and 553 of the Bankruptcy Code (the *"Avoidance Actions"*), but, subject to the entry of the Final DIP Order, shall include the proceeds of Avoidance Actions.

Subject to the entry of the Final DIP Order, the DIP Tail Advances shall not be subject to surcharge under Section 506(c) of the Bankruptcy Code or the "equities of the case" exception under Section 552(b) of the Bankruptcy Code.

All of the security interests and liens described herein with respect to the Loan Parties shall be effective and perfected as of the entry of the Interim DIP Order and without the necessity of the execution of security agreements, pledge agreements, financing statements or other agreements.

|                          |                          |
|--------------------------|--------------------------|
| **Adequate Protection of TCB:** | As adequate protection of TCB as the lender under (i) the Existing Tail Loan Agreement, (ii) that certain Loan and Security Agreement, by and between TCB and Reverse Mortgage Funding LLC, dated as of October 2018, as amended (the "***Existing Buyout Facility***"), (iii) that certain Mortgage Warehouse Agreement, dated as of July     2022 by and between TCB and Reverse Mortgage Funding LLC, as amended (the "***Existing Repo Facility***"), and (iv) any other prepetition secured indebtedness owing from the Loan Parties to the TCB (collectively, the "***Existing Facilities***"), TCB shall receive: |

(a) pursuant to Bankruptcy Code Section     2), adequate protection replacement liens on the DIP Collateral, junior only to the DIP Liens;

(b) a superpriority administrative expense claim as contemplated by Sections 507(b) and     c)(1) of the Bankruptcy Code (the "***Existing Lender Superpriority Adequate Protection Claim***"), junior only to the DIP Tail Advances Superpriority Claim granted in respect of the DIP Tail Advances obligations;

(c) with respect to Advances funded to the Debtors prior to the Petition Date, the Debtors shall comply on a post-petition basis with all terms of payment set forth in the Existing Tail Loan Agreement to the extent necessary to facilitate such payment terms, including, but not limited to, sections 2.4, 2.7(b), 2.7(c), 2.8 and 2.10;

(d) solely using the proceeds of the DIP Fee Notes, without duplication of amounts required to be paid pursuant to the above, upon entry of the Interim DIP Order, payment in cash of all reasonable professional fees and expenses of TCB (Paul, Weiss, Rifkind, Wharton & Garrison LLP, and one local Delaware counsel);

(e) express recognition under any future DIP Order approving the DIP Tail Advances that pursuant to §§     555, and 559 of the Bankruptcy Code, TCB is authorized to exercise its rights and remedies to liquidate, accelerate and/or terminate its relevant governing agreements under the

4

Existing Facilities with the Borrower and any related documents, and to the extent not within the scope of § b)(6) or (7), the automatic stay is lifted to allow TCB to exercise such rights and remedies and/or to set off against any amounts of the Borrower held by TCB that constitute proceeds of its collateral;[2]

(f) express authorization under the DIP Orders that TCB is authorized to apply any amounts received from the FHA to which TCB is entitled on account of (i) assignment of "Active Buyouts" to FHA or (ii) any claim submitted following liquidation of "Non-Active Buyouts, in each case, to the extent that TCB is entitled to such proceeds under the Existing Buyout Facility; and

(g) upon entry of the Interim Order, the Debtors shall be authorized to take all steps and actions reasonably necessary to facilitate compliance with or satisfaction of the Debtors' obligations to buyout certain FHA guaranteed loans by a third-party acceptable to Ginnie Mae by December 19, 2022.

Any DIP Order (as defined herein) shall include relief from the automatic stay to make such payments as adequate protection.

|  |  |
|---|---|
| **Cash Management:** | Subject to approval by the Bankruptcy Court, after commencement of the Chapter 11 Cases, the Loan Parties shall use a cash management system reasonably satisfactory to TCB. TCB shall not be permitted to exercise setoff rights unless otherwise permitted by any order of the Bankruptcy Court authorizing the Debtors' continued use of their cash management system, any order of the Bankruptcy Court approving post-petition financing, including, without limitation, the DIP Orders, or any further order of the Bankruptcy Court.. |
| **Compliance with Terms of Payment:** | With respect to any DIP Tail Advances, the Debtors shall comply in all respects with the terms of payment set forth Article 2 of the Existing Tail Loan Agreement. |
| **Challenge Period:** | The Interim DIP Order and Final DIP Order shall provide that a Committee and any other party in interest must file a pleading with the Bankruptcy Court challenging the validity, extent, perfection and/or priority of any claims or security interest of TCB no later than 75 days after entry of the Interim DIP Order. Failure of the Committee or any other party in interest to file such a pleading with the Bankruptcy Court shall forever bar such party from making such a challenge. |
| **Closing Date**: | The date on which the Interim DIP Order to which this term sheet is approved and entered by the Bankruptcy Court and the conditions precedent under the DIP Tail Advances have been satisfied or waived (the "**Closing Date**"), but in no event later than December 9, 2022. |

---

[2] The Debtors shall fully and expeditiously cooperate with TCB to facilitate the exercise of such rights.

On or before December 9, 2022, an interim DIP order (the "*Interim DIP Order*") shall have been entered, which shall be in form and substance acceptable to TCB.

On or before the 35th day following entry of the Interim DIP Order, a final DIP Order shall have been entered and shall not have been reversed, modified, amended, stayed or vacated and shall not be subject to a stay pending appeal, and which shall be in form and substance acceptable to TCB (the "*Final DIP Order*", and together with the Interim DIP Order, "*DIP Orders*", and each individually, a "*DIP Order*").

**Maturity**:

The DIP Tail Advances shall be repaid in full in cash (and, to the extent not already repaid or terminated, and all commitments thereunder shall automatically and permanently terminate) on the earliest of following dates (each a "*Maturity Date*"):

(a)     January     2023;

(b)     December 9, 2022, if the Interim DIP Order has not been entered,

(c)     December 16, 2022, if the Bankruptcy Court has not entered an order approving the Stipulation,

(d)     ___ days after entry of the Interim Order if the Final DIP Order has not been entered,

(e)     the "effective date" of a chapter 11 plan filed in the Chapter 11 Cases that is confirmed pursuant to an order entered by the Bankruptcy Court,

(f)     the date the Chapter 11 Cases are dismissed or converted to chapter 7 case(s), and

(g)     the day that is one (1) business day prior to the date upon which any other postpetition debtor-in-possession DIP financing facility of the Debtors is scheduled to mature (as of the Closing Date, without regard to any extension of such maturity date following the Closing Date).

**Interest Rates**:

As set forth in the Existing Tail Loan Agreement

**HECM Tail Collateral Value:**

For purposes of determining the HECM Tail Collateral Value for any DIP Tail Advances, the definition of HECM Tail Collateral Value in the Existing Tail Loan Agreement shall be replaced by the following:

"*HECM Tail Collateral Value*" means, as of any date of determination, an amount equal to ___ of the aggregate outstanding principal amount of all non-securitized Eligible HECM Tails held by Borrower for which a first priority, perfected, security interest in the HECM Tail Collateral

6

has been granted by Borrower to Bank.  Notwithstanding anything to the contrary contained herein, HECM Tails for which an Advance has been outstanding for sixty (60) days or longer shall be expressly excluded from the calculation of the Borrower Base, except for, subject to the Extended Period HECM Tail Sublimit, Extended HECM Tails; provided, that once an Advance on a HECM Tail has been timely repaid, Borrower may request a subsequent Advance on the same HECM Tail (and consequently such HECM Tail may be included in the Borrower Base) so long as such HECM Tail remains an Eligible HECM Tail.

| **Participation Agreement** | The Existing Tail Loan Agreement shall be automatically deemed to be modified in all appropriate respects to (i) permit the transactions contemplated by that certain Participation Agreement to be entered into by and between TCB and Longbridge (the "<u>Participation Agreement</u>"), pursuant to which Longbridge has agreed (subject to the fulfillment of the conditions precedent therein), among other things, to participate in the making DIP Tail Advances up to five percent (5%) (i.e., $4,000,000) of the DIP Tail commitment prior to TCB making any DIP Tail Advances and (ii) reflect the Longbridge's status as an "Indemnified Party" under Section 10.10 of the Loan and Security Agreement by virtue of it being a successor and/or assign of TCB. |
| --- | --- |
| **Expenses**: | Solely using the proceeds of the DIP Fee Notes, the Borrower will pay all reasonable and documented out-of-pocket costs and expenses (including reasonable and documented fees and expenses of counsel (including local counsel in each appropriate jurisdiction) and a financial advisor) for TCB (which include, without limitation, Paul, Weiss, Rifkind, Wharton & Garrison LLP and one Delaware local counsel) in connection with administering the DIP Tail Advances, preparing all documents and enforcing any and all obligations relating to the DIP Tail Advances. |
| | Leadenhall shall reimburse Longbridge for all reasonable out-of-pocket fees, costs and expenses incurred by Longbridge in connection with Longbridge's evaluation, negotiation, entry into, and monitoring of any financing to Borrower and its affiliates as debtors and debtors-in-possesion in connection with their chapter 11 cases (the "Reimbursable Expenses"), which, for the avoidance of doubt, shall include, but shall not be limited to, fees of Weil, Gotshal & Manges LLP, Lowenstein Sandler LLP, and Richards, Layton & Finger each as counsel to Longbridge, and the monthly fees of Houlihan Lokey, Inc., as financial advisor to Longbridge; provided, that Leadenhall's reimbursement of the Houlihan Lokey, Inc. monthly fees shall be capped at $50,000 per month. Leadenhall shall remit to Longbridge any reimbursement which is owed to Longbridge pursuant to the terms of this Stipulation within ten (10) days of Leadenhall's receipt of a written request from Longbridge for reimbursement of Reimbursable Expenses incurred by Longbridge, which reimbursement shall be made by wire transfer in immediately available funds to an account designated by Longbridge; provided, that at Longbridge's election, Longbridge shall be entitled to |

offset the amount of such reimbursement against any of its obligations to Leadenhall.

**Affirmative Covenants**:

(a) The Loan Parties shall ensure that Celink, subject to the Debtors' reservation of rights for preexisting claims, continues to act as subservicer with respect to all loans acquired by Longbridge before the Transfer Date;

(b) the Loan Parties shall provide all notices of litigation, defaults, and unmatured defaults and other information reasonably requested (including (i) all documents filed under seal with the Bankruptcy Court or (ii) distributed to any Committee to the extent that such information or communications reasonably relate to TCB),

(c) the Loan Parties provide notice of any event, occurrence, or circumstance in which a material portion of the DIP Collateral is damaged, destroyed, or otherwise impaired or adversely affected,

(d) the Loan Parties promptly and diligently oppose any motion filed by persons in the Bankruptcy Court to lift the stay on the DIP Collateral (other than any such motion(s) filed by TCB), any motion filed by persons in the Bankruptcy Court to terminate the exclusive ability of the Loan Parties to file a plan of reorganization, and any other motion filed by persons in the Bankruptcy Court that, if granted, could reasonably be expected to have a material adverse effect on TCB or any DIP Collateral,

(e) the Loan Parties shall take all commercially reasonable actions necessary for the remaining balance of all Tail Advances to be securitized by GNMA by no later than January      2023.

(f) satisfaction of each of the following (each, a ***"Milestone"***):

    1. By no later than December 9, 2022, the Bankruptcy Court shall enter the Interim DIP Order, in form and substance acceptable to TCB.

    2. By no later than December 16, 2022, the Bankruptcy Court shall enter an order approving the Stipulation.

    3. By no later than December 19, 2022, the Debtors' obligations under the GNMA program requirements to effectuate and consummate the buyout of the FHA guaranteed loans shall have been fulfilled (whether by the Debtors or another party).

    4. By no later than      days following entry of the Interim DIP Order, the Bankruptcy Court shall

enter the Final DIP Order, in form and substance reasonably acceptable to TCB.

5. By no later than January 3, 2023, the transfer of the Borrower's Ginnie Mae HECM servicing rights to Longbridge or some other party (the "*Transfer Date*") shall have been consummated.

6. By no later than December 16, 2022, no less than $60,000,000 of the Advances are securitized by GNMA by such date.

**Events of Default**:     Events of default to include, without limitation, the following:

(a)     the filing of any pleading, motion or application seeking, or the entry of an order authorizing, approving or granting:

    (i)     conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code;

    (ii)    the dismissal of any of the Chapter 11 Cases (or any subsequent Chapter 7 case);

    (iii)   appointment of a trustee, examiner or disinterested person with expanded powers relating to the operations or the business of any Loan Party in the Chapter 11 Cases;

    (iv)    additional post-petition senior financing or liens on the DIP Collateral, in each case, without the consent of TCB;

    (v)     any action adverse to TCB its rights and remedies in the DIP Collateral;

    (vi)    relief from the automatic stay for the benefit of any other creditor with respect to any material DIP Collateral without the consent of TCB; or

    (vii)   any Loan Party's motion to disallow in whole or in part TCB's claim in respect of the obligations under the DIP Tail Advances, the Advances, the Existing Tail Loan Agreement, the Existing Buyout Facility or any other indebtedness owing to TCB, or contest any material provision of any DIP Tail Advances documents;

(b)     the failure of any Loan Party to comply with any DIP Order;

(c)     an order is entered by the Bankruptcy Court in any of the Chapter 11 Cases without the express prior written consent of TCB (i) to revoke, reverse, stay, modify, supplement or amend

9

APP349

the DIP Orders in a manner that is inconsistent with the DIP Tail Advances that adversely affects, and is not otherwise consented to by, TCB, (ii) to grant or permit the grant of a senior lien on the DIP Collateral (other than liens permitted under the DIP Tail Advances);

(d)    the commencement of, support of or failure to oppose any action against TCB by or on behalf of any Loan Party or any Loan Party's affiliates or officers;

(e)    any lien or administrative expense claim is allowed having priority to or ranking in parity with the rights of TCB;

(f)    [reserved]

(g)    the filing of any chapter 11 plan that does not provide for repayment in full in cash of the DIP Tail Advances without the consent of TCB;

(h)    payment of or granting senior adequate protection with respect to any of the existing secured debt of any of the Loan Parties, other than as set forth herein without the consent of TCB or in the DIP Orders;

(i)    liens or super-priority claims with respect to the DIP Tail Advances shall at any time cease to be valid, perfected and enforceable in all respects with the priority described herein;

(j)    allowance of any claim under Bankruptcy Code Section 506(c) or otherwise against any or all of TCB or the DIP Collateral;

(k)    any termination or modification of the exclusivity periods set forth in Bankruptcy Code Section 1121;

(l)    any subsidiary of a Loan Party that is not subject to the Chapter 11 Cases becomes subject to an insolvency proceeding without the consent of TCB;

(m)    the occurrence of any actions taken by GNMA that have a material adverse effect on the operation of the Debtors' business; or

(n)    the failure to meet any Milestone.

TCB may exercise remedies consistent with the DIP Orders upon five (5) business' days' notice from TCB to the Loan Parties of the occurrence of an event of default; provided, however, that TCB agrees not to oppose a request by the Loan Parties for an expedited hearing during such five (5) business-day period to re-impose or continue the automatic stay under Section        of the Bankruptcy Code.

| | |
|---|---|
| **Conditions Precedent to Borrowing**: | The conditions precedent to the borrowing of the DIP Tail Advances (x) on the Closing Date are set forth on <u>Exhibit A</u> hereto and (y) thereafter, are the conditions in the Existing Tail Loan Agreement as modified by this Term Sheet, including (i) with respect to HECM Tail Collateral Value and (ii) that the following conditions from the Existing Tail Loan Agreement shall be not required to be satisfied:[3] (i) absence of any Default or Event of Default arising (a) before the commencement of the Chapter 11 Cases, (b) because of the Chapter 11 Cases, (c) because of the occurrence of any event of default (or the equivalent) in respect of any other indebtedness of the Borrower or any affiliate thereof, (d) because of any failure to satisfy any financial covenant or test at any time and/or (e) because of failure to give any notice with respect to any matter described in the foregoing clauses or (ii) inability to make any representation or warranty because of any of the matters described in clause (i) above or related in any way to the solvency or financial condition of the Borrower or any affiliate thereof.<br><br>Notwithstanding anything else provided herein, TCB shall have no obligation to provide any DIP Tail Advances following the earlier to occur of (i) January 3, 2023 and (ii) the Transfer Date. |
| **Governing Law**: | The governing law provisions of the Existing Tail Loan Agreement shall control; provided, that the parties will submit to the exclusive jurisdiction and venue of the Bankruptcy Court, or in the event that the Bankruptcy Court does not have or does not exercise jurisdiction, then in any state or federal court of competent jurisdiction in the State, County and City of New York, borough of Manhattan. |
| **Releases** | The DIP Orders shall provide for releases effective as of the entry of the Interim DIP Order of TCB and Longbridge in connection with the Loan Parties and all prepetition and postpetition transactions. |

---

[3] For the avoidance of doubt, TCB does not waive any (or any rights with respect to) Defaults or Events of Default, and hereby expressly reserves all rights in all respect.

## EXHIBIT A

Conditions Precedent to Initial Borrowings under DIP Tail Advances on the Closing Date:

(a)    The Loan Parties shall have complied in full with the notice and other requirements of the Bankruptcy Code, in a manner acceptable to TCB with respect to the Interim DIP Order and TCB shall have received such evidence thereof as it shall reasonably require. No trustee, or other disinterested person with expanded powers pursuant to Section 1104(c) of the Bankruptcy Code, shall have been appointed or designated with respect to any Loan Party or their respective business, properties or assets and no motion shall be pending seeking any such relief. All of the "first day orders" and "second day orders" entered by the Bankruptcy Court at the time of the commencement of the Chapter 11 Cases and prior to the Interim DIP Order shall be in form and substance reasonably satisfactory to TCB. A cash management order approving the cash management arrangements of the Loan Parties consistent with the requirements under the DIP Tail Advances, and otherwise in form and substance reasonably satisfactory to TCB shall have been entered and shall be in full force and effect.

(b)    The Interim DIP Order shall have been approved by the Bankruptcy Court.

(c)    Leadenhall has agreed to support the Active Buyout obligations on December 19, 2022.

(d)    Starwood has agreed to support the Active Buyout/Non-Active Buyout securitization scheduled on December 15, 2022.

(e)    Confirmation that Celink will use the proceeds of the applicable DIP Tail Advances only for the Approved Purpose.

(f)    TCB shall have received a copy of the Participation Agreement, duly authorized and executed by TCB and Longbridge.

(g)    GNMA, Longbridge, Leadenhall, RMF Parent, and the Debtors shall have executed the Transfer Stipulation.

(h)    TCB shall have received a written agreement from GNMA stating: (a) GNMA shall support the Debtors' securitization of any HECM Tails and HECM Loans in accordance with the HECM program; and (b) GNMA shall agree that if any successor Issuer of the MSRs (or GNMA itself) does not transfer the MSRs to a new Issuer within 60 days, GNMA will pay off any remaining outstanding amounts under the DIP Tail Facility on or before such 60-day period; provided, that, if the Tails are securitized, then GNMA will pay off the premiums on the Tails.

**EXHIBIT B**

Guarantors

- Reverse Mortgage Investment Trust Inc.

- RMIT Cash Management LLC

- RMIT Operating I LLC

- RMIT Operating II LLC

**<u>EXHIBIT C</u>**

<u>Existing Tail Loan Agreement</u>

## TEXAS CAPITAL BANK, NATIONAL ASSOCIATION

## FIFTH AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT

**THIS FIFTH AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT** ("Agreement") is made and entered into as of August 26, 2021 (the "Effective Date"), by and between TEXAS CAPITAL BANK, NATIONAL ASSOCIATION, a national banking association ("Bank") and REVERSE MORTGAGE FUNDING LLC, a Delaware limited liability company ("Borrower").

### RECITALS

A.       Borrower has requested that Bank extend credit to Borrower as described in this Agreement.

B.       Subject to and upon the provisions, terms and conditions of this Agreement, Bank is willing to make such credit available to Borrower and has agreed to lend to Borrower the amounts herein described for the purposes set forth below.

### AGREEMENT

NOW, THEREFORE, in consideration of the premises, the covenants, representations, warranties and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby covenant and agree as follows:

### ARTICLE 1
### CERTAIN DEFINITIONS

1.1     Definitions.  As used in this Agreement, all exhibits and schedules hereto and in any note, certificate, report or other Loan Documents made or delivered pursuant to this Agreement, the following terms will have the meanings given such terms in Article One.

"Accounts" mean all of Borrower's accounts receivable of every nature and description, whether now existing or hereafter arising, the Proceeds and products thereof including, without limitation, all notes, drafts, acceptances, instruments, and chattel paper arising therefrom, any returned or repossessed goods the sale of which created any such accounts receivable, and all Proceeds (in any form or fashion) of any sale or other disposition of Borrower's inventory.

"Acknowledgment Agreement" means that certain Acknowledgement Agreement, executed by the Agency, the Borrower, and Leadenhall Capital Partners LLP.

"Advance" means any disbursement of an amount or amounts to be loaned by Bank to Borrower hereunder or the reborrowing of amounts previously loaned hereunder.

"Advance Request" means, as of the date of preparation, a certificate requesting an Advance in the form of **Exhibit A** prepared by an Authorized Officer.

"Affiliate" means, as to any Person, any other Person (a) that directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, such Person, (b) that directly or indirectly beneficially owns or holds ten percent (10%) or more of any class of voting stock of such Person, or (c) that controls ten percent (10%) or more of the voting stock of which is directly or indirectly beneficially owned or held by the Person in question.  As used herein, the term "control" means the possession, directly or indirectly, of the power to direct or cause direction of the management and

policies of a Person, whether through the ownership of voting securities, by control, or otherwise; provided, however, in no event shall Bank be deemed an Affiliate of Borrower; provided that Affiliate shall not mean any Person satisfying any of the foregoing to the extent that such Person obtains such status through ownership of a corporate parent of Borrower and such Person is not in the reverse mortgage origination business.

"Agency" means Ginnie Mae, or any other governmental agency which now or hereafter purchases and/or guaranties mortgage loans.

"Aging Report" has the meaning set forth in Section 6.1(i).

"Agreement" means this Fifth Amended and Restated Loan and Security Agreement, as the same may, from time to time, be amended, supplemented, or replaced.

"Approved Purposes" mean for the purpose of pooling and securitizing HECM Tails into a HMBS and delivering same to a HECM Tail Investor for purchase.

"Article" and "Articles" have the meanings set forth in Section 1.6.

"Asset Representation" means each of the representations set forth in (i) the last sentence of Section 5.12, (ii) Section 5.14, (iii) Section 5.15 to the extent related to a specific HECM Tail, (iv) Section 5.20, (v) Section 5.21 and (vi) Section 5.22.

"Authorized Officer" means the President, Chief Executive Officer, Chief Financial Officer, and any other officers legally authorized by Borrower and approved hereafter in writing by Bank.

"Bank" means Texas Capital Bank, National Association and its successors and assigns.

"Borrower" means the Person identified as such in the introductory paragraph hereof, and its successors and assigns.

"Borrower Base" means at any time an amount equal to the HECM Tail Collateral Value of all Eligible HECM Tails which have been identified by Borrower on the most recent Aging Report delivered to the Bank pursuant to Section 6.1(i), subject to the Extended Period HECM Tails Sublimit.

"Borrowing Base Certificate" means, as of any date of preparation, a Borrowing Base Certificate in substantially the form of **Exhibit B** attached hereto, prepared by and certified by an Authorized Officer of Borrower.

"Borrowing Limit" means the lesser of the Borrower Base or the Committed Sum.

"Business Day" means a day other than a Saturday, Sunday or a day on which commercial banks in Dallas, Texas, or the State of New Jersey, are authorized to be closed. Unless otherwise provided, the term "days" means calendar days.

"Capital Lease Obligation" means, with respect to any Person, the amount of Debt under a lease of property by such Person that would be shown as a liability on a balance sheet of such Person prepared for financial reporting purposes in accordance with GAAP, or other method of accounting acceptable to Bank.

"Code" means the Uniform Commercial Code of the State of Texas or other applicable jurisdiction as it may be amended from time to time.

"Collateral" means the following, wherever located, in which Borrower now has or at any time hereafter has or acquires any right, title or interest, and all Proceeds and products thereof, together with all books and records, customer lists, credit files, computer files, programs, printouts and other computer materials and records related thereto:

(a)    Borrower's rights, title and interest in HECM Tails made by Borrower for the purpose of pooling and securitizing into a HMBS and delivering same to a HECM Tail Investor, and any and all instruments or certificates representing such HECM Tails; provided, that Bank's security interest in any such HECM Tail or instrument (used herein as such term is defined in the Code) or certificate representing such HECM Tail shall terminate (x) at such time as Borrower has delivered to Bank, to Bank's satisfaction, evidence that such HECM Tail has been securitized into a HMBS and Bank has irrevocably received from the HECM Tail Investor good funds or (y) the related HECM Loan was securitized, has been repurchased or acquired by Borrower out of a securitized pool and, to the extent that Borrower had previously received an Advance from Bank in respect of such HECM Tail, Bank has irrevocably received from Borrower good funds.

(b)    Borrower's rights, title and interest into any HMBS resulting from the pooling and securitization of HECM Tails described in clause (a) above; provided, that Bank's security interest in any HMBS described in clause (a) above shall terminate at such time as Bank has irrevocably received good funds from the sale or financing of such HMBS.

(c)    together with the following ancillary rights:

(i)    all insurance, claims for insurance, and rights to guaranty repayments accruing with respect to the HECM Tails;

(ii)    all of the Borrower's files, certificates, correspondence, appraisals, accounting entries, journals and reports, other information and data that describes, catalogs or lists such information or data, or that otherwise directly relate to the HECM Tails, and other information and data that is used or useful for managing and administering the HECM Tails;

(iii)    all media (tapes, discs, cards, drives, flash memory or any other kind of physical or virtual data or information storage media or systems) on which is stored only information or data that relates to the HECM Tails, and on which no other material information and data that relates to property other than the HECM Tails is stored;

(iv)    the nonexclusive right to use (in common with the Borrower) Borrower's operating systems to manage and administer the HECM Tails and any of the related data and information described above, or that otherwise relates to the HECM Tails, together with the media on which the same are stored to the extent stored with material information or data that relates to property other than the HECM Tails (tapes, discs, cards, drives, flash memory or any other kind of physical or virtual data or information storage media or systems, and the Borrower's rights to access the same, whether exclusive or nonexclusive, to the extent that such access rights may lawfully be transferred or used by the Borrower's permittees), and any computer programs that are owned by the Borrower (or licensed to the Borrower under licenses that may lawfully be transferred or used by the Borrower's permittees) and that are used or useful to access, organize, input, read, print or otherwise output and otherwise handle or use such information and data;

(v)    all security for or claims against any Person in respect of the HECM Tails; and

(vi)    all Accounts, Proceeds, payments, entitlements and rights to payments, in each case, arising out of HECM Tails.

(d)      the Repayment Account.

provided, however, that the term "Collateral" shall not include any Servicing Rights of the Borrower.

"Commitment" means the obligation of Bank to make the Revolving Loans in an aggregate principal amount at any time outstanding up to but not to exceed in the aggregate the Borrowing Limit in effect from time to time.

"Commitment Fee" means Two Hundred Sixty Thousand and No/      Dollars ($260,000.00).

"Committed Sum" means Sixty-Five Million and No/      Dollars ($65,000,000.00).

"Compliance Certificate" means a certificate, substantially in the form of **Exhibit C** attached hereto, prepared by and executed by an Authorized Officer of Borrower.

"Conforming Loan" means a HECM Loan with respect to which each of the following statements is accurate and complete:

(a)      Such HECM Loan is a binding and valid obligation of the Obligor thereon, is in full force and effect and enforceable in accordance with its terms, except as enforceability may be limited by Debtor Relief Laws, and is eligible for inclusion in a Ginnie Mae HMBS securitization;

(b)      Borrower is the owner and, pursuant to the Custodian, holder of the HECM Loan and HECM Note, subject to prior participations, if any, sold by Borrower in prior HMBS securitizations in portions of the HECM Loan other than the HECM Tail, and Borrower's interest in the HECM Tail is free and clear of all liens and encumbrances;

(c)      The HECM Note evidencing such HECM Loan is genuine in all respects as appearing on its face and as represented in the books and records of Borrower, and all information set forth therein is true and correct;

(d)      The HECM Note evidencing such HECM Loan contains the entire agreement of the parties thereto with respect to the subject matter thereof, has not been modified or amended in any respect not expressed in writing therein and is free of concessions or understandings with the Obligor thereon of any kind not expressed in writing therein;

(e)      Such HECM Loan is in all respects in accordance with all requirements of Law applicable thereto, including, without limitation, all federal and state Laws applicable to residential mortgage loans, including without limitation home equity conversion mortgages, and the regulations promulgated thereunder and all applicable usury Laws and restrictions, and all notices, disclosures and other statements or information required by Law or regulation to be given, and any other act required by Law or regulation to be performed, in connection with such HECM Loan have been given and performed as required;

(f)      All advance payments and other deposits on such HECM Loan have been paid in cash, and no part of said sums has been loaned, directly or indirectly, by Borrower to the Obligor, except in accordance with the terms of the HECM Loan, and, other than as disclosed to Bank in writing or as permitted under the HECM Loan, there have been no prepayments;

(g)      The property covered by such HECM Loan is insured against loss or damage by fire and all other hazards normally included within standard extended coverage in accordance with the provisions of such HECM Loan with Borrower named as a loss payee thereon;

(h)      Such HECM Loan is secured by a first Mortgage on property consisting of a completed one-to-four unit single family residence which is not used for commercial purposes and which is not a construction loan;

(i)       Such HECM Loan is covered by title insurance insuring the Mortgage as a first and prior lien on the real property encumbered by the Mortgage;

(j)      Subject to Ginnie Mae's rights under the Acknowledgment Agreement and the Ginnie Mae Contract, at all times such HECM Loan will be owned by Borrower free and clear of all Liens, except in favor of Bank;

(k)      Such HECM Loan conforms to Ginnie Mae, HUD or Federal Housing Administration guidelines and is insured by the Federal Housing Administration; and

(l)      Borrower shall have retained and shall not have conveyed Servicing Rights with respect to such HECM Loan.

"Consent to Third Party Auditor Engagement Agreement" has the meaning set forth in Section 6.14.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of stock or other ownership interest, by contract, by the ability to appoint directors or managers or otherwise; it being acknowledged that a Person shall not be deemed to lack Control of another Person solely because certain decisions may be subject to "major decisions" consent or approval rights of limited partners, shareholders or non-managing members or representative body or bodies of the foregoing, as applicable ("Controlled" and "Controlling" each have the meanings correlative thereto).

"Current Financial Statements" means the financial statements of Borrower most recently submitted to Bank and dated within sixty (60) days of the Effective date.

"Custodian" means any custodian of a HECM Loan for the benefit of Borrower and Ginnie Mae designated in writing by Borrower to Bank and acceptable to Bank.

"Debt" means with respect to any Person at any time (without duplication), all obligations of such Person for borrowed money, whether evidenced by bonds, notes, debentures, or other similar instruments, including, without limitation, term financing, but expressly excluding mortgage loan warehouse or repurchase facilities and purchase money debt.

"Debtor Relief Laws" means the Bankruptcy Code of the United States and all other applicable liquidation, conservatorship, bankruptcy, moratorium, rearrangement, insolvency, reorganization, or similar debtor relief Laws affecting the rights of creditors generally from time to time in effect.

"Eligible HECM Tail" means a HECM Tail with respect to which each of the following statements is accurate and complete (and the Borrower by including such HECM Tail in any computation of the HECM Tail Collateral Value of the Borrower Base shall be deemed to so represent to Bank at and as of the date of such computation):

(a)      Such HECM Tail arises from a Conforming Loan;

(b)      Such HECM Tail has not been securitized into a HMBS;

(c)    Such HECM Tail has not been extended and outstanding sixty (60) days or more prior to Borrower's request for an Advance or, subject to the Extended Period HECM Tail Sublimit, one hundred-eighty (      days or more prior to Borrower's request for an Advance;

(d)    Such HECM Tail has not been included in the Borrower Base for more than sixty (60) days;

(e)    Such HECM Tail is eligible for securitization; and

(f)    If such HECM Tail is an Extended Period HECM Tail, the outstanding principal amount of such Extended Period HECM Tail, when added to the outstanding principal amount of all other Extended Period HECM Tails, does not exceed the Extended Period HECM Tail Sublimit.

"Environmental Laws" means any and all federal, state, and local laws, regulations, judicial decisions, orders, decrees, plans, rules, permits, licenses, and other governmental restrictions and requirements pertaining to health, safety, or the environment, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. § 9601, et seq., the Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6901, et seq., the Occupational Safety and Health Act,      U.S.C. § 651, et seq., the Clean Air Act, 42 U.S.C. § 7401 et seq., the Clean Water Act,      U.S.C. § 1251, et seq., and the Toxic Substances Control Act, 15 U.S.C. § 2601, et seq., as the same may be amended or supplemented from time to time.

"Event of Default" has the meaning set forth in Article Nine of this Agreement.

"Existing Litigation" has the meaning set forth in Section 5.5.

"Extended Period HECM Tails" means Eligible HECM Tails held by Borrower which have been extended for sixty (60) days or more but less than one hundred-eighty (      days.

"Extended Period HECM Tail Sublimit" means Three Million and No/      Dollars ($3,000,000.00).

"GAAP" means generally accepted accounting principles, applied on a consistent basis, set forth in Opinions of the Accounting Principles Board of the American Institute of Certified Public Accountants and/or in statements of the Financial Accounting Standards Board which are applicable under the circumstances and in effect as of the date in question; provided, however, that the phrase "applied on a consistent basis" means that the accounting principles applied in the current period be comparable in all material respects to those applied in preceding periods, except  to the extent that a deviation therefrom is expressly permitted by this Agreement.

"Ginnie Mae" means the Government National Mortgage Association and any successor.

"Ginnie Mae Contract" means (a) 12 U.S.C. § 1721(g) (the "Act") and the implementing regulations governing the mortgage-backed securities program operated by Ginnie Mae pursuant to Section      g) of the Act, 24 C.F.R. Part      (b) applicable Guaranty Agreements and contractual agreements between Ginnie Mae and Borrower, and (c) the Guide, Handbook 5500.3 Rev. 1, and other applicable guides.

"Guarantor" means any Person who from time to time guarantees all or any part of the Indebtedness.

6

"Guaranty" means a written guaranty of each Guarantor in favor of Bank, in form and substance satisfactory to Bank, as the same may be amended, modified, restated, renewed, replaced, extended, supplemented or otherwise changed from time to time.

"Guide" means the Ginnie Mae Mortgage-Backed Securities Guide, Handbook 5500.3 Rev. 1, as amended from time to time, together with the other documents or instruments issued for the benefit of Ginnie Mae thereunder (including without limitation, any guarantees).

"Hazardous Material" means any substance, product, waste, pollutant, material, chemical, contaminant, constituent, or other material which is or becomes listed, regulated, or addressed under any Environmental Law, including, without limitation, asbestos, petroleum, and polychlorinated biphenyls.

"HECM Loan" means Federal Housing Administration-insured home equity conversion mortgage loans which are evidenced by a HECM Note and secured by a Mortgage, together with the rights and obligations of a holder thereof and payments thereon and proceeds therefrom.

"HECM Note" means the note or other evidence of indebtedness evidencing the indebtedness of an Obligor under a HECM Loan.

"HECM Tail" means the aggregate of any additional amounts, including but not limited to amounts created by additional draws by the Obligor, interest accruals, mortgage insurance premiums, fees, or charges, which accrue, are disbursed, or are added to the balance of a previously-securitized HECM Loan after the closing date of any prior securitization of the HECM Loan or any prior HECM Tail related thereto.

"HECM Tail Collateral" means HECM Tails, together with any instruments or certificates representing any HECM Tails, including, without limitation, the related HECM Loans and HECM Notes.

"HECM Tail Collateral Value" means, as of any date of determination, an amount equal to ninety-five percent (95.0%) of the aggregate outstanding principal amount of all non-securitized Eligible HECM Tails held by Borrower for which a first priority, perfected, security interest in the HECM Tail Collateral has been granted by Borrower to Bank. Notwithstanding anything to the contrary contained herein, HECM Tails for which an Advance has been outstanding for sixty (60) days or longer shall be expressly excluded from the calculation of the Borrower Base, except for, subject to the Extended Period HECM Tail Sublimit, Extended Period HECM Tails; provided, that once an Advance on a HECM Tail has been timely repaid, Borrower may request a subsequent Advance on the same HECM Tail (and consequently such HECM Tail may be included in the Borrower Base) so long as such HECM Tail remains an Eligible HECM Tail.

"HECM Tail Investor" means any securitizer, investor, or other Person who purchases a HECM Tail or any pool of which a HECM Tail is a part, from Borrower.

"HMBS" means a Home Equity Conversion Mortgage-Backed Security.

"HUD" means the U.S. Department of Housing and Urban Development.

"Inchoate Lien" means any Lien for Taxes not yet due and payable and any mechanic's Lien and materialman's Lien for services or materials for which payment is not yet due.

"Indebtedness" means all present and future indebtedness, obligations, and liabilities of Borrower to Bank, including all direct and contingent obligations arising under letters of credit, banker's acceptances, bank guaranties and similar instruments, overdrafts, Automated Clearing House obligations, and all other financial accommodations which could be considered a liability under GAAP, or other

method of accounting acceptable to Bank, and all renewals, extensions, and modifications thereof, or any part thereof, now or hereafter owed to Bank by Borrower, and all interest accruing thereon and costs, expenses, and reasonable attorneys' fees incurred in the enforcement or collection thereof, regardless of whether such indebtedness, obligation, and liabilities are direct, indirect, fixed, contingent, liquidated, unliquidated, joint, several, or joint and several, including, but not limited to, the indebtedness, obligations, and liabilities evidenced, secured, or arising pursuant to any of the Loan Documents and all renewals and extensions thereof, or any part thereof, and all present and future amendments thereto, together with all liabilities of such Borrower in respect of indemnities or repurchase obligations made in connection with the sale of HECM Loans.

"<u>Laws</u>" means all statutes, laws, ordinances, regulations, orders, writs, injunctions, or decrees of the United States, any city or municipality, state, commonwealth, nation, country, territory, possession, or any Tribunal.

"<u>Liabilities</u>" means, at any particular time, all amounts which in conformity with GAAP, or other method of accounting acceptable to Bank, would be included as liabilities on a balance sheet of a Person.

"<u>Lien</u>" means any lien, security interest, Tax lien, mechanic's lien, materialman's lien, or other encumbrance, whether arising by contract or under Law.

"<u>Liquid Assets</u>" means, at any particular time, the sum of Borrower's cash, cash equivalents (certificates of deposit and other depository accounts established at FDIC-insured banks), United States government-issued securities and other registered, unrestricted equity or debt securities which are publicly traded on a recognized United States exchange and have been approved by Bank, in its sole and absolute discretion and which, in all events, are held in Borrower's name and are free and clear of all Liens (except Liens in favor of Bank).

"<u>Litigation</u>" means any proceeding, claim, lawsuit, and/or investigation conducted or threatened by or before any Tribunal, including, but not limited to, proceedings, claims, lawsuits, and/or investigations under or pursuant to any environmental, occupational safety and health, antitrust, unfair competition, securities, Tax, or other Law, or under or pursuant to any agreement, document, or instrument.

"<u>Loan</u>" means the Revolving Loans.

"<u>Loan Documents</u>" mean this Agreement, the Note, the Security Documents, and any and all other agreements, documents, and instruments executed and delivered pursuant to the terms of this Agreement, and any future amendments hereto, or restatements hereof, or pursuant to the terms of any of the other loan documents, together with any and all renewals, extensions, and restatements of, and amendments and modifications to, any such agreements, documents, and instruments.

"<u>Material Adverse Effect</u>" means any set of circumstances or event which with respect to any Person (a) could reasonably be expected to have a material adverse effect upon the validity, performance, or enforceability of any Loan Document against such Person, (b) is or could reasonably be expected to have a material adverse effect upon the condition (financial or otherwise), properties, liabilities (actual or contingent), business operations or prospects of such Person, (c) could reasonably be expected to materially impair the ability of such Person to pay the Indebtedness or to fulfill its Obligations under the Loan Documents, or (d) could reasonably be expected to cause an Event of Default.

"<u>Maximum Rate</u>" means the maximum non-usurious rate of interest (or, if the context so requires, an amount calculated at such rate) which Bank is allowed to contract for, charge, take, reserve, or receive in this transaction under applicable federal or state (whichever is higher) Law from time to time in effect

APP362

after taking into account, to the extent required by applicable federal or state (whichever is higher) Law from time to time in effect, any and all relevant payments or charges under the Loan Documents.

"Mortgage" means a mortgage or deed of trust, on standard forms in form and substance satisfactory to Bank, securing a HECM Note and granting a perfected, first lien on residential real property consisting of land and a one-to-four-family dwelling thereon which is completed and ready for occupancy.

"Mortgage Warehouse Agreement" means that certain Mortgage Warehouse Agreement between Bank and Borrower wherein Bank agrees from time to time to purchase participation interests in mortgage loans originated by Borrower, as said Mortgage Warehousing Agreement may be amended from time to time.

"Net Income" shall mean, for any particular period, Borrower's net income (after provision for taxes), as determined in accordance with GAAP.

"Note" means the Revolving Note.

"Obligated Party" means the Borrower or any other Person who is or becomes party to any agreement that guarantees or secures payment and performance of the Indebtedness and/or the Obligations or any part thereof.

"Obligations" means any and all of the covenants, conditions, warranties, representations and other obligations (other than to repay the Indebtedness) made or undertaken by Borrower or any Obligated Party to Bank as set forth in the Loan Documents.

"Obligor" means the Person or Persons obligated to pay the indebtedness which is the subject of a HECM Loan or HECM Tail.

"Organizational Documents" means (a) in the case of a corporation, its articles or certificate of incorporation and bylaws, (b) in the case of a general partnership, its partnership agreement, (c) in the case of a limited partnership, its certificate of limited partnership and partnership agreement, (d) in the case of a limited liability company, its articles of organization and limited liability company or other operating agreement or regulations, and (e) in the case of any other entity, its organizational and governance documents and agreements.

"Permitted Businesses" mean, with respect to Borrower, those businesses in which Borrower was engaged as of the Effective Date (which includes originating mortgage loans and providing services ancillary thereto) or other businesses, as determined by the Bank in its sole but good faith discretion, reasonably related thereto.

"Permitted Liens" means all (a) Inchoate Liens, (b) Liens created under the Mortgage Warehouse Agreement, (c) Liens created in respect of any Debt of the Borrower not restricted under Section 7.1 of this Agreement, (d) Liens of Ginnie Mae pursuant to the Guide, and (e) Liens created by or pursuant to the Loan Documents in favor of Bank, and all renewals and extensions of the foregoing.

"Person" means any individual, firm, corporation, limited liability company, association, partnership, joint venture, trust, other entity, or a Tribunal.

"Proceeds" means any "proceeds," as such term is defined in Chapter 9 of the Code and, in any event, shall include, but not be limited to, (a) any and all proceeds of any insurance, indemnity, warranty, or guaranty payable to Borrower from time to time with respect to any of the Collateral, (b) any and all payments (in any form whatsoever) made or due and payable to Borrower from time to time in connection

with any requisition, confiscation, condemnation, seizure, or forfeiture of all or any part of the Collateral by any Tribunal (or any person acting under color of Tribunal), and (c) any and all other amounts from time to time paid or payable under or in connection with any of the Collateral.

"Regulation U" means Regulation U issued by the Board of Governors of the Federal Reserve System as in effect from time to time.

"Release" means, as to any Person, any release, spill, emissions, leaking, pumping, injection, deposit, disposal, disbursement, leaching, or migration of Hazardous Materials into the indoor or outdoor environment or into or out of property owned by such Person, including, without limitation, the movement of Hazardous Materials through or in the air, soil, surface water, ground water, or property.

"Remedial Action" means all actions required to (a) clean up, remove, treat, or otherwise address Hazardous Materials in the indoor or outdoor environment, (b) prevent the Release or threat of Release or minimize the further Release of Hazardous Materials so that they do not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment, or (c) perform pre-remedial studies and investigations and post-remedial monitoring and care.

"Repayment Account" means the deposit account established, owned and controlled by Bank, into which all proceeds from each sale of HMBS relating to the HECM Tail Collateral shall be funded and deposited, and such account and all funds deposited or maintained therein shall be disbursed and applied by Bank for the payment of the Obligations and Indebtedness; provided that the Repayment Account shall be and is hereby pledged as security for Borrower's Obligations and Indebtedness (and this Agreement shall be deemed to constitute a security agreement).

"Revolving Loan" and "Revolving Loans" have the meanings set forth in Section 2.1.

"Revolving Note" means the promissory note, dated as of the Effective Date, in the maximum principal amount of Sixty-Five Million and No/    Dollars ($65,000,000.00), executed by Borrower and payable to the order of Bank, in form and substance satisfactory to Bank, and all amendments, extensions, renewals, replacements, increases, and modifications thereof.

"Revolving Principal Balance" means the aggregate unpaid principal balance of the Revolving Note on any date of determination.

"Rights" mean any remedies, powers, and privileges exercisable by Bank under the Loan Documents, at Law, equity, or otherwise.

"RMIT" means Reverse Mortgage Investment Trust Inc. or any successor thereto.

"SCGG Party" means any of (i) Starwood Capital Group Global II, L.P., a Delaware limited partnership, (ii) Starwood Capital Group Holdings, L.P., a Delaware limited partnership or (iii) another entity Controlled by, or under common Control and ownership with, any SCGG Party listed in clauses (i)-(ii).

"Section" and "Sections" have the meanings set forth in Section 1.6.

"Security Documents" means this Agreement and each other pledge agreement, security agreement or similar agreement or document required by or delivered to Bank from time to time that purports to create a Lien in favor of any of Bank to secure payment or performance of Indebtedness and/or Obligations or any portion thereof.

"Servicing Agreement" means, the arrangement, whether or not evidenced in writing, pursuant to which Borrower (or a party designated by Borrower and approved by Bank) acts as servicer of HECM Loans, whether or not any such HECM Loan is owned by Borrower, which may include, but is not limited to, the Ginnie Mae Contract.

"Servicing Rights" means all of the Borrower's rights and interests under any Servicing Agreement, including the rights to (a) service the HECM Loans that are the subject matter of such Servicing Agreement and (b) be compensated, directly or indirectly, for doing so.

"Submission List" means a list in the form of Schedule A-2 to the form of Advance Request.

"Subordinated Debt" means all unsecured Debt of Borrower whether now existing or hereafter incurred which is subordinate in right of payment to the Indebtedness, pursuant to a written agreement in form and content satisfactory to Bank.

"Subsection" and "Subsections" have the meanings set forth in Section 1.6.

"Subsidiary(ies)" means any entity more than fifty percent (50%) of whose ownership, equity or voting interest now or hereafter is owned directly or indirectly by Borrower or any Subsidiary or may be voted by Borrower or any Subsidiary.

"Tangible Net Worth" means, for any Person at any particular time, all amounts which, in conformity with GAAP, or other method of accounting acceptable to Bank, would be included as owner's equity on a balance sheet of a Person; but excluding (a) all assets which are properly classified as intangible assets, and (b) all loans and advances to any owner, officer, or employee of such Person.

"Taxes" means all taxes (including withholding), assessments, fees, levies, imposts, duties, deductions, withholdings, or other charges of any nature whatsoever from time to time or at any time imposed by any Laws or by any Tribunal, excluding state and local sales and use taxes.

"Tribunal" means any state, commonwealth, federal, foreign, territorial, or other court or governmental department, commission, board, bureau, agency, or instrumentality.

"Tribunal Proceedings" has the meaning set forth in Section 5.4.

"Unpaid Judgments" has the meaning set forth in Section 5.5.

1.2    Terms Defined in the Code.  Terms (whether or not capitalized) defined in the Code which are not otherwise defined in this Agreement are used herein as defined in the Code as in effect on the date hereof.

1.3    Accounting Matters.  Any accounting term used in this Agreement or the other Loan Documents shall have, unless otherwise specifically provided therein, the meaning customarily given such term in accordance with GAAP, or other method of accounting acceptable to Bank, and all financial computations thereunder shall be computed, unless otherwise specifically provided therein, in accordance with GAAP, or other method of accounting acceptable to Bank, consistently applied.  That certain items or computations are explicitly modified by the phrase "in accordance with GAAP, or other method of accounting acceptable to Bank" shall in no way be construed to limit the foregoing.

1.4    Headings.  The headings, captions, and arrangements used in any of the Loan Documents are, unless specified otherwise, for convenience only and shall not be deemed to limit, amplify, or modify the terms of the Loan Documents nor to affect the meaning thereof.

1.5     <u>Number and Gender of Words</u>.  Whenever herein the singular number is used, the same shall include the plural where appropriate, and words of any gender shall include each other gender where appropriate.  Reference herein to Borrower shall mean, jointly and severally, each Person comprising same.

1.6     <u>Articles, Sections and Exhibits</u>.  All references herein to "Article," "Articles," "Section," "Sections," "Subsection," and "Subsections" contained herein are, unless specified indicated otherwise, references to articles, sections, and subsections of this Agreement.  All references herein to an "Exhibit" or "Schedule" are references to exhibits or schedules attached hereto, all of which are made a part hereof for all purposes, the same as if set forth herein verbatim, it being understood that if any exhibit or schedule attached hereto which is to be executed and delivered, contains blanks, the same shall be completed correctly and in accordance with the terms and provisions contained and as contemplated herein prior to or at the time of the execution and delivery thereof.  The words "herein," "hereof," "hereunder" and other similar compounds of the word "here" when used in this Agreement shall refer to the entire Agreement and not to any particular provision or section.

**ARTICLE 2**
**<u>COMMITMENT TO LEND, TERMS OF PAYMENT</u>**

2.1     <u>Revolving Loans</u>.  Subject to and upon the terms and conditions of this Agreement, Bank agrees to make one or more Advances (hereinafter called, individually, a "<u>Revolving Loan</u>" and, collectively, the "<u>Revolving Loans</u>") to Borrower for Approved Purposes in an aggregate principal amount at any one time outstanding up to but not exceeding the Borrowing Limit.  Within the limit of the Borrowing Limit in effect from time to time, Borrower may borrow, repay, and reborrow at any time and from time to time from the Effective Date to the earlier of (a) the maturity date of the Revolving Note, or (b) the termination of Bank's Commitment hereunder.  If, by virtue of payments made on the Revolving Note, the principal amount owed on the Revolving Note during its term reaches zero at any point, Borrower agrees that all of the Collateral and all of the Loan Documents shall remain in full force and effect to secure any Advances made thereafter, and Bank shall be fully entitled to rely on all of the Collateral and all of the Loan Documents unless an appropriate release of all or any part of the Collateral or all or any part of the Loan Documents has been executed by Bank. The Revolving Principal Balance may not exceed the Borrowing Limit at any time.

2.2     <u>Revolving Note.</u> The Revolving Loans shall be evidenced by, be repayable, and accrue interest in accordance with, the Revolving Note.  Subject to the terms and conditions in this Agreement, the Revolving Note, and the other Loan Documents, Borrower may borrow, repay, and reborrow under the Revolving Note. The unpaid principal balance of the Revolving Note shall be repaid as provided therein.

2.3     <u>Borrowing Procedure.</u> Borrower shall give Bank notice of each Revolving Loan by means of a written request containing the information required by Bank and delivered (by hand, electronically, or by mechanically confirmed facsimile) to Bank no later than 1:00 p.m. (Texas time) on the day on which the Revolving Loan is desired to be funded.  Bank, at its option, may accept telephonic requests for such Advances, provided, however, that such acceptance shall not constitute a waiver of Bank's right to require delivery of a written request in connection with subsequent Revolving Loans.  Any telephonic request for a Revolving Loan by Borrower shall be promptly confirmed by submission of a properly completed written request to Bank, but failure to deliver a written request shall not be a defense to payment of a Revolving Loan.  Bank shall have no liability to Borrower for any loss or damage suffered by Borrower as a result of Bank's honoring of any requests, execution of any instructions, authorizations or agreements or reliance on any reports communicated to it telephonically, by facsimile or electronically, and purporting to have been sent to Bank by Borrower and Bank shall have no duty to verify the origin of any such communication or the identity or authority of the Person sending it.  Subject to the terms and conditions of this Agreement, each Revolving Loan shall be made available to Borrower

12

by depositing the same, in immediately available funds in an account designated by Borrower maintained with Bank.

2.4    Payments.  If a scheduled payment under the Revolving Note is not made in a timely manner, Bank is authorized by Borrower to debit the amount of any such payments from the Repayment Account or any other depository account of Borrower with Bank.  If at any time the Revolving Principal Balance exceeds the Borrowing Limit, Borrower shall immediately repay to Bank an amount sufficient to eliminate such excess.

2.5    Purpose of Loans.  Borrower represents that the proceeds of the Revolving Loans will be used only for Approved Purposes.

2.6    Sale of Participations; Disclosure of Information.  Reserved.

2.7    Sale or Securitization of HECM Tails; Processing.

(a)    Establishment of Repayment Account.  Upon closing this Agreement, Borrower shall deposit One Hundred Thousand and No/    Dollars ($100,000.00) into the Repayment Account.  In the event the balance of the Repayment Account falls below One Hundred Thousand and No/    Dollars ($100,000.00) at any time during the term of this Agreement, whether such be due to any shortfall in proceeds from any sale or securitization of an Eligible HECM Tail, any offset by the Bank in accordance with its rights, or any other reason, Borrower shall deposit into the Repayment Account such amount as may be necessary to maintain a minimum balance of One Hundred Thousand and No/    Dollars ($100,000.00).

(b)    Payments from HECM Tail Investors.  When any HECM Tail, or a pool of which a HECM Tail is a part, is sold to or securitized by a HECM Tail Investor, Borrower shall cause such HECM Tail Investor or the Custodian to deposit the proceeds of such sale or securitization or from the sale or financing of the HMBS resulting from such securitization in immediately available funds directly into the Repayment Account on Borrower's behalf.  Upon Bank's request, Borrower will obtain or provide such irrevocable payment instructions as Bank may reasonably request.

(c)    Processing Payments from HECM Tail Investors.  With respect to each payment or amount of funds deposited into the Repayment Account by a HECM Tail Investor or the Custodian from a sale or securitization of any HECM Tail or otherwise:

(i)    Each payment shall be applied on a "first-in-first-out" basis so that Advances made hereunder shall be repaid in the chronological order in which such Advances were made; i.e., Advances made first are first to be repaid;

(ii)    In the event that insufficient funds are delivered by the HECM Tail Investor or the Custodian to fully repay any Advance outstanding for more than sixty (60) days, Borrower shall immediately pay Bank the difference between such Advance and the amount, if any, delivered by the HECM Tail Investor or the Custodian (subject, however, to Borrower's limited right following such payment to request another Advance against the same HECM Tail so long as said HECM Tail remains an Eligible HECM Tail);

(iii)    The proceeds of each such payment shall be applied by Bank pursuant to Section 2.8.

2.8    Order of Application.  Prepayments of the Indebtedness under this Agreement shall be applied to the principal.  Except as otherwise provided in the Loan Documents or otherwise agreed by Bank, and except for prepayments of the Indebtedness, all payments of the Indebtedness under this

13

Agreement, including proceeds from the exercise of any Rights under the Loan Documents or proceeds of any of the Collateral, shall be applied to the Indebtedness under this Agreement in the following order, any instructions from Borrower to the contrary notwithstanding:  (a) to the expenses for which Bank shall not have been reimbursed under the Loan Documents, and then to all indemnified amounts due under the Loan Documents; (b) to fees then owed Bank hereunder; (c) to accrued interest on the portion of the Indebtedness being paid or prepaid; (d) to the portion of the principal being paid or prepaid; (e) to the remaining accrued interest on the Indebtedness; (f) to the remaining principal; and (g) to the remaining Indebtedness.  All amounts remaining after the foregoing application of funds shall be paid to Borrower.

2.9    <u>Commitment Fee.</u>  Borrower shall pay to Bank the Commitment Fee for agreeing to make the Revolving Loan.  The Commitment Fee shall be due and payable by Borrower to Bank on or before the Effective Date.

2.10    <u>Mandatory Repayments.</u>  Borrower shall immediately make mandatory payments (in the amounts set forth below) on the Revolving Loan upon the occurrence of any of the following events:

(a) If at any time the Revolving Principal Balance exceeds the Borrowing Limit, Borrower shall pay to Bank an amount equal to any such excess;

(b) If at any time at least sixty (60) days have elapsed since the date of an Advance to finance any HECM Tail hereunder and such Advance has not been sooner repaid, Borrower shall pay to Bank an amount equal to the amount of such Advance;

(c)    The sale or securitization of a HECM Tail, or a pool of which a HECM Tail is a part, to or by a HECM Tail Investor, the Borrower shall pay to Bank an amount equal to such HECM Tail;

(d)    If at any time the aggregate outstanding amount of Advances made in relation to Extended Period HECM Tails exceeds the Extended Period HECM Tail Sublimit, Borrower shall pay to Bank an amount equal to such excess.

2.11    <u>Borrower Base Exclusion.</u>  Notwithstanding anything contained to the contrary herein, any HECM Tail that has been securitized into a HMBS shall be expressly excluded from the Borrower Base hereunder.

2.12    <u>Increased Cost and Reduced Return.</u>

(a)    If, after the date hereof, Bank shall have determined that the adoption of any applicable Law, rule, or regulation regarding capital adequacy or any change therein or in the interpretation or administration thereof by any governmental authority, central bank, or comparable agency charged with the interpretation or administration thereof, or any request or directive regarding capital adequacy (whether or not having the force of Law) of any such governmental authority, central bank, or comparable agency, has or would have the effect of reducing the rate of return on the capital of Bank or any corporation controlling Bank, due to the obligations of Bank hereunder, to a level below that which Bank or such corporation could have achieved but for such adoption, change, request, or directive (taking into consideration its policies with respect to capital adequacy), then, within fifteen (15) days after demand by Bank, Borrower shall pay to Bank such additional amount or amounts as will compensate Bank for such reduction.

(b)    Bank shall promptly notify Borrower of any event of which it has knowledge, occurring after the date hereof, which will entitle Bank to compensation pursuant to this Section. In the event that Bank claims compensation under this Section, Bank shall furnish to Borrower a statement setting forth the additional amount or amounts to be paid to it hereunder which shall be conclusive in the absence of

manifest error. In determining such amount, Bank shall act in good faith and may use any reasonable averaging and attribution methods.

2.13    Termination Right.  Reserved.

2.14    Unused Facility Fee; Minimum Utilization.  Borrower agrees to pay to Bank an unused facility fee with respect to each calendar quarter during the term of the Note, beginning with the calendar quarter ending September       2021, based on the daily average unused amount of the Committed Sum during such calendar quarter. The unused facility fee shall be an amount equal to A x (B-C) x (D/E), where: A equals one-half percent (0.50%); B equals the Committed Sum; C equals the daily average outstanding Advances during such calendar quarter; D equals the actual number of days elapsed during such calendar quarter; and E equals       The accrued unused facility fee shall be payable quarterly, in arrears, within fifteen (15) days of each calendar quarter end. Notwithstanding anything contained to the contrary herein, Bank hereby agrees that for any calendar quarter in which Borrower maintains daily average outstanding Advances in an amount that is equal to or greater than fifty percent (50.0%) of the Committed Sum, Bank shall waive the unused facility fee for such calendar quarter and such unused facility fee shall not be due and payable by Borrower for such calendar quarter.

# ARTICLE 3
# COLLATERAL

3.1    Security Interests.  Borrower hereby pledges, assigns and grants to Bank a continuing first priority security interest in all of Borrower's right, title and interest in and to all of the Collateral to secure the prompt and complete payment and performance when due of all of the Indebtedness and all of the Obligations.

3.2    Power of Attorney.  Borrower hereby designates and/or appoints Bank and each of its designees or agents as attorney-in-fact of Borrower, irrevocably and with power of substitution, with authority to take any or all of the following actions upon the occurrence of an Event of Default, subject to any rights of Ginnie Mae under the Ginnie Mae Contract with respect to the HECM Tail Collateral and the servicing of the HECM Loans: (i) with respect to any HECM Tail Collateral, demand, collect, receive, settle, compromise, adjust, foreclose and resell and/or give discharges and releases, all as Bank may determine; (ii) commence and prosecute any actions in any court for the purposes of collecting amounts owed on HECM Tail Collateral and enforcing any other rights in respect thereof; (iii) defend, settle or compromise any action brought and, in connection therewith, give such discharge or release as Bank may deem appropriate; (iv) receive, open and dispose of mail addressed to Borrower and endorse checks, notes, drafts, acceptances, money orders, bills of lading, warehouse receipts or other instruments or documents evidencing payment made on account of or funds paid relating to HECM Tail Collateral on behalf of and in the name of Borrower; (v) sell, assign, transfer, make any agreement in respect of, or otherwise deal with or exercise rights in respect of, any HECM Tail Collateral as fully and completely as though Bank were the absolute owner thereof for all purposes; (vi) adjust and settle claims under any insurance policy related thereto; and (vii) execute and file in the public records financing statements or amendments thereto or any other documents or writings deemed necessary by Bank to evidence or perfect Bank's security interest in the HECM Tail Collateral; provided that Bank agrees to furnish copy of any document executed hereunder to Borrower, as applicable, upon request; and (viii) enter on the premises of Borrower in order to exercise any of Bank's rights and remedies.  The appointment of Bank as attorney-in-fact is coupled with an interest and is irrevocable.

3.3    Borrower Remains Liable; No Duty of Bank.  Notwithstanding anything to the contrary contained herein, (a) Borrower and each other Obligated Party shall remain liable under the contracts and agreements to which such Person is a party and which are included in the Collateral and shall perform all of its respective duties and obligations thereunder to the same extent as if this Agreement had not been executed, and (b) Bank shall not have any obligation or liability under any of the contracts and

15

agreements included in the Collateral by reason of this Agreement, nor shall Bank be obligated to perform any of the obligations or duties of Borrower or any other Obligated Party thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

3.4     <u>Authorization to File Financing Statements</u>.  Borrower hereby irrevocably authorizes Bank at any time and from time to time to prepare and file one or more financing statements (and any continuation statements and amendments thereto) describing the Collateral whether or not the Borrower's signature appears thereon.

3.5     <u>Collection of HECM Tail Collateral</u>.  Prior to the Bank exercising its right to collect HECM Tail Collateral, pursuant to this <u>Section 3.5</u>, Borrower shall collect with diligence all payments due thereunder.  After the occurrence of an Event of Default, Borrower shall, at the request of the Bank, notify the Borrower's servicer to make all such payments directly to the Bank unless prohibited or otherwise restricted under the Ginnie Mae Contract.

3.6     <u>Further Assurances Concerning Collateral</u>. In furtherance of the foregoing, the Borrower hereby agrees to perform, or cause to be performed, such acts and duly to authorize, execute, acknowledge, deliver, file and record (or cause such actions to be taken with respect to) such financing statements, assignments, security agreements, deeds of trust, mortgages, bond powers and supplements, modifications or amendments to any of them, and such other papers as Bank may reasonably request in order to establish and preserve the priority of, perfect and protect the Liens granted or intended to be granted to Bank in and to any and all such Collateral and to preserve and protect Bank's rights in respect of all present and future Collateral for the Obligations.

3.7     <u>Rights in Property Held by the Bank</u>.  As further security for the prompt satisfaction of all Obligations, the Borrower hereby assigns, transfers, and sets over to the Bank all of its right, title, and interest in and to, and grants the Bank a lien on and a security interest in, all amounts that may be owing, from time to time, by the Bank to the Borrower in any capacity, including, but without limitation, any deposit or other account with the Bank, including, without limitation, the Repayment Account, which lien and security interest shall be independent of, and in addition to, any right of set-off that the Bank has hereunder or otherwise, excluding escrow accounts.

3.8     <u>Rights Subject to the Guide</u>.  Bank hereby acknowledges that the pledge, assignment or grant of a first priority security interest in any Collateral or Lien on any HECM Tail Collateral, or the exercise of Bank's rights and remedies hereunder, is subject to the rights and interests of Ginnie Mae under the Guide.

**ARTICLE 4**
**CONDITIONS PRECEDENT TO LENDING**

4.1     <u>Initial Extension of Credit</u>.  The obligation of Bank to make the initial Advance under any Note is subject to the condition precedent that Bank shall have received on or before the day of such Advance all of the following, each dated (as applicable and unless otherwise indicated) on or as of the Effective Date, in form and substance satisfactory to Bank:

(a)     <u>Resolutions</u>.  Resolutions of the Board of Directors (or other governing body) of Borrower and each other Obligated Party certified by the Secretary (or other custodian of records) of Borrower and each other Obligated Party which authorize the execution, delivery, and performance by Borrower or any such Obligated Party of this Agreement and the other Loan Documents to which Borrower or any such Obligated Party is or is to be a party;

(b)     <u>Incumbency Certificate</u>.  A certificate of incumbency certified by an authorized officer or representative certifying the names of the individuals or other Persons authorized to sign this Agreement

16

and the other Loan Documents to which Borrower or any other Obligated Party is or is to be a party on behalf of Borrower or any such Obligated Party together with specimen signatures of such Persons;

(c)    <u>Organizational Documents</u>.  The Organizational Documents for Borrower and each other Obligated Party as of a date acceptable to Bank;

(d)    <u>Governmental Certificates</u>.  Certificates of the appropriate government officials of the state of incorporation or organization of Borrower and each other Obligated Party as to the existence and good standing of Borrower or any such Obligated Party, each dated within ten (10) days prior to the date of the initial Advance;

(e)    <u>Note</u>.  The Note, executed by Borrower;

(f)    <u>Credit Agreement</u>.  This Agreement, executed by the Borrower;

(g)    <u>Insurance Matters</u>.  Copies of insurance certificates describing all insurance policies required by the Agreement and the other Loan Documents, together with loss payable and lender endorsements in favor of Bank with respect to all insurance policies covering Collateral;

(h)    <u>Fees</u>.  Payment of the Commitment Fee from the Borrower;

(i)    <u>Security Documents</u>.  The Security Documents executed by each party thereto;

(j)    <u>Guaranty Agreements</u>.  A Guaranty Agreement executed by each Guarantor;

(k)    <u>Consent to Third Party Auditor Engagement Agreement</u>.  Reserved;

(l)    <u>Other Loan Documents</u>.  Each other Loan Document, duly executed by each Obligated Party which is a party thereto;

(m)    <u>Opinion of Counsel</u>.  An opinion of Borrower's legal counsel in form and content satisfactory to Bank to the effect that: (a) upon due authorization and execution, each of the Loan Documents shall be legal, valid and binding instruments, enforceable against Borrower in accordance with their respective terms; (b) Borrower is duly formed and has all requisite authority to enter into the Loan Documents; and (c) upon the recordation or filing of a UCC financing statement, Bank will have a perfected first priority security interest in the Collateral, and (d) such other matters, incident to the transactions contemplated hereby, as Bank may reasonably request;

(n)    <u>Additional Items</u>.  All other additional items as may be reasonably required by the Bank.

4.2    <u>Conditions for All Advances</u>.  In addition to the conditions precedent stated elsewhere herein, Bank shall not be obligated to make any Advance unless:

(a)    <u>Representations and Warranties</u>.  The representations and warranties made in <u>Article Five</u> of this Agreement are true and correct at and as of the time the Advance is to be made, and the request for an Advance shall constitute the representation and warranty by Borrower that such representations and warranties are true and correct at such time.

(b)    <u>No Event of Default</u>.  On the date of, and upon receipt of, the Advance, no Event of Default, and no event which, with the lapse of time or notice or both, could reasonably be expected to become an Event of Default, shall have occurred and be continuing.

(c)    <u>Advance Request</u>.    Bank has received an Advance Request, as well as such other documents, opinions, certificates, agreements, instruments and evidences as Bank may reasonably request, including, but not limited to, a Borrowing Base Certificate and an Aging Report.

(d)    <u>Additional Documentation</u>.    Bank shall have received such additional approvals, opinions, or documents as Bank may reasonably request.

Each Advance hereunder shall be deemed to be a representation and warranty by the Borrower to Bank that the conditions specified in this <u>Section 4.2</u> have been satisfied on and as of the date of the applicable Advance, unless expressly waived in writing by Bank.

4.3    <u>Further Conditions for All Advances</u>. In addition to the conditions precedent stated elsewhere herein, Borrower acknowledges that the Consent to Third Party Auditor Engagement Agreement previously executed by Borrower shall continue in full force and effect during the term of the Loan.

## ARTICLE 5
## <u>REPRESENTATIONS AND WARRANTIES</u>

Borrower represents and warrants to Bank as follows:

5.1    <u>Existence</u>.  Borrower is a duly organized, validly existing, and in good standing under the laws of the State of its formation, and is duly qualified to transact business and is in good standing in all jurisdictions where the nature and extent of its business and property requires the same. Borrower does not conduct business under any tradename other than as previously disclosed to the Bank in writing, in connection with Borrower's application for the Mortgage Warehouse Agreement and/or application for the Loan.

5.2    <u>Authorization</u>.  Borrower possesses all requisite authority, power, licenses, permits, and franchises to conduct its business and execute, deliver, and comply with the terms of the Loan Documents.  The execution and delivery of this Agreement, the consummation of the transactions herein contemplated and compliance with the terms and provisions hereof, the making of the Loans, and the execution, issuance, and delivery of the Loan Documents have been duly authorized and approved by all necessary entity action on the part of Borrower.  No consent or approval of any Tribunal or any other Person is required in order for Borrower to legally execute, deliver, and comply with the terms of the Loan Documents, except for those consents and/or approvals that the Borrower has obtained and delivered to Bank, and which Bank has approved.

5.3    <u>Properties; Permitted Liens</u>.  Borrower has good and indefeasible title to the Collateral, in each case free and clear of any Liens except the Permitted Liens.  Borrower has full power and authority to grant to Bank the security interest in the Collateral pursuant hereto.  When financing statements have been filed in the appropriate offices against Borrower with respect to any Collateral, Bank will have a fully perfected first priority security interest in that portion of the Collateral in which a security interest may be perfected by filing, subject only to any Permitted Liens.

5.4    <u>Compliance with Laws and Documents</u>.  Borrower is not, nor will the execution, delivery, and performance of and compliance with the terms of the Loan Documents cause Borrower to be, in violation of any Laws or in default (nor has any event occurred which, with the giving of notice or lapse of time or both, could constitute such a default) under any contract in any respect which could reasonably be expected to have a Material Adverse Effect.  During the past five (5) years, there have been no proceedings, claims, or (to the best of Borrower's knowledge) investigations against or involving Borrower by any Tribunal under or pursuant to any environmental, occupational safety and health, antitrust, unfair competition, securities, or other Laws which could have a Material Adverse Effect, except

as previously disclosed to the Bank in writing, in connection with Borrower's application for the Mortgage Warehouse Agreement and/or application for the Loan (the "Tribunal Proceedings").

5.5     Litigation.  Except for Litigation in which Borrower is exclusively a plaintiff without a counterclaim, crossclaim, or similar action asserted against Borrower and except as previously disclosed to the Bank in connection with Borrower's application for the Mortgage Warehouse Agreement and/or application for the Loan (the "Existing Litigation"), there are no material actions, suits, or legal, equitable, arbitration or administrative proceedings pending, or to the knowledge of Borrower, threatened against Borrower which, if determined adversely to Borrower, would have a Material Adverse Effect on Borrower or its financial condition, and there are no material outstanding or unpaid judgments against Borrower except as previously disclosed to the Bank in connection with Borrower's application for the Mortgage Warehouse Agreement and/or application for the Loan (the "Unpaid Judgments").

5.6     Taxes.  All federal, state, foreign, and other Tax returns of Borrower required to be filed have been filed, all federal, state, foreign, and other Taxes imposed upon Borrower which are due and payable have been paid, and no material amounts of Taxes not reflected on such returns are payable by Borrower, other than Taxes being contested in good faith by appropriate legal proceedings.

5.7     Enforceability of Loan Documents.  All Loan Documents when duly executed and delivered by Borrower will constitute legal, valid, and binding obligations of Borrower enforceable against Borrower in accordance with their terms subject to Debtor Relief Laws and except that the availability of equitable remedies may be limited.

5.8     Financial Statements.  All financial statements of Borrower heretofore and hereafter to be delivered to Bank have been and shall continue to be prepared in accordance with GAAP, or other method of accounting acceptable to Bank (subject to the absence of notes for interim financial statements), and do and shall fairly represent the financial condition of Borrower as of the date of each such financial statement (subject to reasonable year end adjustments for interim financial statements).  There are and shall be no material liabilities, direct or indirect, fixed or contingent, as of the date of each such financial statement which are not reflected therein or in the notes thereto.  Except for transactions directly related to, or specifically contemplated by, this Agreement and transactions heretofore disclosed in writing to Bank, there has been no material adverse change in the financial condition of Borrower as shown by the Current Financial Statements for Borrower between the date of such Current Financial Statements and the date hereof, nor has Borrower incurred any material liability, direct or indirect, fixed, or contingent, except as otherwise disclosed to and approved in writing by Bank.  Neither Borrower nor any of its Subsidiaries has any material Debt, other contingent liabilities, liabilities for taxes, any long-term lease obligations or unusual forward or long-term commitments, or any hedge agreement or other transaction or obligation in respect of derivatives, that are not reflected in the most recent financial statements referred to in this paragraph.

5.9     Regulation U.  The proceeds of the Advances are not and will not be used directly or indirectly for the purpose of purchasing or carrying, or for the purpose of extending credit to others for the purpose of purchasing or carrying, any "margin stock" as that term is defined in Regulation U of the Board of Governors of the Federal Reserve System.

5.10    Subsidiaries.  Borrower has no Subsidiaries as of the date of this Agreement except those previously disclosed to the Bank in writing in connection with Borrower's application for the Mortgage Warehouse Agreement and/or application for the Loan.  There are no outstanding subscriptions, options, warrants, calls, rights or other agreements or commitments of any nature relating to any equity interests of the Borrower or any Obligated Party, except as created by the Loan Documents.

5.11    Other Debt.  Except as previously disclosed to the Bank in writing on Schedule 5.11 attached to this Agreement, Borrower is not directly, indirectly, or contingently obligated with respect to

19

APP373

any Debt as of the Effective Date. Borrower represents and warrants to Bank that the amount, description, nature of any collateral securing, and lender or creditor in respect of, such Debt is true and correct. To the best of Borrower's knowledge and belief, Borrower is not in default in the payment of the principal of or interest on any such Debt. Further, as of the Effective Date, Borrower is not directly, indirectly, or contingently obligated with respect to any Debt which is secured by HECM Tails or any pool of which a HECM Tail is a part.

5.12    <u>Regulatory Acts</u>.    Borrower is not an "investment company" or "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940, as amended, nor is Borrower subject to regulation under the Federal Power Act, the Interstate Commerce Act, or any other Law (other than Regulation X of the Board of Governors of the Federal Reserve System) which regulates the incurring by Borrower of debt, including, without limitation, Laws regulating common or contract carriers or the sale of electricity, gas, steam, water, or other public utility serves. All HECM Loans relating to HECM Tails that are Collateral have been and will hereafter be produced in compliance with all applicable laws.

5.13    <u>Locations</u>.    The location of Borrower's chief executive office and all other locations where Borrower conducts its business are the same as were previously disclosed to the Bank in writing in connection with Borrower's application for the Mortgage Warehouse Agreement and/or application for the Loan.

5.14    <u>Accounts</u>.    Each Account related to HECM Loans or HECM Tails represents the valid and legally binding indebtedness of a bona fide account debtor arising from the sale or lease by Borrower of goods or the rendition by Borrower of services and is not subject to contra accounts, setoffs, defenses or counterclaims by or available to account debtors obligated on such Accounts except as disclosed by Borrower to Bank from time to time in writing.    The amount shown as to each such Account on Borrower's books is the true and undisputed amount owing and unpaid thereon, subject only to discounts, allowances, rebates, credits and adjustments to which the account debtor has a right and which have been disclosed to Bank in writing.

5.15    <u>General</u>.    There is no significant material fact or condition relating to the financial condition and business of Borrower, or the Collateral which has not been disclosed in writing to Bank, and all writings heretofore or hereafter exhibited, made, or delivered to Bank by or on behalf of Borrower are and will be genuine and in all respects what they purport and appear to be.

5.16    <u>Licensing</u>. The Borrower and the Servicers (if any) of its Mortgage loans, including HECM Loans, are duly registered as mortgage lenders and servicers in each state in which such Mortgage loans have been or are from time to time originated, to the extent such registration is required by any applicable Laws, except where the failure to register could not reasonably be expected to result in a Material Adverse Effect.

5.17    <u>Intellectual Property</u>.    All material Intellectual Property owned or used by the Borrower, or any Subsidiary, in relation to HECM Loans or HECM Tails, together with application or registration numbers, where applicable, is the same as previously disclosed to the Bank in writing, in connection with Borrower's application for the Mortgage Warehouse Agreement and/or application for the Loan. Borrower has disclosed to the Bank in writing each Person who owns, or is licensed to use, all Intellectual Property necessary to conduct its business as currently conducted except for such Intellectual Property the failure of which to own or license could not reasonably be expected to have a material adverse effect, in connection with Borrower's application for the Mortgage Warehouse Agreement and/or application for the Loan.    Each such Person will maintain the patenting and registration of all Intellectual Property with the United States Patent and Trademark Office, the United States Copyright Office, or other appropriate Governmental Authority and each such Person will promptly patent or register, as the case may be, all new Intellectual Property.

APP374

5.18    <u>Solvency</u>. Borrower and each Subsidiary are solvent and generally able to pay their debts as they come due.

5.19    <u>Financial Information</u>.    All representations and warranties set forth in the Loan Documents with respect to any financial information concerning Borrower shall apply to all financial information delivered to Bank by Borrower or any Person purporting to be an Authorized Officer or other representative of Borrower regardless of the method of transmission to Bank or whether or not signed by Borrower or such Authorized Officer or other representative, as applicable.

5.20    <u>Individual HECM Loans</u>. Borrower hereby represents that each HECM Note and HECM Loan which is part of the Collateral relates to a Conforming Loan.

5.21    <u>Individual HECM Tails</u>. Subject to Ginnie Mae's rights under the Ginnie Mae Contract, Borrower hereby represents with respect to each HECM Tail which is part of the Collateral:

(a)    Each HECM Tail is a binding and valid obligation of the Obligor thereon, relates to a Conforming Loan, is in full force and effect and enforceable in accordance with its terms, except as enforceability may be limited by Debtor Relief Laws;

(b)    Any instrument evidencing a HECM Tail is genuine in all respects as appearing on its face and as represented in the books and records of Borrower, and all information set forth therein is true and correct;

(c)    Each HECM Tail is in all respects in accordance with all requirements of Law applicable thereto, including, without limitation, all federal and state Laws applicable to residential mortgage loans, including without limitation home equity conversion mortgages, and the regulations promulgated thereunder and all applicable usury Laws and restrictions, and all notices, disclosures and other statements or information required by Law or regulation to be given, and any other act required by Law or regulation to be performed, in connection with such HECM Tail have been given and performed as required;

(d)    Each HECM Tail is owned by Borrower free and clear of all Liens, except in favor of Bank; and

(e)    the aggregate outstanding principal amount of Extended Period HECM Tails does not exceed the Extended Period HECM Tail Sublimit.

5.22    <u>Individual Eligible HECM Tails</u>. Borrower hereby represents with respect to each HECM Tail that is submitted with an Advance Request, each such HECM Tail is, at the time of the Advance Request, an Eligible HECM Tail.

**ARTICLE 6**
**AFFIRMATIVE COVENANTS**

So long as Bank is committed to make Advances hereunder, and thereafter until payment and performance in full of all of the Indebtedness and Obligations, Borrower covenants and agrees that:

6.1    <u>Reporting Requirements</u>.  Borrower shall furnish (or, in the case of subclause (a) and (c), make available through public filings) to Bank the following, all in form and detail satisfactory to Bank:

(a)    <u>Annual Financial Statements</u>.  Promptly after becoming available, and in any event within ninety (90) days after the close of each fiscal year of Borrower and RMIT, a consolidated audited balance sheet of Borrower and RMIT as of the end of such year, and a consolidated audited statement of

income and retained earnings of Borrower and RMIT for such year, setting forth in each case in comparative form the corresponding figures for the preceding fiscal year, accompanied by the related report of independent certified public accountants acceptable to Bank, which report shall be to the effect that such statements have been prepared in accordance with GAAP;

(b)       Monthly Financial Statements. Within forty-five (45) days after the last day of each calendar month, internally prepared consolidated financial statements (including, but not necessarily limited to, balance sheets and related statements of income and cash flow) of Borrower and RMIT, showing the financial position and results of operations of Borrower and RMIT as of and for such calendar month and for the period from the beginning of the current fiscal year to the last day of such calendar month, together with a certificate executed by the principal financial officer of Borrower certifying that such financial statements present fairly the financial position of Borrower and RMIT as of the last day of such periods in conformity with GAAP;

(c)       Quarterly Financial Statements. Promptly after becoming available, and in any event within forty-five (45) days after the close of each fiscal quarter of Borrower and RMIT, a consolidated balance sheet of Borrower and RMIT as of the end of such fiscal quarter, a consolidated statement of income and retained earnings for such fiscal quarter and a consolidated operating statement of Borrower and RMIT for such fiscal quarter setting forth in each case in comparative form the corresponding figures for the corresponding fiscal quarter of the preceding fiscal year, prepared in accordance with GAAP and certified by the principal financial officer of Borrower and RMIT;

(d)       Weekly Hedging Reports. If Borrower has been approved by Bank to sell Mortgage Loans to Issuers and is selling Mortgage Loans to an Issuer, weekly hedging reports, in such form and content required by Bank;

(e)       Audit Reports. Promptly upon receipt thereof, a copy of each other report submitted to Borrower by independent accountants in connection with any annual, interim or special audit of the books of Borrower;

(f)       Other Information Requested by Bank. Such other information concerning the business, properties or financial condition of Borrower as Bank may reasonably request;

(g)       Borrowing Base Certificate. With each Advance Request and within five (5) days after the last day of each calendar month, a Borrowing Base Certificate as of the date of the Advance Request, or the end of such month, as applicable.  Such Borrowing Base Certificate shall be in the form of **Exhibit B** attached hereto or in such other form as Bank may reasonably require;

(h)       Compliance Certificate.  Within forty-five (45) days after the last day of each calendar month, (1) a Compliance Certificate as of the end of such month; and (2) a certificate of the chief financial officer of Borrower (i) stating that to the best of such Person's knowledge, no Event of Default has occurred and is continuing, or if an Event of Default has occurred and is continuing, a statement as to the nature thereof and the action which is proposed to be taken with respect thereto, and (ii) showing in reasonable detail the calculations demonstrating compliance with Article Eight.  Additionally, Bank reserves the right to request a Compliance Certificate and the accompanying certificate of the chief financial officer of Borrower concurrently with the delivery of the annual financial statements referred to herein.  Such Compliance Certificate shall be in the form of **Exhibit C** to the Agreement or in such other form as Bank may reasonably require; and

(i)       Aging Report.  With each Advance Request and within five (5) days after the last day of each calendar month, a report on the aging of Eligible HECM Tails which, in a form satisfactory to Lender, (i) sets forth the inception date of each Eligible HECM Tail, (ii) reflects and categorizes the length of time each such HECM Tail has been outstanding, (iii) sets forth the date of each Advance

22

APP376

related to each such Eligible HECM Tail, and (iv) reflects and categorizes the length of time each such Advance has been outstanding, certified as true and accurate by an Authorized Officer (the "Aging Report").

6.2    Insurance.    Borrower shall maintain with financially sound and reputable insurers, insurance with respect to its business and properties against such liabilities, casualties, risks and contingencies and in such types and amounts as is customary in the case of Persons engaged in the same or similar businesses and similarly situated and as required by Bank.  The insurance required herein shall be in such amounts and covering such risks as is usually carried by companies engaged in similar businesses and owning similar properties in the same general areas in which Borrower operates, provided that such insurance must include: (a) a fidelity bond of at least One Million and No/      Dollars ($1,000,000.00); and (b) an errors and omissions policy with minimum coverage of at least One Million and No/      Dollars ($1,000,000.00); each with maximum deductibles of Fifty Thousand and No/ Dollars ($50,000.00) and each in such form, with endorsements and issued by insurers reasonably acceptable to Bank. Borrower shall also maintain workmen's compensation insurance, property insurance, and comprehensive general liability insurance, reasonably satisfactory to Bank. Bank reserves the right, in its sole and absolute discretion, to increase such insurance coverage requirements *ab initio* or from time to time during the term of this Agreement. Each fidelity bond and errors and omissions policy covering Collateral shall name Bank as loss payee and Borrower shall notify the Bank in writing if any such policy has been canceled or reduced at least thirty (      days prior thereto.  Upon request of Bank, Borrower shall furnish, or cause to be furnished to Bank from time to time a summary of the insurance coverage of Borrower in form and substance satisfactory to Bank and if requested shall furnish Bank copies of the applicable policies.

6.3    Payment of Debts.    Borrower will pay or cause to be paid all of its Debt prior to the date on which penalties attach thereto (except to the extent and so long as the payment thereof is being properly contested in good faith by appropriate proceedings and adequate reserves have been established therefor).

6.4    Taxes.    Borrower will promptly pay or cause to be paid when due (for the account of Bank, where appropriate) any and all Taxes due by Borrower, including, without limitation, all taxes, duties, fees, levies and other charges of whatsoever nature which have been or may be imposed by any government or by any department, agency, state, other political subdivision or taxing authority thereof or therein; provided that Borrower shall not be required to pay and discharge any such Taxes or charges so long as the validity thereof shall be contested in good faith by appropriate proceedings and Borrower shall set aside on its books adequate reserves with respect thereto and shall pay any such Taxes or charge before the property subject thereto shall be sold to satisfy any lien which has attached as security therefor.

6.5    Expenses of Bank.    Borrower will reimburse Bank for all reasonable out-of-pocket costs, fees, and expenses incident to the Loan Documents or any transactions contemplated thereby, including, without limitation, all recording fees, all recording taxes, and the reasonable fees and disbursements of special counsel for Bank for negotiation and preparation of the Loan Documents, preparation and review of other documents, and providing of other legal services, from time to time, in connection herewith up through the Effective Date, and thereafter for services (a) in connection with any subsequent Advance, (b) in connection with or in anticipation of an Event of Default or otherwise in the enforcement of the Loan Documents, (c) in connection with any amendment or waiver to any of the Loan Documents, (d) in connection with any request or action initiated by Borrower, or (e) in connection with the exercise of any of Bank's rights and remedies under this Agreement, the Note, or any of the other Loan Documents, or at law, including, without limitation, all consulting fees, filing fees, brokerage fees and commissions, fees incident to security interests, liens, and other title and other searches and reports, escrow fees, attorney's fees, legal expenses, court costs, auctioneer fees and expenses, and other fees and expenses incurred in connection with liquidation or sale of the Collateral, all of which shall be and become a part of the Indebtedness.

6.6    <u>Maintenance of Entity Existence, Assets and Business; Continuance of Present Business</u>. Borrower will preserve and maintain its existence and all of its leases, licenses, permits, franchises, qualifications, and rights that are necessary or desirable in the ordinary conduct of its business, including Borrower's approval to participate in the Ginnie Mae HMBS program.  Borrower will conduct its business in an orderly and efficient manner in accordance with good business practices.  Borrower will keep or cause to be kept all of Borrower's assets which are useful and necessary in their respective businesses in good repair, working order and condition, and will make or cause to be made all necessary repairs, renewals and replacements as may be reasonably required.  Borrower will carry on and conduct its business in substantially the same fields as such business is now and has heretofore been carried on.

6.7    <u>Books and Records</u>.  Borrower will maintain proper books of record and account in which full, true, and correct entries in conformity with GAAP, or other method of accounting acceptable to Bank, shall be made of all dealings and transactions in relation to its business and activities. Borrower shall maintain and implement administrative and operating procedures (including, without limitation, an ability to recreate all records pertaining to each of the HECM Tails in the event of the destruction of the originals of such records) and keep and maintain all documents, books, records, computer tapes and other information reasonably necessary or advisable for the performance by Borrower of its obligations with respect to the HECM Tails.

6.8    <u>Compliance with Applicable Laws and with Contracts</u>.  Borrower will comply with the requirements of all applicable material Laws, rules, regulations and orders of any governmental authority, except where contested in good faith and by proper proceedings.  Borrower will comply in all material respects with all agreements, contracts, and instruments binding on it or affecting its properties or business.

6.9    <u>Comply with Agreement</u>.  Borrower will fully comply with the terms, provisions and conditions of this Agreement and of all documents executed pursuant hereto.

6.10    <u>Notice of Event of Default, Suits, and Material Adverse Effect</u>.  Upon discovery, Borrower will promptly notify Bank of any breach of any of the covenants contained in <u>Article Six</u> and <u>Article Seven</u> of this Agreement which are reasonably expected to result in the occurrence of any Event of Default hereunder, or of the filing of any claim, action, suit or proceeding before any Tribunal against Borrower in which an adverse decision could have a Material Adverse Effect upon Borrower and advise Bank from time to time of the status thereof.

6.11    <u>Information and Inspection</u>.  To the extent applicable, upon request, Borrower will furnish to Bank as soon as available copies of all (a) materials filed pursuant to the Securities Act of 1933, or 1934, as amended, by Borrower with the Securities and Exchange Commission, (b) reports to stockholders, and (c) press releases, and at any reasonable time any other information pertinent to any provision of this Agreement or to Borrower's business which Bank may reasonably request. Borrower shall permit an authorized representative of Bank to visit and inspect at reasonable times any of the properties of Borrower and to discuss the affairs, finances, and accounts of Borrower with the officers and employees of Borrower.

6.12    <u>Depository Relationship</u>.  To induce Bank to establish the interest rates provided for in the Notes and if and to the extent permitted by applicable laws, Borrower will use and maintain Bank as a principal depository bank, including for the maintenance of business, cash management, operating and administrative deposit accounts for activities related to Approved Purposes.

6.13    <u>Additional Information</u>.  Borrower will promptly furnish or cause to be furnished to Bank such other information not otherwise required herein respecting the business affairs, assets and liabilities of Borrower, Guarantor, the Subsidiaries and the Collateral as Bank shall from time to time reasonably request.

6.14   Asset Audit.  Borrower shall permit representatives of Bank and its third party auditor, at the expense of Borrower, to regularly monitor and audit the processing and status of the Collateral during the term of this Agreement, and Borrower shall make its books and records and personnel available at all times during normal business hours for such purpose.  Borrower shall pay the costs and expenses of the third party auditor.  Borrower has entered into a Consent to Third Party Auditor Engagement Agreement (herein so called), dated on or about March 1, 2016, as required by Bank and agrees that such auditing has been implemented and shall continue throughout the term of the Loan.

6.15   Covenants Relating to Collateral:

(a)   Records and Reports; Notification of Event of Default.  Borrower will maintain complete and accurate books and records with respect to the Collateral, and furnish to Bank such reports relating to the Collateral as Bank shall from time to time reasonably request.

(b)   Inspection.  Borrower will permit representatives of the Bank and its third party auditor, during normal business hours with reasonable advance notice to Borrower (i) to inspect the Collateral, (ii) to examine and make copies of the records of Borrower relating to the Collateral, and (iii) to discuss the Collateral and the related records of Borrower with, and to be advised as to the same by, Borrower's officers and employees.

(c)   Taxes.  Borrower will pay when due all taxes, assessments and governmental charges and levies upon the Collateral, except those which are being contested in good faith by appropriate proceedings and with respect to which no Lien exists.

(d)   Defense of Title.  Borrower will take any and all actions necessary to defend title to the Collateral against all persons and to defend the security interest of Bank in the Collateral and the priority thereof against any Lien not expressly permitted hereunder.

(e)   Liens.  Borrower will not create, incur, or suffer to exist any Lien on the Collateral except (i) the security interest created by this Security Agreement, and (ii) Permitted Liens.

(f)   Change in Location, Jurisdiction of Organization or Name.  Borrower will not (i) maintain a principal place of business at a location other than a location previously disclosed to the Bank in writing, in connection with Borrower's application for the Mortgage Warehouse Agreement and/or application for the Loan, (ii) change its name or taxpayer identification number, (iii) change its mailing address, or (iv) change its jurisdiction of organization, unless, in each case, Borrower shall have given Bank not less than thirty (      days' prior written notice thereof, and Bank shall have determined that such change will not adversely affect the validity, perfection or priority of Bank's security interest in the Collateral.

(g)   Other Financing Statements.  Borrower will not sign or authorize the preparation and filing of any financing statement naming it as debtor covering all or any portion of the Collateral, except as permitted by the Loan Documents.

(h)   Further Assurances.  At any time and from time to time, upon the request of Bank, and at the sole expense of Borrower, Borrower shall promptly execute and deliver all such further instruments and documents and take such further action as Bank may deem necessary or desirable to preserve and perfect its security interest in the Collateral and carry out the provisions and purposes of this Agreement, including, without limitation, (a) the preparation (and execution, if necessary) and filing of such financing statements as Bank may require and (b) the deposit of all certificates of title issuable with respect to any of the Collateral and noting thereon the Bank's security interest hereunder.

25

(i)     Collection of HECM Tails.  Except as otherwise provided in this Security Agreement, Borrower will collect and enforce, at Borrower's sole expense, all amounts due or hereafter due to Borrower under the HECM Tails.

6.16     Repayment Account; Minimum Balance.  Borrower shall maintain a balance of not less than One Hundred Thousand and No/     Dollars ($100,000.00) in the Repayment Account at all times.

6.17     Additional Guarantors.  Borrower shall notify Bank at the time that any Person becomes a Subsidiary of REVERSE MORTGAGE INVESTMENT TRUST INC., a Maryland corporation, and, if requested by Bank, reasonably promptly thereafter cause such Person to (a) become a Guarantor by executing and delivering to Bank a Guaranty Agreement in form and substance acceptable to Bank, and (b) execute and/or deliver to Bank such other documents and instruments as Bank may require.

### ARTICLE 7
### NEGATIVE COVENANTS

So long as Bank is committed to make Advances hereunder, and thereafter until payment and performance in full of all of the Indebtedness and all of the Obligations, Borrower covenants and agrees that, without the prior written consent of Bank:

7.1     Debt.  Borrower will not incur, create, assume, or permit to exist, any Debt, except:

(a)     Debt to Bank;

(b)     Debt secured by Mortgage loans (or interests therein, including, without limitation, mortgage servicing rights and advances) other than HECM Loans;

(c)     Debt (i) which exists on the Effective Date which has been disclosed to Bank in writing prior to the Effective Date, or (ii) with respect to which Bank has provided written consent;

(d)     Trade Debt incurred in the ordinary course of business;

(e)     Subordinated Debt;

(f)     Debt incurred in the ordinary course of business to hedge the risk of interest rate fluctuations or any of the Borrower's portfolios or pipelines of HECM Loans or Tails in respect of other Permitted Debt obligations; and

(g)     Debt incurred in connection with the issuance of securities issued in connection with a securitization of HECM Loans or HECM Tails.

Notwithstanding anything in this Agreement to the contrary, other than a lien created in favor of Ginnie Mae pursuant to the Guide, Borrower shall not incur, create, assume, or permit to exist any Debt which is secured by HECM Tail Collateral or any pool of which HECM Tail Collateral is a part, without the prior written consent of Bank.

7.2     Contingent Liabilities.  Borrower will not, directly or indirectly, assume, guarantee, endorse, contingently agree to purchase or otherwise become liable upon the obligation of any Person (other than Borrower) except  (a) by the endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of business, and (b) joint and several liabilities of the Borrower with one or more of its Affiliates pursuant to warehouse or aggregation borrowing arrangements, providing for no more than 10.0% recourse liability by the Borrower under such arrangements.

26

7.3     Limitation on Liens.  Borrower will not, directly or indirectly, incur, create, assume, or permit to exist any Lien upon any of its property, assets, or revenues, whether now owned or hereafter acquired, except:

(a)     The Permitted Liens;

(b)     Encumbrances consisting of minor easements, zoning restrictions, or other restrictions on the use of real property that do not (individually or in the aggregate) materially affect the value of the assets encumbered thereby or materially impair the ability of Borrower to use such assets in its business, and none of which is violated in any material respect by existing or proposed structures or land use;

(c)     Liens for taxes, assessments, or other governmental charges which are being contested in good faith and for which adequate reserves have been established;

(d)     Liens resulting from good faith deposits to secure payments of workmen's compensation or other social security programs or to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, or contracts (other than for payment of Debt), or leases made in the ordinary course of business; and

(e)     Liens on mortgage servicing rights (including, without limitation, Servicing Rights).

Notwithstanding anything in this Agreement to the contrary, other than a lien created in favor of Ginnie Mae pursuant to the Guide, Borrower shall not, directly or indirectly, incur, create, assume, or permit to exist any Lien upon HECM Tail Collateral, or any pool of which such HECM Tail Collateral is a part, or any instrument or certificates representing, or any rights incident to, such HECM Tail Collateral or pools, without the prior written consent of Bank.

7.4     Mergers, Etc.  Without the prior written consent of Bank, Borrower shall not, directly or indirectly: (a) become a party to any merger or consolidation, (b) purchase or otherwise acquire all or any part of the assets or shares or other evidence of beneficial ownership of any Person, or (c) sell or otherwise transfer all or substantially all of the assets or Properties of Borrower to any other Person; or (d) wind-up, dissolve or liquidate; provided that Borrower may merge or consolidate with (i) any wholly owned subsidiary of Borrower, or (ii) any other Person if Borrower is the surviving corporation; and provided further that, in either case, if after giving effect thereto, no Event of Default would exist hereunder.

7.5     Restricted Payments.  Reserved.

7.6     Loans and Investments.  Borrower will not, directly or indirectly, make any advance, loan, extension of credit, or capital contribution to or investment in, or purchase, any stock, bonds, notes, debentures, or other securities of, any Person, except:

(a)     Mortgage loans, including HECM Loans, made in the ordinary course of business;

(b)     Draws on Mortgage loans, including HECM Tails, made in the ordinary course of business;

(c)     Any advance, loan, extension of credit, or capital contribution to or investment in, or purchase, any stock, bonds, notes, debentures, or other securities made in the ordinary course business of advancing or originating Mortgage loans and which do not invoke the provisions of, and are not subject to, Regulation U;

(d)     Readily marketable direct obligations of the United States of America or any agency thereof with maturities of one year or less from the date of acquisition; and

(e)      Fully insured depository accounts maintained at a commercial bank operating in the United States of America having capital and surplus in excess of Fifty Million and No/      Dollars ($50,000,000.00).

7.7      <u>Limitation on Issuance of Equity</u>.  Borrower will not, directly or indirectly, at any time issue, sell, assign, or otherwise dispose of (a) any of its equity interests, (b) any securities exchangeable for or convertible into or carrying any rights to acquire any of its equity interests, or (c) any option, warrant, or other right to acquire any of its equity interests.

7.8      <u>Transactions with Affiliates</u>.  Borrower will not, directly or indirectly, enter into any transaction, including, without limitation, the purchase, sale, or exchange of property or the rendering of any service or the payment of any management, advisory or similar fees, with any Affiliate of Borrower, except in the ordinary course of and pursuant to the reasonable requirements of Borrower's business, pursuant to a transaction which is otherwise expressly permitted under this Agreement, and upon fair and reasonable terms no less favorable to Borrower than would be obtained in a comparable arm's-length transaction with a Person not an Affiliate of Borrower.

7.9      <u>Disposition of Assets</u>.  Borrower will not, directly or indirectly, sell, lease, assign, transfer, or otherwise dispose of any of its assets, except (a) dispositions or financings of inventory (including, without limitation, Mortgage loans) in the ordinary course of business, (b) dispositions, for fair value, of worn out and obsolete equipment not necessary to the conduct of its business, (c) dispositions of HECM Tails in the ordinary course of business so long as Borrower makes all mandatory prepayments to Bank required hereunder, (d) sales of HMBS in the ordinary course of business so long as Borrower makes all mandatory prepayments to Bank required hereunder, or (e) transactions between Affiliates that are not otherwise prohibited under this Agreement, which sale, lease, assignment, transfer or other disposition would not reasonably be expected to result in a material adverse effect on Borrower or its ability to perform its obligations hereunder.

7.10      <u>Nature of Business</u>.  Borrower will not engage in any business other than the Permitted Businesses.

7.11      <u>Environmental Protection</u>.  Borrower will not, directly or indirectly, (a) use (or permit any tenant to use) any of its properties or assets for the handling, processing, storage, transportation, or disposal of any Hazardous Material, (b) generate any Hazardous Material, (c) conduct any activity that is likely to cause a Release or threatened Release of any Hazardous Material, or (d) otherwise conduct any activity or use any of its respective properties or assets in any manner that is likely to violate any Environmental Law or create any Environmental Liabilities for which Borrower would be responsible.

7.12      <u>No Negative Pledge</u>.  Excepting mortgage loan warehouse or repurchase facilities, purchase money debt, restricted cash accounts, and arrangements permitted pursuant to <u>Sections 7.1</u> and <u>7.3</u>, in each case, which are in place as of the Effective Date, Borrower will not enter into or permit to exist any arrangement or agreement, other than pursuant to this Agreement, any Loan Document, or the Guide, which directly or indirectly prohibits or limits the ability of Borrower to or from creating or incurring a Lien on any of its assets, whether now owned or hereafter acquired.

7.13      <u>Judgments</u>.  Borrower will not allow any judgment or judgments rendered against it in excess of Five Million and No/      Dollars ($5,000,000.00) in the aggregate over any twelve month period to remain undischarged or unsuperseded for a period of thirty (      days during which execution shall not be effectively stayed.

7.14      <u>Sale and Leaseback</u>.  The Borrower will not enter into, and will not permit any Subsidiary to enter into, any arrangement with any Person pursuant to which it leases from such Person

real or personal property that has been or is to be sold or transferred, directly or indirectly, by it to such Person.

7.15    Prepayment of Debt.  Reserved.

7.16    Actions with Respect to HECM Tail Collateral.  Borrower shall not transfer, sell, assign, or deliver any HECM Tail Collateral pledged to Bank to any Person other than Bank, except through a HMBS as contemplated herein.

## ARTICLE 8
## FINANCIAL COVENANTS

Borrower covenants and agrees that, as long as any Indebtedness or Obligations or any part thereof is outstanding or Bank is under any obligation to make additional Advances under this Agreement, Borrower will, at all times, observe and perform the following financial covenants:

8.1    Minimum Ginnie Mae Required Net Worth.  Borrower shall maintain net worth of not less than $5,000,000.00 plus one percent (1.0%) of Borrower's Total Effective HMBS Outstanding Obligations, or such greater amount which is the sum of the minimum net worth requirements for all program types in which Borrower is approved to participate by Ginnie Mae, which shall include the HMBS program ("Ginnie Mae Required Net Worth").  For the purposes of this Section 8.1, (a) "Total Effective HMBS Outstanding Obligations" shall mean, as of any date of determination, the sum of (i) all HMBS securities outstanding, (ii) available commitment authority to issue new HMBS pools, and (iii) total HMBS pools funded by Borrower; and (b) Borrower's net worth shall be calculated as provided under Chapter 2, Part 9 of the Guide, or as otherwise required by Ginnie Mae.

8.2    Minimum Ginnie Mae Required Liquid Assets.  Borrower shall maintain liquid assets of not less than twenty percent (20.0%) of Borrower's Ginnie Mae Required Net Worth, or such greater amount which is the sum of the minimum liquid assets requirements for all program types in which Borrower is approved to participate by Ginnie Mae, which shall include the HMBS program. For the purposes of this Section 8.2, "liquid assets" shall mean cash and cash equivalents as defined under Financial Accounting Standards Board Statement of Financial Accounting Standards No. 95, or such other definition of liquid assets set forth in the Guide with respect to minimum liquid assets requirements for the Ginnie Mae HMBS program.

## ARTICLE 9
## EVENTS OF DEFAULT

The term "Event of Default" as used herein shall mean the occurrence of any one or more of the following events:

9.1    Payment of Indebtedness.  Borrower shall fail to punctually make any payment of fees or other sums when due hereunder, or under any other Loan Document to which it is a party or other document executed in connection herewith, and such failure shall continue for a period of three (3) Business days thereafter (provided that Bank shall not be required to provide any such three (3)-day grace period more than two (2) times in any twelve (12)-month period).

9.2    Misrepresentation.  Any material statement, warranty or representation made at any time by or on behalf of Borrower in this Agreement, any other Loan Document or any document executed in connection herewith, or in any writing, or any statement or representation made in any certificate, report, or opinion delivered to Bank pursuant to any Loan Document, is false, calculated to mislead, misleading or erroneous in any material respect at the time made; provided that a false, misleading or erroneous breach of any Asset Representation shall not be an Event of Default hereunder unless such breach was

calculated to mislead or otherwise intentionally misrepresented; provided further, however, that any HECM Tail which is the subject of any false, misleading or erroneous Asset Representation or to which any false, misleading or erroneous Asset Representation relates shall be excluded from the Borrower Base hereunder, regardless of Borrower's intent.

9.3    <u>Covenants</u>.    The failure or refusal of Borrower or any Obligated Party to perform, observe, and comply with any material covenant or agreement contained in any of the Loan Documents, which failure or refusal continues for a period of fifteen (15) Business days (provided that Bank shall not be required to provide any such fifteen (15)-day grace period more than two (2) times in any twelve (12)-month period).

9.4    <u>Voluntary Debtor Relief</u>.    Borrower or any Obligated Party shall: (i) apply for or consent to the appointment of a receiver, trustee, custodian, intervenor or liquidator of such Person or of all or a substantial part of its assets; (ii) file a voluntary petition in bankruptcy, admit in writing that it is unable to pay its debts as they become due or generally not pay its debts as they become due; (iii) make a general assignment for the benefit of creditors; (iv) file a petition or answer seeking reorganization or an arrangement with creditors or to take advantage of any bankruptcy or insolvency laws; (v) file an answer admitting the material allegations of, or consent to, or default in answering, a petition filed against it in any bankruptcy, reorganization or insolvency proceeding; or (vi) take any action for the purpose of effecting any of the foregoing.

9.5    <u>Involuntary Proceedings</u>.    An involuntary petition or complaint shall be filed against Borrower or any Obligated Party seeking bankruptcy or reorganization of such Person or the appointment of a receiver, custodian, trustee, intervenor or liquidator of it, or of all or substantially all of its assets, and such petition or complaint shall not have been dismissed within thirty (    days of the filing thereof; or an order, order for relief, judgment or decree shall be entered by any court of competent jurisdiction or other competent authority approving a petition or complaint seeking reorganization of such Person or appointing a receiver, custodian, trustee, intervenor or liquidator of such Person, or of all or substantially all of its assets, and such order, judgment or decree shall continue unstayed and in effect for a period of thirty (    days.

9.6    <u>Attachment</u>.    The failure to have discharged within a period of thirty (    days after the commencement thereof any attachment, sequestration, or similar proceedings against any of the material assets of Borrower or any Obligated Party.

9.7    <u>Other Debt</u>.    Borrower or any other Obligated Party shall default in the due and punctual payment of the principal of or the interest, under the Mortgage Warehouse Agreement or on any Debt (other than the Loans made hereunder) with Bank, secured or unsecured, or in the due performance or observance of any covenant or condition of any agreement executed in connection therewith (including, without limitation, the Mortgage Warehouse Agreement), and such default shall have continued beyond any period of grace or cure provided with respect thereto.

9.8    <u>Change in Management</u>.    Borrower shall both (a) permit any change in the senior executive management of Borrower whereby more than two of any of Craig Corn, Jim Rose, Richard Jensen, Michelle Zachensky or David Peskin no longer serve as senior executive management of Borrower, except by reason of death, disability or retirement and (b) fail to appoint successors for such individuals, such that more than two of Craig Corn, Jim Rose, Richard Jensen, Michelle Zachensky or David Peskin or successors with substantially similar qualifications and industry experience to such individuals do not serve as senior executive management of Borrower for more than ninety (90) days.

9.9    <u>Change in Ownership</u>.  Borrower shall both (a) permit any change in the ownership or control of Borrower, or permit the sale, transfer or conveyance of any shares or other interest in Borrower and (b) cease to be Controlled by a SCGG Party.

9.10    <u>Defaults on Other Debt or Agreements</u>.  Borrower or any other Obligated Party shall default in the due and punctual payment of the principal of or the interest on any Debt owing to any Person (other than Bank), or shall fail to perform, observe or comply with any covenant, agreement or other obligation to be performed, observed or complied with by Borrower or such Obligated Party in any agreement ancillary to such Debt, subject to any grace and/or cure periods provided therein, which failure could reasonably be expected to result in a material adverse effect on the business, operations, condition (financial or otherwise), or assets of Borrower or such Obligated Party, the ability of Borrower or such Obligated Party to perform its Obligations under any Loan Document to which it is a party or by which it is bound, or the enforceability of any Loan Document.

9.11    <u>Proceedings against Obligated Parties</u>.  Borrower shall fail within thirty (    days to pay, bond or otherwise discharge any judgment or order for payment of money in excess of Five Million and No/    Dollars ($5,000,000.00) in the aggregate over any twelve month period that is not otherwise being satisfied in accordance with its terms and is not stayed on appeal or otherwise being contested in good faith.

9.12    <u>Loan Documents</u>.  Any of the Loan Documents ceases to be in full force and effect, or be enforceable by Bank in accordance with their terms.

**ARTICLE 10**
**CERTAIN RIGHTS AND REMEDIES OF BANK**

10.1    <u>Rights Upon Event of Default; Attorney in Fact</u>.  If any Event of Default shall occur and be continuing, Bank may without notice terminate the Commitment and declare the Indebtedness or any part thereof to be immediately due and payable, and the same shall thereupon become immediately due and payable, without notice, demand, presentment, notice of dishonor, notice of acceleration, notice of intent to accelerate, notice of intent to demand, protest, or other formalities of any kind, all of which are hereby expressly waived by Borrower; provided, <u>however</u>, that upon the occurrence of an Event of Default under <u>Section 9.4</u> or <u>Section 9.5</u>, the Commitment shall automatically terminate, and the Indebtedness shall become immediately due and payable without notice, demand, presentment, notice of dishonor, notice of acceleration, notice of intent to accelerate, notice of intent to demand, protest, or other formalities of any kind, all of which are hereby expressly waived by the Borrower.  If any Event of Default shall occur and be continuing, Bank may exercise all rights and remedies available to it in law or in equity, under the Loan Documents, or otherwise; provided that all such rights, including those set forth in this <u>Section 10.1</u>, shall be subject to the terms and conditions of the Ginnie Mae Contract, if applicable. Further, conditioned upon the occurrence and continuation of an Event of Default, Borrower hereby irrevocably appoints and designates Bank and each Vice President or more senior officer of Bank as Borrower's agent and attorney-in-fact, to execute and deliver documents and instruments and take such actions as said agent and attorney-in-fact shall deem, in his discretion, necessary or appropriate to allow Bank to realize upon the benefit of its security interests and liens in the HECM Tail Collateral, including without limitation, opening mail or other correspondence addressed or directed to Borrower, endorsing and negotiating checks, money orders or other instruments payable to Borrower with respect to the HECM Tail Collateral, processing, executing, and recording in the public records such assignments and instruments of transfer as may be appropriate to fully vest in Bank title to the HECM Tail Collateral, seeking and prosecuting collection of or settling and compromising amounts owed on the HECM Tail Collateral or exercising the rights of the holder of the HECM Tail Collateral, selling, assigning or transferring the HECM Loans, and in general acting under changed circumstances, the exact nature of which may not be currently foreseen or foreseeable, in order to effectuate Bank's rights under this Agreement, and such appointment shall be deemed coupled with an interest.

10.2    Rights Relating to Collateral.

10.2.1    Application of Proceeds.  If any Event of Default shall have occurred and be continuing, Bank may at its discretion, in accordance and as provided in the Code and other applicable law, apply or use any cash held by Bank as Collateral and any cash proceeds received by Bank in respect of any sale or other disposition of, collection from, or other realization upon, all or any part of the Collateral as follows in such order and manner as Bank may elect:

(a)    To the repayment or reimbursement of the reasonable costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) incurred by Bank in connection with (i) the administration of the Loan Documents, (ii) the custody, preservation, use or operation of, or the sale of, collection from, or other realization upon, the Collateral, and (iii) the exercise or enforcement of any of the rights and remedies of Bank hereunder;

(b)    To the payment or other satisfaction of any Liens upon the Collateral;

(c)    To the satisfaction of the Indebtedness under this Agreement;

(d)    To the payment of any other amounts required by applicable law; and

(e)    By delivery to Borrower or any other party lawfully entitled to receive such cash or proceeds whether by direction of a court of competent jurisdiction or otherwise.

10.2.2    Deficiency.  In the event that the proceeds of any sale of, collection from, or other realization upon, all or any part of the Collateral by Bank are insufficient to pay all amounts to which Bank is legally entitled, Borrower and any Obligated Party shall be liable for the deficiency, together with interest thereon as provided in the Loan Documents.

10.2.3    Non-Judicial Remedies.  In granting to Bank the power to enforce its rights hereunder without prior judicial process or judicial hearing, Borrower expressly waives, renounces, and knowingly relinquishes any legal right which might otherwise require Bank to enforce its rights by judicial process.  Borrower recognizes and concedes that non-judicial remedies, including non-judicial foreclosure, subject to Ginnie Mae's rights under the Ginnie Mae Contract, are consistent with the usage of trade, are responsive to commercial necessity and are the result of a bargain at arm's length.  Nothing herein is intended to prevent Bank or Borrower from resorting to judicial process at either party's option.

10.2.4    Other Recourse.  Borrower waives any right to require Bank to proceed against any third party, exhaust any Collateral or other security for the Indebtedness, or to have any third party joined with Borrower in any suit arising out of the Indebtedness or any of the Loan Documents, or pursue any other remedy available to Bank, subject to Ginnie Mae's rights under the Guide.  Borrower further waives any and all notice of acceptance of this Agreement.  Borrower further waives any defense arising by reason of any disability or other defense of any third party or by reason of the cessation from any cause whatsoever of the liability of any third party.

10.2.5    Disclaimer of Warranties, Sales on Credit and Limitation of Liability.  In connection with any foreclosure sale of the Collateral, Bank may specifically disclaim any warranties of title or the like.  This procedure will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral.  If Bank sells any of the Collateral upon credit, Borrower will be credited only with payments actually made by the purchaser, received by Bank and applied to the indebtedness of the purchaser.  In the event the purchaser fails to pay for the Collateral, Bank may resell the Collateral and Borrower shall be credited with the proceeds of

the sale. Bank shall not incur any liability as a result of the sale of the Collateral, or any part of it, at any private sale. The Borrower hereby waives any claims it may have against the Bank arising by reason of the fact that the price at which the Collateral may have been sold at such private sale was less than the price that might have been obtained at a public sale, less than the price that might have been obtained had the Collateral been sold pursuant to a purchase agreement for it obtained by the Borrower, or less than the aggregate amount of the outstanding Revolving Loans and the unpaid interest accrued on them, even if the Bank accepts the first offer received and does not offer the Collateral to more than one offeree.

       10.2.6 <u>License</u>. Bank is hereby granted a license or other right to use, following the occurrence and during the continuance of an Event of Default, without charge, Borrower's labels, patents, copyrights, rights of use of any name, trade secrets, trade names, trademarks, service marks, customer lists and advertising matter, or any property of a similar nature, as it pertains to the Collateral, in completing production of, advertising for sale, and selling any Collateral, and, following the occurrence and during the continuance of any Event of Default, Borrower's rights under all licenses and all franchise agreements shall inure to Bank's benefit.

    10.3   <u>Setoff</u>. At any time an Event of Default exists, Bank shall be entitled to exercise the Rights of setoff and/or banker's lien against the interests of Borrower in and to each and every account (excluding escrow accounts or accounts that contain monies held for the benefit of Persons other than Borrower or any Affiliates) and other property of Borrower which are in the possession of Bank to the extent of the full amount of the Indebtedness, whether or not any such Indebtedness is then due. The rights and remedies of Bank hereunder are in addition to other rights and remedies (including, without limitation, other rights of setoff) which Bank may have.

    10.4   <u>Performance by Bank</u>. Should any covenant, duty, or agreement of Borrower fail to be performed in accordance with the terms of the Loan Documents, subject to Ginnie Mae's rights under the Guide, Bank may, at its option, perform or attempt to perform such covenant, duty, or agreement on behalf of Borrower. In such event, or if Bank expends any sum pursuant to the exercise of any Right provided herein, Borrower shall, at the request of Bank, promptly pay to Bank such amount expended by Bank in such performance or attempted performance, together with interest thereon at the Maximum Rate from the date of such expenditure by Bank until paid. Notwithstanding the foregoing, it is expressly understood that Bank does not assume any liability or responsibility for the performance of any duties of Borrower or Guarantor hereunder or in connection with all or any part of the Collateral.

    10.5   <u>Appointment of Receiver</u>. Subject to Ginnie Mae's rights under the Guide, at any time an Event of Default exists, Bank shall be entitled to exercise the right to appoint or seek appointment of a receiver, custodian, or trustee of Borrower or any of the Collateral pursuant to an order by any Tribunal, and Borrower consents to such appointment and will not oppose Bank's efforts to obtain such receiver, custodian, or trustee.

    10.6   <u>Diminution in Collateral Value</u>. Bank does not assume, and shall never have, any liability or responsibility for any loss or diminution in the value of all or any part of the Collateral.

    10.7   <u>Bank Not In Control</u>. None of the covenants or other provisions contained in this Agreement shall, or shall be deemed to, give Bank the Right to exercise control over the affairs and/or management of Borrower, the power of Bank being limited to the Right to exercise the remedies provided in the other Sections of this Article; <u>provided</u> however, if Bank becomes the owner of any ownership interest of any Person, whether through foreclosure or otherwise, Bank shall be entitled to exercise such legal Rights as it may have by virtue of being an owner of such Person.

    10.8   <u>Waivers</u>. The acceptance of Bank at any time and from time to time of part payment on the Indebtedness shall not be deemed to be a waiver of any Event of Default then existing. No waiver by

Bank of any Event of Default shall be deemed to be a waiver of any other then-existing or subsequent Event of Default. No waiver by Bank of any of its Rights hereunder, in the other Loan Documents, or otherwise shall be considered a waiver of any other or subsequent Right of Bank.  No delay or omission by Bank in exercising any Right under the Loan Documents shall impair such Right or be construed as a waiver thereof or any acquiescence therein, nor shall any single or partial exercise of any such Right preclude other or further exercise thereof, or the exercise of any other Right under the Loan Documents or otherwise.

10.9    <u>Cumulative Rights</u>.  All Rights available to Bank under the Loan Documents shall be cumulative of and in addition to all other Rights granted to Bank at Law or in equity, whether or not the Obligations be due and payable and whether or not Bank shall have instituted any suit for collection, foreclosure, or other action under or in connection with the Loan Documents.

10.10    <u>**INDEMNIFICATION OF BANK**</u>**. BORROWER SHALL INDEMNIFY, DEFEND, PROTECT AND HOLD HARMLESS BANK, BANK'S PARENTS, SUBSIDIARIES, AND AFFILIATES, AND ALL DIRECTORS, OFFICERS, EMPLOYEES, REPRESENTATIVES, AGENTS, ATTORNEYS, SUCCESSORS, AND ASSIGNS (COLLECTIVELY, THE "<u>INDEMNIFIED PARTIES</u>") FROM AND AGAINST ANY AND ALL LOSSES, LIABILITIES, DAMAGES, CLAIMS, PENALTIES, JUDGMENTS, OBLIGATIONS, DISBURSEMENTS, COSTS AND EXPENSES (INCLUDING REASONABLE ATTORNEYS' FEES AND EXPENSES), ACTIONS, PROCEEDINGS, OR DISPUTES (COLLECTIVELY "<u>LOSSES</u>") INCURRED OR SUFFERED OR TO WHICH ANY INDEMNIFIED PARTY MAY BECOME SUBJECT WHICH DIRECTLY OR INDIRECTLY ARISE FROM OR RELATE TO THIS AGREEMENT, THE OTHER LOAN DOCUMENTS, THE HECM TAILS, OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY, INCLUDING ANY AND ALL LOSSES DUE TO: (A) ANY NEGLIGENT OR FRAUDULENT ACT OR OMISSION OF BORROWER OR ITS AGENTS OR EMPLOYEES; (B) ANY BREACH BY BORROWER OF ANY MATERIAL WARRANTY OR REPRESENTATION CONTAINED HEREIN; (C) ANY BREACH BY BORROWER OF ANY MATERIAL TERM OR CONDITION OF THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT; (D) THE PRESENCE, RELEASE, THREATENED RELEASE, DISPOSAL, REMOVAL, OR CLEANUP OF ANY HAZARDOUS MATERIAL LOCATED ON, ABOUT, WITHIN OR AFFECTING ANY OF THE PROPERTIES OR ASSETS OF THE BORROWER OR ANY SUBSIDIARY; (E) ANY EVENT OF DEFAULT; (F) ANY FAILURE BY BORROWER TO COMPLY WITH ANY LAW; AND (G) THE UNMARKETABILITY OF ANY HECM TAIL RESULTING FROM ANY MATTER DESCRIBED IN CLAUSES (A) THROUGH (F) OF THIS SENTENCE. WITHOUT LIMITING ANY PROVISION OF THIS AGREEMENT OR OF ANY OTHER LOAN DOCUMENT, IT IS THE EXPRESS INTENTION OF THE PARTIES HERETO THAT EACH PERSON TO BE INDEMNIFIED UNDER THIS SECTION SHALL BE INDEMNIFIED FROM AND HELD HARMLESS AGAINST ANY AND ALL LOSSES ARISING OUT OF OR RESULTING FROM THE SOLE CONTRIBUTORY OR ORDINARY NEGLIGENCE OF SUCH PERSON; PROVIDED, HOWEVER, THE INDEMNITIES PROVIDED IN THIS <u>SECTION 10.10</u> DO NOT EXTEND TO LOSSES, LIABILITIES, CLAIMS, OR DAMAGES CAUSED BY BANK'S GROSS NEGLIGENCE OR MISCONDUCT. BANK MAY EMPLOY AN ATTORNEY OR ATTORNEYS TO PROTECT OR ENFORCE ITS RIGHTS, REMEDIES AND RECOURSES UNDER THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, AND TO ADVISE AND DEFEND BANK WITH RESPECT TO ANY SUCH ACTIONS AND OTHER MATTERS.  BORROWER SHALL REIMBURSE BANK FOR THEIR RESPECTIVE ATTORNEYS' FEES AND EXPENSES (INCLUDING EXPENSES AND COSTS FOR EXPERTS) IMMEDIATELY UPON RECEIPT OF A WRITTEN DEMAND THEREFOR, WHETHER ON A MONTHLY OR OTHER TIME INTERVAL, AND WHETHER OR NOT AN ACTION IS ACTUALLY COMMENCED OR CONCLUDED.    ALL OTHER REIMBURSEMENT AND INDEMNITY OBLIGATIONS HEREUNDER SHALL BECOME DUE AND PAYABLE WHEN ACTUALLY INCURRED BY**

**BANK.  ANY PAYMENTS NOT MADE WITHIN THIRTY (    DAYS AFTER WRITTEN
DEMAND THEREFOR SHALL BEAR INTEREST AT THE HIGHEST RATE PERMITTED
UNDER APPLICABLE LAW FROM THE DATE OF SUCH DEMAND UNTIL FULLY PAID.
THE PROVISIONS OF THIS SECTION SHALL SURVIVE THE TERMINATION OF THIS
AGREEMENT.**

    10.11   <u>Limitation of Liability</u>.   Neither Bank nor any Affiliate, officer, director, employee,
attorney, or agent of Bank shall have any liability with respect to, and Borrower hereby waives, releases,
and agrees not to sue any of them upon, any claim for any special, indirect, incidental, or consequential
damages suffered or incurred by the Borrower in connection with, arising out of, or in any way related to,
this Agreement or any of the other Loan Documents, or any of the transactions contemplated by this
Agreement or any of the other Loan Documents.  Borrower hereby waives, releases, and agrees not to sue
Bank or any of Bank's Affiliates, officers, directors, employees, attorneys, or agents for punitive damages
in respect of any claim in connection with, arising out of, or in any way related to, this Agreement or any
of the other Loan Documents, or any of the transactions contemplated by this Agreement or any of the
other Loan Documents. Nothing in this <u>Section 10.11</u> shall be construed to limit the provisions of <u>Section
3.9</u>, applicable law, or the Guide.

**ARTICLE 11
<u>MISCELLANEOUS</u>**

    11.1   <u>Headings</u>.  The headings, captions, and arrangements used in any of the Loan Documents
are, unless specified otherwise, for convenience only and shall not be deemed to limit, amplify, or modify
the terms of the Loan Documents, nor affect the meaning thereof.

    11.2   <u>Number and Gender of Words</u>.  Whenever herein the singular number is used, the same
shall include the plural where appropriate, and vice versa; and words of any gender shall include each
other gender where appropriate.

    11.3   <u>Notices</u>.   Unless otherwise expressly provided herein, all notices and other
communications provided for hereunder shall be in writing (including by facsimile transmission) and
mailed, faxed, or delivered, to the address or facsimile number specified for notices on the signature page
below or to such other address as shall be designated by such party in a notice to the other parties.  All
such other notices and other communications shall be deemed to have been given or made upon the
earliest to occur of (a) actual receipt by the intended recipient or (b) (i) if delivered by hand or courier,
when signed for by the designated recipient; (ii) if delivered by mail, four (4) business days after deposit
in the mail, postage prepaid; and (iii) if delivered by facsimile, when sent and receipt has been confirmed.
Electronic mail and internet websites may be used only to distribute routine communications, such as
financial statements and other information, and to distribute Loan Documents for execution by the parties
thereto, and may not be used for any other purpose.

    11.4   <u>Form and Number of Documents</u>.  Each agreement, document, instrument, or other
writing to be furnished to Bank under any provision of this Agreement must be in form and substance and
in such number of counterparts as may be satisfactory to Bank and its counsel.

    11.5   <u>Survival</u>.  All covenants, agreements, undertakings, representations, and warranties made
in any of the Loan Documents shall survive all closings under the Loan Documents and shall continue in
full force and effect so long as any part of the Indebtedness remains outstanding and, except as otherwise
indicated, shall not be affected by any investigation made by any party.  Notwithstanding anything
contained herein to the contrary, the covenants, agreements, undertakings, representations, and warranties
made in <u>Section 6.5</u> and <u>Section 10.10</u> shall survive the expiration or termination of this Agreement,
regardless of the means of such expiration or termination.

11.6    **GOVERNING LAW; PLACE OF PERFORMANCE.  THE LOAN DOCUMENTS ARE BEING EXECUTED AND DELIVERED, AND ARE INTENDED TO BE PERFORMED, IN THE STATE OF TEXAS, AND THE LAWS OF SUCH STATE AND OF THE UNITED STATES SHALL GOVERN THE RIGHTS AND DUTIES OF THE PARTIES HERETO AND THE VALIDITY, CONSTRUCTION, ENFORCEMENT, AND INTERPRETATION OF THE LOAN DOCUMENTS, EXCEPT TO THE EXTENT OTHERWISE SPECIFIED IN ANY OF THE LOAN DOCUMENTS.  THIS AGREEMENT, ALL OF THE OTHER LOAN DOCUMENTS, AND ALL OF THE OBLIGATIONS OF BORROWER UNDER ANY OF THE LOAN DOCUMENTS ARE PERFORMABLE IN DALLAS COUNTY, TEXAS.    VENUE OF ANY LITIGATION INVOLVING THIS AGREEMENT OR ANY LOAN DOCUMENT SHALL BE MAINTAINED IN AN APPROPRIATE STATE OR FEDERAL COURT LOCATED IN DALLAS COUNTY, TEXAS, TO THE EXCLUSION OF ALL OTHER VENUES.**

11.7    <u>Maximum Interest</u>.  It is expressly stipulated and agreed to be the intent of Borrower and Bank at all times to comply strictly with the applicable Texas law governing the maximum rate or amount of interest payable on the indebtedness evidenced by any Note or any Loan Document, and the Related Indebtedness (or applicable United States federal law to the extent that it permits Bank to contract for, charge, take, reserve or receive a greater amount of interest than under Texas law).  If the applicable law is ever judicially interpreted so as to render usurious any amount (a) contracted for, charged, taken, reserved or received pursuant to any Note, any of the other Loan Documents or any other communication or writing by or between Borrower and Bank related to the transaction or transactions that are the subject matter of the Loan Documents, (b) contracted for, charged, taken, reserved or received by reason of Bank's exercise of the option to accelerate the maturity of any Note and/or any and all indebtedness paid or payable by Borrower to Bank pursuant to any Loan Document other than any Note (such other indebtedness being referred to in this Section as the "Related Indebtedness"), or (c) Borrower will have paid or Bank will have received by reason of any prepayment by Borrower of any Note or Related Indebtedness, then it is Borrower's and Bank's express intent that all amounts charged in excess of the Maximum Rate shall be automatically canceled, ab initio, and all amounts in excess of the Maximum Rate theretofore collected by Bank shall be credited on the principal balance of any Note and/or the Related Indebtedness (or, if any Note and the Related Indebtedness have been or would thereby be paid in full, refunded to Borrower), and the provisions of any Note and the other Loan Documents shall immediately be deemed reformed and the amounts thereafter collectible hereunder and thereunder reduced, without the necessity of the execution of any new document, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder and thereunder; <u>provided</u>, <u>however</u>, if any Note has been paid in full before the end of the stated term of any such Note, then Borrower and Bank agree that Bank shall, with reasonable promptness after Bank discovers or is advised by Borrower that interest was received in an amount in excess of the Maximum Rate, either refund such excess interest to Borrower and/or credit such excess interest against such Note and/or any Related Indebtedness then owing by Borrower to Bank.  Borrower hereby agrees that as a condition precedent to any claim  or counterclaim (in which event such proceeding shall be abated for such time period) seeking usury penalties against Bank, Borrower will provide written notice to Bank, advising Bank in reasonable detail of the nature and amount of the violation, and Bank shall have sixty (60) days after receipt of such notice in which to correct such usury violation, if any, by either refunding such excess interest to Borrower or crediting such excess interest against the Note to which the alleged violation relates and/or the Related Indebtedness then owing by Borrower to Bank.  All sums contracted for, charged, taken, reserved or received by Bank for the use, forbearance or detention of any debt evidenced by any Note and/or the Related Indebtedness shall, to the extent permitted by applicable law, be amortized or spread, using the actuarial method, throughout the stated term of such Note and/or the Related Indebtedness (including any and all renewal and extension periods) until payment in full so that the rate or amount of interest on account of any Note and/or the Related Indebtedness does not exceed the Maximum Rate from time to time in effect and applicable to such Note and/or the Related Indebtedness for so long as debt is outstanding.  In no event shall the provisions of Chapter         of the Texas Finance Code (which regulates certain revolving credit loan accounts and revolving triparty accounts) apply to any

Note and/or any of the Related Indebtedness. Notwithstanding anything to the contrary contained herein or in any of the other Loan Documents, it is not the intention of Bank to accelerate the maturity of any interest that has not accrued at the time of such acceleration or to collect unearned interest at the time of such acceleration.

11.8     Ceiling Election. To the extent that Bank is relying on Chapter     of the Texas Finance Code to determine the Maximum Rate payable on any such Note and/or any other portion of the Indebtedness, Bank will utilize the weekly ceiling from time to time in effect as provided in such Chapter     as amended. To the extent federal law permits Bank to contract for, charge, take, receive or reserve a greater amount of interest than under Texas law, Bank will rely on federal law instead of such Chapter     for the purpose of determining the Maximum Rate. Additionally, to the extent permitted by applicable law now or hereafter in effect, Bank may, at its option and from time to time, utilize any other method of establishing the Maximum Rate under such Chapter     or under other applicable law by giving notice, if required, to Borrower as provided by applicable law now or hereafter in effect.

11.9     Invalid Provisions. If any provision of any of the Loan Documents is held to be illegal, invalid, or unenforceable under present or future Laws effective during the term thereof, such provision shall be fully severable, the appropriate Loan Document shall be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part thereof, and the remaining provisions thereof shall remain in full force and effect and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance therefrom. Furthermore, in lieu of such illegal, invalid, or unenforceable provision, there shall be added automatically as a part of such Loan Document a provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible and be legal, valid, and enforceable.

11.10     Entirety and Amendments. This instrument embodies the entire agreement between the parties relating to the subject matter hereof (except documents, agreements and instruments delivered or to be delivered in accordance with the express terms hereof), supersedes all prior agreements and understandings, if any, relating to the subject matter hereof, and may be amended only by an instrument in writing executed jointly by Borrower and Bank and supplemented only by documents delivered or to be delivered in accordance with the express terms hereof.

11.11     Multiple Counterparts. This Agreement has been executed in a number of identical counterparts, each of which constitutes an original and all of which constitute, collectively, one agreement; but in making proof of this Agreement, it shall not be necessary to produce or account for more than one such counterpart.

11.12     Joint and Several Liability. The liability of all Persons obligated to Bank in any manner under this Agreement shall be joint and several.

11.13     Parties Bound. This Agreement shall be binding upon and inure to the benefit of Borrower, Bank and their respective successors and assigns; provided, however that Borrower may not, without the prior written consent of Bank, assign any of its Rights, duties, or obligations hereunder. No term or provision of this Agreement shall inure to the benefit of any Person other than Borrower and Bank and their respective successors and assigns; consequently, no Person other than Borrower and Bank and their respective successors and assigns, shall be entitled to rely upon, or to raise as a defense, in any manner whatsoever, the failure of Borrower or Bank to perform, observe, or comply with any such term or provision.

11.14     Bank's Consent or Approval. Except where otherwise expressly provided in the Loan Documents, in any instance where the approval, consent or the exercise of judgment of Bank is required, the granting or denial of such approval or consent and the exercise of such judgment shall be (a) within the sole discretion of Bank, and (b) deemed to have been given only by a specific writing intended for the

purpose and executed by Bank.  Each provision for consent, approval, inspection, review, or verification by Bank is for Bank's own purposes and benefit only.

      11.15    <u>Loan Agreement Governs</u>.    In the event of any conflict between the terms of this Agreement and any terms of any other Loan Document, the terms of this Agreement shall govern.  All of the Loan Documents are by this reference incorporated into this Agreement.

      11.16    <u>WAIVER OF JURY TRIAL</u>.    TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, BORROWER HEREBY IRREVOCABLY AND EXPRESSLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT, OR OTHERWISE) ARISING OUT OF OR RELATING TO ANY OF THE LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREBY OR THE ACTIONS OF BANK IN THE NEGOTIATION, ADMINISTRATION, OR ENFORCEMENT THEREOF.

      11.17    <u>Independence of Covenants</u>.  All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or be otherwise within the limitations of, another covenant shall not avoid the occurrence of an Event of Default if such action is taken or such condition exists.

      11.18    <u>USA Patriot Act</u>.  Bank is subject to the requirements of the USA Patriot Act (Title III of Pub. L.    56 (signed into law October 26, 2001)) (the "*Act*") and hereby notifies the Borrower that pursuant to the requirements of the Act, it is required to obtain, verify, and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Bank to identify the Borrower in accordance with the Act.

      11.19    <u>Amended and Restated Loan Agreement</u>.    This Agreement is in amendment and restatement of, and is intended to carry forward the liens and security interests of (i) that certain Loan and Security Agreement, dated September 16, 2015, executed by and between Borrower and Bank, (ii) that certain that certain First Amended and Restated Loan and Security Agreement, dated November    2016, executed by and between Borrower and Bank, (iii) that certain Second Amended and Restated Loan and Security Agreement, dated April 13, 2018, executed by and between Borrower and Bank, (iv) that certain Third Amended and Restated Loan and Security Agreement, dated July 15, 2019, executed by and between Borrower and Bank; and (v) that certain Fourth Amended and Restated Loan and Security Agreement, dated August 26, 2020, executed by and between Borrower and Bank (collectively, the "<u>Prior Loan Agreement</u>").  Borrower acknowledges that the liens and security interests of Bank pursuant to the Prior Loan Agreement are renewed, extended, amended and restated in full force to secure payment of the Note.

      11.20    <u>STATUTE OF FRAUDS NOTICE</u>.  THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

**[Signature Page Follows]**

38

EXECUTED to be effective as of the date first written above.

**BANK:**

TEXAS CAPITAL BANK, NATIONAL
ASSOCIATION

By: _____
Aric Crouch, Vice President

TEXAS CAPITAL BANK, N.A.
2000 McKinney Avenue, Suite 700
Dallas, Texas 75201
Attention:  Aric Crouch
E-mail:  aric.crouch@texascapitalbank.com

**BORROWER:**

REVERSE MORTGAGE FUNDING LLC,
a Delaware limited liability company

By: _____
Craig Corn, Chief Executive Officer

Address for Notices:

1445 Broad Street, Floor 2
Bloomfield, New Jersey 07003
Attn:       Craig Corn
E-mail:    ccorn@reversefunding.com

Signature Page

RLOC – HECM Tail Loan

APP393

## EXHIBIT A

## ADVANCE REQUEST

FROM:    REVERSE MORTGAGE FUNDING LLC, a Delaware limited liability company ("Borrower")

TO:    TEXAS CAPITAL BANK, NATIONAL ASSOCIATION ("Bank")

DATE:    _____, 20___

I.    Borrower hereby requests Revolving Loans in the amount and on the date specified below, pursuant to the Fifth Amended and Restated Loan and Security Agreement between Borrower and Bank dated as of August 26, 2021 (as amended, modified or restated from time to time, the "Agreement"). Capitalized terms used herein and defined in the Agreement shall be used herein as so defined.

II.    Loans requested:

    (a)    Borrower hereby requests Revolving Loan(s) in the aggregate principal amount of $_____.

    (b)    Requested advance date: _____, 20___.

III.    The undersigned officer of Borrower represents and warrants to Bank:

    (a)    Borrower is entitled to receive the requested Revolving Loan(s) under the terms and conditions of the Agreement;

    (b)    all items which Borrower is required to furnish to Bank pursuant to the Agreement accompany this Advance Request (or shall be delivered to Bank in accordance with the Agreement);

    (c)    all HECM Tails included in the attached Submission List are Eligible HECM Tails which conform in all respects with the applicable requirements set forth in the Agreement;

    (d)    no Event of Default has occurred and is continuing under the Agreement;

    (e)    no change or event which with notice and/or the passage of time would constitute an Event of Default has occurred;

    (f)    after giving effect to the Revolving Loan(s) requested hereby, the aggregate amount of the outstanding principal balance of the Revolving Loan(s) will not exceed the Borrowing Limit; and

    (g)    after giving effect to the Revolving Loan(s) requested hereby, the aggregate amount of the outstanding principal amount of the Extended Period HECM Tails will not exceed the Extended Period HECM Tail Sublimit.

Borrower has attached and submits herewith a Borrowing Base Certificate and a Submission List describing all Eligible HECM Tails included in the HECM Tail Collateral Value of the Borrower Base, as well as an Aging Report in accordance with Section 6.1(i) of the Agreement.

The representations and warranties of Borrower stated herein, contained in the Agreement, and contained in each other Loan Document to which Borrower is a party are true and correct in all respects on and as of the date hereof.

**BORROWER:**

REVERSE MORTGAGE FUNDING LLC,
a Delaware limited liability company

By:     _____
Name:  _____
Title:   _____

## SCHEDULE A-1

**BORROWING BASE CERTIFICATE**

To be Attached

## SCHEDULE A-2

**SUBMISSION LIST**

To be Attached

## SCHEDULE A-3

**AGING REPORT**

To be Attached

## EXHIBIT B

### BORROWING BASE CERTIFICATE

FOR PERIOD ENDED _____ (THE " <u>DATE OF DETERMINATION</u> ")

BANK:          TEXAS CAPITAL BANK, NATIONAL ASSOCIATION

BORROWER:      REVERSE MORTGAGE FUNDING LLC, a Delaware limited liability company

      This certificate is delivered under the Fifth Amended and Restated Loan and Security Agreement dated as of August 26, 2021, between Borrower and Bank (as from time to time amended, the "<u>Agreement</u>").  Capitalized terms used in this certificate shall, unless otherwise indicated, have the meanings set forth in the Agreement.  On behalf of Borrower, the undersigned certifies to Bank that, as of the Date of Determination, (a) no Event of Default has occurred and is continuing, (b) a review has been made to determine the amount of the current Borrower Base, (c) the HECM Tails included in the Borrower Base below are each Eligible HECM Tails and otherwise meet all conditions to qualify for inclusion therein as set forth in the Agreement, and (d) the information set forth below hereto is true and correct as of the Date of Determination:

A.   Loan Balance:

    1.   Total Principal Outstanding as of Borrowing Base Report
        dated _____, 20_____ ("<u>Prior Date of Determination</u>")     $_____

    2.   Principal payments made since Prior Date of Determination     $_____

    3.   New Advances since Prior Date of Determination     $_____

    4.   Estimated Amount Outstanding (1 <u>minus</u> 2 <u>plus</u> 3)     $_____

B.   Borrower Base Calculation:

    5.   Total outstanding monetary amount of all Eligible HECM Tails
        (attach a schedule)     $_____

    6.   Total monetary amount of previously pledged Eligible HECM Tails
        which are no longer Eligible HECM Tails     $_____

    7.   Total monetary amount of previously pledged Eligible HECM Tails
        which are the subject of any false, misleading or erroneous Asset
        Representation or to which any false, misleading or erroneous Asset
        Representation relates     $_____

    8.   Borrower Base (Lines 5 <u>minus</u> Line 6 <u>minus</u> Line 7 <u>multiplied by</u>     $_____
        Advance Rate of 95% <u>minus</u> all curtailments made pursuant to
        <u>Section 2.10</u> of the Agreement) (Aging Report attached)

    9.   Availability (Line 8 minus Line 4)     $_____

    10.   Mandatory Paydown (Line 4 minus Line 8)     $_____

APP399

C.   Sublimits

    11.   Extended Period HECM Tail Sublimit            $     3,000,000.00

    12.   Aggregate outstanding principal amount of Extended Period HECM  $_____
          Tails

    13.   Mandatory paydown (Line 12 minus Line 11)        $_____

D.   Outstanding HECM Tails

    14.   Total outstanding advances on HECM Tails which have not been  $_____
          securitized into HMBS, including amounts funded by Bank

This Borrowing Base Report is executed as of the Date of Determination.

                      REVERSE MORTGAGE FUNDING LLC,
                      a Delaware limited liability company

                      By:  _____
                      Name: _____
                      Title: _____

## EXHIBIT C

### COMPLIANCE CERTIFICATE

REPORTING PERIOD: _____, 20_____ through _____, 20_____

This Compliance Certificate (this "Certificate") is being delivered in connection with that certain Fifth Amended and Restated Loan and Security Agreement (as amended and modified from time to time, and including all addenda and exhibits thereto, the "Agreement") dated August 26, 2021, executed by TEXAS CAPITAL BANK, NATIONAL ASSOCIATION ("Bank") and the undersigned executing this Certificate as "Borrower". Capitalized terms used in this Certificate shall, unless otherwise indicated herein, have the meanings set forth in the Agreement. On behalf of Borrower, the undersigned certifies to Bank as of the last day of the reporting period indicated above (the "Determination Date") that: (a) no Event of Default has occurred and is continuing; (b) all representations and warranties of Borrower contained in the Agreement and in the other Loan Documents are true and correct in all material respects; and (c) the information set forth below and all documents provided to Bank to substantiate the same are true, correct and complete.

**Minimum Ginnie Mae Required Net Worth**:

| *Actual Total Effective HMBS Outstanding Obligations/Net Worth (as of the Determination Date)* | | *Required minimum Ginnie Mae Required Net Worth (pursuant to the Agreement)* |
|---|---|---|
| A.  Total Effective HMBS Outstanding Obligations (sum of Lines i.—iii.) | $_____ | Greater of (i) $5,000,000.00 plus Line B = $_____, or (ii) the sum of the minimum net worth requirements for all program types in which Borrower is approved to participate by Ginnie Mae ($_____) ("*Ginnie Mae Required Net Worth*") |
|     i.   All HMBS securities outstanding | $_____ | |
|     ii.  Available commitment authority to issue new HMBS pools | $_____ | |
|     iii. Total HMBS pools funded by Borrower | $_____ | |
| B.  Total Effective HMBS Outstanding Obligations (Line A) multiplied by .01 | $_____ | |
| C.  Net worth, as calculated pursuant to the Guide or otherwise required by Ginnie Mae | $_____ | |

**Minimum Ginnie Mae Required Liquid Assets**:

| Actual Ginnie Mae Required Net Worth/Liquid Assets (as of the Determination Date) | | Required minimum Ginnie Mae Required Liquid Assets (pursuant to the Agreement) |
|---|---|---|
| A. Ginnie Mae Required Net Worth | $_____ | Greater of (i) Ginnie Mae Required Net Worth (Line A) <u>multiplied</u> by .20 = $_____, or (ii) the sum of the minimum liquid assets requirements for all program types in which Borrower is approved to participate by Ginnie Mae ($_____) |
| B. Liquid Assets, pursuant to the Guide | | |
| Cash | $_____ | |
| Cash Equivalents | $_____ | |
| *TOTAL ELIGIBLE LIQUID ASSETS:* | $_____ | |

**Non-Financial Requirements:**

| In Compliance for the Reporting Period | Mark for all Required |
|---|---|
| Financial Statements and Reports: | |
| (a) Deliver Annual Consolidated Financial Statements – 90 days Grace; Audited | _____ Yes _____ No |
| (b) Deliver Monthly Consolidated Financial Statements – 45 days Grace | _____ Yes _____ No |
| (c) Deliver Quarterly Consolidated Financial Statements – 45 days Grace | _____ Yes _____ No |
| (d) Deliver Weekly Hedging Reports (If applicable) | _____ Yes _____ No _____ N/A |
| (e) Deliver Monthly Borrowing Base Certificate – 5 days Grace | _____ Yes _____ No |
| (f) Deliver Monthly Compliance Certificate – 45 days Grace | _____ Yes _____ No |
| (g) Deliver Monthly HECM Tails Aging Report – 5 days Grace | _____ Yes _____ No |
| <u>Depository Relationship</u>: Borrower to use and maintain Bank as its principal depository bank | _____ Yes _____ No |
| <u>Minimum Repayment Account Balance</u>: Borrower to maintain minimum balance of $100,000.00 in Repayment Account | _____ Yes _____ No |
| <u>Change in Management</u>: Borrower not to change its senior executive management except as permitted in Section 9.8 of the Agreement | _____ Yes _____ No |
| <u>Change in Ownership or Control</u>: Borrower not permit to change its ownership or control, or permit the sale, transfer or conveyance of any shares or other interest in Borrower | _____ Yes _____ No |
| <u>No Defaults</u>: No Event of Default and no event which, with the lapse of time or notice or both, could reasonably be expected to become an Event of Default has occurred and is continuing | _____ Yes _____ No |
| <u>Compliance with Affirmative Covenants</u>: As of the | |

| | | |
|---|---|---|
| date hereof, Borrower is in compliance with all Affirmative Covenants set forth in the Agreement | _____ True | _____ False |
| Compliance with Negative Covenants: As of the date hereof, Borrower is in compliance with all Negative Covenants set forth in the Agreement | _____ True | _____ False |
| Representations and Warranties: As of the date hereof, all Representations and Warranties set forth in the Agreement are true and correct | _____ True | _____ False |

**Exceptions from Compliance:**

Please provide notice and details regarding any exception from compliance (describe areas of non-compliance, or else note "none" if there are no points of non compliance): _____

_____
_____
_____
_____
_____
_____
_____

**[Signature Page Follows]**

EXECUTED by Borrower as of the Determination Date.

**<u>BORROWER</u>**:

REVERSE MORTGAGE FUNDING LLC,
a Delaware limited liability company

By:     _____
Name:  _____
Title:   _____

## SCHEDULE 5.11

## OTHER DEBT

| Lender /Trust | Type | Description of Collateral Security, if Any | Principal Balance [1] |
|---|---|---|---|
| Leadenhall Capital Partners LLP [2] | Secured MSR Financing | | $96,598,539.45 |
| RMF Proprietary Issuance Trust 2019-1 [3] | Asset Backed Notes | | $174,954,873 |
| RMF Proprietary Issuance Trust 2020-1 [4] | Asset Backed Notes | | $183,576,822 |
| RMF Buyout Issuance Trust 2020-1 [5] | Asset Backed Notes | | $111,203,430 |
| RMF Buyout Issuance Trust 2020-2 [6] | Asset Backed Notes | | $285,552,730 |
| RMF Buyout Issuance Trust 2020-HB1 [7] | Asset Backed Notes | | $472,387,055 |
| RMF Proprietary Issuance Trust 2021-1 [8] | Asset Backed Notes | | $246,754,192 |
| Veritate Issuance Trust 2021-1 [9] | Asset Backed Notes | | $75,400,000 |

(1) Principal balance as of June    2021, except for Veritate Issuance Trust 2021-1, which represents the amount issued.

(2) $100,000,000 Facility size.

(3) Issued $256,667,000 of notes on October 15, 2019.  This is non-recourse debt.

(4) Issued $219,300,000 of notes on April    2020.  This is non-recourse debt.

(5) Issued $175,730,000 of notes on January    2020.  This is non-recourse debt.

(6) Issued $371,054,000 of notes on June 26, 2020.  This is non-recourse debt.

(7) Issued $471,524,000 of notes on October 19, 2020. This is non-recourse debt.

(8) Issued $249,300,000 of notes on June 4, 2021. This is non-recourse debt.

(9) Issued $75,400,000 of notes on July    2021.  This is non-recourse debt.

As of December 6, 2021

REVERSE MORTGAGE FUNDING LLC
1445 Broad Street, Floor 2
Bloomfield, New Jersey 07003
Attn: Craig Corn

Re:    Modification and increase of revolving line of credit loan from TEXAS CAPITAL
BANK (previously known as Texas Capital Bank, National Association) ("Lender" or
"Bank") to REVERSE MORTGAGE FUNDING LLC, a Delaware limited liability
company ("Borrower"), guaranteed by REVERSE MORTGAGE INVESTMENT
TRUST INC., a Maryland corporation, RMIT CASH MANAGEMENT LLC, a Delaware
limited liability company, RMIT OPERATING I LLC, a Delaware limited liability
company, and RMIT OPERATING II LLC, a Delaware limited liability company
(collectively, "Guarantors")

Gentlemen:

Reference is hereby made to that certain Fifth Amended and Restated Loan and Security
Agreement (as modified and amended by that certain letter agreement, dated November 1, 2021, by and
between Lender, Borrower, and Guarantors, the "Loan Agreement"), dated August 26, 2021, by and
between Borrower and Lender, securing that certain $200,000,000.00 Ninth Amended and Restated
Promissory Note (the "Note"), dated November 1, 2021, executed by Borrower, payable to the order of
Lender, guaranteed by Guarantors as reflected in those certain Guaranty Agreements (collectively, the
"Guaranty Agreements"), dated of even date with the Loan Agreement, executed by Guarantors in favor
of Lender, and the loan transaction evidenced thereby (the "Loan") (the Note, Loan Agreement, Guaranty
Agreements, and all other documents executed in connection therewith, as modified and amended by that
certain letter agreement, dated November 1, 2021, by and between Lender, Borrower, and Guarantors, are
collectively referred to herein as the "Loan Documents"). Capitalized terms used but not defined herein
shall have the meanings set forth in the Loan Agreement.

This Agreement (herein so called) shall evidence the agreement, effective for all purposes as of
the date set forth above, by and between Borrower, Guarantors, and Lender, to modify the Loan
Documents as follows:

1.    During the period of December 6, 2021 through December 31, 2021 (the "Temporary
Increase Period"), the Committed Sum is hereby increased from TWO HUNDRED MILLION and
NO/100 DOLLARS ($200,000,000.00) to TWO HUNDRED THIRTY-FIVE MILLION and NO/100
DOLLARS ($235,000,000.00). Borrower acknowledges and agrees that Borrower shall execute and
deliver with this Agreement a promissory note of even date herewith in substitution, modification,
rearrangement, but not extinguishment of the Note (the "New Note"), in form and substance acceptable to
Lender. Hereafter, references within this Agreement and the Loan Documents to the "Note" or the
"Revolving Note" shall mean and refer to the New Note.

2.    The definition of "Committed Sum" in the Loan Agreement is modified and amended to
read in its entirety as follows:

"Committed Sum" means (i) during the period of December 6, 2021 through
December 31, 2021, TWO HUNDRED THIRTY-FIVE MILLION and NO/100

APP406

DOLLARS ($235,000,000.00); and (ii) commencing on January 1, 2022 and continuing through the remaining term of the Loan, ONE HUNDRED FIFTEEN MILLION and NO/100 DOLLARS ($115,000,000.00).

3.    Immediately upon the expiration of the Temporary Increase Period, and without the necessity of any further action on the part of Lender, Borrower, or Guarantors, the Committed Sum shall automatically be decreased to ONE HUNDRED FIFTEEN MILLION and NO/100 DOLLARS ($115,000,000.00). Borrower acknowledges and agrees that in the event the Revolving Principal Balance exceeds the Borrowing Limit, as affected by the decrease in the Committed Sum upon the expiration of the Temporary Increase Period, Borrower shall immediately pay to Bank an amount sufficient to eliminate such excess.

Guarantors acknowledge and agree that the increase of the Committed Sum as set forth herein is a substantial and direct benefit to Guarantors and hereby consent to the execution of this Agreement and the New Note by Borrower. As an inducement to Bank to increase and extend such credit to Borrower, Guarantors acknowledge and agree that the Guaranty Agreements shall continue to be valid and binding guarantees of Guarantors enforceable in accordance with the terms thereof, and shall guarantee payment by Borrower to Bank of the Note, as modified by this Agreement.

Contemporaneously with its execution of this Agreement, Borrower shall deliver to Lender an opinion of Borrower's legal counsel in form and content satisfactory to Lender to the effect that: (i) each of the Loan Documents, as modified herein, are legal, valid and binding instruments, enforceable against Borrower in accordance with their respective terms; (ii) Borrower is duly formed and has all requisite authority to enter into this Agreement and the Loan Documents, as modified herein; and (iii) Lender has a first priority security interest in the Collateral, perfected as of the date of filing of Lender's UCC-1 financing statement with respect to the Loan, and (iv) such other matters, incident to the transactions contemplated hereby, as Lender may reasonably request.

The Loan Documents are hereby modified where appropriate, to reflect the modification of the terms of the Loan as provided herein.  Except for the modifications set forth herein, the Loan Documents shall remain in full force and effect, all liens and security interests securing the Note are hereby retained and preserved, and the liability of Guarantors and Borrower for repayment of the Note and under the Guaranty Agreements and other Loan Documents continues unaffected.  Guarantors and Borrower hereby acknowledge and agree that there are no claims or offsets against, or defenses or counterclaims to, their respective liabilities under the Note and the Loan Documents.

**This Agreement represents the final agreement between the parties with respect to subject matter hereof, and may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements between the parties.  There are no unwritten oral agreements between the parties.**

In the event this Agreement accurately expresses our agreements with respect hereof, please so indicate by executing this Agreement in the space provided below and returning a fully executed copy to the undersigned.  The parties executing this Agreement on behalf of Borrower and Guarantors hereby represent that they have been duly authorized to enter into this Agreement and bind Borrower and each Guarantor, respectively, thereby.

**[Signature Page Follows]**

Very truly yours,

TEXAS CAPITAL BANK

By: _____
    Aric Crouch, Vice President

**AGREED TO AND ACCEPTED.**

**BORROWER:**

REVERSE MORTGAGE FUNDING LLC,
a Delaware limited liability company

By: _____
    Craig Corn, Chief Executive Officer

**GUARANTORS:**

REVERSE MORTGAGE INVESTMENT TRUST INC.,
a Maryland corporation

By: _____
    Craig Corn, Chief Executive Officer

RMIT CASH MANAGEMENT LLC,
a Delaware limited liability company

By: _____
    Craig Corn, Chief Executive Officer

RMIT OPERATING I LLC,
a Delaware limited liability company

By: _____
    Craig Corn, Chief Executive Officer

RMIT OPERATING II LLC,
a Delaware limited liability company

By: _____
    Craig Corn, Chief Executive Officer

Very truly yours,

TEXAS CAPITAL BANK

By: _____

Aric Crouch, Vice President

**AGREED TO AND ACCEPTED.**

**BORROWER:**

REVERSE MORTGAGE FUNDING LLC,
a Delaware limited liability company

By: _____

Craig Corn, Chief Executive Officer

**GUARANTORS:**

REVERSE MORTGAGE INVESTMENT TRUST INC.,
a Maryland corporation

By: _____

Craig Corn, Chief Executive Officer

RMIT CASH MANAGEMENT LLC,
a Delaware limited liability company

By: _____

Craig Corn, Chief Executive Officer

RMIT OPERATING I LLC,
a Delaware limited liability company

By: _____

Craig Corn, Chief Executive Officer

RMIT OPERATING II LLC,
a Delaware limited liability company

By: _____

Craig Corn, Chief Executive Officer

**Exhibit C**

**Approved Budget**

**Reverse Mortgage Investment Trust Inc.**
**DIP Budget**
*($ in millions)*

| | DIP Budget | | | | | | |
|---|---|---|---|---|---|---|---|
| **Week Number:** | 1 | 2 | 3 | 4 | 5 | 6 | |
| **Week Ending:** | 2-Dec | 9-Dec | 16-Dec | 23-Dec | Dec | 6-Jan | Total |
| Asset Recoveries/Collections | $ - | $ - | $ - | $ - | $ - | $ 1.5 | $ 1.5 |
| Originations & Servicing Activity | - | (14.3) | 3.0 | (1.9) | (0.7) | - | (13.9) |
| Operating Disbursements | - | (1.2) | (1.9) | (1.7) | (3.2) | (0.7) | (8.7) |
| Restructuring Costs | (1.2) | (1.4) | (1.4) | (1.4) | (1.6) | (1.4) | (8.4) |
| **Net Cash Flow** | **$ (1.2)** | **$ (16.9)** | **$ (0.3)** | **$ (5.0)** | **$ (5.6)** | **$ (0.6)** | **$ (29.6)** |
| Beginning Cash | $ 6.3 | $ 5.0 | $ 0.1 | $ 3.9 | $ 2.9 | $ 0.8 | $ 6.3 |
| Net Cash Flow | (1.2) | (16.9) | (0.3) | (5.0) | (5.6) | (0.6) | (29.6) |
| DIP Funding | - | 12.0 | 4.0 | 4.0 | 3.5 | - | 23.5 |
| Ending Cash | $ 5.0 | $ 0.1 | $ 3.9 | $ 2.9 | $ 0.8 | $ 0.2 | $ 0.2 |






# 2023
## ANNUAL
## REPORT






APP412

*Our Guaranty Matters*



Secretary of Housing and Urban Development Marcia L. Fudge and Ginnie Mae President Alanna McCargo.

App. 413

# TABLE OF CONTENTS

SECRETARY'S MESSAGE ........................................................................ 4

A MESSAGE FROM GINNIE MAE ...................................................... 5

EXECUTIVE SUMMARY ...................................................................... 7

PROMOTING HOMEOWNERSHIP BY CREATING A MORE
ACCESSIBLE AND INCLUSIVE HOUSING FINANCE SYSTEM ............................. 8

    I.  BROADEN HOUSING FINANCE AVAILABILITY FOR UNDERSERVED
       PARTICIPANTS AND EXPAND ACCESS TO GINNIE MAE PROGRAM .......... 10

    II.  ENHANCING THE VALUE OF GINNIE MAE SECURITIES ................................ 12

    III. ADVANCING DIGITALIZATION AND OPTIMIZATION OF
        THE MORTGAGE-BACKED SECURITIES PROGRAM ......................................... 14

    IV. PROVIDING A LEADING VOICE IN THE HOUSING FINANCE SYSTEM ........ 16

THE ROAD AHEAD .............................................................................. 18

MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL
POSITION AND RESULTS OF OPERATIONS ................................................... 20

AUDIT OF FISCAL YEARS 2023 AND 2022 ........................................ AUDIT-1

APPENDIX A ........................................................................................ A-1

APP414

# SECRETARY'S MESSAGE



### MAKING A POSITIVE SOCIAL IMPACT ON THE HOUSING FINANCE SYSTEM FOR 55 YEARS

Under the Biden-Harris Administration, the U.S. Department of Housing and Urban Development has made strides to address barriers to housing affordability, increase access to homeownership particularly for underserved groups, and contribute to a more equitable housing finance system.

Higher construction costs, a lack of affordable housing supply, inflation, and rising interest rates exacerbate existing challenges and disparities. Ginnie Mae plays a critical role in ensuring individuals and families can access affordable mortgages, even in times of economic stress.

For 55 years, Ginnie Mae has worked to make affordable, equitable homeownership and rental housing a reality for tens of millions of American households, with a particular focus on historically underserved communities. For five decades, Ginnie Mae has been a liquidity engine for government-backed mortgage loans to low-to-moderate income (LMI) borrowers, first-time homebuyers, seniors, veterans, rural communities, and Tribes.

Ginnie Mae's commitment, to ensuring that mortgage lenders have the liquidity necessary to expand their reach to more borrowers that have historically faced barriers to accessing affordable credit and housing, will impact even more households for generations to come.

Despite many challenges in Fiscal Year 2023, the Ginnie Mae team achieved significant results, serving more than 1.2 million households. In fact, in Fiscal Year 2023, Ginnie Mae made progress in enhancing the depth and breadth of its program's social impact and sustainability efforts through several programmatic policy updates, including its new Social Bond designation for investors. This work advances HUD's Strategic Goal 3 to "Promote Homeownership" and the Ginnie Mae-specific Objective 3B to "Create a More Accessible and Inclusive Housing Finance System."

Through it all, the corporation has created social impact through its core business, while demonstrating fiscal strength and improving its risk management and technology capabilities in all matter of economic environments.

As we look ahead to the next 55 years, I am pleased Ginnie Mae will continue to lead and drive strategic objectives that will ensure an equitable, sustainable, and affordable U.S. housing finance system that serves all Americans.

> For 55 years, Ginnie Mae has worked to make affordable, equitable homeownership and rental housing a reality for tens of millions of American households, with a particular focus on historically underserved communities.

*Marcia L. Fudge*

**MARCIA L. FUDGE
SECRETARY
U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**

APP415

# A MESSAGE FROM GINNIE MAE



### DEAR MADAME SECRETARY,

It is my privilege to present the Fiscal Year 2023 Annual Report for the Government National Mortgage Association (Ginnie Mae), reflecting another year of portfolio growth and strong business performance. Ginnie Mae continues to deliver on its core mission to expand housing affordability across America by connecting domestic and global capital to the nation's housing finance system.

Ginnie Mae has helped tens of millions of American households access affordable mortgage lending, homeownership, and rental opportunities over its 55-year history. As we celebrate our 55th anniversary, in Fiscal Year 2023, Ginnie Mae supported more than 1.2 million households serving veterans, servicemembers, urban, rural, tribal, and underserved communities. Mortgage-backed securities (MBS) issuance topped $404.4 billion, with Ginnie Mae MBS outstanding reaching an historic high of $2.476 trillion, representing        of the total MBS market. These numbers reflect portfolio growth of $188.4 billion, a year-over-year increase of 8.25%.

During the year, macroeconomic conditions, including increased interest rates and lack of affordable housing supply, produced pressures on the U.S. housing market that reduced overall mortgage originations when compared to the prior year. Despite these difficult times, in Fiscal Year 2023, Ginnie Mae's month-over-month MBS issuance exceeded the volumes of the Government Sponsored Enterprises (GSEs), Fannie Mae and Freddie Mac, indicating that government-backed mortgage loan programs remained a critical option for borrowers.

During the first quarter of Fiscal Year 2023, while conventional mortgage lenders and issuers experienced liquidity constraints, the increased pressures on the reverse mortgage sector resulted in the bankruptcy of a large issuer and Ginnie Mae's seizure of its reverse MBS portfolio. Ginnie Mae executed a seamless transition as it expanded its essential business functions and the associated financial obligations to manage this portfolio. Our dedicated team proactively used all available tools to bring stability to the market and ensure seniors were able to access their home equity, showing the industry that Ginnie Mae stands by its Guaranty.

In Fiscal Year 2023, Ginnie Mae's value proposition remained strong. International and domestic investor meetings revealed, once again, that Ginnie Mae securities are an attractive and stable investment, especially for those investors seeking to maximize their social and sustainable impact. In response to investor demand, a focal point of the fiscal year was the expansion of our sustainability framework focused on low-to-middle income pool-level disclosures and the first-of-its-kind social bond label update within our portfolio. These efforts tell the story of Ginnie Mae's critical role as a social impact organization with a unique and powerful position in the housing finance industry.

During the year, we continued to engage with stakeholders and federal agency partners to advance innovative ways to expand the Ginnie Mae Guaranty to mission-driven lenders such as credit unions, community development financial institutions, and housing finance agencies. Through the Biden-Harris Administration's Interagency Community Investment Committee (ICIC), we are leveraging our knowledge, expertise, programs, and longstanding partnership with the Federal Home Loan Banks to increase liquidity for government-backed mortgages and connect the power of the capital markets to the passion and knowledge of community lenders and the neighborhoods they serve.

Fiscal Year 2023 has shown us that we can successfully tackle any challenge working collaboratively with our private and public stakeholders, counterparties, and federal agency partners. I am grateful for your continuing support of Ginnie Mae's mission and programs as we work together to find innovative and lasting solutions to housing affordability and liquidity and remain actively engaged with our stakeholders to advance a more equitable housing finance system for all.

> As we celebrate our 55th anniversary, in Fiscal Year 2023, Ginnie Mae supported more than 1.2 million households serving veterans, servicemembers, urban, rural, tribal, and underserved communities.

**ALANNA MCCARGO**
**GINNIE MAE PRESIDENT**

APP416



**CORRECTION**

We have updated the Mortgage Partnership Finance®
(MPF®) Program and Interagency Community Investment
Committee (ICIC) information on pages 10 and 11 to better
reflect the nature of the work between Ginnie Mae and the
Federal Home Loan Banks in these areas. We thank the
FHLBC for their review and input to this section.

APP417

# EXECUTIVE SUMMARY

August 1, 2023, marked the 55th anniversary of the enactment of the Housing and Urban Development Act of 1968 which created the Government National Mortgage Association (Ginnie Mae) as an independent government corporation within the U.S. Department of Housing and Urban Development (HUD), tasked with supporting liquidity for government mortgage lending programs through the secondary market. Ginnie Mae was created on the heels of the Civil Rights Act of 1968, which enshrined the rights of all Americans to access fair, affordable housing and mortgage lending, capping a year of remarkable progress toward building a more equitable and robust housing finance system and society.

Congress established Ginnie Mae to promote access to mortgage credit throughout the nation with an intentional focus on support for Low- and Moderate-Income (LMI) households, inner cities, rural areas, and other historically underserved communities. Today, Ginnie Mae also supports seniors, veterans, and tribal communities. Ginnie Mae provides an explicit full faith and credit guaranty of the U.S. government on the timely payment to investors of principal and interest on mortgage-backed securities (MBS) collateralized by single-family and multi-family housing loans insured or guaranteed through the loan programs of the Federal Housing Administration (FHA), U.S. Department of Veterans Affairs (VA), U.S. Department of Agriculture, Rural Development (USDA), and the Office of Native American Programs within HUD's Public Indian Housing (PIH).

In Fiscal Year 2023, Ginnie Mae had strong MBS performance despite unprecedented trends in the macroeconomic housing environment with accelerating interest rates and a lack of affordable housing supply which slowed down mortgage originations. In Fiscal Year 2023, as a testament to its resilience, Ginnie Mae MBS portfolio grew by $188.4 billion from last year, representing a year-over-year increase of 8.25%. Total Ginnie Mae MBS issuance in FY23 was $404.4 billion, representing support for more than 1.2 million households in America. Ginnie Mae MBS outstanding reached another historic high of $2.476 trillion[1], representing 35% of the total U.S. MBS market.

Ginnie Mae achieved this growth while communities and households across the country were facing challenging market conditions. While MBS volume decreased overall,

proportionately, Ginnie Mae's volume declined at a slower pace than the remainder of the MBS market. Month over month, Ginnie Mae's volume surpassed that of the government sponsored enterprises (GSEs), Freddie Mac and Fannie Mae, reflecting the resilience of federal mortgage programs and the critical need for affordable financing options during times of rising interest rates and home prices.



President Lyndon B. Johnson signs bill establishing a Department of Housing and Urban Development.
*LBJ Library photo by Donald Stoderl.*

[1] Remaining Principal Balance (RPB) as of Fiscal Year-end 2023 was $2.473 trillion.

App. 418

Throughout Fiscal Year 2023, to ensure continuous support and scale of government insured mortgage programs, Ginnie Mae enhanced its approach to meet the needs and risks facing its issuers and investors. Notable highlights and accomplishments from the year include:

- Continuous enhancements to the securitization platform and digitalization capabilities for issuers enabled by Ginnie Mae's technology migration to the cloud and expanded digital automation capabilities.

- Expanding access to Ginnie Mae through enhanced partnership strategies with the Federal Home Loan Banks (FHLBanks); taking a leading role in the Biden-Harris Interagency Community Investment Committee (ICIC) and expanding the work of Ginnie Mae's Community Development Financial Institution and Minority Depository (CDFI-MDI) Working Group to include outreach to credit unions and housing finance agencies (HFAs).

- The rollout of enhanced LMI MBS investor disclosures and a sustainability framework outlining the social and environmental impact of Ginnie Mae MBS for domestic and international investors who have Environmental, Social and Governance (ESG) portfolio mandates and goals.

- Additional support for the FHA Home Equity Conversion Mortgage (HECM) program through Ginnie Mae's HECM MBS (HMBS) program enhancements and taking on a large HMBS mortgage portfolio due to an issuer failure.

This annual report is designed to provide background on Ginnie Mae and its current financial position for policymakers and stakeholders. The report is prepared annually to satisfy applicable legal requirements in accordance with and pursuant to the provisions of the Government Corporation Control Act,    U.S.C. Section 9106.

# PROMOTING HOMEOWNERSHIP BY CREATING A MORE ACCESSIBLE AND INCLUSIVE HOUSING FINANCE SYSTEM

Chartered to expand affordable housing in America by linking domestic and global capital to the nation's housing finance market, Ginnie Mae is the principal liquidity provider for government mortgage programs. Over the course of its history, Ginnie Mae has supported the financing of affordable, equitable homeownership and rental housing for tens of millions of American households, serving LMI borrowers, first-time homebuyers, veterans, seniors, and urban, rural, and tribal communities.

Since the onset of the global financial crisis of 2008, Ginnie Mae MBS portfolio has grown every year. This trend continued with Fiscal Year 2023 MBS issuance topping $404.4 billion, reflecting year-over-year growth of $188.8 billion from Fiscal Year 2022. In Fiscal Year 2023, outstanding portfolio peaked at $2.476 trillion[2], representing        of the U.S. MBS market, an impressive year-over-year growth of more than 8.25%.

At the end of Fiscal Year 2023, the MBS collateral included over 14,000 multi-family loans supporting more than 1.3 million affordable rental housing units in both urban and rural markets. In addition, during the year, Ginnie Mae securitized 13 multi-family loans and more than 18,000 single-family loans on federally recognized American Indian reservations and off-reservation trust lands.

---

[2]  Remaining Principal Balance (RPB) as of Fiscal Year-end 2023 was $2.473 trillion.

At the end of Fiscal Year 2023, FHA-insured mortgages accounted for 65.0% of issuance in Ginnie Mae pools. VA-guaranteed mortgages accounted for 31.3%, and USDA and tribal loans contributed the remainder.

In Fiscal Year 2023, mortgages to first-time homebuyers through all four government agencies, FHA, VA, USDA and PIH, collateralized nearly 68% of Ginnie Mae's issuance, standing steady year-over-year with only a slight decrease from Fiscal Year 2022.

Focusing on the FHA single-family mortgage loan programs, during Fiscal Year 2023, 98% of FHA single-family insured loans were pooled into Ginnie Mae MBS. Of the securitized FHA loans to households with a primary female borrower, 61% were first-time homebuyers which represents an increase of 6 percentage points compared to Fiscal Year 2022.

Of the securitized FHA loans made to households for which ethnicity was disclosed, the overwhelming majority of loans made to households of color were to first-time homebuyers. Within the subgroup of loans by race/ethnicity, the percentage of those loans made to first-time homebuyers in Fiscal Year 2023 increased in comparison to Fiscal Year 2022 as shown below:

- 71% to Asian-American Pacific Islander households compared to 62% in Fiscal Year 2022, an increase of 9 percentage points.

- 80% to African American household compared to 62% in Fiscal Year 2022, an increase of 18 percentage points.

- 75% to Hispanic households compared to 68% in Fiscal Year 2022, an increase of 7 percentage points.

- 65% to Native American households compared to 63% in Fiscal Year 2022, an increase of 2 percentage points.

In Fiscal Year 2023, although macroeconomic conditions, including higher interest rates and a lack of affordable housing supply, caused overall MBS issuance to decline, month over month, Ginnie Mae's issuance volume, comprised exclusively of MBS collateralized by government-backed loans, surpassed the volume of the GSEs.

HUD's recognition of Ginnie Mae's significant impact on accessible housing finance is reflected in Ginnie Mae's prominent role in HUD's strategic plan. Last year, for the first time in Ginnie Mae's history, HUD included Ginnie Mae in its Five-Year 2022-2026 Strategic Plan under the objective of "Promoting Homeownership by Creating a More Accessible and Inclusive Housing Finance System." To accomplish this objective, Ginnie Mae is executing on four comprehensive strategies:

1. Broaden housing finance availability for underserved participants and expand access to Ginnie Mae programs.

2. Pursue further methods of enhancing the value of Ginnie Mae securities by meeting new sources of investor demand.

3. Develop the operational capacity to advance the digitalization and optimization of the Ginnie Mae MBS platform to drive more efficient outcomes for issuers, investors, and borrowers.

4. Provide a leading voice in the housing finance system by engaging with key stakeholders to communicate and coordinate on Ginnie Mae's strategic objectives.

The following sections summarize how Ginnie Mae's initiatives and accomplishments in Fiscal Year 2023 advanced these strategies.



Secretary of Housing and Urban Development Marcia L. Fudge speaks to an audience during the Ginnie Mae Digital Collateral Summit.

# I. BROADEN HOUSING FINANCE AVAILABILITY FOR UNDERSERVED PARTICIPANTS AND EXPAND ACCESS TO GINNIE MAE PROGRAM

## CDFI-MDI Working Group and Partnership with the Federal Home Loan Banks

In Fiscal Year 2023, Ginnie Mae continued to seek partnerships and avenues to make the Ginnie Mae Guaranty and the secondary market more accessible to lenders that could scale lending opportunities at the state and local level and reach even more underserved borrowers. In Fiscal Year 2022, Ginnie Mae launched its CDFI-MDI Working Group to seek a greater understanding of the obstacles challenging smaller community-based lenders. To further that work, in the fourth quarter of Fiscal Year 2022, Ginnie Mae executed an information-sharing Memorandum of Understanding (MOU) with Treasury's CDFI Fund, culminating with the receipt of data in the first quarter of Fiscal Year 2023, to facilitate targeted research and conversation with CDFIs and MDIs.

In Fiscal Year 2023, the CDFI-MDI Working Group conducted focus groups with CDFI depositories (banks, credit unions) and non-depositories (loan funds). Discussions centered on the hurdles facing CDFIs such as down payment assistance and income underwriting. During the year, Ginnie Mae also expanded its working group to research the challenges facing local Housing Finance Agencies (HFAs).

In Fiscal Year 2023, the CDFI-MDI Working Group's findings were instrumental in Ginnie Mae's continuing partnership with the National Credit Union Administration (NCUA) in exploring innovative ways for community-based credit unions to gain access to the Ginnie Mae Guaranty. During the Fiscal Year, Ginnie Mae and NCUA conducted a joint webinar, with over 200 credit unions in attendance, to explain both government mortgage lending and the Ginnie Mae MBS Programs.

With the insights and information the CDFI-MDI Working Group gained, Ginnie Mae continued its efforts to expand its partnership with the Federal Home Loan Bank of Chicago (FHLBank Chicago) and the Mortgage Partnership Finance® (MPF®) Program. Through the MPF Program, FHLBank Chicago,

as the "issuer of record," aggregates and securitizes government-backed mortgages originated by MPF Participating Financial Institutions (PFIs) onto the Ginnie Mae MBS platform, providing better pricing and liquidity, and allowing smaller lenders to scale their impact. Currently, six of the eleven Federal Home Loan Banks (FHLBanks) actively participate in the MPF Program with four additional FHLBanks utilizing the MPF Program's master servicing and operational support. Since inception, the MPF Program has produced over $3.11 billion in Ginnie Mae MBS issuance, supporting over 14,500 households across the country. Ginnie Mae is committed to increasing the MPF Program's volume by reaching deeper into underserved communities in collaboration with the FHLBanks.

## Interagency Community Investment Committee (ICIC)

In Fiscal Year 2023, Ginnie Mae advanced the MPF Program through the Biden-Harris Administration's Interagency Community Investment Committee (ICIC), a coalition of federal agencies focused on a set of implementation and operational issues that will facilitate the flow of capital and other financial resources into underserved communities. The ICIC members' work includes assessing how federal programs can be more accessible to small-scale lenders with limited resources. The MPF Program, in partnership with Ginnie Mae and participating FHLBanks, is a successful example of such programs.



Chief Risk Officer Gregory A. Keith converses with Ginnie Mae staff during the Global Investor Summit.



Principal Executive Vice President Sam Valverde, Chief of Staff Felecia Rotellini, and Director of External Affairs Luke Villalobos and HUD Region V Administrator Diane Shelley pose with Federal Home Loan Bank of Chicago representatives.

As of the fourth quarter of Fiscal Year 2023, HUD, a founding member agency of the ICIC, leads the ICIC efforts. Ginnie Mae, as a HUD program office, brought together ICIC members, USDA and Treasury's CDFI Fund, to develop an Agency Action that utilizes the MPF Program as a vehicle for lenders, serving in rural and tribal communities, to securitize their loans on the secondary mortgage market. This Agency Action will help LMI communities gain greater access to government mortgage programs through community-based lenders through the MPF Program. Ginnie Mae and its ICIC partners, working alongside the FHLBanks, will conduct educational outreach designed to reach potential new government mortgage originators through three webinar events targeted at tribal and rural communities by the end of calendar year 2023. The first webinar was conducted in the fourth quarter of Fiscal Year 2023 in collaboration with the MPF Program, FHLBank Chicago, FHLBank Des Moines, USDA, and Ginnie Mae, reaching more than 100 PFIs. 96% of the attendees expressed a desire to learn more about government lending programs. As work with the ICIC on this Agency Action continues, Ginnie Mae is formalizing an MOU with the participating federal agencies and the participating FHLBanks to enhance data sharing capabilities, furthering the initiative. Collaboration and development of the MOU began in Fiscal Year 2023.

### Supporting Financing for Affordable Housing Supply

Manufactured housing is built in factories and moved to the properties where they are set, lowering the cost of construction, and reducing the time to market. On July 10, 2023, Harvard's Joint Center for Housing Studies reported that, even accounting for differences in size, amenities, and the cost of transportation, manufactured housing is still a more cost-effective solution for affordable housing compared to site-built homes. In some cases, the savings are estimated to be as much as 73% compared to traditional site-built housing. Industry and policymakers envision greater first time-home ownership opportunities.

In the fourth quarter of Fiscal Year 2022, Ginnie Mae partnered with FHA to launch an initiative to redefine program requirements for Title 1 manufactured housing lending and securitization and issued a joint public request for input (RFI). Continuing this work in Fiscal Year 2023, the results of the RFI were studied and researched. Through this preparatory work, potential policy and program enhancements, aimed at attracting more lenders and creating access to liquidity and volume through the Ginnie Mae Guaranty, are in development for Fiscal Year 2024.



From left to right: Senior Vice President of the Office of Enterprise Data and Technology Solutions Barbara Cooper-Jones, President Alanna McCargo, and Fannie Mae Senior Vice President and Chief Operating Officer Ramon Richards engage in conversation at the Ginnie Mae Digital Collateral Summit.

## II. ENHANCING THE VALUE OF GINNIE MAE SECURITIES

### Environmental, Social and Governance (ESG) enhancements to Ginnie Mae MBS

Domestic and global capital markets investors continue to drive demand for ESG investments, in particular investments that have a measurable social or environmental impact. Ginnie Mae's unique structure, as a securitization platform and guarantor for MBS exclusively dedicated to government mortgage programs, has successfully harnessed investor demand to drive positive social change from our first MBS offering in 1970. Over the course of Fiscal Year 2023, Ginnie Mae has driven awareness of this track record of success by providing reliable and privacy-sensitive disclosures reflecting our social and environmental impact.

In Fiscal Year 2023, Ginnie Mae entered into memoranda of understanding with its insuring agency partners to obtain loan-level data for the mortgages that are pooled in our MBS. Using this pool-level data, Ginnie Mae began disclosing LMI Income data including (1) the number of underlying loans made to LMI borrowers; (2) the percentage of LMI loan count out of total loan count; (3) the unpaid principal balance (UPB) of LMI loans in the MBS; and (4) the percentage of LMI UPB out of total MBS UPB. These enhanced disclosures increase the visibility of the social impact of Ginnie Mae MBS for domestic and international investors with ESG portfolio strategies.

Major accomplishments in Fiscal Year 2023 include several key rollouts of enhancements and disclosures that increase Ginnie Mae's investment value proposition and underscore Ginnie Mae's long-standing commitment to financing affordable and sustainable housing for underserved and low-income communities:

- In June, Ginnie Mae published its first monthly ESG composite. This visual depiction of MBS data allows Ginnie Mae to highlight, at a glance, the program's positive impact and key ESG metrics.

- In July, Ginnie Mae announced a new Environmental, Social, and Governance (ESG) web page to the Ginnie Mae website, which provides details on the organization's ESG strategy with a focus on the environmental and social impacts the MBS program offers to investors.

- In September, Ginnie Mae launched its "Social Bond" label for Single-Family Forward MBS prospectuses and released the Social Impact and Sustainability Framework.

App. 423

Together, these updates support Ginnie Mae's mission-oriented work and communicate the positive social impact of its programs to investors. This additional information increases investor awareness of the investment value proposition in Ginnie Mae securities, increasing opportunities to attract new sources of capital in support of lenders and borrowers Ginnie Mae ultimately serves.

Ginnie Mae was recognized by the Climate Bonds Initiative as the Largest Green Asset-Backed Security Issuer of calendar year 2022.

### HECM Mortgage-Backed Securities (HMBS) Program

Ginnie Mae's HMBS provides additional capital and liquidity in support of FHA's HECM program, which empowers hundreds of thousands of seniors to access their home equity for additional financial security and flexibility so they can age in place. It is an important financial solution for seniors seeking ways to boost their retirement income by tapping accumulated equity in their home. HECM loans are pooled into HMBS within the Ginnie Mae II MBS program, which supports HMBS issuer liquidity. HMBS also serves as collateral for Ginnie Mae's Real Estate Mortgage Investment Conduits (REMIC) backed by HMBS (H-REMICs).

The unpaid principal balance of HMBS did not grow during Fiscal Year 2023, remaining at slightly more than $59 billion, representing support for nearly 287,000 senior households and reflecting a 5% decrease in households from Fiscal Year 2022. Demand in the structured market for HMBS remained consistent with a slight increase despite the changing macroeconomic conditions. In Fiscal Year 2023,

29 H-REMIC transactions were issued, up from 24 in Fiscal Year 2022. Although HECM activities increased in the fourth quarter of Fiscal Year 2023, with August's application and endorsement counts both above 12-month rolling averages, in Fiscal Year 2023 HMBS issue volumes declined in reaction to accelerating interest rates.

While traditional mortgage lenders and issuers felt liquidity constraints in Fiscal Year 2023, the HMBS sector faced a uniquely acute set of challenges from this interest rate environment. This stress was evidenced in the first quarter of Fiscal Year 2023, when a large HMBS issuer, Reverse Mortgage Funding (RMF) filed for bankruptcy. Following the bankruptcy, Ginnie Mae extinguished RMF from the HMBS program and seized and assumed control of the servicing of RMF's HMBS portfolio consisting of over 30% of the HMBS market with a value of $20 billion. Upon seizure of the defaulted portfolio, Ginnie Mae assumed all obligations to the HMBS investors and all servicing responsibilities, stepping into the role of issuer. At the Fiscal Year-end, Ginnie Mae's Balance Sheet increased by over 50% primarily as a result of the RMF default.

During Fiscal Year 2023, new challenges in the availability of liquidity for financing borrower draws proved more pressing for the industry and policymakers. In response, Ginnie Mae reduced pool sizes to provide relief to smaller HMBS issuers. Ginnie Mae also announced changes to the HMBS pooling system to permit issuers to securitize multiple tail participations related to a single HECM loan continuously throughout each month, allowing for quicker access to capital market funding, effective in the first quarter of Fiscal Year 2024.



Senior Vice President of the Office of Capital Markets John F. Getchis and Mortgage Bankers Association (MBA) Chief Economist and Senior Vice President of Industry Technology Michael Fratantoni engage in a panel discussion and answer audience questions during the Ginnie Mae Global Investor Summit.

## III. ADVANCING DIGITALIZATION AND OPTIMIZATION OF THE MORTGAGE-BACKED SECURITIES PROGRAM

### Digital Collateral

In Fiscal Year 2023, Ginnie Mae's Digital Collateral Program successfully achieved its goal to grow and transform its pilot program into a permanent program. This initiative contributes to HUD's Five-Year strategic plan objective to promote homeownership and create a more accessible and inclusive housing finance system by lowering mortgage origination costs and giving borrowers more flexibility.

During Fiscal Year 2023, Ginnie Mae approved 13 new participants in the Digital Collateral Program (eIssuers) and has enough applications under review to triple the size of the original program. eIssuer participation has increased in both loan volume issuance and the number of eIssuers. In Fiscal Year 2023, Ginnie Mae actively securitized and placed in its electronic vault, (eVault) over 110,917 electronic mortgage notes (eNotes), representing $29.9 billion in securitized collateral, a 15% increase over Fiscal Year 2022. Approximately 54% of Ginnie Mae's securitized Digital Collateral are VA loans, with the remainder primarily FHA eNotes.

One of the Digital Collateral Program's greatest achievements in Fiscal Year 2023 was the support and flexibility it provided to active servicemembers and veterans. With technology such as Remote Online Notarization, servicemembers directly participate in the homebuying process wherever they are stationed around the globe. In Fiscal Year 2024, Ginnie Mae will replace its issuance system, Ginnie*NET*, requiring all eIssuers to report into the Single-Family Pool Delivery Module (SFPDM). This advancement is a critical step toward additional transparency and functionality of Ginnie Mae's digital capabilities, bringing Ginnie Mae one step closer to the eventual commingling of paper and eNotes.

### Securitization Platform Migration to the Cloud

In the first quarter of Fiscal Year 2023, Ginnie Mae successfully completed its migration activities to the cloud. Ginnie Mae's cloud platform is foundational to business operations, including securitization processing, disclosures, analytics, risk management, compliance, monitoring, accounting, and financial reporting. The cloud platform enables improved security, digital, advanced analytics, and other business transformation opportunities. Today, Ginnie Mae has a more flexible and agile platform to deliver new housing finance and securities products. Ginnie Mae's ability to leverage current technological advances will result in greater agility and speed in its business operations as demonstrated by processing efficiencies already gained.



The Ginnie Mae Digital Collateral Program Director Lynne Chandler moderates a discussion panel with panelists Natasha Rader, Vice President of Product Strategy, Veterans United Home Loans; Eva Torres, Assistant Vice President of Operations Manager, Structured Mortgage Finance, Teachers Insurance and Annuity Association of America (TIAA) Bank; Selma Omerovic, Structured Mortgage Finance Collateral Specialist, TIAA Bank; Anna R. Mravinc, Assistant Vice President, Custody Operations, U.S. Bank; and Simon Moir, Vice President and Segment Leader, eOriginal/Wolters Kluwer at the Ginnie Mae Digital Summit.

App. 425



From left to right: Ginnie Mae Program Manager for Strategic Planning and Operations for the Office of the President (OOP) Smitha Vasanth poses with Senior Project Managers for the Office of the President (OOP)/Strategic Planning and Operations Candice Cantrell and Jacqueline Townsend, as well as the U.S. Department of Housing and Urban Development Senior Business Analyst, Chastity Abrom.

These new capabilities and transformational opportunities make the Ginnie Mae platform more attractive to those who need and want to do business with Ginnie Mae.

## Platform Enhancements

In Fiscal Year 2022, Ginnie Mae launched SFPDM, a significant achievement in its ongoing modernization efforts and to adhere to the industry's MISMO compliance standards. This accomplishment marked a pivotal milestone in Ginnie Mae's journey towards data standardization, greater efficiency and effectiveness.

Throughout Fiscal Year 2023, Ginnie Mae devoted extensive resources and efforts to collaborate with its stakeholder community. Ginnie Mae's primary focus was seamless onboarding of users onto the SFPDM platform and ensuring their readiness to transition to the new MISMO standard.

This collaborative approach encompassed a diverse array of initiatives, leaving no stone unturned in Ginnie Mae's commitment to ensure a seamless transition for users. The transition included a series of comprehensive training sessions, the establishment of dedicated user support channels, and the maintenance of open and continuous communication channels. Ginnie Mae's adoption team was unwavering in its dedication to proactively address any concerns and challenges that arose, creating an environment conducive to a smooth and successful transition. The results of the effort speak volumes, as Ginnie Mae is pleased to report that its comprehensive approach yielded significant success. As of September 24, 2023, Ginnie Mae issuers using SFPDM or testing a MISMO compliant pool delivery dataset (PDD) in the Validation and Testing Tool (VTT) accounted for 92% of Ginnie Mae's outstanding portfolio balance, indicating that Single Family

Issuers are well positioned to meet the critical December 1, 2023, cutover date.

In parallel, Ginnie Mae made strategic investments in improving the user experience, embracing digitization, and optimizing application processes. These efforts were undertaken with a clear objective: to enhance efficiency for all stakeholders. Optimization of applications not only streamlines processes but also brings forth several additional benefits:

- Faster Development Time: Ginnie Mae not only enhanced efficiency but also reduced development time, meaning a quicker response to market demands and emerging trends.

- Compatibility for Extensibility: The applications are designed with extensibility in mind, ensuring seamless integration with other tools and products, allowing for a more versatile and adaptable ecosystem.

- Scalability at the Application Level: Ginnie Mae recognized the importance of scalability. The applications are structured to facilitate transition to tools that provide scalability at the application level, allowing us to adapt to changing requirements and scale up operations as needed.

Ginnie Mae's commitment to modernization, demonstrated through the implementation of the SFPDM and continuous collaboration with stakeholders, reflects Ginnie Mae's dedication to excellence. Ongoing efforts to enhance the user experience drive efficiency and maximize the benefits of application optimization, underscoring Ginnie Mae's mission to meet industry demands and deliver top-tier service.

App. 426



Product Manager of Multiclass Securities Richard Perrelli, Managing Director for International Markets Alven Lam, Chief of Staff Felecia Rotellini, and Ginnie Mae President Alanna McCargo meet with the Korea Housing and Urban Guarantee Corporation (HUG) President and executive team during a trip to Taiwan, Seoul, South Korea, and Taipei.

## IV. PROVIDING A LEADING VOICE IN THE HOUSING FINANCE SYSTEM

### Successful LIBOR to SOFR Index Transition

On May 30, 2023, Ginnie Mae announced the transition of all outstanding London Interbank Offered Rate (LIBOR) MBS to the Chicago Mercantile Exchange (CME) Group's Term Secured Overnight Financing Rate (SOFR) (CME Term SOFR) with the publication of All Participants Memoranda (APM) 23-06 and 23-07. The applicable spread adjustments also transitioned in accordance with all Adjustable Interest Rate (LIBOR) Act-related regulations and FHA's Mortgagee Letter 2023-09. Ginnie Mae MBS began its transition following the retirement of LIBOR on June 30, 2023. Ginnie Mae followed the recommendation of the Alternative Reference Rates Committee (ARRC) to use the Refinitiv USD IBOR Cash Fallback based on the CME Term SOFR, plus applicable spread adjustments for legacy LIBOR adjustable-rate mortgages and 30-day average SOFR for new originations. SA, a new SOFR-based pool for annually adjusting Home Equity Conversion Mortgages (HECM), was launched on July 1, 2023. New originations of single-family mortgages remain based on the Constant Maturity Treasury (CMT) index.

### A Leader in the Global Capital Markets

In the first quarter of Fiscal Year 2023, Ginnie Mae hosted its Global Investor Summit in Washington, DC, in HUD's Brooke-Mondale Auditorium. The program included robust discussions and keynote speeches on Risk Management and the MBS market; Innovation in Housing Finance; ESG Impact Investing and the Ginnie Mae MBS as a Sustainable Investment. This forum was well attended by both domestic and international guests including institutional investors, mortgage bankers, representatives of foreign central banks, sovereign wealth funds, public pensions, insurance companies, investment banks, global asset management firms, fixed-income managers, and housing finance policymakers and professionals. International guests included representatives from Taiwan, the Philippines, Indonesia, Japan, South Korea, Saudi Arabia, and Singapore.

Throughout Fiscal Year 2023, the objective of Ginnie Mae's international engagements and forums in Japan, Singapore, Taiwan, South Korea, and Canada, was to promote its investment value proposition to attract foreign capital and improve liquidity for the U.S. housing market. These

App. 427

meetings serve the important purpose of fostering global relationships, exchange of ideas on housing finance, policy, housing market indicators, ESG impact investing and innovative products while sharing cultural and common values. Ginnie Mae is a global leader in housing finance, capital markets and the advancement of affordable housing in the United States.

## Leading the Expansion of Government Lending and Access to the Ginnie Mae Guaranty

In Fiscal Year 2023, Ginnie Mae continued to expand its collaboration with industry partners including the National Council of State Housing Agencies (NCSHA) and the National Credit Union Administration (NCUA). Through the NCSHA, President McCargo met with HFAs and toured Ginnie Mae projects, learning more about how to expand the Ginnie Mae Guaranty to support HFAs. In February 2023, Ginnie Mae co-hosted with NCUA a "Ginnie Mae 101" webinar to introduce NCUA's member credit unions to the Ginnie Mae's business model, MBS programs, and lending opportunities aimed at expanding the origination of government-backed mortgages and ultimately access to the Ginnie Mae Guaranty.

On May 9, 2023, Ginne Mae hosted a Digital Innovation Summit at the Ginnie Mae headquarters in Washington, DC, to showcase the advancements in its Digital Collateral program and the future of digitalization. This summit provided a forum for collaboration between the private sector and federal agencies which is the key to maximizing the impact of digital tools, fostering a more resilient and efficient housing finance system, and providing broader access to credit for American households. Ginnie Mae brought together panelist with expertise on every component of a digital mortgage platform including warehouse lenders, eIssuers, an eCustodian, and an eVault provider to broadly discuss the ecosystem of eNotes and how innovation can continue to move the industry forward. Through this day-long program, Ginnie Mae emphasized the benefits of its Digital Collateral Program on expanding access to affordable housing finance for rural households and deployed veterans and showcased its continuing ability to strengthen its operational capacity to advance the digitalization and optimization of the MBS platform.

## Leading the Assessment and Management of Counterparty Risk

In Fiscal Year 2022, Ginnie Mae announced updated financial standards required for a non-depository, independent mortgage banks (IMB) to qualify as eligible issuers that were critical to ensuring the ongoing safety, stability, and certainty of the Ginnie Mae MBS program. The first stage of implementing these requirements was effective in the fourth quarter of Fiscal Year 2023. Specifically, issuers must meet heightened net worth and liquidity requirements that reflect the risk of their entire book of business and the full spectrum of their mortgage banking activities. In addition to this important implementation milestone, Ginnie Mae continues to monitor issuer progress towards compliance toward the new Risk Based Capital Ratio requirement that will become effective in December 2024.

During Fiscal Year 2023, Ginnie Mae continued to invest in human capital, policy analysis, predictive analytical tool development and process design to advance on-going efforts to measure and mitigate counterparty risk. As an example, using a proprietary issuer stress testing framework, we assess potential challenges to the MBS ecosystem, including the escalation of interest rates over the last eighteen months. The issuer stress testing results have informed policy development, supported staffing and headcount planning and added significant analytical rigor to stakeholder engagement. As a member of the Nonbank Servicing Task Force of the Financial Stability Oversight Committee (FSOC), Ginnie Mae has established itself as leader in the measurement and assessment of risks to the MBS and housing finance systems associated with the non-depository mortgage bank sector.



Senior Vice President of the Office of Management Operations Tawanna Preston, Chief Financial Officer Adetokunbo "Toky" Lofinmakin, and President McCargo pose for a photograph as Ms. Lofinmakin receives an official Ginnie Mae Senior Executive Service (SES) Certificate during the Ginnie Mae 55th anniversary celebration event

App. 428

# THE ROAD AHEAD

Looking forward, Ginnie Mae will continue to strengthen the MBS and HMBS programs, and enhance its securities products to meet investor, borrower, and issuer needs. With the completion of Ginnie Mae's migration to the cloud in the first quarter of Fiscal Year 2023, Ginnie Mae remains committed to its pursuit of innovation and technological transformation that is now more readily available, ensuring digital collateral expansion and progress toward loan-level capabilities.

With the successful implementation of its issuer net worth and liquidity requirements in the fourth quarter of Fiscal Year 2023, Ginnie Mae will continue to monitor issuer progress toward compliance with its Risk-Based Capital Ratio requirements effective in December 2024. In this current market environment, Ginnie Mae is laser-focused on solutions to address and mitigate counterparty risks in the future. Ginnie Mae's issuers are partners in carrying out its mission to expand access to affordable lending and housing for millions of underserved Americans, and ensuring the resilience of the market and industry through economic cycles is a top priority.

As a successful social impact company, Ginnie Mae remains steadfast in its core priorities to promote affordable housing finance, create liquidity and stability in the MBS ecosystem, and harness the capital markets for the public good. To that end, Ginnie Mae will continue to expand its work related to impact disclosures, make additional programmatic changes to support manufactured housing finance, and look to expand access to the Ginnie Mae Guaranty for lenders that have historically been unable to participate. Ginnie Mae will also continue making programmatic enhancements that support the liquidity needs of its issuers.

The business results in Fiscal Year 2023 are a testament to Ginnie Mae's resilience and ability to manage the headwinds of the current changes in the industry. To continue its successes, Ginnie Mae will need appropriate resources to achieve its objectives and program modernizations as well as to adequately prepare for and respond to market disruptions. Despite generating significant revenue, Ginnie Mae relies on Congressional appropriations to fund all staffing and expenses. Incremental growth in Ginnie Mae's funding over the years, disproportionate to significant increases in its portfolio, impacts Ginnie Mae's ability to carry out its statutory purpose to support critical primary market government programs in the secondary market. Looking ahead to the next 55 years, Ginnie Mae will continue to advocate for greater resources ever focused on its mission to ensure stability, affordability, and access to mortgage credit for government housing programs that create a more equitable housing finance system for all.



APP429



Ginnie Mae staff members pose for a picture at the Ginnie Mae 55th anniversary celebration event.



# MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL POSITION AND RESULTS OF OPERATIONS

The following is management's discussion and analysis (MD&A) of the financial position and results of operations of Ginnie Mae for the Fiscal Years ended September  2023 and 2022. This MD&A should be read in conjunction with Ginnie Mae's financial statements and related notes, included in this annual report, and issued to Congress.

## MISSION

Ginnie Mae's mission is to provide liquidity and stability to the housing finance system by guaranteeing mortgage-backed securities (MBS) collateralized by mortgage loans insured or guaranteed by the Federal Housing Administration (FHA), the U.S. Department of Veterans Affairs (VA), the U.S. Department of Agriculture (USDA), and the Office of Public and Indian Housing (PIH). Our primary focus in 2023 was ensuring liquidity and stability for issuers and managing counterparty risks to ensure the health and sustainability of the housing finance system during the current high interest rate environment. We also stayed focused on our investor base, both domestic and international, continuing to communicate the inherent value proposition of our mortgage bond programs. Specifically, we made progress on our MBS investor data disclosures, and sustainability framework to convey Ginnie Mae's social impact and our ability to provide a unique opportunity for values-aligned fixed income-investments. We also continued to pursue our mission through implementing policies and initiatives to broaden support to issuer and MBS market liquidity, enhancing the value of Ginnie Mae securities, and advancing the digitalization and optimization of the MBS program.

## ECONOMIC ENVIRONMENT

In 2023, the housing market faced challenging macroeconomic conditions from a high inflationary environment, rising interest rates, and the residual impact of the COVID-19 pandemic, all of which impact Ginnie Mae.

The Federal Reserve approved six consecutive interest rate increases varying between 25 and 75 basis points during Fiscal Year 2023 in response to inflation, which rose 3.70% over the last 12 months, as measured by Consumer Price Index (CPI). The current housing market continues to present affordability challenges for many households, driven by home price appreciation and higher interest rates. The lack of affordable housing supply is exacerbated by inflation and higher costs to construct new housing. The  year fixed-rate mortgage (FRM) rate increased to 7.31% as of September  2023, compared to 6.70% as of September  2022, which is its highest level since 2000. This 0.61% increase caused mortgage application volume to fall to the lowest level since 1997.

Despite these market headwinds, Ginnie Mae continued to experience portfolio growth, generate a strong revenue stream of guaranty fees, and ended the year with significantly positive results of operations. The ensuing sections provide more details on the impact of these macroeconomic factors on Ginnie Mae's business.

### Key Market Economic Indicators

Below we discuss how the relevant macroeconomic conditions can influence our business and financial results. The key economic indicators include interest rates, along with broad macroeconomic factors including GDP, the unemployment rate, and personal consumption. Our forecasts and expectations are based on many assumptions, subject to many uncertainties and may change, perhaps substantially, from our current forecasts and expectations.

### How Interest Rates Can Affect Our Business

#### *Fair value gains (losses)*

Ginnie Mae is exposed to fair value gains and losses resulting from changes in interest rates, primarily through the fair value measurement of the guaranty asset, forward

mortgage loans, and reverse mortgage loans and the related home equity conversion mortgage (HECM) mortgage-backed security (MBS, collectively HMBS) obligations.

- Discount rate: As interest rates rise, Ginnie Mae's estimated discount factor increases. The discount factor is used to measure the fair value of future cash flows. All else equal, higher discount rates used in the valuation of these financial assets and liabilities would result in lower fair value estimates of these items. Conversely, a lower discount factor used in the fair value estimate of these assets and liabilities would result in a higher fair value.

- Borrower rate: For variable rate loans, which represent the majority of reverse mortgage loans and the related HMBS obligations, the borrower's interest rate resets to current market interest rates. Accordingly, net cash flows typically increase when borrower's interest rates are higher. However, this increase can be outweighed by the impact that changes the interest rates have on the discount rates used in this valuation. In this current period of rising interest rates, the increase in borrower rates had more of an impact than the increase in the discount rate on reverse mortgage loans.

- Prepayment rate: Increases in interest rates usually lengthen the expected lives of mortgage loans, as borrowers are less likely to refinance or make additional payments, thus lowering prepayment rates. Similarly, decreases to interest rates increase the likelihood that borrowers refinance or make additional payments, which increases prepayment rates. Lower prepayment rates lengthen the weighted-average life used in estimating the guaranty asset, which has a beneficial effect on its valuation. However, this positive increase can be outweighed by the effect that changes in interest rates have on the discount rates used in this valuation. In the current year, the increase in the discount rate had more of an impact than the benefit gained from lower prepayment rates on guaranty asset.

### Counterparty credit risk

Changes in interest rates can drive adjustments to the cost of financing for issuers. As interest rates rise, so too does the cost of financing for MBS issuers. Increases in the cost of financing, coupled with lower origination volumes characteristic of high interest rate environments can increase liquidity pressure on issuers. Refer to Risk Factors section below for more details on counterparty credit risk.



APP432

## How GDP, the Unemployment Rate, and Personal Consumption Can Affect Our Business

General economic indicators such as GDP, the unemployment rate, and personal consumption can have a broad effect on businesses, including Ginnie Mae, and influence many aspects of the mortgage industry, such as the demand for housing and borrower default rates.

- Housing demand: During periods of economic prosperity demand for housing is higher, which can lead to increased mortgage originations, refinancings, and thus MBS issuances. Higher MBS issuances can increase the growth rate of Ginnie Mae's MBS portfolio, as well as MBS program income, most notably in the form of guaranty fees and commitment fees. The opposite is true in a slowing economy, when unemployment rates may be higher and personal consumption and demand for housing is lower. In these situations, the growth rate could become stagnant or decrease. In 2023, housing demand declined, which resulted in less MBS issuances.

- Default rates: Elevated unemployment rates and lower income growth can also limit borrowers' ability to meet their financial obligations, leading to higher default rates. Although unemployment remained low and income continued to grow in the current year, default rates increased in the high interest environment, resulting in a slight increase in credit losses. However, the severity of credit losses Ginnie Mae incurs on defaulted loans is minimized by the added layers of risk absorption that Ginnie Mae is positioned behind. In addition to borrowers' home equity and issuers' capital, Ginnie Mae has the added protection of the insurance of other federal agencies (FHA, VA, USDA, and PIH). This means that Ginnie Mae's most significant exposure to losses would be to the extent costs (e.g., foreclosure costs) are incurred that are not subject to reimbursement by the insurers.



APP433

## HOME EQUITY CONVERSION MORTGAGE-BACKED SECURITY (HMBS) ISSUER EXTINGUISHMENT

In December 2022, Ginnie Mae extinguished a defaulted home equity conversion mortgage (HECM) issuer. In instances where a Ginnie Mae issuer defaults, and is terminated and extinguished, Ginnie Mae stands by its guaranty and steps into the role of the issuer. This entails assuming all servicing rights and obligations of the issuer's guaranteed portfolio, including making timely pass-through payments. This was the first extinguishment event of a HECM issuer by Ginnie Mae and thus the first time that Ginnie Mae was required to onboard a substantial portfolio of HECM loans and corresponding HMBS obligations.

HECMs provide seniors aged 62 and older with a loan secured by their home, which can be taken as a lump sum, line of credit, or scheduled payments. HECM loan balances grow over the loan term through borrower draws of scheduled payments or line of credit draws, funded by the issuer, as well as through the accrual of interest, servicing fees, and FHA mortgage insurance premiums.

In relation to forward mortgages, HECM loans are more complex to service. A combination of the defaulted issuer portfolio size and product complexity posed a significant operational challenge for Ginnie Mae. Nevertheless, Ginnie Mae, in coordination with the Master Sub-Servicers (MSS) to whom servicing was delegated, ensured that minimal disruption was felt by borrowers and investors alike. This effort is a testament to Ginnie Mae's ability to step into the role of the issuer when necessary, stand behind its guaranty of timely payments to investors, and provide stability to the mortgage industry.

## FINANCIAL POSITION

As highlighted in *Figure 1*, total assets as of September 2023, increased to $60.2 billion from $39.5 billion as of September 2022. Total liabilities were $29.4 billion, and investment of the U.S. Government was $30.8 billion

as of September 2023, compared to $9.7 billion and $29.8 billion during the same period in the prior year. The significant increase in both total assets and total liabilities were driven by the onboarding of HECM loans and corresponding HMBS obligations associated with the aforementioned HECM issuer default.

In Fiscal Years 2023 and 2022, Ginnie Mae generated ample cash to fund its operations. As of September 2023, Ginnie Mae held unrestricted cash and cash equivalents of $28.5 billion, which is an increase of approximately $0.8 billion from $27.7 billion as of September 2022. Restricted cash and cash equivalents totaled $1.7 billion as of September 2023, which is an increase of approximately $0.3 billion from $1.4 billion as of September 2022. Ginnie Mae has increased its total cash and cash equivalents[1] balances for eight continuous years since 2015.

Ginnie Mae adopted the Current Expected Credit Loss (CECL) Standard in the Fiscal Year beginning October 1, 2022. Since the adoption of CECL, Ginnie Mae elected the fair value option (FVO) on mortgage loans held for investment including accrued interest, net, now recorded as forward mortgage loans, at fair value, which was $1.4 billion as of September 2023. Prior to the adoption of CECL, the mortgage loans held for investment including accrued interest, net was $1.6 billion as of September 2022. It has steadily been declining since 2015 as loans pay down as a result of scheduled and unscheduled payments or transitioned to foreclosure and to Real Estate Owned (REO) properties. Due to the aforementioned HECM issuer default in December 2022, two new Financial Statement Line Items (FSLI) were added to the Balance Sheet as of September 2023, and they are the primary drivers for the increase in total assets and liabilities: Reverse mortgage loans, at fair value amounted to $19.5 billion and HMBS obligations, at fair value amounted to $19.1 billion. The guaranty asset was $8.4 billion as of September 2023, which represents 13.87% of total assets, compared to $8.6 billion as of September 2022, a decrease of $0.2 billion. The guaranty liability for Fiscal Year 2023 is $9.4 billion, which represents 31.92% of total liabilities and is compared to $9.0 billion as of September 2022, an increase of $0.4 billion.

---

[1]  Total cash and cash equivalents include restricted and unrestricted cash, which also includes short-term investments.

**FIGURE 1** – SELECTED FINANCIAL DATA FROM BALANCE SHEET

|  | September 2023 *(Dollars in thousands)* | September 2022 *(Dollars in thousands)* |
|---|---|---|
| **Assets:** | | |
| Cash and cash equivalents | $ 28,494,701 | $ 27,661,211 |
| Restricted cash and cash equivalents | $ 1,683,383 | $ 1,441,925 |
| Mortgage loans held for investment including accrued interest, net | - | $ 1,570,208 |
| Forward mortgage loans, at fair value | 1,435,663 | - |
| Reverse mortgage loans, at fair value | 19,525,649 | - |
| Guaranty asset | $ 8,352,885 | $ 8,595,302 |
| Other assets[2] | $ 709,625 | $ 249,585 |
| **Total Assets** | **$ 60,201,906** | **$ 39,518,231** |
| **Liabilities:** | | |
| Liability for loss on mortgage-backed securities program guaranty | $ 111,115 | $ 10,934 |
| Guaranty liability | $ 9,371,617 | $ 8,966,555 |
| HMBS obligations, at fair value | $ 19,147,154 | - |
| Other liabilities[3] | $ 730,768 | $ 692,289 |
| **Total Liabilities** | **$ 29,360,654** | **$ 9,669,778** |
| Investment of U.S. Government | $ 30,841,252 | $ 29,848,453 |
| **Total Liabilities and Investment of U.S. Government** | **$ 60,201,906** | **$ 39,518,231** |

---

[2] Other assets include Accrued fees and other receivables; Claims receivable, net; Advances, net; Acquired property, net; Fixed assets, net; Reimbursable costs receivable, net; and Other assets.

[3] Other liabilities include Accounts payable and accrued liabilities; Deferred liabilities and deposits; Deferred revenue; and Liability for representations and warranties.

APP435

## LIQUIDITY AND CAPITAL ADEQUACY

Ginnie Mae reported $30.2 billion total cash and cash equivalents as of September 30, 2023, an increase of approximately $1.1 billion from $29.1 billion as of September 30, 2022. Total cash and cash equivalents included $21.2 billion and $9.0 billion of U.S. Treasury overnight certificates and Funds with U.S. Treasury[4], respectively, as of September 30, 2023, compared to $18.5 billion and $10.6 billion, respectively, as of September 30, 2022. MBS Guaranty Fees, driven by the outstanding unpaid principal balance (UPB) of Ginnie Mae's guaranteed MBS portfolio, continued to provide a strong source of cash at $1.5 billion collected, which is consistent with previous years. The overall increase to cash and cash equivalents was mainly attributed to guaranty income and interest income from our investments in U.S. Treasury overnight certificates, which benefited from a high interest rate environment.

Ginnie Mae's MBS guaranty is backed by the full faith and credit of the U.S. Government. Currently, Ginnie Mae's activities are self-financed and do not require financial assistance from the U.S. Government. Rather, Ginnie Mae generates income, which increases U.S. Government

receipts. Ginnie Mae's management believes that the organization should continue to maintain adequate cash reserves to withstand downturns in the housing market that could cause issuer defaults to increase. Title III of the National Housing Act authorizes Ginnie Mae to issue obligations to the U.S. Treasury in an amount sufficient to enable Ginnie Mae to service MBS portfolios for which Ginnie Mae has defaulted and extinguished. On September 15, 2023, Ginnie Mae and Treasury entered into a borrowing agreement that establishes the operating procedures for this long-standing authority and the specific terms and conditions for loans from Treasury to Ginnie Mae. This agreement provides Ginnie Mae additional flexibility to service defaulted MBS portfolios. As of September 30, 2023, Ginnie Mae has not exercised its borrowing authority and has no apportioned borrowing authority.

Ginnie Mae's primary uses of cash consist of administrative and contractor costs related to the support of its MBS guaranty program. Refer to the *Results of Operations – Revenues and Expenses* section for further detail. Purchases of forward mortgage loans, at fair value were $31.2 million in

---

[4]  Funds with U.S. Treasury balance includes Deposit in Transit.



Ginnie Mae Special Advisor to the President Britt Van poses with Principal Executive Vice President Sam Valverde, President Alanna McCargo, Chief of Staff Felecia Rotellini, and Senior Advisor for Strategic Operations and Interim Executive Vice President and Chief Operating Officer Laura M. Kenney on a Washington DC rooftop overlooking the Capitol during Ginnie Mae's 55th Anniversary celebration.

App. 430

Fiscal Year 2023 and purchases of loans held for investment were $16.7 million in Fiscal Year 2022. Ginnie Mae seizes MSRs in the event of issuers' default, at which point Ginnie Mae assumes the role of the defaulted and extinguished issuer. Due to the HMBS issuer extinguishment, Ginnie Mae stepped into the role of the issuer during Fiscal Year 2023. In this role, Ginnie Mae purchased $695.8 million in reverse mortgage loans, at fair value, representing additional principal draws by borrowers and made $3.4 billion in payments to HMBS investors on HMBS obligations. Conversely, $1.5 billion in proceeds from repayments of reverse mortgage loans were received from borrowers. Next, purchases of fixed assets were $13.6 million in Fiscal Year 2023 and $19.3 million in Fiscal Year 2022, respectively. Ginnie Mae's fixed asset purchases include commercial software, hardware, and internally developed software.

Further, Ginnie Mae maintained highly favorable expense coverage and efficiency ratios throughout Fiscal Years 2023 and 2022, which is indicative of healthy cash flow and effective cost management. Expense coverage ratio measures Ginnie Mae's ability to generate enough cash to satisfy cash requirements of routine operations. Ginnie Mae's expense coverage ratio decreased from 77.5 in Fiscal Year 2022 to 53.5 in Fiscal Year 2023, primarily because of additional MBS program expenses associated with the onboarding of the extinguished issuer's HECM portfolio. While this represents a decrease year over year, this ratio continues to demonstrate Ginnie Mae's strong cash position. Efficiency ratio shows Ginnie Mae's ability to utilize resources effectively; an efficiency ratio of 50% or under is considered optimal. See *Figure 2* for Balance Sheet Highlights and Liquidity Analysis.

**FIGURE 2 –** BALANCE SHEET HIGHLIGHTS AND LIQUIDITY ANALYSIS

| | For the year ended September 2023 *(Dollars in thousands)* | For the year ended September 2022 *(Dollars in thousands)* |
|---|---|---|
| **Balance Sheet Highlights** | | |
| Total Cash and cash equivalents | $ 30,178,084 | $ 29,103,136 |
| Other | $ 30,023,822 | $ 10,415,095 |
| **Total Assets** | **$ 60,201,906** | **$ 39,518,231** |
| **Total Liabilities** | **$ 29,360,654** | **$ 9,669,778** |
| **Liquidity Analysis** | | |
| Total UPB Outstanding[5] | $ 2,472,843,019 | $ 2,284,456,605 |
| Investment of U.S. Government as a Percentage of Average Total Assets[6] | 51.47% | 77.29% |
| Expense Coverage Ratio[7] | 53.5 | 77.5 |
| Efficiency Ratio[8] | 20.44% | 19.61% |

---

[5]  Unpaid Principal Balance (UPB) of Ginnie Mae MBS.

[6]  Investment of U.S. Government divided by Average Total Assets.

[7]  Cash and cash equivalents divided by the non-interest expense exclusive of fixed asset amortization.

[8]  Non-interest expense exclusive of fixed asset amortization divided by the total revenue exclusive of income that does not provide actual cash flow. See Results of Operations section for description of non-real cash flow income.

APP437

## RESULTS OF OPERATIONS

### Explanation and Reconciliation of Ginnie Mae's Use of Non-GAAP Financial Measures and Key Performance Measures

Throughout this MD&A, non-GAAP financial measures are used to provide users with meaningful insights into Ginnie Mae's results for the period presented. Non-GAAP financial measures represent the comparable GAAP financial measures adjusted for certain items outside of normal business operations. Whenever used, non-GAAP financial measures are reconciled to GAAP measures to show adjustments applied.

Below are the non-GAAP financial measures used in this MD&A:

### *Non-GAAP Results of Operations (Earnings)*

To arrive at non-GAAP earnings, GAAP results of operations are adjusted for expense or income items that do not involve any real cash flow impact for Ginnie Mae, as shown in the table below:

**FIGURE 3 –** NON-GAAP RESULTS OF OPERATIONS FOR FISCAL YEARS 2023 AND 2022

|  | For the year ended September   2023 *(Dollars in thousands)* | For the year ended September   2022 *(Dollars in thousands)* |
|---|---|---|
| GAAP Results of Operations | $ 937,606 | $ 1,057,482 |
| **Adjustments for non-real cash flow items:** |  |  |
| Income on guaranty obligation | $ (824,828) | $ (2,034,881) |
| Total Non-cash Other (Gains)/Losses[9] | $ 2,201,391 | $ 2,401,948 |
| Total (Recapture) / Provision | $ (7,601) | $ 21,783 |
| Fixed Asset Amortization | $ 18,545 | $ 19,725 |
| **Non-GAAP Results of Operations** | **$ 2,325,113** | **$ 1,466,057** |

---

[9] Total Non-cash Other (Gains)/Losses includes Gain (Loss) on Guaranty Asset, Gain (Loss) other, Gain (Loss) on forward mortgage loans, at fair value (applicable to Fiscal Year 2023 only); Gain (Loss) on reverse mortgage loans, at fair value (applicable to Fiscal Year 2023 only); Gain (Loss) on HMBS obligations, at fair value (applicable to Fiscal Year 2023 only); and Gain (Loss) on acquisition of HMBS obligations, at fair value (applicable to Fiscal Year 2023 only).

## Free Cash Flow

As Ginnie Mae is expected to have enough cash reserves to satisfy our guaranty to investors, our free cash flow has been determined as cash flow from operating activities.

*FIGURE 4 –* FREE CASH FLOW FOR FISCAL YEARS 2023 AND 2022

|  | For the year ended September 2023 *(Dollars in thousands)* | For the year ended September 2022 *(Dollars in thousands)* |
|---|---|---|
| Cash Generated from Operating Activities | $ 3,400,448 | $ 1,503,177 |
| **Adjustments for:** | | |
| Purchases of Fixed Assets | $ (13,628) | $ (19,300) |
| **Free Cash Flow** | **$ 3,386,820** | **$ 1,483,877** |

## Revenues

Ginnie Mae generated positive results of operations (i.e., net gain) of $0.9 billion in Fiscal Year 2023, compared to positive results of operations of $1.1 billion in Fiscal Year 2022, a decrease of $0.2 billion from 2022. The decrease was largely driven by a $1.2 billion decrease in income on guaranty obligation, which was $0.8 billion in 2023, compared to $2.0 billion in 2022. This decrease in income on guaranty obligation represents a decrease in guaranty obligation amortization of prior issuances, mainly driven by the decreased prepayment and refinancing activities resulting from higher interest rate in Fiscal Year 2023, which led to a lower rate of amortization of the UPB of MBS. The decrease in results of operations was partially offset by a $0.9 billion decrease in loss on guaranty asset, which was $1.5 billion in 2023, compared to $2.4 billion in 2022. The decrease in loss on guaranty asset was mainly driven by lower paydowns resulting from the higher interest rate. Ginnie Mae's core business and overall cash position remains strong in 2023 as evidenced by positive non-GAAP Earnings of $2.3 billion, compared to positive non-GAAP Earnings of $1.5 billion in 2022 due to increased interest income when rates move higher.

Ginnie Mae's profitability ratios remain strong. As of September 2023, Ginnie Mae's non-GAAP Results of Operations (Earnings) as a percentage of Average Total Assets is 3.88%, compared to 3.80% as of September 2022. The ratio demonstrates our ability to generate net earnings from our core business and highlights Ginnie Mae's actual performance. For more profitability metrics, see *Figure 5* for Highlights from Statement of Revenues and Changes in Investment of U.S. Government and Profitability Ratios.

*FIGURE 5 –* HIGHLIGHTS FROM STATEMENT OF REVENUES AND CHANGES IN INVESTMENT OF U.S. GOVERNMENT AND PROFITABILITY RATIOS

| | For the year ended September 2023 *(Dollars in thousands)* | For the year ended September 2022 *(Dollars in thousands)* |
|---|---|---|
| **Highlights from Statement of Revenues and Changes in Investment of U.S. Government** | | |
| MBS program income[10] | $ 1,661,462 | $ 1,688,362 |
| Income on guaranty obligation | $ 824,828 | $ 2,034,881 |
| Other interest income | $ 944,298 | $ 130,924 |
| **Total Revenues** | **$ 3,430,588** | **$ 3,854,167** |
| Fixed asset depreciation and amortization | $ (18,545) | $ (19,725) |
| Administrative expenses | $ (46,786) | $ (41,315) |
| Mortgage-backed securities program and other expenses[11] | $ (477,109) | $ (313,837) |
| Acquired Property expenses, net | $ (8,833) | $ (1,610) |
| **Total Expenses** | **$ (551,273)** | **$ (376,487)** |
| **Total Recapture (Provision)[12]** | **$ 7,601** | **$ (21,783)** |
| Gain (loss) on forward mortgage loans, at fair value | (92,138) | - |
| Gain (loss) on reverse mortgage loans, at fair value | 1,968,690 | - |
| Gain (loss) on acquisition of HMBS obligations, at fair value | (282,679) | - |
| Gain (loss) on HMBS obligations, at fair value | (1,996,867) | - |
| Gain (loss) on guaranty asset | (1,545,856) | (2,401,950) |
| Gain (loss) other | (460) | 3,535 |
| **Total Other Gains / (Losses)** | **$ (1,949,310)** | **$ (2,398,415)** |
| **Results of Operations** | **$ 937,606** | **$ 1,057,482** |
| **Non-GAAP Results of Operations (Earnings)** | **$ 2,325,112** | **$ 1,466,057** |

[10] MBS program income includes MBS guaranty fees; commitment fees; multiclass fees; other MBS program; income interest on mortgage loans held for investment (applicable to Fiscal Year 2022 only); and interest on pass-through assistance program receivable (applicable to Fiscal Year 2022 only).

[11] Mortgage-backed securities program and other expenses includes contractor expenses totaling $451.0 million and $308.8 million as of September 2023 and 2022, respectively. Refer to Expenses section for further details.

[12] Total recapture (provision) includes mortgage-backed program guaranty, claims receivable; loss on uncollectible advances, recapture (provision) for mortgage loans held for investment including accrued interest, net (applicable to Fiscal Year 2022 only); and reimbursable cost (applicable to Fiscal Year 2022 only).

APP440

| | For the year ended September 2023 *(Dollars in thousands)* | For the year ended September 2022 *(Dollars in thousands)* |
|---|---|---|
| **Profitability Ratios** | | |
| Return on Average Total Assets[13] | 1.56% | 2.74% |
| Non-GAAP Results of Operations (Earnings) as a percentage of Average Total Assets[14] | 3.88% | 3.80% |
| Non-GAAP Results of Operation (Earnings) as a percentage of Total Revenues[15] | 67.78% | 38.04% |

In Fiscal Year 2023, Ginnie Mae earned total revenues of $3.4 billion down from $3.9 billion in 2022. Revenue streams for Ginnie Mae mainly consist of MBS program income, income on guaranty obligation, and other interest income.

---

[13] Results of Operations divided by Average Total Assets.
[14] Non-GAAP Results of Operations divided by Average Total Assets.
[15] Non-GAAP Results of Operations divided by Total Revenues.



### *MBS Program Income*

MBS program income consists primarily of guaranty fees, commitment fees, multiclass fees, and other MBS program income (e.g., Interest on Mortgage Loans Held for Investment). For Fiscal Year 2023, MBS program income was primarily driven by guaranty fees of $1.5 billion, followed by commitment fees of $85.2 million, and multiclass fees of $37.5 million. Combined, guaranty fees and commitment fees contributed 97.05% of total MBS program revenue for Fiscal Year 2023.

For Fiscal Year 2022, MBS program income was primarily driven by guaranty fees of $1.4 billion, followed by commitment fees of $130.5 million, gross interest on mortgage loans held for investment of $82.8 million, and multiclass fees of $33.6 million. Combined, guaranty fees, interest on mortgage loans held for investment, and commitment fees contributed 97.42% of total MBS program revenue for Fiscal Year 2022.

- *Guaranty Fees* – Ginnie Mae guarantees the payment of principal and interest pass-through payments, which are backed by the full faith and credit of the U.S. Government, to its MBS investors. Ginnie Mae charges a fee for providing this guaranty to each MBS mortgage pool. These fees are received over the life of Ginnie Mae securities. Guaranty fees are collected on the aggregate UPB of the guaranteed securities outstanding. The outstanding MBS portfolio balance as of Fiscal Year 2023 was $2.5 trillion, which increased by $188.4 billion compared to Fiscal Year 2022. MBS guaranty fees also grew year-over-year, by approximately 6.69% to $1.5 billion in Fiscal Year 2023. Please refer to *Figure 6* below for a more detailed view of UPB growth over the past three Fiscal Years.

### *FIGURE 6 –* UPB OUTSTANDING IN GINNIE MAE'S MBS PORTFOLIO FROM FISCAL YEAR 2021 TO FISCAL YEAR 2023



- *Commitment Fees* - Ginnie Mae earns a fee for providing approved issuers with the authority to pool mortgages into Ginnie Mae MBS. This authority expires at the end of the 12th month from its approval for single-family, HMBS, and manufactured housing issuers and 24th month from its approval for multifamily issuers. Ginnie Mae receives commitment fees as issuers request commitment authority. Ginnie Mae issued $0.4 trillion in commitment authority in Fiscal Year 2023, a 21.75% decrease from Fiscal Year 2022, which was primarily due to higher interest rates and inflation reducing the demand for mortgages and consequently new MBS issuance. Ginnie Mae recognizes the commitment fees as earned when issuers use their commitment authority. Total commitment fees earned in Fiscal Year 2023 were $85.2 million, compared to $130.5 million earned in Fiscal Year 2022. Commitment Fees are deferred until earned or expired, whichever occurs first. As of September ⬚ 2023 and 2022, commitment fees deferred totaled $28.2 million and $31.6 million, respectively.

- **Multiclass Fees** - Multiclass fees are one-time upfront fees related to the issuance of multiclass products. Multiclass fees are part of MBS program revenue and consist of Real Estate Mortgage Investment Conduits (REMIC) and Platinum Securities Program fees. Ginnie Mae guaranteed approximately $35.1 billion of newly issued Platinum Certificates in Fiscal Year 2023, compared to $46.1 billion of newly issued Platinum Certificates in Fiscal Year 2022. Fees earned on Platinum Certificates totaled $7.6 million for both Fiscal Year 2023 and 2022. Ginnie Mae guaranteed REMIC issuances of $108.8 billion in Fiscal Year 2023, compared to $150.1 billion in Fiscal Year 2022. Fees earned on REMIC securities for Fiscal Year 2023 totaled $29.9 million, compared to $26.1 million for Fiscal Year 2022. REMIC fees consist of a guaranty fee and may include a Modification and Exchange (MX) combination fee. MX combination fees allow sponsors to combine REMIC and/or MX securities at the time of issuance. Ginnie Mae recognizes the MX combination portion of the REMIC fee in the period it is received. Platinum Securities Program fees, as well as the guaranty fee portion of the REMIC fees are deferred and amortized into income evenly over the contractual life of the underlying financial instruments. As of September     2023 and 2022, REMIC and Platinum Securities Program fees deferred totaled $580.3 million and $563.1 million, respectively.

  The outstanding balance of multiclass securities as of September     2023, was $737.9 billion, of which $139.9 billion and $598.0 billion were Platinum and REMIC securities, respectively. This represents a $78.9 billion increase from the $659.0 billion outstanding balances as of September     2022, of which $117.4 billion and $541.6 billion were Platinum and REMIC securities, respectively.

- **Interest on Mortgage Loans Held for Investment (prior to the adoption of CECL - Fiscal Year 2022)** - Ginnie Mae accrues interest for loans at the contractual interest rate of the underlying mortgage unless the loans become 90 days past due, at which point the loans are placed on nonaccrual or modified accrual status. In Fiscal Year 2022, gross interest on mortgage loans held for investment was $82.8 million. Subsequent to the adoption of CECL, beginning Fiscal Year 2023, accrued interest is part of the unit of account for forward mortgage loans, at fair value. Accordingly, interest income is recognized in the Gain (loss) on forward mortgage loans, at fair value financial statement line item. This totaled $73.5 million

as of September     2023, which was primarily driven by a decrease in the outstanding balance of forward mortgage loans.

### Income on Guaranty Obligations

The guaranty obligation represents the non contingent liability for Ginnie Mae's obligation to stand ready to perform its guaranty. Ginnie Mae amortizes the guaranty obligation into revenue based on the declining UPB of MBS pools. In Fiscal Year 2023, income on guaranty obligation was $0.8 billion, which is 24.04% of total revenues and decreased by $1.2 billion compared to Fiscal Year 2022.

### Other Interest Income

Ginnie Mae invests excess cash held within the Capital Reserve Account and the Liquidating Account in U.S. Treasury overnight certificates. Ginnie Mae's interest income increased significantly in Fiscal Year 2023 due to the significant increase in the U.S. Treasury overnight rate as well as an increase in the U.S. Treasury Securities balance as compared to Fiscal Year 2022. In Fiscal Year 2023, interest income on U.S. Treasury overnight certificates increased to $944.3 million, up from $130.9 million in Fiscal Year 2022.

### Expenses

Total expenses increased by 46.43% to $551.3 million in Fiscal Year 2023, compared to $376.5 million in Fiscal Year 2022, an increase of $174.8 million. The increase was associated with higher servicing fee expense due to the extinguishment and onboarding of an HMBS issuer's portfolio in December 2022.

In recent years, Ginnie Mae's staffing model has been characterized by modest levels of permanent staff complemented by private firms or consultants that provide certain operational support services on a contractual basis. This relationship is integral to Ginnie Mae's business model and will continue to be an important part of Ginnie Mae's approach. In Fiscal Year 2023, Ginnie Mae's total contractor expenses were 81.82% of total expenses, compared with 82.03% in Fiscal Year 2022.

## MBS PROGRAMS, ISSUANCES, AND PORTFOLIO GROWTH

Fiscal Year 2023 showed a decrease in Ginnie Mae MBS issuances mainly due to the rising interest rate environment causing a decline in mortgage applications and refinance activity. Ginnie Mae MBS issuances decreased by 37.74% to $404.4 billion in Fiscal Year 2023 from Fiscal Year 2022, as shown in *Figure 7*.

**FIGURE 7 –** GINNIE MAE MBS ISSUANCES FROM FISCAL YEAR 2021 TO FISCAL YEAR 2023



As shown in *Figure 8* below, Ginnie Mae supported approximately 1.2 million units of housing for individuals and families in Fiscal Year 2023, a 41.91% decline from Fiscal Year 2022 due to the rising interest rates. The current total outstanding UPB in Ginnie Mae's MBS portfolio balance of $2.5 trillion represents over 11.5 million active loans. As of September ___ 2022, the total outstanding Ginnie Mae MBS portfolio of $2.3 trillion represents over 11.0 million active loans. Ginnie Mae has guaranteed approximately $10.2 trillion in MBS since its inception.

**FIGURE 8 –** TOTAL HOUSING UNITS FINANCED BY GINNIE MAE'S SINGLE-FAMILY, MULTIFAMILY, AND MANUFACTURED HOUSING PROGRAMS FROM FISCAL YEAR 2021 TO FISCAL YEAR 2023





Senior Vice President of the Office of Enterprise Data and Technology Solutions Barbara Cooper-Jones speaks to an audience at the Ginnie Mae Digital Collateral Summit.

### Single-Family Program

Ginnie Mae's Single-Family Program is the conduit for government insured/guaranteed mortgage lending to the worldwide capital markets. This program allows borrowers in government programs to reap the benefits of the full faith and credit of the United States by adding liquidity into the market in order to lower their borrowing costs.

Ginnie Mae's Single-Family Program consists of single-family mortgages originated for the purchase, construction, or renovation of single-family homes originated through FHA, VA, USDA, and PIH loan insurance/guaranty programs. The vast majority of the mortgages in Ginnie Mae securities are insured by FHA and VA. FHA-insured loans accounted for 64.03% of Fiscal Year 2023 Ginnie Mae MBS issuances, while VA-insured loans accounted for 32.12%; USDA and PIH loans contributed to 3.85%. Comparatively, FHA-insured loans accounted for 59.62% of Fiscal Year 2022 Ginnie Mae MBS issuances, while VA-insured loans accounted for 35.64%; USDA and PIH loans contributed to 4.75%.

Ginnie Mae's portfolio of Single-Family FHA loans grew in Fiscal Year 2023 to a UPB of $1.2 trillion compared to $1.1 trillion at the end of Fiscal Year 2022. There were FHA loans in all 50 states, 3 territories, and the District of Columbia in Ginnie Mae pools as of September 30, 2023 and September 30, 2022.

In addition, Ginnie Mae's portfolio of Single-Family VA loans grew to a UPB of $940.2 billion compared to $883.3 billion in Fiscal Year 2022. There were VA loans in all 50 states, 3 territories, and the District of Columbia in Ginnie Mae pools as of September 30, 2023 and September 30, 2022.

Although other agencies and private issuers may pool FHA and VA insured loans for their own MBS or hold them in portfolios as whole loans, almost all FHA and VA loans are financed through Ginnie Mae securities. In Fiscal Year 2023, 98.08% of FHA fixed-rate loans and 97.31% of VA fixed-rate loans were placed into Ginnie Mae guaranteed MBS. In Fiscal Year 2022, 97.30% of FHA fixed-rate loans and 97.31% of VA fixed-rate loans were placed into Ginnie Mae guaranteed MBS. Since inception, Ginnie Mae has guaranteed $9.7 trillion in single-family MBS, helping to finance affordable and community-stabilizing single-family developments across the nation.

Although loans underlying our securities may not be concentrated in specific areas, Ginnie Mae has provided homeownership opportunities in every U.S. state and territory. *Figure 9* highlights the geographic distribution of single-family properties securing Ginnie Mae MBS as of September 30, 2023.

App. 445

*FIGURE 9 –* GEOGRAPHIC DISTRIBUTION OF SINGLE-FAMILY PROPERTIES SECURING GINNIE MAE MBS AS OF SEPTEMBER 2023



Breakout Concentration

802                                                              1,134,259

| State | Loans | Percent of Total Loans | UPB |
|---|---|---|---|
| Texas | 1,134,259 | 10.16 | 215,211,298,692 |
| Florida | 884,809 | 7.93 | 194,691,258,469 |
| California | 705,368 | 6.32 | 235,302,901,753 |
| Georgia | 513,583 | 4.60 | 95,936,329,484 |
| Virginia | 454,833 | 4.07 | 118,466,404,325 |
| Ohio | 432,103 | 3.87 | 57,606,564,924 |
| North Carolina | 425,128 | 3.81 | 77,528,770,743 |
| Pennsylvania | 395,115 | 3.54 | 59,618,631,744 |
| Illinois | 376,079 | 3.37 | 61,033,286,388 |
| New York | 311,884 | 2.79 | 66,476,496,279 |
| **Top 10 Total** | **5,633,161** | **50.46** | **1,181,871,942,801** |

The figures below display the percentage of Ginnie Mae's single-family mortgages (measured by UPB) by Ginnie Mae's top five depository issuers and top five non-depository issuers.

**FIGURE 10 –** TOP FIVE DEPOSITORY AND NON-DEPOSITORY ISSUERS OF GINNIE MAE SINGLE-FAMILY MORTGAGES AS OF SEPTEMBER  2023

**FIGURE 11 –** TOP FIVE DEPOSITORY AND NON-DEPOSITORY ISSUERS OF GINNIE MAE SINGLE-FAMILY MORTGAGES AS OF SEPTEMBER  2022



As of September  2023, Lakeview Loan Servicing, LLC, together with its affiliates, serviced approximately 13.42% of our single-family mortgages, compared with Freedom Home Mortgage Corporate, with its affiliates, which serviced approximately 12.06% as of September  2022.



*Figures 12* and *13* show the UPB of the top 10 single-family Ginnie Mae MBS issuers.

**FIGURE 12 –** UPB OF THE TOP 10 SINGLE-FAMILY GINNIE MAE MBS ISSUERS AS OF SEPTEMBER    2023

| Issuer Name | Category | UPB |
|---|---|---|
| Lakeview Loan Servicing, LLC | Non-Depository | $304,319,539,668 |
| Freedom Home Mortgage Corporation | Non-Depository | $291,201,480,507 |
| PennyMac Loan Services, LLC | Non-Depository | $263,859,411,506 |
| Nationstar Mortgage, LLC | Non-Depository | $127,617,751,015 |
| Newrez LLC | Non-Depository | $125,862,240,433 |
| Rocket Mortgage, LLC | Non-Depository | $109,973,350,811 |
| Carrington Mortgage | Non-Depository | $107,102,610,767 |
| Wells Fargo Bank, NA | Depository | $101,794,042,300 |
| Planet Home Lending | Non-Depository | $63,598,906,077 |
| U.S. Bank, NA | Depository | $55,440,953,569 |
| Other | | $717,333,421,074 |



APP449

***FIGURE 13 –*** UPB OF THE TOP 10 SINGLE-FAMILY GINNIE MAE MBS ISSUERS AS OF SEPTEMBER    2022

| Issuer Name | Category | UPB |
|---|---|---|
| Freedom Home Mortgage Corporation | Non-Depository | $251,551,717,948 |
| PennyMac Loan Services, LLC | Non-Depository | $238,674,967,937 |
| Lakeview Loan Servicing, LLC | Non-Depository | $238,349,564,718 |
| Nationstar Mortgage, LLC | Non-Depository | $116,615,820,831 |
| Wells Fargo Bank, NA | Depository | $114,702,748,205 |
| Rocket Mortgage, LLC | Non-Depository | $102,758,249,037 |
| Carrington Mortgage Services, LLC | Non-Depository | $79,157,855,544 |
| Newrez LLC | Non-Depository | $66,123,821,468 |
| Caliber Home Loans, Inc. | Non-Depository | $52,700,507,102 |
| United Wholesale Mortgages, LLC | Non-Depository | $49,899,300,441 |
| Other | | $775,917,583,551 |

## Multifamily Program

Ginnie Mae's Multifamily Program consists of FHA and USDA insured/guaranteed loans originated for the purchase, construction, or renovation of apartment buildings, hospitals, nursing homes, assisted living facilities, and other housing options. By guaranteeing pools of multifamily loans that are sold to investors in the global capital markets, Ginnie Mae enables issuers to reduce mortgage interest rates paid by property owners and developers. The guaranty also allows issuers to obtain a better price for the mortgage loans in the secondary mortgage market due to the decreased risk of default. The issuers can then use these proceeds to make new mortgage loans available at a competitive mortgage rate. In addition, these projects stabilize and bring jobs to communities across the country.

At the end of Fiscal Year 2023, Ginnie Mae guaranteed securities comprising 99.87% of eligible multifamily FHA loans. The Multifamily Program portfolio increased by $7.3 billion, from $141.9 billion at the end of Fiscal Year 2022 to $149.3 billion at the end of Fiscal Year 2023. This increase was consistent across FHA and USDA multifamily loans and was largely due to higher net new issuances compared to the liquidation caused by the ongoing housing shortage and continued demand for additional multifamily housing despite rising interest rates.

*Figure 14* on the next page shows the geographic distribution of multifamily properties securing Ginnie Mae MBS as of September    2023. Since 1971, Ginnie Mae has guaranteed $467.2 billion in multifamily MBS, helping to finance affordable and community-stabilizing multifamily housing developments across the nation.

APP450

**FIGURE 14 –** GEOGRAPHIC DISTRIBUTION OF MULTIFAMILY PROPERTIES SECURING GINNIE MAE MBS
AS OF SEPTEMBER      2023



Breakout Concentration

4                                                    1,263

| State | Loans | Percent of Total Loans | UPB |
|---|---|---|---|
| Texas | 1,263 | 8.53 | 16,269,763,031 |
| California | 1,055 | 7.13 | 10,417,577,110 |
| Ohio | 1,029 | 6.95 | 5,801,698,903 |
| Illinois | 693 | 4.68 | 6,929,029,491 |
| North Carolina | 644 | 4.35 | 5,158,478,543 |
| Michigan | 614 | 4.15 | 4,632,908,122 |
| Indiana | 613 | 4.14 | 4,040,081,317 |
| New York | 577 | 3.90 | 10,599,835,821 |
| Florida | 543 | 3.67 | 7,475,098,605 |
| Minnesota | 482 | 3.26 | 4,306,854,350 |
| **Top 10 Total** | **7,513** | **50.76** | **75,631,325,293** |

APP451

Ginnie Mae's portfolio of Multifamily FHA loans grew in Fiscal Year 2023 to a UPB of $147.5 billion compared to $140.2 billion at the end of Fiscal Year 2022. There were FHA loans in all 50 states, 2 territories, and the District of Columbia in Ginnie Mae pools as of September ___ 2023 and September ___ 2022.

In addition, Ginnie Mae's portfolio of Multifamily USDA loans, grew in Fiscal Year 2023 to an outstanding UPB balance of $1.8 billion compared to $1.7 billion in Fiscal Year 2022. There were USDA loans in 47 states and 1 territory in Ginnie Mae pools as of September ___ 2023 and September ___ 2022.

The figures below display the percentage of Ginnie Mae's multifamily loans (measured by UPB) by Ginnie Mae's top five depository issuers and top five non-depository issuers.

**FIGURE 15 –** TOP FIVE DEPOSITORY AND NON-DEPOSITORY ISSUERS OF GINNIE MAE MULTIFAMILY MORTGAGES AS OF SEPTEMBER ___ 2023

**FIGURE 16 –** TOP FIVE DEPOSITORY AND NON-DEPOSITORY ISSUERS OF GINNIE MAE MULTIFAMILY MORTGAGES AS OF SEPTEMBER ___ 2022





| AS OF SEPTEMBER ___ 2023 | AS OF SEPTEMBER ___ 2022 |

As of September ___ 2023, Lument Real Estate Capital, together with its affiliates, serviced approximately 14.94% of our multifamily loans, compared with ORIX Real Estate Capital, together with its affiliates, which serviced approximately 15.02% as of September ___ 2022.

APP452

*Figures 17* and *18* show the UPB of the top 10 multifamily Ginnie Mae MBS issuers.

**FIGURE 17 –** TOP 10 MULTIFAMILY GINNIE MAE MBS ISSUERS AS OF SEPTEMBER     2023

| Issuer Name | Category | UPB |
|---|---|---|
| Lument Real Estate Capital | Non-Depository | $ 22,298,958,076 |
| Greystone Funding Company LLC | Non-Depository | $ 13,137,868,996 |
| Berkadia Commercial Mortgage | Non-Depository | $ 11,756,945,422 |
| Walker & Dunlop, LLC | Non-Depository | $ 10,276,358,173 |
| Dwight Capital LLC | Non-Depository | $ 9,725,805,435 |
| Wells Fargo Bank, N.A. | Depository | $ 7,081,032,155 |
| PGIM Real Estate Agency Financing, LLC | Non-Depository | $ 5,750,597,488 |
| Merchants Capital Corp. | Non-Depository | $ 5,472,534,203 |
| KeyBank, NA | Depository | $ 4,964,747,514 |
| NewPoint Real Estate Capital LLC | Non-Depository | $ 4,475,313,694 |
| Other | | $ 54,298,738,922 |

*FIGURE 18 –* TOP 10 MULTIFAMILY GINNIE MAE MBS ISSUERS AS OF SEPTEMBER ☐ 2022

| Issuer Name | Category | UPB |
|---|---|---|
| ORIX Real Estate Capital, LLC | Non-Depository | $ 21,315,339,413 |
| Greystone Funding Company LLC | Non-Depository | $ 11,718,362,887 |
| Berkadia Commercial Mortgage | Non-Depository | $ 10,892,062,730 |
| Walker & Dunlop, LLC | Non-Depository | $ 9,598,444,105 |
| Dwight Capital LLC. | Non-Depository | $ 8,680,820,929 |
| Wells Fargo Bank, N.A. | Depository | $ 7,083,038,377 |
| PGIM Real Estate Agency Financing, LLC | Non-Depository | $ 5,708,018,730 |
| Merchants Capital Corp. | Non-Depository | $ 5,484,882,560 |
| KeyBank, NA | Depository | $ 5,026,148,832 |
| NewPoint Real Estate Capital LLC | Non-Depository | $ 4,240,177,296 |
| Other | | $ 52,127,329,043 |

☐ | Our Guaranty Matters

## HMBS Program

As previously mentioned, Ginnie Mae's HMBS Program provides liquidity for FHA-insured reverse mortgages. Total HMBS issuances in Fiscal Year 2023 decreased to $7.2 billion from $15.6 billion in Fiscal Year 2022. The decrease in HMBS issuances was due to consistently rising interest rates throughout the fiscal year. The UPB of HMBS as of September    2023, was $59.0 billion, of which $40.2 billion was from non-defaulted issuers. This balance remained relatively stable year over year, as compared to $59.2 billion as of September    2022. Refer to Note 14: *Concentrations of Credit Risk* for risk analysis related to Ginnie Mae's HMBS Program.

*Figures 19* and *20* show the UPB of the top 10 Ginnie Mae HMBS issuers.

**FIGURE 19 –** TOP 10 GINNIE MAE NON-DEFAULTED HMBS ISSUERS AS OF SEPTEMBER    2023

| Issuer Name | Category | UPB |
|---|---|---|
| Finance of America Reverse | Non-Depository | $ 16,522,369,317 |
| Longbridge Financial | Non-Depository | $ 7,995,668,977 |
| PHH Mortgage Corporation | Non-Depository | $ 7,445,989,990 |
| Mortgage Assets Management | Non-Depository | $ 4,373,240,176 |
| Mutual of Omaha Mortgage | Non-Depository | $ 1,351,911,411 |
| Traditional Mortgage | Non-Depository | $ 1,282,861,192 |
| Plaza Home Mortgage | Non-Depository | $ 490,229,553 |
| Sun West Mortgage Company | Non-Depository | $ 327,502,169 |
| Cherry Creek Mortgage | Non-Depository | $ 187,221,000 |
| The Money Source Inc | Non-Depository | $ 156,250,393 |
| Other | | $ 105,461,293 |

APP455



**FIGURE 20 –** TOP 10 GINNIE MAE HMBS ISSUERS AS OF SEPTEMBER 2022

| Issuer Name | Category | UPB |
|---|---|---|
| Reverse Mortgage Fund | Non-Depository | $ 21,408,532,657 |
| Finance of America Reverse | Non-Depository | $ 10,609,500,396 |
| Longbridge Financial | Non-Depository | $ 7,335,920,599 |
| PHH Mortgage Corporation | Non-Depository | $ 7,047,670,042 |
| Mortgage Assets Management | Non-Depository | $ 6,169,623,249 |
| American Advisors Group | Non-Depository | $ 4,209,149,294 |
| Traditional Mortgage | Non-Depository | $ 1,089,015,078 |
| Mutual of Omaha Mortgage | Non-Depository | $ 427,285,261 |
| Plaza Home Mortgage | Non-Depository | $ 426,132,697 |
| Sun West Mortgage Company | Non-Depository | $ 317,756,661 |
| Other | | $ 299,634,946 |

| Our Guaranty Matters

### Manufactured Housing Program

Ginnie Mae's Manufactured Housing Program provides a guaranty for mortgage loans insured by FHA for the purchase of a new or used manufactured home. This program provides liquidity in the market that in turn lowers costs for borrowers. The manufactured housing program consists of more affordable housing alternatives for first time low-income borrowers. Manufactured housing loans (FHA Title I) include loans secured by a manufactured (mobile) home unit or both the manufactured unit and land. In the past, the limited nature of this program left low- to moderate-income borrowers with no adequate financing options for manufactured housing. In Fiscal Year 2023, Ginnie Mae has taken action to explore policy and program enhancements to revitalize the Manufactured Housing Program that will provide greater financing and securitization opportunities for personal property manufactured housing. The Manufactured Housing program's UPB was $143.0 million at the end of Fiscal Year 2023, a decrease from $167.0 million at the end of Fiscal Year 2022. Refer to Note 14: *Concentrations of Credit Risk* for risk analysis related to Ginnie Mae's Manufactured Housing Program.

## MORTGAGE-BACKED SECURITIES PRODUCTS

### Single-Class

Ginnie Mae offers two single-class securities product structures – Ginnie Mae I MBS and Ginnie Mae II MBS:

- Ginnie Mae I MBS are pass-through securities providing monthly P&I payments to each investor. They are single-family, multifamily, or manufactured housing pools of mortgages with similar maturities and interest rates offered by a single issuer.

- Ginnie Mae II MBS are similar to Ginnie Mae I MBS but allow multiple-issuers and single-issuer pools. They permit the securitization of Adjustable-Rate Mortgages (ARMs), manufactured home loans, and HECM, and allow small issuers unable to meet the dollar requirements of Ginnie Mae I MBS program to participate in the secondary mortgage market.

The figure below shows Ginnie Mae single-class securities product issuances by year:

*FIGURE 21* – GINNIE MAE I AND II MBS ISSUANCES FROM FISCAL YEAR 2021 TO FISCAL YEAR 2023



APP457



Tawanna Preston, Senior Vice President of the Office of Management Operations, and Ginnie Mae staff members pose for a photograph during the 2022 Ginnie Mae Holiday Party.

## Multiclass

Ginnie Mae offers two multiclass securities product structures – Platinum and REMIC securities:

- Platinum Securities are formed by combining Ginnie Mae MBS into a new single security. Platinum Securities can be constructed from both fixed-rate and ARM securities. They provide MBS investors with greater market and operating efficiencies, and may be used in structured financings, repurchase transactions, and general trading.

- REMIC Securities direct underlying MBS principal and interest payments to classes with different principal balances, interest rates, average lives, prepayment characteristics and final maturities. REMIC Securities allow dealers to have more flexibility for creating securities that meet the needs of a variety of investors. Principal and interest payments are divided into varying payment streams to create classes with different expected maturities and other characteristics.

The figure below shows Ginnie Mae multiclass securities product issuances by year.

**FIGURE 22 –** REMIC AND PLATINUM SECURITY ISSUANCES FROM FISCAL YEAR 2021 TO FISCAL YEAR 2023



App. 458

The figure below shows Ginnie Mae REMIC security issuances by sponsor for the current year.

**FIGURE 23 –** REMIC SECURITY PRODUCTS CONTRIBUTIONS BY SPONSOR IN FISCAL YEAR 2023



REMIC ISSUANCES
($ Billions)

### Attractiveness in International Markets

Ginnie Mae securities are attractive to foreign investors as they offer a risk-free interest rate that is backed by the U.S. Government, which has never defaulted on its debt. Additionally, in the more recent economic environment, the U.S. dollar has significantly strengthened in relation to other currencies, which decreases volatility from foreign exchange fluctuations for foreign investors investing in Ginnie Mae MBS. Higher yields than U.S. Treasuries is also an important factor that attracts the foreign institutional investors. Of the outstanding Ginnie Mae MBS portfolio of $2.5 trillion, as of September      2023, approximately $400.0 billion is held by foreign investors. The majority of foreign investors are from Asia, the Middle East, and Europe, and primarily consist of central banks, sovereign wealth funds, pension funds, life insurance companies, and investment banks.

### MORTGAGE SERVICING

Ginnie Mae's loan servicing functions are contracted to two MSSs. As Ginnie Mae relies on these MSSs for servicing data and accounting reports, any operational or technical failures in MSSs own controls may negatively impact Ginnie Mae's own operations. To mitigate such a risk, Ginnie Mae performs ongoing reviews and monitoring of the MSSs.

Upon Ginnie Mae's assumption of defaulted issuers' entire Ginnie Mae guaranteed pooled-loan portfolio, Ginnie Mae assumes the servicing rights and servicing obligations associated with servicing those portfolios. Ginnie Mae earns servicing fees as compensation for its servicing and administrative duties. Refer to Note 2: *Summary of Significant Accounting Policies – Mortgage Servicing Right* for further information.

APP459

## SIGNIFICANT PROGRAM CHANGES

### Program Eligibility Requirements

Prompted by the changing nature of the U.S. housing finance system, Federal Housing Finance Agency (FHFA) and Ginnie Mae issued a joint statement on August 17, 2022, updating minimum financial eligibility requirements for seller/servicers and issuers. Ginnie Mae additionally introduced a risk-based capital requirement for single family issuers who are non-depository mortgage companies in an effort to measure these issuers' ability to remain sustainable during market disruptions. These enhanced eligibility requirements reflect FHFA and Ginnie Mae's shared goals to promote confidence in approved issuers and seller/servicers and improve the safety and soundness of the U.S. MBS ecosystem through all economic cycles. FHFA and Ginnie Mae's effort to coordinate on financial eligibility requirements provides greater consistency for enterprise seller/servicers and Ginnie Mae issuers.

Ensuring that Ginnie Mae issuers can acquire financing during times of stress is critical to preserving access to credit for those borrowers who depend on Ginnie Mae and our agency partners. These enhanced requirements will promote the resilience of our issuers and better enable them to operate throughout challenging economic cycles. The majority of the requirements are effective on September     2023, with Ginnie Mae's risk-based capital requirement effective December     2024.

### HMBS Program Enhancements

Ginnie Mae has continued to monitor the changing economic environment, noting that the rising interest rate environment and contractionary monetary policy has increased liquidity pressure on HMBS issuers and increased counterparty risk to Ginnie Mae. In response, Ginnie Mae has made a number of HMBS program changes in an effort to alleviate this short-term liquidity pressure on issuers. Ginnie Mae announced on February 15, 2023, that the minimum HMBS pool size would be reduced so that the amount of time issuers must carry balances between disbursement and HMBS securitization is minimized. Additionally, on September 22, 2023, Ginnie Mae announced a revision to existing HMBS pooling eligibility requirements, which no longer limits securitization to a single participation related to a particular HECM loan each month. Allowing multiple participations to be securitized each month shortens the time additional participations must be held, lessening constraints on issuer's capital. These program enhancements are effective as of April 1, 2023 and October 1, 2023, respectively. Ginnie Mae will continue to explore additional measures to support HMBS issuers, while minimizing risk to investors.

### Transition to Single-Family Pool Delivery Module

Beginning January     2022, Ginnie Mae began transitioning from Single-Family and Manufactured Housing Program pooling in Ginnie*NET* to the new Single-Family Pool Delivery Module (SFPDM) in MyGinnieMae, which will be the only application for pooling starting December 1, 2023. This modernized application provides new capabilities, including more insight into the progress of pool submissions through an intuitive and user-friendly interface that enhances the user experience. SFPDM enables Ginnie Mae to align with mortgage industry standards for the delivery of Single-Family issuance data. Since SFPDM became available in April 2022, Single Family and Manufactured Housing issuers have continued to actively transition from Ginnie*NET* and have securitized over $14.0 billion through the modernized application. Ginnie Mae is committed to working with issuers to execute a smooth transition of business processes.



APP460

Juanita Cruz-Latimer, Director of the Knowledge Management Division enjoys the 2022 Ginnie Mae Holiday Party festivities.

## MORTGAGE-BACKED SECURITIZATION PLATFORM MODERNIZATION

Ginnie Mae's securitization "platform" consists of the systems and processes that function collectively to execute the conversion of government-insured or guaranteed loans into government guaranteed securities. The platform provides for transmission of loan and pool information, collateral, and funds from and to a wide variety of program participants and its unimpaired functioning is a fundamental responsibility of Ginnie Mae. During 2022 and 2023, efforts to modernize the platform focused on the migration of Ginnie Mae's applications to the cloud. On October 22, 2022, Ginnie Mae completed the migration of the last set of applications to AWS cloud with no operational impact as a result of the seamless migration. During 2023, Office of Enterprise Risk's (OER) Valuation Modeling and Mortgage Research (VMMR) modeling platform was also migrated to the AWS cloud. In addition, Ginnie Mae also re-certified and re-credited all IT systems and services under the AWS cloud infrastructure. Completion of these projects positioned Ginnie Mae for future success with significant improvements in the utility, adaptability, and security of the platform.

As part of the modernization efforts, Ginnie Mae introduced its Digital Collateral Program, which allows issuers and borrowers in the government-backed mortgage segment to access a paperless, efficient, secure means of closing on a home mortgage (i.e., eMortgage). The term eMortgage generally refers to the use of electronically signed closing documents paired with an original electronic promissory note (eNote) signed on an eClosing platform and registered with an official eRegistry upon execution. Reliant on existing federal laws and highly secured technological standards, eMortgages bring a number of efficiencies to both borrowers and Ginnie Mae issuers, such as improving the tracking and delivery of closing documents, reducing data errors, and increasing access to the closing process through Remote Online Notarization (RON). Ginnie Mae securitized its first, eligible eNote via its Digital Collateral Program in January 2021. On June 20, 2022, Ginnie Mae exited its pilot phase and opened the program permanently to eligible applicants. Ginnie Mae regularly assesses its Digital Collateral Program and extended the ability for all Ginnie Mae issuers to use RON to execute Power of Attorney (POA) documents. Additionally, Digital Collateral approved participants (eIssuers) have access to the aforementioned SFPDM platform to securitize eNotes with more enhanced user-friendly interface. As of Fiscal Year 2023, the size of the program has doubled with 13 newly added eIssuers, 3 eSubservicers, and 110,917 eNotes securitized. There are approximately $29.9 billion of Ginnie Mae MBS backed by Digital Collateral that have been securitized.

## TRANSITION FROM THE LONDON INTERBANK OFFER RATE (LIBOR) TO ALTERNATIVE REFERENCE RATES

In July 2017, the UK Financial Conduct Authority (the FCA) announced its intention that it would no longer be necessary to persuade, or compel, banks to submit LIBOR rates after December 31, 2021. Since then, the FCA and other official sector bodies have strongly advised end-users of the need to transition from LIBOR by this date. On March 5, 2021, as a result of an Intercontinental Exchange (ICE) Benchmark Administration (IBA) consultation, the FCA announced that the publication of 1-week and 2-month U.S. dollar LIBOR would cease after December 31, 2021, and the publication of all other U.S. dollar LIBOR settings would cease or be deemed unrepresentative after June 30, 2023.

Ginnie Mae' LIBOR transition plan, which was previously approved by the Department of Housing and Urban Development (HUD) Secretary, has effectively coincided with the FCA's guidance and has, to date, been implemented with minimal disruptions with respect to the MBS Program and its participants. We continue to work closely with key stakeholders, including other federal agencies, to monitor and mitigate LIBOR cessation risks

from impacting operational processes and financial statement results moving forward.

In October 2020, we retroactively adopted Alternative Rates Reference Committee (ARRC) recommended fallback language into multiclass securities issued prior to March 2020. This appendage to existing LIBOR-linked contracts was in addition to our March 2020 announcement, which stated tranches indexed to LIBOR in the agency's multiclass securities issued after March 1, 2020, and beyond would also include ARRC recommended fallback language therein. The adoption of ARRC recommended language into all future and existing Ginnie Mae multiclass securities has allowed for contracts to effectively transition to an alternative reference rate, such as the Secured Overnight Financing Rate (SOFR), upon LIBOR's official cessation event outlined by the FCA.

With respect to the MBS instruments Ginnie Mae guarantees, prohibitions have been put in place for certain pooled loan securities going forward. These restrictions preclude floating rate loans indexed to LIBOR from being securitized within Ginnie Mae guaranteed MBS. The following changes were made regarding specific security types that have historically included floating rate loans indexed to LIBOR:

- **Ginnie Mae Single-Family Forward Program** – LIBOR-based single-family ARM are no longer eligible for pooling into Ginnie Mae securities. Effective January 1, 2021, all single-family forward ARM loans that rely on LIBOR, including LIBOR-based ARM-to-ARM loan modifications and re-performing LIBOR-based ARMs, are ineligible for pooling into any Ginnie Mae I or Ginnie Mae II security. After June      2023, the existing single-family ARM originated with LIBOR as their benchmark rate convert to the applicable replacement index. ARM mortgages have change dates of July 1, October 1, January 1, or April 1. Accordingly, transition and all conversions will be completed by July 1, 2024.

- *Ginnie Mae Reverse Program* – LIBOR-based HECM ARMs are no longer eligible for pooling into Ginnie Mae securities. Effective March 1, 2021, the first participation of any LIBOR-based HECM is ineligible to be securitized into HMBS. Subsequent participations (that is participations other than the first participation) that are associated with a HECM loan that is backing HMBS with an Issue Date of February 1, 2021, or earlier will continue to be eligible for securitization without restriction. On May      2023, Ginnie Mae announced the transition plan for existing LIBOR-based HECMs and HMBS. The monthly adjustable LIBOR-based HMBS will convert to the appliable replacement index by September 1, 2023, and the annually adjustable LIBOR-based HMBS will begin to transition to the replacement index on September 1, 2023.
- *Ginnie Mae Multifamily Program* – There are no LIBOR-based MBS in the Multifamily program.
- *Ginnie Mae Multiclass Program* – In September 2021, Ginnie Mae announced to Sponsors that December      2021, will be the last date to include LIBOR-indexed REMIC classes for new issuances of floating rate Multiclass Securities. As of March 2020, the SOFR has been an eligible index for new issuances of floating rate Multiclass Securities.

As of the date of this report, the majority of Ginnie Mae's mortgages are not linked to LIBOR. While we do hold MSRs that include LIBOR-linked instruments within the pooled underlying mortgages, the current impact to Ginnie Mae was deemed immaterial. For existing mortgages that are converting to replacement rates, the interest rate of the MBS will transition in a manner consistent with the treatment of the MBS as a fixed investment trust for U.S. federal income tax purposes. Going a step further beyond our current balance sheet, we identified that certain economic models with exposure to floating rate securities incorporate LIBOR as an input component. Through this assessment, we found there was limited impact to Ginnie Mae's current financial statements, including both the guaranty asset and guaranty obligation. However, if Ginnie onboards new MSRs in the event of issuer defaults, the transition from LIBOR to alternative reference rates may have a more significant impact than it does today. Accordingly, we will continue to assess all effects of the transition to our balance sheet alongside market activities and regulatory announcements.

## RISK FACTORS

### Risk Management

The OER oversees Ginnie Mae's Enterprise-wide Risk Management (ERM) program that establishes the organization's risk appetite and aligns it with its strategy, budget, objectives, and key performance indicators (KPIs). ERM includes environmental, social, and governance (ESG), cybersecurity, counterparty, financial control, third-party (i.e., contractors), fraud, and operational risks. Ginnie Mae's ERM approach helps leadership achieve our mission and goals by providing timely and accurate information on risk levels and potential critical effect on business outcomes.

### Credit Risk

Credit Risk is the risk of loss arising from another party's failure or inability to meet its financial and/or contractual obligations. Ginnie Mae is exposed to both borrower credit risk and counterparty credit risk.

Borrower credit risk is the risk of loss arising from the failure or inability of a borrower to meet its financial and/or contractual obligations. Ginnie Mae's borrower credit risk primarily consists of mortgage assets in the non-pooled loans portfolio which is composed of loans acquired from defaulted, terminated, and extinguished issuers of Ginnie Mae guaranteed MBS, and loans purchased/repurchased out of Ginnie Mae guaranteed MBS pools in accordance with Ginnie Mae MBS guidelines. Ginnie Mae's borrower credit risk also includes potential default from multifamily borrowers. Refer to Note 4: *Financial Guaranties and Financial Instruments with Off-Balance Sheet Exposure* and Note 7: *Mortgage Loans* for further information.

Counterparty credit risk is the risk of loss arising from the default of an issuer or other counterparty which may include, but is not limited to, trustees, mortgage servicers, document custodians, and other related institutions. Ginnie Mae considers several factors as part of the counterparty credit risk assessment process, including the issuer's financial and operational vulnerability, credit analysis, and other evidence of probability of default, such as known noncompliance with applicable laws and regulations, interest rates, and other economic conditions. Refer to Note 13: *Reserve for Loss* for further information.

### Concentrations of Credit Risk

Concentrations of credit risk exist when a significant number of issuers are susceptible to similar changes in economic conditions that could affect their ability to meet contractual obligations. This concentration of credit risk may be the result of several factors including, but not limited to, geographic or federal insurer/guarantor

concentration within the portfolio. Generally, Ginnie Mae MBS pools are diversified among issuers. Ginnie Mae issuers hold loans in all 50 states, several U.S. territories, and the District of Columbia, and this helps mitigate the risks associated with geographic concentrations. Risk arising from federal insurer/guarantor concentration exists when these agencies fail or are unable to meet their contractual obligations in the event of a severe economic downturn. However, this risk is deemed remote by Ginnie Mae given the federal backing of these agencies as well as their proven track record through historical economic downturns.

Natural disasters affecting Ginnie Mae's loan portfolio (pooled and non-pooled) occur throughout the year but are typically concentrated during each year's hurricane season. In Fiscal Year 2023, natural disasters had an immaterial impact on the Ginnie Mae loan population. Refer to Note 14: *Concentrations of Credit Risk* for further information.

### Model Risk

Ginnie Mae bears the risk of changes in fair value due to uncertainties related to underlying model inputs and the related difficulty in measurement. Refer to Note 10: *Fair Value Measurement* for illustration of the potential magnitude of certain alternate judgments, including how sensitive estimates are to assumptions based on changes in certain inputs. Ginnie Mae's Modeling and Valuation Committee meets quarterly to approve all key model assumptions and results for applicability and to analyze trends quarter over quarter.

Model risk is the potential for adverse results from decisions based on incorrect model inputs and outputs. OER uses models to determine the value of, and measure risk related to mortgage loans, HMBS obligations, the guaranty asset and related guaranty obligation, claims, advances, and other contingent liabilities. Prior to the adoption of CECL, OER also used models in measuring the allowance for loan losses for mortgage loans held for investment including accrued interest receivable. OER is responsible for developing, testing, and implementing the models.

Adjustments to existing models due to the current economic environment, such as the heightened inflation, rising interest rates, and the residual COVID-19 impact, are subjective and require management judgement. Ginnie Mae actively monitors the performance of its models and stands ready to effectuate changes based on observations and validation findings. OER performs various model testing on a yearly basis to measure the accuracy and effectiveness of modeled estimates. Furthermore, model validation is performed by an independent third-party firm.

### Cybersecurity Risk

Protecting the core and critical assets that Ginnie Mae relies upon for successful operations increases in complexity year over year. Malicious cyber actors continuously evolve their tactics and are highly adaptive against shifting defensive measures. Cyber criminals are increasingly more brazen in their targeting of Government and Financial/Banking organizations. As such, at Ginnie Mae, we have continued our commitment to developing and maturing a strong Cybersecurity Program—investing in innovative solutions, talent development that enables business transformation.

Fiscal Year 2023 initiatives were guided by the results of an independent, third-party Cybersecurity Assessment. The assessment measured Ginnie Mae's Cyber program maturity through a variety of lenses, which included cyber threat landscape, evaluation of the overall IT ecosystem and critical business processes, organizational structure, cybersecurity weaknesses, and IT resource allocation and investments. The assessment highlighted several strengths in Ginnie Mae's program that included early adoption and compliance with many of the principles outlined in Executive Order 14028, Advancing the Nation's Cybersecurity. Ginnie Mae's progress in moving to a consolidated cloud environment is transformative and leading practice amongst Federal organizations.

While the assessment highlighted several strengths, it also provided valuable insights regarding potential gaps and weaknesses in the program. These findings have shaped our strategic planning efforts and future investments for Fiscal Year 2024 and beyond. With governance being at the foundation, we have set a course to address many of the findings by clearly defining cybersecurity roles and responsibilities, developing uniform standards, publishing policies and procedures, and establishing improved training and awareness methods. Additionally, Ginnie Mae has increased its in-house resources to advance cybersecurity program objectives. We are committed to investing in, grooming, and retaining tech-fluent, analytical talent.

As we look ahead to Fiscal Year 2024, our strategic initiatives will continue to build on the investments and advancements made thus far, with an intense focus on resilience and readiness. In doing so, we will look for opportunities to advance automation and integration of security tools that enable our ability to measure and visualize cybersecurity risk, increase collaboration with our business partners and service providers. We expect to conduct more integrated Incident Response, Disaster Recovery, Continuity of Operations, or other simulation events. Ginnie Mae, in partnership with all program participants, must be able to monitor the full spectrum of risks, collaborate in real-time, and reduce the likelihood and impact of cyber-attacks.



A captivated audience listens during the Ginnie Mae 55th anniversary event.

## SOCIAL AND ENVIRONMENTAL IMPACT

Since our inception over 55 years ago, Ginnie Mae has been a leading social enterprise, contributing to expanding access to affordable housing and mortgage lending for historically underserved communities. Ginnie Mae's programs and products provide investors with a unique opportunity for values-aligned fixed-income investments. Through our products, investors are able to positively contribute to environmental and social outcomes while also accessing an expansive secondary market.

There are several driving factors behind our increased focus on Environmental, Social, and Governance (ESG) initiatives in recent years. One of these factors is rapid changes in the climate. Our planet continues to face a number of environmental challenges as we see a sharp increase in the frequency and severity of natural disasters. Another driving factor is increased investor interest in ESG investments. Ginnie Mae has historically been a driver of social change via the secondary mortgage market; thus, we have placed increased focus on opportunities to provide greater insight into the composition of our securities, highlighting our environmental and social impact. Growing investor interest in ESG investments has allowed us to harness a potential new source of demand furthering the impact we have on historically underserved communities.

To further drive the progress on ESG objectives, Ginnie Mae developed a strategic approach to identify and pursue ESG opportunities while also seeking to mitigate climate-related risks. Ginnie Mae's strategic plan (ESG journey map) includes four steps: 1) "ESG assessment", 2) "ESG roadmap", 3) "Enhance Disclosures", and 4) "Physical Climate Risk Assessment." These four steps were designed to help Ginnie Mae identify, set, and make progress towards strategic ESG goals over the short-, medium-, and long-term.

The sections below provide additional information on environmental, social and climate risk factors that are related to Ginnie Mae's mission and objectives.

### Environmental

Over the past several years, Ginnie Mae has been increasingly focused on disclosing how our securities support environmentally positive housing investments that also lower costs for renters. The descriptions and the timeline below give an overview of Ginnie Mae's progress on disclosing the environmental impact of our securities:

### 2021 and 2022

In 2021, Ginnie Mae partnered with the FHA to recognize our Green Mortgage Insurance Discount Program (Green MIP). The Green MIP is designed to incentivize borrowers to make energy-efficient improvements to their properties or to invest in new "green" properties. The program offers a reduction in the annual MIP rate to properties that meet certain green and energy efficiency standards defined by the HUD. Accordingly, Ginnie Mae was able to add the "Green" status field to our multifamily MBS disclosure. The addition of the "Green" status field to Ginnie Mae's MBS instruments in 2021 led to an increase in investment capital in 2022, resulting in Ginnie Mae receiving the Climate Bond Initiative Award for the Largest Green Asset-Backed Security Issuer of 2022 – a significant achievement for the MBS program. This award represents substantial environmental progress for Ginnie Mae and serves as a benchmark for other securities striving to achieve positive environmental impact.

### 2023

In Fiscal Year 2023, Ginnie Mae continues to provide multifamily "Green MBS" data at the pool-level, which identifies properties with "green" features, like energy-efficient windows or water-saving devices, as defined by the FHA. As of September 2023, the number of multifamily green loans (green/market, green/affordable, green/broadly affordable), that are securitized within Ginnie Mae backed MBS, is 1,961.

### Social

Through Ginnie Mae's MBS programs, Ginnie Mae supports low- and moderate-income (LMI) households and military veterans, among others, by expanding access to homeownership. The timeline below provides an overview of Ginnie Mae's progress towards communicating our unique value proposition as a key contributor to creating a more equitable housing finance system for all Americans:

### 2021 and 2022

In 2021, Ginnie Mae enhanced its single-family MBS disclosures to include information about the extent to which loans are supporting LMI areas. More specifically, these LMI Geographic disclosures provide investors with pool level aggregate information about the number of loans, percent of loans, UPB dollars, and percent UPB dollars across low- and moderate-income areas applicable to the pool. In 2022, Ginnie Mae enhanced its MBS disclosures to include the "Affordability" status on its multifamily securities. The "Affordability" status shows the Affordability code as passed on by the FHA.

### 2023

In Fiscal Year 2023, Ginnie Mae made significant progress in communicating critical information to investors about the significant and measurable positive impact Ginnie Mae's securities have on the lives of many lower-income households who achieve homeownership through



APP469

government lending. More specifically, Ginnie Mae enhanced ESG-related disclosures through four key projects to help communicate this message to investors:

1. **"Social Bond" label** – Ginnie Mae announced the launch of the "Social Bond" label for single-family forward MBS prospectuses. Similar to our Green Bond labels, which highlight environmental progress, the revisions to these MBS prospectuses highlight the structural aspects of Ginnie Mae's programs that promote broader access to mortgage financing for historically underserved communities.

2. **Social Impact and Sustainability Framework** – Ginnie Mae introduced the Social Impact and Sustainability Framework which provides an overview of Ginnie Mae's three focus areas for social impact and sustainability. These focus areas are 1) targeted populations, 2) affordable housing, and 3) green housing. The Framework provides further background on Ginnie Mae's history, structure and relation to the United States Government, products and services, and sustainability and impact disclosures.

3. **LMI disclosure** – Ginnie Mae announced the launch of new LMI disclosures designed to augment the LMI Geographic disclosure originally released in May 2021. As of September 2023, the number of underlying loans made to LMI borrowers, that are securitized within Ginnie Mae backed MBS, is 3,192,718. The new disclosures capture the number of underlying loans made to LMI borrowers, the percentage of LMI loan count of total loan count, the UPB of LMI loans in the MBS, and the percentage of LMI UPB of total MBS UPB.

4. **Composite of ESG metrics** – Ginnie Mae began disclosing the composite of ESG metrics, which is in part informed by the aforementioned LMI disclosures. The composite of ESG metrics is a visual depiction of MBS data that allows Ginnie Mae to highlight the program's positive impact and key ESG metrics for investors at a glance.

5. **ESG web page** – Ginnie Mae launched the ESG web page to provide a specific location for ESG-related resources. This web page improves access to ESG-related information and highlights in greater detail Ginnie Mae's ESG journey.

These initiatives have allowed Ginnie Mae to provide more visibility into how the underlying collateral in our MBS are designed to support a positive social and affordable housing outcome.

In addition to the positive impact from our MBS products, Ginnie Mae furthered our social impact by engaging with members of our community and creating an inclusive workplace for our employees. The Community Engagement and Human Capital Management subsections below provide greater detail on these efforts.

### Community Engagement

Ginnie Mae further communities by participating in several community service initiatives. For example, in December 2022, Ginnie Mae organized a toy and food drive to provide local families with gifts and nourishment for the holiday season. In July 2023, Ginnie Mae participated in Habitat DC-NOVA, where Ginnie Mae employees assisted Habitat for Humanity ReStore staff with collecting, organizing, and receiving donated materials. Lastly, Ginnie Mae continues to be actively engaged in FEDS Feed Families, a food drive designed to fight food insecurity.

### Human Capital Management

In addition to externally focused social factors, Ginnie Mae believes the dedication, determination, and collaboration of our employees and staff is a major driver of long-term success. As a continued investment in our people, Ginnie Mae's Workforce Innovation Team (WIT) and the Ginnie Mae



APP467

Employee Engagement Council (GMEEC) strive to foster a sense of belongingness and connectivity through social interaction among peers by hosting team building activities. Through these activities, Ginnie Mae hopes to increase engagement with our employees to improve employee satisfaction, retention, and workforce capability.

The WIT and GMEEC continued to focus on developing long-term workforce planning strategies and sponsoring initiatives to promote and achieve a culture of performance excellence and accountability, while supporting diversity, equity, fairness, and inclusion. For example, Ginnie Mae's Brown Bags and Café initiatives provide employees with valuable opportunities to come together, collaborate, and engage in discussions on vital topics aimed at strengthening employee engagement and human capital resource management insight.

In addition to meeting these objectives, Ginnie Mae has used the Brown Bag forum to highlight special observation months such as Dr. Martin Luther King, Jr. Day, African American History Month, National Women's History, National Fair Housing Month, Asian/Pacific American Heritage Month, LGBTQIA Pride Month, and National Hispanic Heritage Month. Insights gathered during our Ginnie Mae Café sessions have led to the delivery of a series of focused training workshops throughout the

organization. Information provided during these workshops have allowed employees to gather a diverse set of skills and skill enhancements from fostering open dialogues around sensitive topics to effective communication techniques that encourage idea sharing and decision-making with unity and commitment.

These initiatives built on the results from a 2022 enterprise-wide blended skills assessment that addressed both workforce planning and succession planning. The goal of the skills assessment was to identify a high performing talent pool; skills gaps (current and identified future skills needed within the Ginnie Mae workforce); and opportunities to close the skills gaps by:

a) Creating and implementing a strategic recruitment, hiring, and retention plan that focuses on gap closure of existing needs and identified future skills needs

b) Advising on recommended training offerings for employees who wish to move up in leadership by developing their leadership competencies

c) Identifying competency-specific training to recommend to existing Ginnie Mae employees to hone their competencies

### Climate Risk

In the last several years, Ginnie Mae has been increasingly focused on identifying and managing risks associated with climate change. The descriptions and the timeline below give a general overview of Ginnie Mae's progress since 2021.

#### *2021 and 2022*

In accordance with President Biden's Executive Order on Climate-Related Financial Risk issued on May 20, 2021, Ginnie Mae started seeking to comply with the federal government's expectation for "consistent, clear, intelligible, comparable, and accurate disclosure of climate-related financial risks". The actions Ginnie Mae has taken, along with assessing climate risks, align with the Executive Order's mandate, which states the need for agencies to formulate strategies that:

• Measure, assess, mitigate, and disclose climate-related financial risks to Federal Government programs, assets, and liabilities

• Address financing needs associated with achieving net-zero greenhouse gas emissions for the U.S. economy by no later than 2050, limiting global average temperature rise to 1.5 degrees Celsius, and adapting to the acute and chronic impact of climate change

APP468

- Identify areas in which private and public investments can play complementary roles in meeting financing needs

In Fiscal Year 2022 Ginnie Mae developed an initial framework to identify climate risks faced by the organization, the communities, and the broader housing market. An outside vendor was engaged to assist the identification of climate risk factors that will likely have a material impact on the mortgage industry and Ginnie Mae's ability to deliver on our mission.

### 2023

In Fiscal Year 2023 Ginnie Mae leveraged work done in previous years to identify two types of climate-related risks that are being closely monitored:

- **Physical risks** – Including direct damage to assets and indirect impact from supply chain disruption. Physical risks considered include, but are not limited to, the following: geographical distribution of current MBS portfolios and potential exposure to various natural disasters (flooding, wildfires, severe convective storms, among others); historical estimates of expected losses attributable to weather-related natural catastrophes by geographic region; and the impact to building safety and soundness from extreme heat, sea level rise and other precipitation variability.

- **Transition risks** – Including extensive policy, legal, technology, and market changes to transition to a lower-carbon economy. Transition risks considered include, but are not limited to, the following: increased homeownership costs to borrowers and operating costs for issuers; devaluation of property values in climate-impacted areas; population migration and adaptation requirements; a potential shift of investor preference to environmentally sustainable MBS products; and broader reputational risks.

Presently, internal Ginnie Mae risk models implicitly capture and address the impact of historical natural disasters on issuers, pooled loans, and non-pooled assets. Ginnie Mae recognizes the backward-looking nature of underwriting tools, such as flood maps, which may not be effective predictors of natural disasters. In response to the availability and evolution of climate data, and the observation of more frequent and severe weather events due to climate change (as well as their record-setting costs), Ginnie Mae plans to enhance monitoring and analysis of asset- and portfolio level climate risk exposure in the future.



A captivated audience, including Managing Director for International Markets Alven Lam and Senior Business Analyst, Office of Securities Operations Diego Leguizamon, is engaged with a Ginnie Mae presentation.

App. 361



In Fiscal Year 2023, Ginnie Mae added resources to explore more advanced modeling tools and to update our climate risk analysis over the coming years. Additionally, Ginnie Mae has been actively engaged with the HUD's Climate and Environmental Justice Working Group exploring ideas for including the potential needs of historically underrepresented communities in climate-related risk considerations. Based on research of industry practices on climate risk modeling, Ginnie Mae is developing a plan to incorporate forward looking climate risk modeling into the enterprise risk analysis framework. Collaboration with agencies, industry groups, and climate risk experts will inform the development and implementation of the plan.

## ACCOUNTING GOVERNANCE

### Audit Readiness

The U.S. Department of Housing and Urban Development Office of the Inspector General (OIG) has issued an unmodified audit opinion on Ginnie Mae's financial statements since 2020. Ginnie Mae has achieved this through its commitment to audit readiness, which has been evidenced by significant investment in technology, infrastructure, and personnel, spanning multiple years.

Central to its commitment to standardized, auditable financial records are Ginnie Mae's Subledger Database (SLDB) solution. This provides Ginnie Mae the capability to translate mortgage loan servicing data into loan-level accounting entries in an integrated system that supports appropriate accounting treatment in accordance with U.S. GAAP and Ginnie Mae's accounting policies. The SLDB solution has enabled Ginnie Mae personnel to more effectively perform critical accounting, reporting, data processing, technology support and oversight tasks required to track and report the non-pooled asset portfolio.

During Fiscal Years 2021, 2022, and 2023, Ginnie Mae continued to build upon the accomplishments achieved in Fiscal Year 2020, the first full year the SLDB solution was operational, gaining efficiencies through automation, standardization, and modernization of the existing technology. In regard to processing HECM loans in SLDB, a semi-automated solution was implemented in prior year. While significant manual effort was required for the onboarding of a HECM portfolio of an extinguished issuer in December 2022, SLDB and the semi-automated solution were pivotal to a successful and timely onboarding. Efforts to fully automate HECM loan processing, similar to other loan level assets, are ongoing with further optimization of accounting operations and automation of reporting and governance procedures planned. Ginnie Mae's existing capabilities and expected enhancements enable operational

APP470

and audit readiness in the event there is a need to onboard additional HECM portfolio.

Ginnie Mae has also placed a high level of emphasis on strengthening the overall internal control environment by enhancing our accounting policy governance and improving key processes to drive operational efficiencies. These activities are helping drive dynamic change within the finance function at Ginnie Mae, in an effort to continue to reach our strategic goals and instill reliability in the financial statements as a whole. During Fiscal Years 2022 and 2023, Ginnie Mae has also been diligently working to timely close out any remaining prior year findings and recommendations to maintain its audit readiness and unmodified audit opinion.

## Internal Controls

Ginnie Mae management is responsible for establishing, maintaining, and assessing internal controls to provide reasonable assurance that the objectives of the Federal Managers' Financial Integrity Act (FMFIA) of 1982 and the Federal Financial Management Improvement Act (FFMIA) of 1996 are met throughout the organization. OMB Circular No. A-123, Management's Responsibility for ERM and Internal Control, sets forth the guidance agencies must follow to meet the requirements of FMFIA and FFMIA. Ginnie Mae management is responsible for enacting and ensuring a strong internal control environment is in place to mitigate against reporting, financial, operational, and compliance risks. In addition, Ginnie Mae's OER provides guidance and manages the internal control framework for the organization, including conducting internal control

assessments and ERM activities, coordinating with other program offices to evaluate their monitoring and assessment results, and reporting these results to HUD. These assessments, reviews, and continuous monitoring of issuers and contractors enable Ginnie Mae to strengthen our internal controls and minimize risks that would negatively impact financial and operating results. Additionally, the consolidated evaluation of these assessments enable management to prepare a statement of assurance to report any deficiencies in internal control over financial reporting to HUD to ensure the auditability of Ginnie Mae's financial statements.

In reference to the ERM component of OMB Circular No. A-123, Ginnie Mae has delivered on the requirements and met the standards in accordance with the circular as of Fiscal Year 2022. Ginnie Mae developed a standard three-level risk taxonomy to identify, classify, and report the risks associated with the operations of each of the program offices. Each program office is assessed on an annual basis. These results are compiled, analyzed, and aggregated into Ginnie Mae's Risk Register which is provided to HUD leadership. Ginnie Mae management also uses this Risk Register to understand organizational challenges and prioritize activities for Ginnie Mae's ERM program.

Ginnie Mae undertook a restructuring of the Management Internal Control Program during Fiscal Year 2019 in order to implement the requirements of the revised OMB Circular No. A-123 to integrate ERM and internal control over financial reporting (ICFR). This change in structure reflects the requirements of the revised A-123 and *Government Accountability Office Standards for Internal*



APP471

*Control in the Federal Government* (the Green Book) to explicitly integrate ERM with traditional ICFR-only views of risks and controls. OER aligned appropriate resources, responsibility, and governance to establish the revised program, and has implemented a three-year plan to guide its risk management and control assessment strategy, while providing sufficient annual assessment support to comply with the A-123 reporting requirements.

Ginnie Mae began executing against this robust, integrated A-123 strategy in Fiscal Year 2019 and has continued since. During Fiscal Years 2022 and 2023, Ginnie Mae continued the development of comprehensive documentation and performed an assessment of internal controls supporting significant financial statement line items and classes of transactions, including the non-pooled assets. Based on the results of this assessments and other program enhancements, Ginnie Mae was able to provide reasonable assurance that the internal controls were designed appropriately and operating effectively for Fiscal Years 2022 and 2023.

Additionally, Ginnie Mae established and maintained financial management systems to substantially comply with the three essential requirements with FFMIA: Federal financial management system requirements, Federal accounting standards, and the U.S. Standard General Ledger at the transaction level. Ginnie Mae annually assesses whether the financial management systems substantially comply with the essential requirements. For Fiscal Years 2022 and 2023, Ginnie Mae has completed a review of our financial management systems and their compliance with OMB Circular A-123 Appendix D, FFMIA Implementation Guidelines, Federal Information Security Modernization Act (FISMA), and OMB Circular A-123: Management's Responsibility for ERM and Internal Controls. Based on the review, Ginnie Mae reported that all financial management systems were substantially in compliance with FFMIA, FISMA, and OMB Circular A-123.

As part of management's commitment to a strong internal control environment, Ginnie Mae continues to emphasize effective communication amongst all of the program offices to ensure the timely application of internal controls and review of policies, procedures, and related programs to ensure accounting transactions are consistently applied throughout the organization.

## OTHER KEY INFORMATION

### Impact of Adopting the Current Expected Credit Loss (CECL) Standard

In June 2016, the Financial Accounting Standards Board (FASB) issued Accounting Standards Update (ASU) No.

2016-13, *Financial Instruments—Credit Losses (Topic Measurement of Credit Losses on Financial Instruments*, which was later amended by ASU 2019-04, ASU 2019-05, and ASU 2019-11. These ASUs (collectively, the "CECL standard) replace the existing incurred loss impairment methodology for financial instruments that are collectively evaluated for impairment with a methodology that reflects lifetime expected credit losses and requires consideration of a broader range of reasonable and supportable forecast information to develop an estimate. Ginnie Mae adopted this guidance in the Fiscal Year beginning October 1, 2022, using the modified retrospective approach. Ginnie Mae elected the fair value option on mortgage loans held for investment including accrued interest, net and related reimbursable costs receivable and is required to recognize expected lifetime credit losses related to the contingent portion of its guaranty obligation, liability for loss on mortgage-backed securities program guaranty.

Prior to adopting this guidance, Ginnie Mae completed evaluations of data requirements and necessary changes to our fair value and credit loss estimation methods, processes, systems, and controls. Ginnie Mae also completed model validations and multiple tests of our full end-to-end allowance processes.

As a result of the adoption, Ginnie Mae recorded one-time adjustments to the impacted financial statement line items that resulted in a realized gain from mortgage loans held at fair value of $171.4 million, an increase to liability for loss on mortgage-backed securities program guaranty of $116.2 million, and a related increase to investment of U.S. Government of $55.2 million.

### Critical Accounting Estimates

Certain Ginnie Mae accounting policies require management to use estimates and judgments that affect the amounts reflected in our annual financial statements. Ginnie Mae has established policies, procedures, and internal controls to ensure that estimation methods, including any significant judgments, are appropriately reviewed and applied consistently from period to period. Such estimates and judgments inevitably involve varying degrees of uncertainty. Accordingly, certain amounts currently recorded in the financial statements will likely be adjusted in the future based on new available information, and changes in other facts and circumstances. The following is a brief description of Ginnie Mae's critical accounting estimates involving significant judgments.



**Critical Accounting Estimates Impacted by Adoption of the CECL Standard**

- ***Items Measured at Fair Value*** – Ginnie Mae carries several of our assets and liabilities at fair value. The guaranty asset is, and has historically been, measured at fair value on a recurring basis at the end of each reporting period. Ginnie Mae has elected the fair value option on forward mortgage loans, reverse mortgage loans, and HMBS obligations, which are also measured on a recurring basis at the end of each reporting period. Acquired properties (AP) are measured at fair value on a nonrecurring basis as they are reported at the lower of cost or market (LOCOM) subsequent to acquisition.

Estimating fair value requires the application of judgment. The type and level of judgment required is largely dependent on the amount of observable market information available to Ginnie Mae. All assets measured at fair value use internally developed valuation models and other valuation techniques that use significant unobservable inputs and are, therefore, classified within Level 3 of the valuation hierarchy in accordance with Accounting Standards Codification (ASC) 820. Refer to Note 2: *Summary of Significant Accounting Policies and Practices* and Note 10: *Fair Value Measurement* for further details on Ginnie Mae's processes for determining the fair value of the aforementioned assets and liabilities.

APP473

### Critical Accounting Estimates Prior to the Adoption of the CECL Standard

- ***Loss Allowance Estimate*** – Mortgage loans held for investment, including accrued interest are reported on Ginnie Mae's balance sheet net of an allowance. This allowance is intended to adjust the carrying value of non-pooled loans to reflect probable credit losses on each balance sheet date. For large groups of homogeneous loans that are collectively evaluated (pursuant to requirements in ASC 450-20, *Contingencies – Loss Contingencies*), Ginnie Mae aggregates our mortgage loans based on common risk characteristics, for example type of insurance or guaranty (FHA, VA, RD, PIH) associated with the loan or as uninsured loans. The allowance for loan losses estimate is calculated using statistical models that are based on historical loan performance and insurance recoveries. The estimate also includes qualitative factors, where applicable. Examples of changes in factors that will increase Allowance for Loan and Lease Losses (ALLL) include:

    » Increase in foreclosure timeline.

    » Decrease in house price.

    » Increase in portfolio delinquency.

  Ginnie Mae also considers a loan to be impaired when, based on current information, it is probable that amounts due, including interest, will not be recovered in accordance with the contractual terms of the loan agreement (pursuant to requirements under ASC     10, *Receivables – Overall*). Ginnie Mae measures impairment based on the present value of expected future cash flows. Refer to Note 7: *Mortgage Loans Held for Investment Including Accrued Interest, Net* for further information.

### Off-Balance Sheet Arrangements

Ginnie Mae enters into commitments to guarantee future MBS issuances in the normal course of business which are not recognized on the balance sheets. These commitments end when the securities are issued or the commitment period expires, 12 months and 24 months for single-family and multifamily issuers, respectively. Outstanding MBS commitments were $140.8 billion in Fiscal Year 2023 compared to $157.9 billion in Fiscal Year 2022. These outstanding commitments are not representative of Ginnie Mae's actual risk due in part to Ginnie Mae's ability to limit an issuer's request for pools or loan packages from the issuer's previously approved amount of commitment authority.

Ginnie Mae's highest potential off-balance sheet exposure to credit losses is related to the outstanding principal balance of our MBS held by third parties, which was $2.5 trillion as of September     2023, and $2.3 trillion as of September     2022. The maximum exposure is not a representation of Ginnie Mae's actual exposure as it does not consider the impact of insurance, recourse, or the recovery Ginnie Mae would receive by exercising Ginnie Mae's right to the underlying collateral. Ginnie Mae recognized guaranty obligation of $9.4 billion and $9.0 billion on September     2023 and 2022, respectively, related to this portfolio.

### Aggregate Contractual Obligations

Periodically, Ginnie Mae makes certain representations and warranties and indemnification clauses associated with Purchase and Sales Agreements (PSAs) that are enforceable and legally binding. These agreements may require Ginnie to repurchase loans that were previously sold to a third party or to indemnify the purchaser for losses if the loans are modified or not insured/guaranteed by the FHA, VA, USDA, or PIH. On September     2023 and 2022, Ginnie Mae recognized $17.3 thousand and $30.2 thousand as a contingent liability to account for these agreements.

### Financial System Enhancements and Automation

Throughout Fiscal Year 2023, enhancement initiatives have continued for Ginnie Mae's financial systems and supporting applications. This positions Ginnie Mae for end-to-end automated financial reporting and enduring readiness to accommodate future business and workflow requirements. Some key initiatives and enhancements are included below:

- ***SLDB Enhancements*** – As previously noted, the SLDB continues to be a crucial application for maintaining audit readiness. It was also key to the successful implementation of CECL and the onboarding of a HECM portfolio of an extinguished issuer. Accordingly, Ginnie Mae continued to invest in the modernization of the SLDB to improve operational efficiency. Notable efforts included migration to the cloud and standardization of data received by sub-servicers.

- ***Budget Transformation (BT) and Enterprise Planning and Budgeting Cloud Service (EPBCS)*** – The BT project transitions Ginnie Mae to a new budget management approach to enable more strategic and long-term financial planning. It seeks to maximize the return on investment for federal government resources.

APP475



**OFFICE of
INSPECTOR GENERAL**

UNITED STATES DEPARTMENT OF
HOUSING AND URBAN DEVELOPMENT

# Audit of Government National Mortgage Association's Fiscal Years 2023 and 2022 Financial Statements

**Audit Report Number:  2024-FO-0001**

**November 13, 2023**

**Financial Audits Division | Office of Inspector General**
**U.S. Department of Housing and Urban Development**

Date:       November 13, 2023

To:       Alanna McCargo
          President, Government National Mortgage Association, T

From:      //**signed**//
          Kilah S. White
          Assistant Inspector General for Audit, GA

Subject:   Transmittal of Independent Public Accountant's Audit Report on the Government National
          Mortgage Association's Fiscal Years 2023 and 2022 Financial Statements

Attached are the U.S. Department of Housing and Urban Development (HUD), Office of Inspector
General's (OIG) results of the audit of the Government National Mortgage Association's (Ginnie Mae)
fiscal years 2023 and 2022 financial statements and reports on internal control over financial reporting
and compliance with laws, regulations, contracts, and grant agreements and other matters.

We contracted with the independent public accounting firm of CliftonLarsonAllen LLP (CLA) to audit the
financial statements of Ginnie Mae as of and for the fiscal years ended September     2023 and 2022,
and to provide reports on Ginnie Mae's (1) internal control over financial reporting and (2) compliance
with laws, regulations, contracts, and grant agreements and other matters.  Our contract with CLA
required that the audit be performed in accordance with U.S. generally accepted government auditing
standards, Office of Management and Budget audit requirements, and the Financial Audit Manual of the
U.S. Government Accountability Office and the Council of the Inspectors General on Integrity and
Efficiency.

In its audit of Ginnie Mae, CLA reported
- That Ginnie Mae's financial statements as of and for the fiscal years ended September     2023
  and 2022, were presented fairly, in all material respects, in accordance with U.S. generally
  accepted accounting principles.
- No material weaknesses or significant deficiencies[1] for fiscal year 2023 in internal control over
  financial reporting, based on limited procedures performed.
- No reportable noncompliance issues for fiscal year 2023 with provisions of applicable laws,
  regulations, contracts, and grant agreements or other matters.

---

[1]  A material weakness is a deficiency or a combination of deficiencies in internal control over financial reporting,
such that there is a reasonable possibility that a material misstatement of Ginnie Mae's financial statements will
not be prevented or detected and corrected on a timely basis.  A significant deficiency is a deficiency or a
combination of deficiencies in internal control over financial reporting that is less severe than a material
weakness yet important enough to merit attention by those charged with governance.

**Office of Audit | Office of Inspector General**
451 7th Street SW, Room 8180, Washington, DC 20410 | www.hudoig.gov



APP477



In connection with the contract, we reviewed CLA's reports and related documentation and questioned its representatives.  Our review, as differentiated from an audit of the financial statements in accordance with U.S. generally accepted government auditing standards, was not intended to enable us to express and we do not express opinions on Ginnie Mae's financial statements or conclusions about (1) the effectiveness of Ginnie Mae's internal control over financial reporting and (2) Ginnie Mae's compliance with laws, regulations, contracts, and grant agreements or other matters.  CLA is responsible for the attached Independent Auditors' Report, dated November 13, 2023, and the conclusions expressed therein.  Our review disclosed no instances in which CLA did not comply, in all material respects, with U.S. generally accepted government auditing standards.

The Inspector General Act, as amended, requires that OIG post its reports on the OIG website.  Accordingly, this report will be posted at https://www.hudoig.gov.

If you have any questions or comments about this report, please call Brittany Wing, Audit Director, at (        7296.

---

**Office of Audit | Office of Inspector General**
451 7th Street SW, Room 8180, Washington, DC 20410 | www.hudoig.gov

APP478

**CliftonLarsonAllen LLP**
**CLAconnect.com**

## Independent Auditors' Report

Inspector General
U.S. Department of Housing and Urban Development

President
Government National Mortgage Association

In our audits of the fiscal years 2023 and 2022 financial statements of the Government National Mortgage Association (Ginnie Mae), we found:

- Ginnie Mae's financial statements as of and for the fiscal years ended September 2023, and 2022, are presented fairly, in all material respects, in accordance with United States of America (U.S.) generally accepted accounting principles;
- no material weaknesses for fiscal year (FY) 2023 in internal control over financial reporting based on the limited procedures we performed; and
- no reportable noncompliance for FY 2023 with provisions of applicable laws, regulations, contracts, and grant agreements we tested and no other matters.

The following sections discuss in more detail (1) our report on the financial statements, which includes required supplementary information (RSI)[1] and other information[2] included in the Annual Report; (2) our report on internal control over financial reporting; (3) our report on compliance with laws, regulations, contracts, and grant agreements and other matters; and (4) Ginnie Mae's response to our audit report.

### Report on the Audit of the Financial Statements

Opinion
We have audited the accompanying financial statements of Ginnie Mae, which comprise the balance sheets as of September    2023, and 2022; the related statements of revenues and expenses and changes in investment of U.S. Government, and cash flows for the fiscal years then ended; and the related notes to the financial statements.

In our opinion, Ginnie Mae's financial statements referred to above present fairly, in all material respects, Ginnie Mae's financial position as of September    2023, and 2022, and its revenues and expenses and changes in investment of U.S. Government, and cash flows for the fiscal years then ended in accordance with U.S. generally accepted accounting principles.

---

[1]  The RSI consists of "Management's Discussion and Analysis" which are included with the financial statements.
[2]  Other information consists of information included with the financial statements, other than the RSI and the auditors' report.

CLA (CliftonLarsonAllen LLP) is an independent network member of CLA Global. See CLAglobal.com/disclaimer.

Office of Audit | Office of Inspector General                                                    Page | 1

APP479

### INDEPENDENT AUDITORS' REPORT (Continued)

<u>Basis for Opinion</u>
We conducted our audits in accordance with the standards applicable to financial audits contained in *Government Auditing Standards*, issued by the Comptroller General of the United States (*Government Auditing Standards*); and Office of Management and Budget (OMB) Bulletin No. 24-01, *Audit Requirements for Federal Financial Statements* (OMB Bulletin 24-01) guidance. Our responsibilities under those standards are further described in the Auditors' Responsibilities for the Audit of the Financial Statements section of our report. We are required to be independent of Ginnie Mae and to meet our other ethical responsibilities, in accordance with the relevant ethical requirements relating to our audits. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

<u>Responsibilities of Management for the Financial Statements</u>
Management is responsible for (1) the preparation and fair presentation of the financial statements in accordance with U.S. generally accepted accounting principles; (2) preparing, measuring, and presenting the RSI in accordance with U.S. generally accepted accounting principles; (3) preparing and presenting other information included in the annual report, and ensuring the consistency of that information with the audited financial statements and the RSI; and (4) designing, implementing, and maintaining effective internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

In preparing the financial statements, management is required to evaluate whether there are conditions or events, considered in the aggregate, that raise substantial doubt about Ginnie Mae's ability to continue as a going concern for a reasonable period of time.

<u>Auditors' Responsibilities for the Audit of the Financial Statements</u>
Our objectives are to (1) obtain reasonable assurance about whether the financial statements as a whole are free from material misstatement, whether due to fraud or error, and (2) issue an auditors' report that includes our opinion. Reasonable assurance is a high level of assurance but is not absolute assurance and therefore is not a guarantee that an audit of the financial statements conducted in accordance with *Government Auditing Standards* will always detect a material misstatement or a material weakness when it exists. The risk of not detecting a material misstatement resulting from fraud is higher than for one resulting from error, as fraud may involve collusion, forgery, intentional omissions, misrepresentations, or the override of internal control. Misstatements, including omissions, are considered to be material if there is a substantial likelihood that, individually or in the aggregate, they would influence the judgment made by a reasonable user based on the financial statements.

In performing an audit in accordance with *Government Auditing Standards*, we:

- Exercise professional judgment and maintain professional skepticism throughout the audit.
- Identify and assess the risks of material misstatement of the financial statements, whether due to fraud or error, and design and perform audit procedures responsive to those risks. Such procedures include examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements.
- Obtain an understanding of internal control relevant to our audit of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of Ginnie Mae's internal control over financial reporting. Accordingly, no such opinion is expressed.

APP480

**INDEPENDENT AUDITORS' REPORT (Continued)**

- Evaluate the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluate the overall presentation of the financial statements.
- Perform other procedures we consider necessary in the circumstances.
- Conclude whether, in our judgment, there are conditions or events, considered in the aggregate, that raise substantial doubt about Ginnie Mae's ability to continue as a going concern for a reasonable period of time.

We are required to communicate with those charged with governance regarding, among other matters, the planned scope and timing of the audit, significant audit findings, and certain internal control related matters that we identified during the financial statement audit.

Required Supplementary Information
OMB Bulletin 24-01 requires that the RSI be presented to supplement the financial statements. Such information is the responsibility of management and, although not a part of the financial statements, is required by OMB, which considers it to be an essential part of financial reporting for placing the financial statements in an appropriate operational, economic, or historical context.

We have applied certain limited procedures to the RSI in accordance with *Government Auditing Standards*. These procedures consisted of (1) inquiring of management about the methods used to prepare the RSI and (2) comparing the RSI for consistency with management's responses to our inquiries, the financial statements, and other knowledge we obtained during the audits of the financial statements, in order to report omissions or material departures from OMB guidelines, if any, identified by these limited procedures. We did not audit, and we do not express an opinion or provide any assurance on the RSI because the limited procedures we applied do not provide sufficient evidence to express an opinion or provide any assurance.

Other Information
Ginnie Mae's other information contains a wide range of information, some of which is not directly related to the financial statements. This information is presented for purposes of additional analysis and is not a required part of the financial statements or the RSI. Management is responsible for the other information included in the annual report. The other information does not include the financial statements and our auditors' report thereon. Our opinion on the financial statements does not cover the other information, and we do not express an opinion or any form of assurance thereon.

In connection with our audits of the financial statements, our responsibility is to read the other information and consider whether a material inconsistency exists between the other information and the financial statements, or the other information otherwise appears to be materially misstated. If, based on the work performed, we conclude that an uncorrected material misstatement of the other information exists, we are required to describe it in our report.

APP481

## INDEPENDENT AUDITORS' REPORT (Continued)

**Report on Internal Control over Financial Reporting**

In connection with our audits of Ginnie Mae's financial statements, we considered Ginnie Mae's internal control over financial reporting, consistent with our auditors' responsibilities discussed below.

Results of Our Consideration of Internal Control over Financial Reporting

Our consideration of internal control was for the limited purpose described below and was not designed to identify all deficiencies in internal control that might be material weaknesses or significant deficiencies or to express an opinion on the effectiveness of Ginnie Mae's internal control over financial reporting. Given these limitations, during our FY 2023 audit, we did not identify any deficiencies in internal control over financial reporting that we consider to be material weaknesses. However, material weaknesses or significant deficiencies may exist that were not identified.

A *deficiency in internal control* exists when the design or operation of a control does not allow management or employees, in the normal course of performing their assigned functions, to prevent, or detect and correct, misstatements on a timely basis. A deficiency in design exists when (a) a control necessary to meet the control objective is missing or (b) an existing control is not properly designed so that even if the control operates as designed the control objective would not be met. A deficiency in operation exists when a properly designed control does not operate as designed or when the person performing the control does not possess the necessary authority or competence to perform the control effectively. A *material weakness* is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the entity's financial statements will not be prevented, or detected and corrected, on a timely basis. A *significant deficiency* is a deficiency, or a combination of deficiencies, in internal control over financial reporting that is less severe than a material weakness, yet important enough to merit attention by those charged with governance.

During our 2023 audit, we identified deficiencies in Ginnie Mae's internal control over financial reporting that we do not consider to be material weaknesses or significant deficiencies. Nonetheless, these deficiencies warrant Ginnie Mae management's attention. We have communicated these matters to Ginnie Mae management and, where appropriate, will report on them separately.

Basis for Results of Our Consideration of Internal Control over Financial Reporting

We performed our procedures related to Ginnie Mae's internal control over financial reporting in accordance with *Government Auditing Standards* and OMB audit guidance.

Responsibilities of Management for Internal Control over Financial Reporting

Ginnie Mae management is responsible for (1) designing, implementing, and maintaining effective internal control over financial reporting relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error; (2) evaluating the effectiveness of internal control over financial reporting based on the criteria established under    U.S.C. § 3512 (c), (d) (commonly known as the Federal Managers' Financial Integrity Act (FMFIA)); and (3) providing an assurance statement on the overall effectiveness of internal control over financial reporting included in management's discussion and analysis (MD&A).

APP482

**INDEPENDENT AUDITORS' REPORT (Continued)**

<u>Auditors' Responsibilities for the Consideration of Internal Control over Financial Reporting</u>
In planning and performing our audit of Ginnie Mae's financial statements as of and for the fiscal year ended September    2023, in accordance with *Government Auditing Standards*, we considered Ginnie Mae's internal control relevant to the financial statement audit in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of Ginnie Mae's internal control over financial reporting or on management's assurance statement on the overall effectiveness on internal control over financial reporting. Accordingly, we do not express an opinion on Ginnie Mae's internal control over financial reporting or on management's assurance statement on the overall effectiveness of internal control over financial reporting. We are required to report all deficiencies that are considered to be material weaknesses or significant deficiencies. We did not consider or evaluate all internal controls relevant to operating objectives as broadly established by the FMFIA, such as those controls relevant to preparing performance information and ensuring efficient operations.

<u>Definition and Inherent Limitations of Internal Control over Financial Reporting</u>
An entity's internal control over financial reporting is a process effected by those charged with governance, management, and other personnel. The objectives of internal control over financial reporting are to provide reasonable assurance that (1) transactions are properly recorded, processed, and summarized to permit the preparation of financial statements in accordance with U.S. generally accepted accounting principles, and assets are safeguarded against loss from unauthorized acquisition, use, or disposition, and (2) transactions are executed in accordance with provisions of applicable laws, including those governing the use of budget authority, regulations, contracts, and grant agreements, noncompliance with which could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent, or detect and correct, misstatements due to fraud or error.

<u>Purpose of Report on Internal Control over Financial Reporting</u>
The purpose of this report is solely to describe the scope of our consideration of Ginnie Mae's internal control over financial reporting and the results of our procedures, and not to provide an opinion on the effectiveness of Ginnie Mae's internal control over financial reporting. This report is an integral part of an audit performed in accordance with *Government Auditing Standards* in considering internal control over financial reporting. Accordingly, this report on internal control over financial reporting is not suitable for any other purpose.

**Report on Compliance with Laws, Regulations, Contracts, and Grant Agreements and Other Matters**

In connection with our audits of Ginnie Mae's financial statements, we tested compliance with selected provisions of applicable laws, regulations, contracts, and grant agreements consistent with our auditors' responsibilities discussed below.

<u>Results of Our Tests for Compliance with Laws, Regulations, Contracts, and Grant Agreements and Other Matters</u>
Our tests for compliance with selected provisions of applicable laws, regulations, contracts, and grant agreements disclosed no instances of noncompliance or other matters for FY 2023 that would be reportable under *Government Auditing Standards*. However, the objective of our tests was not to provide an opinion on compliance with laws, regulations, contracts, and grant agreements applicable to Ginnie Mae. Accordingly, we do not express such an opinion.

APP483

## INDEPENDENT AUDITORS' REPORT (Continued)

<u>Basis for Results of Our Tests for Compliance with Laws, Regulations, Contracts, and Grant Agreements and Other Matters</u>
We performed our tests of compliance in accordance with *Government Auditing Standards*.

<u>Responsibilities of Management for Compliance with Laws, Regulations, Contracts, and Grant Agreements</u>
Ginnie Mae management is responsible for complying with laws, regulations, contracts, and grant agreements applicable to Ginnie Mae.

<u>Auditors' Responsibilities for Tests for Compliance with Laws, Regulations, Contracts, and Grant Agreements</u>
Our responsibility is to test compliance with selected provisions of laws, regulations, contracts, and grant agreements applicable to Ginnie Mae that have a direct effect on the determination of material amounts and disclosures in Ginnie Mae's financial statements, and to perform certain other limited procedures. Accordingly, we did not test compliance with all provisions of laws, regulations, contracts, and grant agreements applicable to Ginnie Mae. We caution that noncompliance may occur and not be detected by these tests.

<u>Purpose of Report on Compliance with Laws, Regulations, Contracts, and Grant Agreements and Other Matters</u>
The purpose of this report is solely to describe the scope of our testing of compliance with selected provisions of applicable laws, regulations, contracts, and grant agreements, and the results of that testing, and not to provide an opinion on compliance. This report is an integral part of an audit performed in accordance with *Government Auditing Standards* in considering compliance. Accordingly, this report on compliance with laws, regulations, contracts, and grant agreements and other matters is not suitable for any other purpose.

**Ginnie Mae's Response to our Audit Report**

*Government Auditing Standards* requires the auditor to perform limited procedures on Ginnie Mae's response to our report. Ginnie Mae's response was not subjected to the auditing procedures applied in the audits of the financial statements, and accordingly, we express no opinion on the response. The complete text of Ginnie Mae's response is reprinted in Exhibit A.

**CliftonLarsonAllen LLP**

*Clifton Larson Allen LLP*

Greenbelt, MD
November 13, 2023

APP484

**EXHIBIT A**
**Ginnie Mae's Response to the Audit Report**

DocuSign Envelope ID: 809981D6-9721-48FC-88BF-861C4EBA9EE2



Office of the President
3rd Street, SW, Fifth Floor
Washington, DC    04
708-0026

| | |
|---|---|
| DATE: | November 8, 2023 |
| MEMORANDUM FOR: | Brittany Wing, Director, Contracted Financial Statement Audits, Financial Audits Division, HUD Office of Inspector General (OIG) |
| FROM: | Alanna McCargo, President, Government National Mortgage Association (Ginnie Mae) |
| SUBJECT: | Management Response to Fiscal Year (FY) 2023 Audit Report |

Ginnie Mae values the opportunity to respond to the Independent Auditors' Report for FY 2023. This audit was professionally conducted by CliftonLarson Allen (CLA) for the OIG and we take the role that they play on behalf of the American taxpayer, providing oversight and transparency over our financial reporting, important to our stakeholders, including investors, borrowers, and the capital markets.

This year's audit resulted in an unqualified audit opinion which Ginnie Mae is particularly proud of in light of the significant investment in our financial reporting function and previous efforts on audit remediation that have resulted in a strong internal control environment. The results of this audit are integral to maintaining the integrity of our enterprise and the role that Ginnie Mae plays in the capital markets.

Our team continued to experience a challenging economy, characterized by inflationary pressures and rising interest rates, leading to a turbulent housing market and significant escalation in delinquency for Ginnie Mae-based underlying reverse-legacy and defaulted Home Equity Conversion Mortgage (HECM) Mortgage Backed Security (HMBS) issuer and the restructuring of the portfolio at more than $20 billion. The restructuring of the defaulted issuer portfolio was a multidimensional effort encompassing operational and financial reporting readiness and Ginnie Mae's strong internal control environment. Our timely communications and successful collaboration across the organization, including HUD and OIG, resulted in the team's successful onboarding of over 115,000 loans.

We are proud of the financial results and program-level achievements in FY 2023. Our Results of Operations were $938 million, and MBS issuances of over $    billion increased the total value of Ginnie Mae's MBS portfolio to nearly $2.5 trillion. We also engaged in a variety of undertakings and partnerships to enhance our program, and further access of underserved borrowers to affordable credit and housing. We engaged in expanding opportunities for MBS solutions by strengthening partnerships with the Federal Home Loan Banks (FHLBanks), Community Development Financial Institutions (CDFIs), credit unions, and other state-level financial institutions. We implemented a new financial eligibility requirement developed alongside the Federal Housing Finance Agency (FHFA) to promote issuer resilience through deepening capital margins. We also expanded our Environmental, Social and Governance (ESG) product

APP485

**EXHIBIT A**
**Ginnie Mae's Response to the Audit Report**

offerings through enhanced disclosures and the roll-out of social bond language in our single-family Mortgage Backed Securities prospectuses, with the goal of generating greater investor demand for securities supporting ESG objectives.

We remain dedicated to our core mission of expanding access to affordable credit and housing by balancing our commitment to tapping global capital markets housing finance market goals minimizing risk to the taxpayer and we will continue to make investments in technology to advance our strategic goals. The commitment to these investments is a long-term commitment to rebuild the MBS securitization platform to take advantage of the possibilities offered by respectable technology. In FY 2023, we finalized our definition of Ginnie Mae's applications to the sound and confidence to expand access to our Digital Collateral Program to eligible issuers. These efforts position the MBS program/platform for long-term success by adding value for issuers and investors, expanding the ways Ginnie Mae fulfills its mission, and improving overall program resilience and security.

Striving for operational excellence and staying committed to our mission, while maintaining a strong fiscal and financial standing, is our core priority. The results of the internal external audit are an integral part of our operations, providing investor confidence and reassuring the strength of the securities we guarantee. We look forward to continuing to collaborate with OIG and we value the work our auditors do.

Office of Audit | Office of Inspector General                                          Page | 8

**Audit-11** | Our Guaranty Matters

APP486

APP487

# APPENDIX A

Government National Mortgage Association

Fiscal Year Financial Statements

September    2023

Government National Mortgage Association

Fiscal Year Financial Statements

September     2023

## Table of Contents

Balance Sheets ...................................................................................................................3

Statements of Revenues and Expenses and Changes in Investment of U.S. Government..............4

Statements of Cash Flows ......................................................................................................5

Notes to the Financial Statements...........................................................................................7

2

APP489

Government National Mortgage Association

| Balance Sheets | | | | |
|---|---|---|---|---|
| | | **2023** | | **2022** |
| | | September | | September |
| | | *(Dollars in thousands)* | | |
| **Assets:** | | | | |
| Cash and cash equivalents | $ | 28,494,701 | $ | 27,661,211 |
| Restricted cash and cash equivalents | | 1,683,383 | | 1,441,925 |
| Accrued fees and other receivables | | 133,195 | | 122,826 |
| Reimbursable costs receivable, net | | | | 23,981 |
| Claims receivable, net | | 59,787 | | 36,851 |
| Advances, net | | 416,595 | | 649 |
| Forward mortgage loans, at fair value | | 1,435,664 | | - |
| Reverse mortgage loans, at fair value | | 19,525,649 | | - |
| Mortgage loans held for investment including accrued interest, net | | - | | 1,570,208 |
| Acquired property, net | | 44,574 | | 6,160 |
| Fixed assets, net | | 46,528 | | 54,805 |
| Guaranty asset | | 8,352,885 | | 8,595,302 |
| Other assets | | 8,549 | | 4,313 |
| **Total Assets** | $ | **60,201,906** | $ | **39,518,231** |
| | | | | |
| **Liabilities and Investment of U.S. Government:** | | | | |
| | | | | |
| **Liabilities:** | | | | |
| Accounts payable and accrued liabilities | $ | 121,686 | $ | 96,632 |
| Deferred liabilities and deposits | | | | 774 |
| Deferred revenue | | 608,663 | | 594,853 |
| Liability for loss on mortgage-backed securities program guaranty | | 111,115 | | 10,934 |
| Liability for representations and warranties | | 17 | | |
| HMBS obligations, at fair value | | 19,147,154 | | - |
| Guaranty liability | | 9,371,617 | | 8,966,555 |
| **Total Liabilities** | $ | **29,360,654** | $ | **9,669,778** |
| | | | | |
| Commitments and Contingencies (See Note 15) | | - | | |
| Investment of U.S. Government | $ | 30,841,252 | $ | 29,848,453 |
| **Total Liabilities and Investment of U.S. Government** | $ | **60,201,906** | $ | **39,518,231** |

The accompanying notes are an integral part to these financial statements

3

APP490

Government National Mortgage Association

| Statements of Revenues and Expenses and Changes in Investment of U.S. Government | | |
|---|---|---|
| | For the year ended September | |
| | 2023 | 2022 |
| | *(Dollars in thousands)* | |
| **Revenues:** | | |
| Interest Income | | |
| Interest income on mortgage loans held for investment | $ - | $ 82,843 |
| Other interest income | 944,298 | 130,924 |
| Income on guaranty obligation | 824,828 | 2,034,881 |
| Mortgage-backed securities guaranty fees | 1,527,255 | 1,431,430 |
| Commitment fees | 85,221 | 130,493 |
| Multiclass fees | 37,632 | 33,649 |
| Mortgage-backed securities program and other income | 11,534 | 9,947 |
| **Total Revenues** | **$ 3,430,588** | **$ 3,854,167** |
| | | |
| **Expenses:** | | |
| Administrative expenses | $ (46,786) | $ (41,315) |
| Fixed asset amortization | (18,545) | (19,725) |
| Mortgage-backed securities program and other expenses | (477,109) | (313,837) |
| Acquired property expenses, net | (8,833) | (1,610) |
| **Total Expenses** | **$ (551,273)** | **$ (376,487)** |
| | | |
| **Recapture (provision):** | | |
| Recapture (provision) for mortgage loans held for investment including accrued interest, net | $ - | $ (30,587) |
| Recapture (provision) for mortgage-backed securities program guaranty | 15,981 | 8,551 |
| Recapture (provision) for reimbursable cost | - | 5,326 |
| Recapture (provision) for claims receivable | (8,446) | (5,193) |
| Recapture (provision) for loss on uncollectible advances | 66 | 120 |
| **Total Recapture (Provision)** | **$ 7,601** | **$ (21,783)** |
| | | |
| **Other Gain (Loss):** | | |
| Gain (loss) on forward mortgage loans, at fair value | $ (92,138) | $ - |
| Gain (loss) on reverse mortgage loans, at fair value | 1,968,690 | - |
| Gain (loss) on acquisition of HMBS obligations, at fair value | (282,679) | - |
| Gain (loss) on HMBS obligations, at fair value | (1,996,867) | - |
| Gain (loss) on guaranty asset | (1,545,856) | (2,401,950) |
| Gain (loss) other | (460) | 3,535 |
| **Total Other Gains / (Losses)** | **$ (1,949,310)** | **$ (2,398,415)** |
| | | |
| **Results of Operations** | **$ 937,606** | **$ 1,057,482** |
| | | |
| **Investment of U.S. Government at Beginning of Year** | $ 29,848,453 | $ 28,790,971 |
| Adjustment to Investment of U.S. Government | 55,193 | - |
| **Investment of U.S. Government at Beginning of Period** | **$ 29,903,646** | **$ 28,790,971** |
| **Investment of U.S. Government at End of Period** | **$ 30,841,252** | **$ 29,848,453** |

The accompanying notes are an integral part of these financial statements

4

APP491

Government National Mortgage Association

| Statements of Cash Flows | | | | |
|---|---|---|---|---|
| | | For the years ended September | | |
| | | 2023 | | 2022 |
| | | *(Dollars in thousands)* | | |
| **Cash Flows from Operating Activities** | | | | |
| **Results of Operations** | $ | 937,606 | $ | 1,057,482 |
| *Adjustments to reconcile results of operations to net cash (used for) provided by operating activities:* | | | | |
| Fixed asset depreciation and amortization | | 18,545 | | 19,725 |
| Provision (Recapture) for mortgage loans held for investment including accrued interest, net | | - | | 30,587 |
| Provision (Recapture) for mortgage-backed securities program guaranty | | (15,981) | | (8,551) |
| Provision (Recapture) for reimbursable costs | | - | | (5,326) |
| Provision (Recapture) for claims receivable | | 8,446 | | 5,193 |
| Provision (Recapture) for loss on uncollectible advances | | (66) | | (120) |
| Acquired property expenses, net | | 8,833 | | 1,566 |
| (Gain)/loss on forward mortgage loans, at fair value | | 92,138 | | - |
| (Gain)/loss on acquisition of HMBS obligations, at fair value | | 531,901 | | - |
| (Gain)/loss on reverse mortgage loans, at fair value | | (1,968,690) | | - |
| (Gain)/loss on HMBS obligations, at fair value | | 1,996,867 | | - |
| (Gain)/loss on guaranty asset | | 1,545,856 | | 2,401,950 |
| (Gain)/loss other | | 3,319 | | - |
| (Gain)/loss on liability for representations and warranties | | - | | - |
| Income on guaranty obligation | | (824,828) | | (2,034,881) |
| Interest income on mortgage loans held for investment | | - | | (5,355) |
| Mortgage-backed securities program and other expenses | | 21,775 | | - |
| *Changes in operating assets and liabilities:* | | | | |
| Accrued fees and other receivables | | (10,369) | | (3,416) |
| Claims receivable, net | | 1,442,567 | | 32,146 |
| Advances, net | | (415,880) | | 462 |
| Reimbursable costs receivable, net | | (45) | | (1,328) |
| Mortgage loans held for investment including accrued interest, net | | - | | - |
| Forward mortgage loans, at fair value | | - | | - |
| Reverse mortgage loans, at fair value | | - | | - |
| Acquired property, net | | (4,216) | | (483) |
| Other assets | | (4,194) | | ( |
| Accounts payable and accrued liabilities | | 23,426 | | 11,023 |
| Deferred liabilities and deposits | | ( | | (3,923) |
| Deferred revenue | | 13,811 | | 6,043 |
| HMBS obligations, net | | - | | - |
| **Net cash provided by (used in) operating activities** | $ | **3,400,448** | $ | **1,503,177** |
| | | | | |
| **Cash Flows from Investing Activities** | | | | |
| Proceeds from repayments and sales of forward mortgage loans, at fair value | $ | 233,573 | $ | - |
| Proceeds from repayments and sales of reverse mortgage loans, at fair value | | 1,524,171 | | - |
| Proceeds from repayments and sales of mortgage loans acquired as held for investment | | - | | 256,462 |
| Proceeds from the dispositions of acquired property and pre-foreclosure sales | | 33,188 | | 5,663 |
| Purchases of forward mortgage loans, at fair value | | (31,177) | | - |
| Purchases of reverse mortgage loans, at fair value | | (695,780) | | - |
| Purchases of loans held for investment including accrued interest, net | | - | | (16,691) |
| Purchases of fixed assets | | (13,628) | | (19,300) |
| **Net cash provided by (used in) investing activities** | $ | **1,050,347** | $ | **226,134** |
| | | | | |
| **Cash Flows from Financing Activities** | | | | |
| Payments of HMBS related obligations | $ | (3,375,847) | $ | - |
| **Net cash provided by (used in) financing activities** | $ | **(3,375,847)** | $ | **-** |
| | | | | |
| **Net change in cash and cash equivalents** | $ | 1,074,948 | $ | 1,729,311 |
| **Cash and cash equivalents, beginning of the period** | | 29,103,136 | | 27,373,825 |
| **Cash and cash equivalents, end of the period** | $ | **30,178,084** | $ | **29,103,136** |

5

Government National Mortgage Association

| **Supplemental Disclosure of Non-Cash Activities** | | |
|---|---|---|
| Transfers from forward mortgage loans, at fair value to claims receivable, net | $ 32,713 | $ - |
| Transfers from reverse mortgage loans, at fair value to claims receivable, net | 1,427,345 | - |
| Transfers from mortgage loans held for investment including accrued interest, net to claims receivable, net | - | 24,541 |
| Transfers from forward mortgage loans at fair value to acquired property, net | 3,897 | - |
| Transfers to reverse mortgage loans, at fair value to acquired property, net | 23,470 | - |
| Transfers from mortgage loans held for investment including accrued interest, net to acquired property, net | - | 6,273 |
| Transfers from mortgage loans held for investment including accrued interest, net to forward mortgage loans, at fair value | (1,807,939) | - |
| Transfers from reimbursable costs receivable, net to forward mortgage loans, at fair value | (35,010) | - |

The accompanying notes are an integral part of these financial statements

6

Government National Mortgage Association
Notes to the Financial Statements

**Notes to the Financial Statements**

### Note 1: Entity and Mission

The Government National Mortgage Association (Ginnie Mae) was created in 1968, through an amendment of Title III of the National Housing Act as a wholly owned United States (U.S.) government corporation within the U.S. Department of Housing and Urban Development (HUD). Ginnie Mae is a government corporation and, therefore, is exempt from both federal and state taxes. Ginnie Mae guarantees the timely payment of principal and interest (P&I) on Mortgage-Backed Securities (MBS) backed by federally insured or guaranteed mortgage loans to its MBS investors. The guaranty, which is backed by the full faith and credit of the U.S. government, increases liquidity in the secondary mortgage market and attracts new sources of capital for residential mortgage loans from investors. Ginnie Mae's role in the market enables qualified borrowers to have reliable access to a variety of mortgage products. Ginnie Mae's market is the U.S. and its Territories housing market.

Among those Ginnie Mae supports through the MBS program are:

- first-time home buyers;
- low and moderate-income households;
- borrowers in rural, or other areas, where credit access is limited;
- young professionals with unestablished credit histories;
- borrowers with lower credit scores;
- working families with little, or no, down payment;
- borrowers with higher debt to income ratios;
- the construction and renovation of multifamily housing;
- senior citizens who need housing and support services; and
- military veterans who have served the country.

Ginnie Mae requires all mortgages collateralizing guaranteed MBS to be insured or guaranteed by government agencies, including the Federal Housing Administration (FHA), the U.S. Department of Veterans Affairs (VA), the U.S. Department of Agriculture (USDA), and the Office of Public and Indian Housing (PIH)[1]. Ginnie Mae neither originates, purchases, or guarantees direct loans.

Ginnie Mae offers two single-class securities product structures – Ginnie Mae I MBS and Ginnie Mae II MBS:

- Ginnie Mae I MBS are pass-through securities providing monthly P&I payments to each investor. They are single-family, multifamily, or manufactured housing pools of mortgages with similar maturities and interest rates offered by a single issuer.
- Ginnie Mae II MBS are similar to Ginnie Mae I MBS but allow multiple-issuer and single-issuer pools. They permit the securitization of adjustable-rate mortgages (ARMs), manufactured home loans, and home equity conversion mortgages (HECM), and allows small issuers unable to meet the dollar requirements of the Ginnie Mae I MBS program to participate in the secondary mortgage market.

---

[1] *Ginnie Mae did not have any mortgage loans insured by PIH at September    2023, or September    2022. However, PIH insured mortgage loans may exist within MBS pools.*

7

Government National Mortgage Association
Notes to the Financial Statements

Ginnie Mae offers two multiclass securities product structures – Platinum Securities and Real Estate Mortgage Investment Conduits (REMIC) Securities:

- Ginnie Mae Platinum Securities are formed by combining Ginnie Mae MBS into a new single security. Platinum Securities can be constructed from both fixed rate and Ginnie Mae ARM Securities. They provide MBS investors with greater market and operating efficiencies, and may be used in structured financing, repurchase transactions, and general trading.
- REMIC Securities direct underlying MBS principal and interest payments to classes with different principal balances, interest rates, average lives, prepayment characteristics and final maturities. REMIC Securities allow issuers to have more flexibility for creating securities to meet the needs of a variety of investors. Principal and interest payments are divided into varying payment streams to create classes with different expected maturities, differing levels of seniority or subordination or other characteristics.

Ginnie Mae established the following four programs to support both Ginnie Mae I and II MBS, which serve a variety of loan financing needs and different issuer origination capabilities:

- *Single-Family Program* – consists of single-family mortgages originated for the purchase, construction, or renovation of single-family homes originated through FHA, VA, USDA, and PIH loan insurance programs;
- *Multifamily Program* – consists of FHA and USDA insured loans originated for the purchase, construction, or renovation of apartment buildings, hospitals, nursing homes, and assisted living facilities;
- *HECM Mortgage-Backed Securities (HMBS Program)* – consists of reverse mortgage loans insured by FHA; and
- *Manufactured Housing Program* – allows the issuance of pools of loans insured by FHA's Title I Manufactured Home Loan Program.

**Note 2: Summary of Significant Accounting Policies**

The following disclosures pertain to current practices followed by Ginnie Mae in accordance with its accounting policies, except as otherwise indicated.

**Basis of Presentation:** Ginnie Mae's functional currency is U.S. dollars and the accompanying financial statements have been prepared in that currency. The financial statements conform to U.S. GAAP, except as otherwise indicated.

**Going Concern:** The accompanying financial statements are prepared on a going concern basis and do not include any adjustments that might result from uncertainty about Ginnie Mae's ability to continue as a going concern.

**Use of Estimates:** The preparation of financial statements in conformity with U.S. GAAP, which requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, the disclosure of contingent assets and liabilities at the date of the financial statements, the reported amounts of revenues and expenses for the periods presented, and the related disclosures in the accompanying notes. Ginnie Mae evaluates these estimates and judgments on an ongoing basis and bases its estimates on experience, historical, current, and expected future conditions, third-party evaluations, and various other assumptions that Ginnie Mae believes are reasonable under the circumstances. The results of these estimates form the basis for

8

Government National Mortgage Association
Notes to the Financial Statements

making judgments about the carrying values of assets and liabilities, as well as identifying and assessing the accounting treatment with respect to commitments and contingencies.

Ginnie Mae has made significant estimates in a variety of areas including, but not limited to, fixed assets, net, and the valuation of certain financial instruments, such as mortgage servicing rights (MSR), acquired property, net; claims receivable, net and other loan-related receivables, guaranty assets, guaranty liability, HMBS obligations, at fair value, liability for representations and warranties, liability for loss on mortgage-backed securities program guaranty, forward mortgage loans, at fair value, and reverse mortgage loans, at fair value. Actual results could differ from those estimates.

**Fair Value Measurement:** Ginnie Mae uses fair value measurement for the initial recognition of certain assets and liabilities, periodic re-measurement of certain assets on a recurring and non-recurring basis, and certain disclosures. Fair value is defined as the price that would be received to sell an asset or paid to transfer a liability (an exit price) in an orderly transaction between market participants at the measurement date. Ginnie Mae bases its fair value measurements on an exit price that maximizes the use of observable inputs and minimizes the use of unobservable inputs.

**Fair Value Option:** The fair value option under *ASC 825: Financial Instruments* allows certain financial assets and liabilities, such as acquired loans, to be reported at fair value (with unrealized gains and losses reported in the Statement of Revenues and Expenses and Changes in Investment of U.S. Government and related cash flows classified as operating activities). The fair value option was elected by Ginnie Mae for the guaranty asset, and beginning October 1, 2022, mortgage loans, including forward mortgage loans, at fair value; reverse mortgage loans, at fair value and HMBS obligations, at fair value.

**Natural Disasters:** The occurrence of a major natural disaster, such as a hurricane, tropical storm, wildfires, flood, and other large-scale catastrophe, in an area where Ginnie Mae's pooled and non-pooled loans or properties are located could have an adverse impact on our financial condition and results of operations. An unpredictable natural disaster could negatively affect the ability of borrowers to continue to make principal and interest payments, increasing Ginnie Mae's credit losses. It could cause damage or destroy properties that Ginnie Mae owns, and Ginnie Mae may not have insurance coverage to offset all the losses. Further, a major disruptive event, such as a natural disaster, may negatively impact an issuer if the issuer's portfolio is highly concentrated in the affected region. This could lead to an increase in probability of the issuer's default and Ginnie Mae having to step into the role of the issuer. In doing so, Ginnie Mae would then need to assume all servicing rights and obligations of the issuer, including making timely principal and interest payments to the MBS investors. Finally, a natural disaster could negatively impact the valuation of the guaranty asset and MSR assets by having an adverse impact on significant modeling inputs and key economic assumptions, such as prepayment rates and default rates.

**Cash and Cash Equivalents:** Ginnie Mae's cash consists of cash held by the U.S. Treasury (Funds with U.S. Treasury) and cash that is held by the master sub-servicer (MSS) and the Trustee and Administrator of securities on Ginnie Mae's behalf but has not yet been transferred to Ginnie Mae (Deposits in transit). Cash equivalents consist of U.S. Treasury short-term investments issued with an original maturity date of three months or less. Cash receipts, disbursements, and investment activities are processed by the U.S. Treasury. All cash not classified as restricted cash is accessible

9

Government National Mortgage Association
Notes to the Financial Statements

in the event of an issuer default[2], termination and extinguishment[3].

***Funds with U.S. Treasury:*** Represent the available budget spending authority of Ginnie Mae according to the U.S. Treasury and is the aggregate amount of Ginnie Mae's accounts with the U.S. Treasury.

***Deposits in transit:*** Include principal, interest, and other payments collected by the MSS and the Trustee and Administrator of securities, on Ginnie Mae's behalf, in custodial accounts that have not yet been received by Ginnie Mae or remitted to the HMBS holders at the end of the reporting period.

***U.S. Treasury short-term investments***: Represent U.S. Treasury securities which are bought and sold at composite prices received from the Federal Reserve Bank of New York. These securities are maintained in book-entry form at the Bureau of Public Debt and include U.S. Treasury overnight certificates. U.S. Treasury overnight certificates are issued with a stated rate of interest to be applied to their par value with a maturity date of the next business day. These overnight certificates are measured at cost, which approximates fair value. Interest income on such securities is presented within other interest income in the Statement of Revenues and Expenses and Changes in Investment of U.S. Government.

**Restricted Cash and Cash Equivalents:** Cash and cash equivalents are classified as restricted when the statutes, regulations, contracts, or Ginnie Mae's statements of intentions legally limit the use of funds. Restrictions may include legally restricted deposits, contracts entered into with others, or the entity's statements of intention with regard to particular deposits. Restricted cash balances are recorded in a separate line item as restricted cash and cash equivalents. Ginnie Mae received approval from the Office of Management and Budget (OMB) to invest certain portions of restricted cash in U.S. Treasury short-term investments and Ginnie Mae is entitled to the interest income earned on these investments. Restricted cash and cash equivalents also include P&I payments that were not collected by security holders and unapplied deposits held in a suspense account until the appropriate application is determined.

**Escrow Funds (Held in Trust for MBS Certificate Holders or Mortgagors):** Escrow funds are held in trust for payments of mortgagors' taxes, insurance, and related items. These funds are collected by the MSS and held at depository institutions for which Ginnie Mae does not have access. This amount is $21.7 million and $23.6 million as of September        2023, and September        2022, respectively. The escrow balance as of September        2023, represents amounts submitted by the MSS. Escrow funds are not owned, invested, or controlled by Ginnie Mae. Ginnie Mae receives no current or future economic benefits, and there is no associated risk or reward to Ginnie Mae from the escrow funds. As such, escrow funds are not included on Ginnie Mae's Balance Sheet.

**Accrued Fees and Other Receivables:** Ginnie Mae's accrued fees and other receivables primarily include accrued guaranty fees. Accrued guaranty fees, which are based on the aggregate unpaid principal balances (UPB) of the guaranteed securities outstanding, are recorded in the month they

---

[2] *Issuer default is defined as any failure or inability of the issuer to perform its responsibilities under the Ginnie Mae MBS programs.*

[3] *Extinguishment occurs when defaulted issuer's right, title, and interest in the pooled mortgages is taken over by Ginnie Mae. Note that Ginnie Mae may sell the mortgage portfolio to another issuer, or take over the right, title, and interest from issuers after default.*

10

Government National Mortgage Association
Notes to the Financial Statements

are earned. Guaranty fees are discussed in Note 4: *Financial Guarantees and Financial Instruments with Off-Balance Sheet Exposure.*

Ginnie Mae is a designated recipient agency for criminal restitution payments as a result of court order in connection with criminal proceedings against certain defendants, primarily for fraud and false claims. U.S. District Courts are responsible for receiving payments, disbursing restitution to victims, and tracking the debt. Ginnie Mae has determined that these receivables are not probable of collection and have no net realizable value. This assessment is based on Ginnie Mae's position in the recovery hierarchy for debts from defendants, its historical experience with collections on these accounts, and the overall historical experience for the U.S. Government in collecting on this category of receivable.

**Claims Receivable, Net:** Claims receivable, net represents receivables from properties conveyed to insuring or guaranteeing agencies (FHA, VA, USDA, and PIH) and payments owed to Ginnie Mae from such insuring or guaranteeing agencies. Claims receivable consists of the following primary components:

***Short Sale Claims Receivable:*** As an alternative to foreclosure, a property may be sold for an agreed-upon price, at which the net proceeds fall short of the debts secured by liens against the property. Accordingly, short sale proceeds are often insufficient to fully pay off the mortgage. Ginnie Mae's MSS analyze mortgage loans for factors such as delinquency, the appraised value of the property collateralizing the loan, and market locale of the underlying property to identify loans that may be short sale eligible. Short sale transactions are analyzed and approved by the Office of Issuer and Portfolio Management (OIPM) at Ginnie Mae. For FHA-insured loans where the underlying property was sold in a short sale, the FHA typically pays Ginnie Mae the difference between the proceeds received from the sale and the total contractual amount of the mortgage loan and delinquent interest payments at the debenture rate (less the first two months of delinquent interest). FHA is the largest insurer for Ginnie Mae. Short sales on VA, USDA, and PIH guaranteed loans follow a similar process in which the claims receivable amount is determined in accordance with the respective agency guidelines. Ginnie Mae records a short sale claims receivable while it awaits repayment of the shortfall amount from the insuring or guaranteeing agencies.

***Foreclosed Property:*** Ginnie Mae records foreclosed property when the MSS receives title to a residential real estate property that has completed the foreclosure process in its respective legal jurisdiction, or when the mortgagor conveys all interest in the property to Ginnie Mae through its MSS to satisfy the loan through completion of a deed in lieu of foreclosure process or similar legal agreement. These properties differ from acquired properties as Ginnie Mae intends to convey the property to an insuring or guaranteeing agency, instead of marketing and selling the properties through the MSS. The claimed asset is measured based on the amount of the loan outstanding balance expected to be recovered from the insuring or guaranteeing agency.

***Assignment Claims Receivable:*** Ginnie Mae has the option, in its assumed role as issuer of HMBS, to repurchase reverse loans out of securitization pools once the outstanding principal balance of the related reverse mortgage loan is equal to or greater than 98% of the Maximum Claim Amount ("MCA"). Performing repurchased loans are assigned to the FHA in accordance with FHA insurance program requirements and the amount of the outstanding loan balance expected to be recovered from FHA as the insuring agency is recognized as an assignment claim receivable.

11

Government National Mortgage Association
Notes to the Financial Statements

***Allowance for Claims Receivable***: Once the claims receivable is established, Ginnie Mae periodically assesses its collectability by utilizing statistical models, which incorporate expected recovery based on the underlying insuring or guaranteeing agency guidelines, and Ginnie Mae's historical loss experience. Ginnie Mae records an allowance for claims that represents the expected unrecoverable amounts within the portfolio. Claims net of an allowance for claims is the amount that Ginnie Mae determines to be collectible.

The allowance for claims receivable includes effects of charge-offs, recoveries, and amounts deemed uncollectible from the insuring or guaranteeing agency. At initial recognition, a claims receivable is recognized for the amount recoverable from the insurers and any excess amounts not recoverable are charged-off against the allowance for loan losses.

***Charge-Off:*** Once losses are confirmed, Ginnie Mae charges-off any uncollectable amounts against the corresponding allowance.

***Recoveries:*** If the claim proceeds received exceed the claim receivable's carrying amount, Ginnie Mae will apply the excess to amounts previously charged-off (i.e., recovery) with any residual amounts recognized as a gain on the Statement of Revenues and Expenses and Changes in Investment of U.S. Government.

**Advances, Net:** Advances represent pass-through payments made to the MSS to fulfill Ginnie Mae's guarantee of timely P&I payments to MBS holders and excess funds paid to the MSS to service the HECM portfolio, including funding scheduled and unscheduled draws, reimbursable cost advances, FHA monthly insurance premiums paid on behalf of borrowers, and payments to HMBS investors for loan buyouts. Ginnie Mae reports Advances net of an allowance to the extent that management believes Advances will not be collected. The allowance is calculated based on expected recovery amounts from any mortgage insurance or guaranty per established insurance or guarantor rates, Ginnie Mae's collectability experience, and other economic factors.

**Acquired Property, Net:** Ginnie Mae recognizes acquired property when marketable title to the underlying property is obtained and the property has completed the foreclosure process, or the mortgagor conveys all interest in the residential real estate property to Ginnie Mae to satisfy the loan through the completion of a foreclosure or a deed in lieu of foreclosure or other similar legal agreement. These assets differ from "foreclosed property" as they are not conveyed to the insuring or guaranteeing agencies and Ginnie Mae will hold the title while the properties are marketed for sale by the MSS.

Ginnie Mae initially measures acquired property at its fair value, net of estimated costs to sell. At acquisition, a loss is charged-off against the allowance for loan losses account when the recorded investment in the loan exceeds the fair value, net of estimated cost to sell, of the acquired property. Conversely, any recovery of the fair value less estimated costs to sell over the recorded investment in the loan is recognized first to recover any forgone, contractually due P&I, and any excess is recognized in acquired property expenses, net in the Statement of Revenue and Expenses and Changes in Investment of U.S. Government before fair value option (FVO) election.

After FVO election, starting October 1, 2022, Ginnie Mae still initially measures acquired property at its fair value, net of estimated costs to sell. However, at acquisition, the difference between loan fair value and acquired property fair value, net of estimated costs to sell, is booked through gain (loss) on forward mortgage loans, at fair value or gain (loss) on reverse mortgage loans, at fair value, in the Statement of Revenue and Expenses and Changes in Investment of U.S. Government.

12

Government National Mortgage Association
Notes to the Financial Statements

Ginnie Mae subsequently measures acquired property at the lower of its carrying value or fair value less estimated costs to sell. Any subsequent write-downs to fair value, net of estimated costs to sell, from its carrying value (i.e., holding period write-downs) are recognized through a valuation allowance with an offsetting charge to acquired property expenses. Any subsequent increases in fair value, net of estimated costs to sell, up to the cumulative loss previously recognized through the valuation allowance are recognized in acquired property expenses, net in the Statement of Revenue and Expenses and Changes in Investment of U.S. Government.

Ginnie Mae records gains and losses on sales of acquired property as the difference between the net sales proceeds and the carrying value of the property, less amounts recoverable from the insuring or guaranteeing agency. These gains and losses are recognized through acquired property expenses, net on the Statement of Revenues and Expenses and Changes in Investment of U.S. Government.

Subsequent material development and improvement costs for acquired property are capitalized. Other post-foreclosure costs are expensed as incurred to acquired property expenses, net on the Statement of Revenues and Expenses and Changes in Investment of U.S. Government.

**Fixed Assets, Net**: Ginnie Mae's fixed assets consist of hardware and software. Ginnie Mae capitalizes costs based on guidance in *ASC        40: Intangibles – Goodwill and Other – Internal-Use Software* and *ASC        Property, Plant and Equipment*. Additions to fixed assets consist of improvements, newly purchased items, and betterments. Purchased software is recorded at cost and amortized using the straight-line method over its estimated useful life.

The capitalization of software development costs is governed by *ASC        40: Intangibles – Goodwill and Other – Internal-Use Software* if the software is for internal use. After the technological feasibility of the software has been established at the beginning of application development, software development costs, which primarily include salaries and related payroll costs and costs of independent contractors incurred during development, are capitalized. Research and development costs incurred prior to application development (for internal-use software), are expensed as incurred. Software development costs are amortized on a program-by-program basis using a straight-line method commencing on the date when ready for use. Ginnie Mae did not develop software to be marketed during the year ended September      2023, or the year ended September      2022.

Ginnie Mae depreciates its hardware assets using the straight-line basis over a three- to five-year period beginning when the assets are placed in service. Expenditures for ordinary repairs and maintenance are charged to expense as incurred.

Ginnie Mae amortizes its software assets using the straight-line basis over a three- to five-year period beginning when the assets are ready for their intended use. Ginnie Mae shall determine and periodically reassess the estimated useful life over which the capitalized costs will be amortized. Ginnie Mae assesses the recoverability of the carrying value of its long-lived assets, including finite-lived intangible assets, whenever events or changes in circumstances indicate the carrying amount of the assets may not be recoverable. Ginnie Mae evaluates the recoverability of such assets based on the expectations of undiscounted cash flows from such assets. If sum of the expected future undiscounted cash flows were less than the carrying amount of the asset, an impairment loss would be recognized for the difference between the fair value and the carrying amount. Refer to Note 11: *Fixed Assets, Net* for additional information.

13

APP500

Government National Mortgage Association
Notes to the Financial Statements

**Mortgage Servicing Rights:** MSRs represent Ginnie Mae's rights and obligations to service mortgage loans underlying a terminated and extinguished issuer's Ginnie Mae guaranteed pooled-loan portfolio. Ginnie Mae contracts with multiple MSS to provide the servicing of its pooled mortgage loans. The servicing functions typically performed by Ginnie Mae's MSS include collecting and remitting loan payments, responding to mortgagor inquiries, reporting P&I payments, holding custodial funds for payment of property taxes and insurance premiums, counseling delinquent mortgagors, supervising foreclosures and property dispositions, and generally administering the loans. Ginnie Mae receives a monthly servicing fee based on the interest portion of each monthly installment of P&I collected by the MSS on the pooled mortgage loans. The servicing fee is calculated based on the servicing fee percentage embedded in the MBS agreement. Ginnie Mae pays a sub-servicing expense to the MSS in consideration for servicing the loans.

In accordance with *ASC 860: Transfers and Servicing,* Ginnie Mae records a servicing asset (or liability) each time it takes over a terminated and extinguished issuer's Ginnie Mae guaranteed pooled-loan portfolio. The MSR asset (or liability) represents the benefits (or costs) of servicing that are expected to be more (or less) than adequate compensation to a servicer for performing the servicing. The determination of adequate compensation is a market notion and is made independent to Ginnie Mae's cost of servicing. Accordingly, Ginnie Mae's determination of adequate compensation is based on compensation active issuers demand in the marketplace. Typically, the benefits of servicing are expected to be more than adequate compensation for performing the servicing, and the contract results in a servicing asset. However, if the benefits of servicing are not expected to adequately compensate for performing the servicing, the contract results in servicing liability.

Ginnie Mae reports MSRs at fair value to better reflect the potential net realizable or market value that could be realized from the disposition of the MSR asset or the settlement of a future MSR liability. Consistent with *ASC 820: Fair Value Measurements,* to determine the fair value of the MSR, Ginnie Mae uses a discounted cash flow valuation model that calculates the present value of estimated future net servicing income. The valuation methodology factors in key economic assumptions and inputs including prepayment rates, costs to service the loans, contractual servicing fee income, ancillary income, escrow account earnings, delinquency rates- and the discount rate. In addition, the MSR also considers future expected cash flows for loans underlying a terminated and extinguished issuer's portfolio including credit losses. The discount rate is used to estimate the present value of the projected cash flows to estimate the fair value of the MSR. The discount rate assumptions reflect the market's required rate of return adjusted for the relative risk of the asset type. Upon acquisition, Ginnie Mae measures its MSRs at fair value and subsequently re-measures the MSR assets or liabilities with changes in the fair value recorded in the Statement of Revenues and Expenses and Changes in Investment of U.S. Government.

Ginnie Mae's MSR portfolio consists of FHA, VA, USDA, and PIH insured loans with similar collateral types and underwriting standard. Since these loans have similar risk profiles, Ginnie Mae identifies single-family residential MSRs and multifamily residential MSRs. As such, although MSRs are valued at the pool level, they are presented on a net basis (as a servicing asset or liability) at the aggregate class level. Ginnie Mae's MSR balance as of September      2023, and September      2022, is $307.5 thousand and $265.8 thousand, respectively, and is included within the other assets line item on the Balance Sheet.

14

Government National Mortgage Association
Notes to the Financial Statements

**Accounts Payable and Accrued Liabilities:** Ginnie Mae's accounts payable and accrued liabilities generally include obligations for items that have entered the operating cycle, such as accrued compensated absences and other payables. Amounts incurred by Ginnie Mae, but not yet paid at the end of the periods presented, are recognized as accounts payable and accrued liabilities.

***Compensated Absences:*** Under the Accrued Unfunded Leave and Federal Employees Compensation Act (FECA), annual leave and compensatory time are accrued when earned and the liability is reduced as leave is taken. The liability at period-end reflects cumulative leave earned but not taken, priced at current wage rates. Earned leave deferred to future periods is to be funded by future appropriations. To the extent that current or prior period appropriations are not available to fund annual leave earned but not taken, funding will be obtained from future financing sources. Sick leave and other types of leave are expensed as taken. Compensated absence balances are provided by HUD and included within accounts payable and accrued liabilities on the Balance Sheet.

***Other:*** Includes payables for fees incurred in the acquisition of services provided by the MSS and third-party vendors, unclaimed securities holders' payments, and a refund liability for transfer of issuer responsibility fees. Ginnie Mae uses estimates and judgments, as required under U.S. GAAP, to accrue for expenses when incurred, regardless of whether expenses were paid as of month-end.

Accounts payable and accrued liabilities balance is carried at cost, which approximates its fair value at the respective balance sheet dates.

**Deferred Liabilities and Deposits:** Ginnie Mae's deferred liabilities and deposits mainly represent restricted cash receipts from loan prepayments, curtailments, and payoffs from borrowers. These receipts must be directly refunded to the MSS for payment to the MBS investors.

**Deferred Revenue:** The classification of deferred revenue depends on the reason the revenue has not yet been recognized.

- ***Deferred revenue – multiclass fees:*** Deferred multiclass fee revenue represents the guaranty fees paid by the REMIC or Platinum Certificate sponsor, which are deferred and amortized into income evenly over the weighted average contractual life of the security unless truncated by early termination.
- ***Deferred revenue – commitment fees:*** Deferred commitment fee revenue represents payments received in advance of completion of Ginnie Mae's performance obligation. Commitment fee revenue is recognized in income over time as Ginnie Mae completes its performance obligation or the Commitment Authority expires.

Refer to Note 12: *Revenue from Contracts with Customers and Deferred Revenue* for further details.

**Liability for Representations and Warranties (Repurchase Liability):** Ginnie Mae may enter into business transactions and agreements, such as the sale of an MSR or loan portfolio, which provide certain representations and warranties associated with the underlying loans. If there is a breach of these contractual obligations, Ginnie Mae may be required to repurchase certain loans or provide other compensation. Ginnie Mae recognizes a loss contingency that arises from these obligations when it is probable that Ginnie Mae will be required to repurchase loans or provide other compensation. When a loss contingency that arises from such obligations is assessed as reasonably possible, Ginnie Mae discloses the estimate of the possible loss. Repurchase liabilities are measured initially and in subsequent periods under *ASC 450-20: Contingencies – Loss*

15

Government National Mortgage Association
Notes to the Financial Statements

*Contingencies.* In instances where the terms of these agreements are determined to include financial guaranties, Ginnie Mae recognizes expected credit losses related to the guaranties in accordance with *ASC       20: Financial Instruments – Credit Losses*.

Refer to Note 13: *Reserve for Loss* for details on Ginnie Mae's liability for representations and warranties balance.

**HMBS Obligations, at Fair Value:** HMBS obligations, at fair value, represents the acquisition of pools of HMBS accounted for as secured borrowing, which means Ginnie Mae has stepped into the role of issuer upon default, termination, and extinguishment of an HMBS issuer and retained HECM loans on its balance sheet, as the securitization structure has not met all of the requirements for sale accounting. The liability for pass through payments to HMBS security holders includes Ginnie Mae's assumed obligation to repay the secured borrowing to HMBS security holders, as well as obligations related to the servicing of the HECM loans and HMBS.

Refer to Note 10: *Fair Value Measurement* for further details on how the fair value of HMBS obligations is determined.

**Recognition of Revenues and Expenses:** *ASC 606: Revenue from Contracts with Customers*, establishes principles for reporting information about the nature, amount, timing, and uncertainty of revenue and cash flows arising from Ginnie Mae's contracts with customers. *ASC 606* requires Ginnie Mae to recognize revenue to depict the transfer of promised services to customers in an amount that reflects the consideration received in exchange for those services recognized as performance obligations being completed. A performance obligation may be satisfied over time or at a point in time. Revenue from a performance obligation satisfied over time is recognized based on the measurement of value to the customer of the services transferred by Ginnie Mae to-date relative to the remaining services promised under the contract. Revenue from a performance obligation satisfied at a point in time is recognized at the point in time the customer obtains control of the promised service. Commitment fees, Real Estate Mortgage Investment Conduit (REMIC) modification and exchange (MX) combination fees, and certain MBS program fees, such as transfer of issuer responsibilities, new issuer applications, certificate handling, and acknowledgement of agreement fees are in the scope of *ASC 606*, as these revenues are from Ginnie Mae's contracts with issuers (i.e., Ginnie Mae's customers in the ordinary course of business). The guidance in *ASC 606* applies to all contracts with customers except financial instruments and other contractual rights or obligations within the scope of *ASC       Receivables*, *ASC 860: Transfers and Servicing*, and guarantees within the scope of *ASC 460: Guarantees*, among other topics. As such, interest income on mortgage loans, other interest income, income on guaranty obligation, MBS guaranty fees, REMIC and Platinum Certificates guaranty fees, and certain MBS program and other fees are subject to other GAAP requirements for recognition and excluded from the scope of *ASC 606*.

Refer to Note 12: *Revenue from Contracts with Customers and Deferred Revenue* for disaggregation of revenue in the scope of *ASC 606*.

Ginnie Mae recognizes revenue from the following sources:

- ***Interest income on forward mortgage loans*** – Interest income on forward mortgage loans is included within the gain (loss) on forward mortgage loans, at fair value financial statement line item. Ginnie Mae accrues interest for loans at the contractual interest rate of

16

APP503

Government National Mortgage Association
Notes to the Financial Statements

the underlying mortgage. Any prepaid interest is recognized as deferred revenue when received.

- **Interest income on reverse mortgage loans –** Interest income on reverse mortgage loans is included within the gain (loss) on reverse mortgage loans, at fair value financial statement line item. Ginnie Mae accrues interest for reverse mortgage loans at the contractual interest rate of the underlying reverse mortgage.

- **Other interest income** – Ginnie Mae earns interest income on U.S. Government securities related to U.S. Treasury overnight certificates. Prior to 2018, Ginnie Mae earned and collected interest on uninvested funds, which was calculated using the applicable version of the Credit Subsidy Calculator 2 (CSC2) provided by the OMB. In September 2018, the U.S. Treasury clarified rules regarding the collection of interest on uninvested funds in the Financing Fund. Based on additional conversations with and clarifications from the U.S. Treasury, Ginnie Mae was not entitled to earn interest on uninvested funds without a signed borrowing agreement in accordance with the Federal Credit Reform Act of 1990. Ginnie Mae is in ongoing discussions with OMB and its legal counsel on whether it is fully subject to the provisions of the Federal Credit Reform Act of 1990. As a resolution of the matter between Ginnie Mae and OMB is pending, the U.S. Treasury and Ginnie Mae agreed that Ginnie Mae will not earn or collect interest on uninvested funds until the matter is resolved. Due to U.S. Treasury's new criteria for earning and collecting interest on uninvested funds, no interest income was earned and recognized on uninvested funds for the year ended September      2023. At present, there is uncertainty regarding the applicability of the Federal Credit Reform Act of 1990 to Ginnie Mae, and whether Ginnie Mae will be required to pay or earn such interest in the future.

- **Income on guaranty obligation** – Ginnie Mae amortizes its guaranty obligation into revenues based on the remaining UPB of the related MBS pools.

- **Mortgage-backed securities guaranty fees** – Ginnie Mae receives monthly guaranty fees for each MBS mortgage pool, based on a percentage of the pool's UPB. Fees received for Ginnie Mae's guaranty of MBS are recognized as earned.

- **Commitment fees** – Ginnie Mae receives commitment fees in exchange for providing review and approval services of commitment authority usage requests submitted by the issuers. This service allows for the approved issuer to pool mortgages into MBS that are guaranteed by Ginnie Mae.

  Ginnie Mae uses a third-party entity, the Pool Processing Agent (PPA), to determine whether the issuer has sufficient commitment authority to issue the pool or loan package and approve the issuance. Ginnie Mae recognizes commitment fee revenue based on the gross amount collected from the issuers because Ginnie Mae directs the PPA's services and is ultimately responsible for fulfilling the services performed by the PPA on Ginnie Mae's behalf.

  The total amount of the commitment fees is determined and paid at the time the issuer initially requests the commitment authority. Commitment fee revenue depends on the volume of commitment authority used, which is affected by changes in interest rates. Commitment fee revenue is recognized in income over time as issuers use their commitment authority, which represents the completion of Ginnie Mae's performance

17

Government National Mortgage Association
Notes to the Financial Statements

obligation. The remaining balance of the commitment fees is deferred until the service is used or expired, whichever occurs first. Fees from expired commitment authority are not returned to issuers and are recognized as income.

- ***Multiclass fees*** – Ginnie Mae receives one-time upfront fees related to the issuance of multiclass products. Multiclass products include REMICs and Platinum Certificates. The fees received for REMICs consist of a guaranty fee and may include a MX combination fee.

  The guaranty fee is paid by the REMIC sponsor and is based upon the total principal balance of the deal. It is deferred and amortized into income evenly over the weighted average contractual life of the security unless truncated by early termination. All deferred REMIC guaranty fee income is recognized at security termination.

  The MX combination fee allows the sponsor to combine REMIC and/or MX securities at the time of issuance. Ginnie Mae provides administrative services when MX combinations are requested by sponsors. Any permitted combinations by the sponsor are set forth in the combination schedule to an offering circular supplement. The MX combination fees are recognized immediately in income at the point in time when the administrative services are complete (i.e., upon the combination of REMIC and/or MX securities). Revenue earned from REMIC MX Combination fee depends on the demand for the service, which is affected by the interest rate environment.

  The guaranty fees received for Platinum Certificates are deferred and amortized into income evenly over the weighted average contractual life of the security.

- ***Mortgage-backed securities program and other income*** – Ginnie Mae recognizes income for MBS program related fees, including transfer of issuer responsibilities, new issuer applications, acknowledgement agreement fees, certificate handling, mortgage servicing, and civil monetary penalty.

  Transfer of issuer responsibility fees are one-time, upfront fees received by Ginnie Mae for providing review and approval services of issuers' requests to transfer responsibilities associated with their MBS. Transferors and transferees may reject the transfer at any time before its completion, even after Ginnie Mae approves it, which requires a fee refund. As such, the entire amount of consideration is constrained until the pool transfer is complete. Transfer of issuer responsibility fees are recorded as a refund liability and recognized as income when Ginnie Mae's performance obligation is complete and the uncertainty around the constraint is resolved (i.e., when pool transfer is complete).

  New issuer application fees, acknowledgment agreement fees, and certificate handling fees are one-time non-refundable upfront fees received by Ginnie Mae for providing various services related to the MBS program. These services include Ginnie Mae's consideration of the issuer's application to become an authorized MBS issuer, approval of an acknowledgment agreement permitting a pledge of servicing by an issuer, and providing evidence of security ownership. The fees are recognized in income when payment is received, as Ginnie Mae 's performance obligation is completed at that time.

Ginnie Mae receives various other fees which are recognized in income when payment is received.

18

APP505

Government National Mortgage Association
Notes to the Financial Statements

Ginnie Mae's expenses are classified into three groups:

- **Administrative expenses** – The main components of the administrative expenses are payroll expenses, travel and training expenses, benefit expenses, and other operating expenses.

- **Fixed assets depreciation and amortization** – Depreciation and amortization consists of depreciation on acquired, leased, and in-use hardware; and amortization of capitalized software acquired, leased, and in-use, by Ginnie Mae. Fixed assets are depreciated and amortized, on a straight-line basis, over a three to five-year period.

- **Mortgage-backed securities program and other expenses** – The main components of the MBS program and other expenses are multiclass expenses, MBS information systems and compliance expenses, sub-servicing expenses, asset management expenses, and pool processing and central paying agent expenses.

Amounts recognized as expenses represent actuals or, when actuals are not available, estimates of costs incurred during the normal course of Ginnie Mae's operations.

**Securitization and Guarantee Activities:** Ginnie Mae's primary business activity is to guarantee the timely payment of P&I on securities backed by federally insured or guaranteed mortgages issued by private institutions. Ginnie Mae approves issuers to pool loans and issue Ginnie Mae guaranteed MBS, or "virtual trusts", which is unlike substantially all the securitization market. Additionally, for federal income tax purposes, the Ginnie Mae pool is considered a grantor trust[4]. For consolidation purposes, each of these virtual trusts is considered individual legal entities and, in accordance with *ASC 810: Consolidation,* are considered variable interest entities (VIEs).

*Variable Interest Entities Model:*

For entities in which Ginnie Mae has a variable interest, Ginnie Mae determines whether, if by design, (i) the entity has equity investors who, as a group, lack the characteristics of a controlling financial interest, (ii) the entity does not have sufficient equity at risk to finance its expected activities without additional subordinated financial support from other parties or (iii) the entity is structured with non-substantive voting rights. If an entity has at least one of these characteristics, it is considered a VIE, and is consolidated by its primary beneficiary. The primary beneficiary is the party that (i) has the power to direct the activities of the entity that most significantly impact the entity's economic performance; and (ii) has the obligation to absorb losses or the right to receive benefits from the entity that could potentially be significant to the entity. Only one reporting entity, if any, is expected to be identified as the primary beneficiary of a VIE. Ginnie Mae reassesses its initial evaluation of whether an entity is a VIE upon occurrence of certain reconsideration events.

Ginnie Mae's involvement with legal entities that are VIEs is limited to providing a guaranty on interest payments and principal returns to MBS holders of the Ginnie Mae virtual trusts. Ginnie Mae is not the primary beneficiary of the Ginnie Mae virtual trusts as it does not have the power to control the significant activities of the trusts. Other than its guaranty, Ginnie Mae does not provide, nor is it required to provide, any type of financial or other support to these entities. The guaranty fee receivable represents compensation for taking on the risk of providing the guaranty

---

[4] *This liability for pass through payments includes Ginnie Mae's assumed obligation to repay the secured borrowing to HMBS security holders, as well as obligations related to the servicing of the HECM loans and HMBS.*

19

Government National Mortgage Association
Notes to the Financial Statements

to MBS certificate holders for the timely payment of P&I in the event of issuers' default. Ginnie Mae's maximum potential exposure to loss under these guaranties is primarily comprised of the amount of outstanding MBS and commitments and does not consider loss recoverable from the FHA, VA, USDA, and PIH.

The following table presents assets and liabilities that relate to Ginnie Mae's interest in VIEs:

| | September 2023 | September 2022 |
|---|---|---|
| | *(Dollars in thousands)* | |
| Guaranty asset | $ 8,352,885 | $ 8,595,302 |
| Guaranty fee receivable | 128,000 | 121,000 |
| **Total** | **$ 8,480,885** | **$ 8,716,302** |
| | | |
| Guaranty liability | $ 9,371,617 | $ 8,966,555 |
| Liability for loss on mortgage-backed securities program guaranty | 111,115 | 10,934 |
| **Total** | **$ 9,482,732** | **$ 8,977,489** |
| | | |
| Maximum exposure to loss: | | |
| Outstanding MBS | $ 2,472,843,019 | 2,284,456,605 |
| Outstanding MBS commitments | 140,780,632 | 157,894,490 |
| **Total** | **$ 2,613,623,651** | **$ 2,442,351,095** |

Refer to Note 4: *Financial Guarantees and Financial Instruments with Off-Balance Sheet Exposure* for further details.

**The Current Expected Credit Loss Standard**

In June 2016, the Financial Accounting Standards Board (FASB) issued Accounting Standards Update (ASU) No. 2016-13, *Financial Instruments – Credit Losses* (Topic      Measurement of Credit Losses on Financial Instruments, which was later amended by ASU 2019-04, ASU 2019-05, and ASU 2019-11. These ASUs (collectively, the "CECL standard") replace the existing incurred loss impairment methodology for financial instruments that are collectively evaluated for impairment with a methodology that reflects lifetime expected credit losses and requires consideration of a broader range of reasonable and supportable forecast information to develop an estimate. Ginnie Mae adopted this guidance in the Fiscal Year beginning October 1, 2022, using the modified retrospective approach. Ginnie Mae elected the fair value option on mortgage loans held for investment including accrued interest, net and related reimbursable costs receivable. Ginnie Mae is also required to recognize expected lifetime credit losses related to the contingent portion of its guaranty obligation, which is recognized in liability for loss on mortgage-backed securities program guaranty.

Prior to adopting this guidance, Ginnie Mae completed evaluations of data requirements and necessary changes to its fair value and credit loss estimation methods, processes, systems, and controls. Ginnie Mae also completed model validations of its full end-to-end fair value and allowance processes.

**Significant Accounting Policies Impacted by Adoption of the CECL Standard**

**Mortgage Loans:** When a Ginnie Mae issuer defaults, and is terminated and extinguished, Ginnie Mae steps into the role of the issuer and assumes all servicing rights and obligations of the issuer's entire Ginnie Mae guaranteed portfolio, including making timely pass-through payments. Ginnie Mae utilizes the MSS to service these portfolios. There are currently two MSS that service the terminated and extinguished issuer portfolios of pooled and non-pooled loans.

20

Government National Mortgage Association
Notes to the Financial Statements

In its role as issuer, Ginnie Mae assesses individual loans within its pooled portfolio to determine whether the loan must be purchased out of the pool. Ginnie Mae must purchase mortgage loans out of the MBS pool when the mortgage loans are ineligible for insurance or guaranty by the FHA, VA, RD, or PIH, as well as loans that have been modified beyond the trial modification period. Additionally, Ginnie Mae has the option to purchase mortgage loans out of the MBS pool when the mortgage loans are insured or guaranteed but are delinquent for more than 90 days.

Ginnie Mae also has the option to repurchase reverse mortgage loans out of the securitization pools in certain instances. These situations include when the outstanding principal balance of the related HECM loan is equal to or greater than 98% of the MCA and the borrower's loan becoming due and payable under certain circumstances; the borrower not occupying the home for greater than twelve consecutive months for physical or mental illness, and the home is not the residence of another borrower; or the borrower failing to perform in accordance with the terms of the loan.

Ginnie Mae has elected to irrevocably apply FVO accounting to its mortgage loans purchased out of the pool described above, as part of the adoption for *ASC      Financial Instruments – Credit Losses* and the transition relief afforded by the guidance. The election allows Ginnie Mae to provide meaningful information to the users of the financial statements, as fair value provides a proxy into market participants' viewpoint on value of these instruments as of the measuring date, with considerations of both market and credit risks. The election also allows Ginnie Mae to classify its forward and reverse mortgage loans to be held at fair value.

**Forward Mortgage Loans, at Fair Value (forward MFV):** Forward mortgage loans, at fair value includes traditional mortgage loans acquired upon default of a Ginnie Mae MBS issuer. Ginnie Mae reports the carrying value of forward mortgages in Forward mortgage loans, at fair value on the Balance Sheet at the fair value of the UPB, accrued interest and reimbursable costs receivables, as required by U.S. GAAP.

*Accrued interest receivable:* Ginnie Mae accrues interest on forward mortgage loans at the contractual rate. Interest income on forward MFV is reported in the gain (loss) on forward mortgage loans, at fair value financial statement line item on the Statement of Revenue Expenses and Changes in U.S. Government.

*Changes in fair value:* On a quarterly basis, Ginnie Mae evaluates the fair value of forward MFV and assesses whether adjustments need to be made to account for the changes in the fair value of forward MFV. Gains and losses from fair value changes of forward MFV are reported in the gain (loss) on forward mortgage loans, at fair value financial statement line-item on the Statement of Revenue Expenses and Changes in U.S. Government.

**Reverse Mortgage Loans, at Fair Value (reverse MFV):** Reverse mortgage loans, at fair value includes home equity conversion mortgage (HECM) loans acquired upon default of a Ginnie Mae HMBS issuer. HECMs provide seniors aged 62 and older with a loan secured by their home which can be taken as a lump sum, line of credit, or scheduled payments. HECM loan balances grow over the loan term through borrower draws of scheduled payments or line of credit draws, funded by the issuer, as well as through the accrual of interest, servicing fees, and FHA mortgage insurance premiums.

HECM loan balances are included within reverse mortgage loans, at fair value, and are comprised of securitized HECM loans subject to HMBS obligations as well as any unsecuritized interests that relate to partially securitized HECM loans.

21

APP508

Government National Mortgage Association
Notes to the Financial Statements

*Accrued interest receivable:* Ginnie Mae accrues interest on reverse mortgage loans, at fair value at the contractual rate. Interest income on reverse MFV is reported in the gain (loss) on reverse mortgage loans, at fair value financial statement line item on the Statement of Revenue Expenses and Changes in U.S. Government.

*Changes in fair value:* On a quarterly basis, Ginnie Mae evaluates the fair value of reverse MFV and assesses whether adjustments need to be made to account for the changes in the fair value. Gains and losses from fair value changes of reverse MFV are reported in the gain (loss) on reverse mortgage loans, at fair value financial statement line-item on the Statement of Revenue Expenses and Changes in U.S. Government.

**Reimbursable Costs Receivable, Net:** Costs incurred on pooled forward loans, that are expected to be reimbursed, are recorded as reimbursable costs receivable, and reported net of an allowance for amounts that management believes will not be collected. These costs for non-pooled forward and reverse loans are included within forward and reverse mortgage loans, at fair value effective October 1, 2022. Reimbursable costs arise when there are insufficient escrow funds available to make scheduled tax and insurance payments for loans serviced by Ginnie Mae, wherein Ginnie Mae advances funds to cover the escrow shortfall to preserve a first lien position on the underlying collateral. In addition, Ginnie Mae advances funds to cover servicing related expenses to preserve the value of the underlying collateral. The allowance for reimbursable costs is estimated based on historical loss experience, which includes expected collections from the mortgagors, proceeds from the sale of the property, and reimbursements collected from third-party insurers or guarantors (FHA, VA, USDA, and PIH).

**Financial Guarantees:** Ginnie Mae's financial guaranty obligates Ginnie Mae to stand ready, over the term of the guaranty, to advance funds to cover any shortfall of P&I to the MBS holders in the event of an issuer default.

Ginnie Mae, as guarantor, follows the guidance in *ASC 460: Guarantees,* for its accounting and disclosure of its guaranties. As these guaranties are within the scope of *ASC*    expected credit losses (the contingent aspect) are measured and accounted for in addition to and separately from the fair value of the guaranty (the noncontingent aspect), which is measured in accordance with *ASC 460*.

At inception of the guaranty, Ginnie Mae recognizes the guaranty obligation (the noncontingent aspect) at fair value. When measuring the guaranty liability under *ASC 460*, Ginnie Mae applies the practical expedient, which allows for the guaranty obligation to be recognized at inception based on the premium received or the receivable owed to the guarantor, provided the guaranty is issued in a standalone arm's length transaction with an unrelated party. The fair value of the guaranty obligation is calculated using the discounted cash flows of the expected future premiums from guaranty fees over the expected life of the mortgage pools. The estimated fair value includes certain assumptions such as future UPB, prepayment rates, issuer buyouts and default rates.

Guaranties are issued on standalone transactions for a premium and Ginnie Mae records a guaranty asset for the same value as the guaranty liability at inception. These offsetting entries are equal to the considerations received and have a neutral net impact upon the initial recognition of the guaranty liability and guaranty asset on the net financial position of Ginnie Mae.

Refer to Note 4*: Financial Guarantees and Financial Instruments with Off-Balance Sheet Exposure* for further details.

22

APP509

Government National Mortgage Association
Notes to the Financial Statements

**Liability for Loss on Mortgage-Backed Securities Program Guaranty:** U.S. GAAP requires Ginnie Mae to recognize a loss contingency that arises from the following:

- The guaranty obligation that Ginnie Mae has to the MBS holders as a result of a probable issuer default. The issuers have the obligation to make timely P&I payments to MBS certificate holders. However, if an issuer defaults, Ginnie Mae ensures the contractual payments to MBS certificate holders are made. When assessing whether an issuer may default, Ginnie Mae takes into consideration various factors including the issuer's financial and operational vulnerability, a qualitative and quantitative corporate credit analysis, and other evidence of the issuer's potential default (e.g., known regulatory investigations or actions).

- The obligation that Ginnie Mae has to the multifamily MBS issuers to reimburse them for applicable losses in the event of a loan default, pursuant to the Multifamily Guaranty Agreement.

The contingent aspect of the guaranty obligation is measured initially and in subsequent periods under *ASC 20: Financial Instruments – Credit Losses*.

Refer to Note 13: *Reserve for Loss* for details on Ginnie Mae's current practice.

**Significant Accounting Policies Prior to Adoption of the CECL Standard**

**Mortgage Loans Held for Investment Including Accrued Interest, Net:** When a Ginnie Mae issuer defaults, and is terminated and extinguished, Ginnie Mae steps into the role of the issuer and assumes all servicing rights and obligations of the issuer's entire Ginnie Mae guaranteed portfolio, including making timely pass-through payments. Ginnie Mae utilizes the MSS to service these portfolios. There are currently two MSS that service the terminated and extinguished issuer portfolios of pooled and non-pooled loans.

In its role as issuer, Ginnie Mae assesses individual loans within its pooled portfolio to determine whether the loan must be purchased out of the pool. Ginnie Mae must purchase mortgage loans out of the MBS pool when the mortgage loans are ineligible for insurance or guaranty by the FHA, VA, USDA, or PIH, as well as loans that have been modified beyond the trial modification period. Additionally, Ginnie Mae has the option to purchase mortgage loans out of the MBS pool when the mortgage loans are insured or guaranteed but are delinquent for more than 90 days.

*Mortgage Loans Held for Investment:* Ginnie Mae has the intent and ability to hold acquired loans for the foreseeable future or until maturity, therefore, the mortgage loans are classified as held for investment (HFI). Ginnie Mae reports the carrying value of HFI loans on the Balance Sheet at the UPB along with accrued interest, net of cost basis adjustments, and net of allowance for loan losses including accrued interest, as required by U.S. GAAP. In the event that Ginnie Mae clearly identifies mortgage loans that it intends to sell, as well as develops a formal marketing strategy or plan of sale, Ginnie Mae will reclassify the applicable loans from HFI to held for sale (HFS). For loans which Ginnie Mae initially classified as HFI and subsequently transfers to HFS, those loans would be recognized at the lower of cost or fair value until sold, with any related cash flows classified as operating activities. At September 2023, and September 2022, Ginnie Mae had no loans classified as HFS.

*Accrued Interest Receivable*: Ginnie Mae accrues interest on mortgage loans HFI at the contractual rate. Of those loans not greater than 90 days past due, Ginnie Mae records an allowance

23

Government National Mortgage Association
Notes to the Financial Statements

on accrued interest to the extent interest is uncollectible for conventional loans and to the extent interest is not recoverable per insurance guidelines for insured or guaranteed loans.

***Non-Accrual and Modified Accrual:*** Ginnie Mae's current policy establishes when a loan should be placed on non-accrual status, the method of recording payments received while a loan is on non-accrual status, and the criteria for resuming accrual of interest. Ginnie Mae places uninsured loans on non-accrual status once either principal or interest is greater than 90 days past due (DPD) and collectability of payments is not reasonably assured. For uninsured loans placed on non-accrual status, interest previously accrued but not collected becomes a part of Ginnie Mae's recorded investment and is assessed for impairment under Accounting Standards Codification *(ASC) 450-20: Contingencies – Loss Contingencies* for whole loans, and under *ASC 10: Receivables – Overall* for loans deemed to be impaired. While a loan is on non-accrual status, Ginnie Mae has elected to apply any cash received for uninsured loans to the carrying value of the loan based on the cost recovery method.

In accordance with the policy, once insured loans are greater than 90 days past due, they are placed on modified accrual status, whereby interest is accrued at the rate recoverable from the insurer. Only loans for which Ginnie Mae has discontinued the accrual of interest are considered non-accrual loans (i.e., uninsured loans greater than 90 days past due for which no interest is accrued). Insured loans greater than 90 days past due are still accruing interest, although the rate may differ from the contractual rate based on the level of coverage provided by the applicable insurer/guarantor (i.e., modified accrual). For insured loans placed on modified accrual status, unpaid interest previously recognized at the contractual rate is reduced down to the recoverable amount per insurance guidelines. The remaining accrued interest receivable balance becomes part of Ginnie Mae's recorded investment and is assessed for impairment under the same guidance as the UPB of the same loan, *ASC 450-20* for whole loans or *ASC 10* for loans deemed impaired. For FHA-insured loans on modified accrual status, cash receipts are applied in accordance with the P&I amortization schedule due, to the extent of the coverage provided by FHA insurance. For loans insured or guaranteed by other insurers/guarantors (VA, USDA, or PIH), Ginnie Mae has elected to apply cash received to the carrying value of the loan based on the cost recovery method.

Loans can be returned to accrual status if Ginnie Mae is able to determine that all P&I amounts contractually due are reasonably assured of repayment within a reasonable period and there is a sustained period of reperformance.

***Allowance for Loan Losses:*** Ginnie Mae performs periodic and systematic reviews of its loan portfolios to identify credit risks and assess the overall collectability of the portfolios to determine the estimated uncollectible portion of the recorded investment on the loans when (1) available information at each Balance Sheet date indicates that it is probable a loss has occurred and (2) the amount of the loss can be reasonably estimated.

For large groups of homogeneous loans that are collectively evaluated (pursuant to requirements in *ASC 450-20*), Ginnie Mae establishes the allowance for loan losses and records an allowance against both principal and interest. When Ginnie Mae determines that it is probable a credit loss will occur and that loss can be reasonably estimated, Ginnie Mae recognizes the estimated amount of the incurred loss in the allowance for loan losses. Ginnie Mae aggregates its mortgage loans based on common risk characteristics, primarily by the type of insurance or guaranty (FHA, VA, USDA, PIH) associated with the loan, as each has a different recovery rate. Ginnie Mae also categorizes uninsured loans separately from insured loans. The allowance for loan losses estimate

24

APP511

Government National Mortgage Association
Notes to the Financial Statements

is calculated using statistical models that are based on historical loan performance and insurance or guaranty recoveries, as well as macroeconomic data. The estimate also includes qualitative factors, where applicable.

This allowance for losses represents management's best estimate of probable credit losses inherent in Ginnie Mae's mortgage loan portfolio. The allowance is netted against the recorded investment on mortgage loans presented on the Balance Sheet.

*Charge-Off:* Ginnie Mae charges-off accrued interest and UPB when it believes collectability of interest or principal is not reasonably assured. Ginnie Mae's policy is to charge-off confirmed losses against the loan and allowance for loan losses to either fair market value or net recoverable value when the asset is at or greater than        days delinquent.

*Recoveries:* Ginnie Mae records recoveries of uninsured loans previously charged-off when cash is received from the borrower related to P&I in excess of the recorded investment. For insured loans, Ginnie Mae records recoveries of previously charged-off accrued interest amounts when cash is received from the borrower related to interest in excess of the recorded interest receivable. Recoveries of loans previously charged-off are recognized as an increase to the allowance for loan losses when payment is received.

*Impaired Loans:* Ginnie Mae considers a loan to be impaired when, based on current information, it is probable that amounts due, including interest, will not be received in accordance with the contractual terms of the loan agreement (pursuant to requirements under *ASC        10: Receivables – Overall*). Ginnie Mae's impaired loans include troubled debt restructuring (TDR) and purchased credit impaired (PCI) loans. For impaired loans, Ginnie Mae measures impairment based on the present value of expected future cash flows. Ginnie Mae's expectation of future cash flows incorporates, among other items, estimated probabilities of default and prepayment based on a number of economic factors as well as the characteristics of a loan. Additionally, Ginnie Mae considers the estimated value of the collateral, as reduced by estimated disposition costs, and estimated proceeds from insurance and similar sources, if applicable.

*Troubled Debt Restructuring*: To avoid foreclosure, the MSS, on behalf of Ginnie Mae, may offer concessions to help mortgagors who have fallen into financial difficulties with their mortgages.

Various concessions may be provided through modification, including:

- A delay in payment that is more than insignificant;
- A reduction in the contractual interest rate to lower than the market interest rate at the time of modification;
- Interest forbearance for a period of time for uncollected interest amounts, which is more than insignificant;
- Principal forbearance that is more than insignificant; and
- Discharge of the mortgagor's obligation due to filing of Chapter 7 bankruptcy.

Ginnie Mae considers these modifications concessions granted to mortgagors experiencing financial difficulties and classifies these loans as TDRs consistent with *ASC        40: Receivables – Troubled Debt Restructuring by Creditors.* Ginnie Mae measures the impairment on these loans restructured in a TDR based on the excess of the recorded investment in the loan over the present value of the expected future cash flows, discounted at the loan's original effective interest rate.

25

Government National Mortgage Association
Notes to the Financial Statements

***COVID-19 Related Forbearances:*** In March 2020, the Coronavirus Aid, Relief, and Economic Security Act, referred to as the CARES Act, was enacted to provide financial relief to businesses, individuals and public institutions affected by the COVID-19 pandemic. Section 4013 of the CARES Act and the Consolidated Appropriations Act provides financial institutions the option to temporarily suspend the accounting and reporting requirements for TDRs for loan modifications provided they are: 1) related to the COVID-19 pandemic, 2) the modification occurs between March 1, 2020 through the earlier of January 1, 2022 or 60 days after the date on which the COVID-19 outbreak national emergency terminates, and 3) the loan was not more than    days delinquent as of December    2019. The scope of this Section applies to forbearance arrangements, repayment plans, interest rate modifications, and any similar arrangement that defer or delays the payment of principal or interest.

FHA, VA, and USDA insured loans fall in scope of Section 4022 "Foreclosure Moratorium and Consumer Right to Request Forbearance" of the CARES Act which grants forbearance rights and protection against foreclosure to borrowers with a federally backed mortgage loan[5]. Per Section 4022, upon the borrower's request, a servicer must provide forbearance for up to    days provided that the borrower must attest that they have experienced financial hardship due to COVID-19. Section 4022 also notes that the forbearance period may be extended for an additional period of up to    days at the request of the borrower, provided that, the borrower's request for an extension is made during the covered period, and, at the borrower's request, either the initial or extended period of forbearance may be shortened. FHA, VA, and USDA did not extend its foreclosure moratorium to the insured borrowers past July    2021. Forbearance application window remained open through the end of the nationally declared emergency[6] to provide additional forbearance for borrowers that meet relevant criteria.

In April 2020, the Board of Governors of the Federal Reserve, Federal Deposit Insurance Corporation, National Credit Union Administration, Office of the Comptroller of the Currency, and Consumer Financial Protection Bureau, in consultation with state financial regulators, issued a revision to the *Interagency Statement on Loan Modifications by Financial Institutions Working with Customers Affected by the Coronavirus* ("Interagency Statement"), which was confirmed with the staff of the Financial Accounting Standards Board. The Interagency Statement encourages financial institutions to work constructively with borrowers impacted by COVID-19, provides additional information over loan modifications, and clarifies interactions between the interagency statement and related relief provided by the CARES Act. The Interagency Statement allows for an entity either choose to account for an eligible loan modification under Section 4013 of the CARES Act or in accordance with the Interagency Statement's interpretation of existing US GAAP (*ASC    40*) in the context of COVID-19. The scope of the Interagency Statement applies to modifications such as payment deferrals, fee waivers, extensions of repayment terms, or delays in payment that are insignificant. Loan modifications eligible for relief under the Interagency

---

[5] *The term ''Federally backed mortgage loan'' includes any loan which is secured by a first or subordinate lien on residential real property (including individual units of condominiums and cooperatives) designed principally for the occupancy of from 1- to 4-families that is either (A) insured by the FHA; (B) insured under the National Housing Act; (C) guaranteed under the Housing and Community Development Act of 1992; (D) guaranteed or insured by the Department of Veterans Affairs; (E) guaranteed or insured by the Department of Agriculture; (F) made by the Department of Agriculture; or (G) purchased or securitized by the Federal Home Loan Mortgage Corporation or the Federal National Mortgage Association.*

[6] *FHA and VA allowed their home loan borrowers to make an initial request for COVID-19 forbearance and extensions through May    2023. While USDA did not extend the initial forbearance request window beyond September    2021, USDA borrowers who received an initial COVID-19 forbearance before June    2020, may have been granted additional forbearance.*

26

APP513

Government National Mortgage Association
Notes to the Financial Statements

Statement meet all of the following criteria: 1) modification is in response to the National Emergency, 2) the loan was not _____ days or more past due at the time the modification program is implemented, and 3) the modification is short term in nature (e.g., six months).

Ginnie Mae has elected to account for modifications and take the optional relief provided within the Interagency Statement. For loan modifications to meet the criteria for relief under the Interagency Statement, one requirement is that borrowers have to be current at the implementation of the modification program. As such, institutions may presume borrowers are not experiencing financial difficulties at the time of the modification for purposes of determining TDR status, and thus no further TDR analysis is required for each loan modification in the program. In accordance with the Interagency Statement, loans subject to relief will continue to be presented as current within the financial statement aging disclosures. Further, these loans will continue to recognize interest income subject to Ginnie Mae's existing accounting policy. Refer to Note 7: *Mortgage Loans* for further details.

***Purchased Credit Impaired Loans:*** Ginnie Mae evaluates all purchased loans and assesses whether there is evidence of credit deterioration subsequent to the loan's origination and if it is probable at acquisition that Ginnie Mae will be unable to collect all contractually required payments. Ginnie Mae considers insurance and guaranties from FHA, VA, USDA, and PIH in determining whether it is probable that Ginnie Mae will collect all amounts due according to the contractual terms. Per U.S. GAAP, Ginnie Mae is required to record realized losses on loans purchased when, upon purchase, the fair value is less than the acquisition cost of the loan. Additionally, U.S. GAAP requires Ginnie Mae to accrue and recognize the difference between the initial investment of the loan and the undiscounted expected cash flows (accretable yield) as interest income on a level-yield basis over the expected life of the loan.

For the loans insured by the FHA, Ginnie Mae expects to collect the full amount of the UPB and debenture rate interest (only for months allowed in the insuring agency's timeline), when the insuring agency reimburses Ginnie Mae. As a result, these loans are accounted for under *ASC 20: Receivables – Nonrefundable Fees and Other Costs*. In accordance with *ASC     20-*   these loans are recorded at the UPB plus accrued interest, which is the amount Ginnie Mae pays to purchase these loans. Accordingly, Ginnie Mae recognizes interest income on these loans on an accrual basis less an adjustment to arrive at the debenture rate for the number of months allowed under the insuring agency's timeline, if necessary.

For loans that are delinquent and uninsured, or guaranteed or insured by VA, USDA, or PIH, Ginnie Mae concludes that it is probable that it will not collect all contractually required payments receivable. Accordingly, these loans are considered PCI. Historically, Ginnie Mae has not applied the full PCI requirements under U.S. GAAP to these loans, because Ginnie Mae has determined that non-compliance with the full PCI requirements does not, on its own, preclude the financial statements as a whole from being materially compliant with U.S. GAAP. Currently, upon acquisition, the PCI loans are recorded at UPB plus accrued interest, less allowance. Ginnie Mae measures subsequent impairment on these loans based on the present value of expected future cash flows.

**Financial Guarantees:** Ginnie Mae, as guarantor, follows the guidance in *ASC 460: Guarantees,* for its accounting and disclosure of its guaranties. Prior to the adoption of *ASC     ASC 460* required the guarantor to consider the requirements of *ASC 450-20: Contingencies – Loss Contingencies* in assessing whether a contingent loss needs to be accrued for the guaranty

Government National Mortgage Association
Notes to the Financial Statements

obligation. In the event that, at the inception of the guaranty, Ginnie Mae recognized a contingent liability under *ASC 450*, the liability to be initially recognized for that guaranty shall be the greater of the non-contingent guaranty liability determined under *ASC 460*, or the contingent liability amount required to be recognized at inception of the guaranty in accordance with *ASC 450*.

Refer to Note 4*: Financial Guarantees and Financial Instruments with Off-Balance Sheet Exposure* for further details.

**Recognition of Revenues and Expenses:**

Prior to the adoption of CECL, Ginnie Mae recognized revenue from the following sources:

- ***Interest income on mortgage loans held for investment*** – Ginnie Mae accrues interest for loans at the contractual interest rate of the underlying mortgage unless the loans become 90 days past due, at which point the loans are placed on nonaccrual or modified accrual status.

**Recently Adopted Accounting Pronouncements**

As a result of the adoption of CECL, Ginnie Mae recorded one-time adjustments to impacted financial statement line items that resulted in an estimated realized gain from mortgage loans held at fair value of $171.4 million, an increase to liability for loss on mortgage-backed securities program guaranty of $116.2 million, and a related increase to investment of U.S. Government of $55.2 million. Upon the adoption of CECL on October 1, 2022, Ginnie Mae did not recognize an allowance for credit losses on cash and cash equivalents or restricted cash and cash equivalents. The adoption of this standard did not have a material impact on accrued and other fees receivable, advances, net, or the portion of reimbursable costs receivable, net recognized for pooled loans.

***Reference Rate Reform:*** In December 2022, the FASB issued ASU 2022-06, Reference Rate Reform (Topic 848), which defers the sunset date of Topic 848 from December    2022, to December    2024, to ease the potential burden of transitioning away from the London Interbank Offered Rate (LIBOR) and other discontinued interest rates. The FASB had previously issued guidance under Topic 848 that provided optional practical expedients and exceptions under GAAP related to contract modifications and hedging relationships that reference LIBOR or another reference rate expected to be discontinued. Although Ginnie Mae does not have any hedge accounting relationships, the MBS comprised of LIBOR ARMs (i.e., FHA Single-Family Forward and FHA Reverse) and multiclass securities that reference the LIBOR index only (i.e., REMIC/HREMIC programs) will be impacted by the LIBOR transition. Ginnie Mae elected to apply the provisions of Topic 848, which was effective immediately and will be applied prospectively. Ginnie Mae started transitioning from LIBOR to SOFR on September 1, 2023, and the adoption of this guidance on the transitioned loans in the reverse mortgage portfolio did not have a material impact on our financial statements.

**Recent Accounting Pronouncements Not Yet Adopted**

There were no recent accounting pronouncements that apply to Ginnie Mae, therefore, not yet adopted as of September    2023.

Government National Mortgage Association
Notes to the Financial Statements

**Note 3: Unrestricted and Restricted Cash and Cash Equivalents**

Cash and cash equivalents – unrestricted and restricted – include the following:

| | Unrestricted | September 2023 Restricted *(Dollars in thousands)* | Total |
|---|---|---|---|
| Funds with U.S. Treasury [1] | $ 7,328,704 | $ - | $ 7,328,704 |
|   Unapplied deposits | - | 13 | 13 |
|   Fund balances precluded from obligation | - | 1,510,194 | 1,510,194 |
|   Liability for investor pay off | - | | |
| Total Funds with U.S. Treasury | $ 7,328,704 | $ 1,510,595 | $ 8,839,299 |
| | | | |
| Deposit in Transit: | | | |
|   Cash held by MSS [2] | $ 28,392 | $ 149,030 | $ 177,422 |
|   Cash held by Trustee and Administrator of securities [3] | 7,122 | - | 7,122 |
| Total Deposit in Transit: | $ 35,514 | $ 149,030 | $ 184,544 |
| | | | |
| U.S. Treasury short-term investments [4] | $ 21,130,483 | 23,758 | 21,154,241 |
| **Total** | **$ 28,494,701** | **$ 1,683,383** | **30,178,084** |

| | Unrestricted | September 2022 Restricted *(Dollars in thousands)* | Total |
|---|---|---|---|
| Funds with U.S. Treasury [1] | $ 9,162,672 | $ - | $ 9,162,672 |
|   Unapplied deposits | - | 13 | 13 |
|   Fund balances precluded from obligation | - | 1,417,485 | 1,417,485 |
|   Liability for investor pay off | - | 761 | 761 |
| Total Funds with U.S. Treasury | $ 9,162,672 | $ 1,418,259 | $ 10,580,931 |
| | | | |
| Deposit in Transit: | | | |
|   Cash held by MSS [2] | $ 24,017 | $ - | $ 24,017 |
|   Cash held by Trustee and Administrator of securities [3] | 4,277 | - | 4,277 |
| Total Deposit in Transit: | $ 28,294 | $ - | $ 28,294 |
| | | | |
| U.S. Treasury short-term investments [4] | $ 18,470,245 | $ 23,666 | $ 18,493,911 |
| **Total** | **$ 27,661,211** | **$ 1,441,925** | **$ 29,103,136** |

(1) *This amount represents Ginnie Mae's account balance with the U.S. Treasury. It includes cash and cash equivalents that are restricted by Congress, which Ginnie Mae cannot spend without approval from the legislative body; cash and cash equivalents that are restricted temporarily, until Ginnie Mae determines the appropriate allocation for cash received; and liability for investor payoff, which consists of funds collected for borrower prepayments, principal curtailments, loan payoffs and loan buyouts that have not been remitted to investors as of the end of the reporting period.*

(2) *This amount represents cash collected by the MSS on behalf of Ginnie Mae but not yet received by Ginnie Mae.*

(3) *This amount represents cash collected by the Trustee and Administrator of securities on behalf of Ginnie Mae but not yet received by Ginnie Mae.*

(4) *This amount represents investments in overnight certificates. It also includes the money owed to MBS certificate holders who cannot be located by the administrator of the Ginnie Mae MBS and have not yet been claimed. There is no statute of limitations stating when the MBS certificate holder can claim this cash.*

**Funds with U.S. Treasury:** Ginnie Mae's cash receipts and disbursements are processed by U.S. Treasury. Cash held by U.S. Treasury represents the available budget spending authority of Ginnie Mae (obligated and unobligated balances available to finance allowable expenditures). The restricted balances represent amounts restricted for use for specific purposes. Restrictions may include legally restricted deposits, contracts entered into with others, or Ginnie Mae's statements of intention with regard to particular deposits. The balance consists of the following:

Government National Mortgage Association
Notes to the Financial Statements

- *Unapplied deposits:* Cash received by Ginnie Mae held in a suspense account until the appropriate application is determined.

- *Fund balances precluded from obligation*: Unobligated money within the Programs Fund balance that is restricted by law and cannot be utilized unless allowed by a subsequently enacted law.

- *Liability for investor pass-through payments:* Cash from unremitted P&I collections sent to Ginnie Mae that Ginnie Mae has an obligation to pass through to MBS holders.

**Deposits in Transit:**

- *Cash held by the MSS:* There may be a time lag between when the MSS receives cash collections on behalf of Ginnie Mae, such as principal, interest, and insurance proceeds, and when cash collections are transferred to Ginnie Mae. Ginnie Mae records cash and cash equivalents for receipts collected by the MSS on behalf of Ginnie Mae, but not yet transferred to Ginnie Mae and/or remitted to HMBS holders, at the end of the reporting period.

- *Cash held by Trustee and Administrator of securities*: There may be a time lag between when the Trustee and Administrator of securities receives cash for commitment fees and multiclass fees, respectively, on behalf of Ginnie Mae, and when cash is transferred to Ginnie Mae. Ginnie Mae records cash and cash equivalents for receipts collected by the Trustee and Administrator of securities, but not yet transferred to Ginnie Mae, at the end of the reporting period.

**U.S. Treasury short-term investments:** Ginnie Mae invested the full balance of the Capital Reserve Fund of approximately $21.0 billion and $18.4 billion and the Liquidating Fund of approximately $124.6 million and $124.0 million in overnight U.S. Government securities at September     2023, and September     2022, respectively. At September     2023, and September     2022, Ginnie Mae only held overnight certificates. The U.S. Treasury short-term investments balance includes $23.8 million and $23.7 million of restricted cash related to unclaimed MBS holder payments at September     2023, and September     2022. U.S. Treasury securities are carried at cost, which approximates fair value.

**Note 4: Financial Guarantees and Financial Instruments with Off-Balance Sheet Exposure**

Ginnie Mae receives guaranty fees, which are calculated based on the UPB of outstanding MBS in the defaulted and non-defaulted issuers' pooled portfolio. A guaranty fee represents compensation for guaranteeing the timely payment of P&I to the MBS certificate holders in the event of issuers' default. Ginnie Mae only guarantees securities created by approved issuers and backed by mortgages insured by other federal agencies. The underlying source of loans for the Ginnie Mae I MBS and Ginnie Mae II MBS comes from Ginnie Mae's four main MBS programs (the single family, multifamily, HMBS, and manufactured housing programs) which serve a variety of loan financing needs and different issuer origination capabilities. Refer to Note 1: *Entity and Mission* for more information on each program.

Ginnie Mae recognizes a guaranty asset upon issuance of a guaranty for the expected present value of the guaranty fees. The guaranty asset recognized on the Balance Sheet is $8.4 billion and $8.6 billion at September     2023, and September     2022, respectively. The guaranty liability represents the non-contingent liability for Ginnie Mae's obligation to stand ready to perform on

Government National Mortgage Association
Notes to the Financial Statements

its guaranty. The guaranty obligation recognized on the Balance Sheet is $9.4 billion and $9.0 billion at September 2023, and September 2022, respectively. After the initial measurement, the guaranty asset is recorded at fair value and the guaranty liability is amortized based on the remaining UPB of the MBS pools. The difference in measurement for the guaranty asset and guaranty obligation subsequent to initial recognition may cause volatility in reported earnings due to different measurement attributes in reporting the related financial asset (using projected economic exposures such as interest rates and prepayments) and the financial liability (using actual payoffs and paydowns). Refer to Note 10: *Fair Value Measurement* for discussion surrounding the volatility reflected in the Statement of Revenues and Expenses and Changes in Investment of U.S. Government as a result of changes in assumptions used in estimating the fair value of the guaranty asset.

For the guaranty asset and guaranty liability recognized on the Balance Sheet, Ginnie Mae's maximum potential exposure under these guaranties is primarily comprised of the UPB of MBS and outstanding commitments and does not consider loss recoverable from other agencies. The UPB of Ginnie Mae's MBS was approximately $2.5 trillion at September 2023, and $2.3 trillion at September 2022. It should be noted, however, that Ginnie Mae's potential loss is considerably less due to the financial strength of its issuers. In addition, the value of the underlying collateral and the insurance provided by insuring or guaranteeing agencies indemnify Ginnie Mae for most losses.

The Ginnie Mae guaranteed security is a pass-through security whereby mortgage P&I payments (or curtailments) are passed through to the MBS certificate holders monthly. Exposure to credit loss is primarily contingent on the nonperformance of Ginnie Mae issuers. Ginnie Mae does not anticipate nonperformance by the issuers other than those considered probable of default reflected in the liability for loss on mortgage-backed securities program guaranty line item on the Balance Sheet or considered reasonably possible of default as disclosed in Note 13: *Reserve for Loss*. Terms of the guaranty for single family programs are maximum 40 years. For multifamily programs, the maximum guaranty term is capped at 40 years plus the applicable construction period. For HMBS programs, the maximum guaranty term is 50 years from the issuance of the security. Refer to Note 13: *Reserve for Loss* for discussion of contingent and non-contingent guaranty liability.

Ginnie Mae is also exposed to losses related to its outstanding commitments to guarantee MBS, which are not recognized on its Balance Sheet. These commitments represent Ginnie Mae's guaranty of future MBS issuances. The commitment ends when the securities are issued or the commitment period expires, which is the last day of the month that is one year after the authority is approved for single family issuers and on the last day of the month that is two years after the authority is approved for multifamily issuers. Ginnie Mae's risk related to outstanding commitments is significantly lower than the outstanding balance of MBS due in part to Ginnie Mae's ability to limit commitment authority granted to individual MBS issuers.

Outstanding MBS and commitments were as follows:

| | September 2023 | September 2022 |
|---|---|---|
| | *(Dollars in billions)* | |
| Outstanding MBS | $ 2,473 | $ 2,284 |
| Outstanding MBS commitments | 141 | |
| **Total** | **$ 2,614** | **$ 2,442** |

Government National Mortgage Association
Notes to the Financial Statements

The Ginnie Mae MBS serves as collateral for multiclass products, REMICs, and Platinum Certificates, for which Ginnie Mae also guarantees the timely payment of P&I. These structured securities allow the private sector to combine and restructure cash flows from Ginnie Mae MBS into securities that meet unique investor requirements for cash flow, yield, maturity, and call-option features.

For the years ended September    2023, and 2022, multiclass security program issuances totaled $143.9 billion and $196.2 billion, respectively. The estimated outstanding balance of multiclass securities was $737.9 billion and $659.0 billion on September    2023, and September    2022, respectively. These guaranteed securities do not subject Ginnie Mae to additional credit risk beyond that assumed under the MBS collateral.

**Note 5: Reimbursable Costs, Net**

The following tables present reimbursable costs[1] and related allowance, by loan insurance type:

| | FHA | VA | September 2023 USDA | Conventional | Total |
|---|---|---|---|---|---|
| | | | *(Dollars in Thousands)* | | |
| Reimbursable costs[2] | $ | $  80 | $  5 | $  0 | $ |
| Allowance for reimbursable costs | - | - | - | - | - |
| **Reimbursable costs, net** | **$** | **$  80** | **$  5** | **$  0** | **$** |

| | FHA | VA | September 2022 USDA | Conventional | Total |
|---|---|---|---|---|---|
| | | | *(Dollars in Thousands)* | | |
| Reimbursable costs | $  24,042 | $  1,703 | $  677 | $  121 | $  26,543 |
| Allowance for reimbursable costs | (1,774) | (461) | ( | (17) | (2,562) |
| **Reimbursable costs, net** | **$  22,268** | **$  1,242** | **$** | **$** | **$  23,981** |

*(1) Refer to Note 2: Summary of Significant Accounting Policies for the reimbursable costs description.*

*(2) Costs incurred on pooled forward loans, which are expected to be reimbursed, are recorded as reimbursable costs receivable and reported net of an allowance for amounts that management believes will not be collected. However, costs for non-pooled forward and reverse loans are included within forward and reverse mortgage loans, at fair value effective October 1, 2022.*

**Note 6: Advances, Net**

Advances include payments made to a MSS to cover any shortfalls to investors resulting from mortgagors defaulting on their mortgage payments and excess funds paid to the MSS to service the HECM portfolio, including funding scheduled and unscheduled draws, reimbursable cost advances, FHA monthly insurance premiums paid on behalf of borrowers, and payments to HMBS investors for loan buyouts. Advances are reported net of an allowance, which is based on management's expectations of future recoverability from mortgage insuring and guaranteeing agencies such as FHA, VA, USDA, and PIH. HECM portfolio advances are only classified as advances until the MSS executes on the servicing need, at which point the balance is capitalized to the HECM loan UPB or reduces the HMBS obligation. Given this, HECM advance balances represent excess cash held by the MSS on behalf of Ginnie Mae and are expected to be fully utilized for future servicing or recovered.

In December 2022, a Ginnie Mae HMBS issuer was extinguished, and Ginnie Mae assumed the servicing rights and obligations of the issuer. Accordingly, Ginnie Mae delegated portfolio management to one of its MSS and advanced funds to the MSS to cover the servicing needs of the extinguished portfolio. Ginnie Mae also made advance payments to cover the liability to investors

Government National Mortgage Association
Notes to the Financial Statements

for MBS portfolios acquired from five previously defaulted issuers for the year ended September 2023, and the year ended September 2022.

The following table presents Advances and related allowance:

|  | September 2023 | September 2022 |
|---|---|---|
|  | *(Dollars in thousands)* | |
| HECM portfolio advances | $    414,857 | $        - |
| MBS Advances | 1,764 | 741 |
| Allowance for uncollectible MBS advances | (26) | (92) |
| **Advances, net** | **$    416,595** | **$    649** |

## Note 7: Mortgage Loans

Ginnie Mae adopted the CECL standard as of October 1, 2022. Accordingly, the disclosures below reflect these adoption changes. Prior period presentation was not modified to conform to current period presentation. See Note 2: *Summary of Significant Accounting Policies* for additional information.

### Forward Mortgage Loans, at Fair Value

Ginnie Mae has the option to classify loans as either MFV, HFS, or HFI. As of September 2023, Ginnie Mae classifies single family forward mortgage loans as MFV. Ginnie Mae reports the carrying value of forward mortgage loans at fair value, which represents the fair value of the UPB, accrued interest and reimbursable costs receivable of the mortgage loan. For the year ended September 2023, Ginnie Mae reported a total loss of $92.1 million due to changes in fair market value of forward mortgage loans. As of September 2023, Ginnie Mae had Fair Value and Fair Value Over (Under) Unpaid Principal Balance of aggregated Mortgage loans at fair value that are 90 days or more past due of $168.7 million and ($37.9 million), respectively.

The tables below present the carrying value of MFV loans including accrued interest and reimbursable costs receivable under FVO:

|  | September 2023 | | | |
|---|---|---|---|---|
|  | Fair Value | Unpaid Principal Balances | Fair Value Over (Under) Unpaid Principal Balance | UPB of aggregated mortgage loans at fair value that are 90 days or more past due |
|  | *(Dollars in thousands)* | | | |
| FHA | $    1,293,519 | $    1,504,635 | $    (211,116) | $    182,392 |
| VA | 52,261 | 60,897 | (8,636) | 11,586 |
| USDA | 22,282 | 26,067 | (3,785) | 4,338 |
| Conventional | 67,601 | 79,899 | (12,298) | 8,328 |
| **Total** | **$    1,435,663** | **$    1,671,498** | **$    (235,835)** | **$    206,644** |

### Reverse Mortgage Loans, at Fair Value

In December 2022, a Ginnie Mae HMBS issuer defaulted, and Ginnie Mae assumed the servicing rights and obligations of the defaulted issuer. As part of the acquisition of the issuer's reverse mortgage portfolio, Ginnie Mae recognized a loss of $282.7M which is included in gain (loss) on acquisition of HMBS obligations, at fair value on the Statements of Revenues and Expenses and Changes in Investment of U.S. Government.

Government National Mortgage Association
Notes to the Financial Statements

Ginnie Mae reports the carrying value of reverse mortgage loans at the fair value of the reverse mortgage loan, which represents the fair value of the UPB, accrued interest and reimbursable costs receivable of the reverse mortgage loan. For the year ended September    2023, Ginnie Mae has a total gain of $2.0 billion due to changes in fair market value of reverse mortgage loans.

The tables below present the carrying value of reverse mortgage loans including accrued interest and reimbursable costs receivable under FVO:

| | September    2023 | | |
| | Fair Value | Unpaid Principal Balances | Fair Value Over (Under) Unpaid Principal Balance |
| | | *(Dollars in thousands)* | |
|---|---|---|---|
| FHA | $    19,525,649 | $    20,020,106 | $    (494,457) |

**Mortgage Loans Held for Investment Including Accrued Interest, Net**

Prior to the adoption of the CECL standard, Ginnie Mae classified loans as either HFS or HFI. At September    2022, Ginnie Mae's loan portfolio did not include any HFS loans.

The tables below present the carrying value of HFI loans including accrued interest broken down by underlying insuring agencies:

| | September    2022 | | | | |
| | Conventional | FHA | VA | USDA | Total |
| | | | *(Dollars in thousands)* | | |
|---|---|---|---|---|---|
| Mortgage loans held for investment UPB | $    73,002 | $    1,527,544 | $    60,572 | $    26,265 | $    1,687,383 |
| Accrued interest receivable | 792 | 8,577 | 628 | | 10,308 |
| Recorded investment of mortgage loans held for investment including accrued interest | $    73,794 | $    1,536,121 | $    61,200 | $    26,576 | $    1,697,691 |
| Allowance for loan losses | (2,098) | (120,810) | (2,802) | (1,773) | (127,483) |
| **Mortgage loans held for investment including accrued interest, net** | **$    71,696** | **$    1,415,311** | **$    58,398** | **$    24,803** | **$    1,570,208** |

*Credit Quality Indicators*

Ginnie Mae's HFI loans are periodically evaluated for impairment in accordance with guidance in *ASC 450-20: Contingencies – Loss Contingencies* or *ASC    10: Receivables – Overall*. Ginnie Mae's credit risk exposure on its HFI mortgage loans portfolio is limited by the underlying guaranty or insurance on loans, which may include FHA, VA, USDA, and PIH.

When estimating defaults, prepayments and recoveries, Ginnie Mae considers a number of indicators including macro-economic factors such as interest rates, home price indices, and mortgage delinquency rates. In addition, Ginnie Mae considers a number of credit quality indicators such as loan-to-value (LTV) ratios at origination and current delinquency status as of the end of the reporting period. Other characteristics include age of loan, insuring agency, credit score, and spread of mortgage rate to relevant market rate.

Government National Mortgage Association
Notes to the Financial Statements

The following tables present the recorded investment[1] for mortgage loans by original LTV ratio:

| | Less than 80% | | 80-% | | Greater than | | Total |
|---|---|---|---|---|---|---|---|
| | | | September 2022 | | | | |
| | | | (Dollars in thousands) | | | | |
| Conventional | $ | 5,515 | $ | 65,515 | $ | 2,764 | $ | 73,794 |
| FHA | | 101,990 | | 1,407,865 | | 26,266 | | 1,536,121 |
| VA | | 3,947 | | 43,139 | | 14,114 | | 61,200 |
| USDA | | 1,041 | | 18,680 | | 6,855 | | 26,576 |
| Total | $ | 112,493 | $ | 1,535,199 | $ | 49,999 | $ | 1,697,691 |

(1)  *Recorded investment represents the total UPB along with accrued interest for HFI mortgage loans.*

### Aging Analysis

The following tables present an aging analysis of the total recorded investment in Ginnie Mae's HFI mortgage loans:

| | One Month Delinquent | | Two Months Delinquent | | Three Months Delinquent | | Over Three months Delinquent | | Total Delinquent | | Current | | Total | | Loans Over 90 Days Delinquent and Accruing Interest[2] | | Recorded Investment in Non-accrual loans[3] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | September 2022 | | | | | | | | | | | |
| | | | | | | | | (Dollars in Thousands) | | | | | | | | | |
| Conventional | $ | 5,006 | $ | 2,201 | $ | 1,318 | $ | 5,838 | $ | 14,363 | $ | 59,431 | $ | 73,794 | $ | - | $ | 13,847 |
| FHA | | 128,516 | | 46,506 | | 17,853 | | 162,309 | | 355,184 | | 1,180,937 | | 1,536,121 | | 162,309 | | - |
| VA | | 5,088 | | 2,236 | | 838 | | 12,221 | | 20,383 | | 40,817 | | 61,200 | | 12,221 | | - |
| USDA | | 3,421 | | 963 | | 563 | | 4,309 | | 9,256 | | 17,320 | | 26,576 | | 4,309 | | - |
| Total | $ | 142,031 | $ | 51,906 | $ | 20,572 | $ | 184,677 | $ | 399,186 | $ | 1,298,505 | $ | 1,697,691 | $ | 178,839 | $ | 13,847 |

(2)  *Interest income on insured or guaranteed loans that are over 90 days delinquent is recognized subject to Ginnie Mae's non-accrual policy as discussed in Note 2: Summary of Significant Accounting Policies.*

(3)  *Refer to Ginnie Mae's non-accrual policy as discussed in Note 2: Summary of Significant Accounting Policies.*

### Impaired Loans

The tables below present the recorded investment, related allowance, UPB, average recorded investment, and total interest income recognized for impaired mortgage loans, which include TDR loans and PCI loans:

| | Recorded Investment | | Related Allowance | | Unpaid Principal Balance | | Average Recorded Investment | | Total Interest Income Recognized[4] |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | September 2022 | | | | | |
| | | | | | (Dollars in thousands) | | | | | |
| With related allowance recorded: | | | | | | | | | | |
| Conventional | $ | 37,306 | $ | (1,766) | $ | 37,095 | $ | 39,737 | $ | 1,815 |
| FHA | | 1,140,529 | | (119,636) | | 1,136,594 | | 1,172,867 | | 51,028 |
| VA | | 42,081 | | (2,802) | | 41,927 | | 44,567 | | 1,899 |
| USDA | | 17,910 | | (1,773) | | 17,821 | | 18,474 | | 962 |
| **Total impaired loans with related allowance recorded** | $ | **1,237,826** | $ | **(125,977)** | $ | **1,233,437** | $ | **1,275,645** | $ | **55,704** |
| With no related allowance recorded[5]: | | | | | | | | | | |
| Conventional | | 5,795 | | - | | 5,517 | | 6,651 | | 1,101 |
| FHA | | 203,884 | | - | | 201,050 | | 207,129 | | 11,818 |
| VA | | 19,118 | | - | | 18,645 | | 19,593 | | 1,185 |
| USDA | | 8,666 | | - | | 8,444 | | 8,780 | | 617 |
| Total impaired loans with no related allowance recorded | $ | 237,463 | $ | - | $ | 233,656 | $ | 242,153 | $ | 14,721 |
| **Total impaired loans[6]** | $ | **1,475,289** | $ | **(125,977)** | $ | **1,467,093** | $ | **1,517,798** | $ | **70,425** |

Government National Mortgage Association
Notes to the Financial Statements

(4) *Interest income on impaired loans is recognized subject to Ginnie Mae's non-accrual policy (as applicable), as discussed in Note 2: Summary of Significant Accounting Policies.*

(5) *The amount recoverable from the insurer/guarantor or fair value of the collateral value equals or exceeds the recorded investment of the impaired loan and, as such, no valuation allowance is recorded.*

(6) *The recorded investment, related allowance, and UPB for TDRs was $1,452.6 million, $125.5 million, and $1,444.8 million, respectively, at September    2022. The recorded investment, related allowance, and UPB for PCI loans was $22.6 million, $0.5 million, and $22.3 million, respectively, at September    2022.*

### Troubled Debt Restructuring

A restructuring of a debt constitutes a TDR if Ginnie Mae, for economic or legal reasons related to the debtor's financial difficulties, grants a concession to the debtor that it would not otherwise consider. Additionally, Ginnie Mae considers Chapter 7 Bankruptcies which result in a discharge to the borrower as TDRs because the borrower is undergoing financial difficulty or insolvency and concessions are made to the borrower. Ginnie Mae assesses loans to determine whether they meet the criteria of TDR upon trial modification, as applicable. Ginnie Mae also offers other informal options to troubled borrowers including repayment plans and forbearance agreements which are evaluated for TDR, as applicable.

Section 4022 of the CARES Act provides borrowers with federally backed mortgage loans a foreclosure moratorium and a right to forbearance of loan payments for homeowners experiencing financial hardship due to COVID-19. The majority of Ginnie Mae's non-pooled loan portfolio is insured/guaranteed by the FHA, VA, USDA, or PIH, and therefore eligible for forbearance under Section 4022 of the CARES Act. As described in Note 2: *Summary of Significant Accounting Policies*, Ginnie Mae has elected to follow the guidance issued in the Interagency Statement and, accordingly, loan modifications (including short term payment deferrals of six months or less) subject to relief under the Interagency Statement are not accounted for as TDRs and therefore not included within Ginnie Mae's TDR disclosures. Any further payment deferrals permitted under Section 4022 beyond the six-month period will be assessed for TDR accounting.

Ginnie Mae's loan modification programs may result in various types of concessions (including a combination of concessions) such as term extensions and interest rate reductions (lower than what the mortgagor would receive in the market at the time of the modification). The average term extension granted by Ginnie Mae was 126 months for the year ended September    2022. The average interest rate reduction was 1.60 percentage points for the year ended September    2022.

The following table present the number of loans and recorded investment of loans newly classified[7] as a TDR:

| | For the year ended September    2022 | |
| | Number of Loans[9] | Recorded Investment[8] |
| | *(Dollars in thousands)* | |
|---|---|---|
| Conventional | $            9 | $            707 |
| FHA | | 15,060 |
| VA | 8 | 1,458 |
| USDA | 11 | 1,037 |
| **Total** | **$            140** | **$            18,262** |

(7) *Loans classified as a TDR in one period may be modified again in a subsequent period. In such cases, the subsequent modification would not be reflected in the table since the loan would already have been classified as a TDR.*

(8) *There is not a material difference between the recorded investment in loans pre- and post-modification based on the nature of Ginnie Mae's modification programs which do not include principal and past-due interest forgiveness. As such, amounts represent post-modification recorded investment.*

Government National Mortgage Association
Notes to the Financial Statements

*(9)  Includes modifications that do not meet the criteria under the Interagency Statement to take the optional relief from TDR accounting. As such, these modifications have been assessed under Ginnie Mae's TDR policy and classified as new TDRs.*

The tables below present the number of loans and total recorded investment for the loans that entered a TDR in the preceding twelve months and for which there was a payment default during the period. For purposes of this disclosure, Ginnie Mae defines TDR loans that had a payment default as modifications that became two months or more delinquent subsequent to modification during the period. Additionally, for COVID-19 impacted loans that no longer qualify for the relief under the Interagency Statement guidance, Ginnie Mae will consider these TDR loans to be defaulted at the time they no longer qualify for the relief, unless the loans have been made current in accordance with their amortization schedule:

| | For the year ended September 2022 | |
| --- | --- | --- |
| | Number of Loans | Recorded Investment |
| | *(Dollars in thousands)* | |
| Conventional | $ - | $ - |
| FHA | 7 | 519 |
| VA | 2 | |
| USDA | - | - |
| **Total** | **$ 9** | **$ 921** |

### *Purchased Credit Impaired Loans*

Upon acquisition, if the purchased loan is delinquent and uninsured, or guaranteed or insured by VA, USDA, or PIH, Ginnie Mae concludes that it is probable that it will not collect all contractually required payments receivable. Accordingly, these loans are considered PCI mortgage loans and are recorded at UPB and accrued interest, less allowance, which is not in compliance with the full PCI requirements outlined in *ASC*        Refer to Note 2: *Summary of Significant Accounting Policies* for U.S. GAAP requirements.

### *Foreclosures in Process*

Ginnie Mae accounts for the mortgage loans as Foreclosure in Process if the foreclosure has been filed but not completed. Although foreclosure has been filed, the foreclosure process has not been completed and Ginnie Mae has not received physical possession of the underlying property, and accordingly, Foreclosure in Process loans are accounted for similar to mortgage loans HFI and are reported as a part of the HFI portfolio.

Physical possession of residential real estate property is achieved when either the creditor obtains legal title to the residential real estate property upon completion of a foreclosure, or the mortgagor conveys all interest in the residential real estate property through completion of a deed in lieu of foreclosure in order to satisfy that loan.

The recorded investment of Foreclosure in Process loans was $103.5 million as of September 2022. Although the foreclosure process has begun for these loans, Ginnie Mae believes that a portion of these loans will not complete the foreclosure process due to Ginnie Mae's loss mitigation activities.

### *Allowance for Loan Losses*

Ginnie Mae maintains an allowance for probable incurred losses related to non-pooled mortgage loans. This allowance for loan losses involves significant management judgment and estimates of credit losses inherent in the mortgage loan portfolio. The allowance for loan losses is intended to

Government National Mortgage Association
Notes to the Financial Statements

reduce the carrying value of Ginnie Mae's HFI and related accrued interest for probable credit losses embedded in the loan portfolio at the balance sheet date. HFI and accrued interest are reported net of the allowance on the Balance Sheet.

Ginnie Mae relies on MSS for information to assess mortgagors' ability to pay based on current economic environment assessment, and potential insurance recoveries as determinants in the statistical models that evaluate potential HFI recoveries. For the collective allowance, homogeneous pools of mortgage loans are defined on common characteristics such as age, geographic region, and insurance type, among others.

The projections of losses are built based on actual loan performance data and performance of similar loans, current economic environment, and, when appropriate, management judgment. Ginnie Mae monitors its projections of claim recoveries regularly to validate reasonableness. Ginnie Mae validates and updates its models and assumptions to capture changes in Ginnie Mae's servicing experience and changes in government policies and programs. In determining Ginnie Mae's loan loss reserves, Ginnie Mae also considers macroeconomic and other factors that may affect the performance of the loans in Ginnie Mae's portfolio, including house price changes, nominal GDP growth, unemployment rate and mortgage rate. Ginnie Mae uses probability of default and probability of prepayment models which employ logistic regressions to calculate dynamic default and prepayment probabilities based on criteria described above.

The following table displays the total recorded investment and allowance for loan losses by allowance methodology:

| | For the year ended September 2022 | |
| | *(Dollars in thousands)* | |
|---|---|---|
| Recorded investment: | | |
| Collectively evaluated | $ | 222,402 |
| Individually evaluated | | 1,452,640 |
| Purchase credit impaired | | 22,649 |
| Total recorded investment in loans | $ | 1,697,691 |
| Ending balance of the allowance for loan losses: | | |
| Collectively evaluated | $ | (1,506) |
| Individually evaluated | | (125,463) |
| Purchase credit impaired | | (514) |
| Total allowance for loan losses | $ | (127,483) |
| Net Investment in mortgage loans HFI | $ | 1,570,208 |

The following table presents changes in Ginnie Mae's allowance for loan losses:

| | For the year ended September 2022 | |
| | *(Dollars in thousands)* | |
|---|---|---|
| Balance, beginning of period | $ | (97,183) |
| Recapture (provision) for loan losses | | (30,587) |
| Charge-offs | | 6,082 |
| Recoveries | | (5,795) |
| Balance, end of period | $ | (127,483) |

Ginnie Mae's charge-offs may include write downs recorded when the mortgage loan receivables are transferred between certain asset classes.

38

APP525

Government National Mortgage Association
Notes to the Financial Statements

**Note 8: Claims Receivable, Net**

Claims receivable are balances owed to Ginnie Mae from insuring or guaranteeing agencies (FHA, VA, USDA, and PIH) related to conveyed properties and short sales. Ginnie Mae records an allowance that represents the expected unrecoverable amounts within the portfolio for claims receivable. The claims receivable balance, net of the allowance, represents the amounts that Ginnie Mae determines to be collectible.

The following tables present Ginnie Mae's claims receivable and related allowance, by type of claim:

| | September, 2023 | | | |
|---|---|---|---|---|
| | **FHA** | **VA** | **USDA** | **Total** |
| | | *(Dollars in thousands)* | | |
| Foreclosed property claims receivable[1] | $ 55,497 | $ 864 | $ 870 | $ 57,231 |
| Short sale claims receivable[2] | 1,896 | 53 | - | 1,949 |
| Assignment claims receivable[3] | 3,268 | - | - | 3,268 |
| Allowance for claims receivable | (2,460) | ( ) | - | (2,661) |
| **Claims receivable, net** | **$ 58,201** | **$ 716** | **$ 870** | **$ 59,787** |

| | September, 2022 | | | |
|---|---|---|---|---|
| | **FHA** | **VA** | **USDA** | **Total** |
| | | *(Dollars in thousands)* | | |
| Foreclosed property claims receivable[1] | $ 36,949 | $ - | $ 780 | $ 38,025 |
| Short sale claims receivable[2] | 535 | - | - | 535 |
| Assignment claims receivable[3] | - | - | - | - |
| Allowance for claims receivable | (1,535) | ( ) | (4) | (1,709) |
| **Claims receivable, net** | **$ 35,949** | **$ 126** | **$ 776** | **$ 36,851** |

(1) *Foreclosed property claims receivable represents reimbursements owed to Ginnie Mae by insuring or guaranteeing agencies (which may include FHA, VA, USDA, and PIH) for foreclosed property.*

(2) *Short sale claims receivable are amounts reimbursable to Ginnie Mae from the insuring or guaranteeing agencies (which may include FHA, VA, USDA, and PIH) for properties sold to avoid foreclosure where the proceeds received are insufficient to fully satisfy the remaining balances of the mortgages.*

(3) *Assignment claims receivable are amounts due to Ginnie Mae from the FHA for reverse mortgage sales to FHA. Ginnie Mae, in its assumed role as issuer may buyout HMBS investors and assign (sell) mortgage rights to FHA when the unpaid principal balance of reverse mortgage loans exceeds 98% of the Maximum Claim Amount established at origination.*

**Note 9: Acquired Property, Net**

Ginnie Mae recognizes acquired property in accordance with the accounting policy described in Note 2: *Summary of Significant Accounting Policies*. The acquired properties are typically acquired from foreclosed loans that are either USDA insured [7], FHA-insured [8] or uninsured conventional loans[9]. Acquired properties are assets that Ginnie Mae intends to sell and is actively marketing through the MSS. Activity for acquired properties is presented in the table below:

---

[7] *Properties from foreclosed USDA insured loans are not conveyed to the insuring agency subsequent to foreclosure per the insurance guidelines published by USDA.*

[8] *Properties from foreclosed FHA-insured loans that are under FHA's Claims Without Conveyance of Title program are not conveyed to the insuring agency subsequent to foreclosure, per the insurance guidelines published by FHA.*

[9] *Properties from foreclosed VA insured loans are usually conveyed to the insuring agency subsequent to foreclosure, and are recognized as foreclosed properties under claims receivable, net on Ginnie Mae's balance sheet upon the completion of the foreclosure process. Therefore, acquired properties are usually from USDA insured, FHA-insured or uninsured conventional loans, not VA insured loans.*

39

Government National Mortgage Association
Notes to the Financial Statements

| | For the years ended September | |
|---|---|---|
| | 2023 | 2022 |
| | (Dollars in thousands) | |
| Balance, beginning of period – acquired properties | $ 7,412 | $ 6,313 |
| Additions | 84,917 | 6,727 |
| Dispositions | (40,940) | (5,628) |
| **Balance, end of period – acquired properties** | **$ 51,389** | **$ 7,412** |
| Balance, beginning of period – valuation allowance | (1,252) | ( |
| Change in valuation allowance | (5,563) | (940) |
| **Balance, end of period – valuation allowance** | **$ 6,815** | **$ (1,252)** |
| **Balance, end of period – acquired properties, net** | **$ 44,574** | **$ 6,160** |

**Note 10: Fair Value Measurement**

*ASC 820: Fair Value Measurement* defines fair value, establishes a framework for measuring fair value, and sets forth disclosure requirements regarding fair value measurements. This guidance applies whenever other accounting guidance requires or permits assets or liabilities to be measured at fair value. Fair value measurement assumes that the transaction to sell the asset or transfer the liability takes place either in the principal market for the asset or liability, or, in the absence of a principal market, in the most advantageous market for the asset or liability.

Ginnie Mae uses fair value measurements for the initial recognition of assets and liabilities and periodic re-measurement of certain assets and liabilities on a recurring or non-recurring basis. In determining fair value, Ginnie Mae uses various valuation techniques. The inputs to the valuation techniques are categorized into a three-level hierarchy, as described below:

Level 1    Quoted prices in active markets for identical assets or liabilities that are accessible at the measurement date.

Level 2    Observable inputs other than Level 1 prices, such as quoted prices for similar assets or liabilities, quoted prices in markets that are not active, or other inputs that are observable or can be corroborated by observable market data for substantially the full term of the assets or liabilities.

Level 3    Unobservable inputs that are supported by little or no market activity and that are significant to the fair value of the assets or liabilities.

**Items Measured at Fair Value on a Recurring Basis:** The following tables present the fair value measurement hierarchy level for Ginnie Mae's assets and liabilities that are measured at fair value on a recurring basis:

| | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| | | September 2023 | | |
| | | (Dollars in thousands) | | |
| Assets: | | | | |
| Guaranty asset | $ - | $ - | $ 8,352,885 | $ 8,352,885 |
| Forward mortgage loans, at fair value[1] | - | - | 1,435,663 | 1,435,663 |
| Reverse mortgage loans, at fair value[1] | - | - | 19,525,649 | 19,525,649 |
| **Total Assets** | **$ -** | **$ -** | **$ 29,314,197** | **$ 29,314,197** |
| Liabilities: | | | | |
| HMBS obligations, at fair value[1] | $ - | $ - | $ 19,147,154 | $ 19,147,154 |
| **Total Liabilities** | **$ -** | **$ -** | **$ 19,147,154** | **$ 19,147,154** |

40

APP527

Government National Mortgage Association
Notes to the Financial Statements

| | September 2022 | | | |
|---|---|---|---|---|
| | Level 1 | Level 2 | Level 3 | Total |
| | | *(Dollars in thousands)* | | |
| Assets: | | | | |
| Guaranty asset | $ - | $ - | $ 8,595,302 | $ 8,595,302 |
| **Total Assets** | **$ -** | **$ -** | **$ 8,595,302** | **$ 8,595,302** |

(1)  *In October 2022, the fair value option was elected for Ginnie Mae's mortgage loan portfolio. Accordingly, following this election, mortgage loans and the HMBS obligation are now measured at fair value on a recurring basis.*

Ginnie Mae records transfers into or out of Level 3, if any, at the beginning of the period. There were no transfers into or out of Level 3 during the years ended September   2023, and 2022.

*Guaranty asset –* Ginnie Mae has elected the fair value option for the guaranty asset. The valuation technique used by Ginnie Mae to measure the fair value of its guaranty asset is based on several inputs including, the present value of expected future cash flows from the guaranty fees based on the UPB of the outstanding MBS in the defaulted and non-defaulted issuers' pooled portfolio, new issuances of MBS, scheduled run-offs of MBS, anticipated prepayments, and anticipated defaults.

Ginnie Mae provides the guaranty of P&I payments to MBS holders in the event of issuer default and, in exchange, receives monthly guaranty fees from the issuers based on the UPB of the outstanding MBS in the defaulted and non-defaulted issuers' pooled portfolio.

Due to new MBS issuances, the guaranty asset increased by $1.4 billion and $2.7 billion during the years ended September   2023, and 2022, respectively. These increases are offset by recorded losses of $1.5 billion and $2.4 billion for the years ended September   2023, and 2022, respectively, resulting from paydowns and unrealized losses in fair value of the guaranty asset reflected in the gain (loss) on guaranty asset line item in the Statement of Revenues and Expenses and Changes in Investment of U.S. Government.

The table below presents the range and weighted average of significant unobservable inputs used in determining the fair value of Ginnie Mae's guaranty asset:

| | September 2023 | September 2022 |
|---|---|---|
| | *(Dollars in millions)* | |
| Valuation at period end: | | |
| Fair value | $ 8,353 | $ 8,595 |
| Prepayment rates assumptions: | | |
| Weighted average rate assumption | 54.29% | 55.07% |
| Minimum prepayment rate | 0.00% | 0.00% |
| Maximum prepayment rate | 99.96% | 99.01% |
| Default rate assumptions: | | |
| Weighted average rate assumption | 15.10% | 12.84% |
| Minimum default rate | 0.00% | 0.00% |
| Maximum default rate | 94.73% | 97.72% |
| Discount rate assumptions: | | |
| Discount rate at average weighted average life (WAL) | 4.26% | 2.97% |
| Discount rate at the minimum WAL | 5.54% | 1.85% |
| Discount rate at the maximum WAL | 4.44% | 3.35% |

These significant unobservable inputs change according to macroeconomic market conditions. Significant increases (decreases) in the discount rate, cumulative prepayment rate, or cumulative default rate in isolation would result in a lower (higher) fair value measurement. The cumulative prepayment rate represents the percentage of the mortgage pool's UPB assumed to be paid off prematurely on a voluntary basis over the remaining life of the pool and it is based on historical prepayment rates and future market expectations. The cumulative default rate represents the

41

Government National Mortgage Association
Notes to the Financial Statements

percentage of the pool's UPB that would be eliminated prematurely due to mortgage default over the remaining life of the pool. The discount rate used for the guaranty asset valuation represents an estimate of the cost of financing for Ginnie Mae and it is determined considering Ginnie Mae's overall estimated cost of financing.

***Forward Mortgage Loans, at Fair Value*** – Ginnie Mae has elected the fair value option for forward mortgage loans. The valuation technique used by Ginnie Mae to measure the fair value of its forward mortgage loans is based on the present value of expected future cash flows arising from projected borrower payments, anticipated prepayments, defaults, costs to sell and recoveries in the event of default, including reimbursable costs.

Ginnie Mae recorded a loss of $92.1 million for the year ended September    2023, from changes in the fair value of the forward mortgage loan portfolio reflected in the gain (loss) on forward mortgage loans, at fair value line item in the Statement of Revenues and Expenses and Changes in Investment of U.S. Government.

The table below presents the range and weighted average of significant unobservable inputs used in determining the fair value of Ginnie Mae's forward mortgage loans:

| | September 2023 (Dollars in millions) |
|---|---|
| Valuation at period end: | |
| Fair value | $            1,436 |
| Prepayment rates assumptions: | |
| Weighted average prepayment rate | 28.34% |
| Minimum prepayment rate | 0.00% |
| Maximum prepayment rate | 88.58% |
| Default rate assumptions: | |
| Weighted average default rate | 23.05% |
| Minimum default rate | 0.26% |
| Maximum default rate | 55.54% |
| Discount rate assumptions: | |
| Weighted average discount rate | 5.47% |
| Minimum discount rate | 5.23% |
| Maximum discount rate | 6.03% |

These significant unobservable inputs change according to the loan portfolio and macroeconomic market conditions. Significant increases (decreases) in the discount rate and/or cumulative default rate in isolation would result in a lower (higher) fair value measurement. The impact of the cumulative prepayment rate to the fair value measurement can be positive or negative depending on other unobservable inputs, for instance, the discount rates. The cumulative prepayment rate represents the percentage of a mortgage loan's UPB assumed to be paid off prematurely on a voluntary basis over the remaining life of the loan. The cumulative default rate represents the percentage of a loan's UPB that would be eliminated prematurely due to mortgage default over the remaining life of the loan. The market yield represents the rate a buyer of a similar product would require in an arm's length transaction.

***Reverse Mortgage Loans, at Fair Value*** – Ginnie Mae has elected the fair value option for reverse mortgage loans. The valuation technique used by Ginnie Mae to measure the fair value of its reverse mortgage loans is based on the present value of expected future cash flows arising from payments to borrowers for scheduled and unscheduled draws, Mortgage Insurance Premium (MIP)

42

Government National Mortgage Association
Notes to the Financial Statements

advances, costs to sell as well as projected borrower recoveries and/or insurance proceeds subsequent to termination events.

Ginnie Mae recorded a gain of $2.0 billion for the year ended September    2023, from changes in the fair value of the reverse mortgage loan portfolio reflected in the gain (loss) on reverse mortgage loans, at fair value line item in the Statement of Revenues and Expenses and Changes in Investment of U.S. Government.

The table below presents the range and weighted average of significant unobservable inputs used in determining the fair value of Ginnie Mae's reverse mortgage loans:

| | September 2023 |
|---|---|
| | *(Dollars in millions)* |
| Valuation at period end: | |
| Fair value | $           19,526 |
| Conditional termination rate assumptions: | |
| Weighted average conditional termination rate | 24.03% |
| Minimum conditional termination rate | 5.43% |
| Maximum conditional termination rate | 99.81% |
| Asset discount rate assumptions: | |
| Weighted average discount rate | 5.67% |
| Minimum discount rate | 5.17% |
| Maximum discount rate | 7.69% |

These significant unobservable inputs change according to the loan portfolio and macroeconomic market conditions. Increases (decreases) in the discount rates in isolation would result in a lower (higher) fair value measurement. The relationship between the conditional termination rate and the fair value measurement is less direct and would depend on other inputs. The conditional annual termination rate represents the percentage of the mortgage loan's UPB assumed to be terminated over the remaining life of the loan. The discount rate represents the rate a buyer of similar product would require in an arm's length transaction.

***HMBS obligations, at fair value*** – Ginnie Mae has elected the fair value option for HMBS obligations, at fair value. The valuation technique used by Ginnie Mae to measure the fair value of its HMBS obligations consists of the present value of projected pool buyouts based on the conditional termination rate.

Ginnie Mae recorded a loss of $2.0 billion for the year ended September    2023, from changes in the fair value of the HMBS obligations reflected in the gain (loss) on HMBS obligations, at fair value line item in the Statement of Revenues and Expenses and Changes in Investment of U.S. Government.

The table below presents the range and weighted average of significant unobservable inputs used in determining the fair value of Ginnie Mae's HMBS obligations:

43

Government National Mortgage Association
Notes to the Financial Statements

| | September 2023 *(Dollars in millions)* |
|---|---|
| Valuation at period end: | |
| Fair value | $ 19,147 |
| Conditional termination rate assumptions | |
| Weighted average conditional termination rate | 24.03% |
| Minimum conditional termination rate | 5.43% |
| Maximum conditional termination rate | 99.81% |
| Obligation discount rate assumptions: | |
| Weighted average discount rate | 5.85% |
| Minimum discount rate | 5.17% |
| Maximum discount rate | 7.69% |

These significant unobservable inputs change according to the loan portfolio and macroeconomic market conditions. Increases (decreases) in the discount rates in isolation would result in a lower (higher) fair value measurement. The relationship between the conditional termination rate and the fair value measurement is less direct and would depend on other inputs. The conditional termination rate represents the percentage of a mortgage loan's UPB assumed to be terminated over the remaining life of the loan. The discount rate represents the rate a buyer of a similar product would require in an arm's length transaction.

**Assets Measured at Fair Value on a Nonrecurring Basis:**

Ginnie Mae holds certain assets (acquired properties and conventional HFI loans at or greater than DPD) that are measured at fair value on a nonrecurring basis. These assets are not measured at fair value on an ongoing basis but are subject to fair value adjustments in certain circumstances (e.g., the impairment on the asset).

*Acquired Properties:* Acquired properties are long-lived assets classified as held for sale by Ginnie Mae that qualify for fair value measurement on a nonrecurring basis. Ginnie Mae initially measures acquired properties at their fair value, net of estimated costs to sell. Ginnie Mae subsequently measures acquired properties at the lower of their carrying values or fair values less estimated costs to sell. Subsequent valuation measurements are periodically performed up until the sale of the property. The dates of the fair value measurements vary from property to property and are not always at the reporting period end date. Ginnie Mae's accounting policy allows for the use of fair value measurements from a variety of sources that are within six months of the reporting period end date.

*Mortgage Loans Held for Investment:* Mortgage loans held for investment qualify for fair value measurement on a nonrecurring basis. Ginnie Mae reports the carrying value of HFI loans on the Balance Sheet at the UPB along with accrued interest, net of cost basis adjustments, and net of allowance for loan losses including accrued interest, as required by U.S. GAAP. Ginnie Mae periodically evaluates its HFI portfolio for uninsured loans that are at or greater than DPD in order to write down the recorded investment to the fair market value of the underlying collateral less estimated costs to sell. Ginnie Mae's accounting policy allows for the use of fair value measurements from a variety of sources that are within six months of the reporting period end date.

The following tables present the fair value measurement hierarchy level for Ginnie Mae's assets and liabilities that are measured at fair value on a nonrecurring basis:

44

Government National Mortgage Association
Notes to the Financial Statements

| | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| September 2023 *(Dollars in thousands)* | | | | |
| Acquired property, net | $ - | $ - | $ 44,574 | $ 44,574 |
| **Total Nonrecurring Assets at Fair Value** | **$ -** | **$ -** | **$ 44,574** | **$ 44,574** |

| | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| September 2022 *(Dollars in thousands)* | | | | |
| Acquired property, net | $ - | $ - | $ 6,160 | $ 6,160 |
| Mortgage Loans Held for Investment, net[2] | - | - | 9,514 | 9,514 |
| **Total Nonrecurring Assets at Fair Value** | **$ -** | **$ -** | **$ 15,674** | **$ 15,674** |

*(2) In October 2022, the fair value option was elected for Ginnie Mae's mortgage loan portfolio. Accordingly, following this election, mortgage loans are now measured at fair value on a recurring basis.*

For both acquired properties and conventional HFI loans at or greater than     DPD, Ginnie Mae applies a valuation waterfall methodology in estimating the fair value of those properties. The most commonly used techniques by valuation sources used in the waterfall include discounted cash flow analysis and listing and sales price analysis of similar properties. Inputs to the valuation methodologies include discount rates, recent historical data of the value of similar properties by a certified or licensed appraiser, recent pending sales information of similar properties, current listing of similar properties, estate brokers' specific market research of similar properties, and historical data of the value of similar properties. Ginnie Mae also leverages historical information to calculate the flat estimated costs to sell percentage for its acquired properties when applying the estimated costs to sell to the fair value. The related ranges and weighted averages for these inputs are not meaningful when aggregated as they vary significantly from property to property.

## Note 11: Fixed Assets, Net

Ginnie Mae's fixed assets consist of hardware and software. Fixed assets are carried at cost, less accumulated depreciation or amortization, respectively.

The tables below present the total balance of hardware and software, net of the accumulated depreciation and amortization:

| | Hardware | Software | Total |
|---|---|---|---|
| For the year ended September 2023 *(Dollars in thousands)* | | | |
| Balance, beginning of period | $ 4,125 | $ 275,703 | $ 279,828 |
| Additions | | 13,628 | 13,628 |
| Disposals | - | - | - |
| Impairments | (2,056) | (3,485) | (5,541) |
| **Balance, end of period** | **$ 2,069** | **$ 285,846** | **$ 287,915** |
| | | | |
| *Accumulated depreciation and amortization* | | | |
| Balance, beginning – accumulated depreciation and amortization | $ (2,415) | $ (222,608) | $ (225,023) |
| Depreciation and amortization | (502) | (18,043) | (18,545) |
| Disposals | - | - | - |
| Impairments | 1,063 | 1,118 | 2,181 |
| Balance, end of period – accumulated depreciation and amortization | $ (1,854) | $ (239,533) | $ (241,387) |
| **Balance, end of period – fixed assets, net** | **$** | **$ 46,313** | **$ 46,528** |

45

Government National Mortgage Association
Notes to the Financial Statements

| | | For the year ended September 2022 | | | |
|---|---|---|---|---|---|
| | | Hardware | | Software | Total |
| | | *(Dollars in thousands)* | | | |
| Balance, beginning of period | $ | 4,125 | $ | 256,732 | $ 260,857 |
| Additions | | - | | 19,300 | 19,300 |
| Disposals | | - | | - | - |
| Impairments | | - | | ( | ( |
| **Balance, end of period** | **$** | **4,125** | **$** | **275,702** | **$ 279,827** |
| | | | | | |
| *Accumulated depreciation and amortization* | | | | | |
| Balance, beginning – accumulated depreciation and amortization | $ | (1,652) | $ | (203,645) | $ (205,297) |
| Depreciation and amortization | | (762) | | (18,963) | (19,725) |
| Disposals | | - | | - | - |
| Impairments | | - | | - | - |
| Balance, end of period – accumulated depreciation and amortization | $ | (2,414) | $ | (222,608) | $ (225,022) |
| **Balance, end of period – fixed assets, net** | **$** | **1,711** | **$** | **53,094** | **$ 54,805** |

There were no assets under lease as of September    2023, and September    2022.

Ginnie Mae recorded total depreciation and amortization expense of $18.5 million and $ 19.7 million for the years ended September    2023, and 2022, respectively. Based on the current amount of hardware and software subject to depreciation and amortization, the estimated depreciation and amortization expense over the next five years is as follows: 2024 – $12.6 million; 2025 – $7.4 million; 2026 – $2.0 million; 2027 – $0.9 million; 2028– $0.

There were no intangible assets with indefinite lives as of September    2023, and September 2022. As of September    2023, and September    2022, the original weighted average life of intangible assets (i.e., software) subject to amortization was 4.7 years and 4.8 years, respectively. The remaining weighted average life of intangible assets subject to amortization was 1.1 years and 1.7 years for the same periods.

Ginnie Mae recorded impairments of $5.5 million and $0.3 million for the year ended September    2023, and 2022, respectively. During these periods, Ginnie Mae identified partially decommissioned hardware and stopped the development of certain internal software development projects, due to changes in Ginnie Mae's business and related infrastructure. As the software in development and related developed technology has no reuse or recoverable value, Ginnie Mae wrote these assets down to a fair value of $0 in FY23 and FY22 respectively. Additionally, partially decommissioned hardware was adjusted to reflect its revised remaining service life. These impairments are included in the gain (loss) other line item in the Statement of Revenues and Expenses and Changes in Investment of U.S. Government.

**Note 12: Revenue from Contracts with Customers and Deferred Revenue**

Revenue from contracts with customers includes commitment fees, multiclass fees, and other fees included in mortgage-backed securities program and other income on the Statement of Revenue and Expenses and Changes in Investment of U.S. Government. Refer to Note 2: *Summary of Significant Accounting Policies* for further information, including the identification of revenue sources in the scope of *ASC 606* and those subject to other GAAP requirements.

The following table presents revenue related to contracts with customers, disaggregated by type of revenue:

46

Government National Mortgage Association
Notes to the Financial Statements

| | For the years ended September [] *(Dollars in thousands)* | | |
|---|---|---|---|
| | **2023** | | **2022** |
| **Revenues:** | | | |
| Commitment fees | $ 85,221 | $ | 130,493 |
| Multiclass fees: | | | |
| Multiclass fees not in scope of *ASC 606*[1] | 31,842 | | 29,257 |
| MX combination fees in scope of *ASC 606* | 5,610 | | 4,392 |
| **Total multiclass fees** | $ 37,452 | $ | 33,649 |
| Mortgage-backed securities (MBS) program and other income: | | | |
| Transfer of issuer responsibilities in scope of *ASC 606* | 10,230 | | 9,111 |
| Other MBS program fees in scope of *ASC 606*[2] | 71 | | 54 |
| Other MBS program fees not in scope of *ASC 606*[3] | 1,233 | | 782 |
| **Total mortgage-backed securities program and other income** | $ 11,534 | $ | 9,947 |
| **Total Revenues** | $ 134,207 | $ | 174,089 |

*(1)  Includes REMIC and Platinum Certificates guaranty fees.*

*(2)  Includes new issuer applications fees, certificate handling fees, and acknowledgement agreement fees.*

*(3)  Primarily includes mortgage servicing fees and civil monetary penalty fees.*

Deferred revenue included the following:

| | September 2023 | | September 2022[4] |
|---|---|---|---|
| | *(Dollars in thousands)* | | |
| Deferred revenue – multiclass fees | $ 580,299 | $ | 563,089 |
| Deferred revenue – commitment fees[5] | 28,223 | | 31,644 |
| Deferred revenue – other | 142 | | 120 |
| **Total** | $ 608,664 | $ | 594,853 |

*(4)  The deferred revenue balances as of September    2021, were $528.4 million for multiclass fees, $60.3 million for commitment fees, and $126.0 thousand for other.*

*(5)  Represents payments received in advance of completion of Ginnie Mae's performance obligation. Refer to Note 2: Summary of Significant Accounting Policies for further details.*

## Note 13: Reserve for Loss

As Ginnie Mae guarantees the MBS certificate holders timely payment of P&I on MBS backed by federally insured or guaranteed loans (mainly loans insured by FHA or guaranteed by VA, USDA, and PIH), Ginnie Mae is susceptible to credit losses. Due to the various U.S. GAAP requirements related to accounting for credit losses, Ginnie Mae's financial statements recognize credit losses in multiple financial statement line items, as further outlined below:

**Guaranty liability**: The issuance of a guaranty under the MBS program obligates Ginnie Mae to stand ready to perform under the terms of the guaranty. As a result, a non-contingent and/or contingent liability may be recognized as discussed below:

- ***Non-contingent liability***

    Upon issuance of a guaranty, Ginnie Mae determines a non-contingent liability under *ASC 460* based on the present value of guaranty fees expected to be collected under the guaranty, which is recognized within the financial statement line-item guaranty liability on the

47

Government National Mortgage Association
Notes to the Financial Statements

Balance Sheet (see Note 4: *Financial Guarantees and Financial Instruments with Off-Balance Sheet Exposure)*.

- ***Contingent liability***

*Contingent Liability as Impacted by the Adoption of the CECL Standard*

As noted in Note 4: *Financial Guarantees and Financial Instruments with Off-Balance Sheet Exposure,* Ginnie Mae receives compensation in exchange for its guaranty of timely P&I payments to the MBS certificate holders in the event of an issuer default.

Ginnie Mae records a contingent liability to reflect expected lifetime credit losses on this guaranty in accordance with *ASC    .* This contingent liability is recorded on the Balance Sheet as liability for loss on mortgage-backed securities program guaranty. Determination of the contingent liability is based on factors such as probability of issuer default and macroeconomic indicators (e.g., the FHFA Housing Price Index).

As of September    2023, one Ginnie Mae issuer was considered probable of defaulting. Ginnie Mae estimated no expected losses as of September    2023, related to expected credit losses on pooled single family and HECM loans in the event of issuer defaults.

As of September    2023, Ginnie Mae estimated no expected credit losses on pooled multifamily loans in the event of issuer defaults. The contingent liability for multifamily loan defaults as of September    2023, was $111.1 million.

*Contingent Liability Prior to Adoption of the CECL Standard*

Prior to the adoption of the CECL standard, Ginnie Mae recorded a contingent liability when it is probable that a loss event will occur and the amount of the loss or a range of loss can be reasonably estimated. This contingent liability was measured initially and in subsequent periods under *ASC 450*. Once determined that a loss event was probable to occur, Ginnie Mae estimated the probable losses in the underlying loan portfolio to calculate the loss contingency, which was recorded on the Balance Sheet as liability for loss on mortgage-backed securities program guaranty. Where it is only reasonably possible that a loss event may occur, a contingent liability was not recorded, but is disclosed.

Determining a contingent liability requires considerable management judgment including the evaluation of the likelihood that future events will confirm the loss. When assessing whether it is probable that a loss event will occur, management takes into consideration various factors including the issuer's financial and operational vulnerability, a qualitative and quantitative corporate credit analysis, other evidence of potential default (e.g., known regulatory investigations or actions), interest rates, and general economic conditions.

The loss event for estimating a contingent liability depends on the type of underlying loans in the issuer's portfolio. A contingent liability for single family and HECM loans is triggered when the issuer is probable of defaulting. A contingent liability for multifamily loans may be triggered when either the issuer is probable of defaulting, or the borrower is probable of defaulting.

Ginnie Mae regularly monitors the credit quality of issuers through the internal Issuer Risk Grade (IRG). Ginnie Mae's IRG methodology is similar to the methodology used by credit rating agencies when evaluating corporate financial strength, and the individual IRGs are comparable to the credit ratings from rating agencies. The IRGs are updated on a monthly

48

APP535

Government National Mortgage Association
Notes to the Financial Statements

basis. The IRG is on a scale from 1 to 8, where an IRG of 1 indicates the strongest credit quality, and an IRG of 8 indicates the weakest credit quality.

As of September    2022, one issuer was considered probable of defaulting, for which Ginnie Mae recorded $494.3 thousand as a contingent liability related to probable losses. In addition, Ginnie Mae estimated no potential losses as of September    2022, related to reasonably possible losses on pooled single family and HECM loans in the event of issuer defaults.

As of September    2022, the contingent liability related to pooled multifamily loans probable of defaulting was $10.4 million. Ginnie Mae cannot determine an estimate for a reasonably possible contingent liability for multifamily loan defaults as of September    2022, because there is not a specific loan performance indicator that can be used to accurately reflect the likelihood of a reasonably possible default.

**Defaulted issuer, pooled loans, and allowance for P&I advances***: In the event an issuer cannot fulfill its responsibilities under the applicable MBS program, pass-through payments made by Ginnie Mae to satisfy its guaranty of timely P&I payments to MBS certificate holders are presented in advances, net on the Balance Sheet and Note 6: *Advances, Net*. Advances are reported net of an allowance, which is based on management's expectations of future collections of advanced funds from the mortgagors, proceeds from the sale of the property, or recoveries from third-party insurers or guarantors such as FHA, VA, USDA, and PIH.

**Defaulted issuer, non-pooled mortgage loans, and allowance for loan loss:**

- ***Mortgage Loans and Reimbursable Costs***

  *Mortgage Loans and Reimbursable Costs as Impacted by the Adoption of the CECL Standard*

  Upon adoption of the CECL standard, Ginnie Mae reports mortgage loans and reimbursable costs receivable on non-pooled loans collectively within the Balance Sheet as forward mortgage loans, at fair value. The determination of this fair value estimate considers and reflects credit risk. Refer to Note 10*: Fair Value Measurement* for further details on how the fair value of mortgage loans is determined.

  *Mortgage Loans and Reimbursable Costs Prior to Adoption of the CECL Standard*

  Prior to the adoption of the CECL standard, Ginnie Mae recognized forward mortgage loans purchased out of pools on its Balance Sheet along with the corresponding estimated incurred loss (i.e., allowance for loan losses) within the Balance Sheet as mortgage loans held for investment including accrued interest, net. Costs incurred on non-pooled loans expected to be reimbursed were recorded as reimbursable costs receivable and reported net of allowance within the Balance Sheet as reimbursable costs receivable, net for amounts that management believed would not be collected.

**Liability for representations and warranties:** Ginnie Mae performs an assessment of all existing representations and warranties and indemnification clauses associated with Purchase and Sale Agreements (PSAs) that are enforceable and legally binding. These clauses may require Ginnie Mae to repurchase loans previously sold to a third party or indemnify the purchaser for losses per the contractual terms of the PSA. On September    2023, and September    2022, Ginnie Mae recorded $17.3 thousand and $30.2 thousand as a contingent liability, respectively, for

49

Government National Mortgage Association
Notes to the Financial Statements

representations and warranties under an existing PSA that requires Ginnie Mae to repurchase mortgage loans that are not insured by the FHA or guaranteed by the VA, USDA, or PIH as identified by the purchaser as of or after the sale date. This amount is presented in liability for representations and warranties on the Balance Sheet.

**Note 14: Concentrations of Credit Risk**

*Counterparty credit risk*

Ginnie Mae manages its exposure to counterparty credit risk, defined as the risk of loss arising from the default of an issuer or other counterparty, through financial monitoring, risk modeling at the issuer level, credit reviews, and operational monitoring.

- Financial monitoring includes exposure limit analysis and analysis of projected losses against core capital reserves;

- Risk modeling at the issuer level is performed through Ginnie Mae's focus on the riskiest segment of the issuer base and regular monitoring of issuers on their watch list;

- Credit reviews are performed and considered in determining, for example, respective issuers' commitment authority limits, whether issuers can transfer pools to other approved issuers without impacting the credit profiles of the issuers involved, amongst other determinations;

- Operational monitoring encompasses compliance reviews, assessments of delinquency levels, and due diligence reviews before, during, and after transfer of servicing.

Counterparty credit risk from issuers, borrowers, and insurers is discussed in further detail in the sections below.

*Issuer concentration*

Concentrations of credit risk exist when a significant number of issuers are susceptible to similar changes in economic conditions that could affect their ability to meet contractual obligations.

The tables below summarize concentrations of credit risk by active issuers and loan type on September 2023, and September 2022:

| | September 2023 | | | | | | | |
| | Single Family | | Multifamily | | Manufactured Housing | | Home Equity Conversion | |
| | Number of Issuers | Unpaid Principal Balance | Number of Issuers | Unpaid Principal Balance | Number of Issuers | Unpaid Principal Balance | Number of Issuers | Unpaid Principal Balance |
| | | | | | | *(Dollars in billions)* | | |
|---|---|---|---|---|---|---|---|---|
| Largest performing Issuers | 24 | $ 1,885.9 | 8 | $ 85.6 | - | $ - | 1 | $ 16.5 |
| Other performing Issuers | | 382.3 | 44 | 63.7 | 3 | 0.1 | 11 | 23.7 |
| **Total active issuers** | | $ 2,268.2 | 52 | $ 149.3 | 3 | $ 0.1 | 12 | $ 40.2 |

50

APP537

Government National Mortgage Association
Notes to the Financial Statements

| | Single Family | | Multifamily | | September 2022 Manufactured Housing | | Home Equity Conversion | |
| | Number of Issuers | Unpaid Principal Balance | Number of Issuers | Unpaid Principal Balance | Number of Issuers | Unpaid Principal Balance | Number of Issuers | Unpaid Principal Balance |
| | | | | | *(Dollars in billions)* | | | |
|---|---|---|---|---|---|---|---|---|
| Largest performing Issuers | 23 | $ 1,637.6 | 9 | $ 85.5 | - | $ - | 1 | $ 21.4 |
| Other performing Issuers | | 448.9 | 45 | 56.4 | 3 | 0.2 | 12 | 37.8 |
| **Total active issuers** | | **$ 2,086.5** | **54** | **$ 141.9** | **3** | **$ 0.2** | **13** | **$ 59.2** |

Largest performing issuers are defined based on the total portfolio size and, for single family issuers, includes issuers with greater than 75,000 total loans in the portfolio. For multifamily issuers, largest performing issuers are defined as issuers with a total UPB of $5.0 billion or more. Other performing issuers include manufactured housing and HMBS issuers whose portfolios are outside the defined thresholds for single family and multifamily issuers.

Issuers are only permitted to pool insured or guaranteed loans (from FHA, VA, USDA, or PIH). The insuring or guaranteeing agencies have strict underwriting standards and criteria for quality of collateral. Mortgage loans insured by the FHA receive full recovery of the UPB, including all delinquent interest accrued at the HUD debenture rate since default with the exception of the first two months. USDA, VA, and PIH guaranteed loans are not fully recoverable, however still provide coverage over a substantial portion of the realized losses. Given this, changes in fair value attributable to instrument-specific credit risk for assets or liabilities for which the fair value option was elected were not material for the year ended September 2023.

In the event of an issuer default, termination and extinguishment, Ginnie Mae assumes the rights and obligations of that issuer and becomes the owner of the MSR liability or asset, which typically is salable. Ginnie Mae has the option or requirement to purchase loans out of the pool if certain criteria are satisfied. Upon purchase of the loan out of the pool, Ginnie Mae acquires all lender rights, privileges, and responsibilities. This includes certain collateral rights and ability to claim FHA, VA, USDA, or PIH insured or guaranteed loan loss recoveries.

Ginnie Mae's portfolio of issuers include both traditional banks (depositories) and independent mortgage institutions (non-depositories, or non-banks). As of September 2023, and September 2022, the distribution of Ginnie Mae's business volumes among these two categories was as follows:

| | September 2023 | | | September 2022 | | |
| | Total Number of Issuers | Total Issuances (1) | As Percentage of Total Issuances | Total Number of Issuers | Total Issuances (2) | As Percentage of Total Issuances |
| | | | *(Dollars in millions)* | | | |
|---|---|---|---|---|---|---|
| Depositories | 95 | $ 43,114 | 10.66 % | 98 | $ 72,143 | 11.04 % |
| Non-depositories | | 361,261 | 89.34 | | 581,366 | 88.96 |
| **Total active issuers** | | **$ 404,375** | **100.00 %** | | **$ 653,509** | **100.00 %** |

(1) These amounts represent the total issuances within the past 12 months from October 1, 2022, to September 2023.

(2) These amounts represent the total issuances within the past 12 months from October 1, 2021, to September 2022.

51

Government National Mortgage Association
Notes to the Financial Statements

As more non-banks issue Ginnie Mae securities, the cost and complexity of monitoring increases as the majority of these institutions involve more third parties in their transactions, making oversight more complicated. In contrast to traditional bank issuers, non-banks rely more on credit lines, securitization transactions and other types of external financing, and sales of MSR to provide liquidity. Regardless, Ginnie Mae's issuer composition greatly reduces the risk of exposure to the failure of any one institution.

The impacts to mortgage and borrowing rates stemming from the Federal Reserve's increases to the targeted federal funds rate has had a pronounced effect on issuer origination volumes, borrowing costs, investor spreads on securitization and the fair value of selected Level 3 assets. While these effects are felt across the issuer base, they are more significant for certain product types and issuers, such as HECM and HMBS issuers, due to higher levels of concentration of issuance, access to financing and availability of sub-servicers. As a result, Ginnie Mae is enhancing its assessment of the current interest rate environment and in particular is focusing on those sectors where any impacts could be more acutely manifested.

*Geographical concentration*

Economic conditions unique to a geographical area may affect a borrower's ability to repay their mortgage loan as well as the value of the underlying property. These conditions are impactful to both single family and multifamily issuers and can become impactful to Ginnie Mae in instances where they effect an issuer's ability to make timely principal and interest payments to their shareholders. Ginnie Mae insured issuers hold loans in all fifty states including three U.S. territories and the District of Columbia which helps to mitigate the risks associated with geographical concentrations.

The tables below display geographical concentrations present within Ginnie Mae's Single Family and Multifamily Programs as of September   2023, and September   2022. The states presented in the tables below represent the five geographical areas with the largest exposures by combined single family and multifamily UPB, as of September   2023, and September   2022, respectively:

| | September 2023 | | | | | | | |
| | Single Family | | | | Multifamily | | | |
| | Number of Loans | Loan Percent | Unpaid Principal Balance (UPB) | UPB Percent | Number of Loans | Loan Percent | Unpaid Principal Balance (UPB) | UPB Percent |
| | | | *(Dollars in billions)* | | | | | |
|---|---|---|---|---|---|---|---|---|
| California | 705,368 | 6.32 % | $   235.3 | 10.37 % | 1,055 | 7.13 % | $   10.4 | 6.98 % |
| Texas | 1,134,259 | 10.16 | 215.2 | 9.49 | 1,263 | 8.53 | 16.3 | 10.89 |
| Florida | 884,809 | 7.93 | 194.7 | 8.58 | 543 | 3.67 | 7.5 | 5.00 |
| Virginia | 454,833 | 4.07 | 118.5 | 5.22 | | 2.41 | 6.4 | 4.29 |
| Georgia | 513,583 | 4.60 | 95.9 | 4.23 | | 2.74 | 2.9 | 1.94 |
| Other | 7,469,122 | 66.92 | 1,408.6 | 62.11 | 11,180 | 75.52 | 105.8 | 70.90 |
| Totals | 11,161,974 | 100.00 % | $   2,268.2 | 100.00 % | $14,804 | 100.00 % | $   149.3 | 100.00 % |

52

APP539

Government National Mortgage Association
Notes to the Financial Statements

| | September 2022 | | | | | | | |
| | Single Family | | | | Multifamily | | | |
| | Number of Loans | Loan Percent | Unpaid Principal Balance (UPB) | UPB Percent | Number of Loans | Loan Percent | Unpaid Principal Balance (UPB) | UPB Percent |
| | | | | *(Dollars in billions)* | | | | |
|---|---|---|---|---|---|---|---|---|
| California | 668,930 | 6.28 % | $ 217.2 | 10.41 % | 1,029 | 7.04 % | $ 10.0 | 7.02 % |
| Texas | 1,066,131 | 10.00 | 191.3 | 9.17 | 1,226 | 8.39 | 14.6 | 10.26 |
| Florida | 829,982 | 7.79 | 173.1 | 8.30 | 526 | 3.60 | 7.0 | 4.93 |
| Virginia | 438,492 | 4.11 | 112.2 | 5.38 | | 2.34 | 5.9 | 4.14 |
| Georgia | 487,671 | 4.58 | 86.2 | 4.13 | | 2.75 | 2.7 | 1.90 |
| Other | 7,167,521 | 67.24 | 1,306.5 | 62.61 | 11,094 | 75.88 | 101.7 | 71.75 |
| **Totals** | **10,658,727** | **100.00 %** | **$ 2,086.5** | **100.00 %** | **14,619** | **100.00 %** | **$ 141.9** | **100.00 %** |

Ginnie Mae performs a quarterly assessment to monitor the impacts of natural disasters on the properties owned by Ginnie Mae as well as those securing Ginnie Mae guaranteed mortgage backed securities. For the quarter ending September 2023, there were no material impacts to these portfolios from natural disasters identified.

*Federal insurance concentration*

The insurance coverage provided to Ginnie Mae by the insuring or guaranteeing agencies noted above, covers shortfalls in Ginnie Mae's collection of net proceeds from a foreclosure or short sale, in accordance with the respective agency guidelines. Ginnie Mae is exposed to the risk that these agencies will fail or be unable to meet their contractual obligation in the event of a severe economic downturn. This risk is deemed remote by Ginnie Mae given the federal backing of these agencies as well as their record through historical economic downturns. Family and Multifamily Programs as of September 2023, and September 2022:

| | September 2023 | | | | | | | |
| | Single Family | | | | Multifamily | | | |
| | Number of Loans | Loan Percent | Unpaid Principal Balance (UPB) | UPB Percent | Number of Loans | Loan Percent | Unpaid Principal Balance (UPB) | UPB Percent |
| | | | | *(Dollars in billions)* | | | | |
|---|---|---|---|---|---|---|---|---|
| FHA[3] | 6,786,437 | 60.80 % | $ 1,222.9 | 53.92 % | 13,569 | 91.66 % | $ 147.5 | 98.78 % |
| VA | 3,565,713 | 31.95 | 940.2 | 41.45 | - | - | - | - |
| USDA | 786,057 | 7.04 | 101.2 | 4.46 | 1,235 | 8.34 | 1.8 | 1.22 |
| PIH | 23,767 | 0.21 | 3.9 | 0.17 | - | - | - | - |
| **Totals** | **11,161,974** | **100.00 %** | **$ 2,268.2** | **100.00 %** | **14,804** | **100.0 %** | **$ 149.3** | **100.00 %** |

| | September 2022 | | | | | | | |
| | Single Family | | | | Multifamily | | | |
| | Number of Loans | Loan Percent | Unpaid Principal Balance (UPB) | UPB Percent | Number of Loans | Loan Percent | Unpaid Principal Balance (UPB) | UPB Percent |
| | | | | *(Dollars in billions)* | | | | |
|---|---|---|---|---|---|---|---|---|
| FHA[3] | 6,407,982 | 60.12 % | $ 1,096.8 | 52.57 % | 13,428 | 91.85 % | $ 140.2 | 98.81 % |
| VA | 3,433,858 | 32.22 | 883.3 | 42.33 | - | - | - | - |
| USDA | 793,059 | 7.44 | 102.5 | 4.91 | 1,191 | 8.15 | 1.7 | 1.19 |
| PIH | 23,828 | 0.22 | 3.9 | 0.19 | - | - | - | - |
| **Totals** | **10,658,727** | **100.00 %** | **$ 2,086.5** | **100.00 %** | **14,619** | **100.0 %** | **$ 141.9** | **100.0 %** |

*(3)  In addition, Ginnie Mae's HECM program is insured by FHA. As of September 2023, the unpaid principal balance of HECM loans issued by non-defaulted issuers was $40.2 billion, or 188.2 thousand HECM loans. As of September 2022, unpaid principal balance was $59.3 billion, or 302.4 thousand HECM loans.*

53

Government National Mortgage Association
Notes to the Financial Statements

*Mortgage loan servicing*

Ginnie Mae relies on two MSS (i.e., master sub-service organizations) to provide servicing functions that are critical to its business. Significant reliance is placed on the servicing data and accounting reports provided by the service organizations. Ginnie Mae could be adversely impacted if the MSS lack appropriate controls, experience a failure in their controls, or experience a disruption in service including legal or regulatory action. Ginnie Mae manages this risk by establishing contractual requirements, ongoing reviews of the service organizations, and requiring the service organizations to provide attestation reports over internal controls.

### Note 15: Commitments and Contingencies

*Lease, purchase, and other commitments*

Ginnie Mae may lease facilities, hardware, and software under agreements that could require the agency to pay rental fees, insurance, maintenance, and other costs. As of September    2023, Ginnie Mae did not have any active and open lease contracts related to rental expense or hardware and software.

As of September    2023, and September    2022, Ginnie Mae had approved and committed to make $2.3 billion and $2.7 billion respectively, in payments related to contracts with its various vendors. Some contract terms with its vendors are in excess of one year.

Ginnie Mae has commitments to guarantee MBS, which are off-balance sheet financial instruments. Additional information is provided in Note 4: *Financial Guarantees and Financial Instruments with Off-Balance Sheet Exposure*.

*Legal*

From time to time, Ginnie Mae can be a party to pending or threatened legal actions and proceedings which arise in the ordinary course of business. Ginnie Mae reviews relevant information about all pending legal actions and proceedings for the purpose of evaluating and revising contingencies, accruals, and disclosures.

Legal actions and proceedings resolution are subject to many uncertainties and cannot be predicted with absolute accuracy. Ginnie Mae establishes accruals for matters when a loss is probable and the amount of the loss can be reasonably estimated. For legal actions or proceedings where it is not reasonably possible that a loss may be incurred, or where Ginnie Mae is not currently able to estimate the reasonably possible loss or range of loss, Ginnie Mae does not establish an accrual. Pending or threatened litigation deemed reasonably possible that a loss may have been incurred are disclosed in the notes to the financial statements.

No asserted or unasserted claims or assessments for similar matters have been identified. Additionally, Ginnie Mae's General Counsel has determined that there are no pending or threatened actions or unasserted claims or assessments that could result in potential losses that could be material to the financial statements.

Ginnie Mae's management recognizes the uncertainties that could occur in regard to potential terminated and extinguished issuers and other indirect guaranties, such as large issuer portfolio default, terminated and extinguished, lack of proper insurance coverage of terminated and extinguished loans. Additional information is discussed in Note 13: *Reserve for Loss*.

54

Government National Mortgage Association
Notes to the Financial Statements

*Contingencies*

In December 2019, a novel strain of coronavirus was reported in Wuhan, China. The World Health Organization declared the outbreak to constitute a "Public Health Emergency of International Concern" and on March 1, 2020, the President of the United States proclaimed that the COVID-19 outbreak in the United States was a national emergency. In order to address the then economic impact of COVID-19, the FHA implemented foreclosure and eviction moratoriums that have since expired.

On September      2021, the FHA announced new and extended COVID-19 relief options for borrowers recently or newly struggling to make their mortgage payments because of the pandemic and for senior homeowners with HECMs who need assistance to remain in their homes. The FHA is providing a COVID-19 Forbearance period and HECM Extension of up to six months for borrowers, when requested between October 1, 2021, and May      2023. The new deadline for applications was extended until May      2023, to provide affected borrowers ample time to request a COVID-19 Forbearance or HECM Extension. Currently, no COVID-19-related loan forbearance period is allowed to exceed six months (i.e., November      2023) since the last extension date of May      2023.

On January      2023, the Biden Administration announced its intent to end the national emergency and public health emergency declarations on May 11, 2023. As a result, Ginnie Mae does not anticipate a significant impact on its operating results in the future.

*Unfunded Commitments*

For reverse mortgage loans, Ginnie Mae is required to fund future borrower advances in instances where the borrower has not fully drawn down the HECM loan proceeds available, which may be used by Ginnie Mae to pay FHA monthly insurance premiums on behalf of the borrower. The outstanding unfunded commitments available to borrowers related to reverse mortgage loans were approximately $4.6 billion as of September      2023.

**Note 16: Related Parties**

Ginnie Mae, a wholly owned U.S. Government corporation within HUD, is subject to controls established by government corporation control laws (      U.S.C. Chapter 91) and management controls by the Secretary of HUD and the Director of the OMB. These controls could affect Ginnie Mae's financial position or operating results in a manner that differs from those that might have been obtained if Ginnie Mae were autonomous. Accordingly, the accompanying financial statements may not necessarily be indicative of the conditions that would have existed if Ginnie Mae had been operating as an independent organization.

Ginnie Mae was authorized and has allotted $51.9 million and $52.0 million during the years ended September      2023, and 2022, respectively, for personnel (payroll) and non-personnel (travel, training, and other administration) costs only. For the years ended September      2023, and 2022, Ginnie Mae incurred $46.7 million and $41.1 million, respectively for these costs, which are included in administrative expenses on the Statement of Revenue and Expenses and Changes in Investment of U.S. Government. Ginnie Mae has authority to borrow from Treasury to finance operations in lieu of appropriations, if necessary. Ginnie Mae entered into a borrowing agreement with the U.S. Treasury on September 15, 2023. This agreement provides Ginnie Mae the ability to borrow from the U.S. Treasury sufficient funds to service MBS portfolios defaulted and

55

Government National Mortgage Association
Notes to the Financial Statements

extinguished by Ginnie Mae. No amounts were obligated or used against this authority during the year ended September    2023. Ginnie Mae did not borrow funds for the year ended September    2022.

Additionally, Ginnie Mae has relationships with FHA, VA, and USDA. All transactions between Ginnie Mae and FHA, VA, and USDA have occurred in the normal course of business. Of the total forward mortgage loans, at fair value, approximately $1.3 billion, $52.3 million, and $22.3 million of loans were insured by FHA, VA, and USDA at September    2023, respectively, while $1.5 billion, $60.6 million, and $26.3 million of loans were insured by FHA, VA, and USDA at September    2022, respectively. For reverse mortgage loans, at fair value, approximately $19.5 billion of loans were insured by FHA as of September    2023. In addition, Ginnie Mae submits and receives claim proceeds for FHA, VA, and USDA insured loans that have completed the foreclosure and short sale process.

After the short sale, foreclosed property, and assignment claims receivable are established, on an ongoing basis, the recoverability of the receivables is assessed under U.S. GAAP guidance. The allowance for claims receivable is calculated using statistical models based on expected recovery per underlying insuring agency guidelines and Ginnie Mae's most recent historical recovery experience.

The breakdown of FHA, VA, and USDA claims pending payment or pre-submission to FHA, VA, and USDA is below:

| | September 2023 | | | |
| | FHA | VA | USDA | Total |
| | *(Dollars in thousands)* | | | |
|---|---|---|---|---|
| Foreclosed property claims receivable | $ 55,497 | $ 864 | $ 870 | $ 57,231 |
| Short sale claims receivable | 1,896 | 53 | - | 1,949 |
| Assignment claims receivable | 3,268 | - | - | 3,268 |
| Allowance for claims receivable | (2,460) | ( | - | (2,661) |
| **Claims receivable, net** | **$ 58,201** | **$ 716** | **$ 870** | **$ 59,787** |

| | September 2022 | | | |
| | FHA | VA | USDA | Total |
| | *(Dollars in thousands)* | | | |
|---|---|---|---|---|
| Foreclosed property claims receivable | $ 36,949 | $ | $ 780 | $ 38,025 |
| Short sale claims receivable | 535 | - | - | 535 |
| Assignment claims receivable | - | - | - | - |
| Allowance for claims receivable | (1,535) | ( | (4) | (1,709) |
| **Claims receivable, net** | **$ 35,949** | **$ 126** | **$ 776** | **$ 36,851** |

**Pension Benefits and Savings Plan:** Eligible Ginnie Mae employees are covered by the federal government retirement plans, either the Civil Service Retirement System (CSRS) or the Federal Employees Retirement System (FERS). Although Ginnie Mae contributes a portion of pension benefits for eligible employees, it does not account for the assets of either retirement system. Ginnie Mae also does not have actuarial data for accumulated plan benefits or the unfunded liability relative to eligible employees. These amounts are reported by the Office of Personnel Management (OPM) and are allocated to HUD.

Under the Federal Thrift Savings Plan (TSP), Ginnie Mae provides FERS employees with an automatic contribution of 1% of pay and an additional matching contribution up to 4% of pay. CSRS employees also can contribute to the TSP, but they do not receive matching contributions.

56

Government National Mortgage Association
Notes to the Financial Statements

For the years ended September    2023, and 2022, Ginnie Mae contributed $6.4 million and $5.6 million, respectively, in pension and savings benefits for eligible employees.

**Post-Retirement Benefits Other Than Pensions:** Ginnie Mae has no postretirement health insurance liability since all eligible employees are covered by the Federal Employees Health Benefits (FEHB) program. The FEHB is administered and accounted for by the OPM. In addition, OPM pays the employer share of the retiree's health insurance premium.

**Note 17: Credit Reform**

The Federal Credit Reform Act of 1990 ("FCRA"), which became effective on October 1, 1991, was enacted to more accurately account and budget for the cost of federal credit programs and to place the cost of these credit programs on a basis equivalent with other federal spending. The FCRA evaluates credit programs and provides appropriate funding for programs that operate at a loss, within budgetary limitations, to subsidize the loss element of the credit program. As of September    2023, and September    2022, the investment of U.S. Government account had a balance of $30.8 billion and $29.8 billion, respectively. Federal statute allows Ginnie Mae to accumulate and retain revenues in excess of expenses to build sound reserves which will be consumed for program expenses prior to reliance on any budgeted credit loss subsidy appropriation. Therefore, in the opinion of management and HUD's general counsel, Ginnie Mae is not subject to the FCRA.

**Note 18: Subsequent Events**

Ginnie Mae has evaluated subsequent events through November 13, 2023, the date the financial statements were available to be issued and determined that there have been no events that have occurred that would require adjustments to our disclosures.

57

APP544

This page intentionally left blank.

APP545

This page intentionally left blank.



★ Texas Capital Bank

March 16, 2023

Via [Courier/Electronic Mail]

Alanna McCargo
President
Ginnie Mae
425 Third Street SW, Washington, DC 20024

Julia R. Gordon
Assistant Secretary for Housing and Federal Housing Commissioner of the US Department of Housing and Urban Development
451 7th Street, SW, Washington, DC 20410

Dear President McCargo and Commissioner Gordon,

This letter follows a conversation on March 9, 2023 (the "Conversation") held among representatives from Government National Mortgage Association ("Ginnie Mae"), the Federal Housing Administration ("FHA"), and Texas Capital Bank ("TCB"). TCB seeks assurances from Ginnie Mae and FHA that both entities (a) recognize TCB's lien against and property rights in the Collateral and DIP Collateral (each, as defined below) and (b) will work expeditiously with TCB to monetize the Collateral and DIP Collateral that entered Ginnie Mae's possession when Ginnie Mae seized the MSRs (as defined below) of the Debtor (as defined below).

Specifically, TCB entered into a loan and security agreement (as amended, the "Loan Agreement") with Reverse Mortgage Funding LLC ("RMF"). The Loan Agreement was collateralized by unsecuritized funded amounts (such amounts, "Tail Advances" and together with the cash proceeds therefrom, the "Collateral") relating to home equity conversion mortgage loans ("HECM Loans"), which HECM Loans were previously securitized into home equity conversion mortgage-backed securities ("HMBS"). Tail Advances included, but were not limited to, draw disbursements to the related mortgagor, mortgage insurance premiums, fees, or charges, which accrued, were disbursed, or were added to the balance of a HECM Loan. In connection with the Loan Agreement, TCB entered into an intercreditor agreement (as amended, the "Intercreditor Agreement") with RMF and Leadenhall Life Insurance Linked Investments Fund PLC ("LCP"). LCP entered a loan agreement with RMF (as amended, the "LCP Facility Agreement") collateralized by the mortgage servicing rights relating to HECM Loans held in HMBS (the "MSRs").

2000 McKinney Ave., Suite 700
Dallas, TX 75201
214.932.6600

1

APP548

HUD-0000328

★ **Texas Capital Bank**

Section 3.08 of the HMBS form of Guaranty Agreement (the "Guaranty Agreement") provides that HMBS issuers may not "transfer, assign or convey" any interests in Tail Advances "without the consent of Ginnie Mae in its sole and absolute discretion." Ginnie Mae reviewed, commented upon and signed off on the Loan Agreement, the Intercreditor Agreement and the LCP Facility Agreement. Ginnie Mae exercised its discretion and provided its consent to RMF to allow it to grant a security interest against the Collateral to TCB. Furthermore, while LCP contractually agreed that Ginnie Mae would have the right to seize the MSRs, pursuant to an acknowledgment agreement (as amended, the "AA"), amongst Ginnie Mae, RMF and LCP, Ginnie Mae sought no such rights with TCB. Ginnie Mae did not request nor obtain the same with TCB, as Tail Advances are not yet securitized into HMBS and all property rights in the Collateral resided with RMF and TCB rather than Ginnie Mae.

On November 30, 2022, RMF and affiliated debtors each filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Filing"). Upon the Filing, among other things, numerous direct and indirect events of default occurred under the Loan Agreement, and TCB was no longer committed to fund RMF's Tail Advances under the Loan Agreement.

Shortly after the Filing, RMF, as debtor and debtor-in-possession (the "Debtor"), failed to fund draws made by mortgagors. Lacking sufficient liquidity to continue funding draws, the Debtor explored a variety of funding and financing alternatives. Numerous discussions involving the Debtor, Ginnie Mae, FHA, LCP, TCB and others ensued. At the behest of the Debtor, Ginnie Mae and FHA, as neither Ginnie Mae nor LCP would fund Tail Advances itself, TCB and Longbridge Financial LLC ("Longbridge") agreed to enter into a post-petition financing agreement (the "DIP Financing") providing for TCB and Longbridge to fund Tail Advances and to be secured by existing and new Tail Advances, the cash proceeds therefrom and other collateral (the "DIP Collateral"). The order authorizing the Debtor to enter into such DIP Financing (the "DIP Order")[1] specifically authorized RMF to grant TCB and Longbridge "validly perfected and enforceable security interests in and superpriority liens on" the DIP Collateral. Ginnie Mae was aware of, and consented to, the DIP Financing, did not object to the grants of security interest in the DIP Collateral to TCB and Longbridge, and did not object to the DIP Order. Consistent with the foregoing, in the DIP Order, the United States of America specifically reserved rights against the Debtor, LCP and Longbridge, but did not seek to do so against TCB.

---

[1] Second Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing; (II) Authorizing Certain Debtors' Use of Cash Collateral; (III) Modifying The Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief, *In re Reverse Mortgage Investment Trust Inc, et al.* Case No. 22-11225 (MFW) (Bankr. D. Del., Feb. 23, 2023), Doc. 170.

2000 McKinney Ave., Suite 700
Dallas, TX 75201
214.932.6600

2

HUD-0000329

★ Texas Capital Bank

Prior to finalizing the DIP Financing, TCB and Longbridge expressed the concern that, if Ginnie Mae seized the MSRs, a prolonged period between the funding of Tail Advances and the repayment to TCB and Longbridge could result. TCB and Longbridge, therefore, made it a condition to funding in the DIP Order that they receive adequate assurances from Ginnie Mae for the securitization of the Tail Advances and an orderly process to monetize the Tail Advances in the event of a seizure of the MSRs. Ginnie Mae and FHA provided assurances to TCB on multiple occasions in December 2022. Predicated on these assurances, TCB and Longbridge disbursed a total of $28,689,673.73 under the DIP Financing over four occasions in December 2022. Had Ginnie Mae and FHA not provided such assurances that TCB and Longbridge would not be adversely affected by providing the DIP Financing, TCB and Longbridge would never have executed, let alone provided funding under, the DIP Financing.

On December 20, 2022, Ginnie Mae seized the MSRs from the Debtor (the "Seizure"). At the time of the Seizure, Ginnie released a statement that the Seizure "was accomplished without negatively impacting borrowers." Ginnie Mae's statement did not acknowledge the critical role that TCB and Longbridge played in provided the funding necessary for the Tail Advances to avoid such negative impact. After the Seizure, Ginnie Mae hired Compu-Link Corporation D/B/A Celink ("Celink") to subservice the MSRs.

After Celink began subservicing the MSRs, Ginnie Mae and FHA continued to converse with TCB about how best to securitize and monetize Tail Advances. Ginnie Mae and FHA even met in person with TCB on January 27, 2023 to discuss securitization and other monetization alternatives.

Until the Conversation occurred, TCB was expecting Ginnie Mae to confirm in the Conversation that TCB would receive proceeds from the securitization of the Tail Advances constituting DIP Collateral. Ginnie Mae, surprisingly and disappointingly, did not do so.

Ginnie Mae also may have intimated that TCB and Longbridge have no right to the proceeds from the monetization of the DIP Collateral. This intimation is incorrect. TCB obtained and retains a lien over and property right in the DIP Collateral. TCB continues to expect that it will receive the proceeds from the monetization of the DIP Collateral.

The failure of Ginnie Mae and FHA to recognize and support TCB's interests in the DIP Collateral may have far-reaching and counterproductive consequences. Absent reasonable assurances, TCB fears that financing for many HECM-related assets will cease to exist. Ultimately, therefore, the viability of the HECM program is at issue. TCB has supported and wants to continue supporting a vibrant HECM program and hopes this letter clears up any confusion about interests in the DIP Collateral (though TCB notes that this letter is not a complete statement of all facts and issues relating to the matters addressed herein, and

3

2000 McKinney Ave., Suite 700
Dallas, TX 75201
214.932.6600

HUD-0000330

⭐ **Texas Capital Bank**

nothing in this letter is intended to be nor shall be deemed to be a waiver or release of any right, remedy or cause of action that TCB may have against any person).

TCB, therefore, requests assurances from Ginnie Mae and FHA that both entities (a) recognize TCB's lien against and property rights in the DIP Collateral and (b) will work expeditiously with TCB to monetize the DIP Collateral.

Sincerely,

*Madison Simm*

Madison Simm

Digitally signed by
Madison Simm
Date: 2023.03.16
08:49:16 -05'00'

Madison Simm

cc:
Anna M. Alvarado, Esq. (*via electronic mail*)
Jonathan C. Wishnia, Esq. (*via electronic mail*)
Ken Ziman, Esq. (*via electronic mail*)

Sam Valverde, EVP and COO, Ginnie Mae *(via electronic mail)*
Gregory Keith, SVP and CRO, Ginnie Mae *(via electronic mail)*

4

*2000 McKinney Ave., Suite 700*
*Dallas, TX 75201*
*214.932.6600*

APP551

HUD-0000331

**From:** Craig Corn <ccorn@reversefunding.com>
**Sent:** Friday, March 3, 2023 8:58 AM
**To:** Brian Keena <BKeena@reversefunding.com>; Jim Rose <jrose@reversefunding.com>
**Subject:** RE: Tail proceeds

That is a disaster, and really effed up

---

**From:** Brian Keena <BKeena@reversefunding.com>
**Sent:** Friday, March 3, 2023 9:43 AM
**To:** Jim Rose <jrose@reversefunding.com>; Craig Corn <ccorn@reversefunding.com>
**Subject:** FW: Tail proceeds

This should infuriate TCB.

Brian Keena
Treasurer
Reverse Mortgage Funding
(516)    0006 Direct
(516)    2338 Cell
bkeena@reversefunding.com

---

**From:** Amy Morrill <Amy.Morrill@celink.com>
**Sent:** Friday, March 3, 2023 9:41 AM
**To:** Brian Keena <BKeena@reversefunding.com>; Ryan LaRose <Ryan.LaRose@celink.com>
**Cc:** Crouch, Aric L. <aric.crouch@texascapitalbank.com>; Jim Rose <jrose@reversefunding.com>
**Subject:** RE: Tail proceeds

> **CAUTION:** This email originated from outside of RMF. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Brian – All funds on the unsecured balances have been sent to GNMA as part of the portfolio seizure.

**Amy Morrill**
**First Vice President Investor Reporting**
**Phone:** 517-703-5821

APP552



3900 Capitol City Blvd.
Lansing, MI 48906
**www.celink.com**

**"ACHIEVE** Ambassador" – Cultivating the Customer Experience

---

**From:** Brian Keena <BKeena@reversefunding.com>
**Sent:** Thursday, March 2, 2023 5:    PM
**To:** Amy Morrill <Amy.Morrill@celink.com>; Ryan LaRose <Ryan.LaRose@celink.com>
**Cc:** Crouch, Aric L. <aric.crouch@texascapitalbank.com>; Jim Rose <jrose@reversefunding.com>
**Subject:** Tail proceeds

| This message was sent securely using Zix® |
| :---: |

Amy and Ryan,

Speaking earlier with TCB about our tail facility, Aric indicated they've not received any proceeds on tail payments/payoffs. Under normal course of business, RMF received amounts under "Tail Transfer Amount" on the GNMA remittance report, which were then passed along to TCB to repay our tail facility.  Can you tell us where those funds are being sent now?

TCB has a lien on the unsecuritized amounts on loans that hare currently in GNMA pools, and we are trying to figure out how to get those funds in the right place.

If better to discuss on a call, please let me know.  Thanks.

Brian Keena
Treasurer
Reverse Mortgage Funding
(516)    0006 Direct
(516)    2338 Cell
bkeena@reversefunding.com

CONFIDENTIALITY NOTICE: We intend only the individual or entity to which we have addressed this electronic message to view it. This message may contain privileged and/or confidential information or other information prohibited from unauthorized disclosure by law. You may not disseminate, distribute, copy or otherwise disclose the contents of this communication without our prior written consent. If you are not the intended recipient, or if you have received this communication in error, notify us immediately by return e-mail and delete the original message and any copies of it from your computer system. Reverse Mortgage Funding LLC (NMLS # 1019941).

This message was secured by **Zix**®.

### Disclaimer

The information transmitted in this e-mail and in any replies and forwards are for the sole use of the person or entity to which it is addressed. It may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient or an agent of the recipient is prohibited. If you received this in error, please notify and return the original message to the sender immediately at the above address and delete the material from any computer. Thank you.

CONFIDENTIALITY NOTICE: We intend only the individual or entity to which we have addressed this electronic message to

view it. This message may contain privileged and/or confidential information or other information prohibited from unauthorized disclosure by law. You may not disseminate, distribute, copy or otherwise disclose the contents of this communication without our prior written consent. If you are not the intended recipient, or if you have received this communication in error, notify us immediately by return e-mail and delete the original message and any copies of it from your computer system. Reverse Mortgage Funding LLC (NMLS # 1019941).

CONFIDENTIALITY NOTICE: We intend only the individual or entity to which we have addressed this electronic message to view it. This message may contain privileged and/or confidential information or other information prohibited from unauthorized disclosure by law. You may not disseminate, distribute, copy or otherwise disclose the contents of this communication without our prior written consent. If you are not the intended recipient, or if you have received this communication in error, notify us immediately by return e-mail and delete the original message and any copies of it from your computer system. Reverse Mortgage Funding LLC (NMLS # 1019941).

CONFIDENTIALITY NOTICE: We intend only the individual or entity to which we have addressed this electronic message to view it. This message may contain privileged and/or confidential information or other information prohibited from unauthorized disclosure by law. You may not disseminate, distribute, copy or otherwise disclose the contents of this communication without our prior written consent. If you are not the intended recipient, or if you have received this communication in error, notify us immediately by return e-mail and delete the original message and any copies of it from your computer system. Reverse Mortgage Funding LLC (NMLS # 1019941).