IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| TEXAS CAPITAL BANK,<br><br>　　　　Plaintiff,<br><br>v.<br><br>GOVERNMENT NATIONAL MORTGAGE ASSOCIATION, *et al.*,<br><br>　　　　Defendants. | 2:23-CV-156-Z-BR |

**MEMORANDUM OPINION AND ORDER**

Before this Court is Defendants' Motion for Summary Judgment (ECF No. 84) ("Motion"), filed January 10, 2025. Having reviewed the Motion, briefing, and relevant law, the Court **GRANTS** the Motion.

**BACKGROUND**

This dispute arose after the Government National Mortgage Association ("GNMA" or "Ginnie Mae") extinguished Plaintiff Texas Capital Bank's ("TCB") first-priority lien in collateral related to a HUD-administered reverse mortgage program. ECF No. 1 at 1; 30-1 at 7. The Court has previously summarized the relevant background and will recount it here. *See* ECF No. 79 at 1–6.

**I. The HECM/HMBS Programs**

The Home Equity Conversion Mortgage program ("HECM Program") is a Federal Housing Administration–insured reverse mortgage program that enables seniors to convert their homes' equity into cash. ECF No. 85 at 6. Under the HECM Program, mortgage lenders ("Issuers") lend money to seniors against the equity of their house, and the FHA insures those reverse mortgages. This FHA insurance makes those reverse mortgages eligible for a second

program: GNMA's HECM Mortgage-Backed Securities program ("HMBS Program"). 12 U.S.C. § 1721(g)(1).

The HMBS Program guarantees securities that are backed by pools of mortgages. Under the HMBS Program, an Issuer either acquires or originates a group of loans—reverse mortgages in this case—and places them, or portions of them, together in a "pool." *Id.* The Issuer "may then issue securities backed by HECM loans." ECF No. 85 at 6. GNMA guarantees those securities. *Id.* The guarantee assures security-holders that if the Issuers "cannot timely pay the proper amount of principal and interest to the pool's investors, the U.S. government will pay any shortage of money." *Hoffman v. Phelan Hallinan, LLP*, No. 13-5700, 2016 WL 4089163, at *4 (E.D. Pa. Aug. 2, 2016); 12 U.S.C. § 1721(g)(1). Here, Reverse Mortgage Funding LLC ("RMF") was an Issuer under the HMBS Program. ECF No. 57 at 6.

### II. The Agreements

GNMA executes a Guaranty Agreement with the Issuer when it agrees to guarantee an Issuer's securities on a pool of mortgages. ECF No. 85 at 7. In this case, the Guaranty Agreement dated July 28, 2021, governs the relationship between RMF and GNMA concerning the HECM loans. ECF No. 53-3 at 155–74. RMF and GNMA entered into a Guaranty Agreement. ECF No. 67 at 13–14; ECF No 53-3 at 155–74 (standard Guaranty Agreement). The Guaranty Agreement conveyed to GNMA all title and interests in specified HECM loans. ECF No. 53-3 at 161 (Section 3.01). Then, GNMA conveyed back to RMF certain rights and interests that include the right to service the HECM loans and issue new securities under the Guaranty Agreement and GNMA's Mortgage-Backed Securities Guide. ECF No. 67 at 14. The Guaranty Agreement essentially granted equitable title to the HECM loans to GNMA and legal title in them to RMF. Truth in Lending, 74 Fed. Reg. 60143, 60146 (Nov. 20, 2009) ("[A]s the guarantor of these securities, Ginnie Mae obtains equitable title in the

2

mortgage loans but ... the issuers of the securities retain legal title to the loans that collateralize the securities.").

But in the Guaranty Agreement, GNMA retained the right to take full and absolute ownership of the mortgages and all related interests if RMF defaulted. GNMA was then obligated to service the mortgages and securities itself. *See* ECF No. 53-3 at 171 (Section 10.04) (explaining that on default, "Ginnie Mae may ... automatically effect and complete the extinguishment of any redemption, equitable, legal, or other right, title, or interest of the Issuer in the Mortgages, the related Ginnie Participations and any Other Interests. ... The Mortgages and the related Ginnie Participations and the Other Interests ... automatically shall become the absolute property of Ginnie Mae, subject only to unsatisfied rights of the Security Holders"). Congress granted GNMA power to extinguish under the Guaranty Agreement. Under the statute, GNMA may "provide by contract with the issuer for extinguishment" that results in the mortgages "becom[ing] the absolute property of the Association." 12 U.S.C. § 1721(g)(1). The Guaranty Agreement is the contract the statute requires.

### III. The Tails

RMF filed for bankruptcy. ECF No. 85 at 8. Though bankruptcy "constituted ... immediate default under the Guaranty Agreement," GNMA did not immediately extinguish RMF's rights in the HECM loans. *Id.* GNMA withheld extinguishment if RMF could satisfy "certain conditions." *Id.* RMF remained responsible for servicing the HECM loans and ensuring HMBS security holders received their due. RMF needed funding, and the bankruptcy court authorized it to obtain Debtor-in-Possession loans. *Id.* at 9; ECF No. 86-3 at 63–73. GNMA agreed to not object to this financing if it did not "modify, impair or affect" its rights under the Guarantee Agreement. ECF No. 86-3 at 106.

TCB agreed to loan RMF "tens of millions of dollars." ECF No. 93 at 7–8. As collateral, TCB took a "first-priority lien" on certain HECM loan collateral called "HECM Tails." ECF No. 93 at 8. RMF and TCB memorialized their loan agreement in a Tail Agreement. The Tail Agreement defined an "HECM Tail," the collateral at issue, as:

> The aggregate of any additional amounts, including but not limited to amounts created by additional draws by the Obligor, interest accruals, mortgage insurance premiums, fees, or charges, which accrue, are disbursed, or are added to the balance of a previously-securitized HECM Loan after the closing date of any prior securitization of the HECM Loan or any prior HECM Tail related thereto.

ECF No. 94 at 198, 205.

To understand what a Tail is, more information on how Issuers and GNMA handle HECM Loans is helpful. In essence, a single HECM Loan can be split into multiple assets, some of which may be securitized into a HMBS pool and some of which may not be securitized until a later date or not securitized at all. ECF No. 93 at 6–7. Those portions securitized into an HMBS pool are called Participations. ECF No. 53-3 at 17 (defining a Participation as "an interest in the principal balance of a HECM loan that has been pooled into an HMBS pool"). Participations from many HECM Loans can go into a pool against which GNMA-backed securities are sold. ECF No. 93 at 6.

The "Tails" are portions of an HECM Loan that accrue to the loan balance later. *Id.* at 7. The Tail Agreement defines them as "the aggregate of any additional amounts . . . created by additional draws by the Obligor, interest accruals, mortgage insurance premiums, fees, or chargers, which accrue, are disbursed, or are added to the balance of a previously-securitized HECM Loan after the closing date of any prior securitization of the HECM Loan." ECF No. 86-2 at 42. Though other portions of the HECM Loan are pooled, Tails do not automatically go into the pool and can remain unsecuritized. ECF No. 93 at 7. Every Tail or Participation is "derivative of [an] underlying HECM loan[]." ECF No. 94 at 32.

4

In short, a Tail can only exist if there is an underlying HECM Loan that has already been at least partially securitized into a pool. *Id.* at 10 (Plaintiff's expert report) ("A Tail . . . is an additional draw on an HECM loan whose initial draw Participation has already been pooled/securitized with other Participations."). The reverse mortgage industry considers Tails and securitized Participations to be "separate asset[s]" that are each a "[p]ortion of a HECM loan." *Id.* No Tail can exist unless an underlying, partially-securitized HECM Loan also exists. Tails are simply a portion of an HECM Loan not securitized into a pool even though other parts (Participations) of that same HECM Loan are already securitized into a pool.

### IV. The Dispute

After RMF's default, GNMA did not extinguish and sought an alternative resolution to the crisis that RMF's bankruptcy caused. However, RMF was unable to meet the conditions GNMA imposed on forbearance. ECF No. 85 at 10. So GNMA terminated RMF from the HMBS program, extinguished all the interests of RMF and those claiming through RMF in the mortgages per the Guaranty Agreement, and assumed direct servicing of the relevant mortgages and securities. *Id.* GNMA's action also extinguished any interest TCB had in the Tails. *Id.*

TCB brought this action against GNMA on October 4, 2023. ECF No. 1. This Court dismissed some of TCB's claims on April 3, 2024. ECF No. 48. GNMA filed the administrative record on June 13, 2024. ECF No. 54. TCB filed a Motion for Partial Summary Judgment on June 27, 2024—nearly eleven months before motions for summary judgment were due. ECF Nos. 56, 52 (the operative scheduling order that set the summary judgment motion deadline as May 12, 2025). The Court denied TCB's motion for partial summary judgment on October 18, 2024. ECF No. 79. GNMA then filed this Motion on January 10, 2025, seeking summary judgment on all remaining claims based on the Court's analysis in its opinion denying TCB's

5

motion for partial summary judgment. ECF No. 84. TCB responded on February 21, 2025. ECF No. 91. And GNMA replied on March 14, 2025. ECF No. 97. The Motion is now ripe.

### LEGAL STANDARD

Summary judgment is appropriate if the movant shows there is no genuine dispute of material fact, and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). The moving party bears the initial burden of demonstrating both. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Summary judgment "is particularly appropriate in cases in which the court is asked to review or enforce a decision of a federal administrative agency." *Girling Health Care, Inc. v. Shalala*, 85 F.3d 211, 214–15 (5th Cir. 1996). "Under the APA, it is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record." *Hi-Tech Pharmacal Co., Inc. v. FDA*, 587 F. Supp. 2d 13, 18 (D.D.C. 2008). And it is the role of the court in an APA case to "sit[] as an appellate tribunal." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001); *see also Amin v. Mayorkas*, 24 F.4th 383, 391 (5th Cir. 2022). In such a posture, the "entire case on review is a question of law, and only a question of law." *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993). So summary judgment in an APA case "merely serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Oceana, Inc. v. Locke*, 831 F. Supp. 2d 95, 106 (D.D.C. 2011). Judicial review under the APA is limited to the administrative record. 5 U.S.C. § 706.

ANALYSIS

**I. The APA Claim**

Congress enacted the APA "as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices." *U.S. v. Morton Salt Co.*, 338 U.S. 632, 644 (1950); *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2261 (2024). The APA compels courts to "hold unlawful and set aside" agency actions that are "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2), (2)(C). The central question then is "always, simply, whether the agency has stayed within the bounds of its statutory authority." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013) (emphasis omitted). To answer that question, courts must begin with the statute's text. *Sackett v. Env't Prot. Agency*, 598 U.S. 651, 671 (2023). This inquiry is not mechanical or rigid but instead the plain, "ordinary meaning and structure of the law itself" governs. *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 436 (2019).

GNMA argues that the Court has resolved whether the statute granted GNMA authority to extinguish all interests, including TCB's, in RMF's HECM Loans. ECF Nos. 85 at 12; 79. TCB reiterates its arguments from its motion for partial summary judgment. It claims GNMA lacked the statutory authority to extinguish its interests in the Tails. As additional support, TCB offered an expert in reverse mortgages who described his opinion about how the reverse mortgage industry views HECM Loan divisions. ECF No. 94 at 6–41, 32 ("Un-securitized Tails Are Distinct From Pooled Mortgages And Not Derivative Of Pooled Mortgage Participations"). TCB focuses on whether the Tails are part of "mortgages constituting the trust or pool against which the guaranteed securities are issued." ECF No. 93 at 10 (quoting 12 U.S.C. § 1721(g)(1)). It argues that the statute limits GNMA's authority to extinguish to "property that constitutes" "the trust or pool." *Id.* at 11. In doing so, TCB substitutes "property" for the statutory term "mortgage." It argues that the statute limiting

7

extinguishment authority to the portions of mortgages securitized into a pool "makes perfect sense" because GNMA "guarantees securities that are specifically backed by what is in the pool or trust." *Id.*

### A. The Statute

We begin with the plain text, again. Section 1721(g)(1) provides the authority to extinguish all interests in mortgages backing the HMBS program. Section 1721(g)(1) provides in relevant part:

> The Association is hereby empowered, in connection with any guaranty under this subsection, whether before or after any default, to provide by contract with the issuer for the extinguishment, upon default by the issuer, of any redemption, equitable, legal, or other right, title, or interest of the issuer in any mortgage or mortgages constituting the trust or pool against which the guaranteed securities are issued; and with respect to any issue of guaranteed securities, in the event of default and pursuant otherwise to the terms of the contract, the mortgages that constitute such trust or pool shall become the absolute property of the Association subject only to the unsatisfied rights of the holders of the securities based on and backed by such trust or pool.

12 U.S.C. § 1721(g)(1). The statute thus prescribes several requirements that must be met for GNMA to extinguish interests: First, GNMA's ability to extinguish must be "provide[d] by contract with the issuer." 12 U.S.C. § 1721(g)(1). Second, GNMA may only extinguish the "interest of the issuer." *Id.* And third, GNMA may only extinguish interests "in any mortgage or mortgages constituting the trust or pool." *Id.*

### B. The Tails Are Part of Mortgages That Constitute the Trust or Pool

TCB contends that none of the statutory requirements are present but only presents arguments that GNMA fails on the third requirement. ECF No. 93 at 10, 10–15. The Court's previous opinion resolved this question, and the Court reincorporates its analysis here. ECF No. 79 at 12–13. TCB's expert report does nothing to change the statutory interpretation. The statute "empower[s]" GNMA to extinguish all interests in "any mortgage or mortgages

8

constituting the trust or pool against which the guaranteed securities are issued." 12 U.S.C. § 1721(g)(1). Stepping through the statutory terms helps illuminate GNMA's power:

First, the statute stipulates that the relevant unit is a "mortgage or mortgages." *Id.* Here, these are reverse mortgages. Reverse mortgages "allow homeowners to borrow against their homes so as to convert equity in the home into a line of credit. [They] do not have a fixed term and are usually repaid in one payment." ECF No. 94 at 12–13 (internal footnote omitted). Reverse mortgages in the HECM program are HECM Loans. A single HECM Loan can have multiple divisions—some securitized into an HMBS pool—and some not. *Id.* at 15–17. However, crucially, the HECM Loan—no matter its divisions—is one single mortgage. *See id.* at 17 fig.1 (illustrating how an HECM Loan is divided into multiple Participations but remains *one mortgage*). And a "mortgage" is the unit Congress chose to give GNMA extinguishment power over.

TCB's attempt to change the relevant statutory unit to "property" would alter the statutory analysis. ECF No. 93 at 11 ("The statute makes clear, multiple times, that Ginnie Mae's extinguishment authority is limited to *property* that constitutes . . . the trust or pool that Ginnie Mae is guaranteeing." (emphasis added)). So would its attempt to reword the relevant statutory question from whether mortgages constitute the pool to "whether both the unpooled tails and pooled Participations 'constitute' . . . the pool or the trust." ECF No. 93 at 12. Contrary to TCB's characterization, that is *not* the "statutory question." TCB's sleight of words feebly attempts to change Congress's words. Congress granted extinguishment power over *mortgages*. It did not write "participations that constitute the trust or pool." Nor did it write "property that constitutes the trust or pool." It chose mortgages. And so that is the relevant unit GNMA holds extinguishment power over. It may be true that "Participations— not entire HECM loans—are the relevant economic units in the reverse mortgage industry." ECF No. 94 at 34. The Court easily admits that. But determining the "relevant economic

9

units in the reverse mortgage industry" is an irrelevant inquiry. The reverse mortgage industry did not write the statute. Congress did. And the "relevant economic unit" of the statute is mortgages constituting the HMBS trust or pool. So the Court interprets GNMA's extinguishment power to extend to such mortgages and declines to divvy up those mortgages into smaller units if Congress did not. *See* ECF No. 79 at 12 ("Under TCB's interpretation, the statute might better read 'portions of the mortgages that constitute such trust or pool.'").

Second, for GNMA to have the power to extinguish all interests, the HECM Loan must "constitute[e] the trust or pool against which the guaranteed securities are issued." 12 U.S.C. § 1721(g)(1). As TCB notes, "constitute" means "make up, form, compose." *Constitute*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/constitute [https://perma.cc/H3LW-JT5J]. The HECM Loans that are fully or partially securitized into a pool "make up" the pool.

GNMA's MBS Guide illustrates. It defines a relevant mortgage as any "mortgage identified and described in the Schedule of Pooled Mortgages, or the Schedule of Pooled Participations and Mortgages. . . . For HMBS pools, the term 'Mortgage' shall also be construed to include . . . payments made to . . . or by the mortgagors in respect of the Mortgages after the Issue Date of the MBS." ECF No. 53-3 at 15. The Schedule of Pooled Participations and Mortgages lists the assets that "make up" a pool. The MBS Guide explains the Schedule is "Form HUD 11706H, which provides a description of a pool, including information about the underlying Participations and related mortgages." *Id.* at 20. The Schedule of Pooled Participations and Mortgages is a complete listing of the contents of a pool. It describes the Participations securitized into the pool *and* the mortgages they are a part of. In short, it describes what the pool consists of. It makes clear that without HECM Loans and their securitized parts, a pool holds nothing. And RMF conveyed its *entire* interest in all mortgages on this schedule. ECF No. 53-3 at 161 ("[RMF] does hereby transfer, assign,

set over, and otherwise convey to Ginnie Mae all the right, title, and interest of [RMF] in and to the (i) Mortgages and the related Participations identified and described in the Schedule of Pooled Participations and Mortgages . . . .").

Even if only a portion of an HECM Loan is in a pool, that HECM Loan is one of the mortgages constituting that pool. Congress did not define its units more granularly than "mortgage." Thus, even if the smallest percentage of a particular HECM Loan was pooled, that HECM Loan remains one of the mortgages constituting the pool. Consider the alternative. If a pool contained only partially securitized HECM Loans, then TCB's position would mean that no mortgages constitute that pool—only Participations. No mortgages would constitute the pool, even though the pool retains assets. This would flout the language of the statute. Congress did not write "Participations constituting the trust or pool." It also did not write "parts of mortgages constituting the trust or pool." It wrote "mortgages constituting the trust or pool." That language demands that a mortgage constitutes the trust or pool, even if only the smallest portion is pooled. *See, e.g.*, ECF No. 94 at 556 ("TCB has a lien on the unsecuritized amounts on *loans that []are currently in GNMA pools* . . . ." (emphasis added)). It is still a mortgage that (at least in part) constitutes the trust or pool. No attempts to split mortgages into smaller units can escape the fact that Congress did not define the relevant assets at a more granular level.

TCB misunderstands the Court's prior holding on this point to its detriment. It notes this Court "found that as to mortgages, the statute 'does not distinguish between the portions securitized and unsecuritized.'" ECF No. 93 at 15 (quoting ECF No. 79 at 12). This Court was correct. The statute does not split up the term "mortgage" or distinguish between the parts that are and are not securitized. However, it *does* distinguish between *mortgages* that "constitute such trust or pool" and those that do not. The ones constituting the pool "become

11

the absolute property" of GNMA. 12 U.S.C. § 1721(g)(1). Not only their securitized parts—"the *mortgages* . . . shall become the absolute property." *Id.* (emphasis added).

Finally, the Tails are part of the mortgages constituting the trust or pool. TCB easily admits this. It recognizes that "[u]npooled tails are part of the underlying HECM loans, just as pooled Participations are." ECF No. 93 at 12. Its expert recognizes the same. ECF No. 94 at 32 ("Both securitized Participations and un-securitized Tails Participations are derivative of the underlying HECM loans . . . ."). The unpooled Tails need not be "derivative of" the Participations. *Id.* The statute grants GNMA the power to seize those "underlying HECM loans," as explained. ECF No. 93 at 12. And because Congress does not limit the power to units smaller than mortgages, this Court will not either.

Here, GNMA has the power to extinguish all interests in mortgages "constituting" the HMBS pools. The HECM Loans underlying the Tails constitute the HMBS pools. The relevant unit is "mortgage"—not portions of mortgages. The Court appreciates TCB's frustration with this power. *See, e.g.*, ECF No. 93 at 8 n.3 (explaining GNMA's seizure is "really effed up" (quoting ECF No. 94 at 555)). But it is the power Congress granted and the one TCB consented to when it financed RMF. *See* ECF No. 79 at 9.

**II. The Tortious Interference Claim**

TCB also brings a tortious interference with property rights claim against GNMA. ECF No. 1 at 23. In Texas, tortious interference requires a plaintiff to prove "(1) that an interference with one's property or property rights occurred; (2) such interference was intentional and caused damage; and (3) the interference was conducted with neither just cause nor legal excuse." *Edberg v. Laurel Canyon Ranch Architectural Rev. Comm.*, No. 04-10-00395CV, 2011 WL 541134, at *5 (Tex. App. Feb. 16, 2011). GNMA claims that because its "legal authority to act" has been established, TCB cannot prevail on the first or third element. ECF No. 85 at 16. TCB argues genuine disputes of material fact remain on both

elements. ECF No. 93 at 16–17 ("A reasonable jury could conclude Ginnie Mae intentionally interfered with TCB's property rights . . . A reasonable jury could also conclude that Ginnie Mae's interference was conducted with neither just cause nor legal excuse." (internal modifications and quotations omitted)).

Whether or not TCB prevails on the first element, it fails on the third. TCB admits "the existence of a 'just cause' or 'legal excuse' turns entirely on whether Ginnie Mae had statutory authority under Section 1721(g)(1) to extinguish TCB's rights in the unpooled tails." ECF No. 93 at 17. As shown, GNMA had that authority here. Thus, TCB has failed to show that GNMA's "interference was conducted with neither just cause nor legal excuse." *Edberg*, 2011 WL 541134, at *5. Accordingly, GNMA is entitled to summary judgment on TCB's tortious interference with property claim.

In any event, TCB's tortious interference with property claim is preempted. Congress expressly preempted state tort law when GNMA lawfully exercises its authority under the statute. The statute states "[n]o State or local law . . . shall preclude or limit the exercise by the Association of . . . its ownership rights . . . in the mortgages constituting the trust or pool against which the guaranteed securities are issued." 12 U.S.C. § 1721(g)(1). TCB reasserts that the preemption argument only has purchase if GNMA's "actions here were lawful and did not violate the APA." ECF No. 93 at 17. GNMA's action did not violate the APA. Thus, the express preemption provision applies. The express preemption provision reveals "Congress has emphatically expressed its intent to preempt any state law which would limit GNMA's rights to the mortgage pools in the event of an Issuer's default." *Pipkin v. Mortg. Creditcorp, Inc.*, No. 94-6443, 1995 WL 747437, at *3 (10th Cir. Dec. 18, 1995). Sustaining a state tort claim against GNMA for action it had statutory authority to take would "preclude or limit" GNMA's exercise of its ownership rights in the "mortgages constituting the trust or

pool." 12 U.S.C. § 1721(g)(1). Even if TCB had successfully proved its tortious interference claim, Congress's express preemption provision would defeat it.

Finally, GNMA's Motion references a potential TCB claim under 5 U.S.C. Section 701(1) for unlawfully withheld agency action. ECF No. 85 at 20. TCB denies it made this claim and did not resist GNMA's arguments. ECF No. 93 at 15 n.5. Thus, the Court does not determine whether such a claim existed. But if it did, TCB abandoned it. *See Graham v. Dallas Area Rapid Transit*, 288 F. Supp. 3d 711, 728 (N.D. Tex. 2017) ("When a party fails to pursue a claim or defense beyond the party's initial complaint, that claim is deemed abandoned or waived.").

## Conclusion

Accordingly, Defendants' Motion is **GRANTED**. Defendants are entitled to summary judgment on all TCB's remaining claims.

**SO ORDERED.**

April 2, 2025

MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE